Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
Denisse O. Gastélum SBN 282771
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com
e. dgastelum@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,

PLAINTIFFS,

v.

COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,

DEFENDANTS.

Case No.: 2:20-cv-07870

**COMPLAINT: CLASS ACTION; INJUNCTIVE RELIEF AND DAMAGES**

**42 U.S.C. § 1983: VIOLATION OF FIRST, FOURTH, AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION**

**DEMAND FOR JURY TRIAL**

The above-named Plaintiffs, individually and on behalf of others similarly situated, allege the following upon information and belief:

## I.    INTRODUCTION

1.    This action arises out of several of demonstrations against police brutality which took place in Los Angeles County in the wake of the murder of George Floyd and other instances of police violence directed at persons of color, including when a Los Angeles County Sheriff deputy fatally shot eighteen-year-old Andres Guardado five times in the back on June 18, 2020.  In particular, on at least three occasions, May 30, 2020 at Pan Pacific Park, June 3, 2020 at Grand Park, and June 21, 2020 in Compton, deputies from the Los Angeles County Sheriff's Department ("LASD" or "the Sheriff's Department") used excessive force and committed other constitutional violations against peaceful protesters in violation of their civil rights.  In many instances, including the May 30 and June 3 protests, the Sheriff's Department acted in concert with the Los Angeles Police Department ("LAPD") in their tactical responses to the demonstrators, cooperating by forming skirmish lines in various locations to help control the crowds of protesters.

2.    The consistent, frightening, and forceful message that both the LAPD and the LASD have delivered to protesters in recent months is that the constitutional right to peaceably assemble, as enshrined in the First Amendment, will not stop the law enforcement agencies in Los Angeles County from unleashing rough, indiscriminate violence and dangerous, retaliatory abuses of the powers vested in them, when they are so inclined – particularly, it would seem, when people are in the streets protesting the manner in which these very law enforcement agencies operate with unjustified impunity when it comes to the systemically racist and violently disparate manner in which these agencies treat people of color, especially Black people.  From the immediate, potentially life-threatening pain of being tear gassed or shot with a "less-lethal" projectile to the more psychologically degrading and terrifying experience of being handcuffed on a bus packed with other people

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

during a pandemic, possibly after deputies removed one's mask, possibly after having to choice but to urinate on yourself – the LASD unleashed a host of horrors on protesters whose only crime was to exercise their right to protest, or who, if they did commit a minor misdemeanor or infraction such as a curfew violation, could have been swiftly booked and released.

3.    Exactly 50 years ago on August 29, 1970, the LASD brutalized demonstrators at the Chicano Moratorium march in East Los Angeles in protest of the disproportionate number of poor and working class Latino soldiers killed in the Vietnam War .   As the Los Angeles Times reports, "the Chicano Moratorium ended in clouds of tear gas before it could start.  Following a report that a liquor store had been robbed, L.A. County Sheriff's deputies took action against the crowd.  When the tear-gassing and shooting were all said and done, three people were dead. Among them: L.A. Times columnist and KMEX news director Ruben Salazar, shot in the head with a tear gas canister."[1]

4.    The LASD's message is chilling, and it is intolerable.  For at least the last 50 years, the LASD has delivered it repeatedly.  Unfortunately, there is every indication that occasions will arise in the future in which they will do so again, so long as they are allowed to operate within and perpetuate this same culture of impunity.  Just this week, in fact, in the aftermath of the shooting of Jacob Blake in Wisconsin and the subsequent vigilante murders committed by Kyle Rittenhouse at one of the ensuing protests in Kenosha, Wisconsin, the LASD has once again deployed excessive and unlawful force in response to peaceful protests.  Plaintiffs therefore seek to hold the LASD accountable for these recent abuses and, just as importantly, to ensure that similar abuses will not, under any circumstances, be inflicted on peaceful protesters in the future.

---

[1] Miranda, Carolina, *A 'CATALYTIC MOMENT' for ART AND CULTURE*, Los Angeles Times, (August 23, 2020), *available at* https://www.latimes.com/projects/chicano-moratorium/chicano-moratorium-catalytic-moment-la-art/.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## II.   JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction).  This Court has jurisdiction to issue declaratory or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

6.   Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants reside in, and events giving rise to the claims herein occurred in, the Central District of California.

## III.   PARTIES - PLAINTIFFS

### A.   Pan Pacific Park Incident on May 30, 2020

7.   Plaintiff **Matthew Nielsen** (age 19) participated in the demonstration that began at Pan Pacific Park on May 30, 2020.  He marched with the crowd through the neighborhoods in the Fairfax area, and sometime in the late afternoon, about 5:30-6:30 p.m., on Beverly Boulevard near Stanley Street, he was shot with rubber bullets and teargassed by a line of LASD deputies in full riot gear on the street, suffering severe bruising and contusions.

### B.   Grand Park Incident on June 3, 2020

8.   Plaintiff **Sebastian Militante,** who participated in a peaceful protest in Grand Park, was wrongfully arrested and detained in zip ties on a bus for several hours.  LASD deputies ordered Sebastian to sit right next to other arrested protesters on the bus without appropriate social distancing.  Sebastian (a gender-fluid female) was searched by a female officer, who ran her hand over Sebastian's genitals.

9.   Plaintiff **Krizia Berg** was falsely arrested for failure to disperse on June 3, 2020, while peacefully protesting in Grand Park, and was detained in cuffs for several hours by LASD deputies and held in a bus without appropriate social distancing from other protesters.

10.   Plaintiff **Travis Wells** was wrongfully arrested and detained by LASD deputies for several hours for peacefully protesting in Grand Park on June 3, 2020.

3

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

He was kept in painful zip ties and ordered to sit on an unsafe, crowded bus until he was eventually released early the next morning.  While Travis was held in a line with other protesters for about 30 minutes prior to being ordered on to the bus, a younger deputy was openly derogatory, calling them "punks" and telling them they were wasting their time and causing trouble for no reason.  The deputy pulled down Travis's face mask and the face mask of the person next to him, and said, "If you're here to get attention, you might as well be identified."  The deputy was not wearing a mask and told other deputies to take off the detained protesters' masks.  Travis felt like he was being targeted for being Black because he did not see this happen to any white protesters – only to a group of people of color.  Travis was put on the bus in a crowded cell.  There were at least 20 people in the back – two people to a row.  One protester who was already on the bus told him that a transgender woman was detained with the male protesters.  Travis and the other protesters remained on the bus for another hour until, around 1:30 a.m., when they were driven a short distance.  They then waited for almost two hours to be processed.  By the time Plaintiff Wells was eventually released, his hands were swollen and purple, and his thumb was twitching.

11.   Plaintiff **Christian Monroe** was protesting at Los Angeles City Hall around 8:00-9:00 p.m.  He was wrongfully arrested by LASD deputies in Grand Park sometime after 11:00 p.m.  The deputy who arrested him grabbed him by his belt and his pants, to pull him away from the group.  He then began searching Christian very aggressively, grabbing his genitals and rear end during the arrest.  The deputy also yanked Christian's mask around his neck and ripped it off.

12.   Plaintiff Monroe was detained in handcuffs until he was cited and released approximately four hours later, at around 3:30 a.m.

**C.   Compton Incident on June 21, 2020**

13.   Plaintiff **Shakeer Rahman** attended the march and rally on Sunday, June 21, 2020, from Gardena to Compton, supporting the family of Andres

Guardado, an 18-year-old whom LASD deputies had fatally shot in the back three days earlier.  During the rally, an LASD deputy either hit or shot Shakeer on the side of his head with a tear gas grenade.  The tear gas powder exploded in his hair, blanketing his face.  He struggled to breathe and could barely see for several minutes.  The protest had been peaceful prior to the deputies' attack, and Shakeer was simply standing in place when he was hit.  No protesters around him had weapons, threw anything at the police, or were close enough to the deputies to touch them.

14.     When the grenade exploded in Shakeer's hair, he immediately began to run and his ears were ringing from the explosion.  As he ran, he felt a searing pain in his throat with every breath.  He was uncontrollably coughing and spitting.  He kept trying to open his eyes to see where he was going but his eyes burned with a severe stinging pain.  At most, he could peek a little through the pain to make sure he did not run into anything.

15.     Plaintiff **Devon Young** also participated in the peaceful march and protest of the Andres Guardado killing in Compton.  After the march, although she was engaging in peaceful, lawful conduct, she was tear gassed and pepper balled by LASD deputies.  During a speech, a protester suddenly yelled that LASD deputies were shooting at a smaller, more dispersed group of protesters.  She ran toward the scene and hid behind a wall while trying to film the events.  Eventually, LASD deputies noticed her and another female protester hiding behind the wall.  They pointed a gun at them and told them to move.  The deputies forced them to exit through the line of fire and tear gas.  She inhaled so much gas that she could not breathe or see for several minutes, and experienced intense burning in her eyes and face.  Volunteer medics helped her flush water into her eyes until Devon was able to see again. She stayed until LASD forced her and other protesters off the property.  Plaintiff Young at no time heard an order to disperse or the declaration of an unlawful assembly.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

16.     Plaintiff **Noelani del Rosario-Sabet** was wrongfully arrested and detained by LASD deputies for failure to disperse at the Compton demonstration on June 21, 2020, in support of the Andres Guardado family.  While peacefully protesting, she was arrested by LASD deputies who did not wear masks to prevent COVID-19 transmission despite the Governor's order to wear masks while outside.  Noelani at no time heard an order to disperse or the declaration of an unlawful assembly.  LASD deputies detained Plaintiff Del Rosario-Sabet in handcuffs, in a van with several other protesters, without proper distancing.  She witnessed LASD deputies refuse to allow Grace Bryant, a protester detained in the same van, to use the restroom, causing Bryant to urinate in the van.  All of the protesters were forced to remain in the van after Bryant had urinated.

17.     Plaintiff **Emanuel Padilla** was shot multiple times with pepper balls and rubber bullets or foam rounds during the demonstration in Compton on June 21, 2020, suffering injuries.  LASD deputies also threw a tear gas canister at his feet.

18.     Plaintiff **Austin Tharpe** was tear gassed by LASD deputies during the demonstration in Compton on June 21, 2020.  LASD deputies also wrongfully arrested him for failure to disperse, a misdemeanor.

19.     Plaintiff **James Butler** was shot with pepper balls multiple times by LASD deputies during the demonstration in Compton on June 21, 2020.  LASD deputies also arrested him for failure to disperse, a misdemeanor.

20.     Plaintiff **Linda Jiang** was shot with pepper balls by LASD deputies during the demonstration in Compton on June 21, 2020.

21.     Plaintiff **Grace Bryant** was wrongfully arrested and detained by LASD deputies for failure to disperse at the Compton demonstration on June 21, 2020.  She was arrested while peacefully protesting, by LASD deputies who did not wear masks to prevent COVID-19 transmission, despite the Governor's order to wear masks while outside.  Grace at no time heard an order to disperse or the declaration of an unlawful assembly.  She was detained in a van in handcuffs with several other

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

protesters without proper distancing.  LASD deputies refused to allow Grace to use the restroom, forcing her to urinate in the van.  All of the protesters were detained in the van by LASD deputies after Grace was forced to urinate in the van.  Plaintiff Bryant was also teargassed and/or inhaled dust from pepper balls that were thrown at protesters by LASD deputies.

## IV.    PARTIES-DEFENDANTS

22.    Defendant County of Los Angeles is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The LASD is a local government agency of Defendant County of Los Angeles.  All actions of the LASD are the legal responsibility of the County of Los Angeles.

23.    Defendant Sheriff Alex Villanueva, is and was, at all times relevant to this action, the LASD Sheriff and a policymaker for the Sheriff's Department.  He is sued in both his individual and official capacities.

24.    Defendant Villanueva, in response to footage of LASD deputies firing so-called "less-lethal" projectiles from a vehicle at fleeing protesters, publicly stated that he "expects" deputies to deploy such projectiles, which include rubber bullets, rubber batons, and pepper balls, during protests.[2]  While he is quoted as saying that these weapons are "designed to get someone's attention without injuring them," he and the Sheriff's Department are aware the high risk of injury these weapons pose.

25.    Furthermore, a press release from the Sheriff's Department states that Defendant Villanueva was in charge of the protest-related curfews imposed at the

_____

[2] KTLA 5, *Video Shows Deputies Shooting Fleeing Protestors with pepper balls in Hollywood*, (June 3, 2020), https://ktla.com/news/local-news/video-shows-deputies-shooting-fleeing-protesters-with-pepper-balls-in-hollywood/ (last visited Aug. 27, 2020); KTLA 5, *L.A. County Sheriff Villanueva on the recent protests in Los Angeles*, (June 3, 2020), https://ktla.com/morning-news/l-a-county-sheriff-villanueva-on-the-recent-protests-in-los-angeles/ (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

start of the protests; these curfews were used to arrest many of the protesters in Los Angeles during the first weeks of the protest movement.[3]

26.     Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and employees of Defendant County of Los Angeles and/or the LASD.  Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

27.     Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

28.     A number of incidents have been reported, at times relevant to this action, where unknown LASD deputies used excessive force, participated in unlawful arrests, or perpetuated unconstitutional conditions of detention.

29.     LASD deputies fired less-lethal weapons, without warning and in close range, on peaceful protesters in Compton on June 21, 2020.  Prior to that incident, LASD Deputies were filmed shooting fleeing protesters with pepper balls in Hollywood.[4]   In Lakewood, LASD deputies used tear gas on a large group of

---

[3] Press Release from LASD, *Sheriff orders County-Wide Curfew for Los Angeles County*, (June 3, 2020), https://lasd.org/sheriff-orders-county-wide-curfew-for-la-county/ ("At the direction of Sheriff Alex Villanueva, and until further notification, a county-wide curfew was imposed.") (last visited Aug. 27, 2020).

[4] KTLA 5, *Video Shows Deputies Shooting Fleeing Protestors with pepper balls in Hollywood*, (June 3, 2020), https://ktla.com/news/local-news/video-shows-deputies-shooting-fleeing-protesters-with-pepper-balls-in-hollywood (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

protesters.[5]  An LASD spokesperson has acknowledged that the LASD's widespread involvement in the May/June protests resulted in deputies firing a sufficient amount of non-lethal ammunition to warrant a resupply to the Sheriff's Department.[6]

30.    LASD, through its deputies and other employees and supervisors, participated in unlawful arrests throughout Los Angeles where protesters charged with infractions or misdemeanors were taken into custody in violation of California Penal Code §§ 853.5, 853.6.  Further, LASD buses were used to detain protesters under unconstitutional conditions.  Protesters wrists were bound in zip tie restraints in a manner tight enough to leave lasting marks and injuries. LASD then transported protesters to far-away locations and released them in the middle of the night, while Sheriff Villanueva's own curfew was in effect.  While they were detained on the buses, LASD did not provide protesters water or access to bathroom facilities, despite their repeated complaints.

31.    While in detention on LASD buses, Plaintiffs were kept in close and unventilated quarters, which exposed them to an increased risk of COVID-19.  As administrators of the Los Angeles County Jail system, Sheriff Villanueva and the LASD were and are aware of the health risks posed by the highly communicable nature of the coronavirus that causes COVID-19 and the risk of serious harm it poses to exposed individuals.  Nonetheless, Defendants knowingly and with deliberate indifference detained, or authorized and approved the detention of Plaintiffs and other protesters in conditions which increased the likelihood of infection.

---

[5] The Eastsider LA, *Saturday protests underway across Los Angeles and Orange counties*, (June 6, 2020), https://www.theeastsiderla.com/saturday-protests-underway-across-los-angeles-and-orange-counties/article_3e05daf0-a816-11ea-923e-53dff702c33e.html (last visited Aug. 27, 2020).

[6] Rainey, James, *Police say projectile launchers are safer than other 'less lethal' alternatives. Injured protesters disagree*, Los Angeles Times, (June 12, 2020), *available at* https://www.latimes.com/california/story/2020-06-12/protesters-complain-about-excessive-force (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

32.     Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer.  At all times Defendants were acting under color of state law.

33.     Plaintiffs are informed, believe, and thereupon allege that the practices, policies, and customs of the County of Los Angeles and/or the LASD caused the unlawful action taken against Plaintiffs.

## V.     STATEMENT OF FACTS

34.     On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, suspected of forgery for attempting to use a purported counterfeit $20 bill.  Officer Chauvin, along with two other officers, held Mr. Floyd on the ground, handcuffed him behind his back, and ignored Mr. Floyd's pleas to get off his neck, back and legs and let him breathe.  Mr. Floyd died on the street in Minneapolis.

35.     On the basis of extensive video by onlookers, security cameras and police body cameras, both Minneapolis law enforcement and prosecutors, as well as the public, concluded that George Floyd was another victim in the long line of those who have died at the hands of police because of deliberate and unlawful tactics.

36.     The death of George Floyd sparked an extraordinary wave of protests across the country and the world.  In Los Angeles, thousands of people participated in lawful and peaceful protests.  Based on the alleged unlawful conduct of a few, Defendants responded to these mass protests with expansive curfews and mass arrests for curfew violation, failure to disperse, unlawful assembly, failure to follow a "lawful" order of an officer, and similar misdemeanors and infractions, all designed to punish protesters.  Defendants also routinely used dangerous dispersal techniques on peaceful crowds, including the use of rubber or foam bullets, flashbangs, pepper balls, and other irritants, causing serious injuries.  The routine

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

and undifferentiated use of such widespread arrest and dispersal tactics impinged the protesters' right to engage in protected expressive activity in public spaces without preemption and curtailments.

37.    LASD works in concert with other law enforcement agencies around the county, including the Los Angeles Police Department ("LAPD"), assisting those agencies during times of civil disturbance. Specifically, LASD coordinated with LAPD in their unlawful response to the Pan Pacific Park (May 30, 2020) and Grand Park (June 3, 2020) protests, among others.

38.    LASD has a record of excessive force and has used excessive force against peaceful protests in other instances since the start of the 2020 Black Lives Matters protests in May.  LASD also knew or should have known that its aggressive suppression tactics and punitive, retaliatory actions against peaceful protesters were unlawful and unconstitutional.

39.    On information and belief, as well as the well-documented reports of their practices at the recent protests, LAPD and LASD have repeatedly deployed unlawful, coordinated tactics to suppress and "punish" peaceful protesters in order to chill constitutionally protected expressive activity and deter future instances of such activity.

**A.    Pan Pacific Park (May 30, 2020)**

40.    On May 30, 2020, a Black Lives Matter demonstration/rally took place starting at 12:00 p.m. in Pan Pacific Park in the Fairfax area of Los Angeles.  It was attended by several thousand demonstrators.  After it ended, many of the participants continued peaceful protests, marching throughout the Fairfax area.  Some protesters were closer to the Grove shopping center, and others were further north along Beverly and other streets.

41.    Various pockets of demonstrators moved throughout the region, some on the sidewalks, and others spilled out into and took over the streets.   The demonstrators moved at will, although at times they were blocked or corralled and

contained (e.g. "kettled") by various police agencies, in particular the LAPD. However, due to the sheer mass of the crowds, which continued growing through the afternoon and evening, other law enforcement agencies, including the LASD, moved into the area and assisted with crowd control.

42.     Officers were mostly wearing riot gear and brandishing weapons, including lethal and less-lethal armaments.  At various points, demonstrators were fired upon with various less-lethal munitions, including rubber bullets and tear gas.

43.     Throughout the demonstration, the LAPD and LAPD coordinated their crowd control operations to use excessive force and unlawfully arrest, detain, and search peaceful protesters, with the LAPD controlling certain intersections or areas, while the LASD controlled others.  Similar to the manner in which their tactical deployment was coordinated, the aggressive and unlawful response of the LASD was consistent with, and sent the same message as, that of the LAPD.  Essentially, protesters were to be punished.

44.     Plaintiff **Matthew Nielsen** (age 19) participated in the demonstration that began at Pan Pacific Park on May 30, 2020.  He marched with the crowd through the neighborhoods in the Fairfax area, and sometime in the late afternoon, about 5:30-6:30 p.m., on Beverly Boulevard near Stanley Street, he was shot with rubber bullets and gassed by a line of LASD deputies in full riot gear on the street, and also from above by LASD deputies on the roof tops of the surrounding buildings.  At the time he was shot, Nielsen was trying to give water to another protester who had also been maced or tear gassed by LASD or LAPD.  Nielsen looked up at the LASD deputies on the roof and spread his arms to show he was unarmed.  LASD deputies merely laughed at Nielsen and fired at him.  Nielsen was struck in the shoulder, chest, and upper thigh, suffering severe bruising and contusions, and made it to safety only with great difficulty because he was so overcome by the gas that he almost vomited.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**B.      Grand Park Protest (June 3)**

45.      In the afternoon of June 3, 2020, several thousand supporters of Black Lives Matter participated in a large demonstration on Spring Street in front of Los Angeles City Hall, protesting the murder of George Floyd in Minnesota.  Because of the size of the crowd, the demonstrators spilled out down the street north to Temple Street, and south to First Street.  Protesters occupied different and disparate groupings, some forming marches that circled the block as they chanted slogans.

46.      The bulk of the protesters occupied Spring Street in front of City Hall, and many congregated in Grand Park across the street, which is owned by the County of Los Angeles and is accordingly patrolled by LASD deputies.  The positioning of the demonstrators was fluid, moving back and forth between Spring Street and Grand Park.

47.      The demonstration, while loud and boisterous, was peaceful.   No disturbances of any kind marred the atmosphere.  The police presence, both from LASD and LAPD, was heavy and obvious.  Both were replete with riot gear of all types, including rifles that fired rubber bullets and other less-lethal projectiles.

48.      Throughout the demonstration, LASD and LAPD coordinated to use excessive force, and unlawfully arrest, detain, and search peaceful protesters.

49.      At about 9:30 p.m., officers began pushing the crowds of people back. Some were forced onto the County property at Grand Park, others were kettled in different directions.  In Grand Park, demonstrators who attempted to leave were blocked from exiting by LAPD officers.  Many demonstrators expressed confusion and frustration about not being permitted to leave.  At approximately 10:00 p.m., deputies from LASD began pushing a large group of demonstrators into a small pocket.  They announced they were going to begin arresting people.  Demonstrators tried unsuccessfully to leave the area, but were kettled in by LASD deputies and prevented from exiting.  Elsewhere, LAPD officers were kettling other groups of

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

protesters, seemingly evincing a coordinated effort to detain, if not arrest, as many people as possible.

50.     The process was chaotic.  One demonstrator was zip-tied, but was then allowed to roam freely.  He drifted into the mass of demonstrators and someone cut off his zip ties.  Demonstrators complained of being arrested without an opportunity to leave, to no avail.  LASD deputies applied zip ties too tightly in some instances, inflicting great pain.  Demonstrators complained of the tight zip ties, again to no avail.  Complaints were universally ignored by the deputies.  At one point, LASD deputies concentrated on zip-tying only White people, then singled out African American demonstrators for more aggressive treatment, including tighter zip ties.  Many LASD deputies expressed negative comments about the demonstrators, calling them punks and outside agitators.  Many of the demonstrators were subjected to extremely intrusive and unwarranted searches by LASD deputies, including the fondling of genitals, and touching females' breasts by searching underneath their clothing.  Several transgender or gender fluid people were subjected to intrusive body searches by LASD deputies of the opposite gender.  Searches were random and appeared punitive and demeaning in nature.  LASD deputies also deliberately removed the protective masks of some of the demonstrators, exposing them to possible COVID-19 infection.

51.     Despite the COVID-19 pandemic, protesters were then loaded onto buses in close quarters, where they were held for hours, then transported to disparate locations before release.  Demonstrators were arrested primarily for refusal to disperse, a misdemeanor violation, without regard to California law mandating a cite and release procedure.  Protests of mistreatment were met with punitive measures such as tightened zip ties and isolation in individual cells on the buses.

52.     Despite arrests beginning at about 10:00-10:30 p.m., demonstrators were not released until 3:00-3:30 a.m. or later, well after the curfew that was then in

effect had begun.  Arrestees were held for an average of five hours, and after release, were forced to walk or find alternative transportation back to their vehicles.

### C.     Compton Protest (June 21)

53.     On June 18, 2020, LASD deputies shot and killed Andres Guardado, an eighteen-year-old Latino man from Gardena.  This was the second killing by the LASD in two days: Terron Jammal Boone had been shot and killed by LASD deputies on June 17, 2020 in front of a seven-year-old girl.

54.     In response to these killings, hundreds of members of the local community came together to demand transparency from the LASD.  No footage had been released of either incident, and a hold had been placed on Guardado's autopsy results.   These protesters gathered on Father's Day to hear speeches from Guardado's father and cousin, as well as family members of others killed by law enforcement.  The group marched over three miles, from Redondo Boulevard in Gardena, where Guardado was killed, to the Compton Civil Complex where LASD's office is located.

55.     By 2:15 p.m., several hundred protesters had gathered to march the roughly three miles to the Compton Complex containing the Sheriff's station. During the march, at least one LASD helicopter flew over the protesters.  Upon arrival at the Complex, the protesters were met with metal barriers and deputies in full riot gear on multiple sides of the plaza.  Protesters, listening to speeches and demanding that LASD release the tape of Guardado's killing, were monitored by a LASD helicopter from above. A voice from the helicopter called the protesters "troublemakers" and "outsiders," saying they were not welcome in Compton and they should leave so their children didn't get hurt.[7]

_____

[7] Levin, Nicole, *LA Sheriff's Department Attacks Protesters in Compton*, Medium, (June 23, 2020), https://knock-la.com/la-sheriffs-department-attacks-protesters-compton-732bcd93c0c8 (last visited Aug. 27, 2020);

56.     By around 5:00 p.m., a group of roughly 100 protesters remained in the plaza, holding signs and chanting phrases like "release the tape" at the line of deputies behind a barricade. Without any provocation or warning, LASD deputies began to fire less-lethal rounds into the crowd at close range, less than twenty feet:



_____

https://twitter.com/fajardonews/status/1274869206295515136 (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF





*See* https://twitter.com/LATACO/status/1274874827786997761 (depicting the unprovoked attack in a two-minute video).[8] These rounds included pepper balls and flashbangs, as well as cannisters of pepper spray and tear gas.[9] Fleeing

---

[8] *See also, e.g.*, Chavez, Aida, After Killing of 18-Year-Old Andres Guardado, *LA Protestors Struggle Against the Limits of Police Reform*, The Intercept, (June 25, 2020, https://theintercept.com/2020/06/25/andres-guardado-los-angeles-police (last visited Aug. 27, 2020); ABC 7, *Pepper balls deployed at march over Garden deputy-involved fatal shooting*, (June 22, 2020), https://abc7.com/gardena-deputy-involved-shooting-compton-sheriff-protest-police-brutality/6259240/ (last visited Aug. 27, 2020); https://twitter.com/josie_huang/status/1274860188898430976 (posting videos) (last visited Aug. 27, 2020); https://twitter.com/JenaeLien/status/1275238292045180928 (posting photographs) (last visited Aug. 27, 2020).
[9] https://twitter.com/LATACO/status/1274874827786997761 (last visited Aug. 27, 2020); https://www.instagram.com/p/CBy8iWXBo5G (last visited Aug. 27, 2020); https://twitter.com/josie_huang/status/1274859389921267713 (last visited

17

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

protesters were injured, as well as medics assisting the wounded and media personnel documenting the event.  KPCC reporter Josie Huang reported that she herself was teargassed.[10]  There are conflicting reports over whether rubber bullets or foam rounds were used, but multiple protesters suffered injuries from projectiles fired by the deputies.  Several protesters with their hands up were shot directly in the back, and those assisting injured attendees were themselves struck by rounds.  LASD deputies continued to fire indiscriminately into the crowd after protesters began to disperse, striking protesters who struggled to flee through the narrow passage.

57.    After this initial group was forcibly dispersed, an even smaller group of protesters returned to the spot to continue to chant and hold up signs.  At one point, a water bottle was thrown from the smaller group toward the deputies, striking the metal barricade instead.  Despite there being only approximately ten individuals near the barricade, deputies fired additional flashbangs into the back of the crowd.  At no point did deputies attempt to contain or isolate any particular protester(s) they deemed to be threatening, choosing instead to fire indiscriminately at all those remaining, even those at a significant distance away.  No orders to disperse were given until some fifteen minutes after the initial incident, when the Sheriff's Department helicopter announced that the gathering was an unlawful assembly.

58.    News sources report that between six and ten individuals were seized at the protest, and LASD's own records show that at least two individuals were arrested for protest-related behavior in Compton that day.[11]

---

Aug. 27, 2020); https://twitter.com/desertborder/status/1274857566091149313 (last visited Aug. 27, 2020).

[10] https://twitter.com/josie_huang/status/1274860188898430976 (last visited Aug. 27, 2020).

[11] Daily Breeze, https://www.dailybreeze.com/2020/06/22/arrests-made-at-compton-protest-over-andres-guardados-death-near-gardena/ (less than 10 arrested) (last visited Aug. 27, 2020); CBS 2 L.A., at 2:30, *Protestors, Deputies Clash During Demonstrations Against LASD Shooting of 18-Year-Old Andres*

59.     Protesters reported that deputies opened fire without warning and LASD issued their initial dispersal order fifteen minutes after the munitions were fired.  Those fleeing the clouds of pepper spray, tear gas, foam rounds and "less-lethal" munitions further cleared the Complex, as Sheriff's Department members made several arrests. According to one reporter: "A group of protesters were arrested that were standing in front of the police line that had very few people. When we ran over to record what they were doing, the cops fired at us indiscriminately."[12]

60.     According to protesters, LASD deputies gave no warning prior to their use of "less-lethal" munitions.  People were running away, eyes red from tear gas and pepper balls, throats burning.  Community medics quickly tended to the wounded, while LASD deputies paused for a few moments before firing more rounds as gutsy protesters regrouped and continued to approach the line of LASD deputies.

61.     In addition to pepper spray and pepper balls, LASD deputies shot rubber bullets and threw flash grenades that were loud and disorientating.  Reporters and medics alike were teargassed and shot at with pepper balls, foam rounds and/or rubber bullets.   Around 5:25 p.m., LASD deputies arrested a small group of protesters (who were kneeling) near the adjacent fence where the speakers had been.  The protesters were peaceful and not near the fence where LASD deputies were shooting, so it is unclear why they were targeted for arrest.  Around 6:30 p.m.,

---

*Guardado*, (June 21, 2020), https://www.youtube.com/watch?v=nzveuJttTJQ (7 arrested, cited, and released) (last visited Aug. 27, 2020); Fox 11, *March for security guard killed by LA County sheriff deputies was peaceful, until the end*, (June 22, 2020), https://www.foxla.com/news/march-for-security-guard-killed-by-la-county-sheriff-deputies-was-peaceful-until-the-end (crew saw at least 6 people placed in handcuffs) (last visited Aug. 27, 2020); *see also* http://shq.lasdnews.net/CrimeStats/CAASS/desc.html (providing relevant department records, specifically entry numbers 19294617 and 19294604) (last visited Aug. 27, 2020).

[12] Levin, Nicole, *LA Sheriff's Department Attacks Protesters in Compton*, Medium, (June 23, 2020), https://knock-la.com/la-sheriffs-department-attacks-protesters-compton-732bcd93c0c8 (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

LASD deputies marched in a line to push remaining protesters toward the sidewalk away from City Hall and the LASD station.  LASD deputies gave dispersal orders at this time.  At least one protester who refused to move to the sidewalk was arrested by LASD deputies.

> **D.    The LASD Willfully Violated the Rights of Plaintiffs and Other Peaceful Protesters to Send a Message.**

62.    California Penal Code § 409, which defines an unlawful assembly, has repeatedly been construed to require a showing of imminent violence that so permeates a lawful expressive activity permitting law enforcement to curtail the rights of all demonstrators.  Facts justifying the declaration of an unlawful assembly order anywhere, let alone throughout the County, in advance of any expressive activity, did not exist.  Instead, Sheriff Villanueva announced an unlawful assembly without adequate notice and unlawfully employed indiscriminate, untargeted use of force, in an attempt to silence protesters and discourage future protests.  During at least one incident, LASD deputies gave no warning or announcement of unlawful activity prior to their indiscriminate use of force against non-violent protesters.

63.    LASD deputies transported hundreds of peaceful protesters to jails and make-shift detention sites throughout the County.  LASD held many of those arrested on buses for extended periods of time before being off-loaded into garages, parking lots, or stadiums to be cited and released.  Because there was no plan for processing mass arrests, many arrestees were held on the buses and driven around the County for long periods of time in close contact in unventilated buses – handcuffed and without any bathroom access – while the LASD attempted to locate a place where they could be processed and released.  As a result, arrestees for infractions and misdemeanors were driven to far distant locations in the County and, after processing, released in the middle of the night without their property and with no way to get home, all the while being out during a time of Sheriff Villanueva's own curfew and risking re-arrest if detained again by LASD or other law

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

enforcement agencies. Notably, any public transit or ride-sharing options that might have been available posed significant risk to arrestees during the COVID-19 pandemic.

64. Throughout the time they were arrested and held in LASD custody, Plaintiffs were handcuffed tightly behind their backs and denied food, water, and access to bathroom facilities, resulting in many arrestees urinating on themselves in the closed buses. All arrestees, regardless of the alleged crime, were unnecessarily and unreasonably confined in close, enclosed quarters without any ventilation, dramatically increasing the risk of COVID-19 exposure. It is well known and was, or should have been known to Defendants, that being in closed spaces without vigorous air movement significantly increases the risk of COVID-19 exposure. Moreover, both LASD and Sheriff Villanueva were well aware of the increased risk of COVID-19 exposure because of 1) LASD's role in administering the L.A. County Jail system; 2) the County and LASD's involvement in mitigation efforts for COVID-19 for individuals in congregate spaces, including the temporary placement of unhoused individuals at the County's recreation centers; and 3) the pending class action lawsuit against LASD regarding its management of the jail system during COVID-19.

65. All members of the Arrest Class (defined in ¶ 98(a)) were held by LASD in restraint for a minimum of three hours in these excruciatingly painful conditions from the time they were first handcuffed. Some class members experienced numbness in their hands, and their requests to loosen the zip ties or remove them went unanswered. Without access to bathrooms, some arrestees were forced to urinate on themselves.

66. The unlawfulness and harm of such handcuffing practices is well-established. The Ninth Circuit has long recognized that tight handcuffs for even relatively short periods of time can cause significant pain and damage. For nearly three decades, if not longer, law enforcement in California have been "on notice that

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

abusive handcuffing can amount to excessive force and no officer could reasonably believe it is proper to fail to assist arrestees who complain that their handcuffs are too tight." *Taylor-Ewing v. City of Los Angeles*, No. CV075556GHKJWJX, 2009 WL 10681951, at *3 (C.D. Cal. July 31, 2009) (citing *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995); *Meredith v. Erath*, 342 F.3d 1057, 1061, 1063–64 (9th Cir. 2003); *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Maley v. County of Orange*, 224 Fed. App'x 591, 593 (9th Cir. 2007)); *see also Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) ("Contrary to defendants' assertion, the use of excessive force by officers in effecting an arrest was clearly proscribed by the Fourth Amendment at least as early as 1985.").[13]

67.     Arrestees were uniformly held under these unlawful conditions of confinement despite the fact that, to address the COVID-19 pandemic, a $0 bail was in effect throughout Los Angeles County for any misdemeanor where the bail would formerly have been less than $50,000.  The prolonged detention of the Arrest Class is even more unjustified in light of the California Penal Code §§ 853.5 and 853.6, which permits individuals suspected of an infraction or misdemeanor violation to be cited and released promptly, in the field or after booking, unless one of a limited number of restrictions apply.  On information and belief, in this instance the LASD elected to transport every arrestee, regardless of the offense, to a "station" for booking, even though many, if not nearly all, were processed outside of a building and simply cited and released at that location.   This was done to punish demonstrators for their protest activity, an exercise of their First Amendment rights, and to deter future demonstrations.

-----

[13] *See generally* JJ Payne-James, *Restraint Techniques, Injuries, and Death: Handcuffs Encyclopedia of Forensic and Legal Medicine*, Volume 4 (December 2016), *available at* https://www.researchgate.net/publication/301776305_ Restraint_Techniques_Injuries_and_Death_Handcuffs (listing studies of neurology injuries caused by handcuffing) (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

68.     Official LASD policies state that "misdemeanor prisoners shall be released in the field whenever it is reasonable and safe to do so."  Los Angeles Sheriff's Department Manual of Policies and Procedures ("LASD MPP") 5-03/115.05.  According to this policy, individuals who are not under the influence of alcohol, narcotics or dangerous drugs, and who do not fall into the mandatory and non-release policies defined in 5-03/115.20 should be given a field release following the procedures laid out in 5-03/115.10 "as soon as such person may reasonably and safely be released."  LASD MPP 5-03/115.00.  All LASD squad cars have the ability to issue citations and release individuals according to 5-03/115.10.

69.     Defendants detained members of the Arrest Class for several hours, in many if not most instances, rather than cite and release them in the field as mandated by Penal Code §§ 853.5 and 853.6.  On information and belief, Plaintiffs allege that, without any individual suspicion that the arrestees would violate the law if released, Defendants opted to arrest and detain all protesters both to preempt and/or punish lawful expressive activity, and to deter such activity in the future.

70.     In this instance, Defendants' failures were exacerbated because the obligation to release those arrested in the field and charged with infractions or misdemeanors is mandatory under California Penal Code §§ 853.5 and 835.6.  LASD's conduct reflects Defendants' intent to deny Plaintiffs' basic rights without justification in retaliation for the exercise of their First Amendment rights violated the First, Fourth, and Fourteenth Amendment rights of Plaintiffs and the class members, and with the specific and deliberate intent to interfere with the exercise of Plaintiffs' rights to assembly and due process.

71.     Defendants had ready alternatives to the prolonged detention of the Arrest Class.  The LASD has the technological capability to cite and release in the field using modern technology.  LASD vehicles in the field are equipped with technology that allows deputies to perform cite and release arrests, inputting the information of arrestees reliably without the need to confine them in unsafe

situations for prolonged periods of time. There is no reason why the protesters in the Arrest Class could not have been processed, without injury or anguish, exactly the same way.

## VI.   MONELL ALLEGATIONS

72.   Based upon the principles set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), Defendant County is liable for all injuries sustained by Plaintiffs as set forth herein.  Defendant County bears liability because its policies, practices and/or customs were a cause of and Plaintiffs' injuries, and/or because Defendant County ratified the unlawful actions of its employees that caused Plaintiffs' damages.

73.   The LASD has implemented and endorsed multiple policies, customs, and practices resulting in repeated, widespread violations of law, as outlined above, including:

   a.  shutting down the exercise of First Amendment activities by imposing arbitrary curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest;

   b.  at times, declaring unlawful assemblies without adequate sound amplification audible enough to be heard and understood by the protesters, and without providing directions, means and opportunity to disperse before taking aggressive police action;

   c.  kettling lawful demonstrators in order to arrest them without affording them an opportunity to leave, and taking aggressive police action without declaring an unlawful assembly;

   d.  the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bong grenades;

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

e.  arresting and not releasing in the field persons charged solely with infractions or misdemeanors in violation of California law; and

f.  unlawfully imposing on arrestees unlawful and unduly prolonged conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation in small congregate spaces – while on buses as previously outlined.

74.  Defendants' repeated widespread and unlawful acts over several weeks and involving many locations throughout the County of Los Angeles constitute an unlawful custom and policy of violating protest participants' constitutional rights.

75.  Sheriff Villanueva, as the official head and leader of the Sheriff's Department, was the person most responsible for the hiring, training, and supervision of the LASD deputies working under his command, and ensuring that their actions, conduct, policies, practices and customs complied with the Constitutions of the United States and the State of California, regarding their response to the ongoing demonstrations.  Sheriff Villanueva was fully knowledgeable and apprised of the actions taken by his deputies on May 30 during the widespread demonstrations in the Fairfax area of Los Angeles.  He stated in a news conference on June 2 that LASD deputies would be working with protesters to ensure their rights and maintain public safety.[14]

76.  However, Villanueva did not thereafter repudiate or stop the actions of the LASD officers, thereby ratifying them. Moreover, in public statements, he stated that the actions of the LASD were proper, and that he expected "deputies to defend themselves" using so-called "less-lethal" force when facing protesters throwing objects at deputies in full riot gear.  He has stated that he expects officers to use the

_____

[14] Mercury News report on protests in Los Angeles County (June 2, 2020), https://www.mercurynews.com/2020/06/02/2100-plus-arrested-so-far-in-los-angeles-county-while-protests-rage/ (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

specific less-than-lethal rounds at issue in this action, and falsely claimed that they do not cause injury to protesters.[15]

77.    Indeed, following his public comments on June 2, 2020, the demonstration regarding the Andres Guardado killing by Sheriff's deputy took place in Compton, resulting in the widespread violations of protesters' rights under the First Amendment, and the indiscriminate and aggressive use of violence against the demonstrators, including the use of less-lethal armaments, and described above, and the use of pepper spray and tear gas against non-violent protesters, resulting in numerous injuries and painful reactions.  Sheriff Villanueva's comments did not result in any significant change in the response of LASD deputies to lawful protesters, but, instead, resulted in significant and extreme tactics to break up the demonstration even though the majority of the demonstrators were peaceful, and non-violent, and the overwhelming and widespread use of violence by deputy sheriffs against them.

78.    The so-called "less-lethal" force used by LASD deputies is actually quite often lethal with intended use and with unintended use, such as when a chemical irritant canister is directly targeted at individuals in close range.  A 2017 report by Physicians for Human Rights states that "[d]irect impact by the canisters and grenades carrying tear gas can cause significant blunt trauma and death."[16]  A more recent report issued by Physicians for Human Rights, in June 2020, points out that tear gas canisters have been fired as projectiles to target individuals during

---

[15] KTLA 5 video of interview with Sheriff Villanueva (June 3, 2020) https://ktla.com/morning-news/l-a-county-sheriff-villanueva-on-the-recent-protests-in-los-angeles/ (last visited Aug. 27, 2020).

[16] Physicians for Human Rights, *Health Impacts of Crowd-Control Weapons: Chemical Irritants (Tear Gas and Pepper Spray)*, Physicians for Human Rights website (January 1, 2017), https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-chemical-irritants-tear-gas-and-pepper-spray/ (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

recent protests.[17]  The report recommends, among other things, that (1) firing gas canisters or grenades directly into a crowd or towards individuals should be prohibited; (2) firing grenades or canisters containing chemical irritants into closed spaces or open spaces where there is no safe egress should be prohibited; and (3) firing multiple canisters in the same spot or firing repeatedly should be avoided, as this can cause serious injury or even death.  Moreover, Physicians for Human Rights notes that while the stated objective of disorientation devices, such as flash-bangs, is to cause disorientation and a sense of panic, the potential for injuries cause by the pressure of the blast or by shrapnel from the fragmentation of the grenade is disproportionately high, and could even lead to death. Therefore, they assert that "these weapons have no place in effective crown management."[18]

79.   LASD operates within the California law enforcement mutual aid framework, alongside the LAPD and other municipal agencies during times of civil unrest.  The Black Lives Matter and related protests which have occurred in May and June 2020 fall under the mutual aid systems definition of civil disorder or unrest, as outlined by the City of Los Angeles Emergency Operations Plan, Civil Disturbance Hazard Specific Annex (Feb. 2018).  That document notes that "The County Sheriff is a key role player within the system with each sheriff serving as the Regional Mutual Aid Coordinator." *Id.* at 16.  Further: "Any requirement for additional public safety presence should be addressed through contractual arrangements." *Id.*

---

[17] Physicians for Human Rights, *Crowd-Control Weapons and Social Protest in the United States*, Physicians for Human Rights website (June 2020), https://phr.org/wp-content/uploads/2020/06/PHR-Fact-Sheet_Crowd-Control-Weapons-and-Social-Protest-US.pdf (last visited Aug. 27, 2020).
[18] Physicians for Human Rights, *Disorientation Devices*, Physicians for Human Rights website, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Disorientation_Devices.pdf (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

80.     The LASD operates on a contract basis to provide services for forty-two cities within Los Angeles County, as well as being the primary law enforcement agency responsible for the unincorporated areas of the County.  Thus, the LASD and Sheriff Villlanueva are responsible for any law enforcement needs by contract or otherwise in those areas, including presence at protests and demonstrations.

81.     As stated above, the County, through Sheriff Villanueva and the LASD, has failed to train its officers in the appropriate constitutional responses to peaceful demonstrations.  The County is well aware of its constitutional duties in these circumstances in light of litigation over the years that has specified these duties in no uncertain terms.

82.     In fact, 50 years after LASD's brutalization of protesters at the Chicano Moratorium march which resulted in the murder of Ruben Salazar and three other protesters, LASD's unconstitutional response to protests persists.  The LASD's response to the recent protests, as detailed above, confirms either that no effective training was provided, or that the LASD's culture of impunity and endorsement of deputies who engage in punitive violence empowered deputies to disregard their "training," knowing what was truly expected of them and having confidence that they would not be disciplined or otherwise held accountable.

83.     As stated above, the County, through Sheriff Villanueva and the LASD, has failed to train its officers in the appropriate constitutional responses to peaceful demonstrations. The County is well aware of its constitutional duties in these circumstances in light of litigation over the years that has specified these duties.  The LASD is fully aware of the inadequacy of police training may serve as the basis for § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton,* 489 U.S. 378, 388 (1989). "[W]here a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants

such a shortcoming can be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*

84.     Plaintiffs' failure-to-train claim is based on the Supreme Court's explanation that in some cases "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for additional training.

### A. LASD's Internal Gangs Actively Encourage Deputies to Commit Constitutional Violations and Act with Impunity.

85.      LASD's custom and policy of violating constitutional rights is also rooted in LASD's internal gangs that actively encourage deputies to conduct illegal seizures, use excessive force, and utilize a general style of aggressive policing.[19]

86.     Nearly three dozen federal civil rights lawsuits were filed against LASD claiming that LASD has a "gang culture that encourages excessive force, particularly against minorities."[20]

87.     The "Executioner" gang that dominates Compton sheriff station are a band of deputies that are known to wield power at the Compton station. The Executioners receive tattoos of skulls with Nazi imagery and AK-47s – also known as "inking" – after killing or seriously harming members of the public.

88.     Nearly all high-profile shootings involving the LASD Compton station deputies have been linked to the Executioners gang.

---

[19] Los Angeles Times, <u>LA County deputy alleges 'Executioner' gang dominates Compton sheriff station</u>, July 30, 2020, *available at* https://www.latimes.com/california/story/2020-07-30/sheriff-clique-compton-station-executioners (last visited Aug. 27, 2020).

[20] The Appeal, Claims of Racism and Brutality Dog Los Angeles County Sheriff 'Deputy Gangs', September 28, 2018, available at https://theappeal.org/claims-of-racism-brutality-dog-los-angeles-county-sheriff-deputy-gangs/ (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

89.     Other well-documented LASD deputy gangs include the Spartans, Regulators, Grim Reapers, and Banditos, which all operate out of several LASD stations.  At least 17 LASD gangs have been identified by Sean Kennedy, member of the Civilian Oversight Commission and professor at Loyola Law School.

90.     LASD deputies who are a part of these internal gangs retaliate against and ostracize deputies who report their fellow deputies for misconduct.

91.     LASD Deputy Austreberto "Art" Gonzalez confidentially reported an assault by an Executioner deputy on a fellow deputy to the LASD's Internal Affairs Bureau. Within 48 hours, his report leaked to an Executioner gang member and graffiti was found on the Compton station's entrance keypad that read, "ART IS A RAT."[21]

92.     Based on the above events, Deputy Gonzalez filed a claim for retaliation against LASD stating that he was forced to step down from his field training officer position after deputies refused to partner with him. Whistleblower Gonzalez estimates that as many as 40% of Compton deputies are members or prospects of the Executioners gang. Alan Romero, Deputy Gonzalez's attorney, asserts that "Deputy Gonzalez was never asked to join the Executioners, as the gang identified prospects as those Deputies most likely to engage in violence or shootings. . . This created an emergent public safety issue as gang prospects, hoping to get into the gang, would have been incentivized to engage in a beating or killing to gain gang prestige, when the situation may have otherwise been de-escalated to avoid violence."[22]

---

[21] ABC 7, Deputy gang with matching tattoos rules Compton patrol station, LASD deputy alleges, July 31, 2020, *available at* https://abc7.com/lasd-executioners-deputy-gang-sheriff-alex-villanueva-art-gonzalez/6343979/ (last visited Aug. 27, 2020).

[22] Fox News, LASD has been 'permeated' by a violent deputy gang with matching tattoos called the 'executioners', August 3, 2020, *available at*, https://www.foxnews.com/us/lasd-has-been-permeated-by-a-violent-deputy-gang-with-matching-tattoos-called-the-executioners (last visited Aug. 27, 2020).

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

93.   LASD Sherriff Villanueva has repeatedly turned a blind eye to gangs within his own department despite an FBI investigation and several internal investigations.  Inspector General Max Huntsman stated that he has been unable to investigate these LASD gangs "because of the obstruction of the Sheriff's Department."

94.   Plaintiffs allege that the existence of these deputy gangs, and the unwillingness or inability of Sheriff Villanueva to prohibit deputies from belonging to these gangs or participating in their activities, fosters a culture in which violence and excessive force by deputies is tolerated, promoted, and rewarded.

95.   The County had either actual or constructive knowledge of the existence of the "Executioners" but failed to take any reasonable steps to stop them. Such failure to stop the "Executioners" fostered a custom and practice that encouraged deputies to engage in unconstitutional conduct such as using excessive force on civilians.

96.   Consistent with these allegations, the LASD deputies at the Compton protest on June 21, 2020, unleashed an unprovoked and flagrantly unlawful deluge of dangerous attacks on a peaceful crowd of protesters, without any warning or attempt to disperse the crowd.  The deputies' willingness to deploy such violence, knowing that reporters were present and people would use their phones to record the incident, indicates that the deputies were confident that they would not be held accountable for their gross misconduct.  Such confidence is only possible in a culture of impunity.

VII.   **CLASS ACTION ALLEGATIONS**

A.   **CLASS DEFINITION – 23(B)(2)) (INJUNCTIVE RELIEF CLASS)**

97.   The injunctive relief class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the County of Los Angeles in the exercise of their

rights of free speech, assembly and petition in general, and particularly as it relates to protesting police violence and discrimination against people of color, especially Black Americans.

**B.    CLASS DEFINITIONS – 23(B)(3) (DAMAGES CLASSES)**

98.    One or more of the named Plaintiffs (which are indicated for each class or subclass) bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to the Federal Rules of Civil Procedure, Rule 23(b)(1), (b)(2) and (b)(3).  The damages classes are defined as:

a. **ARREST CLASS:** Beginning May 30, 2020 through the present, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests regarding the killing of George Floyd and Andres Guardado and/or other protests regarding related incidents in the County of Los Angeles, who were solely engaged in peaceful protest and/or observing the proceedings and were arrested by the LASD for either misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly, and who were held on buses and subjected to prolonged tight hand-cuffing, denied access to bathrooms, water and food, and enclosed, crowded spaces without ventilation. The Class Representatives for this class are Sebastian Militante, Krizia Berg, Travis Wells, Christian Monroe, Austin Tharpe, James Butler, and Grace Bryant.

b. **DIRECT FORCE CLASS:** Beginning May 30, 2020 through the present, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests regarding the killing of George Floyd and Andres Guardado, and/or other protests regarding related incidents in the County of Los Angeles, who were solely engaged in peaceful protest and/or observing the proceedings and were subjected to force with so-called "less-lethal weapons," such as batons, rubber bullets

or foam rounds, pepper spray in various forms, and flashbangs, by LASD deputies.  The Class Representatives for this class are Matthew Nielsen, Shakeer Rahman, Devon Young, Noelani del Rosario-Sabet, Emanuel Padilla, Austin Tharpe, James Butler, Linda Jiang, and Grace Bryant.

## C.   RULE 23 PREREQUISITES

### i.  Numerosity

99.    Each class is inclusive of people present to protest and those otherwise present in the vicinity as bystanders. In accordance with Federal Rules of Civil Procedure, Rule 23(a), the members of the class are so numerous that joinder of all members is impracticable.

### ii.  Common Issues of Fact or Law

100.   Although the actions complained of in this Complaint occurred at different times and locations, Defendants acted uniformly with respect to each class. For example, all arrestees were placed on buses and subjected to the described conditions of confinement, i.e., crowded, poorly-ventilated buses in the midst of a pandemic even though they were entitled to field release; and so forth.

101.   Plaintiffs are informed and believe and thereon allege that the LASD officers acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the LASD and the County of Los Angeles.

102.   The common questions of fact include, but are not limited to:

a. Did Defendants impose curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest;

b. Did Defendants declare unlawful assemblies without adequate sound amplification and without providing both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly police action;

c.  Did Defendants routinely break up George Floyd and Andres Guardado and related protests through the use of force (batons, rubber or foam bullets, tear gas or pepper balls, and flash bangs) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force;

d.  Did Defendants routinely, while breaking up George Floyd and Andres Guardado and related protests, hit people with batons and/or rubber or foam bullets, shot tear gas or pepper balls, and set off flash bangs although those people were not engaging in conduct justifying such force;

e.  When arresting people at the George Floyd and Andres Guardado protests, did Defendants routinely subject arrestees to prolonged detention on buses, while tightly hand-cuffed, denied access to bathrooms, water and food, and where they were kept in enclosed spaces without ventilation;

f.  When arresting people at the George Floyd and Andres Guardado protests, did Defendants routinely subject arrestees charged solely with misdemeanors to custodial arrest without regard to whether they were entitled to field release as provided in California Penal Code §§ 853.5 and 853.6;

103.  The common questions of law include, but are not limited to:

a.  Must Defendants, when imposing a curfew based on some present at a protest that is unlawful, accommodate, or attempt to accommodate, the right to peaceable assembly and protest;

b.  Must Defendants when declaring unlawful assemblies, provide adequate sound amplification and provide both directions, means and opportunity to disperse before taking aggressive and injurious – potentially deadly – police action;

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

c.  Did Defendants routinely break up George Floyd and Andres Guardado and related peaceful protests through the use of force (batons, form rounds, and/or rubber bullets) without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force violate the First, Fourth or Fourteenth Amendments and their state law analogues;

d.  Did the LASD, while breaking up George Floyd and Andres Guardado and related protests routinely hit people with batons, foam rounds and/or rubber bullets, shoot tear gas or pepper balls, and set off flash bangs although those people were not engaging in conduct justifying such force violate the First, Fourth or Fourteenth Amendments and their state law analogues;

e.  Did the LASD, after arresting people at police misconduct protests, and routinely subjecting arrestees to prolonged detention on buses, while tightly hand-cuffed, without access to bathrooms, water and food, and kept in enclosed, crowded spaces without ventilation violate the Fourth or Fourteenth Amendments and their state law analogues;

f.  Did the LASD's custodial arrest of people at the protests who were charged with misdemeanors, and who qualified under California Penal Code §§ 853.5 and/or 815.6 for field release, violate their rights under California Government Code §§ 853.5 and/or 815.6, and their rights under the Fourth and Fourteenth Amendments and their state law analogues;

g.  Did some or all of the conduct described above constitute a policy or custom of Defendant County;

h.  Is any individual Defendant sued in his individual capacity entitled to qualified immunity on the federal claims;

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

i.  Did any of the conduct alleged herein violate California Civil Code §
    52.1 (the Bane Act);

j.  Are general classwide damages available to the various classes;

k.  Are statutory damages under California Civil Code § 52.1 available to
    the various classes.

104.  Defendants detained and/or arrested the putative class and sub-classes as a group and treated all similarly, acting on ground applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment rights—and their analogous state Constitution, statutory, and common law rights—were violated raise common question of law and fact. the Defendants have acted, threaten to act, and will continue to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

105.  The questions of law and fact common to the classes, which are outlined above, predominate over any questions affecting only individual members.

### iii.  Typicality

106.  In accordance with Federal Rules of Civil Procedure, Rule 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were all present at George Floyd and/or Andres Guardado and related protests in the County of Los Angeles; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

107.  Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

108.   In accordance with Federal Rules of Civil Procedure, Rule 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### iv.  Adequate Representation

109.   The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

110.   The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case.

111.   Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

### v.  Maintenance and Superiority

112.   In accordance with Federal Rules of Civil Procedure, Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

113.   In accordance with Federal Rules of Civil Procedure, Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

114.   In accordance with Federal Rules of Civil Procedure, Rule 23(b)(2), Defendants have acted on grounds generally applicable to the class.

115.   In accordance with Federal Rules of Civil Procedure, Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.,* the County of Los Angeles. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

116.   Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part from LASD records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

117.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Leading members of Plaintiffs' counsel have effectively litigated similar class actions to resolution without issue.  The class action is superior to any other available means to resolve the issues, and courts have managed similar litigation with similarly disparate damages as a result of LASD misconduct, such as in the *Aichele*

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

litigation (*Aichele, et al. v. City of Los Angeles, et al.*, No. 2:12-CV-10863-DMG (C.D. Cal. August 26, 2012)).  Liability can be determined on a class-wide basis. General damages can also be determined on a classwide basis.

118.   In accordance with Federal Rules of Civil Procedure, Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that LASD computer records contain a last known address for class members who were arrested.  Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail, email and cell phone outreach, social media and efforts of organizations that organized the protests.  Plaintiffs contemplate that the notice inform class members of the following regarding their damages claims:

A.   The pendency of the class action, and the issues common to the class;

B.   The nature of the action;

C.   Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D.   Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

E.   Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

119.   As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs and the class members have been denied their constitutional, statutory, and legal rights as stated herein, and have suffered general

and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

120.   Plaintiffs have not yet filed a California Government Code § 910 class claim addressing their state law damages claims, but intend to do so in the near future. Once that occurs, and the time permitted by California law to file a lawsuit on such claims has elapsed, Plaintiffs intend to amend this complaint to add state law damages claims.  Because injunctive relief under state law does not require the filing of a prior administrative claims, Plaintiffs' injunctive relief claims currently entail violation of Plaintiffs' rights under California as well as federal law, including but not limited to Cal. Const. Article 1, §§ 1, 2, 3, 7, 13, 17 and 26; Civil Code § 52.1; Penal Code §§ 853.5, 853.6; and Government Code § 815.6.

121.   Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

122.   All of the following claims for relief are asserted against all Defendants.

123.   Although Plaintiffs' legal theories significantly overlap, they apply differently to different classes.  Accordingly, Plaintiffs state their claims by class.

124.   Plaintiffs restate and incorporate by reference each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

## VIII.    FIRST CLAIM FOR RELIEF – INJUNCTIVE RELIEF CLASS
**(First, Fourth, and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983; California Constitution Article 1, §§ 2, 3, 7, 13; Penal Code §§ 853.5, 853.6; Civil Code §§ 52.1, 815.6 – for Injunctive Relief)**

125.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

126.   The Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, shutting down the exercise

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

of First Amendment activities through the use of indiscriminate and unreasonable force against protesters.

127.   Defendant County, through Defendant Villanueva and the LASD, has failed to train its officers in the constitutional responses to peaceful demonstrations, as revealed by the above allegations, despite the long history of such violations in the past, and Defendants' commitment to correct them.  The recurrence of the same violations with respect to these arrests indicates an intentional refusal to preserve the constitutional rights of protesters.

128.   Without intervention by this Court, members of the Injunctive Relief Class who have participated and wish to participate in protest activities, particularly related to police violence, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions.  The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

129.   Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

130.   Defendants' polices practices, customs, conduct and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein.  The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in expressive activities in the County of Los Angeles. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

and in the future of these constitutional rights, and has chilled their exercise of these rights.

131.   Specifically, Plaintiffs are concerned that, if arrested, whether lawfully or unlawfully, they will again be denied the liberty interest codified at California Penal Code §§ 853.5–.6, will be subjected to unlawful conditions of confinement exposing them to increased risk of COVID-19 and/or other communicable diseases, and will be subjected to unreasonable and excessive force by LASD.

132.   Plaintiffs are also concerned that, when engaged in protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice in the event unlawful assemblies are declared; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying protesters.

133.   Plaintiffs therefore seek injunctive relief from this Court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

134.   Plaintiffs also seek injunctive relief in the form of an order requiring that Defendants seal and destroy any and all records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, biological samples, and information obtained from such biological samples collected from the Plaintiff class, and identify to the Plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

///
///
///
///

42
COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

## IX.    SECOND CLAIM FOR RELIEF – ARREST CLASS
### (Fourth and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983 – for Damages and Injunctive Relief)

135.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

136.   From May 30, 2020 to the present, all Arrest Class members were arrested on misdemeanor charges of failure to obey a curfew, failure to disperse, failure to follow a lawful order of a police officer and/or unlawful assembly during Floyd protests and were placed on buses and driven to a variety of facilities where they were processed and released.  All those arrestees were on the buses for several hours, both to get to their destination and then held on the bus until they were processed.  While held on buses or otherwise detained prior to their release, Arrest Class members were subjected to prolonged tight hand-cuffing; denied access to bathrooms, water and food; and held in enclosed, crowded spaces without ventilation, which significantly increased their risk of COVID-19 exposure because, even if they had previously been similarly distanced from others during outside protests, the risk of exposure is significantly greater in enclosed, unventilated spaces.

137.   Defendants' above-described conduct violated Arrest Class members' rights to be free from unreasonable seizures under the Fourth Amendment and under the Fourteenth Amendment's due process clause and the state constitutional analogues.

138.    As a result of Defendants' wrongful conduct, Arrest Class members suffered damages as alleged above.

139.   As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Arrest Class is entitled both to full compensation for the damages they have suffered and to relief from the potential that such violations will recur.

## X.     THIRD CLAIM FOR RELIEF – DIRECT FORCE CLASS
### (Fourth and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. § 1983 – for Damages and Injunctive Relief)

140.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

141.   All Direct Force Class members were shot with so-called "less-lethal weapons" and/or struck with batons.

142.   From May 30, 2020 to the present, members of the Direct Force Class who were shot with "rubber bullets" or "foam rounds," struck with batons, or tear gassed or struck with pepper balls were injured in a manner that evinced that Defendants applied force unlawfully. Many class members were struck with rubber bullets or foam rounds and other so-called "less-lethal" weapons in the face, head, shoulder and neck areas. LASD has denied shooting rubber bullets or foam rounds even though protesters sustained injuries from "non-lethal" rounds.[23] Video footage of various incidents shows officers shooting straight at peaceful protesters who posed no threat to the police or the public.[24] Similarly, individuals suffered baton strikes meant not to compel people to retreat, but to injure and punish them on site.

143.   Defendants used unreasonable and excessive force in indiscriminately engaging in baton strikes, shooting rubber bullets and/or foam rounds, tear gassing, and shooting pepper balls, and setting off flash bang grenades at protesters not based on an individualized determination of individual conduct justifying such force, in violation of the Fourth Amendment and its state law analogues. Further, this conduct

---

[23] Suter, Leanne, *Pepper balls deployed at march over Gardena deputy-involved fatal shooting*, ABC 7, (June 22, 2020), https://abc7.com/gardena-deputy-involved-shooting-compton-sheriff-protest-police-brutality/6259240/ (last visited Aug. 27, 2020).

[24] *See* KTLA 5, *Video shows deputies shooting fleeing protesters with pepper balls*, (June 3, 2020), https://ktla.com/news/local-news/video-shows-deputies-shooting-fleeing-protesters-with-pepper-balls-in-hollywood/ (last visited Aug. 27, 2020).

was deliberately indifferent to the Direct Force Class members' rights, shocks the conscience, and violates the decencies of civilized conduct, under the Fourteenth Amendment and its state law analogues.

144. As a result of Defendants' wrongful conduct, Direct Force Class members suffered damages as alleged above.

145. As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Direct Force Class is entitled both to full compensation for the damages they have suffered and to relief from the potential that such violations will recur.

## XI.     REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

146. An order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure, Rule 23(b)(2) and (3);

147. A permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

148. A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights under the Constitution and laws of the United States and of Plaintiffs and the class members;

149. An order directing that all arrest records be removed from all criminal databases, whether operated by the City or County of Los Angeles, or the State of California, and that all arrests be reduced to a "detention" other than those cases in which the individual arrested is convicted of the charge;

150. General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal and state constitutional and statutory rights, in addition to pain and suffering, all to be determined according to proof;

151. An award of attorneys' fees pursuant to 42 U.S.C. § 1988, Cal. Civil Code §§ 52(b) & 52.1(h), and Cal. Code of Civil Proc. § 1021.5;

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

152. Costs of suit;

153. Pre- and post-judgment interest as permitted by law; and

154. Such other and further relief as the Court may deem just and proper.

Dated: August 27, 2020

Respectfully submitted,

By: /s/ Jorge Gonzalez
Jorge Gonzalez
A PROFESSIONAL CORPORATION

Paul Hoffman
Michael D. Seplow
Aidan C. McGlaze
Kristina A. Harootun
John Washington
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

Carolyn Y. Park
LAW OFFICE OF CAROLYN PARK

Arnoldo Casillas
Denisse O. Gastélum
CASILLAS & ASSOCIATES

Morgan E. Ricketts
RICKETTS LAW

*Attorneys for Plaintiffs and Proposed Class.*

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs hereby make a demand for a jury trial in this action.

3

4   Dated: August 27, 2020                    Respectfully submitted,

5

6                                             By: /s/ Jorge Gonzalez
                                              Jorge Gonzalez
7                                             A PROFESSIONAL CORPORATION

8                                             Paul Hoffman
                                              Michael D. Seplow
9                                             Aidan C. McGlaze
10                                            Kristina A. Harootun
11                                            John Washington
                                              SCHONBRUN SEPLOW HARRIS
12                                            HOFFMAN & ZELDES LLP

13                                            Carolyn Y. Park
14                                            LAW OFFICE OF CAROLYN PARK

15                                            Arnoldo Casillas
16                                            Denisse O. Gastélum
                                              CASILLAS & ASSOCIATES

17                                            Morgan E. Ricketts
18                                            RICKETTS LAW

19                                            *Attorneys for Plaintiffs and Proposed*
20                                            *Class.*

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF