1   Jorge Gonzalez SBN 100799          Carolyn Y. Park SBN 229754
    A PROFESSIONAL CORPORATION          LAW OFFICE OF CAROLYN PARK
2   2485 Huntington Dr., Ste. 238       595 Lincoln Ave., SUITE 200
    San Marino, CA 91108-2622           Pasadena, CA 91103
3   t. 626-328-3081                     t. 213-290-0055
    e. jgonzalezlawoffice@gmail.com     e. carolynyoungpark@gmail.com
4
    Paul Hoffman SBN 71244              Arnoldo Casillas SBN 158519
5   Michael D. Seplow SBN 150183        Denisse O. Gastélum SBN 282771
    Aidan C. McGlaze SBN 277270         CASILLAS & ASSOCIATES
6   Kristina A. Harootun SBN 308718     3777 Long Beach Blvd., 3RD FLO,
    John Washington SBN 315991          Long Beach, CA 90807
7   SCHONBRUN SEPLOW HARRIS,            t. 323-725-0350
    HOFFMAN & ZELDES LLP                e. acasillas@casillaslegal.com
8   11543 W. Olympic Blvd.              e. dgastelum@casillaslegal.com
    Los Angeles, California 90064
9   t. 310-396-0731; f. 310 399-7040    Morgan E. Ricketts SBN 268892
    e. hoffpaul@aol.com                 RICKETTS LAW
10  e. mseplow@sshhzlaw.com             540 El Dorado Street, Ste. 202
    e. amcglaze@sshhzlaw.com            Pasadena, CA 91101
11  e. kharootun@sshhzlaw.com           t. 213-995-3935
    e. jwashington@sshhlaw.com          e. morgan@morganricketts.com
12
13  Attorneys for Plaintiffs.

14

### UNITED STATES DISTRICT COURT

15

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

16

17  KRIZIA BERG, GRACE BRYANT,          Case No.: 2:20-cv-07870-DMG-PD
    JAMES BUTLER, NOELANI DEL           *Assigned to: Honorable Dolly M. Gee*
18  ROSARIO-SABET, LINDA JIANG,
    SEBASTIAN MILITANTE,
19  CHRISTIAN MONROE, MATTHEW           **MEMORANDUM OF POINTS**
    NIELSEN, EMANUEL PADILLA,           **AND AUTHORITIES IN**
20  SHAKEER RAHMAN, AUSTIN              **SUPPORT OF PLAINTIFFS'**
    THARPE, TRAVIS WELLS,               **APPLICATION FOR A**
21  DEVON YOUNG, individually and on    **TEMPORARY RESTRAINING**
    behalf others similarly situated,   **ORDER AND PRELIMINARY**
22                                      **INJUNCTION**
                      PLAINTIFFS,
23    v.

24  COUNTY OF LOS ANGELES, a
    municipal entity, SHERIFF ALEX
25  VILLANUEVA, and DOES 1-10
    inclusive,
26
                      DEFENDANTS.
27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION...............................................................................................1

II.     THE FACTS THAT NECESSITATE THIS APPLICATION .......................2

III.    ARGUMENT....................................................................................................7

   A. This Court should grant a TRO to enjoin the LASD from using excessive
      force against non-violent protesters....................................................................7

   B. The LASD Is Indiscriminately Using Kinetic Projectiles, Flash Grenades,
      and Chemical Agents Against Protesters in Dangerous, Unconstitutional
      Ways..................................................................................................................8

      1. The Use of Serious, "Less Lethal" Force Against Peaceful Protesters
         Constitutes a Seizure. .....................................................................................8

      2. The Fourth Amendment Requires Objectively Reasonable Force.................9

      3. The LASD Is Using "Rubber Bullets" and Similar "Less-Lethal"
         Projectiles in an Objectively Unreasonable Manner....................................10

   C. A Temporary Restraining Order and Preliminary Injunctive Relief Are
      Urgently Needed and Well Justified to Put an End to These
      Unconstitutional and Life-Threatening Practices. ...........................................16

   D. REQUESTED RELIEF....................................................................................18

IV.  CONCLUSION ................................................................................................19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Federal Cases</u>

*Abay v. City of Denver,*
  445 F.Supp.3d 1286 ................................................................ 11, 16, 17

*Anti Police-Terror Project v. City of Oakland,*
  2020 WL 4584185 (N.D. Cal., Aug. 10, 2020) ........................ 14, 15, 17

*Arc of California v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) ................................................................ 7

*Arce v. Douglas,*
  793 F.3d 968 (9th Cir. 2015) ................................................................ 8

*Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't,*
  2020 WL 3128299 (W.D. Wash. June 12, 2020) ........................ 16, 17

*Boyd v. Benton County,*
  374 F.3d 773 (9th Cir. 2004) ........................................................ 14, 15

*Deorle v. Rutherford,*
  272 F.3d 1272 (9th Cir. 2001) ............................................................ 11

*Don't Shoot Portland v. City of Portland,*
  2020 WL 3078329 (D. Or., June 9, 2020) ...................................... 14, 15

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ...................................................... 8, 17

*Felarca v. Birgeneau,*
  891 F.3d 809 (9th Cir. 2018) ................................................................ 9

*Fisher v. City of San Jose,*
  2003 WL 27384298 (N.D. Cal. Sept. 18, 2003) .................................. 11

*Flynt Distrib. Co. v. Harvey,*
  734 F.2d 1389 (9th Cir. 1984) .............................................................. 8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES – CONT'D

Page(s)

*Federal Cases*

*Graham v. Connor*,
490 U.S. 386 (1989) ............................................................................. 9

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ............................................................ 8

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ............................................................ 17

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012) ................................................... 8, 10, 11

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 17

*Sammartano v. First Judicial District Court*,
303 F.3d 959 (9th Cir. 2002) ............................................................ 17

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013) ............................................................ 7

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005) ............................................................ 14

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ............................................................ 7

*United States v. Mohr*,
318 F.3d (4th Cir. 2003) ................................................................... 14

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ........................................................................... 8

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ............................................................................... 7

iii

# TABLE OF AUTHORITIES – CONT'D

Page(s)

*Federal Cases*

*Young v. City of Los Angeles,*
  655 F.3d. 1156 (9th Cir. 2011) ................................................................. 14, 15, 16

<u>State Statutes</u>

California Civil Code § 52.1 ................................................................. 7, 17

<u>Federal Rules</u>

FRCP 65(b) ................................................................. 7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.    **INTRODUCTION**

The Los Angeles County Sheriff's Department ("LASD") has repeatedly and continually deployed so-called "less-lethal" weapons, including rubber bullets, pepper balls, and tear gas indiscriminately against persons engaged in peaceful protests against police violence in the aftermath of the deaths of George Floyd and others.  The LASD continues to use such excessive force as an improper crowd control method to break up demonstrations, without giving protesters adequate warnings and time to comply with orders to disperse.  Instead of deploying these weapons in a defensive manner to protect themselves and others, the LASD has been deliberately using less lethal munitions and chemical agents in an indiscriminate and retaliatory fashion against people engaged in lawful activities, including journalists and legal observers.

These tactics must be stopped forthwith in order to protect the rights of citizens to express themselves peacefully.  Plaintiffs have demonstrated good cause for the issuance of a Temporary Restraining Order to enjoin the LASD from using less than lethal munitions and chemical agents against non-violent protesters.  The evidence submitted demonstrates that the LASD continues to violate the law and its own policies by using such force against peaceful protesters.  Plaintiffs have shown a strong likelihood of prevailing on the merits.  Meanwhile, Sheriff Alex Villanueva continues to disregard calls for the LASD to reform and change its tactics, and instead has chosen to challenge the authority of the Board of Supervisors and the Inspector General.  Each day there are new reports of misconduct by the LASD against peaceful citizens.  Accordingly, in order to protect the First Amendment right to protest and promote the public interest, this Court should enjoin the LASD from using less-lethal weapons and chemical agents against peaceful protesters.

///

///

///

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## II.   **THE FACTS THAT NECESSITATE THIS APPLICATION**[1]

The Complaint in this matter was filed on August 27, 2020, alleging in essence, that the LASD had been engaging in violent, retaliatory abuses of power aimed at punishing people who were lawfully exercising their rights to protest the increasingly disturbing incidence of police abuse, and in particular, the lethal use of force against people of color. Even before the ink was drying on the final drafts, the LASD deputies continued to engage in the same unlawful behavior Plaintiffs allege in the Complaint.

On August 25, 2020, a lawful, peaceful demonstration through the streets of downtown Los Angeles resulted in LASD using less-lethal projectiles, and tear gas against demonstrators. About 100 demonstrators marched on the streets to the County jail, a County of Los Angeles facility, protesting the Pasadena killing of Anthony McClain, where they encountered barricades described as a "giant slinky." They then marched back in the direction of City Hall. At Broadway and Temple, LASD deputies fired rubber bullets, pepper balls, and tear gas at the non-violent demonstrators, effectively breaking up the demonstration. At no time did the LASD deputies give any warning or announce any declaration of an unlawful assembly, nor did they give any dispersal order to allow demonstrators to leave and escape arrest before being subjected to the use of less-lethal force. (*See* Decl. of Joseph Mischo ("Mischo Decl.") at ¶ 6), (Decl. of Addie Tinnell ("Tinnell Decl.") at ¶ 22), (Decl. of Taegen Meyer ("Meyer Decl.") at ¶ 7), (Decl. of Vishal Singh ("Singh Decl.") at ¶ 8).

Joseph Mischo, a protester at the August 25th march, recalled: "I was hit in my right eye with a pepper ball. I was hit in my left buttock and left elbow with what I believe to have been rubber bullets and/or foam rounds. I was about 20-25 feet from the sheriff deputies when they shot at me. . . I did not see any protesters throw anything at deputies or spray painting. The shields that protesters carried were made of foam. I did not hear a dispersal order, a declaration of unlawful assembly, or a warning of any kind prior to the

---

[1] Plaintiffs have documented these violations in voluminous declarations included in their Appendix.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

use of force." (Mischo Decl. at ¶¶ 5-7). National Lawyers Guild Los Angeles chapter ("NLG-LA") staff member, Addie Tinnell did not hear any warning prior to the use of less lethal munitions: "Without any warning whatsoever, the sheriff's deputies began firing numerous munitions at the crowd. Both of the legal observers present were hit and injured by flash bang grenades, and one of them was hit at close range. I believe the legal observers were targeted." (Tinnell Decl. at ¶ 4).

Two legal observers from the NLG-LA, present at every demonstration and easily identifiable from their lime green baseball hats, were specifically targeted with a tear gas grenade after they had become separated from the main group and were following directions from LASD deputies to move across the street. They were struck in the legs, suffering painful injuries. LASD deputies continued shooting rubber bullets and flash grenades at them as they ran away and sought protection with other demonstrators. (*See* Decl. of Jill O'Neil ("O'Neil Decl.") at ¶ 14, 26), (Decl. of Diana Barbadillo ("Barbadillo Decl.") at ¶¶ 13-14). NLG-LA legal observer, Jill O'Neill, recounted: "I saw a deputy throw a flash bang grenade at me. I ran away from it to the right (south), and then suddenly I felt something explode between my legs. It is my personal belief that the flash bang grenades were thrown at me and Diana Barbadillo intentionally because of our legal observer status, based on the attitudes of the deputies we spoke with beforehand. We were the only two legal observers present." (O'Neil Decl. at ¶¶ 11-12).

Then, one week later on September 5, 2020, at a larger demonstration of about 250-300 people protesting the recent LASD killing of a Black man riding a bicycle, Dijon Kizzee, at the Sheriff's station in South Central Los Angeles on Imperial. LASD deputies (dressed in full riot gear) again erected a barrier surrounding the station with a giant "slinky." The demonstration primarily took place on Imperial Highway, which had been blocked from traffic. As people were milling around listening to speeches, LASD deputies began firing on the crowd with rubber bullets, pepper balls, flash bangs, and tear gas grenades. (*See, e.g.,* at ¶ 6-8), (Barbadillo Decl. at ¶ 26), (Decl. of David Ramirez ("Ramirez Decl.") at ¶ 5). Again, no warning or dispersal order had been given, and even as people

retreated and ran away from the location, LASD deputies chased them and shot at them with rubber bullets.  (*See id.*).  A young seven-year old girl and her Mother were overcome with tear gas, causing them to have difficulty breathing.[2]  (*See* O'Neil Decl. at ¶ 23).  After shooting at the demonstrators with less-lethal munitions, deputies were heard directing people east on Imperial.  (*See* Decl. of Katherine Franco ("Franco Decl.") at ¶ 21).  NLG-LA legal observer Katherine Franco recalled the following: "I never heard the deputies say they would start shooting or give an order to disperse prior to shooting.  Minutes after they started shooting, at 8:44 p.m., they gave a dispersal order that was loud enough for many of the demonstrators to hear . . . I had a bad reaction to the tear gas such that I had to call a friend to help me leave the demonstration, since I could not drive myself due to the tear gas.  I was coughing uncontrollably and had a hard time breathing. It burned my eyes so that I could not see for at least ten minutes . . ."  (Franco Decl. at ¶¶ 21-22).

By now, demonstrations were taking place almost nightly in front of the Sheriff's station in South Central on Imperial Highway.  On September 7, a peaceful demonstration of about 75-100 people took place, again protesting the killing of Dijon Kizzee.[3]  At approximately 10:00 pm LASD deputies started shooting rubber bullets, pepper balls, tear gas, and other munitions at the demonstrators.  (*See* Decl. of Imorie Recio ("Recio Decl.") at ¶¶ 5).  No warning or dispersal order was given prior to the commencement of the attack. (*See id.*).  19 year-old Imorie Recio who attended the protest observed: "I did not see any protesters throw anything at the sheriff deputies at any time. I do not know why they sheriff deputies began to use less lethal force against us."  (*Id.*).  Amongst others, deputies shot Recio in her right ankle with a black stinger grenade.  It left a big cut and swelled up right

---

[2] Josie Huang, *In South LA, March For Dijon Kizzee Turns Chaotic Outside Sheriff's Station*, LAist website (Sept. 6, 2020), https://laist.com/2020/09/06/dijon_kizzee_south_la_los_angeles_sheriffs_department_deputies_march_110.php.

[3] Leila Miller, Alene Tchekmedyian, *Dozens arrested as protesters and deputies clash in Dijon Kizzee demonstrations in L.A.*, LA Times website (Sept. 9, 2020), https://www.latimes.com/california/story/2020-09-09/demonstrators-arrested-dijon-kizzee.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1   away.  (*Id.* at ¶ 6).  She was struck at least three times in the back, probably with pepper
2   balls, and once in her right calf with a rubber bullet, making it difficult for her to stand.
3   (*Id.*).  Meanwhile, she was choking on tear gas.  (*Id.*).  She ran to a 7-11 on the corner and
4   sought treatment from paramedics.  (*Id.*)  While an ice pack was being applied, she heard
5   an announcement to disperse from an amplified speaker, even as the deputies continued to
6   shoot and advance toward the retreating protesters.  (*Id.*).  Recio recalled: "After I got in the
7   car, I noticed most people were running away but 10-20 people stood ground.  LASD
8   deputies continued moving forward while shooting for 20-30 minutes."  (*Id.* at ¶ 9).

9        The next night, September 8, a similar demonstration took place at the LASD station
10   on Imperial Highway.   Again, despite the peaceful and non-violent nature of the
11   demonstration, at about 8:15 pm LASD deputies declared an unlawful assembly through an
12   amplifier.  This time they gave demonstrators 5 minutes to leave.  (Decl. of Lisamarie
13   Betancourt ("Betancourt Decl.") at ¶ 6).  Within five minutes they began to advance on the
14   demonstrators, pushing them back toward Normandie.  (*Id.* at ¶ 7).  Then, LASD deputies
15   charged the crowd and struck down a leader with a bullhorn, arresting him.  (*Id.* at ¶ 8).  As
16   soon as they did, LASD deputies charged the rest of the crowd and began shooting at them
17   with rubber bullets and stingers.  (*Id.*).  LASD deputies continued shooting at the crowd of
18   people with an intent to injure, and not just disperse.  (*Id.* at ¶ 9).  Protest attendee Lisamarie
19   Betancourt recounted: "Given the fact that the protesters were nonviolent, and the deputies
20   were not being threatened, it appeared to me that the LASD deputies were shooting less
21   than lethal weapons with an intent to injure and not simply to disperse the crowd . . . I was
22   hit by a foam bullet on my chest and it was bleeding through my clothes. I have a big bruise
23   through by ribs.  (*Id.* at ¶¶ 9-10).

24        That demonstrators were being targeted by deputies is patently clear.  On September
25   9, Breo Freeman picked up supplies including water, a cooler, hand sanitizer, snacks, and a
26   first aid kit to take in his pick-up truck to provide to demonstrators.  (Decl. of Breo Freeman
27   ("Freeman Decl.") at ¶ 2).  When he returned to his truck after half-an-hour, all four tires of
28   his truck had been slashed.  (*Id.* at ¶ 6).  A reluctant witness reportedly saw LASD deputies

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

slash the tires.  (*Id.* at ¶ 7).  As he was about to call AAA for assistance, four LASD vehicles arrived.  (*Id.* at ¶¶ 8-12).  LASD deputies accosted him, detaining him in a patrol vehicle while they searched his truck without permission.  (*Id.*).  LASD deputies admitted they had detained him because he was bringing supplies to the demonstrators.  (*Id.* at ¶ 13).

Then, on September 11, a press conference was called by the National Lawyers Guild at which numerous demonstrators voiced their complaints about the LASD's mistreatment of demonstrators.  The press conference was surrounded by 30 or more LASD deputies dressed in riot gear, displaying less-lethal weapons and kettling the group with the use of a "slinky" barricade.   (Decl. of David Cunningham ("Cunningham Decl.") at ¶¶ 11-16), (Decl. of Cynthia Anderson-Barker ("Anderson-Barker Decl.") at ¶¶ 9-17).  It appeared the LASD deputies intended to intimidate the participants.  (*See* Anderson-Barker Decl. at ¶ 17).  One LASD deputy even attempted to snatch one of the speakers over the barricade for taking pictures of other deputies.[4]  (Cunningham Decl. at ¶ 20).

Sheriff Villanueva is under fire for his behavior and the conduct of his deputies.  The Inspector General, Max Huntsman, whose function is to investigate and oversee complaints of deputy misconduct has been highly critical of the LASD and Sheriff Villanueva's unwillingness to cooperate with his investigations.  Most recently, Sheriff Villanueva has refused to cooperate with Inspector General Huntsman's investigation of the notorious arrest of local KPCC reporter Josie Huang.[5]  Sheriff Villanueva tried to justify her arrest by claiming she failed to properly identify herself as a reporter, a claim belied by numerous videos of the encounter.  Videos from multiple vantage points clearly show a press badge

---

[4] Leila Miller, Alene Tchekmedyian, *Deputies in riot gear surround peaceful news conference related to Kizzee shooting*, LA Times website (Sept. 11, 2020), https://www.latimes.com/california/story/2020-09-11/deputies-in-riot-gear-peaceful-press-conference-related-to-kizzee-shooting.
[5] Brittany Martin, *Inspector General Says the Sheriff's Department May Have Made False Claims About a Reporter's Arrest*, Los Angeles Magazine (September 17, 2020), https://www.lamag.com/citythinkblog/josie-huang-arrest-lasd-villanueva/.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

hanging from Huang's neck as she repeatedly declared that she was a journalist with KPCC.[6]

## III.   ARGUMENT

### A.   This Court Should Grant a TRO to Enjoin the LASD From Using Excessive Force Against Non-Violent Protesters.

Injunctive relief is warranted and necessary under the First, Fourth and Fourteenth Amendments of the U.S. Constitution; and under Article 1, Sections 3, 7, and 13 of the California Constitution and California Civil Code Section 52.1, to protect Plaintiffs and the classes they represent from being prevented from protesting, from serious, potentially permanent and even lethal injuries.  Plaintiffs meet all the requirements for injunctive relief because they are (1) likely to succeed on the merits, (2) will suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013).

The same factors apply to an application for a temporary restraining order, but a court may grant a temporary restraining order when irreparable injury may occur before the hearing for a preliminary injunction can be held.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining that the Ninth Circuit's "analysis is substantially identical for the injunction and the TRO"); *see also* FRCP 65(b) (allowing TRO to be granted without notice).  Here, marches and demonstrations are continuing, and Plaintiffs' rights are in jeopardy absent this Court's intervention.  Plaintiffs seek a temporary restraining order in order to protect their constitutional rights pending a full hearing on their motion for a preliminary injunction.

The Ninth Circuit "evaluate[s] these factors via a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards

---

[6] Alex Wigglesworth, *L.A. County deputies arrest radio reporter covering protest outside hospital, LA Times website* (September 13, 2020), https://www.latimes.com/california/story/2020-09-13/deputies-arrest-radio-reporter-covering-protest-outside-hospital.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citations omitted).

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  Since this case involves a government actor, the balance of equities factor merges with the fourth factor, public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

"Given the haste that is often necessary" when moving for injunctive relief, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  For this reason, "[a] party is not required to prove her case in full on preliminary injunction," *Arce v. Douglas*, 793 F.3d 968, 976 (9th Cir. 2015), and "[t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of  preventing irreparable harm before trial."  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

As shown herein, Plaintiffs have presented substantial evidence (*See* Plaintiffs' Appendix) that the challenged tactics of the LASD violate the constitutional rights of peaceful protesters and therefore Plaintiffs are likely to prevail on the merits.

**B.**    **The LASD Is Indiscriminately Using Kinetic Projectiles, Flash Grenades, and Chemical Agents Against Protesters in Dangerous, Unconstitutional Ways.**

**1.  The Use of Serious, "Less-Lethal" Force Against Peaceful Protesters Constitutes a Seizure.**

The Fourth Amendment governs law enforcement's use of force against protesters, even when the officers' goal is simply to disperse the crowd.  In *Nelson v. City of Davis*,

8

685 F.3d 867, 877-78 (9th Cir. 2012), the Ninth Circuit applied Fourth Amendment excessive force principles to assess the constitutionality of police firing less lethal projectiles into a crowd of students at a University party striking one of them and causing serious injuries. *See id.* ("Regardless of [the officers'] motives, their application of force was a knowing and willful act that terminated Nelson's freedom of movement.  It unquestionably constituted a seizure under the Fourth Amendment."); *see also Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018) (applying Fourth Amendment analysis to officers' use of batons against protesters with intent to disperse, rather than detain, protesters).

Accordingly, the use of less lethal projectiles against protesters—whether to arrest them or to disperse them or for any other purpose is subject to a Fourth Amendment "reasonableness" analysis.

### 2.  The Fourth Amendment Requires Objectively Reasonable Force.

The Fourth Amendment guarantees the right to be free from excessive force. Excessive force claims are analyzed under an objective reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments."  *Id.* at 396–97. The *Graham* standards consider the particular factual circumstance of each situation.  *See id.* at 396–97.  Relevant factors include the severity of the crime, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest.  *See id.*; *see also* Ninth Circuit Model Jury Instruction No. 9.25 (listing various factors including "the amount of time the officer had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period; the type and amount of force used; and the availability of alternative methods [to take the plaintiff into custody].").

In this case, the LASD used and threatens to continue to use so-called "less-lethal"

force against the protesters, including so-called "rubber bullets" or other impact projectiles, as well flash grenades, and chemical agents, such as tear gas.  As shown herein, the use of such "less lethal" weapons can cause serious and debilitating injuries thereby rendering the use this type of force against peaceful protesters excessive and unreasonable under the Fourth Amendment.

### 3.  The LASD Is Using "Rubber Bullets" and Similar "Less-Lethal" Projectiles in an Objectively Unreasonable Manner.

The LASD continues to use "less lethal" projectiles on protesters indiscriminately. As Plaintiffs have shown, the LASD engaged in undeserved and indiscriminate firing of projectiles on individuals and into crowds of protestors, which causes many serious injuries. There was no justification for this violence, and indeed, it was contrary to well-accepted police practices and training.  (Decl. of Plaintiffs' Expert Roger Clark ("Clark Decl.) at ¶¶ 12-23).

The Ninth Circuit has held that using so called "non-lethal" force against unarmed persons can constitute excessive force in violation of the Fourth Amendment.  In *Nelson*, the Ninth Circuit dealt with the use of such dangerous but "non-lethal" projectiles by police to disperse a crowd, holding that the officers' actions in shooting pepperballs at plaintiff "was an act of excessive force." 685 F.3d at 872.[7]  More specifically, the officers in *Nelson* were trying to disperse a party near UC Davis.  Plaintiff and other students "were attempting to leave the party[,] but the police blocked their means of egress and did not provide any instructions for departing from the complex." *Id.* at 874.  They waited for instructions and "repeatedly raised their hands to show their willingness to comply." *Id.*  While there were bottles thrown at the officers, "no one from [plaintiff's] group threw bottles at the police." *Id.*  Officers then launched a pepperball which struck plaintiff's eye, resulting in "temporary

---

[7] "Pepperball guns are, in essence, paintball guns that fire rounds containing . . . pepper spray. . . . They break open on impact . . . [producing] an effect similar to mace or pepper spray. Pepperballs therefore combine the kinetic impact of a projectile with the sensory discomfort of pepper spray." *Id.* at 873.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

blindness," multiple surgeries, and forced withdrawal from UC Davis "due to the loss of his athletic scholarship." *Id.*

The Circuit concluded that the use of force in this case "was unreasonable and resulted in a violation of the Fourth Amendment." *Id.* at 883. First, the severity of the government's intrusion by use of a pepperball projectile which resulted in "serious and permanent injury to one or more individuals" was "substantially more than a minimal intrusion." *Id.* Second, the government's interest in clearing the apartment complex of party goers was not "sufficient to justify the use of force at issue." *Id.* There was no evidence that plaintiff "posed a risk to the officers or any other persons; the officers had no interest in arresting them; and the group engaged in passive resistance, at most, by failing to immediately disperse if and when such an order was given." *Id.* Third, even when considering "all the partygoers as a single entity," the force used "could not have been justified by the government's interest in stopping any and all disorderly behavior." *Id.*; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) ("Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."); *id.* at 1284 (so holding for a "cloth-cased shot, which is something akin to a rubber bullet.").

*Nelson* and *Deorle* are both controlling authority regarding the police use of rubber bullets or other similar so called "non-lethal" projectiles and require a serious governmental interest before such force can be deployed. Rubber bullets and similar projectiles can cause serious harm to persons, including blindness and permanent debilitating injuries. *Nelson*, 685 F.3d at 873; *Deorle*, 272 F.3d 1285. As in *Nelson*, indiscriminately using rubber bullets or other projectiles on non-violent protesters to effectuate the dispersal of a crowd plainly constitutes excessive force in violation of the Fourth Amendment in these circumstances.[8]

---

[8] *See also, e.g.*, *Fisher v. City of San Jose*, No. C-01-21192 PVT, 2003 WL 27384298, at *9 (N.D. Cal. Sept. 18, 2003) (holding that shooting unarmed misdemeanor suspect who

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The group Physicians for Human Rights (PHR) conducted studies on less lethal munitions and other crowd-control weapons.  The PHR report on kinetic impact projectiles (KIPs), which include rubber and plastic bullets, states:

> KIPs in general are not an appropriate weapon for crowd managements and specifically for dispersal purposes.  Most cannot be used effectively and safely against crowds. At close ranges, levels of lethality and patterns of injury of some KIPS become similar to those of live ammunition.  At longer ranges, KIPs are inaccurate and indiscriminate.  Some KIPs are lethal in close range and ineffective at longer distances which make safe use difficult.[9]

LASD used KIPs at longer ranges, which caused them to be inaccurate and indiscriminate.  LASD used KIPs at close ranges, which constituted lethal force.  LASD used KIPs on protesters who were leaving the area and hit dozens of protesters in the back as they fled.  (*See* Decl. of Alex McElvain ("McElvain Decl.") at ¶¶ 8-9).

LASD's indiscriminate use of less lethal projectiles, flash grenades, tear gas, and other chemical agents violates LASD's own policies regarding use of force.[10]  First, LASD's use of forces was unauthorized in light of known circumstances.  LASD Use of Force Policy section 3-10/020.00 regarding unauthorized use of force reads:

> Department members are authorized to use only that amount of force that is objectively reasonable to perform their duties.  "Objectively reasonable" means that Department members shall evaluate each situation requiring the use

---

did not obey officer's commands in the leg with a rubber bullet constitutes excessive force); *Abay v. City of Denver*, No. 20-cv-01616-RBJ, 2020 WL 3034161 at *3 (D. Colo.  2020) (holding that plaintiffs showed likelihood of success on excessive force claim involving use of rubber bullets on protesters).

[9] Physicians for Human Rights, "Health Impacts of Crowd-Control Weapons: Kinetic Impact Projectiles (Rubber Bullets)", Physicians for Human Rights website (January 1, 2017), https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-kinetic-impact-projectiles-rubber-bullets/.

[10] Los Angeles County Sheriff Use of Force Policy, http://shq.lasdnews.net/content/uoa/EPC/force-policy.pdf.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

> of force in light of the known circumstances, including, but not limited to, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the member or others, and whether the suspect is actively resisting, in determining the necessity for force and the appropriate level of force.  Department members maintain the right to self-defense and have a duty to protect the lives of others.

The LASD's use of force in the recent protests was unreasonable given that the protesters were largely peaceful; there was no threat to the lives of deputies or others; and LASD provided no warning or dispersal order prior to use of force.  LASD's use of force was solely punitive and retaliatory in nature.

Secondly, the LASD's use of chemical agents including tear gas and pepperballs was in violation of its own use of force policy regarding use of chemical weapons, which states, "CS chemical agents shall not be employed, or their use threatened, to disperse demonstrators or others who are not actually endangering public safety and security." *Id*. To reiterate, the protesters were largely peaceful; there was no threat to the lives of deputies or others; and LASD provided no warning or dispersal order prior to use of chemical weapons.

### 4. The LASD's Indiscriminate Use of Tear Gas, Flash Grenades, and Other Chemical Agents Against Peaceful Protestors is Objectively Unreasonable.

As Plaintiffs have shown, the LASD engaged in undeserved and indiscriminate use of flash grenades, tear gas, and other chemical agents against peaceful protestors—as well as legal observers and journalists—which can cause serious injuries.  The risk of injury is especially heightened during the COVID-19 pandemic where tear gassing can contribute to the spread of a potentially lethal virus.  As described above, LASD deputies, without provocation and without sufficient warning or any warning at all, began deploying tear gas. (*See, e.g.,* Franco Decl. at ¶¶ 20-22); (O'Neil Decl. ¶ 26); (Tinnell Decl. at ¶ 19).  LASD deputies, without provocation and without sufficient warning or any warning at all, also

threw flash grenades into the crowd. (*See, e.g.,* Mischo Decl. at ¶¶ 5,12) (McDonald Decl. at ¶¶ 6-7).

Applying the same *Graham* factors discussed above to the LASD's documented, repeated use of tear gas and flash grenades against peaceful protesters compels the conclusion that deployment of these tactics is also objectively unreasonable and therefore violates the Fourth Amendment.  Importantly, LASD's use of chemical agents, such as tear gas, and flash grenades constitutes significant force.  *See Anti Police-Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2020 WL 4584185, at *13 (N.D. Cal., Aug. 10, 2020) ("chemical agents, less lethal projectiles such as rubber bullets and flashbang grenades – constitute significant force.") (citing *Young v. City of Los Angeles*, 655 F.3d. 1156, 1161 (9th Cir. 2011)).

First, chemical agents and flash grenades are a type of "intermediate force" that is "capable of inflicting significant pain and serious injury" and therefore constitute a "significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161 (9th Cir. 2011) (citing *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005); *United States v. Mohr*, 318 F.3d at 623 (4th Cir. 2003); *see also Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) (acknowledging "the inherently dangerous nature of [a] flash-bang device").  Lab studies have not shown what effects tear gas can have on women, children and people with preexisting conditions. [11]  Outside of the lab, tear gas can cause prolonged damage in people with asthma and potentially contribute to miscarriages.  *Id.* It has been demonstrated that tear gas canisters can be lethal if fired at protesters' head, as they were in Iraq in October and November 2019.  *Id.*  Flash bang grenades are documented to have caused injuries and deaths, including burns and fatal heart attacks. *Id.* The intrusion for chemical agents is particularly heightened during the COVID-19 pandemic, where "the use of tear gas under these circumstances may put protestors' health at risk, contributing to the

---

[11] Kelsey D. Atherton, What 'Less Lethal' Weapons Actually Do, Scientific American website (June, 23, 2020), https://www.scientificamerican.com/article/what-less-lethal-weapons-actually-do/.

increased, widespread infection of this lethal virus." *Don't Shoot Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2020 WL 3078329, at *4 (D. Or., June 9, 2020).

Second, with regard to the governmental interest in the use of force, the single "most important" factor to examine is "whether the individual posed an immediate threat to officer or public safety." *Young*, 655 F.3d 1163. By definition, individuals engaging in peaceful protest pose no threat to officers or to public safety. Moreover, given the at-most minimal severity of the "crime" (i.e., failure to follow a dispersal order), and the lack of any attempt to evade or resist arrest, it is clear that this factor also compels the conclusion that using tear gas against peaceful protesters is objectively unreasonable. *Cf. id.* at 1164–65 ("Young's failure to wear a seatbelt was a run-of-the-mill traffic violation that clearly provided little, if any, support for the use of force upon him. . . . And while disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies. . . . When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force.") (citations omitted); *Boyd*, 374 F.3d at 779 (holding that officers cannot blindly throw a flash-bang device "into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury").

As described in Plaintiffs' declarations, "it is not clear that the crowd was refusing to disperse as there is evidence that they may have been given insufficient time to respond or no warnings at all, or they could not hear the warnings." *Anti Police-Terror Project*, 2020 WL 4584185, at *13. Indeed, in several instances, LASD deputies continued firing on demonstrators as they were retreating. (*See, e.g.,* McElvain Decl. at ¶¶ 8-9), (Tinell Decl. at ¶ 26), (McDonald Decl. at ¶ 9). More, Defendants cannot justify such indiscriminate use of tear gas and flash grenades on the basis that there was any purported violence occurring

during that time. *Don't Shoot Portland*, WL 3078329, at *3 (finding significant that "[t]here is no record of criminal activity on the part of Plaintiffs"). "To the contrary, there is even evidence that some protesters were confronted with tear gas while trying to follow police orders and leave the demonstrations." *Id.* Even if (as Defendants will be sure to argue) one or more protesters threw water bottles at the deputies, that does not automatically convert the other innocent non-violent demonstrators into legitimate targets of less lethal projectiles. (*See* Clark Decl. at ¶ 19-20).

Finally, balancing the level of the intrusion against the government interest in the use of force, *Young* compels the conclusion that the LASD's indiscriminate deployment of flash grenades and chemical agents, such as tear gas, is objectively unreasonable. *See id.* at 1166–67 ("Our conclusion comports with the logical notion that it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety.").

**C.   A Temporary Restraining Order and Preliminary Injunctive Relief Are Urgently Needed and Well-Justified to Put an End to These Unconstitutional and Life-Threatening Practices.**

In light of the ongoing nature of the protests against police brutality at the hands of the LASD, as well as the unfortunate likelihood that additional incidents of racially-charged police brutality will catch the attention of an already incensed and increasingly attentive public, the issuance of a temporary restraining order and preliminary injunctive relief with regard to the LASD's indiscriminate use of "less-lethal" projectiles and tear gas, flash grenades, and other chemical agents is well-warranted here.

First, as demonstrated above, Plaintiffs are highly likely to succeed on the merits of their claims. The use of rubber bullets and other similar projectiles on non-violent protesters violates their constitutional rights and therefore the LAPD should be enjoyed from using such projectiles against peaceful protesters. *See Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D. Colo. 2020) (granting preliminary injunction enjoining Denver police from using "less-lethal" projectiles to target the head, back or pelvis area and ordering that "non-

16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

lethal or less-lethal projectiles shall not be shot indiscriminately into a crowd."); *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 WL 3128299, at *5 (W.D. Wash. June 12, 2020) (granting TRO to enjoin Seattle police from employing "projectiles of any kind [including h-bang grenades, "pepper balls," "blast balls," rubber bullets, and foam-tip projectiles] against persons peacefully engaging in protests or demonstrations."); *Anti Police-Terror Project*, 2020 WL 458418, at *12 (enjoining, *inter alia*, firing rubber bullets or similar projectiles at protestors).

Similarly, the LASD's practice of indiscriminately deploying chemical agents and flash grenades without warning violates clear guidance from the Ninth Circuit for the same reasons discussed above.

Second, in light of the potential for serious or even lethal injuries resulting from these practices, there is a clear possibility of irreparable harm in the absence of injunctive relief. *Cf., e.g.*, *Black Lives Matter Seattle-King Cty*, 2020 WL 3128299, at *4 ("Plaintiffs have established a threat of immediate, irreparable harm in the absence of a TRO. They have shown a likelihood of success on their First and Fourth Amendment claims, demonstrating that irreparable injury has already occurred."); *Abay*, 445 F.Supp.3d at 1294 ("Indeed, irreparable harm has already occurred in the form of physical injury and the suppression of speech.").

Finally, the balance of hardships and the public interest weigh strongly in favor of injunctive relief. Notably, "[w]hen the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Moreover, "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002)); *see also Abay*, 445 F.Supp.3d at 1293 ("Here, it is clearly in the public interest to protect plaintiffs' right to demonstrate, the media's ability to document that demonstration, and third parties' ability to render aid to demonstrators without threat of excessive force by

police.").[12]

### D.     __REQUESTED RELIEF__

Plaintiffs request the following injunctive relief to preserve their constitutional rights during future demonstrations:

1.     Defendants should be forbidden from indiscriminately using less-lethal projectiles, including rubber bullets, pepper balls, and other projectiles to disperse or otherwise control crowds of protestors. Such less lethal projectiles should only be deployed if there is a specific immediate threat to the safety of law enforcement personnel or others. Further, before deploying such projectiles into a crowd, the LASD should declare an unlawful assembly, and provide clear and reasonable notice to the crowd and a reasonable time for the crowd to disburse.

2.     Defendants should be forbidden from indiscriminately using tear gas, flash grenades, and other chemical agents or irritants to disperse or otherwise control crowds of protesters without adequate warnings and time for compliance. Such chemical agents should only be deployed after other efforts of containment have failed and after reasonable and audible warnings have been given that the protest has been declared an unlawful assembly. Further, after issuing such warnings, the LASD should give protesters a reasonable time in which to comply with any disbursement orders. Such chemical agents should not be used on protesters who are in the process of complying with the disbursement orders or not resisting arrest.

///

///

///

---

[12] Injunctive relief is also appropriate under the Bane Act for violations thereof. Cal. Civ. Code § 52.1(c).

## IV. <u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant this request for a temporary restraining order and a preliminary injunction.

Dated: September 21, 2020                          Respectfully submitted,

By: /s/ Jorge Gonzalez
Jorge Gonzalez
A PROFESSIONAL CORPORATION

Paul Hoffman
Michael D. Seplow
Aidan C. McGlaze
Kristina A. Harootun
John Washington
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

Carolyn Y. Park
LAW OFFICE OF CAROLYN PARK

Arnoldo Casillas
Denisse O. Gastélum
CASILLAS & ASSOCIATES

Morgan E. Ricketts
RICKETTS LAW

*Attorneys for Plaintiffs and Proposed Class.*
