PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
RAYMOND W. SAKAI, State Bar No. 193507
rsakai@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants
County of Los Angeles and Sheriff Alex Villanueva

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and Does 1-10 inclusive, <br><br> Defendants. | Case No. 2:20-cv-07870-DMG-PD <br><br> Honorable Dolly M. Gee <br><br> **DECLARATIONS OF PAUL B. BEACH, COMMANDER ROBERT J. LEWIS, CAPTAIN DUANE ALLEN, JR., LIEUTENANT DAMON A. JONES AND LIEUTENANT CHARLES L. McDANIEL IN SUPPORT OF OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER** <br><br> *[Opposition Memorandum and Evidentiary Objections filed concurrently herewith]* |

///

///

///

///

///

1

BERG\DECLS & EXHS

TO THE HONORABLE COURT, ALL PARTIES, AND TO THEIR ATTORNEYS OF RECORD:

Defendants County of Los Angeles and Sheriff Alex Villanueva hereby submit the following declarations and exhibits in Support of their Opposition to Plaintiffs' Ex Parte Application for a Temporary Restraining Order.

Dated:  September 28, 2020          LAWRENCE BEACH ALLEN & CHOI, PC


By _____ /s/  Paul B. Beach _____
        Paul B. Beach
        Attorneys for Defendants
        County of Los Angeles and
        Sheriff Alex Villanueva

BERG\DECLS & EXHS

1

# **INDEX**

| DECLARATIONS | | |
|---|---|---|
| | PAGES | DESCRIPTION |
| | 1 | Declaration of Paul B. Beach |
| | 2 - 16 | Declaration of Commander Robert J. Lewis |
| | 17 – 18 | Declaration of Captain Duane Allen, Jr. |
| | 19 – 21 | Declaration of Lieutenant Damon A. Jones |
| | 22 - 30 | Declaration of Lieutenant Charles L. McDaniel |
| EXHIBITS | | |
| EXHIBIT | PAGES | DESCRIPTION |
| A | 31 | YouTube videos |
| B | 32 - 35 | Pictures of vandalism to the LASD's South Los Angeles Station and weapons, shields, helmets and body armor recovered from protesters |
| C | 36 | Instagram videos |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

## <u>DECLARATION OF PAUL B. BEACH</u>

3      I, Paul B. Beach, declare as follows:

4      1.      I am an attorney at law duly licensed to practice before this Court

5 and all the courts of the State of California.  I am a member of the law firm of

6 Lawrence Beach Allen & Choi, PC, attorneys of record for Defendants County of

7 Los Angeles and Sheriff Alex Villanueva in the above-entitled action.  If called

8 upon as a witness, I could and would competently testify to the following facts as

9 personally known to me or upon information and belief.

10      2.      Attached hereto and incorporated hereby as Exhibit "A" are true and

11 correct portions of ONSCENE TV's YouTube footage of the August 31 protest at

12 the Los Angeles County Sheriff's Department's South Los Angeles Station.  The

13 full length video can be viewed at

14 https://www.youtube.com/watch?v=LIVXym2kaX4https://www.youtube.com/wa

15 tch?v=LIVXym2kaX4).

16      3.      Attached hereto and incorporated hereby as Exhibit "C" are true and

17 correct portions of Instagram posts related to the protests at the LASD's South

18 Los Angeles Station from the Instagram account "acatwithnews", user listed as

19 "Sean Beckner-Carmitchel", titled "South LA. I'm hit but ok", posted on

20 September 8, 2020.

21      I declare under penalty of perjury under the laws of the United States of

22 America and the State of California that the foregoing is true and correct.

23      Executed on September 28, 2020, at Glendale, California.

24

25                                      _____ /s/ Paul B. Beach _____

26

27

28

## **DECLARATION OF COMMANDER ROBERT J. LEWIS**

I, Robert J. Lewis, declare as follows:

1.      I am employed by the County of Los Angeles as a Commander with the Los Angeles County Sheriff's Department ("LASD" or "Department").  If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

### **Background**

2.      I have been employed with the LASD for over 35 years and my current assignment is as a Commander with the LASD's Special Operations Division ("SOD").  SOD is comprised of Aero Bureau, Emergency Operations Bureau, Metrolink Bureau, Special Enforcement Bureau, and Transit Services Bureau.  Through its various bureaus and details, SOD provides support to all LASD units and mutual aid assistance to outside agencies.  Additionally, SOD Headquarters maintains functional supervision of the Crisis Negotiation Team and the Muslim Community Affairs Unit.

3.      As part of SOD, the Emergency Operations Bureau ("EOB") is the primary resource for coordinating the LASD's response to natural disasters and complex emergencies, including civil unrest.  EOB works closely with county, city, state, and federal agencies and well as community resources to serve the needs of the public.

### **Respect For Constitutional Rights**

4.      Before addressing the many reasons that the Plaintiffs' proposed order is unnecessary and would threaten the safety of the public and LASD members, as set forth in greater detail below, the LASD recognizes as critical the ability of members of the public to exercise their First Amendment and other

civil rights.  Similarly, the LASD takes allegations of civil rights violations and deputy misconduct extremely seriously and such claims are thoroughly investigated, and corrective action taken when appropriate.

### **Plaintiffs' Claims**

5.    I am informed and believe that Plaintiffs have asked this Court to enter an emergency order generally prohibiting members of the Sheriff's Department from using what are commonly referred to as "less lethal" tools against persons at on-going protests in Los Angeles County.  Use of such tools is rare.  Over the period in question, at times during which there were daily protests, a vast majority of the protests and protesters have been peaceful, requiring no response by the LASD.  Use of less lethal tools in the incidents cited in Plaintiffs' Application were objectively reasonable under the totality of the circumstances in response to violent acts of protesters, threats to the general public's safety, destruction of property and refusal to disperse after an unlawful assembly had been repeatedly announced.  Further, the LASD does not train its deputies to indiscriminately use such tools against persons engaged in peaceful protests.

6.    The proposed prohibition on such tools would endanger the safety of the public, protesters and deputies by removing options for use of force preventative instruments, which deescalate the need to use greater force.  Removing the discretion to deploy such less lethal tools to address differing and often rapidly-evolving situations deputies are faced with will take away options for avoiding the use of greater direct or lethal force, which creates a greater likelihood of injuries to suspects and law enforcement personnel.

## **Every Large Public Gathering Presents Unique Circumstances**
## **And Use Of Force Is Rare**

7.　　　Every large public gathering, including protests and instances of civil unrest, presents unique issues dictating the appropriate responsive plan.  Further, in the field, in responding to these events, deputies are often faced with rapidly evolving situations involving threats to the public.  Underlying every deployment, however, is the paramount interest in respect for constitutional rights, protecting life, maintaining the public peace and protecting property, encapsulated by the LASD Core Values: "With integrity, compassion, and courage, we serve our communities—protecting life and property, being diligent and professional in our acts and deeds, holding ourselves and each other accountable for our actions at all times, while respecting the dignity and rights of all."

8.　　　During the time period relevant to Plaintiffs' Application, from approximately August 25 through today, there have been almost daily LASD responses to protests, an overwhelming majority of which were conducted by peaceful protesters exercising their First Amendment rights and required no use of force, let alone the alleged indiscriminate use of less lethal tools.

## **The Recent Unprecedented Civil Protests**

9.　　　Since late May 2020, there have been large nationwide public protests regarding multiple officer-involved shootings, law enforcement practices, and the desire by some members of the public for systemic changes and reform.  The scope and number of such protests have been unprecedented in recent history.  Thankfully, most of the protesters and many of the protests have been peaceful.  Unfortunately, some have become unlawful and violence against members of the public and law enforcement has resulted.  Certain large-scale protests in Los Angeles County devolved into coordinated mass looting, wanton destruction of public and private property and violent assaults against law

1   enforcement officers, which was well documented and broadcast live by local

2   television networks.

3        10.    On May 30, 2020, California Governor Gavin Newsom proclaimed a

4   state of emergency to exist in Los Angeles County.  In the Governor's

5   Proclamation of a State of Emergency, he stated that Los Angeles County and the

6   City of Los Angeles "have requested State assistance including the activation of

7   the California National Guard based on the civil unrest the City and County of

8   Los Angeles report and based on limited local resources."  The Governor further

9   stated that he determined "that local authority is inadequate to address the threat

10   posed by the civil unrest within Los Angeles County and the City of Los

11   Angeles."  Accordingly, the Governor mobilized the California National Guard

12   "to support response efforts in Los Angeles County and the City of Los Angeles."

13        11.    Similarly, on May 30, 2020, the Mayor of the City of Los Angeles

14   declared a Local Emergency within the City resulting from the civil unrest.  The

15   Mayor declared a Local Emergency because "while the majority of protesters

16   acted lawfully, there has been a significant amount of criminal behavior,

17   including violence against first responders and peaceful protestors, vandalism of

18   public and private property, looting of businesses, and failure to follow the lawful

19   dispersal orders of the Los Angeles Police Department."

20        12.    Furthermore, on May 30, 2020, the Chair of the Los Angeles County

21   Board of Supervisors proclaimed the existence of a local emergency because "the

22   County of Los Angeles is affected or likely to be affected by a public calamity

23   due to conditions of disaster or of extreme peril to the safety of persons and

24   property arising as a result of civil unrest in the County."

25        13.    In conjunction with the orders declaring a Local Emergency, both

26   the City of Los Angeles and the County imposed temporary curfews.  Los Angeles

27   County imposed a County-wide curfew between 6:00 p.m. and 6:00 a.m. of the

28   following day, June 1, 2020.  The County's curfew prohibited any person except

peace officers, fire fighters, National Guard, emergency medical personnel, the media, construction workers, homeless people, and people seeking medical treatment from being "upon a public street, avenue, boulevard, place, walkway, alley, park, or other public area, or any unimproved private realty, within the County between 6:00 p.m. and 6:00 a.m. of the following day."

14.     The first battalion of troops from the California National Guard arrived in Los Angeles on the morning of Sunday, May 31, 2020.

15.     Following the recent period of civil unrest, the LASD has observed, learned from and further trained to reasonably respond to the conduct and evolving tactics of small groups of violent protesters.

## August 25 and September 5-8, 2020

16.     Plaintiffs' Application refers to a few select protests that occurred on August 25 and September 5-8, 2020.  Over this time period to date, there have been numerous protests, including at times daily protests, that have been largely peaceful and most required no use of force by the LASD.

## The Sheriff's Response Team

17.     One of the units in the EOB is the Sheriff's Response Team ("SRT").  The SRT was developed to quickly respond to natural disasters, acts of terrorism, and pre-planned events that are potentially threatening and disruptive to public safety.  In order to assist local, state, federal and tribal governments, the SRT provides highly trained law enforcement personnel and specialized equipment needed during catastrophic events and protests to protect the public, ensure order and enforce laws.

18.     The SRT has been deployed to assist with crowd protection and management protection at large annual public gatherings such as the Rose Parade, West Hollywood LA Pride Parade, West Hollywood Halloween Carnival, Grand

Park July 4th Celebration, and New Year's Eve events.  The SRT has also been deployed to incidents for crowd management and in response to requests from neighboring jurisdictions for mutual aid.

19.    SRT platoons are staffed with a Captain, two Lieutenants, and nine Sergeants, who supervise four squads of Deputies.  For the incidents that are the subject of Plaintiffs' Application, when deployed, all personnel assigned to SRT are under the oversight of the weekly duty, tactical commander, and are in my direct chain of command and supervision.

20.    The SRT has been deployed across the Southern California, Los Angeles region, to respond to the recent civil unrest and to insure the safety of peaceful protesters, the general public and to protect both public and private property.  During August 25 through September 19, the SRT was deployed nearly 20 times to monitor protests and, if necessary, to respond to unlawful activity.  On only five of those deployments did the unlawful conduct of a select group of protesters necessitate the use of less lethal tools.

21.    In fact, since the SRT's inception in 2007, prior to the end of May 2020, it has deployed less lethal tools only once, which was in response to rioting following the 2009 Lakers' post-championship celebration in East Los Angeles.

### August 25, 2020 - Hall of Justice

22.    On August 25, 2020, the SRT was deployed to downtown Los Angeles in advance of a large scheduled protest, including information regarding the potential for acts of violence and vandalism following protests on July 26, 2020, where windows were broken at the First Street Federal Courthouse and two other Federal Buildings.  Further, the night before, on August 24, 2020, protesters had clashed with Los Angeles Police Department officers in front of the LAPD's Headquarters on First Street.

23.    As explained in detail in the Declaration of Lieutenant Damon A.

Jones filed concurrently herewith, while deputies were taking up a defensive line position near the intersection of Temple Street and Broadway next to the Hall of Justice, they were met by a large group of protesters. Protesters threw various objects, including, but not limited to, a tire iron, metal pole and spray paint can. In response and in order to protect themselves, deputies deployed brief rounds of less than lethal tools. The sound of the tire iron hitting the street can clearly be heard in the videos submitted by Plaintiffs. The violent conduct of certain protest members did not allow time for a dispersal order or warning. Shortly thereafter, the crowd dispersed without further incident.

## August 31 to September 12, 2020 – South Los Angeles Station

24.     Nearly two weeks of daily protests at the LASD's South Los Angeles Station ("Station") followed the August 31, 2020 deputy-involved shooting of Dijon Kizzee. There was no use of less than lethal tools during the August 31, September 1, 2, 3, 4, 9, 10, 11, and 12, 2020 protests.

25.     As explained in detail in the Declaration of Captain Duane Allen, Jr. filed concurrently herewith, SRT was deployed to the Station because diversion of the Station's limited resources to address the protests was creating a public safety concern because it was affecting response time to calls for assistance from the public. Although faced with vandalism, property destruction and protesters aiming high-powered strobe flashlights directly into the deputies' eyes, there was no use of less lethal tools as the crowds complied with dispersal orders.

26.     As explained in detail in the Declaration of Lieutenant Charles L. McDaniel filed concurrently herewith, on September 5 through 8, 2020, an identifiable pattern emerged among the violent protesters. After hours of peaceful protest, most of the protesters left the area. A smaller group, many outfitted with shields, umbrellas, helmets, googles and body armor, remained late into the night.

27.     When circumstances allowed and it was feasible, the LASD provided repeated dispersal orders and a reasonable time for any remaining protesters to leave prior to employing any less than lethal tools.  However, based on the violent acts of the remaining protesters and/or to prevent destruction of property, dispersal orders and warnings were not always feasible.

28.     During the protests, weapons, including smoke grenades, illegal explosive fireworks, and shields, body armor and helmets were recovered from some of the protesters, as described in Captain Allen's Declaration.

**The LASD Does Not Condone, And Specifically Prohibits, Excessive Use of Force**

29.     Importantly, the LASD in no way, shape, or form condones excessive use of force against protesters.  In fact, the opposite is true: the LASD specifically prohibits its members from using force contrary to law.  Moreover, as explained below, the LASD dedicates significant resources and efforts to prevent, investigate and, if necessary, punish Department members for improper use of force.

**It Is Critical For The Public's Safety That The LASD Have Less Lethal Tools To Deescalate Violent And Potentially Life-Threatening Situations**

30.     As stated above, use of less lethal tools by the LASD is very rare, consisting of an exceedingly small percentage of the LASD's policing of public protests over the decades.

31.     As I further discuss below, given the LASD's policies regarding the use of less lethal tools and the utility of these devices, depriving deputies of use of these tools would severely undermine the LASD's ability to protect protesters, the general public, deputies and public and private property.

32.     The LASD, County and members of the public would be negatively affected if less lethal tools were taken away, as they are an important tool which maximize the LASD's ability to reduce the potential for a greater use of force, repel attacks, disperse unlawful assemblies and protect the public and deputies.

33.     Less than lethal tools provide an invaluable force preventative option to deescalate dangerous situations that have great potential for or are actually violent and life threatening.  It is the LASD's experience is that if individuals in a crowd who have committed acts of violence or vandalism and incite additional such acts are not appropriately addressed, they can increase the intensity of other members of the crowd who would not ordinarily engage in such illegal acts. Example of such contagious violent crowd group-think mentality has been seen where one or two violent individuals begin to strike a passing vehicle, or police vehicle.  As onlookers see that there is no intervention or consequence for the violent conduct, it triggers more individuals to do the same, which often results in escalation to more vandalism and/or arson.  Allowing group violence to escalate without less lethal intervention increases the potential for more violent and/or lethal confrontations when such behavior is directed at, and/or endangers people, including members of the general public, peaceful protesters, law-enforcement and public safety in general.

34.     Although Plaintiffs' Application refers to less lethal tools generically, they cannot be analyzed monolithically.  Rather, the LASD utilizes various tools, with different capacities, in varying circumstances.  Use of any particular tool is dictated by the unique circumstance presented by the situation in the field.

       a)     PepperBalls, similar to commercially available paint gun balls, are a tool which can be used as an accurate target specific device or for area saturation that can enable deputies to deploy chemical dust from a distance.  The powder is similar to standard OC spray that may be

purchased at sporting goods stores, and is designed to temporarily irritate the mucous membranes in an individual's nose, eyes, throat and lungs, to disorient an attacker.  Additionally, the sound made when the PepperBall launcher is fired is often enough to gain compliance without the further use of force.  If this tool was not available, deputies would have to come into close physical contact with an individual, mandating a physical confrontation if noncompliant, which poses a greater potential for injuries to the suspect and deputies.

The LASD needs the ability to use projectiles that are not target specific to address circumstances presented during mobilization.  For example, during the recent period of civil unrest deputies encountered a situation in which members of the crowd, with their hands up, lined up across a street in front of a violent group.  The group with their hands up was not necessarily being violent; but they were acting as a skirmish line, similar to a human shield, for violent individuals behind them who were throwing large pieces of concrete, rocks, bricks and glass and plastic bottles, commercial grade fireworks and other projectiles at deputies, as well as damaging property.  The ability to utilize a non-target specific device that can skip across the ground behind a group or skirmish line like this is critically important to assist deputies in stopping violent behavior which can lead to further destruction and escalated civil unrest.

b)      The LASD does not use or deploy rubber bullets.  Mistakenly referred to as such, 40MM crushable tip foam rounds are an accurate target specific device that may enable deputies to use a less lethal force option at individuals from a great distance (120 feet) and stop violent actions while removing or limiting the risk to uninvolved persons nearby.  If this tool were not available, numerous deputies would have to move into a group of

individuals, some of whom may not be committing acts of violence, in order to stop the violent actions of a single individual.

c) Inert rubber ball blast grenades, commonly referred to as a "flash bang", are crowd management tools that deliver bright light and loud sound stimuli. They are not projectiles, they are thrown by hand. If this tool was not available, deputies would have to come into close physical contact with an individual, creating the potential for a physical confrontation, in order to gain compliance.

d) CS gas canisters are another hand thrown device that is an "area denial" tool used to disperse unruly and/or violent crowds. As with the other tools, wholesale prohibition elevates the risk of direct contact between groups of violent protesters and law enforcement, raising the risk of injuries.

### The Department Goes To Great Lengths
### To Prevent Civil Rights Violations

35. The LASD exercises great care to prevent civil rights violations. Those efforts begin before Department members are hired and continue throughout the course of employment.

a) Recruitment – The LASD works very hard to recruit honest, compassionate, and hard-working people who were capable of learning, following instruction, and using good judgment. The LASD has criteria and a process that is designed and implemented to recruit these types of people. The LASD also does extensive screening of applicants that includes, without limitation, an extensive background check that includes a criminal history check, motor vehicle check, credit check, employment check, and reference check. The screening employed by the LASD for its applicants is at least as rigorous as that required to obtain a top secret security clearance with a government agency. In addition, the LASD

subjects its applicants to a variety of written and oral exams.  While no organization or system is perfect, my experience is that the LASD's recruitment efforts help supply the Department with personnel who were ready, willing and able to help the Department achieve its goals, including that of protecting civil rights;

   b) Academy Training – Those entry-level LASD candidates who meet the criteria of the recruiting process are required to attend and successfully complete a full-time 19-week Academy School before they become a deputy and work in the LASD's jail facilities.  The Academy operated by the LASD is approved by the Commission on Peace Officer Standards and Training ("POST"), as required by the State of California.  Other law enforcement agencies also send their officers to the LASD Academy.  At the Academy, candidates receive extensive training regarding the LASD's policies and practices, as well as well-established law enforcement techniques.  This schooling includes how to interact with members of the public and their exercise of their First Amendment rights;

   c) Custody Training – Those candidates who successfully complete the Academy are then usually assigned to a custody facility.  When they report to their assigned facility, new deputies are first required to take and pass an 80-hour jail operations course, which includes more-detailed law enforcement training specific to the custody environment.  This training includes, without limitation, how to follow the LASD's policies and practices applicable to custody facilities, including how to allow inmates to raise and resolve complaints that they may have. After this course, each new deputy was then assigned a training deputy for a period of approximately 12 weeks.  In addition, Sergeants and Lieutenants assigned to a custody facility are also required to attend and complete a two-week POST approved Supervisor's School, which covers how supervisor personnel should operate in the custody environment.  These same supervisor personnel are also afforded a 40 hour Custody Incident Command School, which specifically focuses on how to respond to emergencies;

     d)     Patrol Training – LASD personnel who are assigned to patrol are also required to complete six months of patrol training (i.e., on the job training in the patrol environment) with a minimum of two different Field Training Officers. Only those Department members who successful complete this training are allowed to be assigned to work the streets with members of the public;

     e)     In-Service Training – LASD personnel are also required to complete at least 24 hours of in-service training (i.e., on the job training) per year. This training may include, without limitation, such subjects as dealing with members of the public and how to use only that force which is objectively reasonable under the totality of the circumstances.

     f)     Supervision – The LASD, which is the largest Sheriff's Department in the world, also has a management structure that organizes responsibilities and personnel so that the Department's policies are successfully implemented.  This structure includes layers of direct supervision, so that every deputy is supervised by a higher-ranking member of the Department, and that those supervisors are overseen by other higher-ranking Department members, and so on, up to the Sheriff.  These supervisor personnel also receive annual management training.

36.     The Department also has in place a variety of policies and procedures that govern the conduct of Department personnel.  The Department's use of force policy states, "Department members shall use only that force which is objectively reasonable.  Unreasonable force is force that is unnecessary or excessive given the totality of the circumstances presented to the Department members at the time the force is applied.  Unreasonable force is prohibited."

**The Department Investigates And Holds Its Members Accountable For Excessive Force.**

37.     The Department also investigates and, if corrective action needs to

be taken, punishes Department members for improper uses of force.  This process can occur in three different ways, depending upon the nature and severity of the accusation.  If the suspected wrongdoing by LASD personnel is relatively minor, then the accusation will be investigated and addressed at the unit level (e.g., a Department station).  This means that, for example, the Captain of a Department Station will personally supervise and review the investigation and take any and all necessary corrective action against the subject Department member.  If the suspected wrongdoing is of a more serious nature, then the matter will be referred directly to the LASD's Internal Affairs Bureau ("IAB") for investigation.  IAB, which is staffed by trained and experienced supervisors, will conduct a thorough investigation (including interviewing all key witnesses, including the purported victim and involved Department personnel).  If it is determined that the involved Department personnel violated any Department policy, then appropriate discipline (including, if appropriate, termination) will be imposed.  Finally, if the alleged misconduct rises to the level of criminal activity, then the matter will also be referred to the Department's Internal Criminal Investigations Bureau ("ICIB"), which specifically investigates criminal activity by law enforcement.  A complete criminal investigation will be conducted and if it reveals criminal wrongdoing, then the results of the investigation will be referred to criminal prosecutors for their determination as to whether to file criminal charges.

**Members of the Public Have Multiple Avenues Of Relief If They Feel That They Have Been Subject To Abuse By Department Members**

38.     Protesters who feel that they have been mistreated while at demonstrations have several means of obtaining relief.  For example:

a)     <u>Access to Staff and Supervisors</u> – If a member of the public believes that he or she has been mistreated by a Department member, that person has access to other Department members, including supervisors who are assigned

1  to every patrol station in our jurisdiction.

2        b)   <u>Citizen's Complaint Forms</u> – Similarly, persons who wish to

3  make a formal complaint with the Department about the conduct of deputies may

4  complete and turn in a citizen's complaint form.  These complaint forms are

5  available in every station, as well as the Department's website.

6        c)   <u>Ombudsman</u> – In accordance with the County Code, the

7  County also has an Office of the Ombudsman, which is a neutral third-party that

8  is specifically trained and devoted to hearing and responding to complaints about

9  the Department.

10        d)   <u>Government Code Tort Claim</u> – Furthermore, protesters may

11  also file a tort claim against the Department pursuant to the California

12  Government Code.

13        e)   <u>Civil Lawsuit</u> – Finally, protesters who believe that their

14  rights have been violated by the Department or its members may also pursue civil

15  litigation in either federal or state court.

16      39.   The Department acknowledges Plaintiffs' stated concerns, greatly

17  appreciates the Court's involvement in these extremely important issues, and is

18  more than willing to address any of the Court's concerns or answer any if its

19  inquiries.  However, I firmly believe that the Plaintiffs' proposed order is

20  extremely overbroad, not justified and, more importantly, if the Court entered the

21  order, there would be significant negative consequences, both foreseen and

22  unforeseen, to members of the public (including peaceful protesters), as well as

23  members of the Department.

24      I declare under penalty of perjury under the laws of the State of California

25  that the foregoing is true and correct.

26      Executed on September 28, 2020, at Los Angeles, California.

27

28                                 _____
                                Robert J. Lewis

1

## <u>DECLARATION OF CAPTAIN DUANE ALLEN, JR.</u>

2

3        I, Duane Allen, Jr., declare as follows:

4        1.        I am employed by the County of Los Angeles as a Captain with the

5   Los Angeles County Sheriff's Department ("LASD" or "Department").  If called

6   upon as a witness, I could and would competently testify to the following facts as

7   personally known to me or upon information and belief.

8        2.        I have been employed with the LASD for 32 years and since April

9   2019, I have been Captain of the LASD's South Los Angeles Station ("Station").

10        3.        In over three decades with the LASD, my experience is that use of

11   less than lethal tools, such as foam rounds, pepperballs and inert light/sound

12   distraction devices, in response to protests is extremely rare.

13        4.        Nearly two weeks of daily protests at the Station followed the

14   August 31, 2020 deputy-involved shooting of Dijon Kizzee.

15        5.        On the night of August 31, 2020, a large group of protesters gathered

16   at the Station, in front of which Deputies were positioned to form a defensive

17   line.  During the protest, the crowd became boisterous, closed the distance from

18   and stood face-to-face directly in front of the Deputies.  As documented in video

19   uploaded to YouTube, some of the protesters began aiming high-powered

20   strobing flashlights directly into the deputies' eyes in an attempt to blind, injure

21   or otherwise harass them.  As also shown in the video, some members in the

22   crowd damaged and vandalized with graffiti Station property and surrounding

23   areas.  (Attached hereto as Exhibit "A", is a true and correct copies of clips from

24   ONSCENE TV's YouTube footage of the August 31 protest.  The full length

25   video can be viewed at

26   https://www.youtube.com/watch?v=LIVXym2kaX4https://www.youtube.com/wa

27   tch?v=LIVXym2kaX4 ).

28

1      6.     At approximately 11:00 p.m., after the crowd entered Imperial

2  Highway, endangering themselves and motorist, an unlawful assembly was

3  declared and dispersal order announcements were made.  After several minutes,

4  the crowd began to disperse.

5      7.     On September 1, 2020, at approximately 5:30 p.m., a large crowd

6  gathered in front of the Station, again entering onto Imperial Highway.  After

7  approximately two hours, the protesters left without any significant incident.

8      8.     During the first two days of protests, Station response times for

9  emergent and priority calls were delayed due to the need to divert resources to

10  insure the safety of the general public and protesters.

11      9.     Due to the high-demand on limited Station resources, deployment of

12  the Sheriff's Response Team was requested.

13      10.    The protests at the Station were largely peaceful.  On August 31,

14  September 1, 2, 3, 4, 9, 10, 11, and 12, 2020, no deployment of less than lethal

15  tools was necessitated by the protesters' conduct.

16      11.    Attached are pictures of some of the vandalism committed during the

17  protests and protester items recovered, including smoke grenades, illegal

18  explosive fireworks, shields, body armor and helmets.  (Attached hereto as

19  Exhibit " **B** " are true and correct copies of pictures of the vandalism that

20  occurred and items recovered during the protests).

21     I declare under penalty of perjury under the laws of the United States of

22  America and the State of California that the foregoing is true and correct.

23     Executed on September 28, 2020, at <u>Los Angeles</u>, California.

24

25

26                  Duane Allen, Jr.

27

28

**DECLARATION OF LIEUTENANT DAMON A. JONES**

I, Damon A. Jones, declare as follows:

1.     I am employed by the County of Los Angeles as a Lieutenant with the Los Angeles County Sheriff's Department ("LASD").  If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2.     I have been employed with the LASD for 24 years and am currently assigned as a Lieutenant at LASD Professional Standards Division Headquarters.

3.     I am also a member of the LASD's Sheriff's Response Team ("SRT"), and have been so since 2007.  Prior to the recent unprecedented civil unrest, in 13 years, I had never been on a SRT deployment where less lethal munitions were used.

4.     On August 25, 2020, the SRT was deployed to downtown Los Angeles in advance of a large scheduled protest.  On August 24, 2020, the night before, protesters had violently clashed with Los Angeles Police Department officers in front of the LAPD's Headquarters on First Street.  Prior to our deployment we reviewed information regarding the potential for acts of violence and vandalism similar to the July 26, 2020 protests where windows were broken at the First Street Federal Courthouse and two other Federal Buildings.

5.     We initially went to the Hall of Justice, but followed the protesters to the LASD's Men's Central Jail, where protesters gathered and dispersed without incident.

//
//
//
//
//

6.     Thereafter, the protesters returned to the area near the Hall of Justice.  We also responded to the Hall of Justice, and tried to set up protection on the west side, near the intersection of Temple Street and Broadway.  While we were trying to set up a defensive line, we were confronted by a large group of protesters.  Some in the crowd were carrying wood and plexiglass shields and wearing helmets, goggles and gloves.

7.     Closing the distance to within approximately 25 feet of the deputies, some in the crowd threw various objects, including a tire iron, metal pole, spray paint can, rocks and water bottles.  In response and in order to protect themselves, deputies deployed brief rounds of less lethal tools at the individuals throwing the objects and at the ground near those individuals.

8.     The sound of the tire iron hitting the street prior to the deployment of less lethal rounds can clearly be heard in the videos submitted by Plaintiffs.

9.     Based on the sudden violent conduct of the crowd, there was no opportunity to provide a dispersal order or warning.

10.    Thereafter, there was no need for use of any less lethal tools for the rest of the night.

//
//
//
//
//
//
//
//
//
//

1          I declare under penalty of perjury under the laws of the State of California

2   that the foregoing is true and correct.

3          Executed on September 27, 2020, at Los Angeles, California.

4

5          Damon A. Jones

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF LIEUTENANT CHARLES L. McDANIEL

I, Charles L. McDaniel, declare as follows:

1.    I am employed by the County of Los Angeles as a Lieutenant with the Los Angeles County Sheriff's Department ("LASD" or "Department").  If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2.    I have been employed with the LASD for 32 years and am currently assigned as a Lieutenant at LASD's South Los Angeles Station.  I am also a member of the LASD's Sheriff's Response Team ("SRT"), and have been so since 2016.  When deployed, for each squad, I directly supervise four Sergeants and a team of approximately 56 deputies.

4.    On September 5, 7 and 8, 2020, I commanded SRT squads outside of the South Los Angeles Station.

5.    On **September 5, 2020**, several SRTs deployed to South Los Angeles Station:

   A)    One of our goals was to protect the Station's perimeter. Barrier wire was placed in the northern portion of the Station parking lot to prevent protesters from entering the Station property.  The barrier wire had affixed yellow marked police (police do not cross) tape, and was reinforced with zip ties, to try to ensure that it was not breached.

   B)    We positioned Squad Transport Vehicles ("STV") and deputies in front of the Station facing north.

   C)    Protesters arrived and positioned themselves on Imperial Highway in front of the Station.  Deputies maintained their position and did not make contact with protesters, the size of which was estimated to be approximately 250 to 300 people.  The protesters were yelling, waving flags and signs and conducting generally themselves in a peaceful but

agitated manner.  Over the course of several hours, different factions of protesters would arrive and leave.  After several hours, the protesters left the Station and walked eastbound on Imperial Highway.

D)      Some protesters returned a couple of hours later and positioned themselves on the east end of the parking lot in front of the Station.  Over time, numerous protesters approached the barrier wire and taunted deputy personnel as other protesters attempted to defeat the barrier wire by cutting the connecting links.  Multiple warnings were given to the protesters not to touch the barrier wire and to back away, which were ignored.  At one point, a large umbrella was placed over the barrier wire as several protesters concealed themselves behind it in an effort to cut their way through the barrier wire connections.

F)      As a result of their escalated hostile actions, we fired a short burst of pepper-ball rounds into the ground in front of the umbrella's location, and additional commands were given to not touch the barrier wire and to move away from the area.

G)      Suddenly, the protesters began to throw items (e.g., chucks of concrete, rocks, glass bottles, frozen water bottles, fireworks) at the deputies and Station.  In response, deputies deployed less than lethal tools at the protesters who were assaulting us.  Also, the protesters were given orders over the loudspeakers to stop throwing items and leave, along with specific instructions to disperse by going east or west on Imperial Highway.

H)      The use of the less lethal tools and tactics was effective and caused the violent protesters to stop throwing objects and leave the area. No additional less lethal tools were deployed.

I)      The protesters dispersed into the surrounding neighborhood. We did not follow the protesters into the neighborhood, and no protesters were arrested.  Station personnel recovered rocks, concrete chunks, steel bars, bottles and exploded fireworks from around the Station area.  At no time did any protester identify themselves as being injured, nor did anyone approach the Station and request to speak to a supervisor.

6.      On **September 7, 2020**, several SRTs deployed to the area near South Los Angeles Station:

A)      Two SRT squads were positioned on Imperial Highway at the intersection of New Hampshire Avenue, which is to the east of the Station. Because the protesters at this location were peaceful, there was never any need to use less lethal tools.

B)      Two additional SRT squads were positioned on Imperial Highway at the intersection of Normandie Avenue, which is to the west of the Station.

C)      Security barrier wire was set up at the north/south crosswalk of Imperial Highway as it intersects with Normandie Avenue; yellow police tape was affixed to the barrier wire and the do not cross labeling on the tape was clearly visible.  On the northeast corner of the intersection, there is a small strip mall and parking lot, with an adjacent north/south alleyway.  The strip mall parking lot is slightly elevated and there is a waist level brick wall that separates the alley from the parking lot and the adjacent sidewalk.

D)      SRT personnel and their two STVs faced the northwest, in the direction of the strip mall.  A black and white patrol vehicle was additionally placed in the mouth of the alleyway on Imperial Highway facing north.

E)     Eventually, a large group of protesters (approximately 250 to 300) formed in the intersection of Imperial Highway and Normandie Avenue and were blocking vehicle traffic.  Additionally, numerous protesters (125 to 150) gathered in the strip mall parking lot.  As a result, SRT personnel were surrounded on two sides.

F)     As the evening progressed, agitators began to incite the crowd and several protesters attempted to defeat the connecting mechanisms of the barrier wire, and tore away the police tape affixed to it.

G)     Moreover, the protesters in the alleyway adjacent to the strip mall began to push a grocery cart and large metal sign in our direction. They were using the sign and shopping cart as cover and to hide behind. The protesters would suddenly pop up into view and simulate throwing items in our direction in hopes of eliciting a response from us.  Deputies removed the sign and shopping cart from the protesters without incident

H)     Shortly after the sign and shopping cart were removed, hostile protesters began to push a large wooden desk down the alleyway in our direction.  The large wooden desk was quickly pushed within 10 to15 feet of the deputies.

I)     A short time later, several protesters began to throw objects at us from the mini mall parking lot.  I could see frozen water bottles, pieces of concrete, bricks and rocks striking our STVs and the ground adjacent to the deputies.  Additionally, numerous mortar round fireworks were thrown at us, which exploded amongst our personnel.  As a result of the protesters' assaultive actions, deputies deployed less lethal munitions in an effort to defend against the attacks, and in an effort to disperse the crowd out of the parking lot and north onto Normandie Avenue.  At the same time, an unlawful assembly was declared and a dispersal order for everyone to leave the area was repeatedly given.  We then conducted a protective sweep of

the mini mall parking lot to remove protesters who were hiding behind parked vehicles and throwing items in our direction.

J)     A tactical plan was then implemented as we directed the protesters northbound on Normandie Avenue and out of the area.  As we directed the protesters northbound, they would stop in the roadway and use shields to form a protective wall barrier.  Behind the wall barrier protesters would then run up from a position of cover and throw rocks, bottles and fireworks at the deputies.  To defend themselves, the deputies deployed less lethal munitions at the barrier walls and violent protesters to defeat the assault.

K)     As we reached the intersection of 112th Street and Normandie Avenue, the protesters fled into the adjacent neighborhoods and dispersed. SRT personnel did not pursue the protesters, and returned to the intersection of Imperial Highway and Normandie Avenue.  We remained in the general area for several hours to provide security.  At no time did anyone identify themselves as being injured as a result of our deployment of our weaponry and munitions.

7.     On **September 8, 2020**, like the previous day, several SRT squads deployed to the area near South Los Angeles Station:

A)     SRT squads were positioned on Imperial Highway east of the Station where no less than lethal tools were used because the protesters at this location were peaceful.

B)     Additional SRT squads were positioned on Imperial Highway at the intersection of Normandie Avenue, west of the Station.  Physical barriers were constructed, and while sealing the perimeter, protesters would randomly approach the barriers and attempt to provoke deputies with derogatory comments.  As time passed, groups of protesters arrived who were very boisterous, agitated, and clearly angry towards our

1   presence.

2        C)      The crowd steadily grew to approximately 150 to 200 people.

3   A large portion of the crowd was wearing all black, had black face

4   coverings, and wearing protective helmets.  Some had body armour,

5   carried shields and had gas masks.  Most of the protesters were carrying

6   large backpacks.  Some protesters were seen loading objects into their

7   backpacks and strategically placing objects in the bushes of the shopping

8   center at the corner of Imperial Highway and Normandie Avenue.

9        D)      As it got later into the evening, the crowd dynamics became

10  more tense and protesters became more aggressive.  For example, several

11  protesters randomly walked up to the barriers and tried to manipulate them.

12  Verbal commands had to be repeated to protesters to not touch the barriers.

13       E)      Eventually, after 10 p.m., an unlawful assembly was declared

14  over loudspeakers and the protesters were specifically directed to leave the

15  area by going west on Imperial Highway or north on Normandie Avenue.

16  Protesters were given 15 minutes to voluntarily leave the area.

17       F)      After at least 15 minutes, the protesters who did not leave

18  formed a large cluster at the intersection of Imperial Highway and

19  Normandie Avenue.  Protesters with shields took the front, forming a

20  protective barrier for the rest of the crowd.  Additional orders to leave were

21  given and the direction of travel to leave.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

G)      Eventually, deputies walked westbound on Imperial Highway toward the crowd.  Suddenly, the crowd started launching frozen water bottles, rocks, and fireworks in our direction.  Deputies immediately responded with appropriate and directed less lethal force towards the hostile crowd.  In response, the crowd initially dispersed north on Normandie Avenue.  We stopped our deployment of less than lethal tools and reassessed the situation.  The crowd retreated but gathered up again in a tight group with shields and umbrellas on the outer portion of their circle.

H)      We again gave announcements via a portable speaker system to leave the area; the crowd again ignored the command.  As SRT personnel slowly proceeded north on Normandie Avenue near 113th Street, we were again met with frozen water bottles, pieces of cement, and large caliber fireworks.

I)      SRT personnel again responded with appropriate less than lethal tools towards the hostile crowd.  Again the crowd dispersed, additional orders to leave the area were announced, which were ignored, and the crowd reformed in clusters in the middle of Normandie Avenue. Deputies continued to walk northbound on Normandie Avenue, where we were again met with large caliber fireworks and large solid objects being thrown at us.

//
//
//
//
//
//
//
//

J)      Again, deputies responded with appropriate less lethal tools, this time near the intersection of Normandie Avenue and 112th Street. Each time we engaged the crowd, they dispersed but reformed further north in the middle of Normandie Avenue.  We repeated dispersal orders, but the crowd continued to ignore them.  When deputies continued walking northbound on Normandie Avenue, we were again met with hostile protesters shooting large caliber fireworks and throwing large solid objects. We responded with appropriate and directed less lethal force towards the hostile protesters.  This process repeated itself on Normandie Avenue at the intersections of 111th Street and 110th Street.

K)      In total, SRT personnel engaged the violent protesters on five separate occasions before they finally complied with our orders and dispersed.  Approximately 19 arrests were made during the entire incident at various locations along Normandie Avenue.

L)      Subsequently, I reviewed social media video that documents the repeated dispersal announcements provided to the protesters and the reasonable amount of time to comply.  As seen in the video, instead of leaving peacefully, they continued to yell profanities at the deputies and organized to construct a shield barrier.  (A true and correct copy of excerpts of the Instagram post is attached hereto as Exhibit "C".)

8.      On September 9, 10, 11 and 12, 2020, I was also deployed at the South Los Angeles Station.  While there were still protests, none of the conduct of the protesters necessitated the deployment of less than lethal tools.

//
//
//
//

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 27, 2020, at Los Angeles, California.

Charles L. McDaniel

EXHIBIT TO BE FILED WITH NOTICE OF MANUAL FILING

# EXHIBIT A

YouTube Video







EXHIBIT TO BE FILED WITH NOTICE OF MANUAL FILING

# EXHIBIT C

Instagram Video