1  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
2  RAYMOND W. SAKAI, State Bar No. 193507
   rsakai@lbaclaw.com
3  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
4  Glendale, California  91210-1219
   Telephone No. (818) 545-1925
5  Facsimile No. (818) 545-1937

6  Attorneys for Defendants
   County of Los Angeles and Sheriff Alex Villanueva
7

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated, | Case No. 2:20-cv-07870-DMG-PD  Honorable Dolly M. Gee  **DEFENDANTS' OBJECTIONS TO PLAINTIFFS' EVIDENCE IN SUPPORT OF THEIR *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER**  *[Opposition Memorandum and Declarations filed concurrently herewith]* |
| 18              Plaintiffs, | |
| 19        vs. | |
| 20  COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and Does 1-10 inclusive, | |
| 23              Defendants. | |

24

25      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

26      Defendants County of Los Angeles and Sheriff Alex Villanueva

27  (collectively, "Defendants") hereby object to the following evidence submitted by

28

                                   1

Plaintiffs in connection with their *Ex Parte* Application for a Temporary

Restraining Order on the grounds specified below:

## DECLARATION OF CYNTHIA ANDERSON-BARKER – EXHIBIT 1

| Material Objected to: | Grounds for Objection: |
|---|---|
| 1. Entire declaration. | 1. Irrelevant. Fed. R. Evid., Rules 401-403. Specifically, nowhere does the declarant attest to any use of projectiles or chemical irritants by Defendants, which are the subject of the instant EPA. Thus, the entire declaration is irrelevant. |
| 2. Paragraph 2: "I am a civil rights attorney and a member of the Executive Board of the National Lawyers Guild, Los Angeles Chapter ("NLG-LA")." | 2. Irrelevant. Fed. R. Evid., Rules 401-403. |
| 3. Paragraph 3: "NLG-LA is the local chapter of the nation's first racially integrated voluntary bar association, formed in 1937 with a mandate to advocate for fundamental principles of human and civil rights, including the protection of rights guaranteed by the United States Constitution. Since then, the Guild has been at the forefront of efforts to develop | 3. Irrelevant. Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| and ensure respect for the rule of law and basic legal principles." | |
| 4.  Paragraph 4:  "NLG-LA works to ensure legal and practical access to demonstrations in Southern California by regularly providing legal observers at demonstrations to observe and document potentially unlawful or unjustified interference with demonstrators' rights from law enforcement. The NLG-LA also works to ensure the right to protest by helping to secure legal representation for demonstrators facing criminal charges arising out of demonstration activity and affirmative civil cases against local governments and law enforcement agencies for unlawful interference with demonstrators' rights." | 4.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 5.  Paragraph 5:  "I have been an NLG-LA legal observer for almost 30 years." | 5.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 6.  Paragraph 6:  "I assisted with the planning and organization of an NLG-LA sponsored press | 6.  Lack of foundation, argumentative (Fed. R. Evid., Rule 611(a)).  Fed. R. Evid., Rules 601, 602 and 804. |

| | |
|---|---|
| conference on September 11, 2020 to address the ongoing violence by Sheriff's personnel against protesters in the wake of the killing of Mr. Dijon Kizzee by a Los Angeles County Sheriff deputy." | |
| 7.  Paragraph 7:  "The Sheriff's Department had barricaded the entrances to its Imperial Highway Sheriff Station with large yellow wire, therefore we had to hold the press conference next door to the Sheriff's Station, near the LA County Probation Department." | 7.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 8.  Paragraph 8:  "Upon arrival at the location of the press conference, I parked my vehicle in the Probation Department's parking lot. Several news vans were already there." | 8.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 9.  Paragraph 9:  "During the press conference, which began at about 11 a.m., I helped to introduce the speakers. Once the press conference was underway, I noticed that Sheriff deputies were present in full riot gear, displaying | 9.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

4

| | |
|---|---|
| their weapons. Initially, the deputies were around the perimeter of the Sheriff's Department parking lot. I then noticed that Sheriff deputies had shut down Imperial Hwy and blocked the street with armored vehicles in front of the Probation Department parking lot where the press conference was taking place." | |
| 10.  Paragraph 10:  "The deputies then began to encroach further towards the press conference. First, they blocked the entrance to the parking lot with deputies in riot gear brandishing weapons who put up yellow police tape and then large barricades, blocking us in the parking lot from the north. Then deputies in riot gear and brandishing weapons came up behind the press conference dragging a barricade close behind the speakers, blocking us in the parking lot from the east." | 10.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 11.  Paragraph 11:  "While one of the speakers was explaining in | 11.  Hearsay (regarding the purported statements by the unidentified third-party |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| great detail the injuries she had sustained at the hands of Sheriff personnel near the same location at a protest just a few nights before, the deputies suddenly entered the parking lot from the north advancing upon the press conference, startling her. The speaker stopped and broke down in tears at the sight of the deputies coming towards us." | speaker) (Fed. R. Evid., Rules 801, 802); irrelevant (that the deputies entered the parking lot of the Probation Department) (Fed. R. Evid., Rules 401-403); speculation (as to why the unidentified person cried). |
| 12.  Paragraph 12:  "I asked to speak to a lieutenant or a supervisor to request that the deputies stop intimidating our press conference participants. I also asked them to please back away.  Not a single deputy responded to me verbally to explain their presence or their actions. The Sheriff deputies said nothing to us. They did not ask us to move, they did not say we were breaking any law, etc. They merely stood there, in full riot gear with their large weapons, menacing us." | 12.  Irrelevant (that unidentified deputies purportedly did not speak with the declarant) (Fed. R. Evid., Rules 401-403); argumentative (that the deputies were "menacing" protestors by standing around in their uniforms) (Fed. R. Evid., Rule 611(a)). |

6

| | |
|---|---|
| 13.  Paragraph 14: "While pushing us back, the deputies had barricaded my car behind them, preventing my access to my vehicle. After some negotiation, the deputies finally allowed me to access my vehicle and drive out of the Probation Department parking lot." | 13.  Irrelevant (that the declarant was temporarily unable to access her vehicle, which she parked in a County parking lot). Fed. R. Evid., Rules 401-403. |
| 14.  Paragraph 15: "I then drove around and parked in the adjacent parking lot of El Pollo Loco, on the corner of Normandie and Imperial, to assist in my role as a legal observer. The deputies then pushed the remaining media and press conference participants into that adjacent parking lot." | 14.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 15.  Paragraph 17: "A member of the press came up to me in great disbelief. He said he had never seen such a display of intimidation by law enforcement. He asked me how many press conferences I had attended in my career as a civil rights attorney. I answered that I have attended numerous press conferences, some in front of | 15.  Hearsay (as to the statements of an unidentified third party) (Fed. R. Evid., Rules 801, 802); speculation (as to the purported thinking of the unidentified third party). |

| | |
|---|---|
| LAPD headquarters. He was shocked by his experience at this event." | |
| 16.  Paragraph 18:  "On September 11, 2020, the Los Angeles Sheriff's Department exhibited nothing but contempt for the United States Constitution and the rights granted to us in the First Amendment to peaceably assemble and for freedom of the press." | 16.  Argumentative and improper legal argument.  Fed. R. Evid., Rule 611(a). |

## DECLARATION OF DIANA BARBADILLO – EXHIBIT 2[1]

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| 1.  Entire declaration. | 1.  Not signed or dated, therefore, inadmissible.  28 U.S.C. § 1746; Fed. R. Evid., Rule 603. |
| 2.  Paragraph 2:  "I am employed at Loyola Law School." | 2.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 3.  Paragraph 3:  "I have attended trainings to be a legal observer at protests. I have learned to | 3.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

---

[1] This declarant submitted two versions of her declaration (with material changes between the two), so some objections are only applicable to one version of the declaration.

| | |
|---|---|
| recognize and document police tactics and use of force on protesters as part of this training. I have attended at least twenty protests as a legal observer for the National Lawyers Guild, which is an organization which works to advance the rights of all Americans by advocating for groups which are marginalized or oppressed, including those impacted by police violence and peaceful protesters whose rights are violated by law enforcement." | |
| 4.  Paragraph 5:  "At all times while I was at the demonstration, I was wearing a lime green legal observer hat. I believe sheriff's deputies are aware that the hats signify the wearers are attending the protest as NLG-trained legal observers, rather than as participants, because I have attended protests before and spoken to several deputies; they seem to know who we are and our purpose for being there." | 4.  Speculation (as to the purported awareness unidentified deputies may have by the declarant's wearing of a green hat) (Fed. R. Evid., Rules 601, 602 and 804); hearsay (as to purported prior statements of unidentified deputies) (Fed. R. Evid., Rules 801, 802). |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| 5.  Paragraph 14:  "When the grenade went off, something hit me in the leg, and caused a bruise. I am attaching a true and correct copy of a photo of the bruise to this Declaration as **Exhibit A**." | 5.  No photograph is attached as Exhibit A as stated in the declaration. |
| 6.  Paragraph 15:  "Other demonstrators were injured, but I don't know of anyone else that was injured by a flash bang grenade that night, besides Jill O'Neill." | 6.  Lack of foundation; vague.  Fed. R. Evid., Rules 601, 602 and 804. |
| 7.  Paragraph 16:  "One demonstrator named Joe was hit in the eye by some projectile. Many demonstrators had to have their eyes rinsed out due to the pepper balls. There was another person who may have been hit by a beanbag bullet (because that's what I saw on the ground afterwards)." | 7.  Lack of foundation; vague; speculation. Fed. R. Evid., Rules 601, 602 and 804. |
| 8.  Paragraph 19:  "At all times while I was at the demonstration, I was wearing a lime green legal observer hat." | 8.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 9.  Paragraph 26:  "Minutes later, I heard and saw pepper balls being | 9.  Hearsay (as to the purported statements of the unidentified girl and her mother) (Fed. R. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| shot at the ground by the deputies, and I could see almost a smoke-like effect coming up from the ground as a result. I felt some of it as well, as in a tingling sensation around my nose. I heard from a number of demonstrators that a little girl might have been hit. Shortly after that, I spoke with a little girl and her mother; the little girl informed me that she had gotten pepper in her mouth. She was somewhere around 8-10 years old and was crying. She was on roller skates and a rainbow skirt with glitter in her hair." | Evid., Rules 801, 802); irrelevant (as to the attire of the girl) (Fed. R. Evid., Rules 401-403). |
| 10.  Paragraph 27:  "A little after 6 pm, the demonstration began to march east on Imperial towards the 110 freeway. I was a bit behind the march because I was talking to the little girl. I caught up to the front because most of the other legal observers were in the back. The march entered the 110 freeway. The highway patrol came. The march to the freeway remained peaceful the entire time | 10.  Argumentative (that a protest that involves a clear violation of California law—blocking a freeway—is "peaceful").  Fed. R. Evid., Rule 611(a). |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | | |
|---|---|---|
| 1 | and ultimately left the freeway and marched back to the sheriff's station peacefully." | |
| 2 | | |
| 3 | | |
| 4 | 11.  Paragraph 28:  "Once we arrived back at the station around 8:00 p.m. I texted someone at 8:11 p.m. to say that the action was wrapping up because Black Lives Matter was performing their healing ritual, the Assata, in the street outside the sheriff's station, that concludes their actions." | 11.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | 12.  Paragraph 30:  "Jill and I were walking towards them when suddenly we heard shooting begin. We could feel shots hitting at the ground around our feet. At first the sound was high pitched, and then a shotgun-type sound, and then explosions. We turned away, went back to the north of the bushes to the sidewalk, and ducked down to avoid the fire. I never heard a dispersal order, although later I heard the deputies saying "failure to disperse" to the crowd. I don't believe anyone could have heard the majority of | 12.  Speculation (as to what other persons could or could not have heard).  Fed. R. Evid., Rules 601, 602 and 804. |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| what the deputy was saying at that time." | |
| 13.  Paragraph 32:  "We retreated into the street, looked back and saw a lot of smoke and began to feel what must have been pepper spray. There was a large semi-truck parked on the north side of Imperial, and we hid behind it to escape the fire." | 13.  Lack of foundation and speculation (as to what anyone other than the declarant purportedly saw, felt, or their motive for doing anything).  Fed. R. Evid., Rules 601, 602 and 804. |
| 14.  Paragraph 34:  "I began to try to spit in an effort to breathe better and get the pepper taste out of my mouth. I was on someone's lawn north of Imperial, and I apologized to someone who had come out of his home to see what was going on; he told me that it was okay, the pepper spray got to him too." | 14.  Hearsay (as to the purported statements of the unidentified third party).  Fed. R. Evid., Rules 801, 802. |
| 15.  Paragraph 36:  "There were some individuals still west of the station on Imperial. I heard more firing being shot at them. I did not see this, however, and I do not know if any legal observers were present." | 15.  Lack of foundation and speculation (as to anything the declarant did not see and does not know).  Fed. R. Evid., Rules 601, 602 and 804. |

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>DECLARATION OF LISAMARIE BETANCOURT – EXHIBIT 3</u>

| <u>Material Objected to:</u> | <u>Grounds for Objection:</u> |
|---|---|
| 1.  Paragraph 7:  "5 minutes after the dispersal order, the deputies started to advance.  The protesters started retreating right on Normandie. People in the front of the line were being pushed by deputies.  The protesters were pushed back until the group was half a block down the road." | 1.  Lack of foundation (because nowhere does the declarant clearly state where she was to observe the events set forth in this portion of her declaration).  Fed. R. Evid., Rules 601, 602 and 804. |
| 2.  Paragraph 8:  "At 8:25PM, two deputies charged toward the leader with the bullhorn and struck them down.  As soon as the leader was arrested, the rest of the deputies charged toward the group while shooting rubber bullets and stingers.  I tried to stay ground because I believed there was no justification for the use of force. The deputies continued to run, fire, and chase down the protesters for another two blocks.  It only took the deputies 15 minutes to get everyone off the street." | 2.  Lack of foundation (because nowhere does the declarant clearly state where she was to observe the events set forth in this portion of her declaration).  Fed. R. Evid., Rules 601, 602 and 804. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| 3.  Paragraph 9:  "Given the fact that the protesters were nonviolent, and the deputies were not being threatened, it appeared to me that the LASD deputies were shooting less than lethal weapons with an intent to injure and not simply to disperse the crowd." | 3.  Lack of foundation (because nowhere does the declarant clearly state where she was to observe the events set forth in this portion of her declaration); speculation.  Fed. R. Evid., Rules 601, 602 and 804. |

## DECLARATION OF ROGER CLARK – EXHIBIT 4

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| 1.  Entire declaration. | 1.  Irrelevant and lack of foundation since the declarant admits that he has not been an active law enforcement officer for almost 30 years (¶ 3) and his professional training regarding crowd control dates back to the early 1970's, a half-century ago (¶ 5).  Fed. R. Evid., Rules 401-403; Fed. R. Evid., Rule 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). |
| 2.  Paragraph 6:  "During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, from 1984 to 1987, I supervised the training of cadets at our Reserve Training | 2.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| Academy. They were taught, *inter alia,* proper apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: 'The Legal and Moral Use of Force and Firearms.'" | |
| 3.  Paragraph 7:  "During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993." | 3.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 4.  Paragraph 8:  "During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot | 4.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

16

| | | |
|---|---|---|
| 1 | fired - either by my officers or by | |
| 2 | the suspects whom we arrested. | |
| 3 | Many of these suspects were | |
| 4 | armed and considered to be very | |
| 5 | dangerous. Some were | |
| 6 | apprehended during the course of | |
| 7 | their crimes and were very prone | |
| 8 | to use firearms to escape | |
| 9 | apprehension. This record of | |
| 10 | excellence was accomplished | |
| 11 | through the use of proper tactics, | |
| 12 | management and supervision of | |
| 13 | personnel, training in correct | |
| 14 | apprehension methods, and | |
| 15 | adherence to the moral and ethical | |
| 16 | standards endorsed by California | |
| 17 | POST and my Department. These | |
| 18 | methods and principles are also | |
| 19 | embraced by every state training | |
| 20 | commission of which I am aware, | |
| 21 | as well as the national standards | |
| 22 | established by the U.S. | |
| 23 | Department of Justice." | |
| 24 | 5.  Paragraph 9:  "As a result of | 5.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 25 | my position and record as the | |
| 26 | commanding officer of | |
| 27 | N.O.R.S.A.T., I was assigned to | |
| 28 | author Field Operations Directive | |

| | |
|---|---|
| 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the entry into a building for the purpose of an arrest and/or seizure of evidence." | |
| 6.  **Paragraph 10:**  "Additionally, since my retirement, I have provided reports and given testimony regarding a number of alleged civil disturbances, including alleged riots in Los Angeles, Long Beach, San Diego and Davis, California. I have also provided opinions and given testimony regarding law enforcement force inflicted on protests in Fort Wayne, Indiana and Phoenix Arizona. Some relevant Ninth Circuit cases in which my expert testimony was admitted include *Nelson* v. *City of Davis,* 685 F.3d 867 (9th | 6.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| Cir. 2012) (involving pepper-ball projectiles at a mass gathering); and *Young* v. *Cty. of Los Angeles,* 655 F.3d 1156 (9th Cir. 2011) (involving baton strikes and pepper spray)." | |
| 7.  Paragraph 13: "However, there have been several reports in this set of facts indicating that LASD officers deliberately inflicted significant indiscriminate force on the many persons in the crowd, seriously injuring many of them. Such use of indiscriminate force is unlawful and contrary to proper police training and practices." | 7.  Vague, ambiguous, lack of foundation. Fed. R. Evid., Rules 601, 602 and 804. |
| 8.  Paragraph 15: "LASD deputies and officers in general are trained and are generally aware that he use of chemical agents, kinetic projectile (including the 40mm and pepper-ball) and baton strikes are serious and potentially lethal uses of force. LASD policy and training is that the use of such weapons is only permissible when an officer reasonably believes that a specific suspect or subject is | 8.  Lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |

| | |
|---|---|
| violently resisting arrest or poses an immediate threat of violence or physical harm." | |
| 9.  Paragraph 16:  "Even where firing kinetic impact projectiles would be appropriate, officers are trained to only use them by aiming for contact below the knee, avoiding striking body organs such as kidneys and spleen, causing a heart arrhythmia by chest strikes or causing potential brain and head injury with shots to the head and neck, and even then to avoid direct contact with persons by first hitting the ground near their feet." | 9.  Lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 10.  Paragraph 17:  "Officers are also instructed to avoid using baton strikes that hit the head, neck, throat, spine, kidneys and groin areas to decrease the likelihood of causing a serious injury." | 10.  Irrelevant (since none of the declarants attest that baton strikes were used).  Fed. R. Evid., Rules 401-403. |
| 11.  Paragraph 19:  "The deployment of the uses of impact projectiles and baton strikes- even where they are proper - risks | 11.  Irrelevant (since none of the declarants attest that baton strikes were used).  Fed. R. Evid., Rules 401-403.  Lack of foundation. Fed. R. Evid., Rules 601, 602 and 804. |

| | |
|---|---|
| 1 | escalating situations and enraging |
| 2 | crowds. Officers are trained about |
| 3 | this. Additionally, Officers are |
| 4 | trained under POST Learning |
| 5 | Domain # 24, 'Handling |
| 6 | Disputes/Crowd Control' that 'In |
| 7 | a crowd management situation, |
| 8 | law enforcement presence is a |
| 9 | preventive measure and should |
| 10 | remain low profile. The presence |
| 11 | of uniformed officers who display |
| 12 | a command presence is often an |
| 13 | adequate deterrent to unlawful |
| 14 | activities. It is preferable for the |
| 15 | crowd to remain focused on the |
| 16 | event itself rather than on officer |
| 17 | actions at the event.' Officers are |
| 18 | also trained that '[a]n otherwise |
| 19 | peaceful group can become |
| 20 | enraged by inappropriate officer |
| 21 | conduct ....'  The LASD Use of |
| 22 | Force - Tactics Directive also |
| 23 | holds that even where appropriate, |
| 24 | 'Crowd dispersal strategies should |
| 25 | only be used when immediate |
| 26 | action is necessary to stop |
| 27 | violence and/or property damage |
| 28 | |

| | |
|---|---|
| and/or sufficient resources are not present to ensure public safety.'" | |
| 12.  Paragraph 21:  "Then, on September 5th, at a demonstration by the Sheriff's south-central station on Imperial, the demonstration was broken up in similar fashion without warning, again with the use of rubber bullets, pepper balls, flash bangs, and tear gas grenades. A 7 year old girl was overcome by fumes. (Decl. O'Neil, Barbadillo, McDonald, Franco, Ramirez) On September 7th, the conduct was repeated at another demonstration, and a 19 year old girl was shot numerous times, leaving her with multiple bruises and cuts on her body. Even as she was being treated by medics she could hear deputies make an announcement to disperse as deputies continued to shoot at protesters as they were retreating. (Decl. Recio)." | 12.  Hearsay (Fed. R. Evid., Rules 801, 802), speculation and lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 13.  Paragraph 22:  "The next night, September 8th, another demonstration was broken up by | 13.  Lack of foundation, speculation.  Fed. R. Evid., Rules 601, 602 and 804. |

| | |
|---|---|
| deputies. Again, despite the peaceful and non-violent nature of the demonstration, about 8:15 pm deputies declared an unlawful assembly through an amplifier. This time they gave demonstrators 5 minutes to leave. As the demonstrators retreated, deputies charged them and violently arrested a leader with a bullhorn, then fired on other demonstrators with less lethal projectiles, causing injuries. (Decl. Betancourt)." | |
| 14.  Paragraph 23:  "Nothing in the record indicates the indiscriminate use of less lethal projectiles and tear gas against demonstrators without reasonable warnings is consistent with training and standards that LASD deputies should know and follow, or that their use was justified given the serious nature of the use of force and the minimal degree of danger to the deputies." | 14.  Lack of foundation, speculation.  Fed. R. Evid., Rules 601, 602 and 804. |

**<u>DECLARATION OF DAVID CUNNINGHAM - EXHIBIT 5</u>**

23

| Material Objected to: | Grounds for Objection: |
|---|---|
| 1.  Entire declaration. | 1.  The declaration is not made under penalty of perjury under any laws, making it inadmissible.  28 U.S.C. § 1746; Fed. R. Evid., Rule 603. |
| 2.  Paragraph 2:  "I am a second-year law student at UCLA School of Law. I also attended UCLA for undergrad. I am twenty-one years-old." | 2.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 3.  Paragraph 3:  "I am a trained National Lawyers Guild ("NLG-LA") Legal Observer ("LO"). I have been an LO for about seven months. During that time I have LO'd at about thirty protests and demonstrations. I am also a member of Black Lives Matter, Los Angeles ("BLM-LA")." | 3.  Vague, ambiguous and irrelevant.  Fed. R. Evid., Rules 401-403. |
| 4.  Paragraph 4:  "In the past two weeks, since the August 31, 2020 killing of Los Angeles resident Dijon Kizzee by a Los Angeles County Sheriff's deputy, I have been attacked three times by Sheriff's personnel. Twice as an | 4.  Vague and ambiguous.  Fed. R. Evid., Rule 611(a). |

24

| | |
|---|---|
| LO and once as a participant at a peaceful protest." | |
| 5.  Paragraph 5:  "On August 31, 2020, I received a message from NLG-LA that LOs had been requested for a demonstration that evening called to mourn the loss of Mr. Kizzee and to protest police violence. It began at 109th and Budlong Streets in Los Angeles. The protesters then went on a march which ended in front of the Sheriff's station on Imperial Hwy. I was standing in front of the station legal observing at about 1:30 a.m., wearing my clearly visible neon-green NLG-LA LO hat, when I saw a young woman attacked by a Sheriff deputy. I went over to her to document the deputy's use of force. I had taken a few photos and, as I was writing down notes about the incident, Deputy Hernandez attacked me. He grabbed me by the back of my neck and yanked me backwards to the ground. I landed on my back. He and another deputy | 5.  Vague and ambiguous.  Fed. R. Evid., Rule 611(a).  Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA).  Fed. R. Evid., Rules 401-403. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| immediately switched places while protesters helped me to my feet. I took a photo of Deputy Hernandez to document what happened and then continued to legal observe." | |
| 6.  Paragraph 7:  "As the event wrapped up at about 8 p.m., I was standing on the sidewalk on the South side of the street in front of the Sheriff's station on Imperial Hwy. I was speaking with Pastor James, a founder of Clergy for Black Lives. We then heard shots. I hadn't seen any deputies before that or heard any warnings or dispersal order. However, I soon realized Sheriff's personnel were shooting hard rubber bullets, tear gas, and pepper balls at us." | 6.  Lack of foundation, speculation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 7.  Paragraph 12:  "As I got out of my car, a Sheriff deputy approached me and said I couldn't walk across Imperial Hwy. I could see that there was yellow police tape crossing Mariposa. I asked the deputy why the street was shut down and he said there was going | 7.  Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA). Fed. R. Evid., Rules 401-403. |

26

| | |
|---|---|
| to be a riot. I told him that there was only going to be a press conference. I was wearing a suit." | |
| 8. Paragraph 13: "I then got back in my car and drove to the parking lot on the Northeast corner of Normandie and Imperial. I walked across Normandie to where the press conference was setting up. There were news vans from several news stations, and they set up a podium for all the microphones." | 8. Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA). Fed. R. Evid., Rules 401-403. |
| 9. Paragraph 14: "I was the fifth speaker at the press conference. I spoke about law enforcement's use of force against peaceful protesters over the last several months and explained how I had been attacked by Sheriff's personnel twice since the killing of Dijon Kizzee. I spoke about defunding law enforcement, redirecting the money to social services and addressing the homeless crisis, and the gang-like behavior of the Sheriff's department." | 9. Lack of foundation, argumentative. Fed. R. Evid., Rules 601, 602 and 804. Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA). Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| 10.  Paragraph 15:  "During the press conference I saw Sheriff's deputies put up yellow tape across the entrance to the parking lot we were in (at the Imperial Hwy entrance). I saw the deputies then replacing the yellow tape with large yellow barricades. Some deputies were even pointing their large guns that shoot hard projectiles and chemical agents at the press conference. I walked over to take notes and photos of what was happening." | 10.  Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA).  Fed. R. Evid., Rules 401-403. |
| 11.  Paragraph 16:  "I then went back to the microphone and tried to get the crowd to bring its attention back to the press conference. The press conference continued but I went back to my car to get my bright neon-green hat designating me as an NLG-LA legal observer because the deputies were acting aggressively in their riot gear, brandishing their weapons, and putting up barricades on the North and East sides of the press conference. | 11.  Vague, ambiguous, speculation.  Fed. R. Evid., Rules 601, 602 and 804.  Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA).  Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| From their actions, it appeared they wanted to intimidate the press conference participants and shut it down. The media started to grab their cameras and microphones; the Sheriffs had distracted them from filming the press conference." | |
| 12. Paragraph 18: "It was a tense moment and I didn't realize that my LO hat had fallen off. I questioned the deputies, asking why they were pushing the press conference participants back. I heard a deputy across the barricade from me tell another deputy to hold his shield because he was going get me. The deputy then reached over the barricade and grabbed me." | 12. Vague and ambiguous. Fed. R. Evid., Rule 611(a). Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA). Fed. R. Evid., Rules 401-403. |
| 13. Paragraph 19: "I am 5'8 and weigh 135 pounds. The deputy was about 6'2 and over 200 pounds." | 13. Irrelevant. Fed. R. Evid., Rules 401-403. |

## DECLARATION OF KATHERINE FRANCO – EXHIBIT 6

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| 1.  Entire declaration. | 1.  Nowhere does the declarant state under penalty of perjury under any laws, making the statement inadmissible.  28 U.S.C. § 1746; Fed. R. Evid., Rule 603. |
| 2.  Paragraph 2:  "I am an attorney licensed to practice in the State of California. I practice immigration law." | 2.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 3.  Paragraph 3:  "I have attended trainings to be a legal observer at demonstrations. I have learned to recognize and document police tactics and use of force on demonstrators as part of this training. I have attended six or seven demonstrations as a legal observer for the National Lawyers Guild, which is an organization which works to advance the rights of all Americans by advocating for groups which are marginalized or oppressed, including those impacted by police violence and peaceful demonstrators whose rights are violated by law enforcement." | 3.  Irrelevant, vague.  Fed. R. Evid., Rules 401-403. |

30

| | |
|---|---|
| 4.  Paragraph 5:  "At all times while I was at the demonstration, I was wearing a lime green legal observer hat, which I believe sheriff's deputies are aware signifies that I am attending the demonstration as an NLG-trained legal observer rather than as a participant, because I have interacted with them numerous times while legal observing." | 4.  Irrelevant, speculation (as to what unidentified deputies purportedly believe when the declarant wears a hat).  Fed. R. Evid., Rules 401-403. |
| 5.  Paragraph 10:  "Earlier in the demonstration, I saw an estimated 50-60 deputies in riot gear. They also had a vehicle that looked like a tank. I also saw two vehicles that appeared to be heavily armored military grade trucks with a platform where there was a deputy on top of each vehicle. Both deputies were pointing weapons at demonstrators. I could not tell if they were less lethal, but I could not see any of bright colors that usually signify less lethal weapons, so I assume they were firearms." | 5.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

31

| | |
|---|---|
| 6.  Paragraph 14:  "Around 6:05 p.m., most of the demonstrators began to march east on Imperial toward the 110 freeway. This was peaceful. The march entered the freeway and remained peaceful." | 6.  Argumentative (that a protest that involves a clear violation of California law—blocking a freeway—is "peaceful"). |
| 7.  Paragraph 19:  "At 8:38 p.m. the sheriff's barrier was still erected behind a line of landscaping bushes. The vast majority of the demonstrators – as shown with the yellow circle - were standing in the actual street, Imperial Highway, to do a healing ceremony. A much smaller number was between the wide sidewalk and the line of bushes, shown in purple. A smaller group of about twenty at most were between the bushes and the barrier, shown in green on **Exhibit A**, and many of those were affiliated with the press. I knew they were affiliated with the press because they were wearing either vests, or hats, or some other sign of their employment, in addition to the large amount of camera | 7.  Speculation (as to whom were affiliated with the press).  Fed. R. Evid., Rules 601, 602 and 804. |

| | |
|---|---|
| equipment they carry. Some of the twenty or so people standing between the bushes and the barrier at that time were demonstrators, but not the majority of the group." | |
| 8.  Paragraph 21:  "I was a few feet behind the barrier set up by sheriff's in the minutes leading up to the deputies' violence. I had just moved north of the barrier by about ten feet when they began to shoot, just as I turned around to face them again. I never heard the deputies say they would start shooting or give an order to disperse prior to shooting. Minutes after they started shooting, at 8:44 p.m., they gave a dispersal order that was loud enough for many of the demonstrators to hear, and ordered people to leave east on Imperial Highway in the next ten minutes, or face arrest for violation of Penal Code § 409 and, I believe, § 415. I could not hear the second penal code section clearly because I was struggling to catch my breath and see after a | 8.  Speculation (as to what others heard or understood).  Fed. R. Evid., Rules 601, 602 and 804. |

33

| 1 | pepper ball or tear gas grenade | |
| 2 | went off right beside me; the | |
| 3 | deputies were continuing to fire | |
| 4 | even as they issued the dispersal | |
| 5 | order. As far as I could tell, no | |
| 6 | one at the demonstration seemed | |
| 7 | to have any clue as to why the | |
| 8 | deputies started shooting." | |

**DECLARATION OF BREO FREEMAN – EXHIBIT 7**

| Material Objected to: | Grounds for Objection: |
| --- | --- |
| 1. Entire declaration. | 1. Irrelevant. Fed. R. Evid., Rules 401-403. Specifically, nowhere does the declarant attest to any use of projectiles or chemical irritants by Defendants, which are the subject of the instant EPA. Thus, the entire declaration is irrelevant. In addition, the declaration is neither signed nor dated, therefore it is inadmissible. 28 U.S.C. § 1746; Fed. R. Evid., Rule 603. |
| 2. Paragraph 3: "I arrived at St. Francis Cabrini Church at 1430 W. Imperial Highway in Los Angeles at about 7:45 p.m. and parked my black Toyota Tundra truck there. I then took the cooler which contained water, Gatorade, | 2. Irrelevant. Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| and Red bull, to the front line of the protesters who were located at Imperial Highway and Normandie Avenue. I walked among the protester offering them hand sanitizer and water." | |
| 3.  Paragraph 4:  "I then left the cooler on the sidewalk near the front of the protest and went back to my truck to grab the first aid kit. I took the first aid kit to a friend who is one of the front-line street medics who offers medical treatment to those who may need it. The medic took all the useful material I had with me to add to her kit." | 3.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 4.  Paragraph 5:  "At about 8: 15 p.m. I decided to take the cooler back to my truck which was in the church parking lot. I was worried the cooler would get lost because during the previous four nights of protests the Sheriffs had unloaded a barrage of munitions on non-violent protesters. The use of munitions occurred at 8:00 p.m. | 4.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

35

| | |
|---|---|
| the previous night so I was worried this would happen again." | |
| 5.  Paragraph 7:  "I was later informed that a witness had seen a Sheriff deputy slash my tires, but the witness was now reluctant to come forward for fear of retaliation." | 5.  Hearsay (Fed. R. Evid., Rules 801, 802), vague, speculation (Fed. R. Evid., Rule 611(a)). |
| 6.  Paragraph 11:  "I was then thrown into the back of a Sheriff patrol car and three to four Sheriff deputies then searched my truck for about 10-15 minutes. I did not consent to the search of my vehicle." | 6.  Vague.  Fed. R. Evid., Rule 611(a). Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA). Fed. R. Evid., Rules 401-403. |
| 7.  Paragraph 12:  "The Sheriff deputies did not find anything during their search of my truck. They took my name and ran my identification through a computer data base. They did not find anything that would justify continuing to hold me, so they finally released me after 10 - 15 minutes." | 7.  Speculation.  Fed. R. Evid., Rules 601, 602 and 804.  Irrelevant (insofar none of the statements pertain to the use of less than lethal tools, which is the subject of the instant EPA).  Fed. R. Evid., Rules 401-403. |
| 8.  Paragraph 13:  "As I was being released, a Sheriff deputy told me I had been detained because | 8.  Hearsay.  Fed. R. Evid., Rules 801, 802. |

| | |
|---|---|
| people have been bringing supplies like water and ice to the protesters. My friend, Vishal Singh, filmed my release from Sheriff custody. He also asked the Deputies why I was being detained. They did not respond to him. I then locked my truck and walked down the street, leaving my truck with four flat tires and four Sheriff patrol cars in the church parking lot." | |
| 9.  Paragraph 14:  "As a result of this experience I felt threatened and harmed.  The sheriffs were their power to instill fear in those simply trying to help and support peaceful protesters." | 9.  Argumentative, speculation.  Fed. R. Evid., Rules 601, 602, 611(a) and 804. |

## DECLARATION OF DAVID PATRICK McDONALD - EXHIBIT 8

| Material Objected to: | Grounds for Objection: |
|---|---|
| 1.  Paragraph 6:  "At approximately 8:40 pm, the sheriff deputies started throwing CS gas grenades, setting off flash bangs, and shooting less lethal rounds at | 1.  Lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |

37

| | |
|---|---|
| the protesters. The use of force continued for five to ten minutes straight. It appeared that all of the sheriff deputies present were using less lethal munitions against the protesters all at the same time. It appeared that most deputies were firing indiscriminately, but some were targeting specific people." | |

### DECLARATION OF ALEX McELVAIN – EXHIBIT 9

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| 1.  Paragraph 2:  "I am the News Coordinator for the news outlet, Knock LA." | 1.  Irrelevant, misleading (insofar as the statement implies that the declarant is a member of an objective news organization, since Knock LA describes itself as "a new voice on the left" as a "commentary project by Ground Game LA, a community organization that fosters civic empowerment and political engagement.")  *See*, www.knock-la.com/about.  Fed. R. Evid., Rules 401-403, 611(a). |
| 2.  Paragraph 11:  "I walked over to the parking lot of a minimart where there were protesters. While there, I heard a flash bang that | 2.  Hearsay (as to what the declarant purportedly read on social media).  Fed. R. Evid., Rules 801, 802. |

| | |
|---|---|
| sounded like I did not occur at that station.  I later saw reports on Twitter that deputies were throwing flash bang grenades at people away from the station, in the residential neighborhood." | |
| 3.  Paragraph 17:  "I believe this effort to pile objects prompted the deputies to immediately deploy several types of munitions indiscriminately throughout the entire crowd of protesters for several minutes.  The munitions I observed were pepper balls, rubber bullets, flashbangs, and tear gas." | 3.  Speculation, lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 4.  Paragraph 18:  "The sheriff deputies gave no warning or dispersal order before their massive use of force." | 4.  Lack of foundation, argumentative.  Fed. R. Evid., Rules 601, 602 and 804. |

## DECLARATION OF JILLIAN O'NEIL – EXHIBIT 12

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| 1.  Entire declaration. | 1.  The declaration is not made under penalty of perjury under any laws, making it |

| | |
|---|---|
| | inadmissible.  28 U.S.C. § 1746; Fed. R. Evid., Rule 603. |
| 2.  Paragraph 2:  "I am a hairdresser and am working towards obtaining my degree in sociology." | 2.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 3.  Paragraph 3:  "I have attended trainings to be a legal observer at protests. I have learned to recognize and document police tactics and use of force on protesters as part of this training. I have attended around twenty protests as a legal observer for the National Lawyers Guild, which is an organization which works to advance the rights of all Americans by advocating for groups which are marginalized or oppressed, including those impacted by police violence and peaceful protesters whose rights are violated by law enforcement." | 3.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 4.  Paragraph 4:  "On August 25, 2020, I attended a peaceful demonstration in the downtown area of Los Angeles as a legal observer. The subject matter of the | 4.  Lack of foundation, speculation.  Fed. R. Evid., Rules 601, 602 and 804. |

40

| | |
|---|---|
| protest related to police violence, specifically a victim of Pasadena police brutality named Anthony McClain, and there was significant LASD (Los Angeles Sheriff's Department) presence at the demonstration." | |
| 5. Paragraph 5: "At all times while I was at the demonstration, I was wearing a lime green legal observer hat, which I believe sheriff's deputies are aware signifies that I am attending the demonstration as an NLG-trained legal observer rather than as a participant, because I have interacted with them numerous times while legal observing." | 5. Speculation (as to what unidentified deputies know or understand). Fed. R. Evid., Rules 601, 602 and 804. |
| 6. Paragraph 8: "I was observing with Diana Barbadillo. We became separated from the demonstration at one point, and were traveling back towards the group. They were at the corner of Temple and Hill, with backs to us, and one deputy in particular was telling us to get to the side and move across the street. We had a | 6. Speculation. Fed. R. Evid., Rules 601, 602 and 804. |

41

| | |
|---|---|
| short interaction with him in which it was my impression that he did not want to let us go through towards the demonstration. I believe I said words to the effect that we were legal observers or I pointed at my hat, and he responded that we should not get smart. I believe he was unhappy about letting us through based on his tone of voice and facial expression." | |
| 7.  Paragraph 12:  "It is my personal belief that the flash bang grenades were thrown at me and Diana Barbadillo intentionally because of our legal observer status, based on the attitudes of the deputies we spoke with beforehand. We were the only two legal observers present." | 7.  Speculation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 8.  Paragraph 16:  "I observed at least seven other demonstrators who were confirmed injured by the flash bang grenades, besides myself. Several demonstrators had to have their eyes cleaned out by medics. At least two people, | 8.  Lack of foundation, hearsay (as to a purported injury to someone named "Joe"). Fed. R. Evid., Rules 601, 602 and 804. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| including one of the organizers, were on the ground in pain and being attended to by other people. Di Barbadillo had some sort of shrapnel or other hit. I know others got hit but did not need medical attention. I did not directly observe, but I learned later that a person named Joe was hit in the eye directly with one of the projectiles." | |
| 9.  Paragraph 23:  "As soon as I arrived, around 6:00 p.m., I walked over to Addie Tinnell, a fellow legal observer, to speak with her regarding the plan for legal observing. I saw a deputy with a less lethal weapon and heard a noise. Someone claimed that someone had touched the barrier and a deputy had fired at a little girl in response, who ran away to her mother. I spoke with the little girl. She was about 7-10 years old and was crying. She said she had been hit by a pepper ball and that it was in her nose and throat." | 9.  Hearsay.  Fed. R. Evid., Rules 801, 802. |

| | |
|---|---|
| 10.  Paragraph 24:  "The demonstration remained peaceful the entire time and ultimately left the freeway and marched back to the sheriff's station." | 10.  Argumentative (that a protest that involves a clear violation of California law—blocking a freeway—is "peaceful"). |
| 11.  Paragraph 26:  "At around 8:35-8:40 p.m., Di and I were standing at the western entrance to the parking lot, walking towards the barrier. We began to hear shots being fired. I had not heard a dispersal order. I ran for cover with Di. I was hit at least three times on my right hip and the right side of my right leg, which left marks, but was okay to keep walking. I was also tear gassed and could not breathe for what felt like a long time but may have only been 2-3 minutes. I was with Di and Katherine Franco, another legal observer, both of whom were also struggling to breathe. I looked for Addie, who was still ducking for cover. The deputies did not cease firing to allow us to leave. We were exposed and trying to retreat." | 11.  Vague and ambiguous.  Fed. R. Evid., Rule 611(a). |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF DAVID RAMIREZ – EXHIBIT 14

| Material Objected to: | Grounds for Objection: |
|---|---|
| 1.  Paragraph 3:  "Approximately 250 protesters, including myself, walked straight to the 110 North freeway. We blocked traffic on the 110 North freeway southbound for approximately 30 to 45 minutes. The demonstration at the freeway was peaceful." | 1.  Argumentative (that a protest that involves a clear violation of California law—blocking a freeway—is "peaceful").  Fed. R. Evid., Rule 611(a). |
| 2.  Paragraph 6:  "Most protesters were completely exposed and had to use shrubs to protect themselves. Some protesters were protecting themselves by standing behind a truck, and the deputies threw teargas over the truck. I used my cardboard protest sign as a shield. My cardboard protest sign was shot 3 times by rubber and pepper bullets. I tried to stand ground because there was no dispersal order nor a declaration of unlawful assembly at this point." | 2.  Speculation, lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| 3.  Paragraph 10:  "At 7:30 PM, approximately 60 protesters, including myself, gathered at the intersection of Normandie Avenue and Imperial Highway in front of the Laundromat. At that location, the group had a feeling the protesters were being set up to be kettled by the deputies, so the group moved north toward the intersection for better visibility of the deputies. After we moved, we noticed the deputies had already blocked off the south part of the intersection." | 3.  Speculation, lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 4.  Paragraph 11:  "Cars passing by honked in support of the protesters. As soon as the honking happened, people started chanting louder. Then, the deputies declared unlawful assembly through an amplifier and gave us 5 minutes to disperse." | 4.  Speculation, lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 5.  Paragraph 14:  "None of the protesters were throwing projectiles and most protesters tried to stand ground.  I used my cardboard protest sign as shield | 5.  Speculation, lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |

46

| | |
|---|---|
| for protection, and the bullets constantly hit my cardboard protest sign.  It was clear the deputies were shooting toward the people instead of the ground.  The shooting went on for approximately 12 minutes." | |

## DECLARATION OF IMORIE RECIO – EXHIBIT 15

| Material Objected to: | Grounds for Objection: |
|---|---|
| 1.  Paragraph 5: "Without warning, the deputies started shooting at around 10pm. Sheriff deputies fired what I believe were rubber bullets or foam rounds at the protesters and then threw teargas. The protesters felt threatened and put their plastic and cardboard shields up. I did not see any protesters throw anything at the sheriff deputies at any time. I do not know why they sheriff deputies began to use less lethal force against us. I did not hear a declaration of unlawful assembly or dispersal order before shooting." | 1.  Speculation.  Fed. R. Evid., Rules 601, 602 and 804. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| 2.  Paragraph 10: "Bean bags, teargas, stinger grenades, pepper bullets, and foam bullets were used by the deputies." | 2.  Lack of foundation, speculation.  Fed. R. Evid., Rules 601, 602 and 804. |
| --- | --- |

## DECLARATION OF JESSICA ROGERS – EXHIBIT 16

| **Material Objected to:** | **Grounds for Objection:** |
| --- | --- |
| 1.  Paragraph 15. | 1.  There are no photos attached to the declaration as stated by the declarant |

## DECLARATION OF VISHAL SINGH – EXHIBIT 17

| **Material Objected to:** | **Grounds for Objection:** |
| --- | --- |
| 1.  Paragraph 2:  "I am an independent journalist, and I have been covering the protests against police brutality since the end of May 2020." | 1.  Irrelevant, argumentative, vague.  Fed. R. Evid., Rules 401-403. |
| 2.  Paragraph 6:  "One LASD sergeant threatened me with bear mace.  He brandished it and then shoved me backwards." | 2.  Vague, ambiguous, lack of foundation. Fed. R. Evid., Rule 611(a). |

## DECLARATION OF ADDIE TINNELL – EXHIBIT 18

48

| Material Objected to: | Grounds for Objection: |
|---|---|
| 1.  Entire declaration. | 1.  The declaration is not made under penalty of perjury under any laws, making it inadmissible.  28 U.S.C. § 1746; Fed. R. Evid., Rule 603. |
| 2.  Paragraph 2:  "I work for the National Lawyers Guild, which is an organization which works to advance the rights of all Americans by advocating for groups which are marginalized or oppressed, including those impacted by police violence and peaceful demonstrators whose rights are violated by law enforcement. I am in charge of the legal observer program, which trains civilians to recognize and document police tactics and use of force on demonstrators to protect the right of free speech by publicly displaying that police behavior at demonstrations is being documented. I have attended hundreds of demonstrations as a legal observer, have trained dozens of other legal observers, and have organized and supervised | 2.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| legal observer teams at over fifty demonstrations." | |
| 3.  Paragraph 3:  "I participated in a peaceful demonstration on August 25, 2020." | 3.  Vague, lack of foundation.  Fed. R. Evid., Rules 601, 602 and 804. |
| 4.  Paragraph 6:  "At all times while I was at the demonstration, I was wearing a lime green legal observer hat, which I believe sheriff's deputies are aware signifies that I am attending the demonstration as an NLG-trained legal observer rather than as a participant, because I have interacted with them numerous times while legal observing." | 4.  Irrelevant, speculation.  Fed. R. Evid., Rules 401-403. |
| 5.  Paragraph 11:  "Early in the day, I saw deputies pointing less lethal weapons at me for about ten minutes while I did nothing but stand there looking at them. I saw them point less lethal weapons at demonstrators so many times that I could not count. I would estimate at least 20 times that I personally observed this happen; I would describe this activity as fairly constant | 5.  Vague, ambiguous.  Fed. R. Evid., Rule 611(a). |

| | |
|---|---|
| throughout the demonstration, especially the deputies on the strikers." | |
| 6.  Paragraph 12:  "I also saw about six deputies on the roof looking at demonstrators through scopes of weapons. Those appeared to be rifles, not less lethal, and they were pointed at demonstrators for a very long time; I can't say for sure, but it felt like this was going on the entire time the group was there, or almost the entire time." | 6.  Irrelevant.  Fed. R. Evid., Rules 401-403. |
| 7.  Paragraph 15:  "Within minutes of the pepper ball shots, sometime around 6:00 p.m., most of the demonstrators began to march east on Imperial toward the 110 freeway. This was peaceful. The march entered the freeway and remained peaceful." | 7.  Argumentative (that a protest that involves a clear violation of California law—blocking a freeway—is "peaceful").  Fed. R. Evid., Rule 611(a). |
| 8.  Paragraph 21:  "At the time the deputies began firing, the sheriff's barrier was still erected and intact to the south of the line of landscaping bushes. I did not see anything thrown or any | 8.  Speculation, lack of foundation (as to the knowledge and thoughts of persons other than the declarant).  Fed. R. Evid., Rules 601, 602 and 804. |

1   demonstrator attempting to breach
2   the barrier, and I never heard
3   anything later that suggested such
4   a thing had occurred or even any
5   speculation as to what triggered
6   the assault. We were all confused
7   and surprised by the sudden
8   turn of events. At the time the
9   shooting began, the vast majority
10  of the demonstrators were
11  standing in the actual street,
12  Imperial Highway. A smaller
13  number was between the street
14  and the bushes, and a smaller
15  group of around thirty were
16  between the bushes and the
17  barricade, and one or two of those
18  were legal observers; many of the
19  rest were press, that had large
20  amounts of camera equipment or
21  press badges, or other press gear
22  like vests to identify themselves.
23  The actual demonstrators were
24  there to support the family of
25  Dijon Kizzee and Black Lives
26  Matter, which were between the
27  bushes and the street and in the
28  street respectively, so the group of

| | |
|---|---|
| demonstrators was gathered more around those areas. The press and legal observers, by contrast, tended to be more interested in watching and filming or photographing the deputies, and so they were congregating closest to the barrier." | |
| 9.  Paragraph 27:  "I learned from a medic that two people went to the hospital. One could not breathe after the tear gas. I believe the other person was hit by shrapnel." | 9.  Hearsay (Fed. R. Evid., Rules 801, 802), speculation.  Fed. R. Evid., Rules 601, 602 and 804. |

### DECLARATION OF CHAD LODER

| **Material Objected to:** | **Grounds for Objection:** |
|---|---|
| 1.  Paragraph 2:  "I reside in Redondo Beach, CA. and I am a 43-year-old, white male, employed in the tech industry.  I have been a volunteer and mutual aid organizer in humanitarian crises over the past several years, for example, responding to the hurricanes in Puerto Rico to provide emergency food, water, | 1.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

| | | |
|---|---|---|
| 1 | and sanitation supplies for the | |
| 2 | island.  In the beginning stages of | |
| 3 | the COVID-19 pandemic, I | |
| 4 | realized that there would be a | |
| 5 | shortage of PPE (personal | |
| 6 | protective equipment) for first line | |
| 7 | medical responders, so I co- | |
| 8 | founded a group a group called | |
| 9 | Masks For Docs.  Masks For Docs | |
| 10 | has provided over 100,000 masks | |
| 11 | and other PPE to medical workers, | |
| 12 | first responders, and essential | |
| 13 | workers worldwide.  Masks For | |
| 14 | Docs has been featured in the Los | |
| 15 | Angeles Times, KTLA, FOX | |
| 16 | News, VICE, and others.  More | |
| 17 | recently, our group set up a truck- | |
| 18 | portable cooling center to help | |
| 19 | LA's homeless population during | |
| 20 | the heatwave.  I volunteer weekly | |
| 21 | to provide hygiene kits, food, | |
| 22 | water, and clothing for homeless | |
| 23 | people in Los Angeles." | |
| 24 | 2.  Paragraph 8:  "In later viewing | 2.  Hearsay, lack of foundation.  Fed. R. |
| 25 | videos taken by journalists at the | Evid., Rules 801, 802. |
| 26 | time of the incident, I observed the | |
| 27 | following:  The crowd was | |
| 28 | entirely peaceful.  Sheriffs were | |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| 1 | pointing their weapons at a small |
| 2 | group of demonstrators located |
| 3 | outside the plaza parking lot to the |
| 4 | east.  Younger males were pushing |
| 5 | a desk up the street along an alley |
| 6 | way.  There was a small group of |
| 7 | people standing at the front of the |
| 8 | alley, several feet away from the |
| 9 | police line.  The Sheriff Deputies |
| 10 | began shooting pepper balls at |
| 11 | them.  When the deputies started |
| 12 | shooting in the alley, nearly every |
| 13 | Deputy present began to shoot |
| 14 | pepper balls, rubber bullets, and |
| 15 | "Stinger" flash bang grenades |
| 16 | directly into the crowd in the |
| 17 | parking lot, which was made up of |
| 18 | peaceful demonstrators, |
| 19 | journalists, and onlookers. |
| 20 | Attached hereto as Exhibit B is a |
| 21 | google map of the location and I |
| 22 | was standing at the approximate |
| 23 | location of the red X in the |
| 24 | parking lot." |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| 3.  Paragraph 10:  "When I arrived in the South LA neighborhood on September 7, I was detained by Los Angeles County Sheriff's Deputies while walking to the protest.  I informed them I was there to exercise my First Amendment Rights.  They asked me why I had a soft plastic shield and a helmet.  Prior to September 7th, I learned that the Sheriffs had previously shot rubber bullets at crowds without warning or provo-cation.  I responded to them, 'I heard you guys like to shoot people.'  They told me that I was not allowed to have a shield, and I responded that I believed they were incorrect, and that (a) we were not in the City of Los Angeles, (b) regardless, the shield complied with the City of Los Angeles Municipal Code given the size and materials, and that (c) there was no County ordinance prohibiting it.  I informed the Deputies that they had no probable cause to detain me and asked if I | 3.  Vague and ambiguous; lack of foundation; hearsay (Fed. R. Evid., Rules 801, 802); speculation. |

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

| | |
|---|---|
| was free to go.  After approximately twenty minutes with Deputies trying to figure out what to do, they let me go and I proceeded to the protest site. There were several witnesses to this unlawful detention.  I felt that this prolonged detention, and inquisition, without probable cause, was done to intimidate me and threaten me with punishment or violence if I exercised my First Amendment Rights." | |
| 4.  Paragraph 11:  "After September 7, I became aware that Los Angeles County Sheriffs did nothing to clean up the mess they made by shooting pepper balls and rubber bullets into peaceful crowds.  I reached out to people on social media to assist in a Neighborhood Cleanup Day, to clean up any pepper ball or rubber bullet debris and fragments of exploded flashbang grenades. This is in keeping with my mission to provide humanitarian | 4.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

57

| | |
|---|---|
| aid where needed and where I can help.  We carefully used a spray bottle with baking soda and water to spray down pepper ball residue to neutralize it, and to keep contaminants from entering the air and into the lungs of neighbors. We spoke with several local residents who were very upset that the LA County Sheriffs shot out car windows and used flash bang grenades frightening everyone, especially children and pets.  They thanked us for our clean-up efforts and expressed support for the peaceful protests." | |
| 5.  Paragraph 12: "At approximately 5 pm, when I and our volunteers were engaged in that clean-up effort on the sidewalk, Sheriffs rushed our group from behind.  Before I knew what was happening, a man ran up behind me and pinned my arms behind my back, saying 'Don't move'.  The man behind me, who was a Sheriff's Deputy, did not | 5.  Vague and ambiguous; speculation. |

| | |
|---|---|
| 1 | identify himself as a law enforce- |
| 2 | ment officer.  I was confused and |
| 3 | frightened, and in pain from being |
| 4 | rushed from behind while injured. |
| 5 | At least three Sheriff's SUV's had |
| 6 | arrived behind our small volunteer |
| 7 | group, with approximately 6-8 |
| 8 | deputies.  They handcuffed us, |
| 9 | searched our bags despite my clear |
| 10 | and repeated statement of non- |
| 11 | consent, took photos of our faces |
| 12 | using their mobile phones despite |
| 13 | our clear statements of non- |
| 14 | consent, and copied our ID's. |
| 15 | They told us there was a call for |
| 16 | service but could not identify |
| 17 | anything we were doing unlaw- |
| 18 | fully or even anything that raised |
| 19 | suspicion.  We asked what crime |
| 20 | we were suspected of and they |
| 21 | could not tell us.  After keeping us |
| 22 | handcuffed in the back of their |
| 23 | cruisers for several minutes, the |
| 24 | officers informed us we were not |
| 25 | under arrest and were free to go. |
| 26 | The senior Deputy on the scene |
| 27 | refused to provide me with his |
| 28 | name or a business card when I |

59

| | |
|---|---|
| asked him, and the other deputies also refused to provide me with business cards when I asked them. I felt that Deputies were detaining us without any reasonable suspicion, in an attempt to generate a probable cause.  Again, I feel and believe the Deputies engaged in threats, intimidation and coercion in order to deprive us and deter us from exercising our First Amendment Rights." | |
| 6.  Paragraph 13: "At approximately 6:30, I was driving south on Normandie away from the area with two of the other volunteers, when a large team of Los Angeles County Sheriff Deputies in multiple SUV's pulled me over.  The tags on my car were recently expired so I expected to be given a fix-it ticket.  Instead, I was placed in the back of one patrol car, while my two female passengers were placed in the back of another.  They searched the trunk and interior of my vehicle without my consent and | 6.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

| | |
|---|---|
| found the following: a skate helmet, a new first-aid backpack with the tags still on it, a brand-new belt holder for first-aid equipment, a harness for carrying a camera, cleaning supplies for the neighborhood cleanup day, a motocross body protection vest, a respirator, six-to-eight umbrellas, two soft plastic shields, a $150 search and rescue flashlight, and a bag of approximately 20 brand new ear-loop cloth masks (color white) for COVID protection. None of these items is illegal. None of these items has been returned to me." | |
| 7.  Paragraph 14:  "I was sitting in the patrol car for approximately 30 minutes without handcuffs while the Deputies stood around, talked on their radios and mobile phones, and searched and re-searched my car.  I felt and believed that they were looking for some reason, any reason, to arrest me, which was made difficult by the fact that nothing in my car or in my | 7.  Irrelevant.  Fed. R. Evid., Rules 401-403. Lack of foundation. |

61

| | |
|---|---|
| conduct had given a valid reason for arrest.  Finally, a Deputy came and handcuffed my hands behind my back and told me I was being placed under arrest.  The Officers did not place a seat belt on me and then intentionally drove the vehicle fast, whipping it around tight turns, causing me fly around the back seat and injuring parts of my body as I hit the interior of the vehicle.  I repeatedly protested that I was not wearing a seat belt and they were hurting me but they ignored my plea for help.  The LASD Manual of Policy and Procedures, section 5-03/165.03 states:  '*All prisoners shall wear factory installed, or Department authorized and installed, safety belts when being transported in a County vehicle.*'" | |
| 8.  Paragraph 15: "I was taken to the Los Angeles County Sheriff's South LA Station and booked at approximately 7 pm.  I was not given any food until 7 am the next day.  While in jail, I noticed my | 8.  Irrelevant.  Fed. R. Evid., Rules 401-403. |

urine was now mixed with blood.
Although the charges were bogus,
I was given $5000.00 bail.  I was
able to contact the National
Lawyers Guild of Los Angeles,
who were prepared to bail me out
the same evening.  However, the
Sheriffs told our lawyer that the
station was 'shut down' for the
night due to the potential for
protests, which meant that I was
forced to spend the night in jail.
When I was being processed, a
Deputy told me 'The DA won't
actually bring any of these charges
against you guys", which I took as
an admission that the Sheriffs
were knowingly conducting false
arrests of protesters to interfere
with our civil rights.  While I was
in jail, Deputies told me at
different times 'If you didn't want
to get arrested, you shouldn't have
protested in our neighborhood.
Stay in your own neighborhood.'
Even though I was not protesting
when I was arrested, I took this as
confirmation that I was arrested

63

| | |
|---|---|
| merely for daring to lawfully exercise my First Amendment rights on the Sheriff's turf. I was able to bail out and I was released at 3pm on Thursday Sep 10th, with the assistance of lawyers with the National Lawyers Guild." | |
| 9. Paragraph 16: "However, my belongings, including my skate helmet, first aid backpack, camera harness, soft plastic shields, emergency flashlight, cloth masks, and protective vest, and possibly other belongings have been confiscated and not returned to me. I have not been provided with a list of items they confiscated. I am informed and believe that the Los Angeles County Sheriff's Department is unlawfully taking the phones and other property of peaceful protestors in order to intimidate and coerce them in violation of their First amendment Right to speech and assembly and 4th Amendment protections of unreasonable seizures of our persons and property." | 9. Irrelevant (Fed. R. Evid., Rules 401-403); lack of foundation, speculation. |

64

| | |
|---|---|
| 10.  Paragraph 17:  "After I got home from jail, I went to the Little Company of Mary hospital Emergency Room.  Concerned about the bruising and blood in my urine from the night before, they performed a CT scan and blood tests.  I was informed that I had a likely bruise to my spleen or kidney on the left side of my body, but no organ rupture or damage.  I remain in a great deal of pain and discomfort from the brutal and unnecessary force used on me by Los Angeles County Sheriffs.  I want to be able to exercise my First amendment rights without fear that the Sheriffs will injure me or unlaw-fully arrest or detain me while doing so.  Because the Sheriffs confiscated my protective equip-ment, I am afraid that the Sheriffs will injure me again even more severely if I show up at a peaceful protest.  At this point in time, it appears nothing will stop them | 10.  Hearsay (Fed. R. Evid., Rules 801, 802); lack of foundation, vague; argumentative. Fed. R. Evid., Rule 611(a). |

65

| | |
|---|---|
| from causing harm and injury without court intervention." | |
| 11.  Paragraph 18:  "I was told several times by Los Angeles County Sheriff's that if I did not want to be injured or arrested, I should not come to this neighborhood.  I would like to provide additional assistance to the community, for example, by providing school supplies for families with children, but I am traumatized by these incidents and fearful of returning." | 11.  Hearsay (Fed. R. Evid., Rules 801, 802); lack of foundation, vague. |

**Exhibit 19:  "Less Than Lethal Weapons, UN Peacekeeping PDT Standards for Formed Police Units First Edition 2015".**

This exhibit is objected on the ground that it has not been properly authenticated and lacks foundation.  *See* Fed. R. Evid., Rules 602 and 901.  This exhibit is further objected to on the grounds that it is irrelevant.  Fed. R. Evid., Rules 401-403.  This exhibit is further objected to because it contains inadmissible hearsay (and hearsay upon hearsay) with no applicable exception thereto.  Fed. R. Evid., Rules 801, 802.  Furthermore, neither the unauthenticated document nor the information contained therein are the proper subject of judicial notice because they are not a fact that is not subject to reasonable dispute.  Fed. R. Evid., Rule 201.

66

**Exhibit 20:  "Physicians for Human Rights, Health Impacts of Crowd-Control Weapons: Kinetic Impact Projectiles (Rubber Bullets), Physicians for Human Rights website (January 1, 2017), http://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-kinetic-impact-projectiles-rubber-bullets/".**

This exhibit is objected on the ground that it has not been properly authenticated and lacks foundation.  *See* Fed. R. Evid., Rules 602 and 901.  This exhibit is further objected to on the grounds that it is irrelevant.  Fed. R. Evid., Rules 401-403.  This exhibit is further objected to because it contains inadmissible hearsay (and hearsay upon hearsay) with no applicable exception thereto.  Fed. R. Evid., Rules 801, 802.  Furthermore, neither the unauthenticated document nor the information contained therein are the proper subject of judicial notice because they are not a fact that is not subject to reasonable dispute.  Fed. R. Evid., Rule 201.

**Exhibit 21:  "Kelsey D. Atherton, What 'Less Lethal' Weapons Actually Do, Scientific American website (June 23, 2020), http://www.scientificamerican.com/article/what-less-lethal-weapons-actually-do".**

This exhibit is objected on the ground that it has not been properly authenticated and lacks foundation.  *See* Fed. R. Evid., Rules 602 and 901.  This exhibit is further objected to on the grounds that it is irrelevant.  Fed. R. Evid., Rules 401-403.  This exhibit is further objected to because it contains inadmissible hearsay (and hearsay upon hearsay) with no applicable exception thereto.  Fed. R. Evid., Rules 801, 802.  Furthermore, neither the unauthenticated document nor the information contained therein are the proper subject of judicial notice because they are not a fact that is not subject to reasonable dispute.  Fed. R. Evid., Rule 201.

BERG\EVIDENTIARY OBJS TO EPA FOR TRO

**Five Video Files Submitted By Plaintiffs.**

These video files are objected to on the ground that they have not been properly authenticated and lack foundation.  *See* Fed. R. Evid., Rules 602 and 901.

Dated:  September 28, 2020          LAWRENCE BEACH ALLEN & CHOI, PC


By _____/s/  Paul B. Beach_____
                                      Paul B. Beach
                                      Attorneys for Defendants
                                      County of Los Angeles and
                                      Sheriff Alex Villanueva

BERG\EVIDENTIARY OBJS TO EPA FOR TRO