Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Arnoldo Casillas SBN 158519
Denisse O. Gastélum SBN 282771
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com
e. dgastelum@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,

PLAINTIFFS,

v.

COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,

DEFENDANTS.

Case No.: 2:20-cv-07870-DMG-PD
*Assigned to: Honorable Dolly M. Gee*

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF**

# **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................. 1

II.  THE LASD HAS BEEN USING EXCESSIVE FORCE AGAINST
     PEACEFUL PROTESTERS FOR THE PAST SEVERAL WEEKS. ............. 2

III. DEMONSTRATION OF AN OFFICIAL CUSTOM OR POLICY IS NOT
     REQUIRED UNDER THE BANE ACT FOR INJUNCTIVE RELIEF. ....... 12

IV. PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR *MONELL*
     CLAIMS. ......................................................................................................... 14

       A.   The LASD has a custom or practice of indiscriminately using less-
            lethal munitions and chemical agents against peaceful protestors. ...... 15

       B.   Sheriff Villanueva ratified LASD deputies' unlawful conduct. ........... 16

V.   INJUNCTIVE RELIEF SHOULD NOT, NEED NOT, AND CANNOT
     BE LIMITED TO THE NAMED PLAINTIFFS IN THIS CASE. ................. 18

VI. FURTHER DISCOVERY WILL CAUSE UNNECESSARY DELAY
     AND IS NOT NEEDED FOR THE INTERIM RELIEF REQUESTED. ....... 21

VII. CONCLUSION ............................................................................................... 22

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR
INTERIM INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

Page(s)

*Federal Cases*

*Abay v. City of Denver*,
  445 F.Supp.3d 1286 (D. Colo. 2020) ....................................................21

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987)...................................................19, 20

*Chaudhry v. City of Los Angeles*,
  751 F.3d 1096 (9th Cir. 2014)...........................................................13

*City of St Louis v. Praprotnik*,
  485 U.S. 112 (1988) .................................................................16, 17

*Clement v. California Dep't of Corrections*,
  364 F.3d 1148 (9th Cir. 2004).............................................................20

*Davis v. Astrue*,
  874 F. Supp. 2d 856 (N.D. Cal. 2012) ..................................................20

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011)..............................................................14

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
  92 F.3d 1486 (9th Cir. 1996)...........................................................18, 19

*Estate of Osuna v. Cty. of Stanislaus*,
  392 F. Supp. 3d 1162 (E.D. Cal. 2019) ................................................16

*Fuller v. City of Oakland, Cal.*,
  47 F.3d 1522 (9th Cir. 1995).............................................................18

*Gillette v. Delmore*,
  979 F.2d 1342 (9th Cir. 1992) *cert. denied* 510 U.S. 932 (1993)...........15

*Guevara v. Cty. of Los Angeles*,
  2015 WL 224727 (C.D. Cal. Jan. 15, 2015)..........................................15

-ii-

# <u>TABLE OF AUTHORITIES – CONT'D</u>

Page(s)

*Federal Cases*

*I.V. v. Vacaville Unified Sch. Dist.*, No. 2:19-cv-00273-KJM-DB,
   2020 U.S. Dist. LEXIS 28474 (E.D. Cal. Feb. 19, 2020)) .....................................13

*Just Film, Inc. v. Merch. Servs., Inc.*,
   474 F. App'x 493 (9th Cir. 2012) ...........................................................................20

*Justin v. City of L.A.*, CASE NO. CV-00-12352 LGB (AIJx),
   2000 U.S. Dist. LEXIS 17881 (C.D. Cal. Dec. 5, 2000) .......................................19

*K.T. v. Pittsburg Unified Sch. Dist.*,
   219 F. Supp. 3d 970 (N.D. Cal. 2016) ...................................................................12

*Larez v. City of Los Angeles*,
   946 F.2d 630 (9th Cir.1991) ............................................................................17, 18

*Lavan v. City of L.A.*,
   797 F. Supp. 2d 1005 (C.D. Cal. 2011) .................................................................19

*Los Angeles County v. Humphries*,
   562 U.S. 29 (2010) .................................................................................................14

*Martin v. City of Portland*,
   2020 WL 363391 (D. Or. Jan. 21, 2020)................................................................16

*McCarthy v. Barrett*,
   804 F. Supp. 2d 1126 (W.D. Wash. 2011) ............................................................16

*Monell v. Department of Social Services of City of New York*,
   436 U.S. 658 (1978) ........................................................................14, 15, 16, 18

*Mood v. City of Costa Mesa*,
   2016 WL 6902109 (C.D. Cal. June 2, 2016)..........................................................15

*Mora v. City of Garden Grove*,
   2020 WL 4760184 (C.D. Cal. May 1, 2020)..........................................................13

1

## <u>TABLE OF AUTHORITIES – CONT'D</u>

2

Page(s)

<u>*Federal Cases*</u>

3

4

*Nak Kim Chhoeun v. Marin*,
   306 F. Supp. 3d 1147 (C.D. Cal. 2018)......................................................20

5

6

*Nehad v. Browder*,
   929 F.3d 1125 (9th Cir. 2019) .....................................................................14

7

8

*Pashuta v. City of San Diego*, No. 3:19-CV-2386-CAB-(BLM),
   2020 U.S. Dist. LEXIS 57218 (S.D. Cal. Apr. 1, 2020) ...........................12

9

10

*Reese v. City of Sacramento*,
   888 F.3d 1030 (9th. Cir. 2018) .............................................................12, 13

11

12

*Roman v. Wolf*,
   --- F.3d ---- 2020 WL 6040125 (9th Cir. 2020) ........................................21

13

14

*Starr v Baca*,
   652 F.3d 1202 (9th Cir. 2011) *cert. denied* 566 U.S. 982........................17

15

16

*Zepeda v. INS*,
   753 F.2d 719 (9th Cir. 1985) .........................................................18, 19, 20

17

18

<u>*State Cases*</u>

19

20

*Saheli v. White Mem'l Med. Ctr.*,
   21 Cal. App. 5th 308 (2018)........................................................................13

21

<u>*Federal Statutes*</u>

22

23

42 U.S.C. Section 1983................................................................ Passim

24

<u>*State Statutes*</u>

25

Cal. Civ. Code § 52.1..............................................................1, 12, 13

26

Cal. Gov. Code § 910 ....................................................................12

27

Cal. Gov. Code § 912.4 .................................................................12

Cal. Gov. Code § 945.6(a)(2) ........................................................12

28

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR
INTERIM INJUNCTIVE RELIEF

1    Pursuant to this Court's October 8, 2020 Order (Dkt. 26), Plaintiffs Krizia Berg
2  *et al.* hereby submit this supplemental brief in support of their application for a
3  temporary restraining order and request for interim injunctive relief.

4  **I.   INTRODUCTION**

5    As documented below, the Los Angeles County Sheriff's Department
6  ("LASD") is continuing to use dangerous weapons, such as rubber bullets, pepper
7  balls, and tear gas, against non-violent protesters who pose no immediate threat to
8  anyone.  These "less-lethal" weapons can cause serious and permanent, if not fatal,
9  injuries.  There is simply no justification for their use against peaceful protesters under
10  any circumstances, and the use of such force against people who have not been given
11  an opportunity to disperse, or even a clear warning that they need to disperse, is all
12  the more concerning.

13    With protests ongoing, interim injunctive relief is not simply warranted under
14  applicable law; it is urgently needed.  It is only a matter of time before someone dies,
15  or another person is permanently disfigured or incapacitated, as a result of the LASD's
16  unlawful, indiscriminate, and resolutely unapologetic deployment of these damaging
17  weapons that have the potential to inflict wounds from which there can be no recovery
18  (losing an eye, for example), and also have the potential to kill.

19    This sort of interference with the constitutional rights of peaceful protesters,
20  constitutes irreparable harm *per se*, and Plaintiffs have a strong likelihood of
21  succeeding on the merits of their claims.  The interim relief Plaintiffs seek is narrow
22  and intended to preserve the status quo, ensuring only that citizens can exercise their
23  the right to protest peacefully against police violence without risking serious or
24  potentially permanent injury.  Requiring the LASD to comply with the law when
25  using less lethal force is clearly in the public interest and will not at all hamper the
26  LASD's ability to respond to legitimate threats to safety.

27    In light of the fact that injunctive relief can be obtained under the Bane Act
28  (Civil Code Section 52.1), Plaintiffs are not required to demonstrate that the LASD's

unlawful actions are pursuant to an official custom and practice in order for this Court to enjoin Defendants' unlawful conduct.   Nonetheless, ample evidence supports issuance of interim injunctive relief under 42 U.S.C. Section 1983.  Moreover, the injunctive relief should apply to all protesters, and not just the named Plaintiffs, in order for the relief to be effective.  Finally, there is already sufficient evidence in the record for this Court to grant interim injunctive relief without the need for additional discovery, which would only delay resolution of Plaintiffs' requested relief and endanger more people who are simply exercising their constitutional rights.

## II.     THE LASD HAS BEEN USING EXCESSIVE FORCE AGAINST PEACEFUL PROTESTERS FOR THE PAST SEVERAL WEEKS.

This action arises out of the ongoing violent, repeated abuses of powers by the LASD aimed at punishing people who are, and have been since the murder of George Floyd, lawfully exercising their rights to protest the increasingly disturbing incidents of police abuse, and in particular, the lethal use of force against people of color.

The Complaint in this matter was filed on August 27, 2020.  Since the filing of this Complaint, LASD deputies have been relentless in their use of "less lethal" force, which – as advisors to Governor Newsom recently acknowledged – can *still be lethal*,[1] against peaceful demonstrators.  Such indiscriminate violence and dangerous, retaliatory abuses of the police powers cannot be countenanced.

On August 25, 2020, a lawful, peaceful demonstration through the streets of downtown Los Angeles resulted in LASD using less-lethal projectiles, and tear gas against demonstrators.  Appendix Tab ("App.") 2, Declaration of Diana Barbadillo ("Barbadillo Decl.") ¶¶ 4, 6, 10-14, (Docket No. 13-4, Page ID # 126-127); Notice of

---

[1] CBS Sacramento, CBS13/AP; *Gov. Newsom Releases Recommendations On Police Tactics During Protests* (October 13, 2020); https://sacramento.cbslocal.com/2020/10/13/newsom-recommendations-police-tactics-protests/ ("Rubber bullets and chemical irritants can not only injure and ***kill***, they said, but can "rapidly escalate conflict, and … should be used as a last resort to protect life and repel assaults when other means have been exhausted.") (emphasis added).

Errata re: [Corrected] Exhibit 2, ¶¶ 15-16, (Docket No. 18-1, Page ID # 394), (peaceful protestor and legal observer was shot in the leg with flash bang grenade as she attempted to run away from the LASD deputies who were shooting flash bang grenades and pepper balls at the demonstrators; peaceful protestor and legal observer witnessed fellow demonstrator "Joe" get hit in the eye by a projectile); App. 10, Declaration of Taegen Meyer ("Meyer Decl.") ¶¶ 3-6, (Docket No. 13-4, Page ID. # 218) (peaceful protestor observed LASD deputies fire rubber bullets and/or foam rounds and deploy teargas at the protestors; peaceful protestor inhaled teargas during the encounter causing him to cough for two hours); App. 11, Declaration of Joseph Mischo ("Mischo Decl.") ¶¶ 2-4, 5-6, (Docket No. 13-4, Page ID # 222) (peaceful protestor was shot in the face with a pepper ball causing contact with his right eye; peaceful protestor was shot in the left buttock and left elbow with rubber bullets and/or foam rounds as he stood 20 to 25 feet from the LASD deputies; peaceful protestor observed LASD deputies shoot pepper balls, rubber bullets and foam rounds at protestors); App. 12, Declaration of Jillian O'Neil ("O'Neil Decl.") ¶¶ 4-5, 10-13 (Docket No. 13-4, Page ID # 230) (peaceful protestor and legal observer was hit in the legs with a flash bang grenade sustaining injuries to both legs; peaceful protestor observed LASD deputies shoot flash bang grenades at protestors, including protestor and legal observer Diana Barbadillo); App. 17, Declaration of Vishal Singh ("Singh Decl.") ¶¶ 3-5, 8 (Docket No. 13-4, Page ID # 261) (peaceful protestor was teargassed causing irritation to his eyes and coughing; peaceful protestor observed LASD deputies shoot less lethal ammunition and throw tear gas at peaceful protestors and legal observers); App. 18, Declaration of Addie Tinnell ("Tinnell Decl.") ¶¶ 3, 4 (Docket No. 13-4, Page ID # 264) (peaceful protestor observed LASD deputies fire flash bang grenades at legal observers; peaceful protestor observed press representative's injury to his eye after being hit by shrapnel from a flash bang grenade).

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF

On August 25, about 100 demonstrators marched on the streets to the County Jail, a County of Los Angeles facility, protesting the Pasadena killing of Anthony McClain, where they encountered barricades described as a "giant slinky." App. 17, Singh Decl. ¶ 5 (Docket No. 13-4, Page ID #261); App. 11, Mischo Decl. ¶ 3 (Docket No. 13-4, Page ID # 222). They then marched back in the direction of City Hall. App. 11, Mischo Decl. ¶ 4 (Docket No. 13-4, Page ID # 222); App. 17, Singh Decl. ¶ 7 (Docket No. 13-4, Page ID # 261); App. 10, Meyer Decl. ¶ 5 (Docket No. 13-4, Page ID # 218).

At Broadway and Temple, LASD deputies fired rubber bullets, pepper balls, and tear gas at the non-violent demonstrators, aggressively breaking up the demonstration. App. 2, Barbadillo Decl. ¶¶ 4, 6, 10-14 (Docket No. 13-4, Page ID # 126-127); Docket No. 18-1, Notice of Errata re: [Corrected] Exhibit 2, ¶¶ 15-16 (Docket No. 18-1, Page ID # 394); App. 10, Meyer Decl. ¶¶ 3-6 (Docket No. 13-4, Page ID #218); App. 11, Mischo Decl. ¶¶ 2-4, 5-6 (Docket No. 13-4, Page ID # 222); App. 12, O'Neil Decl. ¶¶ 4-5, 10-13(Docket No. 13-4, Page ID # 230); App. 17, Singh Decl. ¶¶ 3-5, 8 (Docket No. 13-4, Page ID # 261); App. 18, Tinnell Decl. ¶¶ 3, 4 (Docket No. 13-4, Page ID # 264).

At no time did the LASD deputies give any warning or announce any declaration of an unlawful assembly, nor did they give any dispersal order to allow demonstrators to leave and escape arrest before being subjected to the use of less-lethal force. App. 11, Mischo Decl. ¶ 6 (Docket No. 13-4, Page ID # 222); App. 10, Meyer Decl. ¶ 7 (Docket No. 13-4, Page ID # 218); App. 17, Singh Decl. ¶ 8 (Docket No. 13-4, Page ID # 261); App. 12, O'Neil Decl. ¶ 10 (Docket No. 13-4, Page ID # 231).

Joseph Mischo, a protester at the August 25th march, recalled: "I was hit in my right eye with a pepper ball. I was hit in my left buttock and left elbow with what I believe to have been rubber bullets and/or foam rounds. I was about 20-25 feet from the sheriff deputies when they shot at me. . . I did not see any protesters throw anything

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR
INTERIM INJUNCTIVE RELIEF

at deputies or spray painting. The shields that protesters carried were made of foam. I did not hear a dispersal order, a declaration of unlawful assembly, or a warning of any kind prior to the use of force." App. 11, Mischo Decl. ¶ ¶ 5-7 (Docket No. 13-4, Page ID # 222).

National Lawyers Guild Los Angeles chapter ("NLG-LA") staff member, Addie Tinnell also did not hear any warning prior to the use of less lethal munitions: "Without any warning whatsoever, the sheriff's deputies began firing numerous munitions at the crowd. Both of the legal observers present were hit and injured by flash bang grenades, and one of them was hit at close range. I believe the legal observers were targeted."  App. 18, Tinnell Decl. ¶ 4 (Docket No. 13-4, Page ID # 264).

Two legal observers from the NLG-LA, Diana Barbadillo and Jillian O'Neil, are present at every demonstration and easily identifiable from their lime green baseball hats.  During the August 25th protest, Ms. Barbadillo and Ms. O'Neil were specifically targeted with a tear gas grenade after they had become separated from the main group and were following directions from LASD deputies to move across the street.  App. 12, O'Neil Decl.  ¶¶  4-5, 10-13 (Docket No. 13-4, Page ID # 231); App. 2, Barbadillo Decl. ¶¶ 4, 6, 10-14 (Docket No. 13-4, Page ID #126-17); Docket No. 18-1, Notice of Errata re: [Corrected] Exhibit 2, ¶¶ 15-16 (Docket No. 18-1, Page ID # 393). They were struck in the legs, suffering painful injuries.  *Id.*  LASD deputies continued shooting rubber bullets and flash grenades at them as they ran away and sought protection with other demonstrators. App. 12, O'Neil Decl.  ¶¶ 14, 26 (Docket No. 13-4, Page ID # 232, 234); App. 2, Barbadillo Decl. ¶¶ 13-14 (Docket No. 13-4, Page ID # 128); Docket No. 18-1, Notice of Errata re: [Corrected] Exhibit 2, ¶¶ 15-16 (Docket No. 18-1, Page ID # 394). NLG-LA legal observer, Jill O'Neill, recounted: "I saw a deputy throw a flash bang grenade at me. I ran away from it to the right (south), and then suddenly I felt something explode between my legs.  It is my personal belief that the flash bang grenades were thrown at me and Diana Barbadillo

intentionally because of our legal observer status, based on the attitudes of the deputies we spoke with beforehand. We were the only two legal observers present." App. 12, O'Neil Decl.  ¶¶  11-12 (Docket No. 18-1, Page ID # 231).

On September 5, 2020, at a larger demonstration of about 250-300 people protesting the recent LASD killing of a Black man riding a bicycle, Dijon Kizzee, at the Sheriff's station in South Central Los Angeles on Imperial, a similar sequence of events unfolded.  LASD deputies (dressed in full riot gear) again erected a barrier surrounding the station with a giant "slinky."  The demonstration primarily took place on Imperial Highway, which had been blocked from traffic.  As peaceful protesters were gathered, listening to speeches, LASD deputies began firing on the crowd with rubber bullets, pepper balls, flash bangs, and tear gas grenades. App. 2, Barbadillo Decl. ¶ 21 (Docket No. 18-1, Page ID # 129); Docket No. 18-1, Page ID # 395, Notice of Errata re: [Corrected] Exhibit 2, ¶ 20; App. 14, Declaration of David Ramirez ("Ramirez Decl."), ¶ 5 (Docket No. 13-4, Page ID # 246).  Again, no warning or dispersal order had been given, and even as people retreated and ran away from the location, LASD deputies *chased them* and shot at them with rubber bullets.  *Id.*

A young seven-year old girl and her mother were overcome with tear gas, causing them to have difficulty breathing.[2]  App. 12, O'Neil Decl. ¶ 23 (Docket No. 13-4, Page ID # 233).  After shooting at the demonstrators with less-lethal munitions, deputies were heard directing people east on Imperial.   App. 6, Declaration of Katherine Franco ("Franco Decl.") ¶ 21 (Docket No. 13-4, Page ID # 184).  NLG-LA legal observer Katherine Franco recalled the following: "I never heard the deputies say they would start shooting or give an order to disperse prior to shooting.  Minutes after they started shooting, at 8:44 p.m., they gave a dispersal order that was loud enough for many of the demonstrators to hear . . . I had a bad reaction to the tear gas

_____

[2] Josie Huang, *In South LA, March For Dijon Kizzee Turns Chaotic Outside Sheriff's Station*, LAist website (Sept. 6, 2020), https://laist.com/2020/09/06/dijon_kizzee_south_la_los_angeles_sheriffs_department_deputies_march_110.php.

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF

such that I had to call a friend to help me leave the demonstration, since I could not drive myself due to the tear gas. I was coughing uncontrollably and had a hard time breathing. It burned my eyes so that I could not see for at least ten minutes . . ." App. 6, Franco Decl. ¶¶ 21-22 (Docket No. 13-4, Page ID # 184).

By now, demonstrations were taking place almost nightly in front of the Sheriff's station in South Central on Imperial Highway.  On September 7, a peaceful demonstration of about 75-100 people took place, again protesting the killing of Dijon Kizzee.[3]   At approximately 10:00 p.m., LASD deputies started shooting rubber bullets, pepper balls, tear gas, and other munitions at the demonstrators.  App. 15, Declaration of Imorie Recio ("Recio Decl.") ¶ 5 (Docket No. 13-4, Page ID # 253). No warning or dispersal order was given prior to the commencement of the attack. *Id*.  The 19-year-old Imorie Recio, who attended the protest, observed: "I did not see any protesters throw anything at the sheriff deputies at any time. I do not know why they sheriff deputies began to use less lethal force against us." *Id.*  Amongst others, deputies shot Recio in her right ankle with a black stinger grenade.  It left a big cut and swelled up right away.  App. 15, Recio Decl. ¶ 6 (Docket No. 13-4, Page ID # 253).  She was struck at least three times in the back, probably with pepper balls, and once in her right calf with a rubber bullet, making it difficult for her to stand.  *Id.*  Meanwhile, she was choking on tear gas.  *Id.*  She ran to a 7-11 on the corner and sought treatment from paramedics.  *Id.*  While an ice pack was being applied, she heard an announcement to disperse from an amplified speaker, even as the deputies continued to shoot and advance toward the retreating protesters.  *Id.*  Recio recalled: "After I got in the car, I noticed most people were running away but 10-20 people

---

[3] Leila Miller, Alene Tchekmedyian, *Dozens arrested as protesters and deputies clash in Dijon Kizzee demonstrations in L.A.*, LA Times website (Sept. 9, 2020), https://www.latimes.com/california/story/2020-09-09/demonstrators-arrested-dijon-kizzee.

stood ground.  LASD deputies continued moving forward while shooting for 20-30 minutes." *Id.* at ¶ 9 (Docket No. 13-4, Page ID # 254).

The next night, September 8, a similar demonstration took place at the LASD station on Imperial Highway.  Again, despite the peaceful and non-violent nature of the demonstration, at about 8:15 pm LASD deputies declared an unlawful assembly through an amplifier.  This time they gave demonstrators five minutes to leave.  App. 3, Declaration of Lisamarie Betancourt ("Betancourt Decl.") ¶ 6 (Docket No. 13-4, Page ID # 134).  Within five minutes they began to advance on the demonstrators, pushing them back toward Normandie.  *Id.* at ¶ 7.  Then, LASD deputies charged the crowd and struck down a leader with a bullhorn, arresting him.  *Id.* at ¶ 8.  As soon as they did, LASD deputies charged the rest of the crowd and began shooting at them with rubber bullets and stingers.  *Id.*[4]  LASD deputies continued shooting at the crowd of people with an intent to injure, and not just disperse.  *Id.* at ¶ 9.  Protest attendee Lisamarie Betancourt recounted: "Given the fact that the protesters were nonviolent, and the deputies were not being threatened, it appeared to me that the LASD deputies were shooting less than lethal weapons with an intent to injure and not simply to disperse the crowd . . . I was hit by a foam bullet on my chest and it was bleeding through my clothes. I have a big bruise through by ribs.  *Id.* at ¶¶ 9-10 (Docket No. 13-4, Page ID # 135).

---

[4] *See* https://www.instagram.com/tv/CE5oxO5nUNn (video footage at 12:50 time stamp depicts LASD deputies firing less lethal weapons indiscriminately at protestors as protestors move away from deputies) (September 8, 2020; last visited October 15, 2020) (Plaintiffs will manually file this video with the Court.); Leila Miller,  *Protests become a 'lifestyle' for some L.A. activists: 'This has been like church for me,'* LA Times website (Sept. 11, 2020), https://www.latimes.com/california/story/2020-10-08/la-me-south-la-sheriffs-station-protestors (photograph Matthew Sanders showing the injury to his left arm from less lethal projectile fired at him by LASD deputies during September 8th protest).

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF

That demonstrators were being targeted by deputies is patently clear.  On September 9, Breo Freeman picked up supplies including water, a cooler, hand sanitizer, snacks, and a first aid kit to take in his pick-up truck to provide to demonstrators.  App. 7, Declaration of Breo Freeman ("Freeman Decl.") ¶ 2 (Docket No. 13-4, Page ID # 189).  When he returned to his truck after half-an-hour, all four tires of his truck had been slashed.  *Id.* at ¶ 6.  A reluctant witness reportedly saw LASD deputies slash the tires.  App. 7, Freeman Decl. ¶ 7.  As he was about to call AAA for assistance, four LASD vehicles arrived.  *Id.* at ¶¶ 8-12.  LASD deputies accosted him, detaining him in a patrol vehicle while they searched his truck without permission.  *Id.*  LASD deputies admitted they had detained him because he was bringing supplies to the demonstrators.  *Id.* at ¶ 13.

Then, on September 11, a press conference was called by the National Lawyers Guild at which numerous demonstrators voiced their complaints about the LASD's mistreatment of demonstrators.  The press conference was surrounded by 30 or more LASD deputies dressed in riot gear, displaying less-lethal weapons and kettling the group with the use of a "slinky" barricade.  App. 5, Declaration of David Cunningham ("Cunningham Decl.") ¶¶ 11-16 (Docket No. 13-4, Page ID # 175-176); App. 1, Declaration of Cynthia Anderson-Barker ("Anderson-Barker Decl.") ¶¶ 9-17 (Docket No. 13-4, Page ID # 123-124).  It appeared the LASD deputies intended to intimidate the participants.  App. 1, Anderson-Barker Decl. ¶ 17 (Docket No. 13-4, Page ID # 124).  One LASD deputy even attempted to snatch one of the speakers over the barricade for taking pictures of other deputies.[5]  App. 5, Cunningham Decl. ¶ 20 (Docket No. 13-4, Page ID # 177).

---

[5] Leila Miller, Alene Tchekmedyian, *Deputies in riot gear surround peaceful news conference related to Kizzee shooting*, LA Times website (Sept. 11, 2020), https://www.latimes.com/california/story/2020-09-11/deputies-in-riot-gear-peaceful-press-conference-related-to-kizzee-shooting.

Sheriff Villanueva is under fire for his behavior and the conduct of his deputies. The Inspector General, Max Huntsman, whose function is to investigate and oversee complaints of deputy misconduct, has been highly critical of the LASD and Sheriff Villanueva's unwillingness to cooperate with his investigations.  Most recently, Sheriff Villanueva has refused to cooperate with Inspector General Huntsman's investigation of the notorious arrest of local KPCC reporter Josie Huang.[6]  Sheriff Villanueva tried to justify her arrest by claiming she failed to properly identify herself as a reporter, a claim belied by numerous videos of the encounter.  Videos from multiple vantage points clearly show a press badge hanging from Huang's neck as she repeatedly declared that she was a journalist with KPCC.[7]

The recurring, well-documented LASD custom and practice of using excessive force against peaceful protesters is ongoing and dangerous.  At a recent, September 25th march, demonstrators gathered to protest the lack of police accountability in the fatal shooting of Breonna Taylor.  Docket No. 25-2, Declaration of Asa Juleff ("Juleff Decl.") ¶¶ 3-4, 7 (Docket No. 25-2, Page ID # 568).  Approximately 50 protestors marched from William S. Hart Park to Santa Monica Boulevard and continued on to other streets in West Hollywood. *Id*. The march began at approximate 8 p.m.  *Id*. When the march arrived that the LASD West Hollywood Station, at approximately 8:30 p.m., the protestors were met with LASD deputies in full riot gear.  *Id*. at ¶ 6.

Given the use of projectiles and chemical agents by the LASD deputies during the recent demonstrations, some protestors used their vehicles to create barriers between the deputies and the protestors.  *Id*. at ¶ 8.  LASD deputies began approaching

---

[6] Brittany Martin, *Inspector General Says the Sheriff's Department May Have Made False Claims About a Reporter's Arrest*, Los Angeles Magazine (September 17, 2020), https://www.lamag.com/citythinkblog/josie-huang-arrest-lasd-villanueva/.

[7] Alex Wigglesworth, *L.A. County deputies arrest radio reporter covering protest outside hospital, LA Times website* (September 13, 2020), https://www.latimes.com/california/story/2020-09-13/deputies-arrest-radio-reporter-covering-protest-outside-hospital.

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF

1  the vehicles and opening the doors to snatch the drivers and passengers out of the
2  vehicles. *Id*. at ¶ 9 (Docket No. 25-2, Page ID # 568-569). One of the drivers, Andy,
3  had come down from his truck. *Id*. at ¶ 10 (Docket No. 25-2, Page ID # 569). An
4  LASD deputy pushed Andy to the ground, then multiple LASD deputies got on top
5  of Andy and began beating Andy, hitting him in the legs with the edge of the riot
6  shield. *Id*.; *see also* Docket No. 25-1, Further Declaration of Diana Barbadillo
7  ("Barbadillo Further Decl."), ¶¶ 24-27, 31 (Docket No. 25-1, Page ID # 563-564).
8  Protestors, including Asa Juleff, walked toward Andy. Docket No. 25-2, Juleff Decl.
9  ¶ 10 (Docket No. 25-2, Page ID # 569). LASD deputies then shot pepper balls at Asa
10 Juleff and the protestors. Juleff Decl. at ¶ 10; Barbadillo Further Decl. at ¶ 29. The
11 pepper balls struck Asa Juleff in the left collarbone, right cheek and above the left
12 eye. Juleff Decl. at ¶ 10. These protectors were 50 feet away from the LASD deputies
13 when they shot the pepper balls. *Id*. At no time were the protestors driving
14 erratically, throwing anything at the LASD deputies, or threatening the deputies. *Id*.
15 at ¶ 11 (Docket No. 25-2, Page ID # 569).

16      In light of the systemic, deeply entrenched issues at stake – in addition to the
17 unfortunate reality that more people of color will be unlawfully executed by law
18 enforcement, and by the LASD in particular, in the coming months – it is clear that
19 these protests are likely to continue for the foreseeable future. Meanwhile, there has
20 been no indication whatsoever by the LASD that its deputies will refrain from using
21 devastating "less lethal" – *but still potentially lethal* – force on protesters who are
22 acting peacefully. To the contrary – despite the LASD's contentions – the
23 documented facts as recounted above indicate that the LASD has endorsed and
24 implemented a County-wide practice of unlawful, violent suppression and retaliation
25 against peaceful protesters.

26      Put simply, as demonstrated above, these dangerous uses of force by the LASD
27 are not isolated incidents. More importantly, these facts demonstrate that LASD has,
28 throughout the County (from the West Hollywood station, to downtown L.A., to

-11-

Compton, to South Central), repeatedly used unlawful force against *peaceful* protesters.

## III. DEMONSTRATION OF AN OFFICIAL CUSTOM OR POLICY IS NOT REQUIRED UNDER THE BANE ACT FOR INJUNCTIVE RELIEF.

Although the initial complaint alleged claims under 42 U.S.C. Section 1983, Plaintiffs will be filing a First Amended Complaint within the next week (and prior to this Court's ruling on their request for interim injunctive relief) which will include specific claims under California law, including claims for violation of the Tom Bane Civil Rights Act (Cal Civ. Code § 52.1). The Bane Act provides for damages and injunctive relief to protect the civil rights of citizens in California.[8] Significantly, unlike Section 1983, the Bane Act allows for vicarious liability for the County and does not require evidence that a deputy acted pursuant to an official municipal policy or custom. *See Pashuta v. City of San Diego*, No. 3:19-CV-2386-CAB-(BLM), 2020 U.S. Dist. LEXIS 57218, at *10 (S.D. Cal. Apr. 1, 2020) (citing *K.T. v. Pittsburg Unified Sch. Dist.*, 219 F. Supp. 3d 970, 982 (N.D. Cal. 2016)) ("California law permits *respondeat superior* liability for Bane Act violations."). Accordingly, because the County and the LASD are vicariously liable for the actions of their deputies, Plaintiffs are entitled to injunctive relief under the Bane Act, even in the absence of an official custom or policy.

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'" *Reese v. City of Sacramento*, 888 F.3d 1030, 1040 (9th. Cir. 2018) (quoting Cal. Civ. Code § 52.1(a)). "The elements of an

---

[8] On September 4, 2020, Plaintiffs presented a claim for damages to Los Angeles County pursuant to Government Code Section 910 asserting claims under California law, including the Bane Act. After 45 days (e.g. October 19, 2020), the claim can be deemed to have been denied and Plaintiffs can bring a lawsuit alleging the state law claims. *See* Cal. Gov. Code, §§ 912.4, 945.6(a)(2).

excessive force claim under § 52.1 are essentially the same as under § 1983, though a Bane Act claim additionally requires a showing of 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure . . .'" *I.V. v. Vacaville Unified Sch. Dist.*, No. 2:19-cv-00273-KJM-DB, 2020 U.S. Dist. LEXIS 28474, at *17 (E.D. Cal. Feb. 19, 2020) (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)).  The Bane Act does not "require[ ] coercion independent from the constitutional violation." *Reese*, 888 F.3d at 1045.  While a showing of specific intent is required, Plaintiffs can prevail on their Bane Act claim by showing that Defendants had "'reckless disregard' for [their] Fourth Amendment right, which would be 'evidence of a specific intent to deprive' [them] of that right." *Mora v. City of Garden Grove*, No. 819CV00418JLSJDE, 2020 WL 4760184, at *10 (C.D. Cal. May 1, 2020) (quoting *Reese*, 888 F.3d at 1045).

In their application for a Temporary Restraining Order, Plaintiffs have discussed at length how Defendants' practice of indiscriminately deploying less-lethal munitions on peaceful protestors, legal observers, and journalists violates the Fourth Amendment.  At minimum, given the indiscriminate deployment of these munitions, including on individuals who were attempting to leave the area, the conduct demonstrates reckless disregard for the rights of protesters to engage in peaceful demonstrations.  Accordingly, because the violent actions of the LASD have undoubtedly interfered with the rights of protesters under both the federal and California constitutions, Plaintiffs are likely to succeed on their Bane Act claim.

Nor can there be any legitimate dispute that injunctive relief is available under the Bane Act, which explicitly authorizes "injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct . . . " § 52.1(b); *see also Saheli v. White Mem'l Med. Ctr.*, 21 Cal. App. 5th 308, 321, 230 (2018), *review denied* (2018) (observing that the Bane

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF

Act provides for "a temporary restraining order or temporary or permanent injunction").

Because Plaintiffs are pursuing injunctive relief through the Bane Act, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and *Los Angeles County v. Humphries*, 562 U.S. 29 (2010), have no application; they apply only to prospective relief under § 1983. Accordingly, regardless of whether Plaintiffs have presented sufficient evidence to enjoin the LASD under *Monell*, an injunction under the Bane Act should still be granted. The plain language of the Bane Act makes clear that Plaintiffs are entitled to injunctive relief to enjoin the LASD's ongoing indiscriminate use of less-lethal force at protests.

Moreover, as set forth below, Plaintiffs have also presented sufficient evidence justifying an injunction based on the LASD's pattern and practice of using excessive force against peaceful protesters. *See Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019) ("[Plaintiffs] need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice.").

## IV.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR *MONELL* CLAIMS.

In addition to having presented sufficient evidence to support interim injunctive relief under the Bane Act, Plaintiffs have presented sufficient evidence to support an injunction against the LASD pursuant to *Monell*. To establish that the County of Los Angeles itself is liable, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

Plaintiffs can prove that the policy, custom, or practice was the cause of injury in three ways: (1) "a city employee committed the alleged constitutional violation

-14-

pursuant to [either] a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) *cert. denied* 510 U.S. 932 (1993).

### A. The LASD has a custom or practice of indiscriminately using less-lethal munitions and chemical agents against peaceful protestors.

As described above, LASD has deployed dangerous, less-lethal munitions on large crowds of peaceful protestors on several nights since the filing of the Complaint. On several occasions, LASD has also indiscriminately used less-lethal munitions on legal observers and journalists.  This disturbing, unlawful policy is so deeply ingrained, in fact, that LASD deputies have continued to deploy these disfiguring, potentially life-threatening weapons against protestors were *attempting to leave* a protest, as described above.  App. 12, O'Neil Decl.  ¶¶ 14, 26; App. 2, Barbadillo Decl. ¶¶ 13-14; Docket No. 18-1, Exh. 2, ¶¶ 15-16.

Plaintiffs' allegation of a policy, custom, or practice may be bolstered by allegations of past incidents of similar "misconduct to others."  *Guevara v. Cty. of Los Angeles*, No. CV 14-08120 DDP, 2015 WL 224727, at *4 (C.D. Cal. Jan. 15, 2015). Court have found that even just two past incidents are more than sufficient allegations to state a claim that a policy has harmed someone.  *Mood v. City of Costa Mesa*, No. SACV151154SVWKK, 2016 WL 6902109, at *5 (C.D. Cal. June 2, 2016), report and recommendation adopted, No. SACV 15-1154-SVW(KK), 2016 WL 6905930 (C.D. Cal. Nov. 22, 2016) (*Monell* allegations of a policy of detaining and harassing homeless people sufficient to hold Costa Mesa liable as complaint alleged two past incidents of harassment by Costa Mesa).

-15-

Plaintiffs have presented compelling evidence, including witness declarations, photographs and video footage, demonstrating that LASD's repeated and indiscriminate uses of less-lethal munitions are not isolated incidents, but constitute a practice or custom. Since the filing of the Complaint, which included widespread and unlawful acts over several weeks involving many locations throughout the County of Los Angeles, LASD has continued to engage in the same behavior on at least three other occasions. The flagrant, repeated infliction of such dangerous, unlawful and punitive force readily establishes a "practice or custom" under *Monell*. *Cf. Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) (denying motion to dismiss *Monell* claim because the complaint "identified multiple prior instances of alleged misconduct."); *Martin v. City of Portland*, No. 3:19-CV-1647-SI, 2020 WL 363391, at *5-6 (D. Or. Jan. 21, 2020) (denying motion to dismiss *Monell* claim because the plaintiff adequately alleged "that the City ha[d] a history of using unconstitutional force on people experiencing mental health crises sufficient to constitute a custom or practice"); *McCarthy v. Barrett*, 804 F. Supp. 2d 1126 (W.D. Wash. 2011) (denying summary judgment to defendants on Fourth and First Amendment *Monell* claims against the City of Tacoma stemming from the use of tear gas and other uses of force to disperse a protest). Accordingly, Plaintiffs have sufficient evidence of the LASD's practice or custom of indiscriminate use of less-lethal munitions at protests.

### B. Sheriff Villanueva ratified LASD deputies' unlawful conduct.

Plaintiffs are also likely to prevail on their ratification theory, under which they need show that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate. *See City of St Louis v. Praprotnik*, 485 U.S. 112, 126-127 (1988); Ninth Circuit Model Jury Instruction No. 9.7.

///

///

There can be no dispute that Defendant Villanueva, as Sheriff of the LASD, is an official with final policymaking authority.[9]   Moreover, based on his public statements, it is clear that Defendant Villanueva was well aware of the unlawful conduct of his deputies.   Indeed, after LASD deputies used excessive force against peaceful protestors at the May 30th demonstration, he stated he would be working with protestors to ensure their rights and maintain public safety.[10]

However, Villanueva did not thereafter repudiate or take any steps to prevent his deputies' indiscriminate uses of force, thereby ratifying them.   Moreover, in public statements, he stated that the actions of the LASD were proper and that he expected "deputies to defend themselves" using so-called "less-lethal" force when facing protesters throwing objects at deputies in full riot gear; he has stated that he expects officers to use the specific less-than-lethal rounds at issue in this action and falsely claimed that they do not cause injury to protesters.[11]   *See Praprotnik*, 485 U.S. at 127

---

[9] Sheriff Villanueva has also been sued in his individual capacity and can be held personally responsible for his own actions in violating the civil rights of plaintiffs and the putative class.  *See Starr v Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011) (holding that the LA County Sheriff can be personally liable under Section 1983 based on "his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'" (quoting *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991)), *cert. denied* 566 U.S. 982.  Accordingly, this Court can also enjoin Sheriff Villanueva in his personal capacity.

[10] Mercury News report on protests in Los Angeles County (June 2, 2020), https://www.mercurynews.com/2020/06/02/2100-plus-arrested-so-far-in-los-angeles-county-while-protests-rage/ (last visited Oct. 14, 2020).

[11] KTLA 5 video of interview with Sheriff Villanueva (June 3, 2020), at 1 minute 55 seconds ("Obviously, if you're taking rocks and bottles, in a confrontation, you're not gonna – there's no politically correct way to address the fact that you're being assaulted with a deadly weapon. *I expect the deputies to defend themselves*. . . . [Less-lethal force devices] are designed to get someone's attention without injuring them.") https://ktla.com/morning-news/l-a-county-sheriff-villanueva-on-the-recent-protests-in-los-angeles/ (last visited Oct. 16, 2020) (emphasis added).

-17-

("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1534 (9th Cir. 1995), as amended (Apr. 24, 1995) (holding that a plaintiff may establish *Monell* liability by demonstrating either delegation to subordinate, or ratification of subordinate's decision); *see also Larez v. City of Los Angeles*, 946 F.2d at 647 ("[LAPD Chief of Police] Gates's statements, coming from a final policymaker on police matters, also properly could have been considered to represent the LAPD's policy or custom of condonation of, and acquiescence in, the use of excessive force by its officers."). Here, the evidence shows that the Sheriff has condoned, directed and approved of the use of excessive force against non-violent protesters, thereby justifying the issuance of interim injunctive relief against the LASD.

## V.  INJUNCTIVE RELIEF SHOULD NOT, NEED NOT, AND CANNOT BE LIMITED TO THE NAMED PLAINTIFFS IN THIS CASE.

In its October 8, 2020 Order, this Court requested that Plaintiffs address whether injunctive relief would inure only to the benefits of the named plaintiffs and not the putative class members pursuant to *Zepeda v. INS*, 753 F.2d 719, 729 n.1 (9th Cir. 1985).  While *Zepeda* expressed a general rule against the issuance of class-wide relief prior to the certification of the class, subsequent rulings have narrowed the precedential value of that holding, particularly in the civil rights context when broad relief is necessary to inure complete relief to the named plaintiffs. "Indeed, this circuit has upheld injunctions against pervasive violations of the Fourth Amendment." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996). "While injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification . . . an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit - even if it is not a class action - *if such breadth is necessary to give prevailing parties the relief to which they are entitled*."  *Id.* at 1501-02 (9th Cir. 1996)

(quoting *Bresgal v. Brock,* 843 F.2d 1163, 1170-71 (9th Cir. 1987) (emphasis in original). This Circuit has further distinguished *Zepeda* on the grounds that "[t]he import of the rule underlying *Zepeda* is that an injunction cannot issue against an entity that is not a party to the suit." *Bresgal*, 843 F.2d at 1170 (granting an injunction because "the injunction here was issued only against the Secretary, who is a party.").

Here, in order to gain full relief, the named Plaintiffs' requested injunction – which will only be issued against the LASD, *see id.* – will incidentally extend to members of the putative class.  In *Easyriders*, the Ninth Circuit upheld that an injunction against a California Highway Patrol policy of enforcing a helmet law without reasonable suspicion against all motorcyclists, instead of just fourteen individual plaintiffs. 92 F.3d at 1501-02. The Court reasoned that given that the policy is set on a statewide level, in practical terms, it is unlikely to expect officers would inquire whether an individual was one of the prevailing plaintiffs in the lawsuit before issuing a citation. *Id.*  The Ninth Circuit therefore found that broad relief was necessary to give the prevailing parties the relief to which they were entitled.  *Id.*

That same logic applies here. As the named Plaintiffs in this case continue to attend protests, they are subject to a real and immediate threat that they will likely be subject to LASD's indiscriminate use of force. *See Lavan v. City of L.A.*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) ("City is seizing and destroying property that has been temporarily left in public places by its owner, but not abandoned. Thus, it would likely be impossible for the City to determine whose property is being confiscated."). It would be absurd and impractical to expect that the LASD deputies who attend these protests to inquire each individual in a large crowd whether they are a named Plaintiff in this case. *See Easyriders*, 92 F.3d at 1501-02.  Accordingly, to ensure that Plaintiffs are not subject to LASD's unconstitutional conduct, this Court has authority to issue an injunction against LASD's indiscriminate use of force at protests prior to certifying the class. *See Justin v. City of L.A.*, CASE NO. CV-00-12352 LGB (AIJx), 2000 U.S.

Dist. LEXIS 17881, at *8 (C.D. Cal. Dec. 5, 2000) (granting broad class-wide relief prior to class certification to enjoin police from harassing homeless population).

As discussed above, the LASD's repeated constitutional violations indicate that LASD has a practice of indiscriminately using less-lethal munitions at protests.  This sort of systematic misconduct warrants broad injunctive relief, and in fact "the Ninth Circuit has indicated that, where there is a systemwide injury because of a policy or practice that pervades an institution, then widespread relief is justified to remedy that injury." *Davis v. Astrue*, 874 F. Supp. 2d 856, 868 (N.D. Cal. 2012) (citing *Clement v. California Dep't of Corrections*, 364 F.3d 1148, 1153 (9th Cir. 2004) (emphasizing that the scope of an injunction depends on the extent of the violation established)).

Further, courts have also held that that "*Zepeda* only stands for the proposition that after a motion to certify a class was expressly denied, the court was limited to entering an injunction only as to the individual plaintiffs."  *Nak Kim Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1164 (C.D. Cal. 2018) (citing *Bresgal*, 843 F.2d at 1170).  As alluded to above, "*Zepeda* does not apply where, as here, an injunction is necessary to forestall harm to putative class members that is likely to transpire before the parties can litigate a motion for class certification."  *Id.*; *see also Just Film, Inc. v. Merch. Servs., Inc.*, 474 F. App'x 493, 495 (9th Cir. 2012) ("We do not read *Zepeda* to preclude our result because in *Zepeda* the trial court had denied class certification and here the trial court has not yet decided the class certification issue.").  Because this Court has not yet denied a class certification motion and the harm is likely to transpire before the parties can litigate a motion for class certification, *Zepeda* has no application here and the Court should issue an interim injunction barring the LASD's indiscriminate use of less lethal force against peaceful protesters.

///

///

///

-20-

1  **VI.   FURTHER DISCOVERY WILL CAUSE UNNECESSARY DELAY AND**
2         **IS NOT NEEDED FOR THE INTERIM RELIEF REQUESTED.**

3         Plaintiffs respectfully contend that no further discovery is needed in light of the

4  compelling evidence, presented above, that the LASD has used and continues to use

5  dangerous, less-lethal force against non-violent protesters.

6         Plaintiffs are not seeking to tie the hands of the LASD or asking the LASD to

7  do anything more than to follow well-established law.  Preliminary injunctive relief

8  would therefore preserve the status quo: that peaceful protesters should not be

9  subjected to excessive force for exercising their First Amendment rights.  *See Abay v.*

10 *City of Denver*, 445 F.Supp.3d 1286, 1293 (D. Colo. 2020)  (granting TRO enjoining

11 Denver police from using less lethal weapons against peaceful protestors) ("Indeed,

12 irreparable harm has already occurred in the form of physical injury and the

13 suppression of speech; there is no reason such harm would not otherwise continue if

14 this relief were denied.")

15        All Plaintiffs seek is for the LASD to stop using rubber bullets, pepper balls

16 and tear gas on people who are not violent or threatening and that prior to deploying

17 any such force, the LASD be required to give sufficient verbal warnings and adequate

18 time for protesters to comply.  Such an order can and should be issued on an interim

19 basis based on the evidence presently before the Court.  *See Roman v. Wolf*, --- F.3d

20 ----  2020 WL 6040125 (9th Cir. 2020) (affirming in part the granting of interim

21 injunctive relief  "because the district court had broad equitable authority to grant

22 provisional relief to remedy a likely constitutional violation.").

23 ///

24 ///

25 ///

26

27

28

-21-

## VII.   CONCLUSION

For all the foregoing reasons, the LASD should be enjoined from using less lethal force such as rubber bullets, pepper balls and tear gas against peaceful protesters and should be required to give verbal warnings and sufficient time to comply before deploying such tactics against protesters.

Dated: October 16, 2020          Respectfully submitted,


By: /s/ Jorge Gonzalez
Jorge Gonzalez
A PROFESSIONAL CORPORATION

Paul Hoffman
Michael D. Seplow
Aidan C. McGlaze
Kristina A. Harootun
John Washington
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP

Carolyn Y. Park
LAW OFFICE OF CAROLYN PARK

Arnoldo Casillas
Denisse O. Gastélum
CASILLAS & ASSOCIATES

Morgan E. Ricketts
RICKETTS LAW

*Attorneys for Plaintiffs and Proposed Class.*

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR REQUEST FOR
INTERIM INJUNCTIVE RELIEF