Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Arnoldo Casillas SBN 158519
Denisse O. Gastélum SBN 282771
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com
e. dgastelum@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,

PLAINTIFFS,

v.

COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,

DEFENDANTS.

Case No.: 2:20-cv-07870-DMG-PD
*Assigned to: Honorable Dolly M. Gee*

**PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF THEIR REQUEST FOR INTERIM INJUNCTIVE RELIEF**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................1

II.   CONTRARY TO DEFENDANTS' ASSERTIONS, THE EVIDENCE
DEMONSTRATES THAT INTERIM INJUNCTIVE RELIEF IS
NEEDED. ..................................................................................................2

      A.   Plaintiffs Submitted Evidence Documenting Seven Separate,
Recent Instances of Coordinated LASD Misconduct and Excessive
Force. ...............................................................................................2

      B.  Being Dressed in Defensive Gear to Protect Against Deputy
Violence is NOT Proof that Demonstrators Assaulted Deputies. .........6

      C.  Plaintiffs Linda Jiang, Grace Bryant, and Emanuel Padilla Fear of
Injury from LASD's Unlawful Use of Force Has Had a Deterrent
Effect on Their Participation in Demonstrations. ...................................6

III.  PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF AGAINST
THE LASD PURSUANT TO THE BANE ACT-CIVIL CODE SECTION
52.1. ........................................................................................................8

IV.  THE LASD'S DEMONSTRATED *DE FACTO* POLICY OR PRACTICE
FOR LESS-LETHAL FORCE READILY SATISFIES *MONELL*. ...............11

V.   DEFENDANTS MISREAD ALL THE CASELAW FOLLOWING
*ZEPEDA*. ..............................................................................................14

VI.  PLAINTIFFS HAVE STANDING FOR INJUNCTIVE RELIEF. ...............16

VII. CONCLUSION .........................................................................................17

1

# <u>TABLE OF AUTHORITIES</u>

Page(s)

2

<u>*Federal Cases*</u>

3

4

*Blankenhorn v. City of Orange*,
  485 F.3d 463 (9th Cir. 2007) ..................................................................11

5

6

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987) .........................................................15, 16

7

8

*Chaudhry v. City of Los Angeles*,
  751 F.3d 1096 (9th Cir. 2014) ...............................................................10

9

10

*City of Canton, Ohio v. Harris*,
  489 U.S. 378 (1989) ...............................................................................12

11

12

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .................................................................................16

13

14

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985) ...............................................................................13

15

16

*Don't Shoot Portland v. City of Portland*,
  2020 WL 3078329 (D. Or. June 9, 2020) .............................................17

17

18

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
  92 F.3d 1486 (9th Cir. 1996) .....................................................14, 15, 16

19

20

*Felder v. Casey*,
  487 U.S. 131 (1988) .................................................................................9

21

22

*Hernandez v. City of San Jose*,
  241 F. Supp. 3d 959 (N.D. Cal. 2017) ..................................................14

23

24

*Hunter v. Cnty. of Sacramento*,
  652 F.3d 1225 (9th Cir. 2011) ...............................................................14

25

26

*Monell v. Department of Social Services of City of New York*,
  436 U.S. 658 (1978) ........................................................................*passim*

27

28

# <u>TABLE OF AUTHORITIES – CONT'D</u>

Page(s)

<u>*Federal Cases (cont'd)*</u>

*Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*,
246 F.R.D. 621 (C.D. Cal. 2007) .......................................................16, 17

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ...................................................................13

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012) ...................................................................11

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) .................................................................................12

*Reese v. City of Sacramento*,
888 F.3d 1030 (9th. Cir. 2018) ................................................................10

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ...................................................................2

*Thomas v. County of Los Angeles*, 2:90-CV- 05217 TJH, overturned in 1993,
978 F.2d 504 (1992) ...................................................................................2

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996).....................................................................13

*Velazquez v. City of Long Beach*,
793 F.3d 1010 (9th Cir. 2015)..................................................................14

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1985)..............................................................14, 15

<u>*State Cases*</u>

*Holt v. Kelly*,
20 Cal.3d 560 (1978)..................................................................................8

*Minsky v City of Los Angeles*,
11 Cal.3d 113 (1974)..................................................................................8

1

## <u>TABLE OF AUTHORITIES – CONT'D</u>

Page(s)

2

*State Cases (cont'd)*

3

4

*Potstada v. City of Oakland,*
   30 Cal.App.3d 1022 (1973) .......................................................................9

5

6

*Williams v. Horvath,*
   16 Cal.3d 834 (1976) ...............................................................................9

7

8

*Federal Statutes*

9

42 U.S.C. Section 1983...........................................................................*passim*

10

*State Statutes*

11

12

Government Code Section 820.2.....................................................................11

13

Government Code Section 905 .........................................................................8

14

15

Government Code Section 911.2.......................................................................9

16

Government Code Section 912.4.......................................................................9

17

Cal. Civil Code Section 3423 ...................................................................10, 11

18

Civil Code Section 52.1 ...................................................................................8

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

If the Los Angeles County Sheriff's Department ("LASD") adhered to its written policies regarding the use of less-lethal force, Plaintiffs would not be pursuing these claims and there would be no need for preliminary injunctive relief. Unfortunately, despite Defendants' deflections and distortions in their Supplemental Opposition (Dkt. 32), the documented facts confirm that the LASD is in fact operating under a dangerous *de facto* policy – i.e., a recurring, sanctioned custom or practice – of unleashing violent, potentially disfiguring or even lethal force, against protesters who pose no danger to anyone and are simply asserting their constitutionally protected rights.  There is an urgent need for preliminary injunctive relief to prevent *any* further instances where such unlawful force is deployed.

Contrary to Defendants' mischaracterizations, Plaintiffs do not seek to tie the LASD's hands when it comes to enabling deputies to protect themselves or others, or to intervene to prevent unlawful activity.  In fact, neither Plaintiffs nor the putative classes in this action have engaged in violence or other unlawful activity, such as looting, that would warrant the deployment of less-lethal force.

Under well-established law, the use of these damaging weapons against peaceful protesters is unreasonable.  However, in recent months, the LASD has repeatedly and unapologetically done so, in a coordinated fashion – deputies acting in concert, supported by their Department, as opposed to a stray "rogue actor" – giving every indication that this unlawful and dangerous practice will remain the *de facto* reality unless this Court intervenes.

Similarly specious, Defendants' technical challenges to Plaintiffs' compelling justifications for preliminary injunctive relief miss the mark entirely.  Under both the Bane Act and Section 1983 (through *Monell*), Plaintiffs' claims are far more than colorable – they fit within the contours of well-established law, demonstrating a high likelihood of success on the merits.  Plaintiffs' entitlement to injunctive relief is

equally clear, and they have standing to pursue such relief on behalf of the putative class members.

## II.    CONTRARY TO DEFENDANTS' ASSERTIONS, THE EVIDENCE DEMONSTRATES THAT INTERIM INJUNCTIVE RELIEF IS NEEDED.

### A. Plaintiffs Submitted Evidence Documenting Seven Separate, Recent Instances of Coordinated LASD Misconduct and Excessive Force.

Plaintiffs provided the Court with evidence of LASD misconduct at demonstrations in the past several weeks, beginning on August 25, 2020, up to September 25, 2020.  At least seven different events occurred, in various parts of the County, presumably under different commands, involving the same dangerous and unlawful misconduct by deputies.[1]

---

[1] Disregarding the scope of this lawsuit, Defendants attempt to minimize their current, recurring civil rights abuses by claiming Plaintiffs only cited five indiscriminate uses of less lethal tools over LASD's 150-year history.  Although the LASD's history is not at issue here, this disingenuous distortion is readily refuted by reference to the public record.  *See, e.g.*, Los Angeles Times, "L.A. County supervisors to consider motion seeking options to remove Sheriff Villanueva" (Oct. 26, 2020), *available at* https://www.latimes.com/california/story/2020-10-26/supervisors-motion-remove-sheriff-villanueva (quoting Supervisor Mark Ridley-Thomas describing Villanueva as being "increasingly viewed as a liability," and claiming the County had paid out "$149 million in the last five years to settle lawsuits and satisfy judgments in cases in which deputies were involved in incidents that include civil rights violations, excessive force, sexual assaults and killings.").

Indeed, over the last 30 years there have been multiple serious civil rights abuses by LASD leading to public scrutiny, including the Kolts Commission Report that resulted in the appointment of Special Counsel Merrick J. Bobb to conduct civilian oversight through the 90's, an injunction issued against the notorious Lynwood station (*Thomas v. County of Los Angeles*, 2:90-CV- 05217 TJH) (overturned in 1993, 978 F.2d 504 (1992)), and *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) in which a complaint was held to have sufficiently alleged supervisory liability against the Sheriff (Leroy Baca) for deliberate indifference based on his knowledge of and acquiescence in unconstitutional conduct by his subordinates.  Moreover, the less-lethal weapons available today had not been invented 100 years ago, let alone

On August 25, 2020, at a demonstration in downtown Los Angeles, no dispersal order or warning was given before deputies fired rubber bullets, pepper balls indiscriminately at protesters, including legal observers from the NLG.  *See* Dkt. 28 at 2:20–6:3 (citing to Declarations of Barbadillo, Meyer, Mischo, O'Neil, Singh, and Tinnel, providing detailed descriptions of dangerous misconduct).   Notably, Defendants *do not address this incident at all* in their Supplemental Opposition (Dkt. 32).

On September 5, 2020, peaceful protesters in front of the South Central station on Imperial met the same fate: indiscriminate use of less-lethal munitions without warning or dispersal order, including tear gas overcoming a seven year old child.  *See* Dkt. 28 at 6:4–7:4 (citing Declarations of Barbadillo, Ramirez, O'Neil, and Franco, describing Sept. 5 misconduct).   On September 7, at the same location, less lethal munitions were used against peaceful protesters without warning, injuring 20-year-old Imorie Recio.  *See* Dkt. 28 at 7:5–8:2. Again, Defendants do not address *either* of these incidents in their Supplemental Opposition.

The next night, September 8, again at the station on Imperial, deputies gave a dispersal order allowing protesters five minutes to leave, then followed them as they left in mass, shooting at them with less lethal munitions despite being non-violent and in the process of retreating.  *See* Dkt. 28 at 8:3–19.  Defendants counter Plaintiffs' reference to the September 8 video (Dkt. 28 at 8 n.4) by arguing Plaintiffs ignored the first 12 minutes of behavior, including that demonstrators created a shield wall and were seen holding a water bottle.  This behavior is not proof of any assaultive behavior against deputies, and does not justify the use of less-lethal weapons.  Furthermore, they point out two individuals running, but the video does not depict them throwing any objects, as argued by Defendants.  What the video does depict, critically, is that

---

150 years ago.  In any event, however, the history is not at issue in this litigation, which pertains *solely* to the LASD's *current* unlawful and dangerous practices.

*the demonstrators were retreating*, in apparent compliance with the dispersal order, and that after retreating about 30-50 meters, the deputies began to open fire on and chase the demonstrators down the street. *Id.* There does not appear to be any justifiable reason for them to deploy the less lethal weapons, especially in the manner depicted: indiscriminately and repeatedly.

The next night, on September 9, a man providing supplies such as water and snacks to demonstrators had his tires slashed, and was accosted by deputies and almost arrested when he returned. *See* Dkt. 28 at 9:1–11.

The week of events culminated with a press conference denouncing this mistreatment, held on September 11 in front of the South Central station and attended by a small scattering of protesters and press corps. Deputies in riot gear amassed in front and cordoned off the press conference with their "slinky" barrier, a show of force clearly made for its intimidating and threatening character. *See* Dkt. 28 at 9:12–23. They even tried to snatch one of the speakers over the barrier because he was taking their pictures. *See id.* Defendants argue that at no point did the deputies interfere with anyone speaking, but they ignore that the import of their intimidation tactics was clear.

Finally, Plaintiffs cite to the demonstration held in West Hollywood on September 25, where demonstrators used vehicles as a barrier against unwarranted attacks on protesters. Deputies tried to forcibly remove people from the vehicles, and used a riot shield to strike one in his legs as he lay on the ground in a fetal position. *See* Dkt. 28 at 10:20–11:15. People standing nearby and across the street witnessing the event were shot at with pepper balls and deputies began throwing flash bang grenades at them. *See* Dkt. 25-1, Barbadillo Decl. ¶¶ 28–29, 24. Asa Juleff was struck in the face and collarbone despite being 50 feet away. *See* Dkt. 25-1, Barbadillo Decl. at ¶¶ 25-34; Dkt. 25-2, Juleff Decl. at ¶¶ 9-12. The report that deputies struck the protester because a deputy had dropped his gun seems not only incredible, but begs several questions: how could the firearm have been caused to "fall to the ground" if

1  it was properly secured and holstered? Why didn't the deputy simply prioritize
2  recovering the handgun?

3       The fact that some demonstrators were struck by vehicles the previous night
4  and had tried to apprehend the drivers is not evidence of assaultive behavior against
5  deputies, and does not, under the standards shown in briefing, justify the use of less-
6  lethal weapons against non-violent demonstrators, especially when the deployment of
7  these weapons was not related to the events tied to the encroachment by vehicles on
8  the marchers.  Ultimately, Defendants' own narrative confirms the very practice
9  Plaintiffs are challenging, and they admit that "deputies deployed a brief volley of
10 less lethal tools."  Dkt. 32 at 6:19.  To the extent such force was directed at direct
11 threats or protesters engaged in unlawful behavior, the supposedly "brief volley" is
12 not objectionable.  However, Defendants gloss over the critical point: *the force was*
13 *deployed indiscriminately*, risking serious or permanent injury to peaceful protesters
14 against whom the use of such dangerous weapons was not justified or lawful.

15      While the LASD may claim there is no official policy to treat demonstrators in
16 a violent manner, Plaintiffs' declarations demonstrate a pattern of misconduct across
17 the County, with incidents in locations patrolled by four different stations (Downtown
18 L.A., Compton, South Central, and West Hollywood).  On multiple occasions,
19 deputies acted with the same type of violence each night, unjustly and unnecessarily
20 injuring innocent protesters, legal observers, and members of the press.

21      The YouTube video of August 31, 2020 (Dkt. 23-1, Exhibit A, *available at*
22 https://www.youtube.com/watch?v=LIVXym2kaX4) does not show any assaults
23 against deputies by protesters.  At all times they are peaceful and non-violent.  Only
24 one incident is shown, when deputies chase a person and arrest them.  The acts leading
25 to the arrest are not shown, only that the person arrested is carrying a large
26 megaphone.  Demonstrators off camera can be heard challenging why the person was
27 targeted for arrest.  *Id.* at 7:50, 8:23-30.  Otherwise, the video does not depict any
28 conduct justifying the indiscriminate use of less-lethal weapons.

-5-

The declaration of Raymond Sakai (Dkt. 34, p. 4 of 30), referencing the videos marked as Exhibits D and E, does not justify the use of less-lethal weapons, as the attacks on demonstrators by vehicles did not prompt their use.  Nor does the "doxing" event outside a deputy's home justify the use of less lethal weapons against demonstrators on the dates cited.  It is simply not relevant, because it is remote in time and place from when they were used.  The misconduct of others simply does not justify the use of dangerous force against peaceful protesters.[2]

**B.  Being Dressed in Defensive Gear to Protect Against Deputy Violence is NOT Proof that Demonstrators Assaulted Deputies.**

Defendants also argue that demonstrators were outfitted with shields, umbrellas, helmets, goggles, and body armor.  This is not evidence that demonstrators assaulted deputies.  Rather, it is evidence that demonstrators acted prudently in **expecting** violence from LASD, in light of the clear and recurring practices of the LASD to deploy such force indiscriminately, and were taking steps to avoid or prevent injury.

**C.  Plaintiffs Linda Jiang, Grace Bryant, and Emanuel Padilla Fear of Injury from LASD's Unlawful Use of Force Has Had a Deterrent Effect on Their Participation in Demonstrations.**

Defendants take issue with the fact that the declarations submitted by Plaintiffs in support of their request for injunctive relief were from putative class members and not the named Plaintiffs. While Plaintiffs contend that the declarations submitted by these putative class members provide sufficient justification for the requested relief, Plaintiffs are submitting the declarations of Plaintiffs and proposed Class Representatives Linda Jiang, Grace Bryant, and Emanuel Padilla who have attended

---

[2] Defendants have objected to Plaintiffs citing to various websites for publicly available materials as lacking foundation.  However, Defendants themselves have cited to similar materials on the internet in their papers. Moreover, these materials are self- authenticating and there can be little dispute as to their authenticity.

other demonstrations since being subjected  to less- lethal munitions during a demonstration in Compton on June 21, 2020.  *See* Declaration of Linda Jiang ("Jiang Decl.") at ¶¶ 3-4*; Declaration of Grace Bryant ("Bryant Decl.") at ¶¶ 4, 5; Declaration of Emanuel Padilla ("Padilla Decl.") at ¶¶ 3-4, 5; *see also* Dkt. 1, ¶ 20 (describing June 21 incident).

Plaintiff Jiang was present at a peaceful demonstration on August 25, 2020 in which the LASD deployed less lethal weapons which injured protesters even though she did not witness anything that would justify their use.  *See* Jiang Decl. at ¶¶ 6-7. Moreover, Plaintiff Jiang also during a peaceful demonstration on September 6, 2020. *Id.* at ¶ 8.  However, when deputies began shooting, she decided to leave because she was afraid that she would be hit again, even though she wanted to remain.  *Id*.  Plaintiff Jiang would go to more demonstrations if she knew she would be safe from deputies indiscriminately using force on her.  *Id.* at ¶ 9.

Plaintiff Bryant also attended several more demonstrations after June 21, 2020 but stopped going after witnessing more incidents where LASD used force without provocation.   Bryant Decl. ¶ 5.   Plaintiff Bryant would have attended more demonstrations if it were not for LASD's unlawful use of force.  *Id.* at ¶ 6.

Plaintiff Padilla attended demonstrations on September 5, 7, 11, 19, and 25. Padilla Decl. ¶¶ 5-11.  On September 5, 7, and 9, LASD deputies used less-lethal force on peaceful protestors.  *Id.* at ¶¶ 6-8.  On September 5 specifically, even a small child was hit with tear gas or pepper spray.   *Id.* at ¶ 6.   At the West Hollywood demonstrations on September 19 and 25, Plaintiff Padilla also witnessed various forms of LASD's unlawful and aggressive conduct, including LASD deputies beating a demonstrator with a shield.   *Id.* at ¶¶ 9-11.   Plaintiff Padilla is forced to leave demonstrations early due to LASD's indiscriminate use of force.  *Id.* at ¶ 13.

Accordingly, Plaintiffs' declarations demonstrate that the LASD's use of projectiles and chemical agents against peaceful protesters has had a chilling effect on their First Amendment rights, thereby justifying the relief sought by Plaintiffs.

III.   **PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF AGAINST THE LASD PURSUANT TO THE BANE ACT-CIVIL CODE SECTION 52.1.**

As set forth in Plaintiffs' initial briefing, it is clear that Plaintiffs may obtain injunctive relief against the LASD under the Bane Act without having to demonstrate that the LASD's unlawful actions against peaceful protesters were pursuant to an official policy or custom.   While Defendants have tacitly conceded that a claim against the LASD under the Bane Act can be based on vicarious liability and thus does not require proof of an official custom or practice, Defendants nonetheless offer several feeble arguments in a vain attempt to rebut the fact that Plaintiffs have a viable claim for injunctive relief under the Bane Act.

First, Defendants mistakenly argue that Plaintiffs have failed to comply with the Government Claims Act and therefore cannot assert a Bane Act claim.   This argument is utterly without merit.   Indeed, the law is crystal clear that the Government Claims Act does not apply to claims for injunctive relief or similar non-monetary remedies.   *See Minsky v City of Los Angeles*, 11 Cal.3d 113, 117 (1974) ("the language of [Government Code] section 905 makes clear that the requirements for presentation of claims apply only to 'claims for money or damages' and not to claims for other forms of relief . . ."); *see also Holt v. Kelly*, 20 Cal.3d 560, 564-65 (1978) (Government Claims Act not applicable to mandamus proceeding which was not an action for damages).   Therefore, the Government Claims Act has no bearing on Plaintiffs' claim for injunctive relief under the Bane Act.[3]

_____

[3]   Defendants argue that the initial TRO application was based on the original Complaint since the First Amended Complaint had not been filed until at the time Plaintiffs filed their application. This argument lacks merit. Even if Plaintiffs had not filed a First Amended Complaint, their original Complaint clearly seeks injunctive relief on behalf of the Plaintiffs and the putative class based on Civil Code Section 52.1. *See* Complaint, Dkt. 1 at page 41, line 24 (asserting claim for injunctive relief pursuant to Civil Code Section 52.1, among other statutes); *see also id.* at page 37,

1    In any event, Plaintiffs complied with the Government Claims Act when they

2    presented their claim to the County of Los Angeles on September 4, 2020.   After 45

3    days (*i.e.*, on October 18, 2020), the claim was deemed to have been denied by

4    operation of law.   *See* Cal. Gov. Code § 912.4 (c); *see also Potstada v. City of*

5    *Oakland,* 30 Cal.App.3d 1022,  1026 (1973), *superseded by statute on other grounds*

6    ("If the governing body 'fails or refuses' to act on a claim within the 45-day period

7    provided for in section 912.4, the claim is deemed rejected by the governing body on

8    the last day of the period within which the governing body is required to act upon the

9    claim . . ."). Accordingly, Plaintiffs were not required to wait for a rejection notice

10   before filing their First Amended Complaint seeking damages under state law since

11   they filed their First Amended Complaint on October 21, 2020—after their

12   Government Claim was deemed rejected by the County.

13   Defendant's suggestion on page 8 of their brief that Plaintiffs' filing of the

14   initial complaint—which only asserted damages claims under Section 1983—prior to

15   having filed their Government claim somehow bars Plaintiffs from filing a First

16   Amended Complaint which adds claims under California law, is absurd. The initial

17   complaint did not assert any damages claims under California law—only under

18   federal law, for which a Government Claim is not required. *See Williams v. Horvath*,

19   16 Cal.3d 834, 842 (1976) ("[W]e hold that the claim provision of [Government Code]

20   section 911.2 is inoperative in an action brought under section 1983"); *see also Felder*

21   *v. Casey*, 487 U.S. 131, 141, 153 (1988). It is beyond dispute that Plaintiffs have

22   complied with the Government Claims Act by presenting their claim to Defendants

23   within six months of accrual and waiting at least 45 days after their claim was

24   presented to file their First Amended Complaint. Accordingly, there is absolutely no

25   basis to dispute that Plaintiffs have satisfied the procedural requirements of the

26   _____

27   line 2 (referring to Bane Act as a common class question). Therefore, both the initial
     Complaint and the operative First Amended Complaint seek injunctive relief under
28   the Bane Act.

Government Claims Act; any argument to the contrary is patently frivolous.  Thus, Defendants' procedural challenges to Plaintiffs' claim for injunctive relief under the Bane Act must be rejected.[4]

Defendants' other arguments regarding the viability of Plaintiffs' claim for injunctive relief under the Bane Act also fail.  First, as discussed in Plaintiffs' initial supplemental brief, the elements for a claim of excessive force under the Bane Act are essentially the same as those for an excessive force claim under 42 U.S.C. Section 1983.  *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)).  To the extent that Plaintiffs are required to show specific intent, the evidence submitted demonstrates that LASD deputies acted with "reckless disregard" for the protesters' constitutional rights by deploying dangerous projectiles and chemical agents against peaceful protesters, which is sufficient under the Bane Act.  *See Reese v. City of Sacramento*, 888 F.3d 1030, 1040 (9th. Cir. 2018). Plaintiffs have submitted compelling evidence of the LASD's deliberate use of excessive force against peaceful protesters which clearly constitutes "threats, intimidation or coercion" and satisfies the elements necessary for injunctive relief under the Bane Act.

Defendants' contention that Plaintiffs' Bane Act claims are somehow precluded by other California statutes lacks merit.  Defendants cite an inapplicable statute, Cal. Civil Code Section 3423, and several cases under that statute dealing with injunctive relief sought by a cabaret, an escort service and a gambling operation, to argue that it would be impermissible for this Court to enjoin the LASD's use of excessive force against peaceful protesters.  Dkt. 32 at 9:10-23.  Civil Code Section

---

[4] Defendants have objected that Plaintiffs have not submitted a copy of their Government Claim to the Court. However, this is completely unnecessary since there is no such requirement for an injunctive relief under the Bane Act.  Plaintiffs see no need to clutter the docket with extraneous documents. However, should the Court request, Plaintiffs will submit a copy of their Government Claim as well as the postcard received from the County acknowledging that the claim was submitted on September 4, 2020.

3423 addresses the "execution of a public statute by officers of the law for public benefit" and the cases cited by Defendants dealt with statutes promoting "public morality."  Accordingly, Section 3423 has no bearing whatsoever on the issuance of injunctive relief in this case.

Furthermore, Defendants, without any analysis, falsely suggest that Government Code Section 820.2 (which provides for immunity for discretionary acts) somehow immunizes them from liability for using excessive force against peaceful protesters.  However, Section 820.2 provides no such immunity.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007) (holding that Section 820.2 does not provide immunity for the use of excessive force by police). Accordingly, Plaintiffs are entitled to injunctive relief against the LASD under the Bane Act.

## IV.    THE LASD'S DEMONSTRATED *DE FACTO* POLICY OR PRACTICE FOR LESS-LETHAL FORCE READILY SATISFIES *MONELL.*

Rather than address the particular factual circumstances Plaintiffs have presented to the Court, the LASD presents a skewed, generalized, and conclusory rendition of the facts regarding its recent, dangerous deployments of less-lethal force. The reason is clear: under even the strictest of objective standards, the use of such damaging weapons against peaceful, non-threatening protesters is clearly unconstitutional.  *Cf. Nelson v. City of Davis*, 685 F.3d 867, 877–83 (9th Cir. 2012) ("[T]he general disorder of the complex cannot be used to legitimize the use of pepperball projectiles against non-threatening individuals.").

The unfortunate fact of the matter, however, is that the LASD has repeatedly failed to adhere to its *written* policies regarding use of force, which *unequivocally prohibit* unreasonable, excessive, and unnecessary force.  *See* Decl. of Commander Robert J. Lewis, ¶ 36 (Dkt. 23-1 at p. 17 of 39).  In contrast, the demonstrated *de facto* policy the LASD has repeatedly endorsed involves indiscriminate deployments of dangerous levels of force at individuals who pose no threat to law enforcement.  Proof of such a custom or practice satisfies the dictates of *Monell v. Department of Social*

*Services of City of New York*, 436 U.S. 658 (1978) under longstanding Supreme Court precedent. *See, e.g.*, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387–88 (1989) (rejecting contention that "only unconstitutional *policies* are actionable under [§ 1983]") (emphasis added); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). ("The 'official policy' requirement [under *Monell*] was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'— that is, acts which the municipality has officially sanctioned or ordered. With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.").

Perhaps then it is no surprise that – rather than addressing the *specific* facts pertaining to *specific* instances of unconstitutional misconduct – the LASD's argument relies on the convenient fiction of a single, monolithic "they," enabling the LASD to assert that "they physically attacked members of the LASD with various weapons." *See* Dkt. 32 at 11:3–4 (p. 19 of 25). Of course, neither Plaintiffs' claims on the merits, nor the specific relief Plaintiffs seek on a preliminary basis, pertain to protesters who are attacking the LASD or present a threat to anyone. To the contrary, Plaintiffs have demonstrated an urgent need to prevent the concerted, *indiscriminate* use of these dangerous weapons – which the LASD has repeatedly deployed against "the crowd" just as recklessly as the LASD presents to this Court the misguided argument that this conduct is justified because *some* protesters behaved in unlawful, threatening ways. As discussed above, one person's misconduct does not justify the use of unreasonable force against other people, even if they happen to be in the same general area at the same time.

Similarly, the LASD takes disingenuous steps to minimize the demonstrated scope of these unlawful practices in recent months. The 150-year history of the

Department has *nothing* to do with the specific pattern at issue here, which pertains to the unlawful, retaliatory suppression of protests about police brutality and systemic racism beginning in May, 2020.  Moreover, it is clear that each documented protest at which such unlawful force was deployed involved *multiple* utilizations of unlawful force.  This is not about a single, rogue deputy who fired once, against policy, into a peaceful crowd.  To the contrary, the recent uses of less-lethal force involve the coordinated actions of multiple deputies at several different stations across the County.

Accordingly, Defendants' reliance on the Supreme Court's decision in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), is misguided.  *Tuttle* holds merely that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  *Id.* at 823–24; *see also id.* at 812 (noting that aside from the particular shooting at issue, neither the shooting officer nor "any other member of the Oklahoma City police force had been involved in a similar incident").  Similarly, the Ninth Circuit's holding in *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) – incidentally, like *Tuttle*, a case involving the shooting of a robbery suspect –  simply restates the general proposition that "liability for improper custom [under *Monell*] may not be predicated on isolated or sporadic incidents."  More specifically, the claim at issue in *Trevino* pertained to allegations that the City of Los Angeles indemnified officers for misconduct as a matter of custom or policy under *Monell*, and the Ninth Circuit found that the record was "virtually devoid of any direct evidence of council indemnification prior to the shooting."  *Id.* at 919.

The coordinated, unlawful deployment of these dangerous weapons at a single protest thus presents remarkably more compelling evidence of a coordinated custom or *de facto* practice.  The fact that multiple deputies engaged in the same, clearly

unconstitutional tactics indicates that there was nothing "isolated or sporadic" about any particular deputy's use of unlawful force.  Self-evidently, these brutal tactics have been coordinated and implemented in a widespread manner at multiple protests. Accordingly, under *Monell*, compelling evidence confirms that the LASD has adopted an unlawful policy regarding its use of less-lethal weapons against protesters.  *See, e.g.*, ("'[A] custom or practice can be inferred from ... evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'"  *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015) (quoting *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011)).

Plaintiffs also satisfy *Monell* under a ratification theory.  Although the compelling evidence of the recurring use of unlawful, dangerous tactics against peaceful protesters is well documented, the record also confirms that at the highest levels, the conduct of LASD deputies in response to the recent protests has been affirmed, condoned, and even championed.  The LASD's evidentiary objections are without merit, in this regard, and the Court can – and should – take Sherriff Villanueva's words into account in assessing this viable, additional confirmation that the LASD has emphatically ratified the violence its deputies have inflicted upon Plaintiffs and other protesters who posed no threat to anyone's safety.  *Cf. Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 980 (N.D. Cal. 2017), *aff'd in part, dismissed in part*, 897 F.3d 1125 (9th Cir. 2018) ("Plaintiffs allegations regarding Garcia's statements after the Trump Rally and [Police Chief] Garcia's failure to reprimand police officers are sufficient to state a claim that the municipality ratified the police officers' allegedly unconstitutional actions.").

## V.   DEFENDANTS MISREAD ALL THE CASELAW FOLLOWING *ZEPEDA*.

Contrary to Defendants' misleading suggestion, the Ninth Circuit in *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) did not at any point discuss the distinction between a permanent versus preliminary injunction.

*Easyrider* cited *Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987)for one proposition only: "an injunction", regardless of whether it is permanent or preliminary, "is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit - even if it is not a class action - *if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" *Easyriders*, 92 F.3d at 1501-02 (quoting *Bresgal*, 843 F.2d at 1170) (emphasis in original).

The reason why *Easyriders* does not even mention this distinction is because *Bresgal's* discussion of why *Zepeda* is inapplicable is not grounded in the fact that *Bresgal* concerns a permanent injunction. While the Ninth Circuit in *Bresgal* briefly mentions that *Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1985) concerns "a preliminary injunction and was limited to that situation", the court went into a more in-depth discussion about why "[t]here is no general requirement that *an injunction* affect only the parties in the suit." *Bresgal*, 843 F.2d at 1169 (emphasis added).  In fact, the Ninth Circuit pointed out the primary reason why *Zepeda* has no application is because "[a] closer examination . . . indicates that the logic behind [it] cannot control here." *Id.* at 1170.  *Zepeda's* general rule that a court cannot determine the rights of persons not before the court is limited in usefulness when a court issues an injunction against a specific defendant that inevitably affects "a major class of persons . . . not before the court." *Id.*  That is when *Bresgal* went on to make clear that the "import of the rule underlying *Zepeda* is that an injunction cannot *issue against* an entity that is not a party to the suit." *Id.* (emphasis added).

The Ninth Circuit then observed that in *Zepeda*, "the injunctive relief requested could 'be granted to the individual plaintiffs without the relief inevitably affecting the entire class.'" *Id.* (quoting *Zepeda*, 753 F.2d at 729 n.1).  However, *Zepeda* allows for a broader injunction if it is necessary to provide "prevailing parties the relief to which they are entitled." *Id.* As outlined in Plaintiffs' supplemental briefing, such relief is necessary for the same reasons in *Bresgal* and *Easyriders*.  Indeed, as set forth in Plaintiff Jiang and Bryant's declarations, they have been deterred from attending

demonstrations based on their observation of the LASD's use of excessive force against other peaceful protesters. *See* Jiang Decl. at ¶ 8-9; Bryant Decl. at ¶¶ 5-6. Further, Plaintiff Padilla has continued to attend several peaceful demonstrations where he witnessed LASD deputies use less-lethal munitions and chemical agents. *See* Padilla Decl. at ¶¶ 5-8. Accordingly, the injunctive relief should extend to all future protests in order for it to be effective and enforce the rights of the Plaintiffs to attend peaceful demonstrates.[5]

## VI.   PLAINTIFFS HAVE STANDING FOR INJUNCTIVE RELIEF.

Unlike the plaintiff in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Plaintiffs' threat of injury is not speculative given the ongoing nature of protests against police brutality. In fact, more protests have taken place over the recent police killing of Walter Wallace Jr. in Philadelphia.[6] "To establish a case or controversy Plaintiffs need not establish that future harm is certain, or even probable." *Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 628 (C.D. Cal. 2007). All they must show is that future harm is not conjectural or hypothetical. *Id.* (citing *Lyons*, 461 U.S. at 105-08).

The evidence submitted by Plaintiffs establishes that on multiple occasions, the LASD used projectiles and chemical agents against peaceful protesters. *See* Dkt. 28 at 2:20–8:19 (citing witness declarations). Moreover, Plaintiff Jiang's and Bryant's

---

[5] Defendants ask this court to reject several published and unpublished district court cases within this circuit only because they incorrectly believe *Easyriders* is inapplicable to preliminary injunctions. The fact that several cases did not even mention whether a preliminary versus permanent injunction is of any importance is because that distinction is not the thrust of *Easyriders* and *Bresgal*. The lack of any analysis on this point in several cases that follow evinces that Defendants are completely off-base. Tellingly, Defendants do not even bother citing to any other cases following *Bresgal* that even note this distinction.

[6] Pat Ralph, <u>Protests over police killing of Walter Wallace Jr. continue for second night in West Philly</u>, Philly Voice (October 28, 2020), *available at* https://www.phillyvoice.com/protests-looting-walter-wallace-jr-shooting-police-west-philly/

declarations establish that they have been deterred from attending demonstrations based on the LASD's past use of force against them and others. *See* Jiang Decl. at ¶ 8-9. Similarly, while Plaintiff Padilla continued to attend several demonstrations— all of which LASD deputies used excessive force in some form—he is forced to leave early and believes others are afraid to attend due to risk of injury. *See* Padilla Decl. at ¶ 5-13. Accordingly, it is clear that Plaintiffs have standing to obtain injunctive relief. *See Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 628 (C.D. Cal. 2007) (finding standing for injunctive relief based on LAPD's history of civil rights violations and declarations that Plaintiffs frequent areas where demonstrations take place).

Plaintiffs who are refraining from protests are only doing so due to their fear of sustaining injuries from LASD's indiscriminate use of force, bolstering the need for this court to issue injunctive relief. As discussed above, Plaintiffs have presented numerous incidents where LASD has indiscriminately used force against peaceful protestors. As such, "Defendants' contention that their overall record of complying with constitutional requirements relating to crowd control is more positive than negative is . . . unpersuasive." *Id.* Accordingly, "[t]here is a real and immediate threat that Plaintiffs will be deprived of [their Fourth Amendment] rights as protests continue." *Don't Shoot Portland v. City of Portland*, 2020 U.S. Dist. LEXIS 100801, *10, 2020 WL 3078329 (D. Or. June 9, 2020). Therefore, Plaintiffs' request for interim injunctive relief should be granted.

## VII.   CONCLUSION

Defendants' mischaracterizations of the facts and misstatements of the applicable law are to no avail. There is an urgent need to enjoin the LASD from continuing to deploy these less-lethal weapons (which could also be described as potentially-lethal weapons) against peaceful protesters, and clearly established law confirms the Court's ability to do so. Plaintiffs urge the Court to intervene without delay, as the LASD's continued implementation of its current practices will put the

lives and bodies of law-abiding people exercising their constitutional rights at risk. The only way to preserve the status quo, and prevent further infliction of potentially permanent or even lethal injuries, is to enjoin the LASD from further indiscriminate use of these dangerous weapons.

Dated: October 30, 2020                    Respectfully submitted,


                                           By:  /s/ Jorge Gonzalez
                                           Jorge Gonzalez
                                           A PROFESSIONAL CORPORATION

                                           Paul Hoffman
                                           Michael D. Seplow
                                           Aidan C. McGlaze
                                           Kristina A. Harootun
                                           John Washington
                                           SCHONBRUN SEPLOW HARRIS
                                           HOFFMAN & ZELDES LLP

                                           Carolyn Y. Park
                                           LAW OFFICE OF CAROLYN PARK

                                           Arnoldo Casillas
                                           Denisse O. Gastélum
                                           CASILLAS & ASSOCIATES

                                           Morgan E. Ricketts
                                           RICKETTS LAW

                                           *Attorneys for Plaintiffs and Proposed
                                           Class.*