UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 1 of 24 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:   IN CHAMBERS—ORDER RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [28]**

On August 27, 2020, Plaintiffs Krizia Berg, Grace Bryant, James Butler, Noelani Del Rosario-Sabet, Linda Jiang, Sebastian Militante, Christian Monroe, Matthew Nielsen, Emanuel Padilla, Shakeer Rahman, Austin Tharpe, Travis Wells, and Devon Young, on behalf of themselves and others similarly situated, filed a Complaint against Defendants County of Los Angeles and Alex Villanueva, in his individual and official capacities as Los Angeles County Sheriff, asserting that the Los Angeles Sheriff's Department ("LASD") has used excessive force against peaceful protesters and unlawfully detained them in violation of their First, Fourth, and Fourteenth Amendment rights.  [Doc. # 1.]

On September 22, 2020, Plaintiffs filed an *Ex Parte* Application for Temporary Restraining Order ("TRO Application") against Defendants.  [Doc. # 13.]  Plaintiffs sought to enjoin LASD from the "indiscriminate" use of (1) "less-lethal" projectiles on crowds of protesters if there is no immediate threat and no order to disperse with time to comply and (2) chemical agents or irritants to disperse or control crowds of protesters without adequate warnings and time to comply.  TRO App. at 2.[1]  On September 28, 2020, Defendants filed their response.  [Doc. # 23.]  On October 7, 2020, Plaintiffs filed a reply and additional evidence.  [Doc. # 25.]

Due to the rushed and disorderly presentation of evidence, the Court denied Plaintiffs' TRO Application and set an expedited briefing schedule for a motion for preliminary injunction.  [Doc. # 26.]  On October 16, 2020, Plaintiffs filed a supplemental brief—which the Court construes as a Motion for Preliminary Injunction ("MPI")—and supporting evidence.  [Doc. ## 28, 29.]  Plaintiffs filed a First Amended Complaint ("FAC") one week thereafter.[2]  [Doc. # 31.]  Two days later, on

---

[1] All page references herein are to page numbers inserted by the CM/ECF system.

[2] Contrary to Defendants' suggestion, Plaintiffs' request for injunctive relief is not mooted by the filing of a FAC on October 21, 2020.  It is true that the FAC supersedes the Complaint, and the original Complaint shall be treated as non-existent.  *See Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015).  But the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|
| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 2 of 24 |

October 23, 2020, Defendants filed their supplemental Opposition, objection to Plaintiffs' evidence, and supporting declarations. [Doc. ## 32, 33, 34.] Plaintiff filed a supplemental Reply, objections, and additional declarations on October 30, 2020. [Doc. ## 37, 38, 39.]

Having carefully reviewed and considered the parties' written submissions, the Court **GRANTS** Plaintiffs' request for a preliminary injunction for the reasons set forth below.

# I.
# BACKGROUND[3]

The death of George Floyd in Minneapolis on May 26, 2020 sparked historic nationwide protests against racial injustice in policing.  Near-daily protests throughout Los Angeles County in 2020 and 2021 have also focused on, among others, the deaths of Breonna Taylor, shot by a police officer in Louisville, Kentucky on March 13, 2020; Andres Guardado, shot by an LASD deputy in Gardena, California on June 18, 2020; Anthony McClain, shot by a police officer in Pasadena, California on August 15, 2020; Jacob Blake, shot by a police officer in Kenosha, Wisconsin on August 23, 2020; and Dijon Kizzee, shot by an LASD deputy in Los Angeles on

---

arguments raised in Plaintiffs' request for injunctive relief still pertain to the claims raised in the FAC, which are similar to the claims raised in the original Complaint.  As Plaintiffs mention in their briefing, their original Complaint brings their claim for injunctive relief for violations of the Bane Act as well as the federal constitution, and their FAC merely clarifies that claim.  *See* Compl. at ¶¶ 120, 125–34; FAC at ¶¶ 159–53.  For a federal court to issue an injunction, there must be a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself.  The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant relief of the same character as that which may be granted finally."  *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *see also Ministries v. Newsom*, No. 20-CV-683-BAS-AHG, 2020 WL 2991467, at *3 (S.D. Cal. June 4, 2020).  Here, the nexus between the FAC's claims and the Plaintiffs' MPI is clear, and Defendants have had an opportunity to respond. The Court sees no need to require Plaintiffs to file a new motion for injunctive relief, and thereby "exalt form over substance."  6 Fed. Prac. & Proc. Civ. § 1476 (3d ed.) (noting that when a court is faced with a motion to dismiss a superseded complaint, "[i]f some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.").

[3] The Court relies on the declarations attached to Plaintiffs' TRO Application and Defendants' Opposition for factual background and notes that it "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  Thus, to the extent the Court relies on evidence objected to as irrelevant, hearsay, or lacking foundation, those objections are **OVERRULED**.  Because the declarations submitted by Plaintiffs each comply with 28 U.S.C. section 1746(2) and Federal Rule of Evidence 603 by including the statement, "I declare under penalty of perjury that the foregoing is true and correct," the Court **OVERRULES** Defendants' objections to those declarations as unsworn.  To the extent the Court does not rely on evidence to which Defendants object, the Court **OVERRULES** those objections **as moot**.  [*See* Doc. ## 23-2, 33.]

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 3 of 24 |
|---|---|---|---|

September 5, 2020.  *See* FAC at ¶¶ 1, 4, 36–38, 55; TRO App., Corrected Ex. 2 (Barbadillo Decl.) at ¶¶ 4, 20 [Doc. # 18-1].

Plaintiffs are participants in these protests across Los Angeles County and seek to represent an injunctive relief class of "all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the County of Los Angeles in the exercise of their rights of free speech, assembly and petition in general, and particularly as it relates to protesting police violence and discrimination against people of color, especially Black Americans," as well as two damages classes relating to injuries from direct force and retaliatory arrest.  FAC at ¶¶ 8–22, 101–02.  LASD is an agency of Defendant County led by Defendant Villanueva, who is being sued in his individual and official capacities.  *Id.* at ¶¶ 23–28.

Though the vast majority of demonstrations since May 2020 have been peaceful and did not involve violence by protesters or law enforcement, Plaintiffs allege that at specific protests, LASD deputies indiscriminately used pepper balls[4], rubber bullets[5], and at times, stinger grenades ("less-lethal projectiles") and tear gas and flash bang grenades ("chemical agents") against protesters.  *Id.* at ¶¶ 14–65; *see* TRO App. at 6.  In their original Complaint and FAC, named Plaintiffs describe, *inter alia*, being shot by rubber bullets or pepper balls and/or tear gassed at protests at Pan Pacific Park on May 30, 2020 and in Compton on June 21, 2020.  FAC at ¶¶ 8, 14–21, 40–61.  Plaintiffs Grace Bryant, Linda Jiang, and Emanuel Padilla each submitted declarations describing their attendance at the June 21, 2020 protest and subsequent protests where LASD deputies used less-lethal projectiles and/or chemical agents on them and other peaceful protesters, legal observers, and journalists.  They also attested to their fear of attending or staying at protests

---

[4] Robert Lewis, Commander of the LASD Special Operations Division, describes pepper balls as "similar to commercially available paint gun balls . . . which can be used as an accurate target specific device or for area saturation that can enable deputies to deploy chemical dust from a distance."  Lewis Decl. at ¶ 34 [Doc. # 23-1].  The powder is "is designed to temporarily irritate the mucous membranes in an individual's nose, eyes, throat and lungs, to disorient an attacker[,]" and Lewis asserts that "the sound made when the PepperBall launcher is fired is often enough to gain compliance without the further use of force."  *Id.*

[5] Although most declarations submitted by Plaintiffs refer to being shot by "rubber bullets," Commander Lewis attests that LASD does not use rubber bullets, but rather "40 [millimeter] crushable tip foam rounds."  Lewis Decl. at ¶ 33.  According to a publication about crowd-control weapons by the groups Physicians for Human Rights ("PHR") and the International Network of Civil Liberties Organizations (INCLO) submitted by Plaintiffs, other terms for such foam rounds are "sponge round," "sponge grenade," and "plastic-tipped bullet."  TRO App., Ex. 20 (PHR & INCLO Report) at 217 [Doc. # 13-4].  The Court will refer to these projectiles as foam rounds.  Because the Court relies on this document only to establish the proper terminology for this type of projectile and does not otherwise rely on its contents, the Court **OVERRULES** Defendants' objections to the PHR & INCLO Report **as moot**.  *See* Defs.' Objs. at 67 [Doc. # 23-2].

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 4 of 24 |
|---|---|---|---|---|

due to the possibility of experiencing such force again.  *See* Bryant Decl., Jiang Decl., & Padilla Decl. [Doc. # 39].

Both Plaintiffs and Defendants submitted declarations describing LASD's policies regarding less-lethal projectiles and chemical agents and also numerous declarations and video and photographic evidence describing protests on August 25, September 5, September 7, September 8, and September 25, 2020 at which LASD officers deployed less-lethal projectiles and/or chemical agents.

## A.    LASD's Policies on Less-Lethal Projectiles and Chemical Agents

Robert Lewis, Commander of the LASD Special Operations Division attests that LASD uses the following less-lethal tools:  pepper balls, foam rounds, flash bang grenades, and tear gas. Lewis Decl. at ¶ 34 [Doc. # 23-1].  Pepper balls are "similar to commercially available paint gun balls . . . which can be used as an accurate target specific device or for area saturation that can enable deputies to deploy chemical dust from a distance."  The powder "is designed to temporarily irritate the mucous membranes in an individual's nose, eyes, throat and lungs, to disorient an attacker[,]" and "the sound made when the PepperBall launcher is fired is often enough to gain compliance without the further use of force."  *Id.*  Pepper balls can also be used as non-target-specific tools that can "skip across the ground behind a [non-violent] group" to reach individuals committing violence behind them.  By contrast, Commander Lewis describes foam rounds as "accurate target specific device[s]" that can "stop violent actions while removing or limiting the risk to uninvolved persons nearby."  Flash bang grenades, or "inert rubber ball blast grenades," are hand-thrown projectiles that deliver "bright light and sounds for crowd management, and CS or tear gas canisters are a hand-thrown "'area denial' tool used to disperse unruly and/or violent crowds. *Id.* at ¶ 34.  Commander Lewis describes these less-lethal tools as critical for the public's safety.  He opines that violent individuals in crowds can easily incite others to engage in illegal acts and argues that less-lethal intervention is necessary to prevent "such contagious violent crowd group-think mentality."  *Id.* at ¶ 33.

Commander Lewis supervises units of the Sheriffs' Response Team ("SRT") units, which comprise "highly trained law enforcement personnel and specialized equipment needed during catastrophic events and protests to protect the public, ensure order and enforce laws."  *Id.* at ¶¶ 17–19.  SRT units were deployed across Southern California in the County and in neighboring counties to respond to the civil unrest of Summer 2020; ensure the safety of peaceful protesters and the general public; and protect both public and private property.  From August 25 through September 19, SRT units were deployed nearly 20 times to monitor protests and, if necessary, to respond to unlawful activity.  Lewis attests that on five of those deployments, the unlawful conduct

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 5 of 24 |
|---|---|---|---|

of a select group of protesters necessitate the use of less-lethal tool.  *Id.* at ¶ 20.  He also attests that since the SRT's inception in 2007, prior to the end of May 2020, it has deployed less-lethal tools only once, in response to rioting following the 2009 Lakers' post-championship celebration. *Id.* at ¶ 21.

Neither Plaintiffs nor Defendants have submitted official written policies regarding LASD's use of force.  According to Commander Lewis' declaration, LASD's use of force policy states that "Department members shall use only that force which is objectively reasonable. Unreasonable force is force that is unnecessary or excessive given the totality of the circumstances presented to the Department members at the time the force is applied.  Unreasonable force is prohibited." Lewis Decl. at ¶¶ 35–36.  He also attests that LASD dedicates significant resources and efforts to prevent, investigate and, if necessary, punish its members for improper use of force. Lewis Decl. at ¶¶ 29, 37.  Plaintiffs' police practices expert, Roger Clark, a 27-year veteran of LASD and other law enforcement agencies, attests that the "LASD Use of Force - Tactics Directive also holds that even where appropriate, 'Crowd dispersal strategies should only be used when immediate action is necessary to stop violence and/or property damage and/or sufficient resources are not present to ensure public safety.'" TRO App., Ex. 4 (Clark Decl.) at ¶ 18 [Doc. # 13-4].[6]

The LASD Sheriff, currently Defendant Villanueva, is the highest-ranking LASD supervisor. Lewis Decl. at ¶ 35.  On June 3, 2020, after the first weekend of civil unrest following George Floyd's death and the proclamations of state of emergency in the County and City of Los Angeles, Villanueva spoke on local news regarding the protests.  When asked about rubber bullets, Villanueva stated that he "expected deputies to defend themselves . . . with less-lethal force" against protesters confronting them with rocks and bottles, and he described rubber bullets, rubber batons, and pepper balls as methods designed to "get somebody's attention without injuring them." FAC at 25 n.2 (citing KTLA 5 video of interview with Sheriff Villanueva (June 3, 2020), https://ktla.com/morning-news/l-a-county-sheriff-villanueva-on-the-recent-protests-in-los-angeles/ (last visited May 28, 2021)); *see also* Lewis Decl. at ¶¶ 10–12.

---

[6] Defendants object to Clark's declaration because he has not been a law enforcement officer for almost 30 years and also argue that various portions of his declaration are irrelevant, lacking in foundation, vague, or hearsay. Defs.' TRO Objs. at 15-23 [Doc. # 23-2]. Clark is an experienced police practices consultant and, in addition to his 27 years of LASD experience, has certifications from California Peace Officer Standards and Training ("POST"). He asserts that he has reviewed POST documents, and he quotes from the LASD Use of Force – Tactics Directive. Clark Decl. at ¶¶ 11, 19 [Doc. # 13-4].  For the purposes of the instant motion, and to the limited extent the Court cites to his opinion, the Court finds him to be a qualified expert. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 6 of 24 |
|---|---|---|---|---|

**B.      August 25, 2020 Protest at Broadway Street and Temple Street**

On August 25, 2020, the SRT was deployed to downtown Los Angeles in advance of a large scheduled protest. *Id.* at ¶ 22. Videos submitted by Plaintiffs show protesters marching south about 25 feet away from a line of deputies holding weapons and shields, when suddenly, the sound of a metal object hitting the street and rounds of shots can be heard, and canisters seen on the ground. *See* Notice of Manual Filing [Doc. # 19]. The videos do not depict protesters throwing items at the deputies.

Lieutenant Damon Jones, a member of the SRT, was at the scene and attests that some in the crowd threw a tire iron, metal pole, spray paint can, rocks, and water bottles at the deputies. Jones Decl. at ¶ 4 [Doc. # 23-1]. Lieutenant Jones asserts that the sudden violence of the crowd gave deputies no opportunity to provide a dispersal order or warning. *Id.* at ¶ 9.

According to Plaintiff Jiang, three protesters, and two legal observers from the National Lawyers' Guild ("NLG") wearing distinctive green hats marking them as legal observers, the peaceful march was winding down by 10 or 11 p.m. when LASD deputies began shooting less-lethal projectiles and chemical agents at them. *See* Jiang Decl. at ¶¶ 6–7; TRO App., Ex. 10 (Meyer Decl.); Ex. 11 (Mischo Decl.); Ex. 12 (O'Neill Decl.); Ex. 17 (Singh Decl.); Ex. 18 (Tinnell Decl.) [Doc. # 13-4]. None of the declarants heard a declaration of unlawful assembly or a dispersal order prior to LASD's use of force, and none describe seeing anyone throw anything at the deputies or engage in vandalism. *See, e.g.*, Meyer Decl. at ¶ 7; Mischo Decl. at ¶ 6; Tinnell Decl. at ¶¶ 3–4.

One legal observer, Jill O'Neill, was standing closer to deputies to attempt to write down their badge numbers when she saw a deputy throw a flash bang grenade at her, which exploded and injured her legs. O'Neill Decl. at ¶¶ 11–13. Photographs show severe bruising and bleeding on both of her legs. *Id.*, Ex. A. Wearing their green hats, O'Neill and fellow legal observer Diana Barbadillo had informed a deputy earlier in the evening that they were NLG legal observers, and both assert that deputies targeted them because of their legal observer status. *Id.* at ¶¶ 5, 11–12; Barbadillo Decl. at ¶¶ 9, 12–13. Two other declarants report seeing the two legal observers in deputies' line of fire. Tinnell Decl. at ¶ 4; Singh Decl. at ¶ 8. Protester Joseph Mischo attests that he was about 20 to 25 feet away from deputies when he was shot in his right eye with a pepper ball and in his left elbow and buttock with foam rounds. Mischo Decl. at ¶ 5. Mischo's eye suffered internal bleeding from the injury, and photographs show severe bruising and bleeding on his eye and buttock. *Id.* at ¶ 9, Att.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 7 of 24 |
|---|---|---|---|---|

**C.      September 5, 2020 Protest Outside LASD's South Los Angeles Station**

Largely peaceful protests began outside LASD's South Los Angeles Station, near the corner of Imperial Highway and Normandie Avenue, on August 31, 2020, after a deputy shot and killed Dijon Kizzee. *See* Allen Decl. at ¶ 5 [Doc # 23-1]. Due to the station's limited resources, the SRT was deployed to the station. Lewis Decl. at ¶ 25. No less-lethal tools were deployed on most nights between August 31 and September 12, 2020. Allen Decl. at ¶ 10; Lewis Decl. at ¶ 24. For example, the Captain of the South Los Angeles Station, Duane Allen, attested (and a video confirms) that on August 31, 2020, boisterous protesters flashed strobing lights directly in deputies' eyes, shouted at them, and vandalized the station, but left after deputies declared an unlawful assembly and issued a dispersal order at around 11 p.m. Allen Decl. at ¶¶ 5–6; TRO Opp., Ex. A. Captain Allen describes another incident in which protesters gathered outside the station for hours and peacefully left. Allen Decl. at ¶ 7. Deputies have recovered items from protesters including smoke grenades, fireworks, shields, helmets, and protest signs. *Id.* at ¶ 11; TRO Opp., Ex. B.

Things changed at the demonstration at the South Los Angeles Station on September 5, 2020. At the north side of the station, LASD had erected a "slinky" perimeter barrier made of caution tape and wire, and deputies stood anywhere from 50 to 100 feet behind the barrier. O'Neill Decl. at ¶ 21; Barbadillo Decl. at ¶ 20; TRO App., Ex. 8 (McDonald Decl.) at ¶ 4. An exhibit submitted by Plaintiffs' declarant Katherine Franco, an NLG legal observer, shows an aerial image of the station with markings indicating where the barrier was located and her recollection of where various groups of people were standing at the demonstration on September 5. TRO App., Ex. 6 (Franco Decl.), Ex. A.

Before 6 p.m., Franco saw some someone throw a milk gallon jug over the barrier from which smoke came out for about ten seconds. *Id.* at ¶ 12. Legal observer Barbadillo attests that she saw one protester throw a water bottle over the barrier, landing halfway between the barrier and where the deputies were standing—perhaps the same item Franco saw thrown. Barbadillo Decl. at ¶ 23. She also saw some protesters shaking the barrier. *Id.* at ¶ 24. Then, at around 6 p.m., LASD deputies began firing pepper balls at the crowd outside the station, including one that hit a young child attending the protest with her family. Padilla Decl. at ¶ 6; Rogers Decl. at ¶ 14; O'Neil Decl. at ¶ 25; Barbadillo Decl. at ¶ 6; Mischo Decl. at ¶ 10. Barbadillo heard a deputy yell something "unintelligible . . . because he was so far away." Barbadillo Decl. at ¶ 24. Franco described these shots as "two warning shots" and heard deputies telling people to move back from the barrier, an order which demonstrators obeyed. Franco Decl. at ¶ 12. Plaintiff Padilla attests to leaving early once deputies started shooting. Padilla Decl. at ¶ 6.

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 8 of 24 |
|---|---|---|---|

After that incident, approximately 300 protesters blocked the 110 freeway for about 30 minutes without further incident. McDonald Decl. at ¶¶ 2–3. After marching away from the 110 freeway, protester David Patrick McDonald attests that about 100–125 people continued to protest at the South Los Angeles Station, with most people standing 15 to 20 feet away from the barrier outside the station. *Id.* at ¶ 4. Franco's map indicates that most protesters were in the street on Imperial Highway, farther from the barrier and the station, while a smaller peaceful group was standing somewhat closer to the barrier, listening to speeches by the family of Dijon Kizzee. Franco Decl., at ¶¶ 17–18, Ex. A. Even closer, between the smaller group and the barrier, was a group of about 20 people, mostly comprised of legal observers and members of the press wearing vests or press badges around their necks or clipped to their bags and carrying heavy equipment. *Id.* at ¶ 19, Ex. A; Barbadillo Decl. at ¶¶ 17–18. Legal observer Addie Tinnell attests that officers pointed weapons at her and at other protesters, and legal observers Barbadillo and Franco also noticed deputies aiming weapons at protesters. Barbadillo Decl. at ¶ 23; Tinell Decl. at ¶¶ 11–12; Franco Decl. at ¶ 10.

At that point in the evening, Lieutenant Charles McDaniel, who commanded SRT squads outside the South Los Angeles Station, observed protesters approaching the barrier in front of the north side of the station and attempting to cut it. McDaniel Decl. at ¶¶ 4–5. He attests that multiple warnings were given to not touch the wire and to back away, which protesters ignored, and that a protester put an umbrella over the barrier to conceal other protesters while they worked to cut through the wire. As a result, Lieutenant McDaniel and other deputies fired pepper balls into the ground toward the umbrella, causing protesters to throw items like rocks, bottles, and fireworks at the deputies and the station, thereby causing deputies to deploy additional less-lethal tools. Protesters were given orders via loudspeakers to stop throwing items and to leave, with which protesters complied. *Id.* at ¶ 5.

Plaintiffs' declarants tell a different story. They claim that around 8 p.m., deputies started shooting projectiles at protesters, legal observers, and journalists outside the station without intelligible warning or apparent provocation. TRO App., Ex. 14 (Ramirez Decl.) at ¶ 5; Tinnell Decl. at ¶ 21; Barbadillo Decl. at ¶¶ 29–30. In response to those shots, protester David Ramirez saw one person throw water bottles at the deputies behind the barrier, at which point the LASD declared unlawful assembly while continuing to throw tear gas canisters. Ramirez Decl. at ¶¶ 6–8. Other protesters near the barrier at the same time did not see signs of provocation or anyone touching the barrier before deputies began firing projectiles and tear gas canisters in a five- to ten-minute barrage that legal observer Tinnell described as sounding like the "Fourth of July." TRO App., Ex. 5 (Cunningham Decl.) at ¶¶ 6–8; Franco Decl. at ¶¶ 17–21; Tinnell Decl. at ¶ 23; Rogers Decl. at ¶ 9; McDonald Decl. at ¶¶ 6–9. Attendees did not hear a dispersal order until after the barrage of shots, and deputies continued to shoot pepper balls and throw tear gas canisters while

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 9 of 24 |
|---|---|---|---|---|

issuing the order.  Franco Decl. at ¶ 2; McDonald Decl. at ¶ 11; O'Neil Decl at ¶ 30.  McDonald was shot in the neck and ribs by either pepper balls or foam rounds.  McDonald Decl. at ¶¶ 9–10.  Ramirez was shot in his pelvis, and photographs show a red, scabbed injury.  Ramirez Decl., Att.  Mischo was shot again in the back with pepper balls.  Mischo Decl. at ¶ 12.  O'Neill was shot again on her right hip and leg.  O'Neill Decl. at ¶ 26.  Protester Jessica Rogers was shot in the leg with a foam round, leading to bleeding and swelling.  Rogers Decl. at ¶¶ 8–14.  All report being severely affected by tear gas.

Alex McElvain, News Coordinator for the media outlet Knock LA, arrived at the station around 9:45 p.m. when most of the protesters had dispersed, and deputies informed him of the dispersal order.  TRO App., Ex. 9 (McElvain Decl.) at ¶¶ 3–5.  He asked deputies where he could observe and report, received no answer, and continued to take photographs and jot notes from the sidewalk about 20 feet away from the barrier.  *Id.* at ¶ 5.  At around 10 p.m., several protesters approached, McElvain moved away from the protesters, and deputies then aimed tear gas canisters and flash bang grenades at him, as well as the protesters.  *Id.* at ¶¶ 6–7.  Along with another photographer, McElvain attempted to walk away from officers with his hands up and his camera in his hand, and the two men shouted that they were leaving.  *Id.* at ¶ 8.  McElvain reports that he was shot in the back and back of his legs with less-lethal projectiles over a dozen times as he ran away.  Photographs of his injuries show bruising and bleeding on his legs.  *Id.* at ¶ 9, Att.

**D.   September 7, 2020 Protest Outside LASD's South Los Angeles Station**

At around 8 p.m. on September 7, 2020, protesters gathered peacefully outside of and across Imperial Highway—a six-lane street—from the station.  Loder Decl. at ¶¶ 4–6 [Doc. # 22].  Lieutenant McDaniel attests that another barrier wire was set up at the north-south crosswalk of Normandie Avenue and Imperial Highway, a block or so away from the station and the area where crowds had gathered on September 5.  As the evening progressed, agitators began to incite the crowd, and several protesters tore away the police tape and connecting mechanisms of the barrier wire.  He noticed protesters pushing a grocery cart and metal sign down an alleyway toward Imperial Highway and the station, pantomiming throwing things at the deputies.  Those items were quickly removed from the protesters.  Lieutenant McDaniel then noticed protesters pushing a wooden desk down the alleyway and attests that people some distance behind the desk, in the strip mall parking lot located northwest of the station across Imperial Highway, began throwing frozen water bottles, pieces of concrete and brick, rocks, and fireworks at deputies and hitting their parked vehicles.  Deputies deployed less-lethal projectiles, and "at the same time," declared an unlawful assembly and gave a dispersal order.  Deputies then swept the area for protesters hiding behind vehicles and directed protesters northbound on Normandie Avenue and out of the area.  McDaniel Decl. at ¶ 6.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|
| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 10 of 24 |

Protesters and a journalist did not observe any items thrown or hear initial dispersal orders, but were injured by the use of force. Journalist McElvain attests that at around 10 p.m., he noticed a couple of men begin pushing a desk through an alleyway in the direction of the station, at which point LASD deputies deployed less-lethal projectiles and chemical agents without warning. McElvain Decl. at ¶¶ 13–18. One protester, Chad Loder, was standing in the strip mall parking lot and did not see anyone approaching the barrier. Loder reports that when shooting started, he tried to walk away and was hit at least 12 times in the groin, legs, and abdominal area with foam rounds, causing bruising, although photographs show injuries only on the front of his body, not the back, as would be consistent with Loder walking away. Loder Decl. at ¶ 7, Ex. A. Another protester, Imorie Recio, at the corner of Imperial Highway and Normandie Avenue, said she did not observe anyone throwing anything at deputies, though she did see someone "ripping the caution tapes and yelling" before deputies began shooting foam rounds and black "stinger" grenades,[7] as well as throwing tear gas canisters. TRO App., Ex. 15 (Recio Decl.) at ¶¶ 4–6. Recio was struck in her right ankle with a stinger grenade, in her back at least three times likely with pepper balls, and once on her right calf with a foam round. She also inhaled tear gas. *Id.* at ¶ 6. Photographs show bruising and bleeding on her leg. She attests that as she received medical treatment from a medic, she heard an announcement to disperse while deputies continued to shoot and advance toward retreating protesters for 20 to 30 minutes. *Id.* at ¶¶ 6–9.

**E.      September 8, 2020 Protest Outside LASD's South Los Angeles Station**

On September 8, 2020, another peaceful march gave way to a tense stand-off between protesters and LASD at the corner of Imperial Highway and Normandie Avenue. Videos submitted by Defendants and a video submitted by Plaintiffs show deputies continuously giving dispersal orders via a loudspeaker while protesters at a distance form a defensive wall of shields—primarily made of plastic and cardboard, although one protester holds a mirror—and umbrellas, yelling curses and slurs at the deputies. Some protesters wore helmets, and others can be seen holding water bottles, though the video clips do not show anything thrown in the direction of deputies. TRO Opp., Ex. C [Doc. # 23]; Notice of Manual Filing [Doc. # 29]. Defendants argue that in Plaintiffs' video, two people run away at the 12 minute and 47 second mark "in response to thrown objects," but the video does not show any objects thrown. Sounds of shots and explosions ring out almost immediately after the two people begin running. Supp. Opp. at 12 [Doc. # 32].

Two protesters recount hearing a declaration of unlawful assembly and dispersal order and being given 5 minutes to disperse at around 8 p.m. but standing their ground. Ramirez Decl. at ¶ 12; TRO App., Ex. 3 (Betancourt Decl.) at ¶¶ 3–8; *see* McDaniel Decl. at ¶ 7 (describing the

---

[7] The parties do not explain precisely what a stinger grenade is.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 11 of 24 |
|---|---|---|---|---|

same scene but saying it was at 10 p.m.).  Protesters Ramirez and Lisa Marie Betancourt attest that the order was repeated, and five to eight minutes after that order, deputies began advancing on the protesters, struck down one of the protest leaders, and began shooting foam rounds and stinger grenades into the crowd.  Ramirez Decl. at ¶¶ 12–13; Betancourt Decl. at ¶ 8.  According to Ramirez, no protesters threw anything, and he describes LASD's projectiles constantly hitting his cardboard protest sign.  Ramirez Decl. at ¶ 14.  He was hit in the rib and thigh with foam rounds.  *Id.* at ¶ 13.  Plaintiff Padilla saw the use of projectiles and also saw a deputy tackle his friend.  Padilla Decl. at ¶ 8.

Lieutenant McDaniel describes the scene differently and attests that some in the hostile crowd—dressed in black and prepared with shields, body armor, and large backpacks—threw frozen water bottles, rocks, and fireworks toward deputies, prompting the use of less-lethal force.  McDaniel Decl. at ¶ 7.

**F.      September 25, 2020 Protest in West Hollywood**

On September 25, 2020, a "Justice for Breonna Taylor" march began in West Hollywood at around 8:25 p.m. and remained peaceful as it progressed to the West Hollywood Sheriff's Station.  TRO Reply, Ex. 1 (Supp. Barbadillo Decl.) at ¶¶ 8–11 [Doc. # 25-1].  Legal observer Barbadillo and protester Asa Juleff reported hearing an announcement of unlawful assembly at around 9 p.m. after protesters reached the station.  *Id.* at ¶ 15; TRO Reply, Ex. 1 (Juleff Decl.) at ¶ 7 [Doc. # 25-2].  Barbadillo heard another announcement at 9:10 p.m. giving protesters two minutes to disperse.  Barbadillo Decl. at ¶ 17.  The protesters changed course and marched into a residential neighborhood, led by two trucks.  *Id.* at ¶¶ 20–23.  Barbadillo and Juleff, as well as Plaintiff Padilla, witnessed deputies surround the trucks and tackle, beat, and shoot pepper balls at people who were in the trucks.  *Id.* at ¶¶ 24–27; Juleff Decl. at ¶¶ 9–10; Padilla Decl. at ¶ 11.  Juleff did not see any cars driving erratically or any protesters throwing things at officers.  Juleff Decl. at ¶ 11.  Deputies also shot pepper balls and threw flash bang grenades at or near Juleff, other protesters, Barbadillo, another legal observer, and journalists wearing press credentials, with one wearing a helmet that said "press" on it, standing half a block or more away.  *Id.* at ¶ 12; Supp. Barbadillo Decl. at ¶¶ 29–31, 34.  Barbadillo neither heard a dispersal order nor saw violence or threats of violence.  Supp. Barbadillo Decl. at ¶ 41.  Juleff submitted photographs of round bruises and wounds on his neck, from what he believes are pepper balls.  Juleff Decl. at ¶ 12.  By 9:51 p.m., the march was over.  Supp. Barbadillo Decl. at ¶ 38.

Sergeant M. Coppes commanded the SRT squads outside the West Hollywood Station that night and denies deliberately targeting legal observers and journalists.  Supp. Opp., Coppes Decl. at ¶¶ 2–3, 5 [Doc. # 34].  He asserts that the SRT was deployed to West Hollywood due to reports

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 12 of 24 |

of protesters being struck by vehicles at protests the prior night in Hollywood.[8]  *Id.* at ¶ 7.  He confirms that unlawful assembly was declared at approximately 9:05 p.m. due to traffic gridlock and that further dispersal orders were given at approximately 9:20 p.m.  *Id.* at ¶¶ 8–9.  Due to concerns about injuries from vehicles and multiple traffic violations by the two trucks leading the march, deputies conducted a traffic stop of those trucks, and two of the truck occupants physically resisted arrest.  *Id.* at ¶¶ 11–17.  Coppes attests that during the scuffle, a deputy's loaded firearm dropped to the ground near the two truck occupants, and one of the occupants held his hands under his body and did not immediately comply with orders to put his hands behind his back, prompting a deputy to beat him with his shield "in order to help gain control of the suspect's hands."  *Id.* at ¶ 17.  Coppes attests that at the same time, protesters began to rush and throw things at deputies, including a large street utility cover and water bottles, and deputies feared that a protester wielding an umbrella was running to the loaded handgun on the ground, prompting a "brief volley of less lethal tools."  *Id.* at ¶ 18.  Coppes does not mention if he saw any legal observers wearing distinctive hats or journalists wearing press credentials.

Plaintiffs assert that marches against police brutality are ongoing.  MPI at 21.[9]

## II.
## LEGAL STANDARD

A plaintiff seeking preliminary injunctive relief must show that:  (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Under the Ninth Circuit's "sliding scale" approach, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  An injunction is therefore also appropriate when a plaintiff raises "serious questions going to the merits," demonstrates that "the balance of hardships tips sharply in [their] favor," and "shows that there is a likelihood of

---

[8] Defendants submitted exhibits of news articles and videos covering the earlier September 24, 2020 protest in West Hollywood, at which a protester was struck by a truck and violence ensued.  Supp. Opp., Ex. D, E, & F [Doc. # 34].

[9] Plaintiffs also submitted declarations involving other incidents at which LASD purportedly harassed or targeted protesters and legal observers.  *See* TRO App, Ex. 1 (Anderson-Barker Decl.); Ex, 7 (Freeman Decl.); Cunningham Decl.; Loder Decl.  Because Plaintiffs do not make clear how these declarations relate to their claims of excessive force used at protests, as opposed to First Amendment retaliation, the Court does not rely on them to resolve the instant MPI based on LASD's use of excessive force.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 13 of 24 |
|---|---|---|---|

irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

### III.
### DISCUSSION

Plaintiffs seek to enjoin the LASD from using less lethal force such as rubber bullets, pepper balls and tear gas against peaceful protesters and to require them to give verbal warnings and sufficient time to comply before deploying such tactics against peaceful protesters. MPI at 28. Defendants argue that Plaintiffs have not shown standing to seek injunctive relief or likelihood of success on the merits of their federal or state law claims.

### A.     Standing

To satisfy Article III standing to seek injunctive relief, Plaintiffs must show that they "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1982). In addition to showing actual injury, a named plaintiff seeking injunctive relief on behalf of a class must also demonstrate a realistic threat of repetition of the violation. *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds*, *Johnson v. California*, 543 U.S. 499 (2005).

Last year, a district court found that plaintiffs—legal observers and journalists attending protests against police brutality in Portland—established standing for injunctive relief against federal law enforcement defendants based on their declarations describing defendants' use of flash grenades, smoke grenades, and rubber bullets against them, notwithstanding defendants' assertion that "such conduct is necessary to protect federal property." *Index Newspapers LLC v. U.S. Marshals Serv.*, No. CV 20-1035-SI, 2020 WL 4220820, at *5 (D. Or. July 23, 2020), *aff'd*, 977 F.3d 817 (9th Cir. 2020). The Ninth Circuit upheld that finding, noting that the plaintiffs submitted 19 declarations and video and photographic evidence of defendants' "ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press between the date the complaint was filed and the date the district court entered its preliminary injunction." 977 F.3d at 826. The Ninth Circuit also found that because the plaintiffs and other declarants asserted that the defendants' "crowd-control measures have 'chilled' the exercise of their First Amendment rights, and that this First Amendment injury is ongoing," the nature of the plaintiffs' injury differed sharply from the injury asserted in *Lyons* and supports plaintiffs' standing to sue for injunctive relief. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 14 of 24 |
|---|---|---|---|

In a 2007 case brought by immigrant rights' nonprofits and individual protesters asserting the use of excessive force at protests by the Los Angeles Police Department ("LAPD"), the court found that named plaintiffs had standing to seek injunctive relief on behalf of a putative class of protesters when they attested to the "direct injury" of "being driven out of a public park and surrounding areas," as well as physical injury, and the evidence showed that the LAPD could use excessive force against then at future protests. *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 626–28 (C.D. Cal. 2007).

Here, the three named Plaintiffs who submitted declarations similarly attest to facing excessive force at protests and having their exercise of First Amendment rights chilled. Plaintiff Bryant attests that at the June 21 demonstration, she never heard an order to disperse or declaration of unlawful assembly before she inhaled either dust from pepper balls or tear gas, and that she stopped attending protests by early August because she was concerned for her safety and the safety of those around her due to the possibility of "unprovoked" use of force by LASD. Bryant Decl. at ¶¶ 3–6. Plaintiff Jiang also asserts that she was shot with pepper balls at the June 21 demonstration and heard deputies shooting at the August 25, 2020 protest—she describes both demonstrations as "peaceful" before deputies began shooting. Jiang Decl at ¶¶ 4–7. Though she was not hit, she saw medics treating others for injuries. *Id.* at ¶ 8. Jiang also attended a demonstration on September 6 but left when she heard shots being fired, and she attests that she "would go to more demonstrations if [she] knew [she] would be safe from deputies indiscriminately using force on [her]." *Id.* at ¶ 9. The most detailed declaration is from Plaintiff Padilla, who attests to being shot with pepper balls and rubber bullets, as well as having a tear gas canister thrown at his feet, at the June 21 demonstration, as well as witnessing the use of tear gas or pepper spray at the demonstrations on September 5 and 7 at the South Los Angeles Station. Padilla Decl. at ¶¶ 3–7. He also attested to deputies using stinger grenades and possibly foam rounds at the demonstration at September 8, and he witnessed the arrest of one of the truck occupants at the West Hollywood protest on September 25. *Id.* at ¶¶ 8, 11. Although he still attends protests, he has preexisting conditions and therefore keeps a low profile and leaves protests early to protect himself. *Id.* at ¶ 13. All report that the demonstrations were peaceful until the deputies began using force.

"[A]ctual repeated incidents" of use of force against these three Plaintiffs have been documented such that the "possibility of recurring injury ceases to be speculative." *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992) (internal quotation marks omitted). Moreover, LASD appears to remain prepared to use those less-lethal means in the future for crowd control, even if they injure non-violent protesters like Plaintiffs. *See, e.g.*, Lewis Decl. at ¶¶ 5, 20–29, 33 [Doc. # 23-1]. As discussed in more detail below, the lack of evidence that any officers have been counseled or disciplined for the uses of force at the August and September 2020 protests in question indicates that those allegedly unreasonable uses of force were officially sanctioned. *See Multi-Ethnic Immigrant Workers Org. Network*, 246 F.R.D. at 627 ("One way to meet the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 15 of 24 |
|---|---|---|---|

'realistic repetition' requirement is to 'demonstrate that the harm is part of a pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'") (quoting *Armstrong*, 275 F.3d at 861) (internal quotation marks omitted). The threat of harm is thus real and immediate if Plaintiffs attend demonstrations.

But even if Plaintiffs do not physically attend more protests in the future, they have also demonstrated the harm of being deterred from exercising their First Amendment right to assembly for fear of injury. *See Index Newspapers*, 977 F.3d at 817 (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.")).

Accordingly, Plaintiffs Bryant, Jiang, and Padilla have shown they have standing to seek injunctive relief. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.").

**B.      Likelihood of Success on the Merits**

Plaintiffs argue that they have shown likelihood of success on the merits of their claim for violations of the Fourth Amendment under 28 U.S.C. section 1983 and California's Tom Bane Civil Rights Act ("Bane Act"), Cal. Civ. Code § 52.1.[10]  MPI at 17, 20.  Defendants argue that Plaintiffs have not satisfied requirements for a claim under the Bane Act or demonstrated that LASD's deputies were acting pursuant to an official policy or custom under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), in order to hold the County and Villanueva, in his official capacity,[11] liable for the actions of LASD deputies under section 1983. *See* Supp. Opp. at 14–22 [Doc. # 32].

Generally, the "the elements of the excessive force claim under § 52.1 are the same as under § 1983." *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013).  For both claims, a plaintiff must show a constitutional violation.  The Court thus first examines the alleged Fourth Amendment violations.

---

[10] Because the TRO Application and MPI do not argue likelihood of success on the merits of Plaintiffs' First Amendment retaliation claim, the Court does not address it.

[11] Plaintiffs' FAC also asserts a claim against Defendant Villanueva in his individual capacity, *see* FAC at ¶¶ 24, 131, and Plaintiffs argue that the Court "can also enjoin Sheriff Villanueva in his personal capacity." MPI at 22 n.9. Because Plaintiffs fail to describe what such an injunction would entail, the Court declines to consider the likelihood of success on the merits of Plaintiffs' claims against Defendant Villanueva in his individual capacity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 16 of 24 |
|---|---|---|---|---|

### 1.  Objective reasonableness of LASD's use of less-lethal projectiles and chemical agents

Excessive force claims are analyzed under an objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Sanchez v. Cnty. of San Diego*, 464 F.3d 916, 928 (9th Cir. 2006) ("The California Supreme Court has made clear . . . that '[t]he touchstone for all issues under the Fourth Amendment . . . is reasonableness.'") (quoting *Ingersoll v. Palmer*, 43 Cal. 3d 1321, 1329 (1987)).  The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing that the officer may be "forced to make split-second judgments" under "tense, uncertain, and rapidly evolving" conditions. *Graham*, 490 U.S. at 396–97.  Defendants do not dispute that LASD's use of less than deadly force constitutes a seizure under the Fourth Amendment.  *See* Supp. Opp. at 18 [Doc. # 32].[12]  The only issue is thus whether a strong governmental interest justifies the use of force.

"Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."  *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (discussing the reasonableness of use of a beanbag projectile "akin to a rubber bullet"); *see Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (finding pepper spray is an intermediate force that presents a significant intrusion upon an individual's liberty interests); *Anti Police-Terror Project v. City of Oakland*, No. CV 20-03866-JCS, 2020 WL 4584185, at *13 (N.D. Cal., Aug. 10, 2020) (finding that chemical agents and flashbang grenades also constitute significant intermediate force).  When evaluating the government's interest, the Court considers factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," as well as the availability of less intrusive alternatives and whether warnings were given.  *Graham*, 490 U.S. at 396.  The most important factor is whether the individual injured by governmental force posed an immediate threat to the safety of the officers or others.  *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017).

Plaintiffs have submitted overwhelming evidence that at the five demonstrations, LASD officers used less-lethal force on peaceful protesters, legal observers, and journalists who were not committing any crime (except, on two occasions discussed in more detail below, not following dispersal orders), not threatening or throwing things at LASD officers, and not resisting arrest.  It

---

[12] Defendants also do not deny that LASD deputies' use of less-lethal projectiles and chemical agents at those protests spanning from June to September 2020 resulted in physical injuries to some protesters, legal observers, and journalists.  In fact, they acknowledge that "certain individual protesters could be entitled to monetary awards for damages."  TRO Opp. at 20 n.3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 17 of 24 |
|---|---|---|---|

is true that various SRT officers attest that at least one protester threw items like water bottles and rocks at LASD deputies at each of the protests in question, and they believe such actions pose immediate threats to officer safety even when the thrown items fall short of the deputies. But when considering the context of the officers' actions, the Court must be "careful not to attribute other protest[e]rs' actions to those plaintiffs who do not admit physically provoking police." *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018). In a case involving officers shooting pepper balls at a crowd of approximately 1,000 partygoers in an attempt to disperse the crowd, the Ninth Circuit held that there was minimal government interest in applying force to a peaceful partygoer where "the officers encountered individuals at various points during their sweeps who threw bottles or other debris at them, or haphazardly threw such items throughout the complex, [but] the defendants admit that they never saw [the plaintiff] throw anything—in their direction or in any other direction." *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012).

Although the context of a demonstration against police use of force is different from that of a rowdy college party, the evidence submitted indicates that, in response to some protesters throwing items at deputies, LASD indiscriminately shot less-lethal projectiles and used chemical weapons against peaceful protesters, legal observers, and journalists alike who had not participated in physical provocation. For example, on August 25, 2020, a flash bang grenade, which Commander Lewis describes as a crowd control mechanism, was thrown directly at a legal observer, Jill O'Neill, who was standing close to deputies and not engaging in any violence. When it exploded, it caused significant injuries to her legs. Particularly concerning is the legal observers' account that the officers were well aware of their legal observer status and still targeted them. On September 5, 2020, at about 6 p.m., in response to a single bottle or jug thrown over a barrier and landing 25 or so feet away from deputies, pepper balls were shot into a peaceful crowd, including one that hit a young girl in the mouth. Later that night, deputies shot a barrage of pepper balls and foam rounds and threw tear gas canisters at legal observers and journalists who attest they wore distinctive identifying gear, and at protesters who attest they were in a peaceful crowd that had not approached the barrier or thrown any items. Disturbingly, even later on September 5, after most of the protesters had dispersed, deputies shot projectiles, likely pepper balls, at a journalist with his hands up and camera in hand as he attempted to run away, an account corroborated in part by photographs of large round bruises on the backs of his legs. On September 7, 2020, no warning was given before a barrage of less-lethal projectiles and chemical weapons that lasted several minutes and appeared to comprise every single type of less-lethal projectile available to LASD. One peaceful protester was hit a dozen times. Lieutenant McDaniels attested that the barrage was triggered by people throwing items at deputies from a strip mall parking lot, but at least one protester not standing in that lot was also injured by the LASD's projectiles, suggesting indiscriminate firing or targeting of non-violent protesters. LASD has not shown a significant government interest in applying force against peaceful protesters, legal observers, and journalists

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 18 of 24 |

where no warning was given before the use of less-lethal weapons, those individuals did not pose an immediate threat of safety to the officers or others, and deputies did not appear to distinguish between peaceful and violent protest attendees.

The government interest is different where protesters hear dispersal orders but defy them, such as at the September 8 and September 25 demonstrations. Protesters' failure to immediately abide by dispersal orders do not automatically justify the use of less-lethal force. *See Nelson*, 685 F.3d at 885 (holding that any reasonable officer should be on notice that "the application of pepper spray to individuals such as [plaintiff] and his associates, whose only transgression was the failure to disperse as quickly as the officers desired, would violate the Fourth Amendment"). But the government interest in using force is stronger where protesters "understood police had ordered them to disperse, ignored or dismissed those orders, and instead directly interfered with officers' attempt to enforce [the law]." *Felarca*, 891 F.3d at 818; *see also Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994) (finding "pain compliance techniques" to be reasonable exercises of force where trespassing protesters were given multiple, escalating warnings to comply with dispersal orders). Defendants thus had a stronger interest in using force at the September 8 and 25 demonstrations. But that interest is qualified by video evidence of the September 8 demonstration showing protesters standing in a defensive formation but retreating from advancing deputies. The video shows a significant distance maintained between the protesters and deputies and does not show anything being thrown at deputies. At the September 25 demonstration, legal observer Barbadillo attests that deputies aimed pepper balls and flash grenades toward her, journalists wearing press credentials, and peaceful protesters standing more than half a block away and not interfering with deputies' arrest of other protesters. Although the failure to obey orders to disperse may have justified some use of force on September 8 and 25, none of Plaintiffs' declarants injured at those protests engaged in direct physical obstruction of the type discussed in *Felarca*, in which protesters at an unauthorized tent encampment linked arms directly in front of their tents in order to block officers' access. 891 F.3d at 818. Even then, the Ninth Circuit held that the government had a legitimate interest only in using "minimal force" to enforce policy. *Id.* Thus, even at demonstrations where orders to disperse were given and flouted, the use of injurious less-lethal force on peaceful protesters, and especially on journalists and legal observers, is not justified by a strong government interest.

A reasonable officer would certainly agree with Commander Lewis's explanation that less-lethal projectiles and chemical agents can be, at times, the least intrusive means to disperse a violent crowd and protect officer safety. The Court also notes that the presence of protesters equipped with helmets and shields, yelling obscenities at the officers, may have given officers a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 19 of 24 |
|---|---|---|---|

reasonable impression of hostility and fear of escalation.[13]  But LASD officers' declarations do not provide any details that describe why their use of force that demonstrably injured peaceful protesters, legal observers, and journalists was reasonable to ensure public safety and prevent violence or property damage.  They do not explain how and why they use specific less-lethal weapons in particular situations, despite a foam round being designed for a different purpose than a flash bang grenade; whether they took any care to aim such weapons away from peaceful protesters, legal observers, or journalists; whether several shots would have sufficed rather than a minutes-long barrage; or whether they could have given clearer, louder orders to disperse before firing.  On the evidence before the Court, the low risk presented by Plaintiffs and their declarants combined with the availability of less intrusive alternatives renders the use of force described by Plaintiffs—particularly at the August 25, September 5, and September 7 protests where no dispersal order was first issued—is unjustified by the government interest.  *See Graham*, 490 U.S. at 396.

Accordingly, Plaintiff has established a likelihood of success on the merits on this prong of their claim that LASD has violated the Fourth Amendment by utilizing excessive force at peaceful protests.  *See All. for the Wild Rockies*, 632 F.3d at 1135.

The Court thus turns to whether Plaintiffs have established likelihood of success or serious questions as to the merits of the other elements of their section 1983 claim.

## 2.  *Monell* liability

Local governments and local officials in their official capacities may be sued under section 1983 for monetary, declaratory, or injunctive relief if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  Plaintiffs seeking to establish *Monell* liability must demonstrate that the government "had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation he suffered."  *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007).  To establish an official custom or policy, plaintiffs must show a constitutional violation under one of three theories:  (1) the employee who caused the alleged harm acted under "an official municipal policy";  (2) the employee acted in keeping with the municipality's "longstanding practice or custom"; or (3) the employee caused the alleged harm through his or her "final policymaking authority."  *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

---

[13] As a counterpoint, however, it does not seem unreasonable for protesters to prepare for sudden use of less-lethal projectiles and chemical agents given LASD's demonstrated capacity to use those weapons.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|----------|----------------------|------|--------------|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 20 of 24 |
|-------|-----------------------------------------------|------|----------|

Plaintiffs argue that even if LASD's official use of force policy is constitutionally sound, LASD has an unofficial custom or policy of indiscriminately using less-lethal projectiles and chemical agents on crowds of peaceful protesters, legal observers, and journalists. MPI at 20–23. A custom or practice can be "inferred" from "'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015) (quoting *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1232–33 (9th Cir. 2011)); *see also Henry v. Cnty. of Shasta*, 132 F.3d 512, 518–21 (9th Cir. 1997), *opinion amended on denial of reh'g,* 137 F.3d 1372 (9th Cir. 1998) (finding that evidence of "identical incident[s]" to that alleged by the plaintiff may establish that a municipality was put on notice of its agents' unconstitutional actions). As discussed above, the evidence before the Court indicates that on at least three, if not five, occasions in the span of one month, LASD officers used excessive force on peaceful protesters, legal observers, and journalists.

In opposition, Defendants argue that Plaintiffs have pointed to only five incidents of use of less-lethal projectiles and chemical agents, and between the SRT's inception in 2007 and the end of May 2020, SRT units had deployed less-lethal tools only once, in response to a sports-related riot. *See* Lewis Decl. at ¶ 21. Although Commander Lewis describes a disciplinary procedure for any violations of internal policies, he does not say that officers were disciplined in connection with the protests at the heart of this case. *See id.* at ¶ 37. Other officers' declarations, Villanueva's comment on television news that he "expected deputies to defend themselves . . . with less lethal force," and Defendants' briefing make clear that Defendants consider the use of force at these protests justified. This number of incidents can also support the existence of an informal practice or custom. The Ninth Circuit has approvingly cited *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir.1996), in which a *Monell* claim could be premised on evidence that the municipality failed to discipline an officer accused of five instances of excessive force. *See Velazquez*, 793 F.3d at 1028.

On the evidence in the record, the Court concludes that five uses of excessive force in one month, for which no officers were disciplined, presents serious questions going to the merits of the *Monell* claim that the LASD has an unofficial custom or policy of indiscriminately using less-lethal projectiles and chemical agents on crowds of peaceful protesters, legal observers, and journalists. *See All. for the Wild Rockies*, 632 F.3d at 1135.

In light of the Court's ruling as to the Section 1983 *Monell* claim, the Court need not, and does not, address the merits of Plaintiffs' other claims at this time.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 21 of 24 |

### 3.  Scope of relief

The Court need not, for the purposes of granting preliminary injunctive relief, provisionally certify a class action for a *Monell* claim.  Under *Monell*, section 1983 plaintiffs may seek injunctive relief against a municipality.  *See Monell*, 436 U.S. at 690.  And individual Plaintiffs may seek a broad injunction to protect the peaceable exercise of their right to attend, observe, or report on peaceful protests.  As the Ninth Circuit has noted:

> While injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification, *see generally Zepeda [v. INS]*, 753 F.2d [719,] 727–28 & n. 1 [(9th Cir. 1983)]*, "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" *Bresgal v. Brock,* 843 F.2d 1163, 1170–71 (9th Cir. 1987) (emphasis in original).

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996).  Injunctive relief tailored to address LASD's use of less-lethal projectiles and chemical agents against peaceful protesters, legal observers, and journalists may therefore be necessary even if only to protect the named Plaintiffs' rights, although such an injunction must not be "more burdensome than necessary to redress the complaining parties."  *Bresgal*, 843 F.2d at 1170 (citation omitted).

Accordingly, the Court finds that the balance of serious issues raised as to the merits of Plaintiffs' *Monell* claim and the high risk of irreparable harm to Plaintiffs' constitutional rights justifies preliminary injunctive relief.

### C.     Irreparable harm

A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22).  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding irreparable harm from risk that the defendants would again deprive the plaintiffs of Fourth Amendment rights in the future)).

Plaintiffs have presented evidence of a deprivation of Fourth Amendment rights that has also had a chilling effect on their First Amendment rights.  Where LASD have "repeatedly denied

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 22 of 24 |
|---|---|---|---|

that they have engaged in any wrongful or unlawful conduct," the risk is high that they will engage in similar use of less-lethal force at future demonstrations. *Index Newspapers LLC*, 2020 WL 4883017, at *24, *aff'd*, 977 F.3d 817 (9th Cir. 2020). Protests over police brutality and racial injustice have continued since the summer of 2020. While the parties have not reported any further LASD uses of force in the intervening period to the scale of that which occurred in 2020, Plaintiffs may still be deterred from participating in such protests. *See Black Lives Matter Los Angeles v. City of Los Angeles*, No. CV 20-5027-CBM (ASx) (C.D. Cal.) [Doc. ## 71, 90] (TRO and Amended TRO finding a likelihood of irreparable harm to protesters in Los Angeles if the Los Angeles Police Department is not enjoined from the use of less-lethal projectiles at protests in the spring of 2021). Plaintiffs have demonstrated likelihood that they will suffer irreparable deprivation of constitutional rights prior to a decision on the merits of this suit if preliminary injunctive relief is not granted.

This factor thus weighs in favor of injunctive relief.

**D.      Public interest and balance of the equities**

When the government is a party, the last two prongs of the injunction analysis merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quotation marks omitted). But the County and the public also have a clear interest in protecting the safety of officers, protest attendees, and others in the vicinity, as well as preventing destruction of property. As the Ninth Circuit has noted, "'[e]ven in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens." *Forrester*, 25 F.3d at 807 (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 287 (1993) (Kennedy, J., concurring)).

Defendants argue that Plaintiffs' proposed injunctive relief is overbroad and will limit deputies' ability to deescalate situations, thereby endangering protesters, deputies, and the public. TRO Opp. at 22–23; *see* Lewis Decl. at ¶ 39. But the preliminary injunction the Court contemplates is narrowly tailored and in fact tracks Commander Lewis's description of the need for differentiation between less-lethal projectiles. For example, according to Commander Lewis, foam rounds are used as target-specific devices that "remov[e] or limit[] the risk to uninvolved persons nearby," and flash bang grenades are not target-specific devices. *See* Lewis Decl. at ¶ 33. Accordingly, LASD deputies should not indiscriminately fire foam rounds when there is risk of hitting "uninvolved persons" and should not throw flash bang grenades at individuals. The injunction will also be tailored to require verbal warnings to be given only where feasible, recognizing that in some exigent circumstances, deputies have to react too quickly to give any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | Date | May 28, 2021 |
|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | Page | 23 of 24 |
|---|---|---|---|

warnings.  *See Deorle*, 272 F.3d at 1284 (holding that while warnings do not have to be given, "warnings should be given, when feasible, if the use of force may result in serious injury").  Given the wide leeway still given to LASD deputies to use less-lethal force when necessary to protect public safety and property, Defendants will not be overly burdened by a tailored preliminary injunction.

Accordingly, the public interest and balance of equities weigh in favor of an injunction to prevent the further use of excessive force in violation of Plaintiffs' Fourth Amendment rights.

**E.      Bond**

Under Federal Rule of Civil Procedure 65(c), the Court may require Plaintiffs to post a bond for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully restrained, pending final judgment in this case.  Fed. R. Civ. 65(c).  Defendants do not request that Plaintiffs post a bond.  Moreover, the Court has discretion to set a nominal bond in public interest cases or waive the bond requirement where requiring security would effectively deny access to judicial review.  *See People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985); *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).  Because this preliminary injunction implicates the public's interest in protecting constitutional rights at peaceful protests, and Defendants do not request a bond, the Court waives the bond requirement.

**IV.**
**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Plaintiffs' MPI.  The parties shall meet and confer regarding the specific language of the Court's tentative preliminary injunction set forth below.  *See, e.g.*, *Black Lives Matter Los Angeles v. City of Los Angeles*, No. CV 20-5027-CBM (ASx) (C.D. Cal. Apr. 28, 2021) [Doc. # 90] (noting that the parties met and conferred regarding the language of a TRO restricting the use of less-lethal projectiles).  By **June 14, 2021**, the parties shall file a Joint Status Report stating either their agreed upon language for the proposed preliminary injunction or their separate statements.  In addition, by **June 14, 2021**, the parties shall meet and confer regarding pretrial and trial dates and deadlines and file an updated Joint Rule 26(f) Report.

After considering the parties' Joint Status Report and making any corresponding modifications to its tentative preliminary injunction, the Court will issue the preliminary injunction, which will not take effect prior to **June 21, 2021**.  The Court will enter the preliminary

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 20-7870 DMG (PDx) | | Date | May 28, 2021 |
|---|---|---|---|---|

| Title | *Krizia Berg v. County of Los Angeles, et al.* | | Page | 24 of 24 |
|---|---|---|---|---|

injunction thereafter.

## TENTATIVE PRELIMINARY INJUNCTION

1. The Los Angeles Sheriffs' Department is hereby enjoined from using less-lethal weapons, including foam rounds, pepper balls, tear gas canisters, flash bang grenades, and stinger grenades, against any persons peacefully attending a protest, march, or other lawful gathering unless reasonable, proportional, and targeted action is necessary to protect against a specific imminent threat of physical harm to officers or identifiable others, to respond to specific acts of violence or destruction of property, or to enforce a declaration of unlawful assembly and dispersal order pursuant to California Penal Code section 409.

   a. If reasonable, proportional, and targeted use of less-lethal projectiles or chemical agents is necessary, foam rounds and any projectile designed to be target-specific shall be aimed at individuals causing the imminent threats of harm, violence, or destruction of property and shall not be indiscriminately fired.

   b. Flash bang grenades, tear gas canisters, and other less-lethal means designed to be non-target-specific shall not be deliberately aimed to strike individuals.

2. Whenever feasible, Los Angeles Sheriffs' Department officers shall issue warnings and/or declare unlawful assembly before the reasonable, proportional, and targeted use of less-lethal projectiles or chemical agents.

   a. Warnings must be given and repeated by means reasonably calculated to ensure that the warnings are heard.

   b. When warnings are given, reasonable time shall be given to comply.

**IT IS SO ORDERED**.