PAUL B. BEACH, State Bar No. 166265
RAYMOND W. SAKAI, State Bar No. 193507
rsakai@lbaclaw.com
SHAWYANE EMADI, State Bar No. 352292
Semadi@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
150 South Los Robles Avenue, Suite 660
Pasadena, California 91101
Telephone No. (818) 545-1925

Attorneys for Defendants
County of Los Angeles and Sheriff Alex Villanueva

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,

              Plaintiffs,

      vs.

COUNTY OF LOS ANGELES, etc., et al.,

              Defendants.

Case No. 2:20-cv-07870-DMG-PD

Honorable Dolly M. Gee

**DECLARATIONS OF RAYMOND W. SAKAI AND GEORGE ZAGURSKI IN SUPPORT OF IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

*[Opposition Memorandum and filed concurrently herewith]*

Date:        December 12, 2025
Time:       9:30 a.m.
Courtroom:  8C

1

TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND THEIR ATTORNEYS OF RECORD:

Defendants County of Los Angeles and Sheriff Alex Villanueva hereby submit the following declarations and exhibits in Support of their Opposition to Plaintiffs' Renewed Motion for Class Certification.

Dated:  October 10, 2025          LAWRENCE BEACH ALLEN & CHOI, PC

By     /s/  Raymond W. Sakai
       Raymond W. Sakai
       Attorneys for Defendants
       County of Los Angeles and
       Sheriff Alex Villanueva

2

| INDEX | | |
|---|---|---|
| | **DECLARATIONS** | **PAGE** |
| | Declaration of Raymond W. Sakai | 1-5 |
| | Declaration of Lt. George Zagurski | 6-10 |
| | Declaration of Lt. Damon A. Jones – 8/25/20 Downtown Los Angeles [Doc. 23-1, filed 9/8/20, Opposition to ex parte] | 11-13 |
| | Declaration of Lt. Charles L. McDaniel – 9/5/20 South LA Station [Doc. 23-1, filed 9/8/20, Opposition to ex parte] | 14-22 |
| | Declaration of Sgt. M. Coppes – 9/25/20 West Hollywood [Doc. 34, filed 10/23/20, Opposition to preliminary injunction] | 23-40 |
| **EXHIBIT** | | **PAGE** |
| D001 | Field Operation Support Services newsletter briefing personnel about the preliminary injunction. | 41-43 |
| D002 | Field Operation Support Services newsletter briefing personnel about 2022 laws regarding civil unrest, including Penal Code §13652. | 44-45 |
| D003 | LASD's Manual of Policy and Procedures, 5-06/030.12 – Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations. | 46-51 |
| D004 | Excerpts from the deposition transcript of Deputy Christopher Vieth | 52-81 |
| D005 | Table – Arrest Class | 82-84 |
| D006 | Table – Chemical Agent Class | 85-90 |
| D007 | Table – Injunctive Relief Class | 91-92 |

3

| | ARREST CLASS | |
|---|---|---|
| D008 | Excerpts from the deposition transcript of Plaintiff Krizia Berg | 93-102 |
| D009 | Excerpts from Plaintiff Krizia Berg's Response to Interrogatories. | 103-109 |
| D010 | Excerpts from the deposition transcript of Plaintiff Sebastian (Serena) Militante | 110-116 |
| D011 | Excerpts from Plaintiff Sebastian (Serena) Militante's Response to Interrogatories. | 117-122 |
| D012 | Excerpts from the deposition transcript of Plaintiff Christian Monroe | 123-131 |
| D013 | Excerpts from Plaintiff Christian Monroe's Response to Interrogatories | 132-135 |
| D014 | Excerpts from the deposition transcript of Plaintiff Travis Wells | 136-147 |
| D015 | Excerpts from Plaintiff Travis Wells' Response to Interrogatories | 148-154 |
| | CHEMICAL AGENT CLASS | |
| D016 | Excerpts from the deposition transcript of Plaintiff Diana Barbadillo | 155-176 |
| D017 | Excerpts from Plaintiff Diana Barbadillo's Response to Interrogatories. | 177-192 |
| D018 | Excerpts from the deposition transcript of Plaintiff Keyanna Bean | 193-217 |
| D019 | Excerpts from Plaintiff Keyanna Bean's Response to Interrogatories | 218-228 |
| D020 | Excerpts from the deposition transcript of Plaintiff Grace Bryant | 229-231 |

| D021 | Excerpts from Plaintiff Grace Bryant's Response to Interrogatories. | 232-238 |
|---|---|---|
| D022 | Declaration of Loan Houng from DKT. 160-1 | 239-240 |
| D023 | Excerpts from the deposition transcript of Plaintiff Taegan Meyer | 241-281 |
| D024 | Excerpts from Plaintiff Taegan Meyer's Response to Interrogatories. | 282-291 |
| D025 | Excerpts from the deposition transcript of Plaintiff Joe Mischo | 292-345 |
| D026 | Excerpts from Plaintiff Joe Mischo's Response to Interrogatories | 346-356 |
| D027 | Excerpts from the deposition transcript of Plaintiff Jillian O'Neil's | 357-410 |
| D028 | Excerpts from Plaintiff Jillian O'Neil's Response to Interrogatories | 411-423 |
| D029 | Excerpts from the deposition transcript of Plaintiff Shakeer Rahman | 424-479 |
| D030 | Excerpts from Plaintiff Shakeer Rahman's Response to Interrogatories | 480-492 |
| D031 | Excerpts from the deposition transcript of Plaintiff David Ramirez | 493-531 |
| D032 | Excerpts from Plaintiff David Ramirez's Response to Interrogatories | 532-544 |
| D033 | Excerpts from the deposition transcript of Plaintiff Noelani Del Rosario-Sabet | 545-549 |
| D034 | Excerpts from Plaintiff Noelani Del Rosario-Sabet's Response to Interrogatories. | 550-553 |

5

| D035 | Excerpts from the deposition transcript of Plaintiff Vishal Singh | 554-600 |
|------|------------------------------------------------------------------|---------|
| D036 | Excerpts from Plaintiff Vishal Singh's Response to Interrogatories | 601-611 |
| D037 | Excerpts from the deposition transcript of Plaintiff Austin Tharpe | 612-648 |
| D038 | Excerpts from Plaintiff Austin Tharpe's Response to Interrogatories | 649-657 |
| D039 | Excerpts from the deposition transcript of Plaintiff Devon Young | 658-677 |
| D040 | Excerpts from Plaintiff Devon Young's Response to Interrogatories. | 678-687 |

6

# **<u>DECLARATION OF RAYMOND W. SAKAI</u>**

I, Raymond W. Sakai, declare as follows:

1.     I am an attorney at law duly licensed to practice before this Court and all the courts of the State of California.  I am an attorney with the law firm of Lawrence Beach Allen & Choi, PC, attorneys of record for Defendants County of Los Angeles and Sheriff Alex Villanueva in the above-entitled action.  If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2.     Attached hereto and incorporated hereby as Exhibit "D004" are true and correct copies of excerpts from the deposition transcript of Deputy Christopher Vieth.

3.     Attached hereto and incorporated hereby as Exhibit "D005" is a table of citations to Plaintiffs' discovery responses, deposition testimony, and declarations relevant to their Arrest Class claims.

4.     Attached hereto and incorporated hereby as Exhibit "D006" is a table of citations to Plaintiffs' discovery responses, deposition testimony, and declarations relevant to their Chemical Agent Class claims.

5.     Attached hereto and incorporated hereby as Exhibit "D007" is a table of citations to Plaintiffs' discovery responses, deposition testimony, and declarations relevant to their Injunctive Relief class claims.

6.     Attached hereto and incorporated hereby as Exhibit "D008" are true and correct copies of excerpts from the deposition transcript of Plaintiff Krizia Berg.

7.     Attached hereto and incorporated hereby as Exhibit "D009" are true and correct copies of excerpts from Plaintiff Krizia Berg's Response to Interrogatories.

1

8. Attached hereto and incorporated hereby as Exhibit "D010" are true and correct copies of excerpts from the deposition transcript of Plaintiff Sebastian (Serena) Militante.

9. Attached hereto and incorporated hereby as Exhibit "D011" are true and correct copies of excerpts from Plaintiff Sebastian (Serena)Militante's Response to Interrogatories.

10. Attached hereto and incorporated hereby as Exhibit "D012" are true and correct copies of excerpts from the deposition transcript of Plaintiff Christian Monroe.

11. Attached hereto and incorporated hereby as Exhibit "D013" are true and correct copies of excerpts from Plaintiff Christian Monroe's Response to Interrogatories.

12. Attached hereto and incorporated hereby as Exhibit "D014" are true and correct copies of excerpts from the deposition transcript of Plaintiff Travis Wells.

13. Attached hereto and incorporated hereby as Exhibit "D015" are true and correct copies of excerpts from Plaintiff Travis Wells' Response to Interrogatories.

14. Attached hereto and incorporated hereby as Exhibit "D016" Excerpts from the deposition transcript of Plaintiff Diana Barbadillo.

15. Attached hereto and incorporated hereby as Exhibit "D017" are true and correct copies of excerpts from Plaintiff Diana Barbadillo's Response to Interrogatories.

16. Attached hereto and incorporated hereby as Exhibit "D018" are true and correct copies of excerpts from the deposition transcript of Plaintiff Keyanna Bean.

2

17.	Attached hereto and incorporated hereby as Exhibit "D019" are true and correct copies of excerpts from Plaintiff Keyanna Bean's Response to Interrogatories.

18.	Attached hereto and incorporated hereby as Exhibit "D020" are true and correct copies of excerpts from the deposition transcript of Plaintiff Grace Bryant.

19.	Attached hereto and incorporated hereby as Exhibit "D021" are true and correct copies of excerpts from Plaintiff Grace Bryant's Response to Interrogatories.

20.	Attached hereto and incorporated hereby as Exhibit "D022" are true and correct copies of the declaration from Plaintiff Loan Houng DKT. 160

21.	Attached hereto and incorporated hereby as Exhibit "D023" are true and correct copies of excerpts from the deposition transcript of Plaintiff Taegan Meyer.

22.	Attached hereto and incorporated hereby as Exhibit "D024" are true and correct copies of excerpts from Plaintiff Taegan Meyer's Response to Interrogatories.

23.	Attached hereto and incorporated hereby as Exhibit "D025" are true and correct copies of excerpts from the deposition transcript of Plaintiff Joe Mischo.

24.	Attached hereto and incorporated hereby as Exhibit "D026" are true and correct copies of excerpts from Plaintiff Joe Mischo's Response to Interrogatories.

25.	Attached hereto and incorporated hereby as Exhibit "D027" are true and correct copies of excerpts from the deposition transcript of Plaintiff Jillian O'Neil.

3

26. Attached hereto and incorporated hereby as Exhibit "D028" are true and correct copies of excerpts from Plaintiff Jillian O'Neil's Response to Interrogatories.

27. Attached hereto and incorporated hereby as Exhibit "D029" are true and correct copies of excerpts from the deposition transcript of Plaintiff Shakeer Rahman.

28. Attached hereto and incorporated hereby as Exhibit "D030" are true and correct copies of excerpts from Plaintiff Shakeer Rahman's Response to Interrogatories.

29. Attached hereto and incorporated hereby as Exhibit "D031" are true and correct copies of excerpts from the deposition transcript of Plaintiff David Ramirez.

30. Attached hereto and incorporated hereby as Exhibit "D032" are true and correct copies of excerpts from Plaintiff David Ramirez's Response to Interrogatories.

31. Attached hereto and incorporated hereby as Exhibit "D033" are true and correct copies of excerpts from the deposition transcript of Plaintiff Noelani Del Rosario-Sabet.

32. Attached hereto and incorporated hereby as Exhibit "D034" are true and correct copies of excerpts from Plaintiff Noelani Del Rosario-Sabet's Response to Interrogatories.

33. Attached hereto and incorporated hereby as Exhibit "D035" are true and correct copies of excerpts from the deposition transcript of Plaintiff Vishal Singh.

34. Attached hereto and incorporated hereby as Exhibit "D036" are true and correct copies of excerpts from Plaintiff Vishal Singh's Response to Interrogatories.

35. Attached hereto and incorporated hereby as Exhibit "D037" are true and correct copies of excerpts from the deposition transcript of Plaintiff Austin Tharpe.

36. Attached hereto and incorporated hereby as Exhibit "D038" are true and correct copies of excerpts from Plaintiff Austin Tharpe's Response to Interrogatories.

37. Attached hereto and incorporated hereby as Exhibit "D039" are true and correct copies of excerpts from the deposition transcript of Plaintiff Devon Young.

38. Attached hereto and incorporated hereby as Exhibit "D040" are true and correct copies of excerpts from Plaintiff Devon Young's Response to Interrogatories.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 10, 2025 at Pasadena, California.

_/s/ Raymond W. Sakai_

5

## DECLARATION OF LIEUTENANT GEORGE ZAGURSKI

I, George Zagurski, declare as follows:

1. I am employed by the County of Los Angeles as a Los Angeles County Sheriff's Department ("LASD") Deputy Sheriff. If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2. I have been affiliated with the LASD for over 45 years. Since 2016, when I retired at the rank of Lieutenant, I have remained active and associated with the LASD as either a reserve or part-time Deputy.

### LASD's jurisdiction and service

3. Formed in 1850, the LASD is the largest sheriff's department in the world, with nearly 18,000 budgeted sworn and professional staff, serving a patrol area of over 3,000 square miles, covering over ten million County residents through countywide functions, providing contract municipal policing to over 40 cities and transit safety services to over 90 cities and four counties throughout the Metro service area, and responding to over one million calls for service annually. Additionally, the LASD provides statewide transportation to and from state prisons.

### Sheriff's Response Team

5. Since its formation in 2007, I have been a member of or affiliated with the LASD's Sheriff's Response Team ("SRT"). Currently, post-retirement, I serve as a part-time Deputy.

6. SRT is part of the LASD's Special Operations Division ("SOD"). Through its various bureaus and details, SOD provides support to all LASD units and mutual aid assistance to outside agencies. The Emergency Operations Bureau ("EOB"), which is part of SOD, is the primary resource for coordinating the LASD's response to natural disasters and complex emergencies, including civil

6

unrest. EOB works closely with county, city, state, and federal agencies and well as community resources to serve the needs of the public.

7. SRT was developed to quickly respond to natural disasters, acts of terrorism, and pre-planned events to protect against any potential threats to public safety. In order to assist local, state, federal and tribal governments, SRT provides highly trained law enforcement personnel and specialized equipment needed during catastrophic events, mass gatherings, protests, and riot suppression to protect the public, ensure order, and enforce laws.

8. SRT has been deployed to assist with crowd protection and management at large annual public gatherings, with attendance often in excess of 100,000 people, such as the Rose Parade, Christopher Street West's LA Pride Parade and Festival, West Hollywood Halloween Carnival, Grand Park July 4th Celebration, New Year's Eve events, and large special events, such as Super Bowl LVI (2022), NCAA College Football National Championship (2023), large concerts, and presidential visits. SRT has also been deployed in response to requests from neighboring jurisdictions for mutual aid. Over the past five years, the SRT has been deployed to police public gatherings with well in excess of one million attendees.

### Update and training regarding
### Preliminary Injunction and Penal Code §13652

9. On August 1, 2021, the Court's Preliminary Injunction regarding the use of less lethal tools took effect.

10. Copies of and material related to the preliminary injunction were distributed to sworn deputy personnel. Attached hereto as Exhibit "COLA2252-2254" is a true and correct copy of the information in Field Operation Support Services newsletter briefing personnel about the preliminary injunction.

11. On January 1, 2022, California Assembly Bill 48, creating Penal Code § 13652 ("Section 13652"), limiting the use of kinetic energy projectiles

and chemical agents in response to protests, assemblies, and demonstrations, took effect.

12. Information regarding this update and other related laws were distributed to all sworn personnel. Attached hereto as Exhibit "D001" is a true and correct copy of the information in Field Operation Support Services newsletter briefing personnel about 2022 laws regarding civil unrest, including Penal Code §13652.

13. Further, the LASD's policy manual was updated in response to Penal Code §13652. Attached hereto as Exhibit "D002" is a true and correct copy of the LASD's Manual of Policy and Procedures, 5-06/030.12 – Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations.

14. The 2022 California Commission of Peace Officer Standards and Training ("POST") Guidelines for Crowd Management, Intervention and Control, which reference the relevant statutory updates, has also been incorporated in the LASD training. These guidelines cover the relationship between First Amendment and other civil liberties of individuals with the interventions required to protect public safety. This includes facilitation of First Amendment activities during public demonstrations, protecting Constitutional rights, fair and impartial enforcement of laws, protection of life and property, unlawful assembly elements, and public and peace officer safety. Additionally, the updated POST Learning Domain 24, Handling Disputes/Crowd Control, which also covers similar material and concepts, is incorporated into Academy training.

15. At SRT, extensive training has been provided regarding the preliminary injunction and Penal Code §13652. This includes incorporation into event action plans (operational plans) and detailed discussion during pre-deployment briefings. Further, this is a standing topic for SRT's ongoing training sessions. Additionally, SRT has provided training to other law enforcement

agencies and participated in multi-agency seminars regarding policing large public events.

### Chemical Agents

16.    I am informed and believe that Plaintiffs' Chemical Agents Class allege that they were subjected to tear gas or other chemical agents by LASD deputies. (Third Amended Complaint [Doc. 165], ¶113).  The LASD maintains a variety of different chemical agents and delivery systems, which are generally used for different tactical purposes and can have different effects.

17.    Oleoresin Capsicum (OC) and OC+ Chlorobenzylidene Malononitrile (CS) Blended Aerosol Agents.  The LASD issues individually carried canisters (commonly 1.5 or 3.3 ounces) for intended for close-range use.  For example, where a Deputy must use physical force to protect himself or other persons from assault, to overcome resistance to effect an arrest, or to restrain a violent person in custody.

18.    Pepperball launchers.  They are designed as less lethal tools for use in a wide variety of tactical applications encountered within law enforcement.  They may be used as an area treatment device to deploy chemical agents, via encapsulated munitions, upon resistive suspects or as a direct fire weapon on assaultive/high risk suspects.  The encapsulated munitions contain Pelargonic Acid Vanillylamide, or PAVA, powder, which is a synthetic compound derived from capsaicin, the active component found in chili peppers.  PAVA is chemically distinct from OC, and because it is delivered in encapsulated munitions it typically has different delivery characteristics, effective range, and operational uses than personally issued OC aerosols.

9

19. _FN-303_. The FN-303 is a compressed-air less lethal launcher that, similar to the pepperball launcher, is capable of firing encapsulated PAVA projectiles. Compared to the pepperball launcher, it is generally capable of a longer effective range.

20. _Other less lethal munitions_. Plaintiffs' Exhibit 14, "Munitions Capability Chart", COLA 431-432, list other less lethal tools. They include OC Stingball grenades, CS Stingball grenades, Spede Heat CS grenades, Triple Chaser CS grenades. Blast Dispersion grenades, Han Ball grenades, and Riot Control grenades. HC Smoke grenades and Safe-smoke grenades do not contain chemical irritants and instead to produce smoke. Each tool is designed for different scenarios, has different effects, and is selected to meet different tactical objectives.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 10, 2025, at Los Angeles, California.

_George Zagurski_
Signer ID. I8BYLGUB16
George Zagurski

10

Document ID: 66c51bf88dd6ada39ac7d72e4a882b54919449965fc3e332cfa75545fa005b00

### <u>DECLARATION OF LIEUTENANT DAMON A. JONES</u>

I, Damon A. Jones, declare as follows:

1. I am employed by the County of Los Angeles as a Lieutenant with the Los Angeles County Sheriff's Department ("LASD"). If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2. I have been employed with the LASD for 24 years and am currently assigned as a Lieutenant at LASD Professional Standards Division Headquarters.

3. I am also a member of the LASD's Sheriff's Response Team ("SRT"), and have been so since 2007. Prior to the recent unprecedented civil unrest, in 13 years, I had never been on a SRT deployment where less lethal munitions were used.

4. On August 25, 2020, the SRT was deployed to downtown Los Angeles in advance of a large scheduled protest. On August 24, 2020, the night before, protesters had violently clashed with Los Angeles Police Department officers in front of the LAPD's Headquarters on First Street. Prior to our deployment we reviewed information regarding the potential for acts of violence and vandalism similar to the July 26, 2020 protests where windows were broken at the First Street Federal Courthouse and two other Federal Buildings.

5. We initially went to the Hall of Justice, but followed the protesters to the LASD's Men's Central Jail, where protesters gathered and dispersed without incident.

//
//
//
//
//

BERG\DECL OF JONES RE OPP TO TRO                    11

6. Thereafter, the protesters returned to the area near the Hall of Justice. We also responded to the Hall of Justice, and tried to set up protection on the west side, near the intersection of Temple Street and Broadway. While we were trying to set up a defensive line, we were confronted by a large group of protesters. Some in the crowd were carrying wood and plexiglass shields and wearing helmets, goggles and gloves.

7. Closing the distance to within approximately 25 feet of the deputies, some in the crowd threw various objects, including a tire iron, metal pole, spray paint can, rocks and water bottles. In response and in order to protect themselves, deputies deployed brief rounds of less lethal tools at the individuals throwing the objects and at the ground near those individuals.

8. The sound of the tire iron hitting the street prior to the deployment of less lethal rounds can clearly be heard in the videos submitted by Plaintiffs.

9. Based on the sudden violent conduct of the crowd, there was no opportunity to provide a dispersal order or warning.

10. Thereafter, there was no need for use of any less lethal tools for the rest of the night.

//
//
//
//
//
//
//
//
//
//

BERG\DECL OF JONES RE OPP TO TRO                12

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 27, 2020, at Los Angeles, California.

_____
Damon A. Jones

## DECLARATION OF LIEUTENANT CHARLES L. McDANIEL

I, Charles L. McDaniel, declare as follows:

1. I am employed by the County of Los Angeles as a Lieutenant with the Los Angeles County Sheriff's Department ("LASD" or "Department"). If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2. I have been employed with the LASD for 32 years and am currently assigned as a Lieutenant at LASD's South Los Angeles Station. I am also a member of the LASD's Sheriff's Response Team ("SRT"), and have been so since 2016. When deployed, for each squad, I directly supervise four Sergeants and a team of approximately 56 deputies.

4. On September 5, 7 and 8, 2020, I commanded SRT squads outside of the South Los Angeles Station.

5. On **September 5, 2020**, several SRTs deployed to South Los Angeles Station:

A) One of our goals was to protect the Station's perimeter. Barrier wire was placed in the northern portion of the Station parking lot to prevent protesters from entering the Station property. The barrier wire had affixed yellow marked police (police do not cross) tape, and was reinforced with zip ties, to try to ensure that it was not breached.

B) We positioned Squad Transport Vehicles ("STV") and deputies in front of the Station facing north.

C) Protesters arrived and positioned themselves on Imperial Highway in front of the Station. Deputies maintained their position and did not make contact with protesters, the size of which was estimated to be approximately 250 to 300 people. The protesters were yelling, waving flags and signs and conducting generally themselves in a peaceful but

BERG\DECL OF McDANIEL RE OPP TO TRO

14

agitated manner.  Over the course of several hours, different factions of protesters would arrive and leave.  After several hours, the protesters left the Station and walked eastbound on Imperial Highway.

D) Some protesters returned a couple of hours later and positioned themselves on the east end of the parking lot in front of the Station.  Over time, numerous protesters approached the barrier wire and taunted deputy personnel as other protesters attempted to defeat the barrier wire by cutting the connecting links.  Multiple warnings were given to the protesters not to touch the barrier wire and to back away, which were ignored.  At one point, a large umbrella was placed over the barrier wire as several protesters concealed themselves behind it in an effort to cut their way through the barrier wire connections.

F) As a result of their escalated hostile actions, we fired a short burst of pepper-ball rounds into the ground in front of the umbrella's location, and additional commands were given to not touch the barrier wire and to move away from the area.

G) Suddenly, the protesters began to throw items (e.g., chucks of concrete, rocks, glass bottles, frozen water bottles, fireworks) at the deputies and Station.  In response, deputies deployed less than lethal tools at the protesters who were assaulting us.  Also, the protesters were given orders over the loudspeakers to stop throwing items and leave, along with specific instructions to disperse by going east or west on Imperial Highway.

H) The use of the less lethal tools and tactics was effective and caused the violent protesters to stop throwing objects and leave the area.  No additional less lethal tools were deployed.

BERG\DECL OF McDANIEL RE OPP TO TRO

15

I) The protesters dispersed into the surrounding neighborhood. We did not follow the protesters into the neighborhood, and no protesters were arrested. Station personnel recovered rocks, concrete chunks, steel bars, bottles and exploded fireworks from around the Station area. At no time did any protester identify themselves as being injured, nor did anyone approach the Station and request to speak to a supervisor.

6. On **September 7, 2020**, several SRTs deployed to the area near South Los Angeles Station:

A) Two SRT squads were positioned on Imperial Highway at the intersection of New Hampshire Avenue, which is to the east of the Station. Because the protesters at this location were peaceful, there was never any need to use less lethal tools.

B) Two additional SRT squads were positioned on Imperial Highway at the intersection of Normandie Avenue, which is to the west of the Station.

C) Security barrier wire was set up at the north/south crosswalk of Imperial Highway as it intersects with Normandie Avenue; yellow police tape was affixed to the barrier wire and the do not cross labeling on the tape was clearly visible. On the northeast corner of the intersection, there is a small strip mall and parking lot, with an adjacent north/south alleyway. The strip mall parking lot is slightly elevated and there is a waist level brick wall that separates the alley from the parking lot and the adjacent sidewalk.

D) SRT personnel and their two STVs faced the northwest, in the direction of the strip mall. A black and white patrol vehicle was additionally placed in the mouth of the alleyway on Imperial Highway facing north.

BERG\DECL OF McDANIEL RE OPP TO TRO

16

E) Eventually, a large group of protesters (approximately 250 to 300) formed in the intersection of Imperial Highway and Normandie Avenue and were blocking vehicle traffic. Additionally, numerous protesters (125 to 150) gathered in the strip mall parking lot. As a result, SRT personnel were surrounded on two sides.

F) As the evening progressed, agitators began to incite the crowd and several protesters attempted to defeat the connecting mechanisms of the barrier wire, and tore away the police tape affixed to it.

G) Moreover, the protesters in the alleyway adjacent to the strip mall began to push a grocery cart and large metal sign in our direction. They were using the sign and shopping cart as cover and to hide behind. The protesters would suddenly pop up into view and simulate throwing items in our direction in hopes of eliciting a response from us. Deputies removed the sign and shopping cart from the protesters without incident

H) Shortly after the sign and shopping cart were removed, hostile protesters began to push a large wooden desk down the alleyway in our direction. The large wooden desk was quickly pushed within 10 to 15 feet of the deputies.

I) A short time later, several protesters began to throw objects at us from the mini mall parking lot. I could see frozen water bottles, pieces of concrete, bricks and rocks striking our STVs and the ground adjacent to the deputies. Additionally, numerous mortar round fireworks were thrown at us, which exploded amongst our personnel. As a result of the protesters' assaultive actions, deputies deployed less lethal munitions in an effort to defend against the attacks, and in an effort to disperse the crowd out of the parking lot and north onto Normandie Avenue. At the same time, an unlawful assembly was declared and a dispersal order for everyone to leave the area was repeatedly given. We then conducted a protective sweep of

BERG\DECL OF McDANIEL RE OPP TO TRO

17

the mini mall parking lot to remove protesters who were hiding behind parked vehicles and throwing items in our direction.

J) A tactical plan was then implemented as we directed the protesters northbound on Normandie Avenue and out of the area. As we directed the protesters northbound, they would stop in the roadway and use shields to form a protective wall barrier. Behind the wall barrier protesters would then run up from a position of cover and throw rocks, bottles and fireworks at the deputies. To defend themselves, the deputies deployed less lethal munitions at the barrier walls and violent protesters to defeat the assault.

K) As we reached the intersection of 112th Street and Normandie Avenue, the protesters fled into the adjacent neighborhoods and dispersed. SRT personnel did not pursue the protesters, and returned to the intersection of Imperial Highway and Normandie Avenue. We remained in the general area for several hours to provide security. At no time did anyone identify themselves as being injured as a result of our deployment of our weaponry and munitions.

7. On **September 8, 2020**, like the previous day, several SRT squads deployed to the area near South Los Angeles Station:

A) SRT squads were positioned on Imperial Highway east of the Station where no less than lethal tools were used because the protesters at this location were peaceful.

B) Additional SRT squads were positioned on Imperial Highway at the intersection of Normandie Avenue, west of the Station. Physical barriers were constructed, and while sealing the perimeter, protesters would randomly approach the barriers and attempt to provoke deputies with derogatory comments. As time passed, groups of protesters arrived who were very boisterous, agitated, and clearly angry towards our

presence.

C)      The crowd steadily grew to approximately 150 to 200 people. A large portion of the crowd was wearing all black, had black face coverings, and wearing protective helmets.  Some had body armour, carried shields and had gas masks.  Most of the protesters were carrying large backpacks.  Some protesters were seen loading objects into their backpacks and strategically placing objects in the bushes of the shopping center at the corner of Imperial Highway and Normandie Avenue.

D)      As it got later into the evening, the crowd dynamics became more tense and protesters became more aggressive.  For example, several protesters randomly walked up to the barriers and tried to manipulate them. Verbal commands had to be repeated to protesters to not touch the barriers.

E)      Eventually, after 10 p.m., an unlawful assembly was declared over loudspeakers and the protesters were specifically directed to leave the area by going west on Imperial Highway or north on Normandie Avenue. Protesters were given 15 minutes to voluntarily leave the area.

F)      After at least 15 minutes, the protesters who did not leave formed a large cluster at the intersection of Imperial Highway and Normandie Avenue.  Protesters with shields took the front, forming a protective barrier for the rest of the crowd.  Additional orders to leave were given and the direction of travel to leave.

//
//
//
//
//
//
//
//

G)  Eventually, deputies walked westbound on Imperial Highway toward the crowd.  Suddenly, the crowd started launching frozen water bottles, rocks, and fireworks in our direction.  Deputies immediately responded with appropriate and directed less lethal force towards the hostile crowd.  In response, the crowd initially dispersed north on Normandie Avenue.  We stopped our deployment of less than lethal tools and reassessed the situation.  The crowd retreated but gathered up again in a tight group with shields and umbrellas on the outer portion of their circle.

H)  We again gave announcements via a portable speaker system to leave the area; the crowd again ignored the command.  As SRT personnel slowly proceeded north on Normandie Avenue near 113th Street, we were again met with frozen water bottles, pieces of cement, and large caliber fireworks.

I)  SRT personnel again responded with appropriate less than lethal tools towards the hostile crowd.  Again the crowd dispersed, additional orders to leave the area were announced, which were ignored, and the crowd reformed in clusters in the middle of Normandie Avenue.  Deputies continued to walk northbound on Normandie Avenue, where we were again met with large caliber fireworks and large solid objects being thrown at us.

//
//
//
//
//
//
//
//

J) Again, deputies responded with appropriate less lethal tools, this time near the intersection of Normandie Avenue and 112th Street. Each time we engaged the crowd, they dispersed but reformed further north in the middle of Normandie Avenue. We repeated dispersal orders, but the crowd continued to ignore them. When deputies continued walking northbound on Normandie Avenue, we were again met with hostile protesters shooting large caliber fireworks and throwing large solid objects. We responded with appropriate and directed less lethal force towards the hostile protesters. This process repeated itself on Normandie Avenue at the intersections of 111th Street and 110th Street.

K) In total, SRT personnel engaged the violent protesters on five separate occasions before they finally complied with our orders and dispersed. Approximately 19 arrests were made during the entire incident at various locations along Normandie Avenue.

L) Subsequently, I reviewed social media video that documents the repeated dispersal announcements provided to the protesters and the reasonable amount of time to comply. As seen in the video, instead of leaving peacefully, they continued to yell profanities at the deputies and organized to construct a shield barrier. (A true and correct copy of excerpts of the Instagram post is attached hereto as Exhibit "C".)

8. On September 9, 10, 11 and 12, 2020, I was also deployed at the South Los Angeles Station. While there were still protests, none of the conduct of the protesters necessitated the deployment of less than lethal tools.

//
//
//
//

BERG\DECL OF McDANIEL RE OPP TO TRO        21

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 27, 2020, at Los Angeles, California.

Charles L. McDaniel

## DECLARATION OF SERGEANT M. COPPES

I, M. Coppes, declare as follows:

1. I am employed by the County of Los Angeles as a Sergeant with the Los Angeles County Sheriff's Department ("LASD"). If called upon as a witness, I could and would competently testify to the following facts as personally known to me or upon information and belief.

2. I have been employed with the LASD since 2012 and am currently assigned to the LASD's County Services Bureau. I am also a member of the LASD's Sheriff's Response Team ("SRT"), and have been so since 2017.

3. On September 25, 2020, I commanded a SRT squad in West Hollywood.

4. I am informed and believe that Plaintiffs allege that on the September 25, 2020 the LASD used indiscriminate force against peaceful protesters that were not threatening the deputies. This is an inaccurate account of what occurred.

5. I am further informed and believe there are allegations that the LASD deliberately targeted legal observers and members of the press. Based on my training and experience with SRT, this is not true.

6. In September 2020, there were three LASD deployments to the West Hollywood Station in response to planned large protests. I am informed and believe, on September 19 and 26, 2020, none of the conduct of the protesters necessitated the deployment of any less lethal tools.

7. On September 25, 2020, SRT was deployed to the West Hollywood Station to maintain the peace and ensure public safety in advance of a large protest following news reports of various injuries to protesters and damage to vehicles at the previous night's protest in Hollywood. For example, protesters were struck by vehicles, with at least one being hospitalized.

BERG\DECLS & EXHS RE OPP SUPPL BRIEF          23

(https://losangeles.cbslocal.com/2020/09/25/breonna-taylor-hollywood-forever-cemetery-protester-injured/ [embedded video shows protester being hit by a pickup truck]). Additionally, a car was chased and attacked by protesters. (https://apnews.com/article/hit-and-run-hollywood-los-angeles-police-police-brutality-bacbaf4f26a2128636be75a33b7a9041 ["A group of protesters in a black pickup truck chased down the white sedan and cut it off"; embedded video shows Prius driver being attacked]). *See* Declaration of Raymond W. Sakai, Exhs. "D-F."

8.　At approximately 9:05 p.m., after hours of protest and when the protesters and their vehicles created huge grid lock – impeding traffic, including emergency vehicles, an unlawful assembly was declared and dispersal orders given.

9.　At approximately 9:20 p.m., further dispersal orders were given.

10.　A large group of approximately 100 pedestrian protesters, that were led by two large lifted (higher off the ground than the stock models) pickup trucks, a black Ford F350 and white Chevrolet Silverado, and followed by various other vehicles continued through the streets of West Hollywood violating various Vehicle Code sections, not limited to:

A.　impeding, and at times, blocking traffic (Veh. Code § 22400(a) "No person shall drive upon a highway at such a slow speed as to impede or block the normal and reasonable movement of traffic unless the reduced speed is necessary for safe operation, because of a grade, or in compliance with law");

B.　failing to stop at posted signs and signals (Veh. Code §22450(a) "The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop at a limit line, if marked, otherwise before entering the crosswalk on the near side of the intersection" and §21453(a) "A driver facing a steady circular red signal

alone shall stop at a marked limit line . . .";

       C.    carrying occupants in the truck beds

(Veh. Code §23116(a) "No person driving a pickup truck or a flatbed motor truck on a highway shall transport any person in or on the back of the truck" and (b) "No person shall ride in or on the back of a truck or flatbed motor truck being driven on a highway."); and

       D.    driving with covered license plates

(Veh. Code §5200(a) "When two license plates are issued by the department for use upon a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear" and §5201.1(b) "A person shall not operate a vehicle with a product or device that" obscures, or is intended to obscure, the reading or recognition of a license plate by visual means).

11.    Further, some of the pedestrian protesters that failed to disperse walked into the opposing lane of traffic impeding vehicles creating a dangerous situation for themselves and motorist. *See* Veh. Code § 21954(a) ("Every pedestrian upon a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway so near as to constitute an immediate hazard."). This was especially so in light of the incidents at the previous night's protest, which apparently involved the same black pickup truck.

12.    There were also reports that some of the remaining protesters had vandalized properties while making their way through West Hollywood.

13. At approximately 9:45 p.m., based on the prior dispersal orders after an unlawful assembly (Pen. Code § 407) was announced, the above Vehicle Code violations and, mindful of the injuries at the Hollywood protest the night before, concern for protesters, other vehicle traffic, and pedestrians, deputies conducted a traffic stop of the two large pickup trucks leading the protest near the intersection

of Sunset Boulevard and San Vicente Boulevard.

14. Deputies detained the driver and occupants of the Ford pickup truck without incident for further investigation.

15. Deputies detained the driver of the Chevrolet pickup without incident.

16. However, two of the occupants of the Chevrolet's truck's bed physically resisted their detention. One of the occupants attempted to forcefully break free by pulling away from the detaining deputy, resulting in both of them going to the ground.

17. Exacerbating the tense and dangerous situation of a deputy being on the ground struggling with an unsearched individual, a second truck bed occupant ("suspect") jumped down and grabbed the first occupant's arm in an attempt to free him from the deputy's detention. (Pen. Code §405a ["A person who participates in the taking by means of a riot of another person from the lawful custody of a peace officer is guilty of a felony. . . ."]). When that second suspect was subsequently taken to the ground, he struggled with deputies, causing a deputy's loaded firearm to fall to the ground near the two struggling suspects. The suspect then rolled onto his stomach, placing his hands underneath the middle of his body and did not immediately comply with orders and attempts to put his hands behind his back. Not knowing if the suspect, who was unsearched, was reaching for something and in light of other protesters running toward the location, a deputy used his plastic shield, making contact with the suspect's legs, in order to help gain control of the suspect's hands. Eventually, deputies were able to handcuff the suspect without further incident. This suspect was arrested on various charges, including a felony.

18. Simultaneous, other protesters began to rush and throw items at the deputies, including a large street utility cover. I am informed and believe that other deputies saw water bottles being thrown and glass breaking. One protester,

BERG\DECLS & EXHS RE OPP SUPPL BRIEF          26

dressed all in black and wielding a large umbrella with a pointed tip, ran towards and got close to where the deputies were struggling with the suspects on the ground. Later, it was determined that the protester was also running towards the area where a deputy's loaded handgun was on the ground. In order to defend themselves and deflect the attack, preventing dangerous hand-to-hand contact, deputies deployed a brief volley of less lethal tools.

19. Shortly thereafter, the protesters and vehicles dispersed from the area necessitating no further deployment of less lethal tools.

20. As a result of some of the protester's conduct, there were a number of arrests on charges varying from the attempted taking by means of a riot of another person from the lawful custody of a peace officer (Pen. Code §405a, a felony), unlawful assembly (Pen. Code §409), and willfully resisting, delaying or obstructing a peace officer (Pen. Code §148(a)).

21. Although it is unclear from Plaintiffs' declarations, it appears that the person they refer to as "Andy" was the suspect, described in ¶17, who was arrest on the felony charge. (*See* Plaintiffs' Supplement Brief, 11:2-8).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 23, 2020, at Los Angeles, California.

_____  10/23/20
M. Coppes

  

≡ MENU    NEWS    SPORTS    BEST OF    VIDEO    WEATHER    CONTESTS/MORE

# Protester Hit By Truck During Hollywood Demonstration To Protest Death Of Breonna Taylor

By CBSLA Staff    September 25, 2020 at 4:30 am    **Filed Under:** Breonna Taylor, Breonna Taylor Protest, Hollywood Forever Cemetery, KCAL 9, Los Angeles



**FOLLOW US**

    

**OUR | NEWSLETTER**

 Sign up and get our latest headlines delivered right to your inbox!

Email address

Subscribe Now!

**MOST VIEWED**

 'Great Pumpkin' Charlie Brown Special No Longer Airing On TV (Sort Of)

 Woman Arrested For EDD Fraud As She Arrived At Riverside Superior Court For Unrelated Identity Theft Case

 Man Killed After Pickup Flips During Street Takeover In Costa Mesa; Driver Charged With Murder

 DNA Match Leads To Arrest In Violent 1996 Slaying, Rape Of Boyle Heights Teen Gladys Arellano

 OC Security Guard Arrested After Allegedly Impersonating A Federal Law Enforcement Agent

 'Worst Possible Outcome': Theme Park Enthusiasts Blast California's Reopening Guidelines

 'Steal A Base, Steal A Taco': Mookie Betts Earns Everyone In America A Free Taco With Stolen Base

**HOLLYWOOD (CBSLA)** — One protester was hospitalized after being struck by a pickup truck during a Breonna Taylor demonstration in Hollywood Thursday night.


Cell phone video shows a protester being struck by a pickup truck in Hollywood, Calif., on Sept. 24, 2020. (Credit: JESSICARAYEROG1/Twitter)

The incident occurred at about 9 p.m. while hundreds of protesters marched down Sunset Boulevard. Video posted to social media showed the driver of a blue truck striking a protester who was holding a sign, knocking them to the ground.

'Largest Of Its Kind In The World': Plans For 101 Freeway Wildlife

  

28

The driver then drove off and was initially detained by law enforcement a few blocks away from the scene before being allowed to leave.

The injured protester was taken to a hospital in unknown condition.

Los Angeles police said the incident had started with an altercation between the driver of the pickup truck and a different protester. When the pickup truck tried to speed away, that is when the protester was struck, police said. The incident remains under investigation.

Then, at about 9:30 p.m., the driver of a white Prius appeared to be attempting to drive past the demonstration that was moving down Sunset Boulevard and was quickly surrounded by protesters marching down the street.

The driver of that vehicle then drove through the intersection, striking a number of protesters, before being boxed in by two other vehicles while protesters hit the windows. The Prius then sped off, and was also later stopped by police.

Crossing In Agoura Hills Released



Feds Arrest Rapper Who Bragged About Getting Rich From Filing EDD Claims In Music Video

Suspect Dead, Officer Wounded After Police Pursuit Ends In Gunfire On 15 Freeway In Barstow



Ads by Google

Send feedback

Why this ad? ▷



**LAPD HQ** ✓
@LAPDHQ

The LAPD is are aware of an incident in Hollywood involving several vehicles and a large group of protestors. Here is the information we can verify at this time.

11:26 PM · Sep 24, 2020

♡ 651     ◯ 1K people are Tweeting about this

Demonstrators continued to march down Sunset Boulevard toward the 101 Freeway before turning south on Gower Street, back to where the demonstration had begun, before dispersing.

The largely peaceful demonstration began at Hollywood Forever Cemetery, 6000 Santa Monica Blvd., at about 7 p.m. where hundreds gathered to protest the grand jury decision in the March



Sept. 24, 2020. (CBSLA)

29

shooting death of Breonna
Taylor by police in Louisville, Kentucky.

This is the second night of demonstrations in Los Angeles following
a grand jury decision to not charge any of the officers directly for
Taylor's death.

Comments (106)



PAID FOR BY WITH HONOR FUND, WHICH IS RESPONSIBLE FOR THE CONTENT OF THIS ADVERTISING. NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATE'S COMMITTEE. WWW.WITHHONORFUND.ORG

CCPA Notice                                                    Taboola Feed

**Challenge Your Brain With This Must-Play Strategy Game. No Install.**

Forge Of Empires | Sponsored

**This Game is So Beautiful it's Worth Installing Just to See**



AP NEWS

Top Stories    Topics ∨    Video    Listen   

ADVERTISEMENT

<      >

# 1 hurt, car crashed in fights at Los Angeles protest

September 25, 2020



LOS ANGELES (AP) — One person was hurt when a truck ran into a small crowd of people protesting police brutality in Los Angeles Thursday night, authorities said.

The driver of a blue pickup truck got into an argument with demonstrators and struck the protester who was standing in the street as the driver tried to get away, police said in a statement. The protester was taken to a hospital with minor injuries.

Officers stopped and identified the truck's driver, who said protesters had attacked his vehicle and he was trying to get away,

AD

|Business Infoline

Trending on AP N

Trump posts une interview before

Giuliani shown in new 'Borat' film

AP Week in Pict

AD

https://apnews.com/article/hit-and-run-hollywood-los-angeles-police-police-brutality-bacbaf4f26a2128636be75a33b7a9041     Exhibit E - 19 1/4



 

The driver was released pending the outcome of a hit-and-run investigation.

A few minutes after that incident, the driver of a white Prius also got involved in an argument with protesters and then tried to drive off, police said. A group of protesters in a black pickup truck chased down the white sedan and cut it off. They and another group of people in a green Mustang confronted the driver and banged on the sedan's windows.

ADVERTISEMENT

"The driver of the Prius attempted to flee the area and reversed into a green Mustang behind it," the police statement said.



The Prius was then able to get away, but police say the driver was detained by Hollywood officers a few blocks away. No one was hurt in the second incident, police said.

No arrests were announced. Police were continuing to gather information about both incidents.

A few dozen demonstrators marched through Hollywood for hours on Thursday, one of many protests across the country demanding justice for Breonna Taylor. Demonstrators were angered after it was announced that the officers who shot the Black woman in her Louisville, Kentucky, apartment during a drug raid last March wouldn't be charged with her death.



**BREAKING NEWS**

Watch live: Trump and Biden meet for final debate                                    ✕

CALIFORNIA

# Driver plows through Breonna Taylor protest in Hollywood, hitting at least one person



Paramedics help a protester who was hit by a vehicle on Sunset Boulevard in Hollywood. (Wally Skalij / Los Angeles Times)

By MATTHEW ORMSETH, JAMES QUEALLY

SEP. 24, 2020 | 10:07 PM  UPDATED  6:37 AM

  

A truck drove through a group of protesters in Hollywood on Thursday night, striking at least one person as it sped through the crowd, according to the police and news footage from the scene.

Demonstrators had gathered at 7 p.m. at Hollywood Forever Cemetery before marching through the streets of Hollywood.

They were decrying the announcement Wednesday that just one of three Louisville, Ky., police officers involved in the death of Breonna Taylor, who was shot to death in a bungled raid of her apartment, had been charged with a crime. The one indicted

35

Exhibit F - 22 1/7

officer, Brett Hankison, was charged not in connection with Taylor's death but for allegedly firing blindly into her apartment building.

The charging decision, anticipated for months, has infuriated people throughout the country and spurred large protests, including one Wednesday night that drew hundreds of people to downtown Los Angeles.

ADVERTISEMENT



On Thursday, the group in Hollywood was walking down Sunset Boulevard, video posted to Twitter and YouTube shows, when a dark-colored pickup accelerated among the protesters, striking one directly and hurtling the person backward. The truck then sped down Sunset Boulevard, nearly hitting other people who leaped out of the way, the footage shows.



WORLD & NATION

**'A lot of hurt.' With no police charges in Breonna Taylor case, mourning blankets Louisville and nation**

Sep. 24, 2020

Capt. Steve Lurie, who leads the Los Angeles Police Department's Hollywood Division, said officers stopped and identified the motorist, although they didn't immediately arrest him. The motorist told them that protesters had attacked his car first, according to Lurie, who added that officers have noted damage to the car.



A protester who was hit by a car is attended to as paramedics arrive on Sunset Boulevard. (Wally Skalij/Los Angeles Times)

Christian Monterrosa, a freelance photojournalist who was following the protest, said the truck was traveling against the flow of the crowd — west, when the group was walking east — when protesters began crowding the vehicle, trying to bring it to a stop.

"I would say the truck instigated the incident, definitely," Monterrosa said, noting that other motorists had yielded to the demonstrators.

ADVERTISEMENT

←

Ads by Google

Send feedback    Why this ad? ▷





WORLD & NATION

**Photos: Protests over charging decision in Breonna Taylor case**

Sep. 25, 2020

Nicholas Prange, a spokesperson for the Los Angeles Fire Department, said paramedics were called just before 9 p.m. to the corner of Sunset Boulevard and Seward Street. An ambulance transported at least one person to a hospital with minor

37

Exhibit F - 24 3/7

injuries, according to the LAPD. Lurie said the person was in stable condition and refused to cooperate with police.

**Caution: Video contains graphic content and strong language.**

jessicarayerogers
@jessicarayerog1

Content warning. Protesters get struck by car during Hollywood march/protest #losangeles #protest #hollywood

9:21 PM · Sep 24, 2020

♡ 8.7K    ♡ 7.1K people are Tweeting about this

Moments after the incident and a few blocks east on Sunset Boulevard, a white Prius tried to drive through the fringes of a group of demonstrators who had gathered in an intersection, according to the LAPD and footage from KCAL-TV Channel 9's chopper, Sky9.

"It wasn't traveling at a fast speed — it was inching forward, trying to get past, and that upset people," said Monterrosa, the photojournalist.

People in the crowd began striking the car's windows and doors, the news footage shows. After the Prius cleared the crowd, a black pickup truck with several people sitting in the bed gave chase, accelerated ahead of the Prius and pulled to an abrupt halt. A man got out of the truck and, according to the footage, appeared to try to pull the driver out of the Prius.

The Prius reversed and collided with a green Mustang convertible, which was associated with the protest, according to the LAPD. A person got out of the convertible and began striking the Prius with a flagpole, the footage shows, and another person arrived on a skateboard, which he used to smash the Prius' windshield. The motorist drove off but was detained a few blocks away by the LAPD. No one was injured in the incident, according to police.

38

https://www.latimes.com/california/story/2020-09-24/breonna-taylor-hollywood-protest

Exhibit F - 25 4/7



A victim is comforted after being hit by a hit and run driver on Sunset Blvd. as she was protesting the Kentucky grand jury's decision in the Breonna Taylor case. (Robert Gauthier/Los Angeles Times)

Police have identified the motorists involved in both incidents, which were still being investigated, the LAPD said in a statement. Lurie, the Hollywood captain, said detectives will review whether the motorists, both of whom maintain they were accosted by protesters, are "the suspect of a hit-and-run or the victim of an assault." Cases could be presented to either county or city prosecutors for charging consideration, he said.

ADVERTISEMENT



Ads by Google

Send feedback    Why this ad? ▷

Meanwhile, protesters continued to march along Fountain Avenue, just south of Sunset. Mo Broughton, 32, of Hollywood used a megaphone to urge protesters to stay behind vehicles that were part of the protest.

"Please stay behind the cars — it's for your protection," she yelled.

An estimated 350 people took to the streets in Hollywood on Thursday night, according to Lurie. Most were peaceful but about 20 were "violent," the captain said,

39

Exhibit F - 26 5/7

painting graffiti and lighting fires in a pair of trash cans.



A Prius runs through a crowd of people on Sunset Boulevard and North Cahuenga Boulevard during a protest held for Breonna Taylor in Hollywood. (Josie Norris/Los Angeles Times)

*Times staff writer Kevin Rector contributed to this report.*

CALIFORNIA



## The stories shaping California

Get up to speed with our Essential California newsletter, sent six days a week.

Enter Email Address

**SIGN ME UP**

You may occasionally receive promotional content from the Los Angeles Times.



Matthew Ormseth

Twitter    Instagram    Email    Facebook

Matthew Ormseth is a reporter for the Los Angeles Times. Before joining The Times in 2018, he covered city news and state politics at the Hartford Courant. He grew up in Arcadia and graduated from Cornell University.

Case 2:20-cv-07870-DMG-KES   Document 169-1   Filed 10/10/25   Page 47 of 693 Page ID #:4638

FOSS Newsletters : 21-11 - Berg vs. County of Los Angeles:  Preliminary Injunction Regarding the Use of Less-Lethal Munitions During Civil Disorder

## 21-11 - Berg vs. County of Los Angeles: Preliminary Injunction Regarding the Use of Less-Lethal Munitions During Civil Disorder



**Los Angeles County Sheriff's Department**

**NEWSLETTER**

Field Operations Support Services

**BERG VS. COUNTY OF LOS ANGELES:**

**PRELIMINARY INJUNCTION REGARDING THE USE OF**

**LESS-LETHAL MUNITIONS DURING CIVIL DISORDER**

### PURPOSE

To inform Department personnel of an impending preliminary injunction affecting the Department's use of less-lethal munitions during civil disorder incidents.  A preliminary injunction is a temporary court order issued during a lawsuit that prevents certain conduct until the conclusion of the trial or until the court issues further directions.

### BACKGROUND

The Department has long facilitated the right for citizens to peaceably and lawfully assemble and speak as guaranteed by the First Amendment of the Constitution of the United States.

On July 6, 2021, a Federal Court entered a preliminary injunction regarding the Department's use of less-lethal munitions during civil disorder incidents, which shall go into effect on August 1, 2021.  Below is a summary of some of the key points from the injunction:

- Reasonable, proportional, and targeted use of less-lethal munitions may be used when necessary to:
    - Protect against a specific imminent threat of physical harm to individuals (including deputies);
    - Respond to specific acts of violence or destruction of property; or
    - Enforce a declaration of unlawful assembly and dispersal order.
- Consistent with Department training, target-specific less-lethal rounds shall not be indiscriminately fired. Personnel are to target imminent assaultive/high-risk subjects with target-specific less-lethal rounds with an aim point of the belt buckle and below to minimize the risk of permanent or lethal injury;
- Targeting of an individual with a non-target-specific munition is prohibited;
- Attempts to remove, surpass, or defeat a protective barrier (including the barrier wire commonly

FOSS Newsletters : 21-11 - Berg vs. County of Los Angeles:  Preliminary Injunction
Regarding the Use of Less-Lethal Munitions During Civil Disorder

deployed by the Sheriff's Response Team) may be considered a threat to deputies;

- When feasible, warnings, unlawful assembly and/or dispersal orders shall be given and repeated prior to the proportional use of less-lethal munitions or chemical agents;

- Whenever feasible, these warnings must be given by means reasonably calculated to ensure these warnings are heard; and

- When warnings are given, reasonable time shall be given to comply.

**The preliminary injunction in its entirety is attached. All Department personnel that may be called upon to deploy less-lethal weapons at civil disobedience incidents shall read and understand ALL of the provisions contained in this preliminary injunction.**

**It is each unit commander's responsibility to insure this injunction is briefed to all personnel before August 1, 2021. It is recommended that these briefings be documented.**

If you require further information, contact Field Operations Support Services at (323) 890-5411 or foss@lasd.org.

## ATTACHMENTS

Less Lethal Weapons Injunction

## REFERENCES

MPP 3-10/100.00 Use of Force Reporting - Department Member Responsibilities

MPP 5-06/030.00 Crowd and Riot Control

MPP 5-06/030.05 Tactical Operations

## Injunction

Pursuant to the Court's Order granting Plaintiffs' Motion for Preliminary

Injunction issued on May 28, 2021 [Doc. # 54], the Court ORDERS that the following

Preliminary Injunction shall go into effect on August 1, 2021, at 12:00 p.m.:

1. The Los Angeles Sheriffs' Department is hereby enjoined from using less-lethal weapons, including foam rounds, pepper balls, tear gas canisters, flash bang grenades, and stinger grenades, against any persons peacefully attending a protest, march, or other lawful gathering unless reasonable, proportional, and targeted action is necessary to protect against a specific imminent threat of physical harm to officers or identifiable others, to respond to specific acts of violence or destruction of property, or to enforce a declaration of unlawful

FOSS Newsletters : 21-11 - Berg vs. County of Los Angeles:  Preliminary Injunction
Regarding the Use of Less-Lethal Munitions During Civil Disorder

assembly and dispersal order pursuant to California Penal Code section 409.1

a. If reasonable, proportional, and targeted use of less-lethal projectiles or chemical agents is necessary, foam rounds and any projectile designed to be target-specific shall be aimed at individuals causing the actual or imminent threats of harm, violence, or destruction of property and shall not be indiscriminately fired.

b. Flash bang grenades, tear gas canisters, and other less-lethal means designed to be non-target-specific may be used in the manner they were designed to be used and shall not be deliberately aimed to strike individuals.

1. When individuals try to remove, surpass, or defeat a protective police barrier, the Los Angeles Sheriff's Department may consider such actions a threat to officers.

2. Whenever feasible, Los Angeles Sheriffs' Department officers shall issue warnings and/or declare unlawful assembly before the reasonable, proportional, and targeted use of less-lethal projectiles or chemical agents.

a. Warnings must be given and repeated by means reasonably calculated to ensure that the warnings are heard.

b. When warnings are given, reasonable time shall be given to comply.

IT IS SO ORDERED.

DATED: July 6, 2021

_____

DOLLY M. GEE

UNITED STATES DISTRICT JUDGE

Case 2:20-cv-07870-DMG-PD Document 58 Filed 07/06/21 ID #:880

**Revised: 7/15/2021**

# 21-19 - 2022 Laws Regarding Civil Unrest



Los Angeles County Sheriff's Department
## NEWSLETTER
Field Operations Support Services

### 2022 LAWS REGARDING CIVIL UNREST

## PURPOSE

The purpose of this newsletter is to inform Department personnel of the changes to California law regarding responses to civil unrest and the operation of subsequent command posts that will take effect on January 1, 2022. Modifications are in progress to bring the Department's policy into compliance.

## BACKGROUND

Assembly Bill 48 and Senate Bill 98 of the current session created Penal Code Sections 13652 and 409.7. The following is <u>a limited summary</u> of the new laws. **Department personnel should review the new laws in their entirety.**

Note: <u>These laws ONLY apply to first amendment activities and civil unrest incidents</u>. The use of chemical agents and kinetic energy projectiles at any other patrol incidents or incidents inside custody facilities will not be affected by these pending laws.

**Penal Code Section 13652, Kinetic Energy Projectiles and Chemical Agents**

Kinetic, less-lethal weapons (stun bag, 40 MM rounds, 37 MM rounds, direct-fired pepper balls, etc.), and chemical agents (tear gas, pepper spray, etc.) shall not be used to disperse any assembly, protest, or demonstration unless the following:

- A threat of serious bodily injury or life-threatening situation is present;
- De-escalation techniques or other alternatives to force have been attempted and failed;
- Repeated audible announcements are made from multiple locations and in multiple languages regarding law enforcements intent to use chemical weapons and/or kinetic energy projectiles;
- Persons are given a reasonable opportunity to leave;
- Use of these less-lethal weapons must be target specific and not indiscriminately fired to help avoid incidental impact on non-involved bystanders;
- Efforts have been made to extract individuals in distress; and
- Medical assistance is promptly provided for the injured.

Kinetic energy projectiles and chemical agents shall not be used when a violation of the law or threat is <u>solely</u>

---

a:

- Violation of curfew;
- Verbal threat; or
- Non-compliance with a law enforcement directive.

If the chemical agent to be deployed is tear gas, only a commanding officer at the scene of the assembly, protest, or demonstration may authorize its use.

The law further requires a detailed public reporting on attributes of the crowd and the law enforcement response to it.  This includes the size of the crowd, the amount and type of less-lethal weapons used, any injuries, and the justification for the use of less-lethal weapons.  Any de-escalation or force mitigating tactics shall also be documented and published.

**Penal Code Section 409.7, Media Access to Command Posts at Civil Unrest**

Any duly authorized member of the media may have access to the immediate, closed area surrounding any command post, police line, or rolling closure.

Any duly authorized member of the media shall not be intentionally assaulted, harassed, or interfered with by law enforcement while they are documenting or reporting a news story.

Duly authorized members of the media are exempt from curfew, dispersal orders, and violations of Penal Code Section 148 while reporting or documenting a news story. If the duly authorized representative is detained by a peace officer or other law enforcement officer, that representative shall be permitted to contact a supervisory officer immediately for the purpose of challenging the detention, unless circumstances make it impossible to do so.

The legislation in its entirety may be viewed by clicking the following links:

[Assembly Bill 48](#)

[Senate Bill 98](#)

If you require further information, contact Field Operations Support Services at  [REDACTED TEXT]

---

Case 2:20-cv-07870-DMG-KES    Document 169-1    Filed 10/10/25    Page 52 of 693 Page ID #:4643

Manual of Policy and Procedures : 5-06/030.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

# 5-06/030.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

## Preamble

The Department respects the rights of people to peaceably assemble.  Department members shall not interfere with persons engaged in the lawful exercise of their rights.  Department members maintain the affirmative duty to preserve the peace, protect life, and prevent the destruction of property.

Participant behavior during an assembly, protest, or demonstration can vary, with some individuals engaging in lawful, constitutional protected actions, civil disobedience (minor criminal acts), and rioting.  All of these behaviors may be present during the same event.  Department members shall take measured, objectively necessary, and reasonable actions appropriate to the behavior they are encountering.

This policy was implemented to comply with California Penal Code Section 13652 and provide guidance for the use of Kinetic Energy Projectiles (KEP) and Chemical Agents (CA) to disperse assemblies, protests, and demonstrations.

Penal Code section 13652 ONLY applies to the use of CA and KEP to disperse assemblies, protests, or demonstrations.

This statute/policy does not apply to other patrol incidents where the use of KEP and CA is objectively reasonable and consistent with Department policy.  Furthermore, Penal Code section 13652 does not apply within any county detention or jail facility.  In addition, the law does not prohibit the use of other less-lethal weapons and force options at protests, assemblies, and gatherings, when their use is objectively reasonable and necessary based on the totality of the circumstances in accordance with the Department's use of force policies and procedures.

## Procedure

The following procedures will be followed prior to deploying KEP and CA to disperse protests, assemblies, and gatherings:

â— The use of KEP or CA shall be objectively reasonable to defend against a threat to life or a threat of serious bodily injury to any        individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control;

â— Department members have attempted de-escalation techniques or other    alternatives to force, when objectively reasonable to do so, and those de-escalation techniques or alternatives to force have failed;

â— Department members have given repeated, audible announcements stating the intent to use KEP and CA and the type to be used, when objectively reasonable to do so.  The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate;

â— Department members have given an objectively reasonable opportunity for persons to disperse

Case 2:20-cv-07870-DMG-KES    Document 169-1    Filed 10/10/25    Page 53 of 693
Page ID #:4644

Manual of Policy and Procedures : 5-06/030.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

_____

and leave the scene;

â—    Department members have made an objectively reasonable effort to identify persons engaged in violent acts and those who are not.  Department members may only use force on those persons engaged in violent acts.  Department members may not indiscriminately fire KEP or CA into a crowd or group of persons; and

â—    Department members must have completed California Commission on Peace Officers Standards and Training (POST) approved training informational video on the proper use of KEP and CA before deploying them.

Department members may only use KEP and CA consistent with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

Department members shall minimize the possible incidental impact of their use of KEP and CA on bystanders, medical personnel, journalists, or other unintended targets.

Department members must make objectively reasonable efforts to extract individuals in distress and promptly provide or summon medical assistance for the injured once it is safe to do so.

Department members shall use KEP consistent with the Departments use of force policy.

NOTE:  Department personnel may observe an objectively dangerous and unlawful situation and are compelled to act immediately without the opportunity to de-escalate, use other alternatives to force, or provide audible announcements allowing for dispersal.   In these cases, Department personnel would be operating within the law and Department policy in using KEP or CA to defend themselves or others from immediate life-threatening attack, serious bodily injury, or to mitigate an objectively dangerous and unlawful situation.

Department members may not use KEP or CA solely for a:

- Violation of curfew;

- Verbal threat; or

- Non-compliance with a law enforcement directive.

Only a commanding officer on scene may authorize the use of tear gas to disperse an assembly, protest, or demonstration.  A commanding officer shall be defined as a Department member who is the on-scene incident commander, at the rank of Sergeant or above.

Penal Code section 13652.1 requires the Department to publish a report on their internet website regarding KEP and/or CA usage within 60 days of the incident.  In accordance with this requirement, supervisors shall document the following information:

- Estimated size of the crowd and the number of Department members or other peace officers involved;

_____

Manual of Policy and Procedures : 5-06/050.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

---

- Amount and types of less-lethal weapons used, including the number of KEP rounds deployed and the quantity of CA dispersed;

- The number of documented injuries caused by the use of KEP and/or CA;

- A description of any efforts to de-escalate a situation and avoid the use of KEP and/or CA; and

- The justification for using KEP and/or CA.

The information shall be forwarded to Sheriff's Information Bureau (SIB) for public dissemination.

## Definitions

The following terms are defined by Penal Code Section 13652 and/or Department policy:

### Chemical Agents

Any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure.  For purposes of this policy, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; PAVA powder contained in pepper balls (commonly referred to as pepper ball powder), pepper spray, or oleoresin capsicum.

### De-escalation

Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat.  This allows more time, options, and resources to be called upon to resolve the situation without the use of force or with a reduction in the force necessary.  De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning.

### Kinetic Energy Projectile

Any type of device designed as less-lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma.  For purposes of this policy, the term includes, but is not limited to; items commonly referred to as rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds.  This definition includes, but is not limited to; the following Department-approved devices: 12-Gauge stun bag, 40 mm foam Exact Impact rounds, Stinger Rounds, 37 mm baton rounds, ARWEN rounds, Stingball grenades, and direct-fired pepper balls or FN-303 rounds.

### Proportional

In the context of a use of force, given the totality of the circumstances, there is a balance between the threat posed, the seriousness of the crime as reasonably perceived by the Department member, and the amount of the force used.  Proportional force does not require Department members to use the same type or amount of force as the suspect.  The more immediate and severe the threat perceived by the Department member, the

---

Case 2:20-cv-07870-DMG-KES   Document 169-1   Filed 10/10/25   Page 55 of 693
Page ID #:4646
Manual of Policy and Procedures : 5-06/030.12 - Use of Kinetic Energy Projectiles and
Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

more likely a greater level of force used may be considered proportional, objectively reasonable, and necessary to counter it.

## Additional Definitions

The following terms are currently undefined legislative terms whose exact meaning has yet to be determined or interpreted by the California Legislature or Courts.  Based on past civil disorder incidents and legal references, the following definitions shall be used to interpret this policy.

### Objectively Dangerous and/or Unlawful Situations

Those situations when based on the totality of the circumstances present, an objectively dangerous or unlawful situation, which absent law enforcement intervention, will continue to place individuals in peril and/or allow an unlawful riotous crowd to continue to commit violations of the law.

Under this definition, the following could be considered objectively dangerous and/or unlawful situations:

- Act(s) of felony vandalism that will likely lead to further felonious acts;

- Looting;

- Willfully overrunning and obstructing roadways with active vehicular traffic endangering life;

- Arson;

- Rioting;

- Illegally taking or attempting to take a prisoner from a peace officer;

- Individuals in distress, injured, trapped, or encircled in a violent crowd;

- Carjacking or violent attacks on motorists during civil disorder;

- Individuals engaged in violent acts;

- Use of biological, chemical agents, substances, or explosives that could inflict serious bodily injury to a peace officer or citizen; or

- Potential immediate takeover by an unlawful crowd of critical facilities that may overwhelm existing resources or impact public safety.

    - *Note* - The preceding is not an all-inclusive list.

### De-escalation techniques

Techniques used to de-escalate a situation.  These may include but are not limited to:

Case 2:20-cv-07870-DMG-KES    Document 169-1    Filed 10/10/25    Page 56 of 693
Page ID #:4647

Manual of Policy and Procedures : 5-06/030.12 - Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

- Dialogue;

- Negotiations;

- Informational flyers;

- Announcements;

- Audible warnings;

- Electronic sign boards;

- Conversations with protesters requesting lawful compliance and cooperation; or

- Other alternatives to force.

## Other alternatives to force

Techniques whose primary goal is not de-escalation, however, when used for de-escalation purposes, may fall into this category.  This can include but are not limited to:

- An overwhelming law enforcement presence;

- Barricades; or

- Deployment of specialized personnel and equipment.

## Objectively reasonable

The determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar situations.

## Frequency/Intensity

The number and types of munitions employed at an Objectively Dangerous and Unlawful Situation and/or the rate of fire of said munitions employed over a specific period of time to quell violence or disperse an unlawful assembly without those munitions employed being deemed as unnecessary or excessive.

## Solely due to a violation of an imposed curfew

A curfew violation alone is insufficient to justify the use of KEP and CA.  This does not exclude the use of other interventions or arrests for violations of the law.

## Solely due to non-compliance with a law enforcement directive

Case 2:20-cv-07870-DMG-KES   Document 169-1   Filed 10/10/25   Page 57 of 693
Page ID #:4648
Manual of Policy and Procedures : 5-06/030.12 - Use of Kinetic Energy Projectiles and
Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations

Absent any criminal activity or objectively dangerous situations, KEP and CA are not authorized when law enforcement officers unsuccessfully attempt to direct an assembly, protest, or demonstration.

In addition, defiance of a lawful dispersal order alone is insufficient to justify the use of KEP and CA.  This does not exclude the use of other interventions or arresting suspects for violations of the law.

**Dispersal Order**

Unlawful assembly Dispersal order

"I am (name_____ ), a deputy sheriff for the Los Angeles County Sheriff's Department. I hereby declare this to be an unlawful assembly and in the name of the People of the State of California, order all those assembled at_____ to immediately disperse, which means to break up this assembly and leave the area. If you do not do so, you may be arrested.

REQUIRED WHEN Kinetic Energy Projectiles AND/ OR CHEMICAL AGENTS ARE TO BE DEPLOYED (FOR OBJECTIVELY DANGEROUS AND UNLAWFUL SITUATIONS)

"You may also be subject to other police actions including the use of kinetic energy projectiles and chemical agents, which include: _____ (insert here type to be used e.g., rubber bullets, plastic bullets, beanbag rounds, foam tipped plastic rounds, tear gas, CN, CS, pepper balls, pepper spray, or OC)  Use of these devices could result in serious injury."

Penal Code section 409 prohibits remaining present at an unlawful assembly, which means that you must leave the area I just described. If you remain in the area just described, you will be in violation of Penal Code section 409. The following routes of dispersal are available_____. You have _____minutes to disperse.  It is currently _____ am/pm and you have ___ minutes to disperse."

**Revised: 7/7/2022**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, ET AL.,                ) Case No.
                                    ) 2:20-cv-07870-DMG-PD
                Plaintiffs,         )
                                    )
v.                                  )
                                    )
COUNTY OF LOS ANGELES, ET           )
AL.,                                )
                                    )
                Defendants.         )
_____     )

REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF

THE COUNTY OF LOS ANGELES (DEPUTY CHRISTOPHER VIETH)

AUGUST 12, 2022

Reported By: Amy E. Simmons, CSR, RPR, CRR, CRC

Page 1

Mullen appearing on behalf of Plaintiffs.    13:12:12

MS. RICKETTS:  Morgan Ricketts appearing    13:12:16
on behalf of Plaintiffs.    13:12:18

MS. BROWN:  Rebecca Brown appearing on    13:12:20
behalf of Plaintiffs.    13:12:21

MR. SAKAI:  Raymond Sakai and Elyse Okada    13:12:24
on behalf of the Defendants.    13:12:29

THE VIDEOGRAPHER:  The court reporter can    13:12:30
swear in the witness.    13:12:31

13:12:47

DEPUTY CHRIS VIETH,    13:12:47
a witness having been first duly sworn to tell the truth,    13:12:47
the whole truth, and nothing but the truth, testified as    13:12:47
follows:    13:12:47

13:12:48

EXAMINATION    13:12:48

BY MR. SEPLOW:    13:12:49

Q.   Good afternoon, Deputy.  Could you please    13:12:49
state and spell your full name for the record,    13:12:51
please.    13:12:53

A.   Sure.  Christopher Frederick Vieth,    13:12:53
C-h-r-i-s-t-o-p-h-e-r; Frederick,    13:12:58
F-r-e-d-e-r-i-c-k; Vieth, V-i-e-t-h.    13:13:07

Q.   Thank you very much.    13:13:12

My name is Michael Seplow.  I'm one of    13:13:14

Page 6

**D004**

the Plaintiff -- one of the attorneys for the                    13:13:18

Plaintiffs in this case.  And you're here today                  13:13:19

for your deposition pursuant to Federal Rule of                  13:13:22

Civil Procedure 30(b)(6).                                        13:13:25

          And it's our understanding that you've                 13:13:28

been designated by the County of Los Angeles                     13:13:30

Sheriff's Department to testify on various topics                13:13:33

regarding transportation of people after -- in the               13:13:37

wake of various post-George Floyd protests.                      13:13:44

          Have you ever had your deposition taken                13:13:50

before, sir?                                                     13:13:51

     A.   No.                                                    13:13:52

          MR. SAKAI:  And one point before we go,                13:13:54

Mike, sorry about that, just to clarify the                      13:13:55

record, you are correct.  And Deputy Vieth is here               13:13:58

to testify as to Categories 23 through 26.                       13:14:02

          MR. SEPLOW:  Correct.  I was going to get              13:14:06

into that, but thank you.                                        13:14:07

     Q.   (BY MR. SEPLOW)  And I sent you -- or you              13:14:09

were sent a link earlier with some of the                        13:14:11

exhibits, so hopefully you have those.                           13:14:14

          Did you get that, Ray?                                 13:14:17

          MR. SAKAI:  I did not.  Is that in the                 13:14:20

same Veritext --                                                 13:14:21

          MR. SEPLOW:  No.  Well, Carlos sent it, I             13:14:22

Page 7

D004

Q.    Are they the same size vans or are they
different size vans?

A.    They are just a regular Econoline van,
15 feet.

Q.    And how is it -- how is it decided which
type of vehicles, vans versus buses, are assigned?

A.    I believe there were no vans assigned.
It was all buses.

Q.    So is it your understanding that for the
transport of arrestees after these various
protests that they were all transported by these
buses which have a 48-person capacity?  Is that a
fair statement?

A.    Yes, sir.

Q.    Thank you.

Now, can you describe the buses for me?
Do they have -- how are the seats set up?

A.    They are divided into sections.  There
are three sections to each bus.  There's a rear
section, a middle section, and a front section.

The rear section holds a capacity of 16
people.

Middle section, 16 people.

Front section has isolation cages, or
cells that -- there's four on each side of the

Page 30

**D004**

bus.  Each cell can hold two people.                13:42:10

And then you have the front section of             13:42:18
the bus where the driver and the security deputy    13:42:19
are seated.                                          13:42:24

Q.    Thank you.                                     13:42:25

Now, is there any kind of divider, like a           13:42:28
chain or cage or anything between the three          13:42:32
sections?                                            13:42:36

A.    Yes.  It's -- each section is -- it's          13:42:36
like a cell door.  So it's heavily secured.  Heavy   13:42:43
metal gate I guess would be the best way to          13:42:52
describe it.                                          13:42:57

Q.    It's a gate that you can see through it;       13:42:57
is that correct?                                      13:43:01

A.    It's obscured, but you can still see           13:43:01
through it.                                           13:43:04

Q.    Okay.  And is there, like, a lock that         13:43:04
deputies have keys to for each of these sections?    13:43:08
Is that how that works?                              13:43:11

A.    Yes.                                            13:43:12

Q.    And would you say it's like a mesh kind        13:43:13
of chain so you can see through it, or --            13:43:15

A.    It's a heavy steel with holes drilled          13:43:19
through it.                                           13:43:25

Q.    Okay.  And how was it determined which         13:43:25

Page 31

detainees get put in which sections of the bus?    13:43:28

MR. SAKAI:  Objection; vague and    13:43:34

ambiguous.  So just -- are we talking about during    13:43:36

just a normal jail to court transfer or the    13:43:41

protests?    13:43:45

MR. SEPLOW:  Fair enough.    13:43:47

Q.   (BY MR. SEPLOW)  Unless I tell you    13:43:48

otherwise, let's assume that my questions relate    13:43:49

to the transporting of arrestees after these    13:43:52

protests.  Okay?    13:43:57

A.   Okay.    13:43:58

Q.   In these instances after the George Floyd    13:44:00

protests and people were arrested, how is it    13:44:05

determined which arrestees get placed in which    13:44:08

sections of the bus?    13:44:12

A.   We would only separate male and female.    13:44:14

So if, you know, you have a lot of males, a lot of    13:44:22

females, they would be separated.  You wouldn't    13:44:27

put them together in the same section.  You would    13:44:29

keep the sections separate that way.    13:44:31

So you would have, let's say, males in    13:44:35

one section, let's say the back, and the females    13:44:38

in another section.  Maybe in the middle or maybe    13:44:41

on a completely different bus.    13:44:44

I don't know if that answers your    13:44:46

Page 32

question.                                               13:44:47

Q.    That -- yes.  So let me ask you this            13:44:47
question:  If there was -- let's say you               13:44:50
arrest -- let's say there were 60 people detained      13:44:53
and there were 30 men and 30 women.                    13:44:58

Would they put all the men on one bus and    13:45:00
then all the women in another bus in that              13:45:03
situation?                                             13:45:05

A.    If it was feasible, yes.                      13:45:05

Q.    Okay.                                         13:45:08

A.    But because you can separate on the          13:45:08
buses, you can have a mixed bus and still have         13:45:13
them separate.                                         13:45:16

Q.    Okay.  So you can have the men in the         13:45:16
back and women in the middle section, for example?     13:45:21

A.    Yes.                                          13:45:24

Q.    And what kind of seating is on the            13:45:24
bus -- on these buses?                                 13:45:28

A.    They are a fiberglass, two-man seat, very     13:45:29
similar to a school bus.                               13:45:38

Q.    Okay.  Are there seat belts?                  13:45:41

A.    No.                                           13:45:43

Q.    Okay.  And if the bus is at full              13:45:44
capacity, would two people be sitting in each          13:45:50
seat?                                                  13:45:53

Page 33

D004

instruction as far as where to set up.  And we    13:52:04

would let whoever was making those arrests take    13:52:08

the arrestees off the bus and then process them    13:52:11

however they -- however they do that.    13:52:14

Q.   (BY MR. SEPLOW)  So it's possible that    13:52:20

they're just processed out in this parking lot, or    13:52:23

it's possible they're taken somewhere else to be    13:52:26

processed?    13:52:29

A.   Correct.    13:52:29

Q.   And that's not your decision; that's the    13:52:30

decision of the arresting department?    13:52:33

A.   Yes, sir.    13:52:34

Q.   Even if it was the sheriff's department    13:52:36

making the arrest, as the transportation people,    13:52:37

you don't decide where they're being processed,    13:52:41

correct?    13:52:44

A.   No, we don't.    13:52:45

Q.   We can start with June 3rd as an example.    13:52:46

So how long did it take to put -- to fill    13:52:54

a bus up with arrestees?    13:53:01

MR. SAKAI:  Well, objection.  It's vague    13:53:04

and ambiguous.    13:53:07

But you could respond, if you can.    13:53:11

THE WITNESS:  It would depend.    13:53:17

Q.   (BY MR. SEPLOW)  What factors would    13:53:18

Page 39

**D004**

influence how long it would take?    13:53:20

A.   How fast they're arresting the arrestees.    13:53:22
There's a lot of factors.  If they're all ready    13:53:29
and we show up as transportation and there are a    13:53:34
number of people already arrested and waiting to    13:53:37
go onto the bus to be transported, it would be    13:53:41
very quick.    13:53:45

But if we're staged and we are just    13:53:46
taking one at a time, it could take however long    13:53:49
it takes.    13:53:55

Q.   So in other words, you could have -- you    13:53:56
could arrest one person, put them on the bus, and    13:54:00
then have them wait on the bus for a while until    13:54:03
other people are arrested and then it was decided    13:54:07
that -- to drive the bus off; is that correct?    13:54:09

A.   Correct.    13:54:11

Q.   Who makes the decision that the    13:54:14
bus -- that you -- let me rephrase that.    13:54:18

Assuming that there's going to be over 48    13:54:20
people arrested, do you try to fill up each bus    13:54:25
before you leave?  Or would you ever leave sooner    13:54:28
than that?    13:54:33

A.   You would try to fill up as much as you    13:54:33
can.    13:54:43

Q.   Okay.  And when people are put on the    13:54:44

Page 40

them back into the particular section; is that

correct?

    A.  Yes.

    Q.  Okay.  And as the transportation
deputies, do you say anything to the -- is there
anything that you're supposed to tell the people
when you put them on the bus?  Is there any
training on that?

    A.  No.

    Q.  Is there any announcements made
that -- to the arrestees once they get on the bus?

    A.  No.

    Q.  Are they informed where they're going and
how long it will take?

    A.  No.

    Q.  Okay.  What happens if an arrestee needs
to use the bathroom?  Is there a procedure for
that?

    A.  Yes.

    Q.  What's that procedure?

    A.  The driver or the security deputy would
then notify a supervisor, whether it be LAPD or
sheriff's department assigned to the bus, "We have
somebody on the bus that needs to use the
restroom," or any issues that come -- arise that

Page 43

our deputies hear, we would then relay that to the     13:58:20

arrest -- the people that arrested them.  And so       13:58:25

they would have to make arrangements to remedy         13:58:29

that.                                                  13:58:35

Q.   And so it would be their decision            13:58:35

whether -- I mean, could they decide, "We don't        13:58:37

want to let you use the bathroom right now; we're      13:58:40

too busy," and make them wait?                         13:58:43

A.   Correct.                                     13:58:45

Q.   And what about if somebody on the bus,       13:58:46

arrestees, is complaining that they're thirsty?        13:58:52

How would that work?                                   13:58:57

A.   The same.                                    13:58:58

Q.   So they would tell the bus driver or the     13:58:59

other deputy, and the deputy then -- would you         13:59:03

radio to the arresting officer?  Or depending --       13:59:06

A.   They're all right there.  So you would       13:59:09

just relay the information.                            13:59:12

Q.   Do the arresting officers stay on the bus    13:59:18

once it leaves, or do they get off the bus?            13:59:22

A.   They get off the bus.  There is a            13:59:24

supervisor that is assigned to the bus that would      13:59:26

go with them during the transport.                     13:59:28

Q.   Okay.  So there would be the bus driver,     13:59:30

the additional deputy, and then a supervisor on        13:59:33

Page 44

**D004**

get on the bus?                                            14:01:48

A.    Yes.                                                 14:01:49

Q.    So that's done by the arresting officers?           14:01:52
If they have to confiscate property, they will            14:01:54
confiscate the property?                                  14:01:58

A.    Correct.                                             14:01:59

Q.    Are the arrestees on the bus given any              14:02:02
kind of paperwork or any kind of information to           14:02:05
have with them on the bus, do you know?                   14:02:11

A.    I don't know.                                        14:02:13

Q.    Okay.  And as I said, I think you said              14:02:13
there's no instructions or directions given to the        14:02:16
people like, "Hey, you've just been arrested.             14:02:19
We're going to take you to the station, and it            14:02:22
will take you an hour."  Nothing like that?               14:02:26

A.    No.                                                  14:02:28

Q.    Okay.  You mentioned that the buses, the            14:02:29
inmates are separated or the arrestees are                14:02:33
separated, rather, by gender; is that correct?            14:02:38

A.    Correct.                                             14:02:39

Q.    Is there a policy for people with gender            14:02:40
nonconforming or transgender people who are               14:02:45
arrested that the sheriff's department uses to            14:02:49
decide which part of the bus they would be on?            14:02:52

A.    Yes.                                                 14:02:54

Page 47

**D004**

Q.    How does that work?                                    14:02:54

A.    They would be isolated from everybody.                 14:02:56

Q.    So they'd be in their own section?                     14:02:59

A.    Yes, like that front section of the bus                14:03:02
that I was referring to earlier.  They would be              14:03:05
placed in there.                                             14:03:09

Q.    Would they be placed in a separate cell                14:03:11
or separate sections?                                        14:03:16

A.    Yes.  That front section that has                      14:03:17
the -- they're more separate.  There's only two              14:03:26
people that are allowed in each little section,              14:03:29
and there's eight sections in that front section.            14:03:31

      So, yeah, they would be, like, isolated               14:03:34
by themselves.  So they wouldn't be around the               14:03:36
males or the females.  They'd just be by                     14:03:38
themselves.                                                  14:03:41

Q.    And when you say "by themselves," could               14:03:42
two transgender people be in the same section, or            14:03:44
would they be in separate sections?                          14:03:47

A.    They could be in their own -- they could              14:03:49
be together.  They could be, yes.                            14:03:53

Q.    Okay.  If somebody -- who makes the                    14:03:54
decision on how to determine whether somebody                14:03:59
belongs in the transgender or nonconforming                  14:04:02
section of the bus?                                          14:04:07

Page 48

D004

had the ultimate authority to determine how to          14:30:32

respond to any particular incident involving any        14:30:35

of the arrestees being transported; is that             14:30:38

correct?                                                14:30:40

        A.    Yes.                                      14:30:40

        Q.    And I wanted to clarify, during the       14:30:41

protest, once the arrestees are being transferred,      14:30:49

are they always in handcuffs at the time they're        14:30:55

being transported?                                      14:30:57

        A.    Yes.                                      14:30:58

        Q.    And each time that somebody is brought    14:30:58

onto the bus, they have to lock it and unlock it,       14:31:05

the sections of the bus; is that correct?               14:31:10

        A.    Correct.                                  14:31:11

        Q.    You wouldn't bring, like, two people on   14:31:12

at the same time?  You would put one in, lock it;       14:31:16

put the other one in, lock it; is that correct?         14:31:20

        A.    It would depend.  If there were two or    14:31:23

three that were arrested at the same time and they      14:31:26

were to walk up onto the bus at the same time,          14:31:27

escorted, then you could walk two or three back at      14:31:29

the same time to a section and then secure that         14:31:34

section.                                                14:31:36

        Q.    Thank you.                                14:31:37

              Is there any climate control on the       14:31:38

Page 57

buses, like air conditioning, heat, or anything like that?    14:31:41 14:31:43

A.    Yes.    14:31:44

Q.    What was there?    14:31:44

A.    Air conditioning and heat.    14:31:45

Q.    Was the air conditioning on during -- I guess some of the protests, let's say the ones that occurred in May and June, was the air conditioning on in the buses during these times?    14:31:46 14:31:52 14:31:54 14:31:57

A.    I don't know.    14:32:00

Q.    What's the general policy on the air conditioning?    14:32:01 14:32:04

A.    You would keep it on.  I mean, we're talking -- this is, like, summer months.  It's hot.  The deputies are in full uniform.  You've got a lot of people on the bus.  It's general practice to have the air conditioner on all the time.  It helps the air circulate; it's fresh; it's cool for everybody on the bus.  So it's general practice to have it on constantly.    14:32:04 14:32:09 14:32:13 14:32:15 14:32:19 14:32:21 14:32:25 14:32:29

Q.    Was the air conditioning ever not working on any of these buses?    14:32:31 14:32:35

A.    Not to my knowledge.    14:32:36

Q.    Can the windows be opened as well?    14:32:37

A.    No.    14:32:41

Page 58

D004

transportation unit, to the sergeants at the end                14:55:04

of the night or the end of the shift.                           14:55:08

Q.   So it says, "The transfer record will                      14:55:09

contain all information as to the requesting                    14:55:11

agency, dates/time" --                                          14:55:14

A.   Times.                                                      14:55:16

Q.   What does dates/times mean to you?                         14:55:17

A.   So to me it means June 3rd at whatever                     14:55:20

time they were there.  At 10:00, whatever time                  14:55:24

they were there, and then the name of the                       14:55:34

arrestee.                                                       14:55:35

Q.   And when "they were there," is that the                    14:55:36

deputies being there or the arrestee being there?               14:55:40

A.   It would be the arrestee.                                   14:55:42

Q.   So they have the time the arrestee was                     14:55:43

placed on the bus, but they wouldn't have the time              14:55:46

they were taken off the bus?                                    14:55:49

A.   Correct.  They would have,                                 14:55:51

like -- because the arrestees were placed on the                14:55:53

bus over a period of time.  So I don't think they               14:55:55

would have the exact time that they were placed on              14:55:57

the bus, but it would be the time that the deputy               14:56:01

had their bus there.                                            14:56:04

Q.   Okay.  So it's not an exact time?                          14:56:06

Somebody could be on the bus for a longer period?               14:56:09

Page 76

A.   Sure.  Someone could be on for 20, 30 minutes, and then you'd have more people being loaded onto the bus.

Q.   Thank you.

So it says here, the next paragraph, "During incidents or situations of uncertainty or of civil unrest, the requesting LASD station/other agency will be responsible for booking of arrestees, searching of arrestees, and retaining arrestee property prior to having arrestees enter the bus."

Do you see that?

A.   Yes.

Q.   And is that what the LASD policy was?

A.   Yes.

Q.   So everybody who is an arrestee on the bus has already been booked and searched before they get on the bus.

Is that a fair statement?

A.   Yes.  Well, as far as booked goes, I think -- I mean, that -- I know that they were searched, handcuffed, placed onto the bus, and then they were transported to another location to be booked/cited out.

Q.   Okay.  Because the -- I mean, it's a

Page 77

D004

Q. Have you ever known of any instances of protests where that did not occur? 15:07:55 15:08:04

A. No. 15:08:05

Q. Then it says -- a note, "Arrestees/Inmates are to be immediately off-loaded into the custody of the arresting agency once the bus reaches the predetermined destination, such as a jail or field booking area." 15:08:06 15:08:12 15:08:14 15:08:16 15:08:18 15:08:23

Do you see that? 15:08:23

A. Yes, sir. 15:08:24

Q. So when, let's say, the bus reaches its destination. 15:08:25 15:08:31

How long does it take to unload the bus? 15:08:32

A. Well, it would determine on how many buses and how many arrestees and, you know, the location. Those all play a factor into how long it would take to process them off the bus. 15:08:33 15:08:37 15:08:41 15:08:47

Q. So if there were multiple buses, does each bus get unloaded one at a time, or do they unload them all at the same time? 15:08:51 15:08:55 15:08:59

A. No, it wouldn't be safe to unload them all at the same time. You would want to do it one bus at a time. You would want to have enough personnel there to accept or receive them coming 15:09:00 15:09:02 15:09:05 15:09:08

Page 86

off of the bus and then to process them safely.    15:09:12

Q.    Okay.  So typically -- let's say there were 48 people on the bus.    15:09:17 15:09:19

What would your estimate be for how long -- and let's say it's only one bus and you don't have to wait for them to unload multiple buses.    15:09:21 15:09:24 15:09:29 15:09:31

How long would that typically take?    15:09:32

A.    You know what?  I couldn't tell you.  I could tell you how long it would take me to unload 48 inmates from just a regular, normal, everyday operation.    15:09:34 15:09:38 15:09:40 15:09:44

Q.    Well, how long would that take?    15:09:45

A.    That would take a couple of minutes.    15:09:48

Q.    And would this be different than the regular, normal, everyday operation?    15:09:51 15:09:52

A.    This, I wasn't there for the processing. I don't know as far as how they -- do they take them off one by one?  Or do they just unload everybody off into a particular area?    15:09:55 15:10:01 15:10:05 15:10:11

Q.    So it's possible that they take people off one by one, that would take longer, correct?    15:10:14 15:10:16

A.    Correct.    15:10:20

Q.    So you could have a situation -- let's say there's four buses and somebody's on the    15:10:21 15:10:23

Page 87

**D004**

Q.   So it's 11 minutes in transit to, like,    15:27:28

over an hour to unload everything?    15:27:34

A.   Correct.    15:27:36

Q.   Okay.  And then it looks like -- it says    15:27:37

"Multiple bodies were offloaded to replace zip    15:27:40

ties."    15:27:43

A.   Okay.    15:27:44

Q.   So if a zip tie was broken, they have to    15:27:44

unload -- off-load you to replace, and they    15:27:46

wouldn't do it while they were on the bus?    15:27:50

A.   Correct, because we    15:27:51

didn't -- transportation, we just -- if someone    15:27:55

was complaining -- and I don't know -- it doesn't    15:27:57

say that it was broken, but let's just say someone    15:27:59

was complaining of pain or, you know, their zip    15:28:02

ties were too tight.    15:28:09

Then it looks like LASD Sergeant Matthews    15:28:11

was informed.  So our guys told the sergeant, and    15:28:14

they were taken off the bus.  And the arresting    15:28:17

deputies then would replace -- to replace zip    15:28:23

ties, and then they were loaded back -- or loaded    15:28:28

back onto the bus until they were ready to be    15:28:33

processed out.    15:28:36

So if people were complaining that their    15:28:37

zip ties were too tight, the driver and security    15:28:39

Page 101

deputy, they didn't do that.  They would just    15:28:42

notify the sergeant.  The sergeant would take his    15:28:47

deputies up and take care of that problem.    15:28:50

That's what I'm getting from reading    15:28:56

their log right here.    15:28:58

Q.   And as you said, this is just one log.    15:29:01

For each time a bus is used to transport    15:29:03

arrestees, there should be a separate log for    15:29:08

that, correct?    15:29:10

A.   There should be a log just like this,    15:29:10

yes.    15:29:12

Q.   And where do they maintain those logs?    15:29:13

A.   They're maintained at the unit.    15:29:16

Q.   Okay.  At the transportation unit, right?    15:29:19

A.   Yes.    15:29:22

MR. SEPLOW:  Okay.  Let's take a little    15:29:26

bit of a break.  Okay?    15:29:27

THE WITNESS:  Sure.    15:29:29

THE VIDEOGRAPHER:  We are going off the    15:29:31

record at 3:29 p.m.    15:29:34

(Break taken from 3:29 p.m. to 3:51 p.m.)    15:51:35

THE VIDEOGRAPHER:  We are back on the    15:51:35

record at 3:51 p.m.    15:51:37

MR. SEPLOW:  Thank you.    15:51:41

Q.   (BY MR. SEPLOW)  Thank you, Deputy.    15:51:42

Page 102

beginning it says, "Assistant Sheriff Daily Civil                16:09:43

Unrest Briefing."                                                 16:09:47

       Do you know what that refers to?        16:09:48

   A.   No, other than what it says.              16:09:50

   Q.   Okay.  Looking at page 3 of the document,  16:09:56

which is 977 -- right there.  "Transportation                    16:10:07

Bureau (CST)."                                                    16:10:07

       Do you see that part?                    16:10:11

   A.   Yes.                                       16:10:11

   Q.   Have you seen anything like that before?   16:10:11

   A.   No.                                        16:10:13

   Q.   Okay.  And it looks like it lists inmates  16:10:14

transported from and to a particular location.                   16:10:20

       Do you see that?                         16:10:23

   A.   Yes.                                       16:10:23

   Q.   So, for example, if you look at 573,       16:10:24

that's the crew, and it looks like they                          16:10:29

transferred 42 female inmates from Grand Park to                 16:10:32

Vignes Street.                                                   16:10:44

       Do you see that?                         16:10:45

   A.   Yes, sir.                                  16:10:45

   Q.   Is that your understanding what that       16:10:45

refers to?                                                       16:10:47

   A.   Yes.                                       16:10:48

   Q.   Okay.  And so for the next one, the Crew   16:10:48

Page 115

D004

520A, which would be the crew -- and they'd have a    16:10:50

bus, and they transported 47 males for the LAPD    16:10:55

from 815 1st Street to MDC?    16:11:05

A.    Correct.  And MDC, that's Metropolitan    16:11:12

Detention Center, which is right around the    16:11:15

corner.  That's LAPD's jail.    16:11:18

Q.    Okay.  And if you flip to the next page    16:11:24

and you look at No. 589 --    16:11:32

A.    Okay.    16:11:35

Q.    So that looks like this Unit 589, this    16:11:36

bus transported 16 males and 22 females for -- do    16:11:40

you know what "HOJJ" stands for?    16:11:54

A.    Hall of justice.    16:11:56

Q.    Okay.  And they transferred them from    16:11:58

Grand Park to 1054 Vignes Street.    16:12:01

Do you see that?    16:12:04

A.    Yes.    16:12:05

Q.    Is that your understanding of what that    16:12:05

shows?    16:12:08

A.    Yes, sir.    16:12:08

Q.    And that's an example of a bus where they    16:12:09

had both men and women on it, so in that case the    16:12:15

men and the women would have been separated in the    16:12:17

bus, right?    16:12:19

A.    Yes.    16:12:20

Page 116

**D004**

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                  )  ss.
COUNTY OF ADA     )

I, AMY E. SIMMONS, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 31 day of August, 2022.

                    AMY E. SIMMONS
                    CSR, RPR, CRR, CRC and Notary
                    Public in and for the
                    State of Idaho.

My Commission Expires: 06-13-2028

Page 136

**D004**

# COURT SERVICES DIVISION

## ASSISTANT SHERIFF DAILY
## CIVIL UNREST BRIEFING
### June 4, 2020

### CENTRAL BUREAU

Number of personnel deployed/locations/missions-

Number of arrests/details of arrests/arrest charges-

Use of force incidents-

Injuries to Department personnel-

Damage to Department buildings or equipment and monetary estimate-

Overtime incurred-

Any other significant information-

### EAST BUREAU

Number of personnel deployed/locations/missions-

Number of arrests/details of arrests/arrest charges-

Use of force incidents-

Injuries to Department personnel-

COLA 000975

EXHIBIT

D004    6

76

Damage to Department buildings or equipment and monetary estimate-

Overtime incurred-

Any other significant information-

## WEST BUREAU

Number of personnel deployed/locations/missions-

Number of arrests/details of arrests/arrest charges-

Use of force incidents-

Injuries to Department personnel-

Damage to Department buildings or equipment and monetary estimate-

Overtime incurred-

Any other significant information-

## CIVIL MANAGEMENT BUREAU

Number of personnel deployed/locations/missions-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

**D004**

COLA 000976

Number of arrests/details of arrests/arrest charges-

Use of force incidents-

Injuries to Department personnel-

Damage to Department buildings or equipment and monetary estimate-

Overtime incurred-

Any other significant information-

## TRANSPORTATION BUREAU (CST)

Number of personnel deployed/locations/missions-

Total Inmates Transported and locations responded to:

| CREW | MALES TRANSPORTED | FEMALES TRANSPORTED | TRANSPORTED FOR | LOCATION | TRANSPORTED TO |
|---|---|---|---|---|---|
| 564 | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | MDC |
| 554 | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | MDC |
| 564A | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | MDC |
| 573* | 0 | 42 | HOJJ | GRAND PARK | 1054 VIGNES ST |
| 520A | 47 | 0 | LAPD PC/MDC | 815 1ST ST, LA | MDC |
| 520A (2ND ASSIGN)* | 37 | 0 | HOJJ | GRAND PARK | 1054 VIGNES ST |
| 565A | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | MDC |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**D004**

COLA 000977

| 568A | 0 | 0 | LAPD WILSHIRE | HARBOR DIV | MDC |
| 569A | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | STANDBY |
| 565A | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | STANDBY |
| 566A | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | STANDBY |
| 568 | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | EOB |
| 586 | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | STANDBY |
| 577 | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | EOB |
| 567A | 0 | 0 | LAPD PC/MDC | 815 1ST ST, LA | STANBY |
| 578 | 0 | 0 | LAPD WILSHIRE | HARBOR DIV | STAGING |
| 585* | 27 | 0 | HOJJ | GRAND PARK | 1054 VIGNES ST |
| 589* | 16 | 22 | HOJJ | GRAND PARK | 1054 VIGNES ST |
| 574 | 0 | 0 | CST | STANDBY | STAGING |
| 591 | 0 | 0 | CST/SECURITY | GRAND PARK | 1054 VIGNESS ST |
| 587 | 0 | 0 | CST/SECURITY | GRAND PARK | 1054 VIGNESS ST |
| 595 | 0 | 0 | CST/SECURITY | GRAND PARK | 1054 VIGNESS ST |
| 576 | 0 | 0 | CST/SECURITY | GRAND PARK | 1054 VIGNESS ST |
| 584 | 3 | 12 | LAPD PC/MDC | 815 1ST ST, LA | MDC |
| 575 | 0 | 0 | CST | STANDBY | |
| 572 | 0 | 0 | CST | STANDBY | |
| 580 | 0 | 0 | CST | STANDBY | |
| 582 | 0 | 0 | CST | STANDBY | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

**D004**

COLA 000978

| 594 | 0 | 0 | CST | STANDBY | |
| 588* | 0 | 0 | HOJJ | GRAND PARK | 1054 VIGNES ST |
| | **130** | **76** | | | |

NUMBER OF PERSONNEL DEPLOYED/LOCATIONS/MISSIONS BELOW-
**25 CREWS DEPLOYED/ 50 PERSONNEL**

2230 HRS- Received pass on from PM shift
2105 HRS- CREW 588 SENT O WILSHIRE DIVISION TO RELIEVE CRW 563A
2225 HRS- CREW 520A 10-97 AT LOS ANGELES CITY HALL WITH ARREST TEAM
2233 HRS- CREW 585 588 REQUESTED TO EAST SIDE OF HOJ PER EOB SGT JORDAN
2312 HRS- CREW 564A 97 AT TST EOS
2316 HRS- CREW 580 585 97 @ HOJ
2317 HRS- CREW 573 97 @ 1ST/ SPRING ST
2332 HRS- CREW 580 585 98 FRM HOJ ENR TO 1ST/SPRING PER SGT FINNEY
2350 HRS- CREWS 574 595 587 591 ENR TO REL 565A 566A 568A 569A
0013 HRS- CREWS 564 568A 569A 565A 566A 568 586 577 567A 591 587 98 FROM LAPD CP HEADING INTO TST PER SGT FINNEY
0101 HRS- CREWS 573 520A 585 588 589 98 FROM GRAND PARK W/ 80 MALES/ 64 FEMALES
0106 HRS- CREWS 573 520A 585 588 589 97 @ 1054 VIGNES
0108 HRS- CREW 591 97 @ 1054 VIGNES RE SECURITY
0115 HRS- CREWS 595 576 587A ENR TO 1054 VIGNES RE EXTRA SECURITY AND TRANSPORTS
0145 HRS- SGT HILE ENR TO 1054 VIGNES PER CAPT HARRIS
0341 HRS- CREW 587A 576 585 98 FROM 1054 VIGNES ST
0344 HRS- CREW 587A 576 585 97 AT 97, CREW 520A 98 FROM 1054 VIGNES
0347 HRS- CREWS 585 520A 588 97 TST
0403 HRS- CREWS 595 591 589 573 AND SGT HILE 97 FROM 1054 VIGNES ST

SIGNIFICANT INCIDENTS-

CREWS 573 520A 589 585 TRANSPORTED 80 MALES AND 64 FEMALES FOR LASD/CSB TO 1034 VIGNES ST, LA TO BE CITED AND RELEASED. CREWS 591 595 576 587 STAGED AS EXTRA SECURITY FOR AREA. CSB/LT. HAYNES INCIDENT COMMANDER ON
SCENE WITH CAPTAIN STEINBRENNER ALSO ARRIVED ON SCENE. IRC SGT. RUIZ WAS SUPERVISOR FOR (1) BOOKING TEAM.

Number of arrests/details of arrests/arrest charges-

130 MALES / 76 FEMALES ARRESTED/DETAINED FOR AGENCIES (SEE CHART ABOVE)

Use of force incidents-

D004
COLA 000979

None

Injuries to Department personnel-

None

Damage to Department buildings or equipment and monetary estimate-

None

Overtime incurred- Still being compiled, updated list to follow.

PM Shift – 294.5
EM Shift – 57
Total – 351.5

Any other significant information-

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

81

D004

COLA 000980

Arrest Class

| Plaintiffs | Facts | Damages |
|---|---|---|
| Berg, Krizia | <u>Exh. D009</u> - ROG#1, p.5  "Berg's Flexicuffs were loose enough to slip out of them and put his mask back on for him"<br><br><u>Dkt 160-1</u>, pp 4-5, para 3, 5 - heard curfew announcements.<br>p5, para 7 "I was one of the last few groups to be arrested"<br>- "I informed them that I am not a man, but they stated that did not matter and put me on a bus with men"<br>p5, para 10 - not provided water or access to bathroom (but doesn't claim had to have/use either)<br><br><u>D008</u> - Depo:<br> 120:12-17, 123:4-13, time getting on the bus, duration and released.<br>125:2-22 re location on bus.<br>127:13-129:15 witnessed someone on the bus lose conscious due to tight handcuffs. | <u>Exh. D009</u> - ROG#2, p.6-7 - On June 21, 2020 she inhaled CS gas where she coughed for hour and a half and struggled to breathe for hours. Sought counseling from June 2021 to December 2021 (paid $1,920 of which 1/10 is attributed to this incident).  Claims lost wages. (ROG#2). |

D005

| | | |
|---|---|---|
| Militante, Sebastian (Serena) | Dkt 160-1 (Decl), p57, para 4 - "handcuffed too tightly"; para 6 (same) para 9 - afraid exposed to COVID 19 para 11 - no access to restroom or water (But never says needed either) Exh. D011 - ROG1 - "As the deputy reached Plaintiff's genitals she groped them, and pressed Plaintiff's testicles up into her body" ROG1 - deputies did loosen some protesters cuffs "when they came back to loosen handcuffs, they only did so moderately for three of the protesters" ROG1 - "Plaintiff also has a winged shoulder blade with limited range of motion in her right arm, which the handcuffing exacerbated, and hurt her shoulder" ROG1 - "those who stayed passed curfew began to move to Grand Park" and Militante went to Grand Park <br><br> Exh. D010 - Depo: 221:13-223:22 - Plaintiff was pushed and flex-cuffed tightly, and she was searched aggressively with her genitals groped 230:15-232:17 re pain and others in pain from cuffs, time in transit on bus. 234:23-235:23 getting cuffs taken off. 239:23-25 Pain from cuffs. 242:23-243:15 re PT services from prior shoulder pain which made it hard to wear cuffs for a prolonged period of time. | Dkt 160-1 (Decl), p58, para 12 "cause significant emotional distress, for which I continue to seek treatment by a therapist" <br><br> Exh. D011- ROG2, 7, 8 - psychological treatment bills ROG2 - claims significant emotional distress for nearly a year because of manner of arrest (groped, no social distancing; detained for hours) |
| Monroe, Christian | Dkt 160-1 (Decl), p74, para 8 - "This LASD Deputy then grabbed my genitals during this purported "pat down." -handcuffing tight para 9, 10 - wasn't provided a facemask; wasn't provided any bathroom breaks <br><br> D013 - ROG2 - Plaintiff experienced pain in his wrists from how tightly Defendant Deputies initially handcuffed Plaintiff, though his handcuffs were eventually adjusted. <br><br> D012  DEPO:  132:3-11 Location on bus. 134:1-135:25 | Exh. D013 - ROG2 "Plaintiff experienced sore genitals for several days following the unnecessarily aggressive pat down performed by Defendant Deputies." |

D005

| Wells, Travis | Dkt 160-1 (Decl), p24, para 8 - painfully tight zip ties<br>para 9 - deputy pulled down mask<br><br>Exh. D014 - Depo - 157:17-25 handcufed and placed on bus.<br>160:19-161:9 time between zip tied and bus moving.<br>163:21-165:9, 170:24-172:1 atmosphere on the bus. | Exh. D015 - ROG 1 - hand discoloration, thumb twitching & numbness continued for 2-3 days |
| --- | --- | --- |

**D005**

|   | Plaintiffs | Dates | Description | Injuries |
|---|---|---|---|---|
| 1 | Barbadillo, Diana | 8/25/2020 DTLA | <u>Doc 160-1 Decl -</u> Attended as a National Lawyers Guild legal observer.<br><br>Depo: 26-4:4; 4:5-14; 6:11-13; 10:12-14<br>"Grenade" - "something hit me in the leg, and caused a bruise"; took two days to heal.<br>5:26-28, 11:8-9; Exh. D34, 68:12-25, 69:5-14 -Pepper balls - non-specified, apparently indirect exposure.<br><br>Pepper Balls were deployed at Compton Sheriff's Department "I couldn't see immediately", 20 minutes before she can see, 45 minutes to fully function, eyes were still irritated wears contact lenses. Took about an hour before back to normal after pepper balls. Pain ranked 8/10. No lingering effects (Depo 62:23 - 65:13) | Pepper Balls: Irritated eyes normal after an hour. No lingering effects. |
| 1 | Barbadillo, Diana | 9/5/2020 SLA Stn | Pepper balls (indirect) - exposed to powder, first exposure caused "tingling sensation", second exposure later that day caused difficulty breathing, 10-15 mins coughing, after two hours returned to normal.<br><u>Exh. D017</u> (ROG 1, 2)<br><u>EXH D016</u> Depo - 6:5-9, 8:1-3, 9:10-15, 11:10-11 [non-specified contact/exposure]); Exh. D34, 69:25-70:13 ("mildly injured"), 71:3-72:1 (dissipated in two hours); Dkt. 100-5, p.8, ¶26, p.9, ¶33). | Pepper Balls: tingling sensation and difficulty breathing after two hours returned to normal. |
| 1 | Barbadillo, Diana | 9/25/2020 (West Hollywood) | No force, was not injured during the protest. (Exh. D34, 72:11-18; Doc. 160-1, p.10, ¶37). | Not injured. |

D006

| 2 | Bean, Keyanna | 9/5/2020 (SLA Stn) | Tear gas – two cannister used, uncontrollable coughing and burning in eyes and throat.  She claims continuing burning in eyes, tickling throat, and persistent hives on face attributed to incident.  As a result of incident, she visited her cardiologist approximately three time.  She has underlying rare heart condition, Tetralogy of Fallot. (Exh. D019, 4:15-21, 6:20-23; Exh. D018, 26:5-15, 35:18-23, 113:13-114:1, 115:1-116:15, 131:8-23, 132:3-10). | Tear Gas: coughing and burning in eyes and throat. |
|---|---|---|---|---|
| 3 | Hoang, Loan | 5/30/20 Grove | Protesting near Beverly Blvd near the Grove (shopping complex) when LASD deployed "tear gas" | |
| 4 | Meyer, Taegan (aka White, Christopher) | 8/25/2020 (DTLA) | Foam round – struck in the thigh by what believes was a foam round, resulting in a severe contusion that was painful for several days. Tear gas - inhaled , causing eyes to burn and issues breathing.  Two weeks later, breathing returned to normal. (Exh. D21; Exh. D40, , 82:10-14, 17-21; Dkt. 100-5, p. 52, ¶¶ 8, 10). | Tear Gas: inhaled, causing eyes to burn and issues breathing, returned to normal after two hours. |
| 5 | Mischo, Joe | 8/25/2020 (DTLA) | Flash bang, unknown LLM, & pepper ball – struck by pepper ball around the right eye, resulting in temporary inability to see out of that eye, went to urgent care for treatment.  He also went to an emergency room and had follow-up care by eye doctors.  He was prescribed antibiotics and eyedrops.  Claims $5,018.01 in medical bills. Struck on left buttocks and left elbow by what he believes were foam rounds. Loud noise from the flash bang was disorienting. Exh. D026, 4:18-23, 7:23-8:6, 8:9-12; Exh. D025, 68:21-69:18, 107:20-110:17; Doc.160-1, p. 63, ¶ 3). | Pepper ball struck right eye temporary inability to see out of eye went to urgent care for treatment. Follow up ER care by eye doctors. Struck on left buttocks and left elbow believes were from foam rounds. |

D006

| | | | | |
|---|---|---|---|---|
| 5 | Mischo, Joe | 9/5/2020 (SLA Stn) | Pepper balls – struck in the back by what he believes were two pepper balls.  The injuries were much less than August 25, 2020.<br>Exh. D026, 5:7-8;<br>Exh. D025, 128:20-25 ("what I think were a few Pepper Balls" ), 137:16-25, 140:2-6;<br>Dkt. 160-1, p. 64, ¶ 8 | Pepper Balls: struck in the back. |
| 6 | O'Neil, Jillian | 8/25/2020 (DTLA) | Attended 8/25/20 & 9/5/20 protests as National Lawyers Guild legal observer. Exh. D028 (ROG 1); Exh. D27, 88:19-21.<br><br>8/25/20: She claims second to third degree burns between her legs, and additional bruising beyond the burns (3/4 of upper thighs and legs) and scrapes on different parts of her body as a result of a piece of flash bang that landed between her legs. It was the "most pain [she] ever felt". She claims that she still has lingering scar tissue from injury, but does not have any other complaints from the first protest. (Exh. D027, 81:22-84:12, 91:21-93:11)<br><br>The two protests allegedly caused her PTSD symptoms and she sought therapy for protests and previous traumas. She claims to have generalized anxiety disorder since she was 7 years old. She claims more than just the emotional distress from the two protests. (Exh. D027, 97:24-98:21, 99:17-24, 103:8-12, and 105:11-112:6). | second to third degree burns between her legs, and additional bruising beyond the burns (3/4 of upper thighs and legs) and scrapes on different parts of her body as a result of a piece of flash bang that landed between her legs.<br><br>PTSD symptoms |

87

**D006**

| 6 | O'Neil, Jillian | 9/5/2020 (SLA Stn) | She claims to have been "hit with rubber bullets and either pepper balls or tear gas[, but] can't say for sure. Whatever it was, something that made you not be able to see or breathe." She alleges she was hit on right side of her body, ribs, lower ribs, and back hip area, and was hit approximately three times, which caused two to three bruises about the size of a fist, baseball sized. Her alleged bruises lasted for several weeks and were treated with over-the-counter medicine/treatments. Her mental health treatment is the same as discussed for the August 25 protest. (Exh. D027, 142:13-23, 143:5-9, 144:10-13, 144:20-22, 145:2-15, 146:5-11, and 146:15-23).<br><br>The two protests allegedly caused her PTSD symptoms and she sought therapy for protests and previous traumas. She claims to have generalized anxiety disorder since she was 7 years old. She claims more than just the emotional distress from the two protests. (Exh. D027, 97:24-98:21, 99:17-24, 103:8-12, and 105:11-112:6). | Pepper balls/ tear gas: vision and breathing impaired, hit on right side of her body, ribs, lower ribs, and back hip area, and was hit approximately three times, which caused two to three bruises about the size of a fist, baseball sized.<br><br>PTSD symptoms |
| 7 | Rahman, Shakeer | 6/21/2020 (Compton) | Tear gas – alleges he was deliberately targeted with cannister that hit and/or exploded near his head, blanketing with him with powder, causing eyes to burn and difficulty breathing.  (Exh. D030, 6:1-4; Exh. D029, 82:2-18; Dkt. 160-1, p.95, ¶ 7).<br><br>Believes he may also have been struck by a foam round, but does not remember. (Exh. D029, 154:21-24)<br><br>DEPO:64:23 - 65:1 Hit in head with teargas canister.<br>78:7 - 17 re throwing teargas.<br>145:6 - 146:9 Describing being hit with a canister.<br>157:7-18 Photos will show all the powder, spray or gas. | Tear Gas:  with cannister that hit and/or exploded near his head, blanketing with him with powder, causing eyes to burn and difficulty breathing. |

D006

| | | | | |
|---|---|---|---|---|
| 8 | Ramirez, David | 9/5/2020 (SLA Stn) | 9Pepper Balls & Tear Gas<br>Tear gas - Difficulty seeing and breathing; burning sensation in eyes which lasted 45 minutes to an hour. (Exh. D030, 5:5-6; Exh. D031, 57:10-17, 74:22-75:10, 76:5-7).<br><br>Pepper balls - Bruising, discomfort, and stinging which dissipated after about two weeks. (Exh. D031, 71:7-24).<br><br>86:16 - 87:10 re asthma attack. | Tear Gas: Difficulty seeing and breathing; burning sensation in eyes which lasted 45 minutes to an hour.<br><br>Pepper Balls: Bruising, discomfort, and stinging which dissipated after about two weeks. |
| 9 | Singh, Vishal | 8/25/2020 (DTLA) | Tear gas<br>Chose to enter tear gas cloud in order to continue filming. (Exh D035, 84:9-85:10, 85:17-19). Difficulty breathing and coughing, all effects had worn off by following morning<br>(Exh. D035, 91:13-92:1, 68:23-25).<br><br>23:10 - 26:12 re exposed to tear gas, OC/pepper spray, bear mace in protest since 2020 and effects of tear gas.<br>26:18 - 28:11 describing grenade or canister deployed.<br>68:23-25 re tear gas worn off next day.<br>69:1-18 re injury complaint re tear gas.<br>82:25 - 85:19 re exposed to tear gas. | Tear Gas: Difficulty breathing and coughing, all effects had worn off by following morning. |
| 10 | Tharpe, Austin | 6/21/2020 (Compton) | Tear gas/Pepper Balls - Burned eyes, throat, and chest; coughing. Lasted three days.  He has been exposed to tear gas at other protests in Beverly Hills. (Dkt 160-1, p. 145, ¶7; Exh D037, 72:19-73:4, 155:13-18, 215:6-19).<br><br>He sought mental health treatment for two months and alleges loss of several paying jobs at $250/hour.<br>(Exh. D038, 9:11-16 ). | Tear gas/Pepper Balls - Burned eyes, throat, and chest; coughing. Lasted three days. |

D006

| 11 | Young, Devon | 6/21/2020 (Compton) | Tear gas - difficulty breathing, burning in eyes, nose, and lungs; lasted for a few days.<br>(Exh, D040, 5:10-14,Exh. D039, 78:22-80:2, 80:6-15, 80:16-2,  85:8-20, 85:25-86:3, 97:19-25).<br><br>81:24 - 82: 5 re duration at protest after being tear gassed.<br>85:8 - 86:10 re injuries from tear gas.<br>88:12-25 re filming and walking through tear gas. | Tear gas - difficulty breathing, burning in eyes, nose, and lungs; lasted for a few days. |

90

**D006**

Injunctive Relief Class

| | Plaintiffs | Decl. Date | |
|---|---|---|---|
| 1 | Barbadillo, Diana | 11/7/2023 | Doc. 160-1, p.35, ¶ 38 - She continued to attend protests, has not stated she experienced any other alleged use of force by the LASD or that she intend to attend future protests. |
| 2 | Bean, Keyanna | 11/7/2023 | Doc. 160-1, p.41, ¶ 10 - Does not state plans to attend future protests. |
| 3 | Berg, Krizia | 11/7/2023 | Doc. 160-1, p. 7, ¶ 18 - Does not state plans to attend future protests. |
| 4 | Bryant, Grace | 11/7/2023 | Doc. 160-1, p. 48, ¶ 16 - Stopped attending protests in early August 2020. |
| 5 | Del Rosario-Sabet, Noelani | 11/7/2023 | Doc. 160-1, p. 113, ¶15 -States has not attended further protests because she does not want to get arrested again. |
| 6 | Hoang, Loan | 11/4/2023 | Doc. 160-1, p. 53, ¶ 9 - After being tear gassed by LASD, I have tried to continue to attend protests, but I am very anxious and afraid for my safety around law enforcement. |
| 7 | Meyer, Taegan | 11/7/2023 | Doc. 160-1, p. 56, ¶ 11 - States that at times she is too anxious to attend protests. |
| 8 | Militante, Sebastian (Serena) | 11/3/2023 | Doc. 160-1, pp.12-14, ¶ 13 - States stopped attending protests after June 3, 2020. |
| 9 | Mischo, Joe | 11/7/2023 | Doc. 160-1, p. 62, ¶ 9 - continued to attend protest. Does not state plans to attend future protests. |
| 10 | Monroe, Christian | 11/7/2023 | Doc. 160-1, p. 18, ¶ 11 - States at times he is too anxious to attend protests significantly fewer protests. Does not state plans to attend future protests. |
| 11 | O'Neil, Jillian | 10/29/2023 | Doc. 160-1, p.72, ¶ 22 - Continued to attend protests. Does not state plans to attend future protests. |
| 12 | Rahman, Shakeer | 11/7/2023 | Doc. 160-1, p.88, ¶ 13 - "I have continued to attend demonstrations for issues that are important to me, such as police brutality. However, as a result of this experience, I am now afraid of being injured by law enforcement at a protest. I am now hesitant to fully participate or get too close to law enforcement out of fear for my safety." Does not state plans to attend future protests. |
| 13 | Ramirez, David | 11/8/2023 | Doc. 160-1, p.97, ¶ 21 - "There are times when I am too anxious to attend protests and events out of fear of subjected to unlawful force by the LASD and as a result of what I have observed." Does not state plans to attend future protests. |

D007

| 14 | Singh, Vishal | 11/6/2023 | Doc. 160-1, p.119, ¶19 - "Although I have attended several protests, there are times when I am afraid to attend protests out of fear of subjected to unlawful force by the LASD and as a result of what I have observed, I am going to think hard before attending additional protests at which the LASD will be present." |
| 15 | Tharpe, Austin | 11/6/2023 | Doc. 160-1, p.129, ¶ 13 - "There are times when I am too anxious to attend protests and events out of fear of subjected to unlawful force by the LASD and as a result of what I have observed." |
| 16 | Wells, Travis | 11/8/2023 | Doc. 160-1, p.23, ¶ 14 - "I am going to think hard before attending additional protests at which the LASD will be present" |
| 17 | Young, Devon | 11/6/2023 | Doc. 160-1, p. 137, ¶ 12 - "After this incident, I continued to attend protests for issues that were important to me, but I experienced significant anxiety and stress at demonstrations due to being tear gassed by LASD deputies." |

D007

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

KRIZIA BERG, ET AL.,                    )
                                        )
            PLAINTIFFS,                 )
                                        ) Case No.:
            VS.                         ) 2:20-cv-07870-
                                        ) DMG-PD
                                        )
COUNTY OF LOS ANGELES, ETC., ET AL.,    )
                                        )
            DEFENDANTS.                 )
                                 _____)


THIS TRANSCRIPT CONTAINS CONFIDENTIAL SECTIONS

PLEASE TREAT ACCORDINGLY


REMOTE DEPOSITION OF KRIZIA BERG HAGALAZ

FRIDAY, DECEMBER 15, 2023, 10:20 A.M.


Reported by Patricia Gray-Conrad, CSR No. 12633

Network Deposition Services Job No. 291893

//

1

Number 5, and it's gonna be Bates Number Berg 2, which is a Facebook post.

(Defendant's Exhibit Number 5 was marked for identification, a copy of which is attached hereto.)

BY MR. SAKAI:

Q    I'm gonna share the screen.  So if you see at the bottom of the screen, it's labeled Berg 2.  And at the top of the screen, it's dated January 20, 2022, 4:16 p.m., and it's Facebook.  I'm gonna magnify this a bit.

The Facebook post at the top left, it says, Krizia Berg.  The date is June 4, 2020.  And it says in the text of the post; (as read)

White privilege is being treated so gently during an arrest that I was able to slip out of my flex cuffs while three Latinx protestors on our mass arrest bus lost circulation up to their shoulder and one Latinx protester passed out.

Is that an true and accurate statement of what you witnessed?

A    Yes, it is.

Q    And so on the day of this -- and this refers to your arrest and handcuffing on the day of the June 3rd, 2020 protest at Grand Park?

A    That's correct.

Q    And so you're not complaining that you were

**D008**

Krizia Berg Hagalaz                                          December 15, 2023

tightly handcuffed on the day of that arrest; is that right?

A    That's correct.

Q    Okay.  And then I'm gonna mark as -- I'm gonna also add to Exhibit Number five, a Page 5 of this post which I will jump to.  Let me ask:  It seems like in the header on the top left, it just looks like that's the day you printed out these posts.

Is my understanding correct?

A    Yeah.  I probably saved them as a PDF.

Q    And so on Page Number 5, it's also dated June 4, 2020.  The top left is your name again, Krizia Berg.  And in the text it says; (as read)

I was arrested at a protest last night but I was just released unharmed.  Love you all, and it's #BlackLivesMatter.

Is this a true and accurate post that you made on June 4th?

A    It's not entirely accurate.

Q    Okay.

A    It doesn't take into account the mental and emotional harm, the stress not being allowed to urinate, the fear of having to walk back alone at 4:00 in the morning because my cell phone was dead and I couldn't call for a ride.  But I wanted my loved ones to know

101

Krizia Berg Hagalaz                                                    December 15, 2023

A    I think I was cuffed and then searched.

Q    Okay.  And did you have your personal property taken away from you?

A    I did.

Q    Okay.  Did that include your phone?

A    It did.

Q    Okay.  And at some point, did you get your personal property returned to you?

A    I did.

Q    Including your phone?

A    Including my phone.

Q    Okay.  And then, do you know about what time you got on the bus?

A    I believe it was around 11:00 p.m.

Q    Okay.  Do you know about what time you were released?

A    It was after 3:00 a.m.

Q    Okay.  Do you recall stating in your interrogatory that you walked home.  It took you about an hour and-a-half and you got home at 3:00 a.m.?

A    Then I may have my timeline a little mixed up.

Q    Okay.  So let me just ask this:  So do you recall signing a verification to interrogatory responses under penalty of perjury?

A    Yes, I do.  Before I answer anymore questions

120

Krizia Berg Hagalaz                                                    December 15, 2023

deputies were on and off the bus.

Q   Did you ever ask anyone else?

A   I did not.

Q   Okay.  Did you ever ask anybody -- were you transported somewhere, from City Hall or Grand Park?

A   I was.

Q   Where were you transported?

A   A parking lot.  I didn't know exactly where it was.  I -- it was in downtown still.

Q   Okay.  How long did it take for the bus to drive from where you were arrested, Grand Park City Hall, to this parking lot?

A   I don't recall.  It was not a long drive.

Q   If I were tell you that this parking lot is in Chinatown, does that refresh your recollection?

A   That sounds right.

Q   Okay.  So after you get to this parking lot in Chinatown, do you ask anyone else if you could use the restroom?

A   Like a -- no, I did not.

Q   After you were released, did you end up using the restroom?

A   When I made it back to my apartment.

Q   So an hour and-a-half after you were released, you use the restroom at your apartment; is that right?

123

pretty bus.  There were two different seats.

Q    And was the bus you were on partitioned into different sections?

A    It was.

Q    Okay.  What section were you in?

A    Well, each seat had its own partition.

Q    Okay.  Let me --

A    I was on the backside of the bus.

Q    Backside of the bus.  So if we were to cut the bus in half, say front, middle and back, what section do you believe you were in?

A    I think I was on the middle, on the right side.

Q    And was the section of the bus you were in, did it have benches or did it have a little jail cell or something else?

A    It had benches.  But, like, each seat was like wrapped in, like, its own little cell.

Q    Got it, okay.  By bars or by a partition?

A    It was some sort of -- like, it had holes in it so you could see everyone around you.  I don't think there were bars.

Q    Okay.  And then in between the front section and the back section, was there a gated partition?

A    There was a gate that separated, like, the

125

**D008**

Krizia Berg Hagalaz                                                    December 15, 2023

Q    Have any conversation with them?

A    We definitely talked about needing to use the restroom, about how crazy it was that we were getting arrested, when we were getting off this bus, how long have we been sitting here.

Q    Have any problems with the person sitting next to you?

A    I didn't have any problems with behavior or anything.

Q    Were you threatened by any of the other protesters on your bus?

A    No, I was not.

Q    While you were in the bus, were you able to take the flex cuffs off?

A    I was able to.

Q    You were able to uncuff or take the flex cuffs off and you were able to fix your mask?

A    Yes.  And I was able to fix the mask of the person next to me.

Q    So you refer to seeing three women who had tight flexi cuffs; is that true?

A    I don't believe I ever said they were women.

Q    I think you refer to them as three, who were -- oh, okay.  Yeah.

So who were these three people you saw with

127

December 15, 2023

tight flex cuffs?

A      I don't know who they were, but they were further to the back of the bus.

Q      Okay.

A      I saw one person who was no longer conscious and there were two other people who were screaming that they couldn't feel their arms anymore.  Collectively, a lot of us on the bus were shouting for attention from the deputy to ask for release and they did not pay attention.

Q      How did you know, in fact, that their handcuffs were tight?

A      Because I trusted them.

Q      Did you see their handcuffs or their flex cuffs?

A      I could not see their flex cuffs that clearly.

Q      Could you, in any way, verify that their cuffs were, in fact, tight?

A      I could not tell.  Only by the intensity of their screams.

Q      And how did you know that one of these protesters had passed out from tight handcuffs?

A      He was no longer moving or responsive to other people.

Q      Anything else?

128

**D008**

A     Not that I can recall.

Q     Why did you come to the conclusion that it was because of tight handcuffs?

A     The person next to him said that his arms were purple.

Q     Okay.  Anything else?

A     That's all that I recall.

Q     Did you see this person's arm?

A     I could not.

Q     Okay.  Did you do anything to document these protester's claims that their handcuffs were too tight?

A     Other than the posts that I made on my social media, I did not.  I may have said something to National Lawyers Guild after my arrest with those details, but I don't recall.

Q     After the protesters were escorted onto the bus but before the bus left to Chinatown, do you recall if any deputies ever reentered the bus and took any of the protesters off the bus?

A     I don't recall.

Q     Were there any females on your bus?

A     Besides me, I don't recall.

Q     Other than what we have just talked about, did you have any other issues or complaints about your treatment after you were arrested on June 3rd?

129

Krizia Berg Hagalaz                                                    December 15, 2023

REPORTER'S CERTIFICATE

I, PATRICIA GRAY-CONRAD, CSR No. 12633, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth; at which time, the witness was placed under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury, under the laws of California, that the foregoing is true and correct.

Dated this 5th day of January 2024

_____

PATRICIA GRAY-CONRAD, CSR No. 12633

//

155

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Blvd. #2910
Los Angeles CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br>*Assigned to: Honorable Dolly M. Gee*<br><br>**PLAINTIFF KRIZIA BERG'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D009**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.      Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

<div align="center"><strong><u>RESPONSES TO INTERROGATORIES</u></strong></div>

**<u>INTERROGATORY NO. 1:</u>**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**<u>RESPONSE TO INTERROGATORY NO. 1:</u>**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On June 3, Berg attended protests in downtown Los Angeles. She went straight to City Hall because that's where she had met fellow protesters the day before. She arrived around 3pm. They marched around downtown streets without incident, although there were a few arrests on the way back to City Hall on their last route. It

appeared that there were some undercover officers in the crowd who had identified possible weapons in people's bags. Curfew at the time was 10 p.m. It was getting dark or close to dark, when all protesters were standing around City Hall around 9 p.m. The crowd began getting word from scouts that LAPD was beginning to cordon off the area, and others said they had seen LASD prison transport buses. No one was in charge of the protest; although it started as the BLM weekly "Jackie Lacey Must Go" protest, they had long since left. The crowd collectively decided to move onto the grass at Grand Park because someone had heard LAPD doesn't have jurisdiction over the park. LAPD then surrounded the park and did not let protesters leave, at least not towards City Hall.

At some point, people who were acting in an organizing or leadership capacity decided that the best course of action for everyone choosing to resist curfew would be to sit in the grass together in a tight formation in Grand Park. The crowd did so. Berg heard announcements from the police, although she does not now remember what they said; she assumes they were curfew announcements. She does not believe there was a clear instruction as to how (by what route) the crowd was expected to leave the area. The crowd had made the decision to continue protesting and believed that the curfew was unconstitutional. The crowd continued to chant and to sing at one point. Various people stood up to address the crowd and keep morale up. At some point, a person in the crowd had left, but was then returned in Flexicuffs; this created a lot of anxiety in the crowd. There was a helicopter circling the whole time shining floodlights on the crowd and news helicopters. Eventually LASD came and sent out some deputies to approach the crowd. A Black deputy began to speak, saying things like, "I appreciate that you are peacefully protesting and you haven't destroyed anything, but you have to leave now, and if you don't, you'll be arrested." He asked to speak to a leader of the group, at which point someone nobody else knew stood up and ran up to the deputy, and they shook hands and took a knee together. Some in the crowd cheered, some booed. The deputy returned to the other deputies, turned back

to the crowd and said the crowd was all under arrest. LASD then completely surrounded the park with dozens of deputies and maybe 100+ police officers. They formed lines and began approaching and arresting one by one. Berg was one of the last few groups to be arrested. Berg's bag was searched. They began to separate people by gender; Berg informed them that she is not a man, but they stated that did not matter and put her on a bus with men. They sat on the bus for over an hour before they even left City Hall. While on the bus, four people (three of whom were Latinx) were Flexicuffed so tightly they could no longer feel their hands or arms. One ended up passing out from the pain. People on the bus were screaming and asking for help, but even when a deputy came onto the bus, he refused to acknowledge their requests. Almost none of the deputies were wearing masks or gloves. People who had lost their masks during the arrests were not given new ones. Protesters were seated 2 to a bench. The person next to Berg's mask fell off his nose and mouth. ==Berg's Flexicuffs were loose enough to slip out of them and put his mask back on for him==. They were then taken to Union Station and left for another hour or two. Berg's phone battery had died by this point. Berg was given a citation, and asked how to get back to City Hall so she could orient herself and get home. She did not see anyone she knew or recognized. She walked home to Berendo and 7th Street, a distance of about four miles which took her an hour and a half by herself at 3am or so.

On June 21, 2020 Berg went to the Andres Guardado protest with a group called the Black Future Project. They participated in a march. Eventually the group ended up at the Compton Sheriff's Station. LASD had already set up fences to keep protesters away from the station. It was a large crowd, but no one was being violent or destructive. Berg walked a bit further away to see if she could film the deputies. She saw deputies on the roof of the station with AR-15s or M4s. Berg saw less lethal weapons held by deputies elsewhere on the ground. Deputies pointed weapons at protesters immediately although they did not fire them right away. Berg stayed away from the speakers area. Berg recalls moving away from the main line of deputies in

riot gear, towards Compton Blvd. At that point, she noticed there was violence happening, some of which she captured on film. She heard grenades going off, and was close enough to experience the CS gas. She helped pull a man named Devin, who had been shot in the face, off to the side so he could get out and get treatment. She then walked back and started filming. More CS gas grenades were deployed. She saw Emanuel Padilla standing with his back to deputies being shot repeatedly with pepper balls. He then moved away; Berg saw others doing the same. Berg picked up one of the CS grenade canisters and still has it. Someone told Berg that deputies had arrested everyone from Black Future Project and had already transported them away. Berg did not see any of that group when she returned to the protest. Berg then filmed the deputies that didn't have name tags; eventually she stopped filming because it did not seem like much else was happening. She recalls a helicopter flying above the Compton City Center using its loudspeaker to identify people and call them out individually. At that point Berg left for fear of being arrested.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

1. On June 21, 2020, Berg inhaled CS gas, which caused her to cough for up to a half hour and struggle to breathe comfortably for four hours, and she was unable to see clearly for about fifteen minutes and felt pain and stinging for another fifteen minutes or so after that.

2. ==Beginning around June 2021 and continuing through December 2021, Berg sought counseling services to address the serious emotional harm caused by Defendants and other law enforcement personnel.==

3. Berg paid a total of $1920 for counseling, of which one tenth is attributed to these two incidents.

4. Berg has lost over a year's wages, which averaged $284.90 gross wages each pay period, including imputed tip income. She stopped working around the end of September 2020, and as of January 19, 2022, has not been able to work since. The lost wages are $14,245 per year, or a total of $17,094 as of January 19, 2022.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As to June 3, 2020, Plaintiff James Butler witnessed the arrests, may be contacted through counsel.

As to June 21, 2020, Plaintiffs James Butler, Grace Bryant, Devon Young, Emanuel Padilla, Austin Tharpe, Noelani del Rosario-Sabet, and Linda Jiang. All may be contacted through counsel for Plaintiffs.

**INTERROGATORY NO. 4:**

Identify every witness to the incident giving rise to your lawsuit, including his/her residential address and telephone number.

## **VERIFICATION**

I have read the below-titled documents and know their contents:

**PLAINTIFF** Krizia Berg **'S RESPONSES TO COUNTY OF LOS ANGELES' FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF SPECIAL INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION**

I am a Plaintiff in this action, numbered 2:20-cv-07870-DMG-PD, filed in the Central District of the United States Federal Court.  The matters stated in the foregoing documents are true and correct to the best of my knowledge except as to matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __03 / 01 / 2022__, in Los Angeles County, California.

_____

Plaintiff  Krizia Berg

**D009**
Doc ID: 672011bd878a97e0b45e454909fbe79934344d33

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, ET AL.,              )
                                  )
        Plaintiffs,               )
                                  )
    vs.                           )   No. 2:20-cv-07870-DMG-PD
                                  )
COUNTY OF LOS ANGELES, ETC.,      )
Et al.,                           )
                                  )
        Defendants.               )
_____)

DEPOSITION OF

SEBASTIAN MILITANTE

Pasadena, California

April 19, 2023

(Contains Confidential Portion)

ATKINSON-BAKER, A VERITEXT COMPANY

(800) 288-3376

Reported by:  MARGARET KINNEY, CSR No. 11398

FILE NO.:  AB 5877890

Page 1

able to approximate how many?

A   No.

Q   More than three?

A   I can't approximate.

Q   Did you see people leave Grand Park after announcements were made?

A   Yes.

Q   How many people?

A   One.

Q   Okay.  And after that person left did they ever come back?

A   Not that I'm aware of.

Q   Did you see any law enforcement stop that person from leaving?

A   I didn't watch him leave.  So no.

Q   Okay.  How do you know he left?

A   I don't.  He could have rejoined the group.

Q   Okay.  Did you feel -- I'm sorry?

A   No.  Nothing.

Q   Did you feel at all that you were free to leave?

A   Yes.

Q   Okay.  How long would you say you were at Grand Park before you were arrested?

A   Somewhere between 45 minutes to an hour.

Q   Okay.  And within that time frame was LAPD the

Page 200

only law enforcement agency there?

A   No.

Q   Who else was there?

A   LASD.

Q   How do you know?

A   Because they needed to bring the buses.

Q   Okay.  Did you see buses?

A   Yes.

Q   How many of them?

A   I don't recall.

Q   Okay.  When you initially saw the buses, did you still feel free to leave?

A   Yes.

Q   But you chose to stay?

A   Yes.

Q   Was it your intention to get arrested that night?

A   No.

Q   Did you feel like getting arrested promoted your -- one of your causes that night?

MS. BROWN:  Objection.  Vague and ambiguous.

THE WITNESS:  I don't -- I don't know if it did.

BY MR. AGAZARYAN:

Q   Did you want to get arrested?

A   I was aware it was a possibility.

Page 201

Q    But regardless, you remained there and then got arrested, correct?

A    Yes.

Q    How did the arrest -- how did getting arrested make you feel?

MS. BROWN:  I'll allow the witness to answer the question.  I just want to -- it's been another hour, if we could break soon.

MR. AGAZARYAN:  Yeah.  It's 4:29.  But before we take a break I do want to the question answered, and then we can take a break.

MS. BROWN:  Okay.  Could you please repeat the question, if you don't mind?

MR. AGAZARYAN:  Madam Court Reporter, would you please repeat the question.

(Record read.)

THE WITNESS:  I don't know if I had any feelings about getting arrested.

MR. AGAZARYAN:  All right.  We can take a break now.  How long a break would you guys want -- let's go off the record.

(Recess.)

THE COURT REPORTER:  The time is 4:41 P.M.

BY MR. AGAZARYAN:

Q    Ms. Militante, when you -- when did you first

Sebastian Militante
April 19, 2023

MS. BROWN:  Objection.  Vague and ambiguous.

Go ahead.

THE WITNESS:  Well, LAPD made a perimeter around our group about 100 yards out, and then LASD made a second perimeter about 50 yards out.  So they were within the LAPD perimeter.  They formed a circle -- they formed two concentric circles around our circle and moved in two officers from LASD to one protestor.  And I --

Q   Okay.  At this -- I'm sorry.

A   And I was one of them.

Q   Okay.  And this was, as you said -- you said it was 10 to 15 minutes after those admonishments, or announcements, that were given by the LASD person, correct?

A   Yes.

Q   Okay.  And do you recall who arrested you?

A   I don't.

Q   How many people arrested you?

A   Two.

Q   And they were -- were they LAPD officers?

A   They were LASD officers.

Q   Okay.  And how did they arrest you?

MS. BROWN:  Objection.  Vague and ambiguous.

THE WITNESS:  They picked me up the ground -- up from the ground, put my hands behind my back, enclosed

Page 208

Sebastian Militante
April 19, 2023

them with zip ties, and brought me over to a bus.

BY MR. AGAZARYAN:

Q   And did it hurt?

A   Which part?

Q   When they applied the zip ties.

A   Not at the time of application.

Q   Okay.  What about the time they lifted you?

A   No.

Q   Okay.  How did you feel when you were arrested?

A   Nervous.

Q   Were you scared?

A   Yes.

Q   Of what?

A   It was a new experience for me.  So I was afraid of the uncertainty with which that experience entailed.

Q   And after you were brought up -- or let's strike that.

Were you zip-tied and then brought up or were you brought up and then zip-tied?

A   I was brought up and then zip-tied.

Q   Okay.  And after you were zip-tied -- what happened next?

A   They brought me to the bus.

Q   Okay.  Do you remember how many buses there were?

Page 209

Sebastian Militante
April 19, 2023

STATE OF CALIFORNIA   )

                       : ss

COUNTY OF SAN DIEGO   )


        I, the undersigned, a Certified Shorthand

Reporter of the State of California, do hereby certify:

        That the foregoing proceedings were taken before

me at the time and place herein set forth; that any

witnesses in the foregoing proceedings, prior to

testifying, were placed under oath; that a verbatim

record of the proceedings was made by me using machine

shorthand which was thereafter transcribed under my

direction; further, that the foregoing is an accurate

transcription thereof.

        I further certify that I am neither financially

interested in the action nor a relative or employee of

any attorney of any of the parties.

        IN WITNESS WHEREOF, I have this date subscribed

my name.


Dated:  May 8, 2023



MARGARET KINNEY

CSR No. 11398

Signature was Requested

Page 251

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, # 115
Culver City, CA 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL GROUP
1001Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
Denisse O. Gastélum SBN 282771
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com
e. dgastelum@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated, <br><br> PLAINTIFFS, <br> v. <br><br> COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD <br> *Assigned to: Honorable Dolly M. Gee* <br><br> **PLAINTIFF SEBASTIAN MILITANTE'S  RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D011**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.    Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

<div align="center"><b><u>RESPONSES TO INTERROGATORIES</u></b></div>

**<u>INTERROGATORY NO. 1:</u>**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**<u>RESPONSE TO INTERROGATORY NO. 1:</u>**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

**May 30, 2020**

On May 30, 2020, Plaintiff attended a protest in Pan Pacific Park in the Fairfax area of Los Angeles.  She arrived in the early afternoon.  Plaintiff and the group left from Pan Pacific Park and marched westward until arriving near Rodeo Drive and

Wilshire, at which point they took Wilshire to Santa Monica, travelled northwards on Santa Monica, and returned to Pan Pacific park. Throughout this time Plaintiff saw no protestor engaged in any act of violence. Plaintiff took a video showing protestors marching. Before sunset, Plaintiff received an alert that there was a curfew and left shortly thereafter.

**June 3, 2020**

On June 3, 2020, at around 4:30 PM, Plaintiff arrived in downtown Los Angeles near the Hall of Justice, joining others who had gathered to protest then District Attorney Jackie Lacey's tenure. From there, Plaintiff and others marched south on Spring Street. They eventually turned around, and made their way back to City Hall. Police officers were present and blocking off adjacent roads as the protestors marched. Throughout her time marching, Plaintiff saw no protestors engage in any violence.

After Plaintiff and others arrived at City Hall, those who stayed past the curfew began to move to Grand Park. Plaintiff understood this was because someone had said the police may be more constrained in using unnecessary and lethal force against peaceful protestors on public property. Plaintiff and the other protestors who went to Grand Park sat in a circle in the park. Plaintiff did not see protestors outside this area at the time.

Plaintiff and others were peacefully conversing and chanting. They chanted that it was a peaceful protest. Someone gave Plaintiff goggles and informed her that they had eye drops, because that person had been gassed the day before.

Police officers began to form lines on each side of the park. Los Angeles Sheriff's Department Deputies had appeared at some time around 10:00 PM, in body armor, helmets, with shoulder pads and shin guards. It seemed as if there were 100 or more deputies. A Black LASD deputy came out and, as other deputies filmed him, stated that the protestors could leave, but if they did not they would be arrested. LASD deputies had completely encircled the protestors. Very shortly after the deputy's

statements LASD deputies began moving in to arrest the protestors. The protestors were nervous and concerned.

At around 11:22 the LASD began arresting protestors. Plaintiff took a photograph of one of the protestors, who seemed to be the first one arrested, as the man was being arrested. Very quickly after this arrest LASD deputies arrested Plaintiff. Plaintiff was seated and lifted her hands up in front of her for the deputies. They forcefully picked her up by her hands. Plaintiff put her hands behind her back to allow for her to be arrested, but two LASD deputies further pushed on her hands and tightly zip tied her hands with flexicuffs.

The two LASD deputies led Plaintiff to a line of people waiting to get into an LASD bus. One of the deputies removed Plaintiff's backpack, put it into a plastic bag, and threw it under the bus. She appeared frustrated with Plaintiff. She searched Plaintiff's body aggressively, gripping her as she did it. As the deputy reached Plaintiff's genitals she groped them, and pressed Plaintiff's testicles up into her body. In doing this it seemed like the deputy wanted to make Plaintiff suffer, and humiliate her.

Deputies took Plaintiff's name and birthday down on the bus, and she was placed immediately next to the person next to her, two persons to a bench. The other protestors were seated the same way. Throughout these interactions the deputies did not wear masks.

The LASD deputies had painfully and unnecessarily handcuffed protestors very tightly. At least four other people appeared in extreme pain. Several could not feel their arms or hands and cried out about this. One of the men in handcuffs had his shoulders rolled so far forward it seemed like the slightest movements were causing him intense pain. Many people on the bus, perhaps six to eight, screamed for the officers to help these people. The deputies ignored the cries for what seemed like fifteen to twenty minutes, and when they came back to loosen the handcuffs, they only did so moderately for three of the protestors. A fourth was painfully handcuffed,

and though several of the parties on the bus cried out to help this man as well, the deputies did not do so.

The handcuffing also hurt Plaintiff. The LAPD Deputies' use of the flexicuffs was very tight, hurt and caused a mark on her wrist for approximately two weeks. The flexicuffs made it extremely difficult to sit comfortably in the bus. ==Plaintiff also has a winged shoulder blade with limited range of motion in her right arm, which the handcuffing exacerbated, and hurt her shoulders.== During the ride Plaintiff tried to move her hands to get the blood flowing. She could barely feel her hands, and felt intense pain during the ride.

The deputies drove Plaintiff and the protestors northwards. The driver would frequently stop the bus and wait where there was no apparent reason to do so and no impediment to them continuing. The deputies would move a very short distance, for example about a bus length forward, then stop and wait for fifteen minutes, after which they would move another bus length forward, wait and repeat.

Eventually, Plaintiff arrived near Union Station in Chinatown, after what felt like about three hours since her arrest. The protestors left the bus one by one. When Plaintiff arrived at a table outside for booking, she was asked for her ID, given a ticket and charged with a misdemeanor for failing to obey a curfew, and released in the early morning, with the curfew still in effect.

After her release she briefly attempted to get a ride to Grand Park and when she could not, she walked back to Grand Park, where she had left her bike. Plaintiff picked up her bike, and rode to her home in Koreatown, arriving at around 4:30 in the morning.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

## VERIFICATION

I, Sebastian Militante, have reviewed Plaintiff's Responses to Defendant County of Los Angeles' Interrogatories, Set One, and verify that the answers are true to the best of my own knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed May 3, 2022 at Makati, Philippines.

_____

Sebastian Militante

**D011**

Christian Monroe                                                    November 15, 2023

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,                        )
                                            )
        Plaintiffs,                         ) CASE No.
                                            ) 2:20-CV-07870-DMG-PD
VS.                                         )
                                            )
COUNTY OF LOS ANGELES, ETC., ET             )
AL.,                                        )
                                            )
        Defendants.                         )
                                            )
_____)

DEPOSITION OF CHRISTIAN MONROE

VOLUME I

Los Angeles, California

Wednesday, November 15, 2023

Reported by: Sonia Blake, CSR
             CSR No. 9854
Job No.:     289280

Q   Okay.  Do you -- so because you mentioned Sheriff's Deputy, that means you believed to have seen Sheriff's deputies there, correct?

A   Yes.

Q   Okay.  Did you -- how many Sheriff's deputies did you see there?

A   Unclear.

Q   Okay.  More than five?

A   Yes.

Q   Okay.  More than 10?

A   Yes.

Q   Okay.  All right.  And can you describe who placed the Flex Cuffs on you?

A   Can you be more clear?

Q   Yeah.  Can you describe what the person who applied the Flex Cuffs on you looked like?

A   He was a white guy.

Q   Okay.  How tall, do you think?

A   Between 5'11 and 6 feet.

Q   Any distinctive features?

A   No.

Q   And you don't recall his name?

A   No.

Q   Okay.  And when he applied Flex Cuffs on you, what did you tell him?

118

124                                                                    D012

MS. MULLEN:  Assumes facts.

Go ahead.

THE WITNESS:  They were tight.

BY MR. AGAZARYAN:

Q   I'm sorry?

A   They were too tight.

Q   Okay.  And what did he say to you?

A   He ignored me.

Q   Okay.  And when you -- before you were placed in Flex Cuffs, did you -- did you hear any dispersal announcements from the Sheriff's Department?

MS. MULLEN:  Vague and ambiguous as to "dispersal announcements."  Assumes facts.  Calls for legal and/or expert opinion as to "dispersal announcements."

Go ahead.

THE WITNESS:  No.

BY MR. AGAZARYAN:

Q   Okay.  Do you remember seeing an African-American Deputy?

A   I can't recall.

Q   Do you remember a Sheriff's Department Deputy speaking to the crowd?

A   No.

Q   Okay.  And if the Sheriff's Department asked the crowd to leave, would you have left?

119

search me.

Q    Okay.  At Grand Park?

A    Yes.

Q    Okay.  And how did he search you?

A    Very aggressively.

Q    Okay.  What do you mean by that?

A    So the officer handed me off to him, and another officer to the left told him to search my face mask.  So he ripped my face mask off my neck from around my head.  Then he proceeded to rub his hands across my torso very aggressively.  Went down my left side of my leg, grabbed my ankle, twisted it around, went up my leg.  Then went down my left leg -- I mean, my right leg, did the same thing.  Grabbed my belt, twisted my belt around with his thumb inside of my belt waist, and then proceeded to grab my genitals.

Q    And how did he grab your genitals?

A    He went up in between my legs and then cuffed them.

Q    He cuffed them with handcuffs?

A    No, like his hand.  He cuffed them with his hand.

Q    Okay.  And did he grab it hard?

A    Yes.

Q    One through 10, 10 being the most painful thing you've experienced in your life and one being not at all

126

painful, where would you rate the --

A   It was about a six.

Q   About a six.  Okay.

And after he grabbed your genitals, what did you tell him?

A   I said, "Really?"

Q   Okay.  And what did he say?

A   Nothing.

Q   Okay.  So Officer 1 handed you off to Officer 2, and then Officer 2 is the one you say grabbed your genitals?

A   Yes.

Q   Okay.  And other than saying "really" to him, did you tell him anything else?

A   No.

Q   Okay.  After Officer 2 searched you, what happened?  Did he hand you off to another officer?

A   Yes.

Q   Okay.  At Grand Park or at another location?

A   At Grand Park.

Q   Okay.  So the -- so this second officer, was he the big one, the 165, pretty big frame?

A   Yes.

Q   Okay.  So Officer 2 then handed you off to Officer 3, who is the 5'10" officer, about 5 feet

127

**D012**

A    No.  He just said, Go up.

Q    Okay.  And you did.

Where did you sit inside the bus?

A    In the back.

Q    Okay.  Do you recall if there were -- if the bus was sectioned?

A    Yes.

Q    Okay.  Separated by, like, a fence?

A    Yes.

Q    Okay.  So you sat in the very back of the bus?

A    Yes.

Q    Okay.  Were you one of the first people loaded into that bus?

A    Yes.

Q    Okay.  When you got into the bus, did you see anyone you knew who was in that bus?

A    Yes.

Q    Who?

A    Duan Wilson.

Q    Other than Duan Wilson?

A    No one.

Q    Okay.  Did you talk to anyone in -- in that bus?

A    Yes.

Q    Who did you talk to?

A    A few strangers.

132

**D012**

Christian Monroe                                                November 15, 2023

From the time you got onto the bus to the time you left City Hall area in that bus, how long -- how much time passed by?

A   It's hard to say.

Q   Okay.  Twenty minutes, maybe?

A   It was more than 20 minutes.  It was more than 20 minutes, yes.

Q   Okay.  All right.  Less than an hour?

A   No.

Q   Okay.  And so do you -- was there a driver of the bus?

A   Yes.

Q   Okay.  Do you know who drove that bus?

A   No.

Q   Okay.  Was there anyone else on the bus other than arrestees?

MS. MULLEN:  Vague.  Ambiguous.  Potentially calls for speculation.

THE WITNESS:  No.

BY MR. AGAZARYAN:

Q   Okay.  So it was just the driver and then the protestors who were arrested?

A   Yes.

MS. MULLEN:  Christian, do you need a break?

THE WITNESS:  No, I'm just pausing to give you

134

time to object.  That's all.

MS. MULLEN:  Thank you.

BY MR. AGAZARYAN:

Q   At some point, you felt the bus move, right?

A   Yes.

Q   Okay.  And when you first felt that bus move and take to you another location, how long do you think that travel time was?

A   All I can say is that by 3:00 a.m. -- between 3:00 and 3:30 a.m. is when I got released, so I can't give you have an estimate time.

Q   Released off the bus or --

A   Like, they let me go off the bus.

Q   Okay.  How do you know it was 3:30 when you got off the bus?

A   I asked the person -- it was roughly around that time -- the people signing, I asked them what time it was.

Q   Okay.  And so when you first got to that -- let's call it the booking location.

Is that fair to call it that?

A   Yes.

Q   Okay.  So when you first got to the booking location with the bus, how long did you remain on the bus until you were let out?

A   Probably about 30 to 45 minutes.

135

**D012**

STATE OF CALIFORNIA          )
                             :  Ss.
COUNTY OF SAN DIEGO          )

I, Sonia Blake, Certified Shorthand Reporter in and for the State of California, Certificate No. 9854, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was taken before me at the time and place herein named; that said deposition was reported by me in shorthand and transcribed, through computer-aided transcription, under my direction; and that the foregoing transcript is a true record of the testimony elicited at proceedings had at said deposition.

I do further certify that I am a disinterested person and am in no way interested in the outcome of this action or connected with or related to any of the parties in this action or to their respective counsel.

In witness whereof, I have hereunto set my hand this 29th day of November, 2023.

_____
Sonia Blake, CSR No. 9854

171

**D012**

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhzlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL GROUP
1001Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Rebecca Brown
NATIONAL LAWYERS GUILD
LOS ANGELES
5165 ½ Santa Monica Blvd., Ste. C
Los Angeles, CA 90029
t. 860-944-5111
e. rebecca@nlg-la.org

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>PLAINTIFFS,<br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br>*Assigned to: Honorable Dolly M. Gee*<br><br>**PLAINTIFF CHRISTIAN MONROE'S RESPONSE DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D013**

Plaintiff was then grabbed by one of Defendant Deputies and led away from the other protestors. Plaintiff did not resist or threaten Defendant Deputy. Defendant Deputy then aggressively ripped off Plaintiff's face mask with such force that the mask ripped. Defendant Deputy then pushed his fingers between Plaintiff's belt and his pants, circling around Plaintiff's entire waist. Defendant Deputy then performed an unnecessarily aggressive pat down, roughly grabbing Plaintiff's genitals during the purported "pat down." Plaintiff complained about the contact, but was ignored. Plaintiff was placed in handcuffs, which were painfully tight.

Defendants then led Plaintiff to a bus pickup. Plaintiff was made to wait approximately one hour until another bus arrived, loaded with other handcuffed protestors. He was made to wait on the bus for approximately two hours. He was not provided any facemask for protection against Covid-19 on the crowded bus, nor was he provided any bathroom breaks. He was still in pain from having his genitals grabbed by the Defendant Deputy.

Defendants then transferred Plaintiff and the other protestors to a parking lot in Downtown Los Angeles. Defendants then issued Plaintiff a citation and handed his belongings. Plaintiff was eventually released at or around approximately 3:00AM.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

-5-

133

**D013**

==Plaintiff experienced pain in his wrists from how tightly Defendant Deputies initially handcuffed Plaintiff, though his handcuffs were eventually adjusted.== Plaintiff experienced sore genitals for several days following the unnecessarily aggressive pat down performed by Defendant Deputies. Plaintiff also experienced emotional distress as a result of the incident. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On information and belief, the following individuals may have relevant information regarding Plaintiff's injuries and/or the Incident:

Govinda: 813-316-8823

Samuel Schatz: 310-990-4208

Discovery is ongoing and Plaintiff reserves the right ot supplement this response.

**INTERROGATORY NO. 4:**

Identify every witness to the incident giving rise to your lawsuit, including his/her residential address and telephone number.

//

//

**D013**

## <u>VERIFICATION</u>

UNITED STATES DISTRICT COURT,

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

*Case No. 2:20-cv-07870-DMG-PD*

I, CHRISTIAN MONROE, have read the **PLAINTIFF CHRISTIAN MONROE'S RESPONSES TO INTERROGATORIES (SET ONE) PROPOUNDED BY DEFENDANT COUNTY OF LOS ANGELES.**

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters, which are stated on information and belief and as to those matters I believe them to be true.

Executed on ____04/15/2022____, at____Los Angeles____, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

CHRISTIAN MONROE

VERIFICATION

135

**D013**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,                     )

                    Plaintiffs,          )    CASE NO.

vs.                                      )    2:20-cv-07870-DMG-PD

COUNTY OF LOS ANGELES, etc.,             )

et al.,                                  )

                    Defendants.          )

_____        )

ZOOM DEPOSITION OF TRAVIS WELLS

San Diego, California

Monday, January 8, 2024

Reported by:  Shelley Lynn Schniepp

              CSR No. 5487

Job No.:      291699

**D014**

incident, June 3rd, 2020?

A.   I would also describe it as average.

Q.   Mr. Wells, at the time of the incident where were you living?

A.   At the time of the incident I was living in Los Angeles, California.

Q.   Where in Los Angeles, California?

A.   I was living in downtown L.A. by MacArthur Park.

Q.   How long had you been residing there at the time of the incident?

A.   I moved to Los Angeles in June of 2019 so it would be a little under a year at that point.

Q.   Where did you reside prior to 2019?

A.   Prior to 2019 I briefly was residing in Sacramento, California after graduate school.  Prior to that I was living in Monterey, California during graduate school.  Prior to that I was living in Sacramento, California.

Q.   Mr. Wells, where do you currently reside?

A.   I currently reside in Sacramento, California.

Q.   How long have you been living there?

A.   I have been living here since "2001."  I moved up during the pandemic.

29

**D014**

they might have -- if that was the case, then they rolled them back up.  There wouldn't have been anything else.

Q.   Mr. Wells, by this point, have you spoken to any of the other protesters?  Have you been having a conversation with anyone?

A.   Not what I can -- what I can remember, no, not at this point.  We weren't in a space -- as they were tying us and moving us around we weren't put next to each other for too long.  Sometimes they would take us in pairs and move us, but then another officer would get assigned to a different area and so then either that protester would get moved with them or they would be assigned to a different officer who is already moving people so at that point no, I didn't speak to any protesters in those lines.

Q.   Mr. Wells, you're handcuffed with the zip ties and you're taken to a line to wait for a bus, correct?

A.   That's correct.

Q.   There's multiple buses there, correct?

A.   There should have been.  There were at least two buses when we were finally in line for the bus and we were waiting either for the second one to get ready or for a third one to come.

157

**D014**

Q.   Was it a male?

A.   It was a male or it was what the officers assumed was a male, yes.

Q.   What complexion skin?

A.   It was probably lighter brown, either that or he was White.

Q.   Long hair or short?

A.   To the best of my memory it was like a medium to potentially longer length.

Q.   Heavy build or skinny or somewhere in between?

A.   Definitely not a heavier build.  Was more skinnier, not like an athletic kind of body type, at least from what I could gather or see from the clothing or remember from that night.

Q.   At a certain point, Mr. Wells, the bus leaves the area where you were loaded on, correct?

A.   At some point, yes.

Q.   How long did it take between the time you were zip tied to when the bus started moving?

A.   I'm not entirely sure of the exact time.  The time frame felt like a very long time.  It felt equally, if not longer, than the time it took the police to finally announce and then detain us and separate us.  It felt like at least two hours if not

160

**D014**

more.

Q.    How long was it between the time you sat down on the bus to the time the bus started moving?

A.    A fairly long time.  I wasn't the first person to get on to the bus, but I was one of the earlier passengers on that bus.  I had been there for a little bit.

Q.    Over an hour?

A.    Yes.

Q.    So the bus starts moving.  What happens next?

A.    The bus starts moving.  If I remember correctly the lights go off.  We're still talking you can see the lamp lights from the street and downtown shining through the window of the bus, but you can't -- you can see the light, but you can't see the lights themselves.  That's why I remembered the bus light being turned off inside.  We started moving for what felt like maybe two seconds, three seconds.  Maybe didn't move more than a couple feet, a few feet, and then we stopped and waited some more time.

Again, eventually started moving again and it felt slower and then we stopped, kept waiting and then ultimately the bus finally started to move after a few of those to the actual final destination spot where we

161

**D014**

they were just talking through us about the process, what was different, generally like the short comings or the perceived ineptitudes of the Sheriffs' departments or police departments that are detaining them.

General lamenting and sharing about other people's pain and then rumors about -- then sharing about other people's experiences, if they had any with any of the officers while they were waiting in line for the bus or being transported.

I remember overhearing one of the protesters specifically mention that like a trans individual protester was being misgendered, sexually harassed, but that -- somebody else mentioned there was actual physical abuse to that individual or to that trans individual being identified at those protests.

I think at that point I mentioned they took our masks off and were getting really close in our face and breathing around us and telling us we deserved it, stuff like that.  Those were generally what we discussed during the bus ride.

Q.    That was during the bus ride.  Did you see any protesters who were able to slip their hands out of their zip ties?

A.    I can't confirm that for certain, but it did sound like some of them were able to or knew how to and

163

D014

would like give tips and tricks potentially if they would work to other folks who were trying to get theirs off.

Q.    When you say you were unable to confirm, what do you mean?

A.    I didn't see them do it.  These were people that were behind me in the bus and I didn't have the space to turn around fully so I could only hear them talk about stuff like that.

Q.    Based on what you heard it appeared that they were able to slip their hands out of their cuffs?

A.    Based on what I heard it sounded like they had experience doing something like that and they had the potential to do something like that.  But I don't know if it appeared they had done it or not.

Q.    Is it fair to say that not all of the protesters were tightly handcuffed?

A.    I'm not sure.  That's not an assessment I don't think I can make.  People's wrist sizes were different and then some people could dislocate their joints.  I would say generally, yes, one could assess that people's handcuffs were tied differently.

Q.    How many protesters do you know personally that had overly tight handcuffs?

A.    I don't know any of them personally.

164

**D014**

MS. RICKETTS:  This calls for speculation, but you can answer.

THE WITNESS:  Again, I don't know them personally, but I overheard, again, a few of us in the bus lamenting about how our handcuffs were hurting.

BY MR. EMADI:

Q.    How many people did you hear lamenting?

A.    At least two -- three to five, maybe, at the most.  I'm not entirely sure.

Q.    Did you witness any harassment personally by law enforcement towards the protesters?

A.    Towards the other protesters?  Is that what you're asking me?

Q.    Correct.

A.    Not while I was on the bus, no.

Q.    At any point did you see law enforcement harassing other protesters?

A.    Yes.  Again, when we were in line waiting for the bus, experienced and witnessed law enforcement officers harassing protesters who were waiting to get on the bus, verbally and pulling their masks off of their face and breathing and coughing into their face during the global pandemic.

Q.    How many instances of pulling the mask down did you see?

165

**D014**

trans woman so the officers were -- I was told or overheard the officers were making remarks about that and then trying to put the trans individual on to the male bus instead of the female bus because of all of that stuff.

Q.   Mr. Wells, was this individual on your bus?

A.   From what I could tell and what I heard that individual was not on my bus.

Q.   Did you speak to this individual personally?

A.   I did not see or speak to this individual personally, no.

Q.   You didn't observe any of the purported behavior that you just mentioned?

A.   That's correct.  From my memory and knowledge, this was only told to me by one of the protesters that were on the bus.

Q.   Do you know who this protester was that said this occurred?

A.   I do not know who the protester was that said that.  I do not remember what they looked like.

Q.   So this is all second-hand?  You have no way of confirming or denying it?

A.   That's correct.

Q.   What was the atmosphere on the bus like for you?

170

**D014**

A.    The atmosphere was for the most part fine.   It was -- it was stressful in the beginning.  I think initially because I had never been in that situation before.  It was reassuring and comforting to be around others in that space, especially others who had been through the process who knew what it looked like, who was able to share their experience and talk about it.

Outside of that, the experience on the bus was also strenuous.  Again, it was multiple hours, long hours and uncomfortable, cramped sitting conditions. Most of our masks were pulled off in that bus and we were all kind of crammed into the back of it in the middle of the global pandemic, which means we were all next to each other.  That part was also frightening especially living in Los Angeles, carrying the pandemic and knowing personally folks and colleagues who had died to COVID and then having that fear of potentially exposing my neighborhood or others to COVID during that time was also very stressful for me.

The seating, again, was very cramped so like it was -- it caused some, like, uncomfortability, just sitting there in the back like on my butt and stuff, but then also again, like, being there for multiple hours and not having my zip ties adjusted caused pain in my wrists, swelling in the wrists and then my hands

171

**D014**

started to shake.

Q.   Were you in any fear caused by the other protesters on your bus?

A.   I was not in any fear caused by any of the other protesters on the bus.

Q.   Were you in any fear of the law enforcement officers who were involved in the transportation?

A.   I'm sorry.  Can I just get a one minute break?  My dog just woke up and now she's barking at something.

Q.   No problem with me.

(Interruption.)

THE WITNESS:  I'm sorry.  I couldn't hear the question you were asking because of my dog barking.  Could you repeat or restate the question, please?

BY MR. EMADI:

Q.   Were you in any fear of the Sheriffs' deputies who were involved in your transportation?

A.   I didn't interact -- again, I didn't interact largely with the Sheriffs' deputies that were in charge of like moving us on the bus.  They never spoke to me while I was sitting there asking to get my zip ties either moved or adjusted.

Q.   So no, you weren't in fear?

A.   I was afraid of police generally during that

172

**D014**

REPORTER'S CERTIFICATE

I, Shelley Lynn Schniepp, Certified Shorthand Reporter in and for the State of California, Certificate No. 5487, do hereby certify as follows:

That the witness in the foregoing deposition was by me first duly sworn to testify to the truth; that the deposition was then reported by me in shorthand and transcribed, through computer-aided transcription under my direction; the foregoing deposition transcript is a true and accurate record of the witness' testimony elicited and proceedings had at said deposition.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal case, before completion of the proceedings, review of the transcript was requested.

I do further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

In witness whereof, I have hereunto set my hand this 16th day of January, 2024.

_Shelley Lynn Schniepp_

SHELLEY LYNN SCHNIEPP, CSR #5487

211

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, # 115
Culver City, CA 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhzlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL GROUP
1001Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Rebecca Brown
NATIONAL LAWYERS GUILD LOS
ANGELES
5165 ½ Santa Monica Blvd., Ste. C
Los Angeles, CA 90029
t. 860-944-5111
e. rebecca@nlg-la.org

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated, <br><br> PLAINTIFFS, <br><br> v. <br><br> COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD <br> *Assigned to: Honorable Dolly M. Gee* <br><br><br> **PLAINTIFF TRAVIS WELLS' RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

148

**D015**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.      Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1:

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

## RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring him to "state all facts" related to his allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

**May 30, 2020**

I attended a protest on or around May 30, 2020, during which I and others marched near Beverly Hills.  The protest had been peaceful and as we proceeded people came out to cheer us from balconies and their homes.

-3-

**D015**

After reaching near City Hall in Beverly Hills, I heard that the police were clamping down on protestors.  The protestors began to return eastward, toward The Grove.   As we did so I noticed that there was a line of deputies in front of us.  They appeared to be in full tactical gear, with masks, vests, batons.  Around this time I heard from other protestors that the deputies had encircled us, and were closing off the area behind us.  I felt intimidated and concerned.

At the time, it seemed as if the deputies were trying to grab protestors and pull them behind the police line.  Protestors appeared to be attempting to pull companions away as this was happening, and pushed back on the shields of officers.  At that point the deputies began hitting the protestors and firing munitions at them and launching tear gas canisters.

I saw two protestors who were shot.  I did not see them do anything to warrant being shot, and they stood at least two rows behind other protestors.  One was a man wearing a tank top who was hit on his side, and I could see the skin peeled from his side form the impact of the projectile. Another was a woman whose skin was peeled off at her shoulder form the apparent impact.  I heard them scream, and then saw the wounds.

After these shootings I heard a declaration of an unlawful assembly, and instruction that we should leave.  But it seemed as if we had nowhere to go.  The officers formed a line in front of us and I understood that they were closing in us from behind and were also armed and risked firing on and wounding protestors.  On either side of us was an apartment complex.  I was concerned that I would be injured, even though I did nothing violent toward any deputies, given what was unfolding and the way the deputies seemed to be injuring other peaceful protestors.  Other protestors were running into traffic.  I ran behind us before I could be injured, found a side street, and escaped.

**D015**

**June 3, 2020**

In the late afternoon of June 3, 2020, I arrived near the Grand Park metro station and made his way to the City Hall area, joining others who had gathered to protest the killing of George Floyd as well as local politics. The organizers had provided masks and hand sanitizers for the protestors, given the significant fears of COVID at the time. The protestors split into smaller groups, marching around City Hall, and around LAPD's headquarters. Eventually, the protestors returned to the City Hall area.

From the City Hall area, the protestors returned to sit in the grass in Grand Park. I noticed around the time that the protestors arrived at Grand Park that Los Angeles Sheriff's Department Deputies had arrived at that location. There were a very large number of deputies, wearing what appeared to be tactical vests, and not wearing face masks. The deputies eventually encircled us. In the park, the protestors conversed and chanted.

One of the deputies spoke on a megaphone. It sounded muffled to me, and because of ambient noise, including helicopter noise, I could not tell what the deputy was saying. Eventually, the LASD deputies who had encircled us began to close in on the protestors. At this point it felt like it had been about an hour since the Sheriff's deputies arrived. I understood that they intended to detain or arrest me. I was nervous and concerned about how the deputies might act.

The deputies began to arrest protestors, with one or two different deputies arresting each protestor. Two deputies zip tied my hands very tightly in plastic handcuffs, as they appeared to be doing to other protestors. One of the deputies brought another protestor to me, and I was taken to a line to get into an LASD bus.

While in line, the tightly bound zip ties began to cause me significant pain. I told deputies that the handcuffs were painfully tight. It appeared the deputies tightly handcuffed other protestors too, as many around me seemed to be saying the same thing, and pleading with the officers to loosen the zip ties. The deputies refused to

**D015**

adjust my handcuffs. I did not see the deputies assist any of the other protestors by loosening or adjusting their zip ties either.

One of the deputies, a young man, who wore no face mask was pulling down the masks of protestors and exposing their faces, and talking very close to them. It seemed designed to instill fear, and I was afraid. I was double-masked, as I was afraid of getting COVID. The deputy pulled down both of my masks. The deputy took one of them and threw it to the ground. Another of my masks was placed with my belongings. I saw this deputy remove the masks only from brown and black protestors.

The deputy indicated to us that we were doing this for attention, and if attention is what we wanted, we should have our faces made visible. He told us our protest would not make a difference.

I was eventually taken onto an LASD bus by deputies. We were packed in the back and sat shoulder to shoulder. There were also open seats at the front of the bus. Once the last of the arrestees was on the bus we attempted to spread out, but could not, as every seat was full. I did not have a mask because it had been removed from me. Throughout these interactions deputies did not wear masks. I did not see any open windows on the bus into which we were placed. On the bus, I heard a transgender protestor was not allowed to go on the bus of the gender she identified with and that she was sexually harassed. During the time I was on the bus I heard 2-3 other people ask for their zip ties to be adjusted or loosened to ease their pain, and to complain that they were too tight when deputies would step onto the bus. The deputies did not respond and left the bus.

As we sat in the bus my discomfort from the tight handcuffs increased. My hands began to swell and I began to lose feeling in them, and my thumb began to twitch. Others appeared to have similar issues, with their hands apparently going numb, swelling, and changing colors. They complained about the pain, but the deputies did not help. When I tried to adjust my arms it felt like the zip ties would

-6-

152

**D015**

get tighter, and the plastic rubbed at the skin and felt like it was chafing it.    Others appeared to be experiencing the same thing.

We sat on the bus for what felt like an hour before we began to move. We were eventually taken to a location to be processed.  Once we arrived at that location, it felt as if we were held another 1-2 hours.  We were taken off the bus one at a time in single file line.  I was told to quickly searched for my belongings, where my backpack and others' belongings had been dumped on the ground. I was processed, fingerprinted, and given a slip indicating the alleged crime for which I was arrested.  Throughout the protest I did not see any protestor engage in violence toward or threaten the safety of any police officer.

I was released some time around 4:30 AM. I went with another protestor to City Hall to help him retrieve his bike. From there, I took a metro back to my apartment, arriving at around 5:30 AM.  My hand still hurt when I returned, and I continued to have discoloration in my hands, numbness in my thumb, and twitching in my thumb that lasted for 2-3 days after the incident.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiffs claims he was zip tied so tightly that it affected the circulation in his hands causing discoloration, numbness in his thumb, and twitching that lasted for 2-3 days after. Plaintiff also suffered pain, suffering, and emotional distress as a result of the incidents he described.

-7-

153

**D015**

## VERIFICATION

I, Travis Wells, have reviewed Plaintiff's Responses to Defendant County of Los Angeles' Interrogatories, Set One, and verify that the answers are true to the best of my own knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____

Travis Wells

**D015**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,                )
                                    )
            Plaintiffs,             )
                                    )
      vs.                           )Case No. 2:20-CV-07870
                                    )         DMG-PD
                                    )
COUNTY OF LOS ANGELES, etc.,        )
et al.,                             )
                                    )
            Defendants.             )
_____)


VIDEOCONFERENCE DEPOSITION OF DIANA BARBADILLO,
VOLUME I

Los Angeles, California

Thursday, November 30, 2023


REPORTED BY:  Gina Anne George
              CSR No. 11260
JOB NO.:      290148

1

Diana Barbadillo                                                           November 30, 2023

Q    Have you ever given a statement to the Sheriff's Department about any of these protest dates?

A    No.

Q    Do you recall reviewing interrogatories or interrogatory responses in this case?

A    Awhile ago I think I may have.  I'm not completely sure, but I do believe so awhile ago.

Q    Do you recall verifying your responses under penalty of perjury?

A    Yes, but that was awhile ago.  I don't remember exactly what was in them, but I do remember having to go over them.

Q    Sure.  Without -- you know, I'm not asking you to remember everything that was in those responses, but at the time you signed your verifications and those interrogatories, was it your understanding that everything -- all the actual responses or the answers in the interrogatories were true and accurate?

A    Yes.

Q    And just to summarize some of your responses, is it accurate or is it true that you're not claiming loss of income in this case?

A    Correct.

21

**D016**

Diana Barbadillo                                                November 30, 2023

Q    And you're not claiming loss of earning capacity.

A    Correct.

Q    Okay.  And then you're claiming no medical bills.

A    Correct.

Q    And you're claiming no mental health bills.

A    Correct.

Q    Do you know any Sheriff Department personnel?

A    No.

Q    Have you ever had any conversations with any Sheriff Department personnel about any of these three protest incidents?

A    No.

Q    On the days -- let's just call the timeframe of these incidents in August and September 2020, did you wear any corrective lenses?

A    Yes, contacts.

Q    Contacts.  And what are the contact lenses for or what vision condition are they for?

A    Oh, I am nearsighted.

Q    And during August and September of 2020, were you having any issues with your vision?

A    No.

22

**D016**

attended, what capacity did you attend them?

A    Most of them as a legal observer but also some just as an -- like attending.  Yeah.

Q    And these three specific protests that are the subject of these claims in your lawsuit, is it true that you attended them in your capacity as a legal observer?

A    Yes.

Q    Of these 100 protests that you've attended as stated in your declaration, how many involve issues related to law enforcement?

A    In the last three years, I don't have an exact number.  More than half or about half.

Q    Just to clarify, so these 100 protests that you -- over 100 protests that you've attended, that has been limited to the last three years?

A    I mean, there were so many, but specifically to the last three years, it was that, but I've definitely been to some, you know, in college and other times in my life, yeah, but the majority of them were in that timeframe.

Q    And of these over 100 protests you've attended in the last three years, how many approximately were you aware that the Sheriff's Department -- Sheriff Department personnel were

46

D016

Diana Barbadillo                                                    November 30, 2023

A    In the last three years?

Q    Yeah.

A    I was injured by a rubber bullet at a protest.  I was not legal observing.  I was there at the Grove in May 2020.

Q    Do you know who fired the rubber bullet?

A    Like the specific officer?

Q    Or the agency.

A    Yes.

Q    And what agency was that?

A    LAPD.

Q    At that Grove protest in May of 2020, did you receive any other injuries?

A    No.

Q    Where were you hit by the rubber bullet?

A    My side, so my left side.

Q    And did it -- did you -- well, did you receive any medical treatment for that injury?

A    No, I just cared for it at home.

Q    Okay.  And can you describe the injury?

A    Sure.  It was a very large bruise.  It broke the skin a little bit, but mostly a bruise.

Q    And how long did that bruise last or that injury from the rubber bullet last?

A    A few weeks.

61

**D016**

Q    And did the -- how long did it take -- well, at some point did that injury resolve or heal?

A    Yes.

Q    And today do you have any long-lasting effects from in a rubber bullet strike?

A    No.

Q    Was it painful?

A    Yes, very painful.

Q    Before you used the pain scale of zero being no pain and ten being the worst pain you felt in your life, where would you rank the rubber bullet strike to your left side?

A    Seven immediately, but then it just sort of just goes down to being a very uncomfortable bruise.

Q    Then how long would you say that it was -- it remained at uncomfortable bruise?

A    Uncomfortable for at least I'd say ten days. It's just not -- yeah, about ten days or so, and then -- yeah, it just depends on the bruise.

Q    As a result of this injury did you miss any work?

A    No.

Q    What was the next injury at a protest that you remember receiving?

A    It was pepper balls were deployed right

62

**D016**

Diana Barbadillo

November 30, 2023

around me.

Q     At what location?

A     It's the Compton Sheriff's Department.  Is it Compton?  Yeah.

Q     And do you recall about when this occurred?

A     That would probably be in June or July of 2020.

Q     Were you injured by any other less lethals?

A     No.

Q     Can you describe your injuries by the pepper balls?

A     Sure.  My eyes were super watery.  Super -- I mean, that's an understatement.  They were really irritated, so I had to have them flushed out.  I couldn't see immediately, and then it just sort of triggers your sinuses, so it causes you to -- at least for me it triggered my sinuses because I was rubbing because it hurt, so I triggered my sinuses and -- so it just got very uncomfortable.  I got kind of congested.  Yeah.

Q     How long --

A     It sort of feels like there's a sensation in your nose when you inhale it.

Q     How long did the effects last -- or the effects of the pepper balls last?

63

**D016**

Diana Barbadillo                                                    November 30, 2023

A    I would say about -- maybe about 20 minutes before I could navigate myself being able to see.  My eyes were still irritated, but I was able to open them more fully after about 20 minutes.

Q    How long did it take before the effects of the pepper balls were gone?

A    Maybe about 45 minutes.  Well, I mean, I was able to function after 45 minutes, but my eyes are still going to be irritated because I wear contact lenses and that's the only way I can see and I can't take them out -- I had to -- I couldn't take them out, otherwise I can't see.

Q    So how long was it before you were back to normal after the pepper balls?

A    Maybe an hour.

Q    Was it painful?

A    Yes.

Q    In the pain scale of zero to ten, what would you rank it?

A    Eight.

Q    And how long did the eight level last?

A    About 15 minutes.

Q    And then what did it move to?

A    It moved to maybe a three.

Q    And how long did that last?

64

**D016**

Diana Barbadillo

November 30, 2023

A     Four another half hour or so or -- yeah.

Q     And then after that, what did it move to?

A     It's still on the scale, so I would say probably about a two.

Q     How long did that last?

A     Another ten minutes.

Q     Then what did it move to?

A     And eventually I got home and flushed out my eyes, and then I was irritated, but I was okay after a few hours.

Q     Did you have any lingering effects of the pepper ball injury?

A     No.

Q     So when is the next time that you were injured at a protest?

A     Let's see.  I believe it was early August. Yeah, early August, downtown L.A., LAPD.  Was it LAPD?  LAPD.

Q     And how were you injured or what were you injured by?

A     It was a -- was that LAPD?  It was the -- no, that was Sheriff's Department.  It was a beanbag gun, a little beanbag.

Q     Any other less lethal?

A     That I was struck with, no.

65

**D016**

Diana Barbadillo                                                November 30, 2023

Q    Where was it, downtown?

A    It was it was on -- oh, shoot.  What is that street?  It's right outside city hall, like the front of the facade of city hall.

Q    Oh, like in between city hall and Grand Park?

A    Yes.

MS. RICKETTS:  Ray, what time did you plan on taking lunch again?

MR. SAKAI:  Around 12:30.  Are you doing okay?

MS. RICKETTS:  Yeah, I'm -- I'm struggling.

MR. SAKAI:  Did you want to break earlier?

MS. RICKETTS:  That would be great.

MR. SAKAI:  Okay.  Perfect.  Let's break right now.  Let's come back at 1:00.  Is that okay?  1:00 or 1:10, what do you prefer?  I'll leave it to Morgan.

THE WITNESS:  Yeah.

MS. RICKETTS:  If it's okay, if we can do 30 minutes.  The sooner we can end the day the better.

MR. SAKAI:  Okay.  Great.  So we'll come back at 12:50.

MS. RICKETTS:  Okay.  Great.

66

**D016**

Diana Barbadillo                                                November 30, 2023

(Lunch recess taken.)

MR. SAKAI:  Back on the record.

Just to confirm our conversation off the record, what I'm going to do is ask limited questions about the incidents and damages with the understanding that we can reschedule the rest of this deposition at a later time.

THE WITNESS:  Okay.

BY MR. SAKAI:

Q    So let's focus on the three incidents that are subject to your claim.

A    Yes.

Q    That would be September the 5th -- excuse me -- August the 25th, September the 5th and September the 25th of 2020; is that correct?

A    Yes.

Q    Okay.  At the first protest on August the 25th, were you injured?

A    Yes.

Q    At that protest, how were you injured?

A    A stinger grenade was thrown in our direction and it detonated -- it exploded right in front of us.

Q    Were you injured in any other way?

A    No.

67

D016

Diana Barbadillo                                                     November 30, 2023

Q    How were you injured by the Stinger grenade?

A    I ended up with a bruise on my leg, on my thigh.

Q    Any other injury from that Stinger grenade?

A    No.

Q    What leg or what thigh?

A    Right thigh.

Q    And is that the -- that's the Exhibit A that you attached to one of your declarations; is that right?

A    Yes.

Q    And so can you describe how the Stinger grenade caused that bruise?

A    When it exploded, something hit my thigh. I'm assuming it would be the -- you know, the capsule or the outer part of the Stinger grenade itself.

Q    Was it painful?

A    Yes.

Q    And on the pain scale of one to ten, how would you rank it?

A    Five, six.  Six.

Q    How long did the six level last?

A    I'd say about ten minutes.  Like the pain itself emanating from there for about ten minutes and it became -- because of the placement of the bruise,

68

**D016**

Diana Barbadillo                                                    November 30, 2023

just kind of uncomfortable to walk.

Q    How long was it uncomfortable to walk?

A    For about -- it was uncomfortable generally for about 15 minutes, 20 minutes.

Q    And then how long did it take to heal or no longer have any affect on your thigh?

A    It took maybe about two days.  After that it becomes just an uncomfortable bruise.

Q    And how long did it take for the bruise to go away?

A    A few weeks I'd say.

Q    And do you have any -- today do you have any lingering symptoms of this injury?

A    No.

Q    Did you seek any medical treatment?

A    No.

Q    Other than the picture that's part of your declaration, do you have any other documentation of this injury?

A    No.  I didn't go to a hospital or a doctor or anything like that.

Q    Okay.  Then what I'll do is I'll skip over all the other questions.  I've save it for the second session specifically for this incident.

The next incident you talked about -- well,

69

**D016**

Diana Barbadillo                                                    November 30, 2023

excuse me.  The second incident that's the subject of your claims is the south L.A. protest on September the 5th, 2020; is that correct?

A      Uh-huh.

Q      Is that a yes?

A      Yes.  Sorry.  Sorry.  Yes.

Q      Were you injured at that protest?

A      Mildly, yes.

Q      How were you injured?

A      Pepper balls were deployed into the crowd, so I had to flush my eyes.

Q      Any other injuries?

A      No.

Q      Was it painful?

A      Yes.

Q      On the pain scale zero to ten, what would you rank it?

A      Because I was a little further away, it wasn't as painful as the first time I got pepper-balled, so I would say about a five.

Q      And how long did that last?

A      About -- that time it didn't last as long. Maybe about ten minutes for me to be able to -- well, after flushing my eyes, it was about ten minutes before I was able to open them and see and then maybe

70

168

**D016**

Diana Barbadillo

November 30, 2023

another ten minutes before I was able to sort of be able to walk away on my own.

Q    And how long did it take for all the symptoms to dissipated?

A    Again, it was -- I had to get home and flush out my eyes, but, again -- and take out my contacts, but after that, I would say about -- after all of that about an hour after I did all that stuff, yeah, all that flushing.

Q    And how long did it take you to get home from this location?

A    So that happened toward the end.  So just to get home from the location or after the incident?

Q    After the incident.

A    I would say about 45 minutes.

Q    So roughly would it be approximately two hours from the time that you were --

A    Yeah.

Q    -- affected?

A    Uh-huh.

Q    Okay.  So it would be --

A    Yes, two hours.  Sorry.

Q    So it would be about two hours from the time you were affected by the pepper spray until you were back to normal?

71

**D016**

Diana Barbadillo                                                    November 30, 2023

A    Yes.

Q    And did you seek any medical treatment for this injury?

A    No, not like at a facility.  I got -- somebody gave me something to flush it out while I was there.

Q    Then per our discussion off the record, I'm going to skip the rest of the questions about the specific protest and -- to cover that at a later date.

So the next protest -- or the last protest where you were injured -- or that is the subject of this -- the claims in this lawsuit was in West Hollywood on September the 25th, 2020; is that correct?

A    Yes.

Q    Were you injured at that protest?

A    No.

Q    Now have we discussed all injuries you received from the Sheriff's Department less lethals in 2020 -- well, since 2020?

A    Do you mean just in general?

Q    Specifically to you.

A    Yes.  Yes.  Yes.

Q    So in summary, there is the Stinger

72

D016

Diana Barbadillo                                                    November 30, 2023

grenade -- we'll call it a piece of it -- that hit

you on August the 25th and then -- is that a yes?

A    Yes.

Q    Okay.  And then on September the 5th there

was affects of the pepper ball --

A    Yes.

Q    -- is that correct?

A    Yes.

Q    And then on September the 25th you were not

injured.

A    Yes.

Q    As a result of any of these -- of these two

injuries or these two incidents you were injured at,

did you seek any mental healthcare?

A    Yes.

Q    And what is that?

A    I went more so just trying to find different

support groups.

Q    Okay.

A    Sorry.  Go ahead.

Q    Oh.  Did you seek any mental health care as

a result of these two incidents or two protest

injuries?

A    No, just the group.

Q    What support group was that?

73

**D016**

Diana Barbadillo                                                    November 30, 2023

A    There were just some folks that reached out to me.  Yeah.  And so one of those people -- or three of those people, they just sort of have these impromptu informal sessions where people can talk about how they feel and how -- yeah, so that was just it.  That is what I preferred.  Yeah.

Q    How long did you participate in these support groups?

A    It wasn't like I went -- like they were regular meetings or anything like that or regularly attended, but I went after each one, yeah.

Q    When is the last time you attended the support group?

A    Last year.  Yes, last year.  That would have been in June of last year, yeah.

Q    Did attending the support group help you?

A    Yes, it did.

Q    Can you describe how it helped you?

A    I just think that it was just one of those things where other people had similar stories, so hearing other people's stories were helpful.  I don't like talking about it, but I like hearing other people speak and so that is how it helps me is to hear other people's stories.

Q    So did the injuries on August the 25th and

74

D016

September the 5th cause you any mental distress?

A    What was that?

Q    Did the injuries from the less lethal -- the Sheriff Department less lethals that you received on August 25th and September the 5th, 2020 cause you any emotional distress?

A    Yes.  Yes, just had a hard time sleeping the nights of those incidents.  After the September 5th one, I took some days off from work.  Yes.

And then after the -- well, you only asked about the first two dates, right?

Q    Sure.  Let's just -- let's include all three of the protest dates.

A    Yeah, I took the first -- I couldn't really sleep after all of them.  I took days off after the September 5th incident, and then after the September 25th incident I took a day.  I didn't legal observe for a little bit.

Q    For how long?

A    It's not that long, but the time it felt like.  It was like a week but...

Q    So to the best of your recollection have you told me all the ways that attending these protests affected you emotionally?

A    Yes.

75

**D016**

Q    So how long after the -- how long did having a hard time sleeping last?

A    For the first -- for August 25th I'd say it was -- there's the night of and then the next day. September 5th, that one was probably about the same and September 25th it was about three days.

Q    After August 25th, can you explain, to your understanding, why you had a hard time sleeping after the protest?

A    First, it was physical pain and then second it was to my -- I mean, the way it really got me was that we -- at the time of the incident, I didn't know what was being thrown at me exactly, so I didn't know what was being thrown in our direction, and the explosion was very jarring for me, yeah, because it's very loud.  It was very loud, and then because it was very loud, everyone sort of panicked around me and so you get caught up in that crowd and so that whole experience was very much imprinted in my mind.

Q    And how long -- well, okay.  So after two days was your sleep back to normal?

A    At that point I think I was sleeping out of exhaustion because I hadn't been sleeping at night. Yeah.

Q    And the same questions as for September 5th,

76

D016

Page ID #:4772

Diana Barbadillo                                                    November 30, 2023

STATE OF CALIFORNIA          )
                             ) ss:
COUNTY OF ORANGE             )


          I, GINA ANNE GEORGE, do hereby certify:

          That I am a duly qualified Certified Shorthand

Reporter, in and for the State of California, holder of

certificate number 11260, which is in full force and

effect and that I am authorized to administer oaths and

affirmations;

          That the foregoing deposition testimony of the

herein named witness was taken before me at the time and

place herein set forth;

          That prior to being examined, the witness named

in the foregoing deposition, was duly sworn or affirmed

by me, to testify the truth, the whole truth, and

nothing but the truth;

          That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me, and were thereafter

transcribed under my direction and supervision;

          That the foregoing pages contain a full, true

and accurate record of the proceedings and testimony to

the best of my skill and ability;

          That prior to the completion of the foregoing

deposition, review of the transcript was not requested.

84

**D016**

Diana Barbadillo                                                    November 30, 2023

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this _3rd_ day of _January_ , _2023_ .

_____

GINA ANNE GEORGE, CSR No. 11260

85

**D016**

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Blvd. #2910
Los Angeles CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br>*Assigned to: Honorable Dolly M. Gee*<br><br>**PLAINTIFF DIANA BARBADILLO'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D017**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.      Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

I am employed at Minx Law. I have attended trainings to be a legal observer at demonstrations.  I have learned to recognize and document police tactics and use of force on demonstrators as part of this training.  I have attended at least twenty

178    -3-    **D017**

demonstrations as a legal observer for the National Lawyers Guild, which is an organization which works to advance the rights of all Americans by advocating for groups which are marginalized or oppressed, including those impacted by police violence and peaceful demonstrators whose rights are violated by law enforcement.

August 25, 2020

On August 25, 2020, I attended a peaceful demonstration in the downtown area of Los Angeles as a legal observer.  The demonstration began at 9:00 p.m., and the subject matter of the demonstration related to police violence against Anthony McClain.  There was significant LASD (Los Angeles Sheriff's Department) presence.  At all times while I was at the demonstration, I was wearing a lime green legal observer hat. I believe sheriff's deputies are aware that the hats signify the wearers are attending the demonstration as NLG-trained legal observers, rather than as participants, because I have attended demonstrations before and spoken to several deputies; they seem to know who we are and our purpose for being there.

At no time did I see any demonstrator throw anything towards a deputy, make an aggressive move towards a deputy, talk about becoming violent towards deputies, or otherwise indicate that the demonstration was anything but peaceful. At one point the group of about 75 demonstrators was traveling south on Broadway peacefully, with a plan to turn left onto Aliso Street and then continue south on Spring Street. However, the group turned around halfway down Aliso Street because there were many sheriff's deputies in their way.  Because Jill O'Neil (a fellow legal observer), Christian Monterosa (a freelance journalist who works with AP news) and I had already traveled ahead of the group to Spring to observe sheriff's presence there, we were separated.  We had to catch up to the group.  We decided it would be faster to go south on Spring, then go west on Temple to Broadway to catch up to the group that way. Upon reaching Spring and Temple, we heard sounds of some kind of less than lethal weapon being fired, so we ran up Temple towards the group.  At that

point, the deputies had their backs to us because they were in the westbound lanes facing westbound (facing the intersection).

A sheriff's deputy with two chevrons saw Jill, Christian, and I running, and directed us to go around the sheriff's deputies by using the south side of the street (the eastbound lanes). We had a short interaction with him, during which the deputy had time to read our hats, which say "National Lawyers Guild." I pointed at my hat to indicate to the deputy who we were. We were already nearly past the entire group of sheriff's deputies at this point. We followed the deputy's instructions to move to the south side of the street.

We then joined the group, which was facing east and simultaneously moving south on Broadway; demonstrators were side-stepping in order to keep their eyes on police to the east as they moved south. Jill and I were in the front of the group, or the furthest to the east, between deputies and the demonstration. Jill was positioned slightly further east, towards the deputies, about 6-10' away from me.

I went to talk to a person that was leading chants; my intent was to ask where they were planning to go next. I was standing right next to her, and both she and I, and Jill, were still facing the deputies. There were two or three demonstrators two or three feet behind us. The next group of demonstrators was about four or five feet behind them.

I saw two deputies together. They were standing in the group of deputies; as I faced them, they were further to the left within the group. One pointed at us while speaking to the other; then, the other also pointed at us before throwing something at us.

At that moment, flash bang grenades and pepper balls began to explode around us. I heard a very loud bang and then there was a lot of smoke; one flash bang grenade landed between the deputies and me, about 2-3' in front of me. The crowd began to

180      -5-                                                    D017

run away.  I ran away from all the shooting, a few yards west at first, and then south. When I finally turned around to see what was happening, I was about twenty feet south of the intersection at Temple and Broadway.  All I could see was smoke. Most of the demonstrators had gone south on Broadway to escape the explosions.

When the grenade went off, something hit me in the leg, and caused a bruise. Other demonstrators were injured as well. I learned later that a demonstrator named Joe was hit in the eye by some projectile.  Many demonstrators had to have their eyes rinsed out due to the pepper balls.  There was another person who may have been hit by a beanbag bullet (because that's what I saw on the ground afterwards).

September 5, 2020 Demonstration

On September 5, 2020, I attended a peaceful demonstration scheduled to begin at 4pm. I attended as a legal observer. The demonstration was attended by as many as about 250-300 other individuals, including several other legal observers and members of the press.  I know that they were press because a lot of them had press badges around their neck or clipped to their bags, some even had vests.  I also know a lot of them personally.  Many of them were carrying heavy equipment that was visible from the front.

At all times while I was at the demonstration, I was wearing a lime green legal observer hat.

The demonstrators had gathered in front of the sheriff's station on Imperial in the South-Central area of Los Angeles to express disapproval regarding the killing of Dijon Kizzee.  There was significant LASD (Los Angeles Sheriff's Department) presence outside the station watching the demonstration and even before it started.

LASD had erected some sort of barrier in front of (to the north of) the station, using yellow caution tape and wire.  It is similar to a slinky and appears as if it can be put

181    -6-    **D017**

up very quickly and stored in a very small space when put away; I heard it referred to as a "tactical slinky". I am not aware of how far around the station the barrier extended, but it did not extend all the way around. The deputies stood close to the station, about 75'-100' behind (to the south of) the barrier.

Imperial is a street that runs east-west. For much of the demonstration, most of the demonstrators were in the street in front of the sheriff's station. Directly south of Imperial at that location is a wide sidewalk. Directly south of the wide sidewalk is a grassy area about twice the width of the sidewalk. Directly south of the grassy area is a line of bushes. Directly south of the line of bushes is a narrower sidewalk. Directly south of the narrow sidewalk is a set of parking spaces oriented north-south. About halfway through those parking spaces, so that cars could not park in them, is where the Sheriff's Department had set up the barrier.

When I arrived, I saw a lot of deputies carrying less lethal weapons, and at times they would lift them up. I was on the west side of the station and saw one or two lift them and point their weapons in the direction of demonstrators.

I never saw anyone try to breach or go over or around the barrier. Maybe ten minutes before 6:00, I saw someone on the demonstrator's side throw a water bottle over the barrier. It landed halfway between the barrier and where the deputies were standing. Other than that, I saw nothing else thrown by the demonstrators until much later.

Around 6:00 p.m., I was right next to the barrier. I saw different folks shake the barrier for a few seconds at a time. At some point, someone was shaking it for a bit longer, like maybe thirty seconds or a minute. It was not really possible to shake the whole line of fencing because it was heavy and long. Nothing really happened in response to the shaking, although I did hear a deputy yell something that was unintelligible to me because he was so far away.

Minutes later, I heard and saw pepper balls being shot at the ground by the deputies, and I could see almost a smoke-like effect coming up from the ground as a result. I felt some of it as well, as in a tingling sensation around my nose. I heard from a number of demonstrators that a little girl might have been hit. Shortly after that, I spoke with a little girl and her mother; the little girl informed me that she had gotten pepper in her mouth. She was 7 years old and was crying. She was on roller skates and wore a rainbow skirt with glitter in her hair.

A little after 6 pm, the demonstration began to march east on Imperial towards the 110 freeway. I was a bit behind the march because I was talking to the little girl. I caught up to the front because most of the other legal observers were in the back. The march entered the 110 freeway. The highway patrol came. The march to the freeway remained peaceful the entire time and ultimately left the freeway and marched back to the sheriff's station peacefully.

Once we arrived back at the station around 8:00 p.m. I texted someone at 8:11 p.m. to say that the action was wrapping up because Black Lives Matter was performing their healing ritual, the Assata, in the street outside the sheriff's station, that concludes their actions.

I walked a circuit two or three times to observe the group. I stopped in the middle and spoke with other legal observers in the middle sidewalk area that travels north-south. I then decided to go speak to some individuals with the media that I know who were standing between the bushes and the barrier. They were closer to the bushes than to the barrier.

Jill O'Neil and I were walking towards them when suddenly we heard shooting begin. We could feel shots hitting at the ground around our feet. At first the sound was high pitched, and then a shotgun-type sound, and then explosions. We turned away, went back to the north of the bushes to the sidewalk, and ducked down to avoid the fire. I never heard a dispersal order, although later I heard the deputies

saying "failure to disperse" to the crowd. I don't believe anyone could have heard the majority of what the deputy was saying at that time.

In the beginning, all I heard were pepper balls, but by the time I got to the sidewalk, I heard flash bangs. I could see sparks and explosions. I felt a few things land around me but don't know what they were.

We retreated into the street, looked back and saw a lot of smoke and began to feel what must have been pepper spray. There was a large semi-truck parked on the north side of Imperial, and we hid behind it to escape the fire.

It was hard to breathe because I was only wearing a cloth mask, but the pepper spray did not get into my eyes much because I had goggles on. I was not hit and did not seek medical attention.

I began to try to spit in an effort to breathe better and get the pepper taste out of my mouth. I was on someone's lawn north of Imperial, and I apologized to someone who had come out of his home to see what was going on; he told me that it was okay, the pepper spray got to him too.

I heard at some point during the firing, nearly at the end of it all, that we had to disperse east on Imperial.

There were some individuals still west of the station on Imperial. I heard more firing being shot at them. I did not see this, however, and I do not know if any legal observers were present.

September 25, 2020 Demonstration

On September 25, 2020, I attended a demonstration in West Hollywood. This was a march in the name of Breonna Taylor. It started in the eastern part of West Hollywood. The crowd had gone to the sheriff's station, and then they kept going. At different

-9-
184                                                                    **D017**

points throughout the march, sheriffs would show up in riot gear blocking the march from going in certain directions. The march leaders would then be forced to take a different route. The protest went through a residential area from Hammond St. and ended up on Sunset Blvd. At that point, sheriffs were not visible, and the group started marching east, led by a large truck; the crowd lagged behind the truck by nearly a full block. But when they got to the end of the block, they were met with many sheriffs by San Vicente. The sheriffs then approached the truck as it was in front of the gas station, and arrested the driver and individuals who were using a loudspeaker. One person was trying to flee, and a sheriff's deputy began beating him with a riot shield. At this point, I was a short block away near Hildale Ave., between the truck and the group on foot. Most of the activists were still somewhat further away, between Hildale and Hammond. The deputies all had less than lethal weapons. I was with Steve Raganold; both of us were there as legal observers, wearing our green NLG legal observer hats. There were also many journalists there wearing gear that said "PRESS" on it. Austin Bassa had a vest that said "PRESS" on it. As the protester was being beaten, pepper balls were fired at us; we were standing on the northern side of Sunset a few yards east of Hildale. The pepper balls landed at our feet but we were still breathing the irritants and had to retreat around the corner of Hildale to take cover. Other journalists hid behind a van parked on the northern side of Sunset. The crowd began to disperse to the south, back down Hammond or Hildale, because deputies were approaching from the western direction. I stayed with my partner and we crossed the street to the southern side of Sunset and Hildale near a building to assess if it was possible to get closer to see who was being detained, and then we were shot at again with the pepper balls, so we left at that point.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On August 25, 2020, Plaintiff was injured in the leg by pepper balls and the ricochet of a flash bang grenade.

On September 5, 2020, Plaintiff was injured again on her legs by pepper balls and experienced pain in her eyes due to the irritants, and spent 10-15 minutes coughing due to the irritants.

On September 25, 2020, Plaintiff again experienced pain in her eyes due to the irritants, and spent 1-2 minutes coughing due to the irritants.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As to August 25 and September 5, Plaintiff Jill O'Neil, who may be contacted through counsel for Plaintiffs.

As to September 25, Steve Raganold (714) 251-0007 14861 Monroe St. Midway City, CA 92655 and Austin Bassa (714) 273-4567, 3951 Claremont St. Irvine, Ca 92614

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous as to whether it requests only recorded or documented statements, or all statements including oral and unrecorded statements, and to the extent it seeks unrecorded as well as recorded statements, it is overly broad. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney/client and/or attorney work product privileges. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Responsive documents have already been filed in this case and are in Defendants' possession.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Plaintiff sought no such treatment.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff claims no such injuries.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff incurred no such expenses.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated her for physical injuries to the same part of her body as the injuries she

D017

claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff does not claim medical damages, and therefore there are no relevant responsive providers.

**INTERROGATORY NO. 10:**

Identify any other action in which you have alleged a violation of your civil rights or other allegedly improper government action and state all facts, in reasonable detail, on which you base the allegations, including the time, place, manner, and participants in each alleged violation.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff presumes that the term "any other action" refers to a separate lawsuit filed by Plaintiff. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.*, 108 F .R.D. 328, 338-39 (N.D. Cal. 1985).Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Plaintiff is not a part of any other such action.

**INTERROGATORY NO. 11:**

Identify each occasion that you have been arrested, including the date of arrest, the arrest charges, the amount of time that you spend incarcerated, and the jurisdiction where the arrest(s) took place.

that contention interrogatories not be answered until after discovery is completed or a pre-trial conference is held).

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

    a. at times, declaring unlawful assemblies without adequate sound amplification audible enough to be heard and understood by the protesters, and without providing directions, means and opportunity to disperse before taking aggressive police action;

    b. kettling lawful demonstrators in order to arrest them without affording them an opportunity to leave, and taking aggressive police action without declaring an unlawful assembly;

    c. the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bang grenades.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not seeking damages for lost income.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985).

Plaintiff further objects to this interrogatory on the grounds that it violates the limit of 25 interrogatories set forth in FRCP 33 as the reference to each separate Request For Admission ("RFA") constitutes a separate integratory. Accordingly, Plaintiff will only respond to this interrogatory regarding the first three requests for admissions. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

With respect to RFA No.1, Plaintiff contends that she does have evidence in support of her claims; specifically, she has multiple videos of the incidents as well as text messages and social media posts evidencing the harm caused.

## VERIFICATION

I have read the below-titled documents and know their contents:

**PLAINTIFF** Diana Barbadillo **'S RESPONSES TO COUNTY OF LOS ANGELES' FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF SPECIAL INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION**

I am a Plaintiff in this action, numbered 2:20-cv-07870-DMG-PD, filed in the Central District of the United States Federal Court.  The matters stated in the foregoing documents are true and correct to the best of my knowledge except as to matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __03 / 08 / 2022__, in Los Angeles County, California.

_____

Plaintiff  Diana Barbadillo

VERIFICATION

**D017**

Doc ID: 264adcc1fa75d6b3512dd9f182f7f308cd839767

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,                    )
                                        )
          Plaintiffs,                   )
                                        )
v.                                      )   Case No.
                                        )   2:20-cv-07870-DMG-PD
                                        )
COUNTY OF LOS ANGELES,                  )
etc., et al.,                           )
                                        )
          Defendants.                   )
_____)

REMOTE VIDEOCONFERENCE DEPOSITION OF

KEYANNA BEAN

OCTOBER 26, 2023

Reported By:  Wendy Harrity
CSR No.:      11494
NDS Job No.:  289274

1

Q.   And what is her name?

A.   Massiah Smith.

Q.   Can you spell her first name for us?

A.   Sure.  M-a-s-s-i-a-h.

Q.   As a result of attending the September 5th, 2020, protest, did your daughter seek any medical or mental healthcare?

A.   Yes.

Q.   Okay.  And what was that?

A.   Treatment at Kaiser.

Q.   Okay.  Anything else?

A.   Not that I recall.

Q.   What type of treatment did she seek at Kaiser?

A.   An examination.

Q.   Okay.  Anything else?

A.   Not that I know of.

Q.   And this examination, was this a single visit?

A.   I don't remember.

Q.   Do you recall seeking any treatment for your daughter Massiah at Kaiser other than this examination after the September 5th, 2020, protest?

A.   I don't recall.

Q.   Okay.  Do you recall what the result of the examination was?

A.   I would have to refer to the medical records.

26

Keyanna Bean                                                        October 26, 2023

A.   I believe I did.

Q.   Do you know how many?

A.   I don't recall.

Q.   At least 1?

A.   I believe I did.

Q.   Okay.  But can you give me any other estimate over 1?

A.   No, I cannot.

Q.   And here in your deposition I don't want you to guess, but I am entitled to your best estimate.

Do you understand the difference between a guess and an estimate?

A.   Yes.

Q.   Okay.  So is your best estimate as you sit here today, that after September of 2020, that you attended at least one other protest, but you don't know how many others?

A.   Right.

Q.   Okay.  And the same question.  Is there any -- same question related to the previous question -- do you have any material or any source of information you can refer to as to how many protests you attended after September 2020?

A.   Not that I know of.

Q.   Okay.  Do you know any employees of the LA

29

Keyanna Bean                                                    October 26, 2023

medical reports and provide them to your counsel?

A.   Yes.

Q.   Okay.  Great.

MS. BROWN:  And Ray, I will go on the record, we will produce anything that's responsive.

MR. SAKAI:  Appreciate it.

MS. BROWN:  No problem.

BY MR. SAKAI:

Q.   Does anything stick out in your mind about these medical reports, medical or mental health reports, that relate to the 2020 protest?

A.   Do you mean medically?

Q.   Yeah.

A.   Are you asking what kind of symptoms?

Q.   Sure.  Yeah.

THE WITNESS:  Is that okay to answer?

MS. BROWN:  You can go ahead and answer.

THE WITNESS:  Okay.  My daughter was prescribed eye medication or eyedrops.  She was also prescribed some medicine for cough and encouraged to take like antihistamines, cough suppressants.

And I was also given eye -- also prescribed eyedrops.

BY MR. SAKAI:

Q.   Anything else?

35

Keyanna Bean                                                                    October 26, 2023

hair and their roller skates and skateboard and items that were in line with the request which was for folks to show up on bikes and prepare for a derby-type demonstration.

Q.   What's a derby-type demonstration?

A.   Meaning that it was a bit of a roller derby, that folks were on bikes and skateboards and roller skates.

Q.   What's the next thing you remember?

A.   My daughter in the car.

Q.   Uh-huh.

A.   And her excitement about participating in something that asks for everyone to have wheels and her speaking about everybody is going to have bikes, roller skates, wheels, roller blades, and her enthusiasm.

Q.   What's the next thing you remember?

A.   To my best recollection, we were going to a more socially distanced area that was not part of the activities, being behind the stage, away from the speakers, away from the -- most of the participants, far away from the barricade, and letting my daughter roller skate in a socially distanced quiet area.

Q.   What do you next remember?

A.   Los Angeles Sheriff's firing teargas canisters at us in our quiet, socially distanced area behind the

100

October 26, 2023

stage away from the activity.

I am sorry.  I have to turn off my alarm.

Q.  Okay.  What do you remember happening next?

A.  The smoke.  Trying to grab my child, her coughing, me coughing, trying to get her away from the smoke.  Yelling towards the Sheriff's, that there were children and to stop shooting.

Q.  What do you remember happening next?

A.  Bringing her to her dad so he could pour water on her face and in her eyes.

Q.  What do you remember happening next?

A.  Documenting what was happening, taking pictures while her dad attended to her.

Q.  Then what do you remember happening?

A.  Fellow demonstrators concerned about our safety and the violence we experienced, asking if we were okay.

Q.  Then what do you remember happening next?

A.  A reporter speaking with us.

Q.  And then what do you remember happening?

A.  Gathering our belongings and leaving.

Q.  Do you know what time you left the South LA station protest?

A.  I don't recall.

Q.  Was the light to still out, sun still out?

A.  It was in the afternoon sometime.

101

**D018**

Keyanna Bean                                                          October 26, 2023

Q.   Okay.

A.   -- that the projectiles were fired from.  And I saw which side of the barricade it landed on, which was their side.

Q.   Can you describe -- well, how many projectiles?

A.   To my recollection, there were two that hit the ground.

Q.   Can you describe the projectiles?

A.   Two objects that came from the direction of the Sheriff's who were behind their barricade in front of the station in their armored vehicles and two small projectiles that hit the ground and began to -- shooting out like gas and things.

Q.   So specifically on these two small objects, what did they look like?

A.   It happened fast.  And I had to get my daughter.  So I don't recall.

Q.   Can you give me any description of these two small objects?

A.   I cannot.

Q.   Then both of these small objects, that they were on the other side of the barrier wire towards the Sheriff's Department?

A.   They were on the Sheriff's side of the barricade.

106

the 5th, 2020?

A.   I believe for a press conference with the City.

Q.   Any other time?

A.   Possibly subsequent demonstrations.

Q.   Do you recall how many subsequent demonstrations you attended at the South LA station?

A.   I don't recall how many.

Q.   Can you explain how the smoke from the two small objects affected you?

A.   I'd say immediate, my eyes were burning. Throat was burning.  Coughing.

In the immediate, my eyes were burning, my throat was burning, and I was coughing.

Q.   Anything else?

A.   I have had problems with my face, the skin on my face, and my eyes.

And my daughter has had problems with a persistent cough and eyes, her face, and in the immediate she was also coughing, of course, her throat burning, her eyes burning.

Q.   Okay.  And then how long did the -- these complaints last?

A.   To the present day, in terms of the highest -- the skin on my face, my eyes.

My daughter has a baseline now of a persistent

113

**D018**

Keyanna Bean                                                    October 26, 2023

cough, that she takes medication.

Q.  And we will talk about your daughter next.
Let's focus on yourself.

So immediately you testified your eyes were
burning, your throat was burning, and you were coughing.

Did the smoke immediately affect you in any
other way?

A.  Not that I know of.

Q.  So how long did that, the immediate initial
eyes burning, throat burning, and coughing last?

A.  I don't recall.

Q.  More than an hour?

A.  I don't recall.

Q.  More than two hours?

A.  I don't recall.

Q.  Okay.  More than three hours?

A.  I don't recall.

Q.  More than a day?

A.  I don't recall.

Q.  More than a week?

A.  Don't recall.

Q.  More than a year?

A.  Are you asking from the coughing?

Q.  No.  I am just grouping them in.  But I could
break them down if you like.

114

Keyanna Bean                                                    October 26, 2023

How long did the burning in your eyes last?

A.   I have had problems to this day with my eyes.

Q.   And how long did the burning in your throat last?

A.   I imagine for that day, possibly longer.  But again, I don't recall.

Q.   Is -- to this day, are you experiencing burning in your throat related to this protest?

A.   I have throat tickling, coughing, to this present day.

Q.   And do you attribute that to the gas at the September 5th, 2020, protest?

A.   Yes.

Q.   Okay.  And how long did the coughing last after the initial gas that you experienced?

A.   The coughing, it was immediate.

Q.   Uh-huh.

A.   It subsided within a few minutes.

Q.   Okay.  Now have you told me all of the effects that you experienced related to the gas?

A.   I believe so.

Q.   Okay.  And then you also mentioned hives.

So can you describe the hives for me?

A.   I didn't -- I thought you did not want to hear about Massiah's injuries.

115

Keyanna Bean                                                    October 26, 2023

Q. Oh, was that -- did you experience the hives, or was that your daughter?

A. I have rashes on my face that I have experienced, but the hives are my daughter.

Q. Okay. So let's -- do you attribute the hives on your face to the gas on September the 5th, 2020?

A. Yes. I do believe that my rashes on my face -- yes, they were.

Q. And when did the hives first develop?

A. Within a year, I believe. Within the year.

Again, it was my daughter with the hives. For me, my -- it was irritation in my face. And then I don't recall the exact date, but, you know, subsequent to that, just like rashes on my face.

Q. Can you describe the hives or rashes on your face?

A. Sure. Itchy, dark spots. They peel. Feel raw. Sensitive near the eyes and other parts of my face.

Q. And how often do these hives develop?

A. I have taken medication. They have been pretty persistent.

I think the better question is when was it not on my face.

Q. Okay. So that's a better question.

116

Keyanna Bean                                                                October 26, 2023

So since the day of this incident, can you tell me approximately how long it has been in -- or how long a period of time that the rashes or hives haven't been on your face?

A.   They might subside for, you know, a few weeks and they return.

And then, you know, be present for months and then reappear -- or I'm sorry, subside and reappear.

Q.   Have you ever received treatment for any injuries from the September 5th, 2020, protest?

A.   I have sought medical treatment from a dermatologist and for my eyes.

Q.   And any other treatment?

A.   Not to my recollection.  For me, not to my recollection.

Q.   Sure.  We will talk about your daughter in a little bit.

So where did you seek dermatological care?

A.   Kaiser.

Q.   And how many times did you see a healthcare professional regarding to dermatology issues?

A.   Oh, I am sorry.  I don't -- I am forgetting cardiac -- cardiac issues in September as well.

Q.   Okay.  Let's talk about -- sure.  Let's talk about that.

117

So what do you attribute to the gas you experienced on September 5th, 2020, to cardiac issues?

A.   Increased anxiety.  Not only the anxiety, but the unwanted attention to our family and being directly targeted.

(Reporter clarification.)

THE WITNESS:  The anxiety.  I don't recall what I just said.  But being targeted and lots of anxiety.  It's affected my eyes, my skin, and I have cardiac issues that I sought medical treatment for.

BY MR. SAKAI:

Q.   Anything else related to cardiac issues from the nine -- from the September 5th, 2020, protest?

A.   Yes.  I have -- I had to have a monitor placed on my heart.  And those type of evaluations, EKG.

I visit with my cardiologist.  And Metoprolol medication and Advil -- or I am sorry, aspirin.

Q.   Anything else regarding your cardiac care?

A.   Not that I recall.

Q.   What is the -- to your understanding, what is the Metoprolol medicine for?

A.   To decrease racing heart and heart palpitations.

Q.   Have you been prescribed that medication before this day -- or September 5th, 2020?

118

Keyanna Bean                                                    October 26, 2023

A.   I believe it was recommended on a need, should I say, a consistency on how much I thought I needed it. But I didn't really need it before September 2020.

Q.   Okay.  Is -- to the best of your recollection, is this the spelling of Metoprolol, it's M-e-t-o-p-r-o-l-o-l?

A.   May I go get the container?

Q.   Sure.  I just want to make sure I have the right medication in mind.

A.   Give me one second.  Okay?

(Recess taken.)

BY MR. SAKAI:

Q.   So was the spelling of the medication correct?

A.   I don't recall how you spelled it.  But it's spelled M-e-t-o-p-r-o-l-o-l.

Q.   Okay.  And are you currently still taking that medication?

A.   Yes.

Q.   And how often and what dosage?

A.   I take it every day.  Sometimes three times a day.

Q.   Okay.

A.   I forgot to mention chest tightness, or it's like difficult to breathe.

And I had several emergency room visits

119

regarding the heart palpitations.

Q. Okay. Now have you told me everything that's related, at least for cardiac issues, stemming from the September 5th, 2020, protest?

A. Chest pain. There was chest pain.

Q. Yes. And with that, have you now told me everything that's related to heart issues from the September 5th, 2020 protest?

A. Yes. I don't know if I mentioned heart palpitations in that --

Q. Yes.

A. Okay.

Q. Other than seeking medical -- well, let me ask.

Have you sought cardiac care related to the September 5th protest?

A. Yes.

Q. And where did you seek the care from?

A. Kaiser.

Q. And did you seek it from more than one healthcare practitioner?

A. No. I have a cardiologist.

Q. Okay. And what is your cardiologist's name?

A. Daniel Sanchez.

Q. Okay. Do you recall how many times you have seen Dr. Sanchez related to the September 5th, 2020,

120

protest?

A.  I think maybe three times.  May have been more, but there was the initial visit.  The placement of the heart monitor, and the visit to read the results and, you know, go over medication, further instruction.

Then follow-ups and prescription of the Metoprolol.

Q.  Okay.  So in these approximately three visits to your cardiologist after the September 5th, 2020, protest, has he ever told you that the smoke that you experienced at the protest has led to these cardiac issues, heart issues?

A.  He -- I don't want to guess, because I don't recall exactly what he said when he did review the results of the heart monitor and go over like the EKG and the palpitations and whatnot that they saw.

And they did advise me to seek a lot more rest.

Q.  Okay.  Did -- at any time during any of your appointments with the cardiologist, did he tell you that any of these cardiac issues were related to the smoke you experienced on September the 5th, 2020?

A.  I don't recall.

Q.  Okay.  How long have you been seeing this cardiologist?

A.  I don't remember what date he became my

121

Keyanna Bean                                                                October 26, 2023

cardiologist.  I did move to Southern California.  So I had to switch cardiologists.

It's possible -- I don't know when.  I'm not sure exactly when he became my cardiologist.

Q.  At the beginning of this deposition you testified as to some longstanding cardiac issues.

Were you seeing Dr. Sanchez prior to September the 5th, 2020, for those issues?

A.  I have -- I had to have cardiac clearance for natural birth.

And so I do believe that I saw him during my pregnancy to clear me for a natural birth.

Q.  Okay.  And then what's the underlying cardiac condition that you have to receive clearance from Dr. Sanchez for?

A.  It's called Tetralogy of Fallot, T-e-t-r-a-l-o-g-o-l-y [sic], of, o-f, Fallot, F-a-l-l-o-t.

Q.  And what is your understanding of that condition?

A.  It's a congenital heart condition of -- in the form of -- it's a birth defect, pulmonary valve, aorta, thickening of the ventricle wall.  It's kind of a quadrant.

Q.  Okay.  Is it your understanding that this

122

condition is rare?

A.   I believe so.

Q.   And because of this condition, were you receiving continual cardiac care, even before this September 5th, 2020, protest?

A.   At least once a year.

Q.   Okay.

A.   I do have a -- I try to stay on a -- normally, if there is no symptoms out of, you know, the norm, then I don't really, you know, go.

Q.   Okay.  Did Dr. Sanchez in any of the post September 5th, 2020, visits, did he ever tell you that because of your underlying health condition, that, you know, the smoke or whatever you experienced would have any different or I guess any more effects than if you didn't have an underlying heart condition?

A.   I don't recall.  I don't recall.

Q.   Did Dr. Sanchez, when he told you to get more rest, did he also tell you to stay out of stressful situations?

A.   I don't recall.

Q.   Okay.  Do you recall asking him if it was okay that you continued attending protests with your condition?

A.   I don't recall.

123

Q.   Okay.  How many times after the September 5th, 2020, incident did you see a healthcare professional related to your eyes?

A.   I don't recall the exact amount of times.

Q.   Over five?

A.   Probably less than five.

Q.   Okay.  So when was the last time you had an appointment for your eyes with a medical healthcare professional?

A.   I think I got a prescription for my eyes two weeks ago.

Q.   And is the prescription the same medication that you shared with us?

A.   Yes.

Q.   Okay.  And were these healthcare professionals through Kaiser also?

A.   Yes.

Q.   Okay.  Did any of the medical healthcare professionals -- or healthcare professionals, did they tell you the issues you experienced with your eyes are related to the smoke from the September 5th, 2020, protest?

A.   I don't recall that.

Q.   Okay.  And as we sit here today, how would you classify the frequency of the itching and burning of

128

Keyanna Bean                                                                    October 26, 2023

your eyes?

A.   Daily.

Q.   And did you suffer from any similar symptoms prior to September 5th, 2020?

A.   No.

Q.   Okay.  Going back to your cardiac condition, the Tetralogy of Fallot, had you ever undergone surgeries to address that situation or that condition?

A.   Yes.

Q.   How many?

A.   Four.

Q.   Okay.  And as a result of those four surgeries, did any of your healthcare professionals put any restrictions on your physical activities?

A.   Not since the last surgery, that I can remember.

Q.   When was your last surgery?

A.   October 14, 2005.

Q.   Okay.  And after the October 14th, 2005, surgery, did -- do you recall if your healthcare professionals provided any prognosis as to your heart condition?

A.   I believe that I -- I believe that there was a recovery period.  And then I was cleared to return to normal.

129

Q. Uh-huh.

A. But I am, you know, welcome to seek professional care through Kaiser. I do take Gabapentin, as I mentioned, for pain.

Q. And that's for the persistent lingering pain related to the car accident and surgeries?

A. Yes.

Q. Okay. I am going to try to summarize my notes. Let me know if I have anything wrong.

So at the -- as a result of the September 5th, 2020, exposure to gas at the South LA protest, you had persistent daily eye irritation.

Is that correct?

A. Yes.

Q. Okay. And as a result of the protest, you have also had persistent and severe hives and rashes that continue until today?

A. Yes.

Q. And as a result of the protest, you have seen your cardiologist for approximately three times, including the administration of a monitor and some additional medication.

Is that also correct?

A. About three times. I don't want to say -- I forget the word you just used.

131

Keyanna Bean                                                    October 26, 2023

Q.   Okay.   Approximately three times?

A.   Correct.   I didn't want to say approximately.

Q.   Okay.   And then prior to this incident, you also had four surgeries for an underlying heart condition, Tetralogy of Fallot?

Is that correct?

A.   Tetralogy of Fallot.

Q.   Okay.   And that underlying heart condition is a relatively rare heart condition?

A.   Yes.

Q.   And then -- let's see.

And then even prior to this incident, you had suffered or continue to suffer continual pain related to the car accident and spinal fusion surgery we talked about.

Is that correct?

A.   You are asking if I experience continual pain subsequent to the car accident?

Q.   Yes.

A.   Yes, I do.

Q.   Okay.   And did the exposure to smoke on -- at the South LA protest on September 5th, 2020, did that make your back pain any worse or have any affect on it?

A.   I think all of the -- I'm -- I don't know how to answer that question.

132

Q.    Okay.    So have you sought medical care or medical consultations for any of the preexisting conditions and the injuries we have talked as a result of the September 5th, 2020, protest?

A.    Again, I did visit my cardiologist, who prescribed the Metoprolol.    And I did increase -- well, not increase, because I wasn't taking it before.    So I began taking the heart medication after, and aspirin daily after.

Again, the care that I was receiving for spinal injury from the -- ended with the case resolution. However, I do, through Kaiser, I do have pain medication prescribed to me.

MR. SAKAI:    I am going to share my screen again.    I am going to mark this as Exhibit No. 4.

(Defendants' Exhibit No. 4 was marked for identification.)

BY MR. SAKAI:

Q.    And that's -- looks like -- I can't tell.    I guess it's an Instagram post that I was e-mailed by your counsel's office yesterday.

Do you recognize this post?

A.    I do.

Q.    Okay.    And is -- what -- and then for the record, it's Bates stamped B0000001.    And it appears to

133

that post protest press conference, did you seek any medical healthcare?

A.  In regards to September --

Q.  The protest that you had -- or excuse me, the press conference that we have on video.

Because of what happened there with the interaction with the other two politicians or aspiring politicians, did you seek any medical care?

A.  I believe that's when I sought medical, cardiac care.  It was for all of it.

Q.  Got it.  So because of the interaction and the stress caused by the interaction with these two gentlemen, that also was why you went to the cardiologist to seek additional care.

Is that what you are saying?

A.  Yes.

Q.  Okay.  Did you seek any mental healthcare because of the September 5th, 2020, protest?

A.  Yes.

Q.  Okay.  And what mental healthcare did you seek?

A.  I spoke with a therapist.

Q.  Anything else?

A.  No.

Q.  How many -- did you speak with one therapist or a couple different therapists?

167

Keyanna Bean                                                        October 26, 2023

REPORTER'S CERTIFICATE


I, WENDY HARRITY, CSR NO. 11494, Certified

Shorthand Reporter, certify:

That the foregoing proceedings were taken before

me, at which time the witness was put under oath by me;

That the testimony of the witness, the questions

propounded, and all objections and statements made at

the time of the examination were recorded

stenographically by me and were thereafter transcribed;

stenographically by me, and were thereafter transcribed;

That the foregoing is a true and correct

transcript of my shorthand notes so taken.

I further certify that I am not a relative or

employee of any attorney of the parties, nor financially

interested in the action.

I declare under penalty of perjury under the laws

of California that the foregoing is true and correct.

Dated this 21st day of November, 2023.




_Wendy Harrity_
_____

WENDY HARRITY, CSR No. 11494



193

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, # 115
Culver City, CA 90232
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL GROUP
1001 Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FL.
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., Ste. 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

Rebecca Brown
NATIONAL LAWYERS GUILD LOS
ANGELES
5165 1⁄2 Santa Monica Blvd., Ste. C
Los Angeles, CA 90029
t. 860-944-5111
e. rebecca@nlg-la.org

Attorneys for Plaintiffs.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>PLAINTIFFS,<br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br>*Assigned to: Honorable Dolly M. Gee*<br><br>**PLAINTIFF KEYANNA BEAN'S RESPONSE TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D019**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.      Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**RESPONSE TO INTERROGATORY NO. 1:**

**June 21, 2020**

On or about June 21, 2020, Plaintiff and her family, including husband, Cliff Smith, attended a peaceful demonstration to protest the fatal shooting of Andres Guardado, an 18-year old security guard, by Defendant Deputies. At the demonstration, Plaintiff witnessed Defendant Deputies fire less lethal munitions into the crowd without provocation, so Plaintiff and most other protesters fled to their cars.

**September 5, 2020**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*,

130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On or about September 5, 2020, Plaintiff, her husband, Cliff Smith, and her daughter, Massiah, attended a derby-themed protest, hosted by Black Lives Matter-Los Angeles (BLM-LA), at the South Los Angeles Sheriff Station. BLM-LA asked attendees to ride bikes and rollerskate in the spirit of Dijon Kizzee, who had been shot by Defendant after being stopped whole riding his bike. My daughter, Massiah, who was then seven years old, wore roller skates. As attendees listened to speeches made by speakers, Plaintiff and her daughter moved to an area, behind the stage, where they could properly socially distance. Plaintiff and her family were several yards from LASD's barrier, which resembled a large yellow spiral, while Sheriffs, clad in riot gear, were even behind the barrier, closer to their station. Plaintiff and her daughter were skating, where it was quiet, away from where the sound/speakers were facing, and uneventful. Without warning, orders for dispersal or provocation, Defendant Deputies shot two tear gas munitions at the attendees. Immediately, chemical smoke erupted, causing Plaintiff and her daughter to cough uncontrollably and burning in throats and eyes. Plaintiff waved her arms over her head, yelled for the Defendant Deputies to stop, and told them that there are kids here. A Defendant Deputy responded by pointed their weapon directly at Plaintiff. Plaintiff's daughter, Massiah, clung to Plaintiff in fear after being tear-gassed. Massiah is now afraid of law enforcement and regularly asks, even now, why Defendant Deputies teargassed her.

**September 7, 2020**

On September 7, 2020, a press conference had been arranged for Plaintiff's family at the South Los Angeles Sheriff's Station. Plaintiff's seven-year-old daughter, Massiah, was afraid to go near the Sheriff's Station, so Plaintiff assured her that they were not attending a demonstration or going near any Defendant Deputies. Plaintiff explained that they would only be speaking to cameras and news stations. It took a lot

of convincing for Massiah to join Plaintiff at the press conference. Massiah did not want to speak, instead, allowing Plaintiff to recall the September 5, 2020 incident, during which Plaintiff and Massiah were tear-gassed without provocation or orders for dispersal. After hearing Plaintiff speak, Massiah decided she would speak. She began answering the questions of the reporters, when suddenly three men approached them. Those men were Joe Collins (then-congressional candidate in the 43rd District), Robert Foster (his manager), and a cameraman. They began speaking over Massiah, said "they gotta stop all this shit", and disrupted the conference. They ignored the reporters who informed them that a child was speaking and asking them to let her finish.

Robert Foster, Joe Collins' manager, began physically threatening members of the organization who arranged the press conference, looming over them, fists balled up. They demanded to know if the attendees of the press conference were from the neighborhood and District. Plaintiff informed them that her daughter had been tear-gassed and was speaking. Then Foster demanded to know if it had taken place in the 43rd District. When informed that it had, he began interrogating, in the middle of the press conference, other attendees as to where they were from. Massiah began vocally protesting the disruption, saying, "Stop and let me finish. I'm a Black girl, who was fired by tear gas! Get out!" When Plaintiff told the disruptors that they should let Massiah speak, Joe Collins demanded to know "What was the child doing here, at night?" After some verbal back and forth between Plaintiff and Collins, Defendant Deputies began advancing, in a line, from one side of the street to the other, with their munitions drawn. Plaintiff and her family fled to their vehicle. Massiah, who had been tear-gassed just 2 days before, at the same LASD station, was, once again, terrified.

**September 11, 2020**

On or about September 11, 2020 Plaintiff and her family attempted to have another press conference – this one arranged by the National Lawyer's Guild Los Angeles Chapter. Before Plaintiff or her family could begin speaking, a man began

yelling and yelled his support of Joe Collins. Plaintiff informed him that she was not there to have a political argument with him and that Massiah would speak that day. The man got physically aggressive with another attendee, who stood between him and Massiah to protect Massiah. The Joe Collins supporter shoved the man who would not let him near Massiah. The Collins supporter also physically threatened Plaintiff, yelled at Plaintiff in her face, then backed off due to the intervention of another attendee. Plaintiff and Massiah addressed the attendee and answered questions. Then, without warning, Defendant Deputies began physically assaulting attendees, pushing attendees and advancing on Plaintiff and her family. Plaintiff and her family then fled to their vehicles.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Defendant Deputies fire two chemical irritant canisters at Plaintiff and her daughter Massiah without warning. Massiah was in physical and emotional distress and required immediate first aid. Plaintiff husband, Cliff Smith, administered first aid in the forms of flushing of the eyes with water and calming. Massiah complained throughout the next day of physical discomfort. The emotional and psychological trauma is ongoing, and exhibits as fear and anxiety in the presence of police, and consistent questioning along the lines of, "Why did the police attack me? Why did they fire tear gas at me?" Discovery is ongoing and Plaintiff reserves the right to supplement this response.

D019

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff did not seek medical treatment for the injuries sustained as a result of the incident. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not making a claim for lost income and/or future earning capacity. Plaintiff did not incur any medical expenses. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

D019

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff did not incur any medical expenses. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.   Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated her for physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff did not receive any medical treatment stemming from the incident. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**D019**

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff will produce all non-privileged responsive documents in his possession, custody and control, other than those documents that Defendants already have. In addition, Plaintiffs have filed declarations from various witnesses in connection with the application for a TRO.

**INTERROGATORY NO. 16:**

If you have applied for Medicare and/or Medicaid within the past ten (10) years, identify each state, city, or other jurisdiction that provided Medicare and/or Medicaid to you.

**RESPONSE TO INTERROGATORY NO. 16:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent that it violates the right to privacy and/or doctor patient privilege and/or seeks information that is neither relevant to this action, nor reasonably calculated to lead to the discovery of admissible evidence, nor proportional to the needs of this case. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not seeking damages for medical costs in this action. Discovery is ongoing.

**INTERROGATORY NO. 17:**

If you have made a claim with any insurance carrier for physical, mental or emotional injuries within the past ten (10) years, identify each claim by date, injury, and insurance carrier.

/ / /

/ / /

**RESPONSE TO INTERROGATORY NO. 17:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify claims relating to physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff is not aware of any such claim. Discovery is ongoing.

**INTERROGATORY NO. 18:**

Identify the amount and source of all money, compensation, or payment of any kind you received from any source from the date of the incident alleged in the Complaint through and including the present in response to any complaint made regarding the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 18:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not making claims for lost wages and/or loss of future earnings.

**INTERROGATORY NO. 19:**

List every specific policy of the County of Los Angeles that you allege violated your constitutional rights in the incident alleged in your Complaint.

/ / /

/ / /

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No, Plaintiff is not seeking loss of earnings damages.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985).

**D019**

## **VERIFICATION**

I, KEYANNA BEAN, have read the following document(s):

1. Plaintiff Keyanna Bean's Responses to Defendant County of Los Angeles' Interrogatories, Set One.

I am a party to this action. The matters stated in the foregoing document(s) are true of my own knowledge, except as to those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

_Keyanna Bean_
KEYANNA BEAN

1
VERIFICATION

**D019**

Grace Ann Palmer Bryant
April 5, 2023

                    UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                            - - -

      _____
                                      )
      KRIZIA BERG, et al.,            ) Case No.
                                      )
                      Plaintiffs,     ) 2:20-cv-07870
                                      )
           vs.                        ) DMG-PD
                                      )
      COUNTY OF LOS ANGELES, etc.,    )
      et al.,                         )
                                      )
                      Defendants.     )
      _____)




                 VIDEOCONFERENCE DEPOSITION OF
                    GRACE ANN PALMER BRYANT
                    WEDNESDAY, APRIL 5, 2023



      ATKINSON-BAKER, A VERITEXT COMPANY
      (800) 288-3376



      Reported by:
           FRANCES SANDOVAL
           CSR. No. 7539
      FILE NO:  5852017

                                            Page 1

EXHIBIT D37 - 695    D020

229

Grace Ann Palmer Bryan
April 5, 2023

And I believe to the point where there -- there were four of us in the van. I stated to the other people in the van that I needed to use the restroom really badly and I was probably going to have to urinate in the van.

And I kind of checked in with them and how they felt about it. Not that it was consequential to what needed to happen, but I just wanted to be courteous, and everybody was very kind and supportive. So I went over by the door and squatted down and urinated by the door.

Q    When you said moved by the door, did you scoot over -- or were flex cuffs still on you at this point?

A    They were, but I was able to remove one hand, they were loose enough.

Q    How did you remove -- well, let rephrase. You said the cuffs were loose?

A    Yes.

Q    Okay. And how long after they were originally placed on you did you get out of the cuffs?

A    A few hours.

Q    Okay. So again, sorry, I know this is a little bit of a sensitive issue. I don't mean to seem offensive at any point, I just want to understand the

Page 223

Grace Ann Palmer Bryant
April 5, 2023

REPORTER'S CERTIFICATION


I, FRANCES SANDOVAL, CSR No. 7539, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly affirmed and that the transcript is a true record of the testimony given;

That said deposition was taken before me at the time and place therein set forth and was taken down by me stenographically and thereafter transcribed via computer-aided transcription under my direction;

I further certify that I am neither counsel for, nor related to, any party to said action, nor interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 16th day of APRIL 2023.


*Frances Sandoval*


FRANCES SANDOVAL, CSR No. 7539


Page 258

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

231

EXHIBIT D37 - 697  **D020**

Jorge Gonzalez, SBN 100799
**A PROFESSIONAL CORPORATION**
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
Tel: 626-328-3081
*e. jgonzalezlawoffice@gmail.com*

Paul Hoffman, SBN 71244
Michael D. Seplow, SBN 150183
Aidan C. McGlaze, SBN 277270
Kristina A. Harootun, SBN 308718
John Washington, SBN 315991
**SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP**
11543 W. Olympic Blvd.
Los Angeles, California 90064
Tel: 310-396-0731 | Fax: 310 399-7040
*e. hoffpaul@aol.com*
*e. mseplow@sshhzlaw.com*
*e. amcglaze@sshhzlaw.com*
*e. kharootun@sshhzlaw.com*
*e. jwashington@sshhlaw.com*

Kaveh S. Elihu, SBN 268249
Colleen M. Mullen, SBN 299059
**EMPLOYEE JUSTICE LEGAL GROUP**
1001Wilshire Boulevard,
Los Angeles, CA 90017
Tel: (213) 382-2222 | Fax: (213) 382-2230
*e: cmullen@ejlglaw.com;*
*ngarcia@ejlglaw.com*

Carolyn Y. Park SBN 229754
**LAW OFFICE OF CAROLYN PARK**
595 Lincoln Ave., Suite 200
Pasadena, CA 91103
Tel: 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas, SBN 158519
Denisse O. Gastélum, SBN 282771
**CASILLAS & ASSOCIATES**
3777 Long Beach Blvd., 3rd  Floor
Long Beach, CA 90807
Tel: 323-725-0350
*e. acasillas@casillaslegal.com*
*e. dgastelum@casillaslegal.com*

Morgan E. Ricketts, SBN 268892
**RICKETTS LAW**
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
Tel: 213-995-3935
*e. morgan@morganricketts.com*

Attorneys for Plaintiffs,

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and Does 1-10 inclusive,<br><br>   Defendants. | Case No.: 2:20-cv-07870-DMG-PD<br><br>Assigned to: *Honorable Dolly M. Gee*<br><br>**PLAINTIFF GRACE BRYANT'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

1

D021

LAist article "Lawsuit Accuses LA Sheriff's Deputies Of Abuses During Protests" by Frank Stoltze dated August 28, 2020, available at https://laist.com/news/lawsuit-la-sheriff-villanueva-deputies-abuses-george-floyd-protests.

Los Angeles Daily News article "Protesters sue Sheriff Villanueva, LA County, for alleged civil rights violations during racial justice demonstrations" by Jonah Valdez dated August 28, 2020, available at https://www.dailynews.com/2020/08/28/protesters-sue-sheriff-villanueva-la-county-for-alleged-civil-rights-violations-during-racial-justice-dem%E2%80%A6

Plaintiff's investigation is ongoing, and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Sarah Brady, LICSW, 15 Gould Ave Malden, MA 02148; (617) 286-2106

Plaintiff's investigation is ongoing, and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this

9

interrogatory to the extent it calls for an expert opinion and/or legal conclusion.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Following her arrest and having endured the threats and humiliation from LASD Officers, Plaintiff's performance at work began to suffer. In the summer of 2020, Plaintiff was working as a software engineering intern for Oracle. She was earning approximately $46/hour. Plaintiff was attending the Massachusetts Institute of Technology ("MIT"). Prior to this incident, Plaintiff had multiple conversations with her supervisor regarding obtaining a job offer as a entry level software engineer earning at least an estimated $115,000/year. However, as her work began to suffer following this incident, she did not obtain a job offer following her internship. Plaintiff also paid for therapy, the amounts of which are reflected in her therapy records. Plaintiff's treatment is ongoing. Plaintiff is unable to calculate an amount of economic injuries at this time. Plaintiff's investigation is ongoing, and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Due to the ongoing emotional distress she continued to experience following the protest, Plaintiff paid for therapy, the amounts of which are reflected in her therapy records. Plaintiff's treatment is ongoing. Plaintiff's investigation is ongoing, and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

10

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.

Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated her for physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff received treatment related to her ongoing emotional distress from Sarah Brady, LICSW, 15 Gould Ave Malden, MA 02148; (617) 286-2106. Plaintiff's investigation is ongoing, and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 10:**

Identify any other action in which you have alleged a violation of your civil rights or other allegedly improper government action and state all facts, in reasonable detail, on which you base the allegations, including the time, place, manner, and participants in each alleged violation.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff presumes that the term "any other action" refers to a separate lawsuit filed by Plaintiff. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Not applicable.

**INTERROGATORY NO. 11:**

Identify each occasion that you have been arrested, including the date of arrest, the arrest

11

responding to this interrogatory, Plaintiff is assuming that Defendant is referring to the unconstitutional policies, customs or practices of the LASD, pursuant to *Monell,* as alleged in the operative complaint.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As set forth in the operative complaint, Plaintiff contends that her rights were violated by the LASD's unconstitutional policies customs and practices, including:

1) Condoning the use of excessive force, including projectiles, chemical agents and baton strikes, against peaceful protesters,

2) failing to properly train LASD deputies regarding the proper  use of force against protesters, including so called non-lethal projectiles, including 37 mm and/or 40 mm projectiles,

3) shutting down and impeding the exercise of First Amendment activities by, *inter alia*:

    i.  taking aggressive police action without declaring an unlawful assembly;

    ii.  the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bong grenade—so as to deter persons from seeking to exercise their first amendment rights.

    iii. arresting and not releasing in the field persons charged solely with infractions or misdemeanors in violation of California law; and

    iv. unlawfully imposing on arrestees unlawful and unduly prolonged conditions of confinement for many hours – including but not limited to tight handcuffing, no bathroom access, no access to food or water, and lack of ventilation in small congregate spaces – while on buses as previously outlined.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

17

Yes.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

In the summer of 2020, Plaintiff was working as a software engineering intern for Oracle. She was earning approximately $46/hour. Plaintiff was attending the Massachusetts Institute of Technology ("MIT"). Prior to this incident, Plaintiff had multiple conversations with her supervisor regarding obtaining a job offer as an entry level software engineer earning at least an estimated $115,000/year. However, as her work began to suffer following this incident, she did not obtain a job offer following her internship.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.*, 108 F .R.D. 328, 338-39 (N.D. Cal. 1985).

Plaintiff further objects to this interrogatory on the grounds that it violates the limit of 25 interrogatories set forth in FRCP 33 as the reference to each separate Request For Admission

18

**<u>VERIFICATION</u>**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,

I have read the foregoing document entitled or described as:

**PLAINTIFF GRACE ANN BRYANT'S RESPONSES TO DEFENDANT'S**

**INTERROGATORIES - SET ONE**

**[X]**    I am a Party to this action.

[  ]    I am an [  ] Officer  [  ] Partner  [  ] a _____, of _____ a corporate or business entity party to this action and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

I am familiar with the contents of the foregoing document.  The information supplied therein is based on my own personal knowledge and/or has been supplied by my attorneys or other agents and is therefore provided as required by law.  The information contained in the foregoing document is true, except as to the matters which were provided by my attorneys or other agents, and, as to those matters, I am informed and believe that they are true.

[  ]    I am one of the attorneys of record for _____, a party to this action.  Such party is absent from the aforesaid county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am familiar with the contents of the foregoing document.  The information supplied therein is based on the party's personal knowledge and/or has been supplied by me or other agents and is therefore provided as required by law.  The information contained in the foregoing document is true, except as to the matters which were provided by the party or other agents, and, as to those matters, I am informed and believe that they are true.

**[X]**    **[FEDERAL]:** I declare under penalty of perjury that the foregoing is true and correct.

Executed on __9/19_____, 2022, at__Los Angeles_____, California.

Grace Bryant (Sep 2, 2022 00:32 PDT)

GRACE ANN BRYANT

VERIFICATION

238

**D021**

# DECLARATION OF LOAN HOANG

I, Loan Hoang, declare as follows:

1.      I am over the age of eighteen. I have personal knowledge of the following facts.

2.      I submit this declaration in support of Plaintiffs' motion for class certification in *Berg et al. v. County of Los Angeles, a municipal entity, Sheriff Alex Villanueva, and Does 1-10*, 2:20-cv-07870.

3.      I am a thirty-five-year-old who suffered physical injuries and emotional distress after Los Angeles Sheriff's Department deputies deployed tear gas on me at the May 30, 2020 protest.

4.      I attended a peaceful protest in Los Angeles on May 30, 2020. At approximately 5:30 PM, I was marching with a large crowd of protesters near Beverly Boulevard and The Grove Drive. The crowd was peaceful. I saw multiple lines of Los Angeles Sheriff's Department deputies.

5.      All of the sudden, LASD deputies began tear gassing us. I tried to run away from the tear gas down a side street. Approximately thirty people also tried to escape the tear gas by running into the side street. However, the deputies deployed tear gas into the side street where we were. I was caught inside a cloud of tear gas smoke. The smoke burned my eyes and throat and made me cough. It made it difficult to breathe. Street medics held to flush out my eyes to alleviate some of the pain and irritation.

6.      The deputies tear gassed the side streets and the neighborhood. I saw many people who were hit with tear gas. Some protesters and medics tried to help those who were hit by the tear gas by flushing their eyes.

7.      I ran away to an area where the deputies were not using tear gas on people. I then left the protest.

**DECLARATION of LOAN HOANG**                    1

239

**D022**

Doc ID: e084fff89433931c47834de34dcc8d7724e02787

8.      Being tear gassed by LASD caused me significant emotional distress.

9.      After being tear gassed by LASD, I have tried to continue to attend protests, but I am very anxious and afraid for my safety around law enforcement. I often leave demonstrations as soon as law enforcement arrives because I am afraid that they will use force on me again, similar to what I experienced on May 30, 2020.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 4___th day of __November__ 2023 in __Los Angeles_____, California.

_____

Loan Hoang

DECLARATION of LOAN HOANG                    2

240

**D022**

Doc ID: e084fff89433931c47834de34dcc8d7724e02787

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRITZIA BERG, et al.          ) Case No: 2:20-cv-07870-DMG-
                              )             PD
                              )
        Plaintiffs,           )
                              )
    vs.                       )
                              )
COUNTY OF LOS ANGELES, etc.,  )
et al.,                       )
                              )
                              )
        Defendants.           )
_____)

- NON-CONFIDENTIAL PORTIONS -

VIDEOCONFERENCE DEPOSITION OF

TAEGAN MEYER

TUESDAY, NOVEMBER 7, 2023

-oOo-

Reported by:  Liliana Rodriguez
              CSR No. 13783
Job No.:      289278

1

**D023**

Go ahead.

THE WITNESS:  I would need to review my end-of-visit summaries, yeah.

BY MR. SAKAI:

Q.  Would you need to review anything else?

A.  That is the only document that I have available myself without requesting it from Kaiser.

Q.  Can you describe what an end-of-visit summary is?

MS. MULLEN:  Calls for speculation.

Go ahead.

THE WITNESS:  After every visit with a Kaiser doctor they provide you with some degree of a summary of what care you received.

BY MR. SAKAI:

Q.  And how many end-of-visit summaries do you have that related to this incident?

MS. MULLEN:  Vague and ambiguous.  Calls for a legal conclusion and for expert opinion.

THE WITNESS:  I'm not sure the exact number. There may be one or two which are relevant.

BY MR. SAKAI:

Q.  Where do you keep those?

A.  They're stored within Kaiser, the portal system.

Q.  Do you have access to your Kaiser portal?

A.  I do.

18

D023

Taegen Meyer                                                                 November 7, 2023

Q.   When's the last time you accessed it to look at these end-of-visit summaries?

A.   With reference to the incident, approximately a year ago.

Q.   Other than these one or two end-of-visit summaries from Kaiser, do you have any other medical or mental health records that relate to your attendance at this incident?

     MS. MULLEN:   Same objection.

     THE WITNESS:   No.   Not within my immediate possession.

BY MR. SAKAI:

Q.   How about outside your immediate possession?

     MS. MULLEN:  Same objections.  Vague and ambiguous.  Calls for a legal conclusion.

     THE WITNESS:  I would have to request those documents from Kaiser.  I don't have access without submitting a request.

     MS. MULLEN:  Which I've represented has been done.

BY MR. SAKAI:

Q.   Other than Kaiser, have you sought any medical or mental health treatment because of the incident at any other location?

A.   No.

19

**D023**

A.   Yes.

Q.   About how many videos do you have?

A.   Three, two.

Q.   So of those two to three videos, where are they stored?

A.   I believe I still have them stored on my phone, and I have provided them to my lawyer.

Q.   And are these -- well, of these two to three videos, are they -- are they of the Twin Tower Men's Central Jail area of downtown?

A.   Yes.

Q.   Other than these videos, do you have any pictures of the incident?

A.   Not that I know.

Q.   Do you have any pictures of your injuries from this incident?

A.   Not -- I don't believe so.

Q.   Other than pictures, have you -- did you document your injuries from the incident in any other way?

MS. MULLEN:   Vague and ambiguous.

THE WITNESS:   I had multiple conversations with practitioners at Kaiser around these injuries, and that was the extent of my documentation.

BY MR. SAKAI:

Q.   Do you recall how many practitioners you

21

**D023**

Taegen Meyer

November 7, 2023

consulted about your injuries from this incident?

A.   Two.

Q.   Do you remember their names?

A.   I don't remember their full names.  I can locate their names pretty easily.

Q.   How can you locate their names?

A.   In my Kaiser portal.

Q.   How many visits or consultations with Kaiser did you have regarding injuries from this incident?

MS. MULLEN:  Calls for a legal and/or expert opinion.

THE WITNESS:   I had two separate conversations.

BY MR. SAKAI:

Q.   Over what period of time?

A.   Approximately one to two months.

Q.   Were these in person or through some other means?

A.   In person.

Q.   Do you recall in approximately September of 2020 signing a declaration about this incident?

A.   Yes.

Q.   Other than that declaration, do you remember making any other statements either written or oral outside of whatever you told your attorneys?  Have you made any other statements about this incident?

MS. MULLEN:  Compound.  Vague and ambiguous as to

22

**D023**

A.   Approximately between 35 and 40.

Q.   And how many protests or rallies have you attended since this incident?

A.   Somewhere between 5 and 10.

Q.   Have you ever been injured at any other protest or rally other than this incident?

MS. MULLEN:  Again, we're limiting the question to 2020 LA County.  Go ahead.

MR. SAKAI:  No limitations.  We're talking about his damages.

MS. MULLEN:  So I'll just --

MR. SAKAI:  Excuse me.  We're talking about her damages.  Apologies.

MS. MULLEN:  I'll just object on overly broad. Vague and ambiguous.  Potentially calls for legal and/or expert opinion.

You can respond if you understand it.

THE WITNESS:  That includes any damages even psychological or just any type of a damage?

BY MR. SAKAI:

Q.   Good point.  I'm going to limit this question to physical injuries.

MS. MULLEN:  Same objections.

THE WITNESS:  I've not received any physical injuries at any other protests.

30

BY MR. SAKAI:

Q. And then second related question. How about have you received any emotional damages or mental injuries as a result of attending any other protest?

MS. MULLEN: Calls for legal and/or expert opinion.

Go ahead. Also vague and ambiguous.

THE WITNESS: I would say so, yes.

BY MR. SAKAI:

Q. Can you describe them?

MS. MULLEN: Same objections.

THE WITNESS: Describe the damages?

BY MR. SAKAI:

Q. Yes.

A. Okay.

MS. MULLEN: Just to be clear, the question is not about just from this incident, correct? It's about --

MR. SAKAI: Other incidents. Other protests or rallies.

THE WITNESS: I would say other -- at other protests and rallies I have experienced I would say I had a panic attack induced by attending a nonviolent rally, and it left me debilitated for a few days.

///

31

**D023**

Taegen Meyer

November 7, 2023

BY MR. SAKAI:

Q. Anything else?

A. No.

Q. When was this protest where you experienced a panic attack?

A. Father's day in 2020.

Q. Where was the protest?

A. It was in South LA. I can't remember the exact streets.

Q. Can you describe the panic attack that you experienced at that protest?

A. I would say that it was a completely nonviolent rally organized by the father of Andres Guardado who was murdered by the police, and during our rally without warning we'd been tear gassed and had rubber bullets, like, shot at the families. And then helicopters were following us as we left the area yelling at us from the helicopters. Somebody was on the speaker. There was no way to access any way out except for just walking for miles while the helicopters were quite literally following us as just, like, individuals as we walked along yelling at us.

At some point along my multiple-mile walk away from the area while attempting to get any form of transportation out of the area I, like, lost a bit of my

32

**D023**

functioning and began just breaking down crying.  And when I got home I probably couldn't stop crying for another like four hours and just, yeah, so...

(Reporter clarification.)

THE WITNESS:  Andres Guardado.

MS. MULLEN:  Taegan, I want to check in.  Are you okay or do you need a break?

THE WITNESS:  I would appreciate just a short break.

MR. SAKAI:  Let's just finish up this line of questioning.  It's not going to be much longer.  I think it would be a better breaking point.

MS. MULLEN:  Only because you were just describing a panic attack.  I just want to make sure you're okay.

THE WITNESS:  I would appreciate a second just to grab some water.

MR. SAKAI:  Sure.  Let's go off the record.  I have roughly 11:00 o'clock, so why don't we come back, I don't know, 11:10.

MS. MULLEN:  Great.

(Off the record.)

BY MR. SAKAI:

Q.  Do you recall the location of this protest or rally we just were referring to?

33

D023

MS. MULLEN:  Asked and answered.

THE WITNESS:  Yeah.  Somewhere in South LA.  Our final stop in the rally was somewhere in Compton, I think.

BY MR. SAKAI:

Q.  Were you -- other than this emotional injury we have talked about, were you physically injured at this protest?

A.  No.

Q.  Did you ever seek any treatment for the panic attack?

A.  No.

Q.  Have you experienced -- have you ever experienced a panic attack before that day?

MS. MULLEN:  Vague and ambiguous.  Potentially calls for expert opinion.

THE WITNESS:  Yes.

BY MR. SAKAI:

Q.  Have you ever experienced a panic attack after that day?

MS. MULLEN:  Vague and ambiguous.  Same objections.

THE WITNESS:  Yes.

BY MR. SAKAI:

Q.  How many panic attacks have you experienced prior

34

D023

to this day?

MS. MULLEN:  I'll just make a standing objection to the term panic attack.  Vague and ambiguous.  Potentially calls for expert opinion.

If you understand it you can go ahead.

THE WITNESS:  And this is just in relation to anything?  Just any sort of --

BY MR. SAKAI:

Q.  Yes.

A.  Okay.  I would say somewhere from 15 to 20 maybe.

Q.  How many panic attacks have you experienced after this day?

A.  In reference to the protest I just was speaking about?

Q.  Yeah.  The South LA protest.

A.  Okay.

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  I would say anywhere from 5 to 10.

BY MR. SAKAI:

Q.  Have you ever sought any medical or mental health treatment for these panic attacks?

A.  Yes.

Q.  What kind of treatment?

MS. MULLEN:  Calls for speculation.  Vague and ambiguous.

35

**D023**

THE WITNESS:  I've seen both a therapist and a psychiatrist at different points in my life.

BY MR. SAKAI:

Q.  Are you still seeing a physical -- excuse me -- a therapist or a psychiatrist currently?

MS. MULLEN:  Compound.

THE WITNESS:  Not in this exact moment.

BY MR. SAKAI:

Q.  Currently are you -- well, when's the last time you've sought treatment from a therapist or a psychiatrist?

MS. MULLEN:  Compound.

THE WITNESS:  I most recently worked with someone who was my -- who served like as my therapist in a way. When he -- like probably a year ago in 2021, 2022.  I would like to clarify that they were not like my Kaiser therapist.  They were someone I was seeking outside of the Kaiser network who was not serving as my formal therapist.  They were not providing updates to my PCP.

BY MR. SAKAI:

Q.  Who was this?

A.  I know her first name is Martha.  I cannot remember her last name at this moment.

Q.  When you meet with Martha is it in person, is it remote or something different?

36

**D023**

(The preceding pages, 40 to 48, are designated as confidential and are bound and indexed separately.)

BY MR. SAKAI:

Q. Other than what you've just shared with us about the -- your upbringing and family relationships which led to depression, do you have any understanding today or were there any other factors that did or currently are leading to your depression?

MS. MULLEN: Vague and ambiguous specifically as to time. Also calls for expert and/or legal conclusion.

If you understand the question, Taegan.

THE WITNESS: I guess just to clarify, we're speaking about me in the present day experiencing depression, are there any other factors that contribute to it?

BY MR. SAKAI:

Q. Yes.

A. Okay. I would say yeah the events of 2020 and 2021 and experiencing both being a witness to and experiencing myself different forms of violence from police, law enforcement.

Q. Anything else?

A. That would be everything else that I named -- that's it, including what I've named before.

Q. Other than what we've talked about the incident

49

D023

that's part of this lawsuit, the downtown LA incident and then this South LA incident we've talked about, were there any other -- were there any other events regarding law enforcement that you've witnessed that have contributed to your depression?

MS. MULLEN:  Vague and ambiguous.  Calls for expert opinion.

THE WITNESS:  I wouldn't say that anything I've been witness to or experienced has contributed to depression.  I would, yeah, not to depression.  I would say it has an impact on me but just not to my depression.

BY MR. SAKAI:

Q.  What kind of impact does it have on you -- did it have on you?

A.  To my anxiety and to, like, other factors in my mental health.

Q.  What other factors?

A.  Yeah.  Anxiety, my, like, ability to -- I would say that like -- can I ask for the question to be restated just so I can get my head around it again?

Q.  Sure.  I'll just try to -- I'll try to remember it.

We talked about what did the events of 2020 and 2021, including the events that you personally

50

witnessed, contribute to your -- we were talking about

depression but you also started to talk about other

factors that were influencing or other ways it was

affecting your mental health.

    A.  Yes.

    Q.  And then I asked other than -- I think you said

anxiety -- then I asked was there anything else other

than anxiety?

        MS. MULLEN:  Just so I'm clear.  Are we talking

about distress stemming from the August 2020 protests?

        MR. SAKAI:  Right now we're talking about the

events from 2020 to 2021.

        MS. MULLEN:  So I'm going to object on vague and

ambiguous.  Calls for expert opinion.  Also just make a

belated objection.  We're seeking garden variety

emotional distress here, so he's -- so your question

should be limited to really what we're dealing with in

the protest.

        But to the extent you understand the question,

Ms. Meyer, you can answer.

        THE WITNESS:  I would just name my anxiety has

worsened and at times having experienced bouts of, like,

dissociation.

BY MR. SAKAI:

    Q.  Anything else?

51

D023

A.   That is all I can think of in this moment.

Q.   Okay.  So what you are referring to -- this is generally referring to what you've experienced following what you've witnessed in 2020 and 2021.  I'm going to ask specifically as a result of this incident in this case August 25, 2020, did you experience any effect on your mental health?

A.   Just to clarify.  What I just answered was inclusive of this incident just in general, and this is a more specific question about this incident?

Q.   Thank you for clarifying.  I'll have follow-up questions on that.

So when you refer to anxiety as a result of attending the incident protest, what are you referring to?

A.   Yeah.  I'm referring to after being present in this incident I experienced, like, an extreme, like, extremely debilitating anxiety which made it such that I felt uncomfortable leaving my home for at least two days.  I lived in the westside of LA at the time and helicopters, passenger helicopters and private helicopters were constantly flying around just regularly as air travel does.  But that would flare up my anxiety immensely and make it such that I felt uncomfortable just with my window open and being able to even hear

52

D023

helicopters brought me to a sense of just, like, debilitation for probably three days, four days after the incident. I just couldn't even handle that sound.

Q. And do you mean -- do you have any other example or explanation of the anxiety from -- as a result of attending the incident protest?

A. Yeah. I apologize. There's construction at a nearby office, so there may be background noise.

I would name being able to just process information was just completely difficult for me in the days following the incident. Seeing any type of red and blue light together just for the days following was an anxiety trigger for me and made it, again, the sense of I can't walk, I can't talk, I can't think. Just frozen for a moment and not even fully present in my own body. Yeah. I think that would be the examples that come to mind immediately.

Q. Anything else you could think of?

A. Nothing I can think of at this time.

Q. Okay. In the last example you referred to a dissociation from what you were experiencing in your body. Is that also what you were referring to when we were going through what the effects of the overall attending these protests are?

A. Yes.

53

**D023**

that a result of this specific incident or is it a result of attending and witnessing the events of 2020 and 2021 overall?

MS. MULLEN:  Vague and ambiguous.  Calls for expert opinion.

Go ahead.

THE WITNESS:  What I just discussed in reference to dissociation was in reference to the specific incident.

BY MR. SAKAI:

Q.  Okay.  Do you have any other description of dissociation you've experienced as a result of attending this incident?

A.  Okay.  As a result of this incident the dissociation began that night just from dissociating, quite literally.  Like I couldn't enter my home for a moment.  I just sat on my patio and I don't know how much time passed.  It was probably two or three hours and in the cold of the night, and I could not move.  I was close enough to home for me to just completely not be able to process anymore.  It was this line of I felt close enough to home where I was safe enough, so I just lost my mind for a second and I couldn't process anything.  That continued for a few days.

The sound of helicopters causing some degree of

55

**D023**

dissociation continued for at least a month after that incident. And then since that period of time I have on occasion experienced some degree of dissociation when either just being witness to police interactions with general public members, whatever those interactions may look like or in, again, with the helicopters. Like sometimes hearing the helicopters where it just brings me to a standstill and I cannot process anything and I cannot move or think, and I just kind of stand there for a little bit of time until I can collect myself.

Q. Now have you told me everything that you attribute at least mental or emotional injuries you received from attending the August 25, 2020, protest?

MS. MULLEN: Calls for expert opinion, legal conclusion.

THE WITNESS: I've named everything that I can think of in this moment at least.

BY MR. SAKAI:

Q. Have you ever sought treatment for your anxiety from this incident?

MS. MULLEN: I believe that was asked and answered.

THE WITNESS: I have sought some degree of treatment, yes.

///

56

BY MR. SAKAI:

Q. Okay. And have you ever sought treatment for the dissociation you've just told us about from the August 25, 2020, protest?

A. I've had conversations with practitioners about it.

Q. So what is the mental health care that you've sought for the anxiety from this protest?

MS. MULLEN: I believe that's both asked and answered. Potentially calls for expert opinion.

Go ahead.

THE WITNESS: Yeah. I've had at least one conversation with my primary care provider and then another conversation with another Kaiser doctor who provides services to me who advised against any type of, like, anxiety medication at that time that would be -- what's the word I'm looking for? -- like potentially harmful in the long term. They didn't want me to take any benzos or anything like that and recommended that I, like, seek talk therapy through some of what I was experiencing. I didn't go through the Kaiser system in seeking that just as a result of past experiences and utilizing Kaiser for therapy services. And so I went out of network and ended up receiving coaching from someone who is licensed as a mental health practitioner

57

**D023**

but was not providing me those services at that time and was providing me coaching services which supported my recovery in many ways.

Q.   I just want to clarify some of your response.

A.   Yeah.

Q.   At the beginning it sounded like you were listing different people who you consulted, and I just want to make sure I have this written down right.

A.   Okay.

Q.   It sounds like you consulted with your mother.

A.   No.  I said my primary care.

MS. MULLEN:  Misstates testimony.

BY MR. SAKAI:

Q.   I'm sorry, I couldn't hear you.

A.   Sorry.  My primary care provider.

Q.   Did you mention anything about your mother?

A.   No.

Q.   Okay.

A.   No.

Q.   So primary care provider.  And this is your primary care provider over at Kaiser?

A.   Yes.

Q.   And then that person was the person that advised you against the -- some psych meds and referred or recommended talk therapy; is that right?

58

**D023**

as that particularly stemming from this incident, but I did discuss my dissociation with my -- the practitioner who serves as my endocrinologist that also is a provider in another department.

Q.  Anyone else?

A.  To the best of my knowledge that's all.

Q.  What, if anything, did the endocrinologist tell you about what you told her?

A.  The best I remember -- I mean, she had raised some concerns about -- if I could restate that.

We were discussing it because I was going through hormone therapy at the time and that had a large impact on someone's emotions just generally.  It -- kind of general mood swings, and I was seeking access to, like, expand my range of options in utilizing HRT, and she had named some concerns having heard what my experiences had been and knowing what I -- knowing where my mental health was, was expressing concerns about, like, expanding what care I was receiving around hormone replacement therapy.

Q.  And did she tell you anything else?

A.  Not that I can remember in that moment.

Q.  Okay.

A.  At least very specifically.

MS. MULLEN:  Sorry.  I just -- I have to sign a

63

**D023**

BY MR. SAKAI:

Q. And I'll ask the deponent. Any questions I ask you about hormone replacement therapy, if you get the instructions from your attorney I'm assuming you would take her advice and refuse to answer my questions; is that correct?

A. Yes.

Q. Okay. How long after the incident did the anxiety that you experienced because of the incident resolve?

MS. MULLEN: Vague and ambiguous. Potentially calls for expert opinion.

Go ahead.

THE WITNESS: I would say the bulk of that anxiety resolved over the course of a year and a half following.

BY MR. SAKAI:

Q. And by that I assume that as we sit here today you are no longer experiencing that anxiety from the incident?

MS. MULLEN: Misstates prior testimony.

THE WITNESS: I would say there's a degree to which I experience that anxiety, but it has resolved in large part.

///

67

D023

(Off the record.)

BY MR. SAKAI:

Q.  Your counsel let me know you would like to clarify something.

A.  Yeah.  I just wanted to clarify that I, to my recollection have not received or sent any text messages outside of what was previously discussed between me and Colleen.

MS. MULLEN:  Colleen the friend.  Not Colleen the attorney.

THE WITNESS:  Yes.  Colleen the friend. Otherwise known as CJ.

BY MR. SAKAI:

Q.  Okay.  Tell us how you were injured on the day of the incident.

A.  I'm sorry.  I didn't hear that question.

Q.  Sure.  Tell us how you were injured on the day of the incident.

A.  Yes.

MS. MULLEN:  Physically injured?

MR. SAKAI:  Yes.

MS. MULLEN:  Vague and ambiguous -- physical injury.  Okay.  Go ahead.

THE WITNESS:  Okay.  I breathed in tear gas, and I was shot with a rubber bullet on my thigh above my

80

D023

knee.

BY MR. SAKAI:

Q.   Any other physical injuries?

A.   No other physical injuries.

Q.   For the rubber bullet, what side of the body did it hit you on?

A.   On my right thigh.

Q.   Prior to this incident have you ever been exposed to tear gas?

A.   I have been present while tear gas was fired, but I have not breathed it in.

Q.   Had you been at any other protests where tear gas -- well, let me ask.  How many other protests had you been at where you had seen tear gas being used?

A.   Two or three.

Q.   And at those two or three other protests you had -- even though you saw tear gas used, you never were exposed to it or breathed into it -- well, let me ask.

     Those two or three other protests, is it accurate to say that the tear gas that you saw being used didn't affect you in any way?

A.   Yes.

Q.   Can you explain how did the tear gas affect you on the day of the incident?

A.   I had extreme difficulty breathing initially and

81

**D023**

a cough that continued throughout the following days.

Q. So when you were first exposed to the tear gas, what did you experience?

A. Extreme difficulty breathing. I attempted to cover my mouth, but it still seeped through any cloth that I had on me. Very -- just difficulty breathing, hard to get air in, coughing.

Q. Did it have any other effect on you other than what you've just told us?

A. No physical effect.

Q. How long did the difficulty breathing last?

A. Probably two hours.

Q. And how long did the coughing last?

A. I would say two weeks.

Q. And how long did it take for any effect of the tear gas to wear off? Well, that's a bad question.

How long after the incident did it take you to not be affected by the tear gas?

A. I think I regained the full ability to, like, breath in and out without any impediment about two to three weeks after the incident.

Q. Previously we talked a little bit about the health care you received. I'm going to ask some more specific questions. Did you receive any specific treatment for your -- for the tear gas exposure on the

82

D023

day of the incident?

A. I did not receive specific treatment for the tear gas exposure.

Q. So in this two -- in the two to three weeks that it took for the effects of the tear gas to wear off, did that happen, you know, on its own without any treatment?

A. I had over the counter --

MS. MULLEN: I was just going to say vague and ambiguous as to treatment.

Sorry. Go ahead.

THE WITNESS: Yeah. I had some over-the-counter medication that I had taken to support with my just difficulty breathing and my cough.

BY MR. SAKAI:

Q. Anything else?

A. That was the extent of my specific treatment for the tear gas.

Q. And what was the over-the-counter medication that you took?

A. I don't remember the exact name of the medication but a combination of cough suppressant syrup and cough drops.

Q. How do you know what object hit you in the right thigh?

A. I saw it on the floor after it hit me.

83

D023

that there were multiple sheriffs there.

Q.   What happened after you were hit by this object?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  One of the street medics who was on the ground checked in with me and inquired as to if I was too hurt and needed further assistance.  I expressed that I was going to step back as I was trying to, like, get further from where the firing of other rubber bullets was taking place.  The tear gas was spreading, so attempting to move away from that area slowly and eventually was able to find a route to exit the protest.

BY MR. SAKAI:

Q.   Describe the -- can you describe with a little bit more specificity where on the body you were hit by the rubber cylinder?

A.   Yeah.  Above my knee a few inches or so on the inside of my thigh.  Is that enough of a description?

Q.   Yes.

Did you photograph this injury in any way?

A.   I did not.

Q.   Can you describe what it felt like when you were first hit with this object?

A.   It was a stinging feeling.

Q.   Anything else?

A.   Not immediately but maybe 20 or so minutes after

85

D023

Taegen Meyer                                                          November 7, 2023

it was a bit of soreness and sensitivity.

Q.   Anything else?

A.   As far as the feeling of being hit, right?

Q.   Yes.

A.   That's how I would describe the feeling of being hit.

Q.   So how long did it take for any effect of being hit by that cylinder to go away?

A.   I would say two to three days the soreness maybe extended a bit beyond that.  Like a few days.

Q.   So can you give an estimate by how many days you no longer felt any effect of this cylinder hitting you?

A.   Yeah.  Like four to five days.

Q.   If you're familiar with the pain scales zero being no pain at all 10 being the most excruciating pain you've ever experienced, where would you describe the sensation of first being hit with the rubber bullet?

A.   Between a 4 and a 5.

Q.   And then by the next -- when did that 4 to 5 start lowering down to a 3, 2?

A.   Yeah.  I would say upon initially being hit was probably 4 or 5.  About 20 or so minutes after the pain did increase ever so slightly and became a 5 to 6.

Q.   Okay.

A.   And then over the course of two to three days the

86

**D023**

pain went down to about a 2.

Q. Did it leave any mark?

A. There was some slight bruising at the time.

Q. And how long did that bruising last?

A. Four to five days.

Q. Today do you have any marks at that location based on --

A. No.

Q. Okay. Did you do anything to treat yourself for this bruising?

A. I had a balm that was given to me by a friend that I used.

Q. Anything else?

A. That was it and when necessary a pain pill, but I think I took one like once, Tylenol.

Q. We did take about -- well, let's just see.

Previously we talked about emotional stress, you know, mental injuries received on this day. Is there anything else that -- well, I just want to make sure that when we were talking about that it was in your mind we were talking about the emotional distress received from this day, this incident.

MS. MULLEN: Vague and ambiguous, but go ahead.

BY MR. SAKAI:

Q. Specifically because in that prior discussion

87

**D023**

BY MR. SAKAI:

Q. You were at the protest; is that right?

A. Yes.

Q. Okay. If someone were to ask, "Hey, how would you describe the crowd?" what would your response be?

MS. MULLEN: Vague and ambiguous.

Go ahead.

THE WITNESS: I would say energized.

BY MR. SAKAI:

Q. Any other description?

A. That's all I can think of in this moment. Maybe -- no, yeah, that's it.

Q. Prior to the sheriff's department deploying their less lethals, including the rubber bullets and the tear gas, did you hear any metal hit the ground?

A. No.

Q. Prior to the sheriff's deploying their less lethals, did you see anything in the protest group that you considered possibly threatening?

A. No.

MS. MULLEN: Vague and ambiguous.

BY MR. SAKAI:

Q. At the moment that you were hit with the -- well, let me ask this first. What's the sequence in the tear gas and the rubber bullets? Which was first?

101

**D023**

Taegen Meyer                                                    November 7, 2023

A.   The tear gas.

Q.   And then how long after you perceived the tear gas or the tear gas started to have an effect on you were you hit with a rubber bullet?

A.   How long was I hit with the rubber bullets?

Q.   No.  How long after you perceived the tear gas and it was affecting you were you hit with the rubber bullet?

A.   Oh.  Within 5 to 10 minutes.

Q.   So between the time that you first -- the tear gas first affected you and the time you were hit by the rubber bullet, what were you doing?

A.   I was using the umbrella which was handed to me.

Q.   Anything else?

A.   Slowly walking back.

Q.   Anything else?

A.   No.

Q.   When you say that you were using the umbrella, what do you mean by that?

A.   Very shortly after the tear gas was deployed rubber bullets were being fired.  And so some bulk of us, not all of the protesters, began to attempt to deflect the rubber bullets so that some could at least try and find an exit from the location.

Q.   Do you know if you were able to deflect any of

102

**D023**

the projectiles with your umbrella?

A.   Yes.

Q.   About how many?

A.   Personally, like one or two.

Q.   At the time the sheriff's department first deployed their less lethals on the day of the incident, what were you focusing on?

MS. MULLEN:   Vague and ambiguous.   Assumes facts.

THE WITNESS:   That's including the tear gas, right?

BY MR. SAKAI:

Q.   Yes.

A.   Okay.   When the tear gas was initially deployed my attention immediately became deflecting any potential projectiles which may follow and ensuring that people could safely leave the area.

Q.   So let's just wined it back a little bit.   When you first perceived that the sheriff's department were firing their less lethals, what were you looking at?

A.   Oh.   We were right next to the park across from City Hall.   I forget what it's called.   I was looking at something over there, like a parking lot or something.

Q.   Do you recall at what location in the group of protesters you were at?   For instance, were you at the front of the protesters where they were walking or were

103

**D023**

Taegen Meyer

November 7, 2023

you at the back, somewhere in the middle?

A.   At the time when the less lethals were deployed?

Q.   Yes.

A.   I was somewhat in the middle of things.

Q.   Did you see any of the protesters attempt to pick up any of the projectiles, including the tear gas, and throw them back at the sheriff's deputies?

A.   No.

MS. MULLEN:  Assumes facts.  Compound.

MR. SAKAI:  I'm going to share a Google overhead. It pretty much looks like a magnified version of the map that was in exhibit number -- I guess that was Exhibit Number 2 or Exhibit Number 1.  So this is a Google aerial.

MS. MULLEN:  Counsel, you're showing your desktop.

MR. SAKAI:  That would be my to-dos.  That's not going to help anybody, not even me.  Here it goes hopefully.  There it is.  I'm going to mark this as Exhibit Number 7.  It's a Google aerial.

(Exhibit 7 marked.)

BY MR. SAKAI:

Q.   I'm going to move in a little bit on the inner section of Broadway and Temple.  Can you identify where you were located when you were first exposed to the tear

104

**D023**

gas?

A.   Yeah.   Around the -- at least as I would describe it in this image where the BR in North Broadway is to the, like, south of that intersection if you could, yes.

Q.   Do you see the pencil?

A.   Yes.

Q.   Okay.   So in this area?

A.   Yeah.   Around that area.

Q.   So I'm just generally going to draw a blue circle over the BR.   And -- okay.   So for the record, it is -- I'm going to represent that the top of the map is north and then the left of the map is west.   So what we're looking at here is on North Broadway south of Temple Street.   Is that the location you're indicating?

A.   Yes.

Q.   Okay.

A.   Can I ask a clarifying question?

Q.   Sure.

A.   This is specifically in reference to when I inhaled tear gas or was affected by it?

Q.   That's right.   Exactly.

A.   Okay.   Yes.

Q.   What location were you at when you were hit by the rubber bullet?

A.   That's not on screen.

105

**D023**

Q.   Okay.  What I'm going to do is I'm going to save this as Exhibit Number 8A.  Apologies for my slow computer.

(Exhibit 8A marked.)

BY MR. SAKAI:

Q.   In the time between your exposure to the gas and when you were hit by the rubber bullet, that was the approximately 5 to 10-minute time length that we talked about before?

A.   Yes.

Q.   Okay.  You talked -- you testified about the effect of the tear gas on you.  So when you were first exposed to it, did you continue -- did you continue traveling down south on North Broadway or did you do something else?

MS. MULLEN:  Vague and ambiguous.

Also if it helps you to have the map to refer to, you can let him know.

THE WITNESS:  It may help depending on what other questions are going to be asked, but I can answer this one.

MR. SAKAI:  I don't have too many specific questions.

THE WITNESS:  Yeah.  So the question is when I was initially exposed to the tear gas, what did I do?

111

**D023**

BY MR. SAKAI:

Q. Yeah.

A. I was holding an umbrella and very slowly walking backwards which was in the direction as you described moving south on Broadway.

Q. Between the time you were first exposed to the tear gas and when you were struck by the rubber bullet, were you doing anything other than walking from -- walking on the street towards the First Street location?

A. No. Just as previously stated, holding an umbrella attempting to deflect rubber bullets.

Q. At any point during this time did you have any communication with any deputies?

A. No.

Q. And during this time did you have any communication with your roommate?

A. Not until after I had been hit by a rubber bullet.

Q. Was your roommate, Juliana, was she injured in any way that you know of?

A. No.

Q. Was Juliana, to your knowledge, exposed to the tear gas?

A. I'm not sure to what degree, but I believe so.

Q. Did you ever talk to her after this incident

112

D023

A.   I was self-employed.  I was not employed by a firm.

Q.   And what were you self-employed doing?

A.   As an artist, and I also offered some creative coaching to other artists and small nonprofits in that space.

Q.   And prior to this incident, let's just say in the three months prior, approximately how many hours a week were you working?

A.   I would say 20 to 25.

Q.   And how about after -- well, as a result of the injuries you sustained because of this incident, did it affect your ability to take jobs?

A.   Yes.

Q.   Can you explain?  How did it affect your ability to take jobs?

A.   I would say when it comes to my self-employed laboring I was unable to just produce work for at least two weeks after the incident and did not take on any additional, like, contract work that was offered to me. Like, I was unable to take on that work for at least a month to two months after this incident.

Q.   Do you have an estimate of how much income you lost during this time?

MS. MULLEN:  Potentially calls for an expert

126

**D023**

and/or legal conclusion.

THE WITNESS:  My estimate would be between 6- to $8,000 over the course of the two months following this incident.

BY MR. SAKAI:

Q.  6- to 8,000 over two months?

A.  Over that three months.

Q.  Three months.  Okay.

Did you keep records of any jobs that you had to turn down because of the injuries?

A.  I don't have any records immediately available to me.

Q.  Just by -- like by calculation, do you have a typical hourly fee that you would charge for these jobs or is it something else per project or...?

A.  I see what you're saying.  At the time?

Q.  Yes, at the time.

A.  My rate at that time was dependant on the client. So if I was working with an individual I would charge slightly less than if I was working with an organization.

Q.  Can you give me an approximate range from low to high?

A.  Just all encompassing?

Q.  Yes.

127

D023

STATE OF CALIFORNIA      )
                         )
COUNTY OF FRESNO         )


        I, Liliana Rodriguez, do hereby certify:


        That I am a duly qualified Certified Shorthand

Reporter, in and for the State of California, holder of

certificate number 13783, which is in full force and

effect and that I am authorized to administer oaths and

affirmations,

        That the foregoing deposition testimony of the

herein named witness was taken before me at the time and

place herein set forth;

        That prior to being examined, the witness named

in the foregoing deposition, was duly sworn or affirmed

by me, to testify the truth, the whole truth, and

nothing but the truth;

        That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me, and were thereafter

transcribed under my direction and supervision;

        That the foregoing pages contain a full, true and

accurate record of the proceedings and testimony to the

best of my skill and ability;

        That pursuant to Federal Rule 30(e), transcript

140

**D023**

review was requested.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this_____20th_____ day of___November___,___2023___.

_____

LILIANA RODRIGUEZ, CSR No. 13783

141

**D023**

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd., #115
Culver City, CA 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Colleen M. Mullen SBN 299059
Employee Justice Legal Group
1101 Wilshire Blvd.
Los Angeles, CA 90017
t. (213) 382-2222
e. cmullen@ejlglaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>PLAINTIFFS,<br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br>*Assigned to: Honorable Dolly M. Gee*<br><br>**PLAINTIFF TAEGEN MEYER's RESPONSE DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D024**

admissible; (b) a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.    Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On or about August 25, 2020, Plaintiff attended a march in protest of the killings of Jacob Blake and Anthony McClain. Plaintiff met other protestors at Los

Angeles City Hall at approximately 8:30pm or shortly thereafter. Plaintiff did not witness any protestors destroy property, throw anything, or, in any way, threaten violence while the protestors initially congregated at City Hall at this time.

At approximately 9:30 pm or shortly thereafter, Plaintiff joined other protestors begin to march to the Twin Towers Correctional Facility ("Twin Towers"), located at 450 Bauchet Street, Los Angeles, CA 90012, the pre-determined destination for the march. From City Hall, the march proceeded along Main Street toward Temple Street and then turned right on Cesar Chavez Avenue. The protestors then turned on Vignes Street and marched to Twin Towers. Plaintiff did not see any protestors destroy any property and/or threaten violence during the march to the Twin Towers. The protest was peaceful. Plaintiff did not hear any law enforcement agency declare the protest to be unlawful at this point.

Plaintiff, along with other protestors, chanted, danced, and listened to speakers outside of Twin Towers for approximately one hour. Plaintiff did not witness any protestors threaten any violence at this time. The protest was peaceful. Plaintiff did not hear any law enforcement agent declare the assembly to be unlawful or issue a dispersal. Nonetheless, Plaintiff then witnessed LASD officers begin to push protestors gradually back away from Twin Towers, forcing the protestors back along Bauchet Street.

On information and belief, the Los Angeles Police Department ("LAPD") used vehicles to block the pathway of the protestors, preventing the protestors from using the same route to return to City Hall.

Eventually, the protestors were forced to proceed to Broadway Street. On information and belief, Defendants trailed behind the protestors as the protestors marched down Broadway Street while also preventing the protestors to turn on Temple. The protestors then had no other option to proceed down Broadway toward First Street.

//

-4-

284    **D024**

While on Broadway between approximately First and Temple in or around Grand Park, Defendants then shot tear gas and rubber bullets indiscriminately into the crowd. At this juncture, Plaintiff did not witness any protestors threaten violence, destroy property, or throw anything at the law enforcement officers to prompt the use of force against the crowd. Plaintiff did not hear any warning prior to Defendants' use of force. Similarly, Plaintiff did not hear Defendants make any dispersal orders or declarations that the assembly was unlawful. Helicopters flew overhead, but Plaintiff does not recall hearing any announcements made via loudspeaker from the helicopters.

Plaintiff was at the front line of the protest when Defendants began shooting tear gas and foam and/or rubber bullets into the crowd. Plaintiff was hit with what is believed to be a foam and/or rubber bullet in her thigh. Plaintiff was exposed to and inhaled tear gas, which caused Plaintiff's eyes to burn and tear up. Plaintiff had difficulty breathing as she could not stop coughing.

After Defendants used force against the unsuspecting protestors, the protestors attempted to disperse and return to City Hall. Plaintiff was able to escape from the use of force by running down First Street, toward the LAPD headquarters.

As a result of Defendants' use of force, Plaintiff suffered from a severe contusion on her thigh where she was hit by a rubber and/or foam bullet. This injury caused Plaintiff pain for several days following the protest. Plaintiff also experienced teary and burning eyes from the tear gas until another protestor assisted Plaintiff with flushing out her eyes. Plaintiff continued to cough for several hours following the protest. Plaintiff also experienced other lingering respiratory issues and had difficulty breathing for several days after the protest as a result of the exposure to tear gas. Plaintiff experienced increase stress, anxiety, anguish, and fear as a result of Defendants' actions. Plaintiff had difficulty engaging with her social and professional networks due to the increased stress and anxiety she experienced following the protest. Plaintiff's emotional distress is ongoing.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff objects that the request calls for an expert opinion and/or legal conclusion. Plaintiff objects that the Interrogatory calls for information that is equally, if not exclusively, available to Defendants. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As a result of Defendants' use of force, Plaintiff suffered from a severe contusion on her thigh where she was hit by a rubber and/or foam bullet. This injury caused Plaintiff pain for several days following the protest. Plaintiff also experienced teary and burning eyes from the tear gas until another protestor assisted Plaintiff with flushing out her eyes. Plaintiff continued to cough for several hours following the protest. Plaintiff also experienced other lingering respiratory issues and had difficulty breathing for several days after the protest as a result of the exposure to tear gas. Plaintiff experienced increase stress, anxiety, anguish, and fear as a result of Defendants' actions. Plaintiff had difficulty engaging with her social and professional networks due to the increased stress and anxiety she experienced following the protest. Plaintiff's emotional distress is ongoing.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**D024**

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff received treatment related to her ongoing emotional distress at the Kaiser West Los Angeles Medical Center, located at 6041 Cadillac Ave., Los Angeles, CA 90034. The identities of Plaintiff's treating physicians are available in Plaintiff's medical records.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert

opinion and/or legal conclusion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Due to the ongoing emotional distress she continued to experience following the protest, Plaintiff turned down multiple job opportunities between September through November 2020. The exact amount of which is yet to be calculated. Plaintiff's medical injuries are ongoing; thus, Plaintiff is unable to provide a specific amount of medical bills incurred as a result of her injuries.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff's medical injuries are ongoing; thus, Plaintiff is unable to provide a specific amount of medical bills incurred as a result of her injuries. Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

*Webber Group, Inc.,* 168 F.R.D. 448, 450 (D. Conn. 1996); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985); Fed. R. Civ. 33(c) (court may order that contention interrogatories not be answered until after discovery is completed or a pre-trial conference is held).

The term "specific custom or practice" is vague and ambiguous and in responding to this interrogatory, Plaintiff is assuming that Defendant is referring to the unconstitutional policies, customs or practices of the LASD, pursuant to *Monell,* as alleged in the operative complaint.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As set forth in the operative complaint, Plaintiff contends thather rights were violated by the LASD's unconstitutional policies customs and practices, including:

1)  Condoning the use of excessive force, including projectiles, chemical agents and baton strikes, against peaceful protesters,

2) failing to properly train LASD deputies regarding the proper  use of force against protesters, including so called non-lethal projectiles, including 37 mm and/or 40 mm projectiles,

3) shutting down and impeding the exercise of First Amendment activities by, *inter alia*:

i.  taking aggressive police action without declaring an unlawful assembly;

ii.   the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bong grenade—so as to deter persons from seeking to exercise their first amendment rights.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Yes.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Plaintiff repeatedly turned down consulting and tutoring opportunities between approximately September 2020 through November 2020. Plaintiff returned to work in or around December 2020.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of

## VERIFICATION

### UNITED STATES DISTRICT COURT,

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

*Case No. 2:20-cv-07870-DMG-PD*

I, TAEGEN MEYER (aka CHRISTOPHER WHITE), have read the **PLAINTIFF TAEGEN MEYER (aka CHRISTOPHER WHITE'S RESPONSES TO INTERROGATORIES (SET ONE) PROPOUNDED BY DEFENDANT COUNTY OF LOS ANGELES.**

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters, which are stated on information and belief and as to those matters I believe them to be true.

Executed on Apr 8, 2022 , at Los Angeles , California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.



TAEGEN MEYER (aka CHRISTOPHER WHITE

VERIFICATION

291                                                                D024

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,                    )
                                        )
          Plaintiffs,                   )
                                        )
          vs.                           ) Case No.:
                                        ) 2:20-cv-
COUNTY OF LOS ANGELES, etc.,            ) 07870-DMG-PD
et al.,                                 )
                                        )
          Defendants.                   )
_____)

REMOTE DEPOSITION OF

JOSEPH MISCHO

LOCATION OF DEPONENT:  LOS ANGELES, CALIFORNIA

MONDAY, MAY 22, 2023

JOB NO.:      5926229

REPORTED BY:   Leticia A. Rojo, CSR No. 12132

Page 1

new account, or did you just change your handle for your old account?

A.    I just changed the handle.

Q.    And are all the posts from 2020 to '23 still up under your new handle?

A.    Yes.

Q.    Have you provided your counsel, your attorney, your social media posts regarding the protests, in 2020 and 2021?

A.    I have provided them posts dealing with the specific incidents of August 25th and September 5th, yes.

Q.    How many?

A.    I believe the five that have been entered.

Q.    You're referring to the five videos?

A.    Yeah.

Q.    Okay.  Other than the video posts on Instagram you referred to describing the August 25th protest, do you have any other social media posts documenting any injuries from the August 25th and September 5th protests?

A.    I made a post.  I believe it was the same post that had the video, that included photos of my eye, and my buttocks, both of those images were

Page 29

Joseph Mischo
May 22, 2023

also submitted.

Q. Other than those photos, do you have -- have you posted any other photos?

A. No.

Q. Okay. Other than those photos, do you have any other documentation of your injuries during these two protests?

A. I'm sure I probably took more photos than I posted.

Q. Where would --

A. I don't know.

Q. Where would these photos be?

A. Probably on my phone.

Q. Have you looked for these other photos at any time?

A. No.

Q. Do you know if you have deleted any of these photos?

A. I have not deleted them.

Q. And do you have any recollection of what these photos show of your injuries?

A. No.

Q. Okay. Do you have any recollection of if you have photos of injuries from the September 5th protest?

Page 30

Joseph Mischo
May 22, 2023

A.    I don't believe I have photos, no.

Q.    Other than communications with your attorneys, do you have any correspondence or communications with anyone else regarding these two protests?

A.    You said correspondences?

Q.    Yeah, any communications.

A.    Yeah, I've, you know, spoken to the friend who was staying with me at the time about this, about the incident on August 25th.  I spoke to my brother about it the night that it happened.  You know.

Q.    And let's see, is your brother Mack?

A.    My brother is Mack, yes.

Q.    Okay.  And then the person who was staying with you, I guess it was Ellen.  I forget her last name?

A.    Ellen Webb, yes.

Q.    Okay.  We'll have some questions a little bit later about what you shared with them.

Do you have any other documentation of your injuries?  And let me specifically say, about -- ask about medical records or invoices?

A.    Sorry, could you just clarify the question, rephrase the question?

Page 31

these two protests with your roommate?

A.    I have not.

Q.    Have you, other than discussing with your brother Matt, have you discussed these protests, these two protests, with any of your other family members?

A.    I would assume that at some point I've described what happened on August 25th to my mother and my father, yeah.

Q.    Anyone else?

A.    No.

Q.    Do you have any recollection of what you discussed about these protests with your mother and father?

A.    No specific recollection, but probably pretty close to what my declaration has been.

Q.    Where do your parents live?

A.    My parents live in Wausau, Wisconsin.

Q.    When did you speak with your brother Matt about these protests?

A.    I spoke with my brother Matt, I would guess or estimate, within an hour after being shot on August 25th, on the phone.

Q.    Did you have any other conversations with your brother about the protests?

Page 38

Joseph Micho
May 22, 2023

A.    No.

Q.    What did you discuss with your brother about the August 25th protest?

A.    He is a doctor in the U.S. Army, and so I discussed what had happened to my eye and what I should expect and do in terms of seeking medical treatment for it.

Q.    Did you discuss anything else with your brother?

A.    No.

Q.    Okay.  What did he tell you about what you should expect?

A.    Essentially to take any pain relief, like ibuprofen, and go to urgent care in the morning.

Q.    Did he tell you anything else?

A.    Not to my recollection.

Q.    And then did he tell you anything else about what you should do to seek treatment?

A.    No.

Q.    What did you tell your brother happened to you?

A.    I described being shot in the right eye with a PepperBall.

Q.    Anything else?

A.    Sure.  I probably also described being

Page 39

**D025**

hit with a foam round, a rubber bullet, and a flash bang as well.

Q.   Anything else?

A.   No.

Q.   At the time of this call, where was your brother, if you know?

A.   I'm not honestly not sure.  He moved recently.

Q.   Was he stationed in the state of California?

A.   No.

Q.   Okay.  Do you recall if he was east coast, midwest, west coast, somewhere else?

A.   He was either in the Seattle, Washington area, or Fayetteville, North Carolina area.

Q.   Are you married?

A.   I'm not.

Q.   Have you ever been married?

A.   No.

Q.   Do you have any kids?

A.   I do not.

Q.   Okay.  At the time of these two protests, were you in any type of relationship?

A.   No.

Q.   Okay.  Where did you go to high school?

Page 40

so.

Q.    Anything else other than Twitter and Instagram?

A.    Not to my recollection.  I believe I deleted my Facebook permanently in 2020.  That would have been the only other thing I ever really had.

Q.    And why did you delete your Facebook in 2020?

A.    One social media account feels like a lot, and I had switched to spending most of my time on Instagram and was culling the distractions.

Q.    Did you post about any of the protests on Facebook?

A.    No.

Q.    Okay.  Have you ever been arrested?

A.    I have been, yes.

Q.    When?

A.    It was in 2013.

Q.    Do you recall which law enforcement agency was involved?

A.    It would been police in Green Bay, Wisconsin.

Q.    And what was your understanding of what the arrest involved?

Page 47

A.    I was cited for a disorderly conduct.

Q.    Do you know what the disposition of the arrest was, or the outcome of the arrest?

A.    Yeah, I plead guilty and paid to get released that night.

Q.    Did you have any issue with how you were treated by the Green Bay, Wisconsin police?

A.    No.

Q.    Other than that, have you ever been arrested?

A.    No.

Q.    Prior to these two protests, have you ever had any contact with the Los Angeles Sheriff's Department?

A.    Can you define contact?

Q.    Sure.  Have you ever had any interaction with any sheriff department deputies?

A.    Can you define interaction?

Q.    Any communications, face-to-face interactions?

A.    Not to my knowledge.

Q.    Prior to the protest that you attended, did you form any opinions about the sheriff's department?

A.    Sure.

Page 48

Joseph Mischo
May 22, 2023

Q.    Between the 5 and 10 protests that you attended before August 25th, did any of those involve the sheriff's department?  Or let me be more specific.

Were any sheriff department deputies at any of these protests?

A.    Yeah, I would find it hard to believe they weren't there, yeah.

Q.    At any of these 5 to 15 protests before August 25th, were you injured?

A.    No.

Q.    At any of those protests, did you see any force being used by law enforcement?

A.    Yes.

Q.    On how many occasions?

A.    I would say the majority of them.

Q.    And do you recall if any of the force during those protests was by sheriff's department deputies?

A.    I don't recall.  The use of specific incidents of force I can recall were LAPD.

Q.    And what were those few specific force, uses of force you recall by the LAPD?

A.    I recall seeing LAPD officers batoning protestors, tackling protestors, firing projectiles

Page 55

towards large gatherings of protestors.

Q.    Anything else?

A.    No.

Q.    Did you ever see any injuries to protestors caused by the LAPD's use of force?

A.    Yes.

Q.    And what type of injuries did you see?

A.    I saw broken skin and blood from less than lethals.

Q.    Anything else?

A.    Eye irritation.

Q.    Anything else?

A.    No.

Q.    Were the injuries that you witnessed or saw from the LAPD use of force similar to the injuries that occurred to you during these two protests, August 25th and September the 5th?

A.    The foam round injury that I sustained was similar to injuries I had seen before in protests.  The PepperBall impact on my eye, I had not seen or witnessed anything like that before.

Q.    When you attended these protests, was it your intent to engage in peaceful protest?

A.    Yes.

Q.    And can you explain why it was your

Page 56

Joseph Micho
May 22, 2023

verbal communication between the sheriffs and LAPD that were there, kind of gave the vibe that things were and could potentially start to get violent, So the group, at that point, made a decision to leave.

Then over the course of more than eight blocks, LAPD, SUVs, followed protestors and sort of ushered them down specific streets, to the point that the majority of the group ended up on the corner of Temple, kind of right behind the Hall of Justice.

When we got to that corner, there were already a significant number of sheriffs there; they had pre-established a scrimmage line. So protestors --

Q. Before you go on, I just want to clarify the geography. Are you referring to the corner of Temple and Broadway?

A. Yes, North Broadway.

Q. Okay. Okay. Go on.

A. So majority of the group that had been marching that night was there with LAPD vehicles behind them and a scrimmage line that had been set up waiting for them. Some tear gas had been thrown. I was walking toward the front of the

Page 68

Joseph Micho
May 22, 2023

group with my bicycle and my phone out.

I heard, felt, a flash bang go off, I believe on my right, and then got hit in my left buttocks by some type of less than lethal, and turned back to my left, kind of just out of instinctual pain reaction, and then felt something explode on my right eye.

All while filming, and at that point, after the flash bang going off, I mean, just focused on getting myself out of there. A person who had been marching, who had some medical knowledge, and, you know, was close enough to see that I needed some help, I couldn't see out of my right eye, sat me down, and just kind of took a look at me, and asked me a couple questions. If I could see, if, you know, they thought I had a concussion. Flushed my eye with some water. And then just basically bandaged it up, you know.

Q. So up to this point, had you already received all the injuries from August 25th?

A. Yes, up to that point. After that, I didn't receive any injuries.

Q. Okay. And to clarify the order of the injuries, there was first, you felt a flash bang on the right side. And did that flash bang physically

Page 69

Joseph Micho
May 22, 2023

affect you?

A.    It was very loud and disorienting.

Q.    Did anything from the flash bang physically touch you other than the sound?

A.    Not that I know of, no.

Q.    Okay.  And then next in order is that you were hit in your left buttocks by some type of projectile; is that right?

A.    Yes.

Q.    Did you see what type of projectile had hit you?

A.    No.

Q.    Did you see any specific deputy who had fired the projectile?

A.    No.

Q.    Okay.  Then you turned to your left, and then you felt a PepperBall explode around or at your right eye.  Did you see any particular deputy shoot that PepperBall at you?

A.    No.

Q.    Okay.

A.    I would say from the time the flash bang went off to the time that I felt the impact on my eye, it was between  one and two seconds.

Q.    So all the injuries you received on

Page 70

August 25th were in that one to two second window?

A.   Yeah.

Q.   Okay.  The chronology, I'm just going to go back and ask some questions to fill in some information.

What was your reason for participating in the August 25th protest?

A.   I mean, in general, it was a response to the death of George Floyd, and the response of protesting I had seen by law enforcement since that point in Los Angeles.

Q.   Was there a specific incident that was the focus of this protest?

A.   I believe there was a -- it had been a death at the hands of the LASD in the last week or two before this protest on August 25th, but I would have to look up who that was.

Q.   Were you in any way involved in organizing this protest?

A.   No.

Q.   Do you know who the organizers were?

A.   No.

Q.   Had you ever attended a protest in Pasadena?

A.   Yes.

Page 71

Joseph Mischo
May 22, 2023

sheriffs and sort of an increasing presence of
LAPD, mostly in police cars, or police SUVs, or
cruisers.

Q.    What, if anything, did you see the
protest group do while they were at the jail?

A.    Chant, yell, throw food.

Q.    Did you see any of the sheriff's deputies
use force at the jail?

A.    I did not.

Q.    Did you see any protestors with shields?

A.    I don't recall seeing any protestors with
shields at Twin Towers.  Later on at Temple
Broadway, I remember seeing a few foam shields.
Also, it's hard to tell if that's watching a video,
and seeing it or a memory.

Q.    How did you know the shields were made
out of foam?

A.    The way that they were being carried,
and, you know, tossed and passed easily with one
hand.

Q.    Okay.  Did you ever handle any of these
shields on August 25th?

A.    No.

Q.    Can you describe what the shields looked
like?

Page 76

hit by the less lethal munitions?

A.    Yeah, I don't see Temple anywhere on here.

Q.    Temple is right here.  It is the street between the Hall of Justice and the criminal justice center, so let's see if there is -- I don't think Temple is actually written on the map, but that's where it is.

MS. RICKETTS:  Can we describe it a little bit better.  Because it is unclear based on the exhibit.  Maybe the street.

MR. SAKAI:  Sure.

Q.    So to the -- well, I'll describe the Hall of Justice, and to the northwest of the Hall of Justice is North Broadway, and to the south of the Hall of Justice, or the southwest, would be Temple Street.  And to the southeast of the Hall of Justice would be Spring Street.

So the intersection of North Broadway and Temple would be where, I think you can see it, where the hand is.

A.    Uh-huh.

Q.    So based on the description, could you identify where you were when you were hit by the less lethal munitions?

Page 79

Joseph Mischo
May 22, 2023

A.   Yes, so in that intersection where the cursor hand is right now.

Q.   Okay.  Let me see if I can get something a little more precise here.  Okay.

So, right now there's an X.  So in that it, there's a cross.  In that cross, could you direct -- can you direct me to move the cross to where you believe you were when you were hit by the munitions?

A.   Yeah, I mean, I think this scale, it's going to be an approximate amount to give you.

Q.   Sure.

A.   Where the cross is right now --

Q.   Uh-huh.

A.   I think if you move -- maybe split the difference, northwest, somewhere a little bit more central in the intersection, so northeast.

Q.   Northeast.  Okay.  Right there?  Or up here?

A.   Yeah.  Somewhere right around there.

Q.   So what I'm going do is draw a circle in that general area, and let me know if that's about right?

A.   Uh-huh.

Q.   Well, I'm going to have to move that

Page 80

Joseph Mischo
May 22, 2023

circle over a little bit.  Okay.

Somewhere in this area?

A.    Yeah, that's accurate.

MR. SAKAI:  So what I'm going to do is, I'm going to mark this as Exhibit No. 1.  And then I'm going to take a screenshot here.  Okay.  So let me make sure I save this.

(Whereupon Exhibit 1 was marked for identification by the court reporter and is attached hereto.)

BY MR. SAKAI:

Q.    My computer is a little bit slow here.

So I marked as Exhibit 1 a Google aerial map of the area near the Hall of Justice, and there is a blue circle in the intersection of North Broadway and Temple in the rough area where the deponent was when he was struck by the less lethal munitions?

A.    Right.

MR. SAKAI:  I am going to share some of the photos that you produced with your declaration.  Okay.  I'm going to mark Exhibit Number 2, which is plaintiff's Bates stamp number 10.

(Whereupon Exhibit 2 was marked for identification by the court reporter and is

Page 81

Joseph Micho
May 22, 2023

deponent.  We only can see a black backpack and black right -- black pants, right leg, tennis shoes, and a little bit of the left leg.

Q.    Does that accurately reflect what we can see of you in this photo?

A.    Yes.

Q.    Do you know who took this photo?

A.    No.

Q.    And do you know, how did you come in possession of this photo?

A.    I believe someone sent it to me on Instagram after the incident.

Q.    Okay.  I'm going to share Plaintiff's number 11, and I'll -- what does -- Plaintiff's number 11 was also attached to the deponent's declaration.

What does this image capture?

A.    That is me on the right side of the image, moments after being shot in the eye.

Q.    At this point, had you already been hit with -- on the elbow, and on the -- on the left elbow and left buttocks?

A.    Yeah, I would assume so.

Q.    And do you recognize anyone in this image, other than yourself?

Page 83

Joseph Mischo
May 22, 2023

(Video played.)

BY MR. SAKAI:

Q.    Okay.  Could you hear the audio there?

A.    I could.

Q.    Okay.  Let's -- I'm going to play it back at around six seconds.  Let me know if you can hear the sound of apparently something metal hitting the ground.

(Video played.)

BY MR. SAKAI:

Q.    So prior to what sounds like the less lethal munitions being fired, could you hear something metal hit the ground?

A.    Yes.

Q.    Do you know what that was?

A.    I don't.

Q.    Did you see any object hit the ground, prior to the less lethals being fired?

A.    No.

(Video played.)

Q.    Okay.  Can you tell at what point during this video that you were first hit by any projectile?

MS. RICKETTS:  I just want to let you know, Ray, it was kind of buggy.  I just saw a

Page 89

**D025**

was safe enough to do anything.

Q.    Did you go straight from the location you were hit by the projectiles, down to this area in Grand Park?

A.    Yeah.  I didn't make any other stops along the way.

Q.    So I'm going to have a spotlight here on the Google Map.  So if you were hit around this location, in the intersection of Temple and Broadway, then you traveled with the rest of the protestors down towards Grand Park, and ended up somewhere on the end of the map?

A.    Yes, that's correct.

Q.    Okay.  And that took about five to ten minutes?

A.    Yeah.  Hard to be super accurate after all that, flash bangs.

(Reporter asks for clarification)

THE WITNESS:  Hard to be super accurate after devices that are intended to discombobulate you go off that close.

BY MR. SAKAI:

Q.    I'm going to draw an arrow, and this is not to be your exact path.  But just to show your direction of travel.  I'm going to start where the

Page 97

Joseph Mischo
May 22, 2023

A.   Yes.

Q.   Okay.  So how quickly do you remember moving away from the location you were initially hit?

A.   Certainly not as quick as the person who was recording this did, but pretty quickly after the stun, I think, had worn off.

Q.   When you initially headed away from the scene, were you on your bike, were you walking, some other way of moving?

A.   Slowly walking.  I had no vision in my right eye at that time.

Q.   Between the time you were hit by munitions and the time you received treatment by a medic down the street, did you talk to anyone else?

A.   I remember telling someone I got hit in the eye, raising my hand, asking for help.  I don't know who any of the people were that helped me, or I was talking to at that point.

Q.   So at -- can you describe how the munitions that struck you affected you?

MS. RICKETTS:  Can you ask one a time, like what you're referring to specifically?

BY MR. SAKAI:

Q.   Okay.  Let's see.  Let's talk about -- so

Page 102

you were first hit in the left buttocks.  How did that affect you?

A.    Pretty severe, intense, kind of blunt pain.

Q.    Okay.  Any other way?

A.    No.  I recall just reacting to that, basically like turning in that direction, to almost cover it up, or kind of make sure that -- yeah, and nothing worse had happened or nothing was embedded in me.

Q.    Okay.  Then how did being struck in your left elbow affect you?

A.    Similar.  Deep, blunt pain.

Q.    Prior to this protest, had you ever been struck by a PepperBall?

A.    No.

Q.    Prior to this incident, had you ever been struck by a rubber bullet, foam round?

A.    No.

Q.    How did the PepperBall to the right eye affect you?

A.    Sharp, hot pain, and immediate loss of vision and any sense of light.  Felt like something almost went through my eye.

Q.    Okay.  And for loss of vision, is that

Page 103

Joseph Mischo
May 22, 2023

right eye, both eyes, or something else?

A.    Right eye, full loss of vision and light.

MR. SAKAI:  Okay.  Let's see.

I'm going to share one of the documents I was e-mailed this morning.  It's a photo -- appears to be a photo of an injury.  It is going to be Mischo Bates stamp number 96.

When I share these images, I'm going to shut off my video camera, because I think it's just taking up too much resources.  It's slowing down everything.  I'll turn it back on after I finish the share.  Okay.

I'm going to mark this as Exhibit 13, which is Bate stamp Mischo 96.

(Whereupon Exhibit 13 was marked for identification by the court reporter and is attached hereto.)

BY MR. SAKAI:

Q.    What does this image depict?

A.    That's my buttocks.

Q.    When did you take this, or when was the image of this photo taken?

A.    The morning after the incident, so it would have been the morning of August 26th.

Q.    And can you describe the injury that

Page 104

depicts?

A.   Bruising and partial dermis tear on the left buttocks.

Q.   Did you seek any medical treatment for this injury?

A.   No.

Q.   And has this injury resolved?

A.   I'm sorry, what was the last word you said?

Q.   Has this injury resolved, healed?

A.   Yes, it healed.

Q.   And how long did it take to heal?

A.   Fully, a couple of weeks.

Q.   Do you have any other pictures of this injury at any other time?

A.   I don't believe so.

Q.   On a pain scale from zero to ten, zero being no pain, ten being the most excruciating pain you have ever experienced, how would you rate the pain associated with the hit on your left buttocks?

A.   Six.

Q.   How long did the level -- pain level six last?

A.   For a few minutes.

Q.   Okay.  And after a few minutes, what

Page 105

Joseph Mischo
May 22, 2023

level of pain did it go to?

A.    More like a four or five.

Q.    And how long did the pain level four to
five last?

A.    For a few days.

Q.    And after a few days, what did it go to?

A.    Like, most bruises, just kind of slowly
decreasingly, lower, and lower pain level.

Q.    Okay.  Had you ever been received a
similar, let's call this a contusion, large bruise
injury before?

A.    Nothing of that magnitude, no.

Q.    Okay.  Prior to this incident, had you
ever been shot by a paintball?

A.    Yes.

Q.    Okay.  And as a result of being hit by a
paintball, did you develop any contusions, bruises?

A.    Small bruise.

Q.    Okay.  How long did it take for the
paintball bruise to heal?

A.    Anywhere between 1 and 5 days.

Q.    Do you have any photos of the injury to
your left elbow?

A.    I don't believe so.

Q.    Can you describe what the injury to your

Page 106

Joseph Micho
May 22, 2023

level elbow was?

A.    Very similar to the injury to my left buttocks.  Either small and round or smaller contact, so, probably 60 percent of the deepness of bruising contusion.

Q.    On that pain scale of zero to ten, what was the injury to your level elbow?

A.    Closer to probably a four or five.

Q.    How long did it stay at four or five?

A.    Between, you know, four or five days and a week.

Q.    How long did it take for the left elbow injury to go away?

A.    Similar, a week or two.

Q.    Today, do you still have any symptoms or affects of the left buttocks injury?

A.    No.

Q.    How about for the left elbow injury?

A.    No.

Q.    How about for the right eye injury?

A.    I went from having 20/15 vision in the right eye in 2020, and for two years after, so 2020 through about 2022, had irregular blurring, almost kind of like migraine symptoms that would appear from time to time, when there was a lot of eye

Page 107

Joseph Mischo
May 22, 2023

stress. As of 2023, really no -- none of that migraine symptom stuff has shown up, luckily.

Q. And as of the day of this deposition, which is May 22nd, 2023, are there any effects of the right eye injury that you're experiencing?

A. No.

Q. On a pain scale from zero to ten, what would you rank or rate the eye injury?

A. An eight.

Q. And how long did it remain at an eight?

A. Close to, I would say, about 18 hours.

Q. Okay.

A. Until they put me on some higher painkillers, and I think the initial swelling stopped, yeah.

Q. And then what did it move to?

A. Five or six.

Q. How long did it remain at a five or six?

A. Probably close to that next week.

Q. Can you describe the effect on your vision of the right eye?

A. The immediate effects after being shot there, I had absolutely no, no sight, no light sensitivity, just absolute darkness about 24 or hours or so. At urgent care, when they opened it

Page 108

up.  I think there was a period of time that they just wanted to leave it bandaged, limited vision, was kind of just seeing what the background of your screen looks like right now, so shapes and colors, light.  Not able to make out the detail.  That kind of just very slowly progressed to be clearer and clearer.

Q.    How long were you wearing a bandage over the right eye?

A.    Shortly after I'd been shot until at some point that next morning or midday, the next morning on the 26th.

Q.    Okay.  And how long did it take for you to be able to see out of the right eye after the incident?

A.    Yeah, can you just clarify "see"? Recognize shapes and light?  Able to read?

Q.    Yeah, so it seems like it was a progression, and you talked about being able to see a blurry background, like in a Zoom meeting.  How long did that blurry vision on your right eye last?

A.    Between a week and two weeks before it was substantially decreased enough that I could kind of use the eye how I'm used to using it.

Q.    And how long did it take before your

Page 109

vision was pretty much back to normal on your right eye?

A.    Yeah.  More than a month.  Less than six months.

Q.    Were you unable to, you know, do anything, participate in any events or activities based on your right eye injury?

A.    Yeah, I mean, for the first two weeks, it was pretty difficult for me to do any type of sustained work that had anything to do with, you know, my visual ability.  So, answering e-mails, and doing kind of just general work up-keep, you know, something I would do in tiny little chunks. I wasn't really supposed to run or do anything that could be jarring to the eye, so I wasn't doing a whole lot more physically than like walking, you know.

MR. SAKAI:  I am going to share my screen.  It's another document that was provided this morning.  It's Bate stamped Mischo 98 through 100, I'm going to mark as Exhibit Number 14.

(Whereupon Exhibit 14 was marked for identification by the court reporter and is attached hereto.)

/////

Page 110

BY MR. SAKAI:

Q.    Okay.    This appears to be text messages between you and your brother Matt; is that correct?

A.    Yeah, that's correct.

Q.    Okay.    And so August 26, 2020, 9:36 a.m., the second text says, "It hurt a lot last night, but no bleeding.    Pain is very low this a.m."

Does that accurately reflect the state of your right eye injury at that time?

A.    Yeah, at 9:30 a.m., sure.

Q.    And then, I just want to make sure that, going over to the third page, this is all part of one text stream, or text trail.

A.    Yeah, it appears to be.

Q.    Okay.    So I'm showing 98, and 99, and then I'm going to go over to 100.    It looks like it's just a continuation?

A.    Yeah, yes.    Yeah, yeah.    There's like a five day date jump in there, but yeah.

Q.    Okay.    In the documents that were provided, there was a rec -- it seems to be there's a credit receipts, and there's medical records that look like invoices.    Do you have, like, payment information for the ophthalmologist from, I believe, it's a medical office or clinic in

Page 111

BY MR. SAKAI:

Q.   Okay.  I mean, you said all the sheriff deputies were cock suckers.  So do you believe that's an accurate characterization of all sheriff department deputies?

A.   No, I don't think that all sheriffs are cock suckers.

Q.   Okay.  And do you have any belief that all sheriff deputies are bad?

A.   No.

Q.   Okay.  At the time you were giving this video statement, where were you on the pain scale of zero to ten?

A.   Probably somewhere in the six to seven.

Q.   How long did you stay in the Grand Park area that night?

A.   I would estimate I left before 1:00 a.m.

Q.   And then at 1:00 a.m., where did you leave to?

A.   I was driven back to my 1701 apartment in Echo Park.

Q.   And what did you do after you returned back to your residence?

A.   Had some drinks and went to bed.

Q.   What time did you go to bed?

Page 118

A.    I would estimate, again, before 2:00 a.m.

Q.    And then what did you have to drink before you went to bed?

A.    A couple beers.

Q.    Did you talk to anyone from the time you left Grand Park until the time you went to sleep?

A.    No.

Q.    Then in your interrogatory responses, it lists that you had some internal bleeding of the eye and that you were prescribed eye drops and antibiotics; is that accurate?

A.    Yes, that's correct.

Q.    To the best of your understanding, can you describe what the injury was to your eye?

A.    Yeah, to the best of my knowledge, the impact of the pepper bullet burst some blood vessels and caused bruising and swelling actually on the eye.  And so I think those eye drops were meant to reduce inflammation and also clear the eye of blood because the particle affecting a lot of my vision.

Q.    Do you know exactly where on your eye or right side of the face the PepperBall hit you?

A.    I don't.

Q.    Okay.  What type of treatment did you

Page 119

receive from Dr. Esmaili?  That's spelled
E-s-m-a-i-l-i.  And he's an ophthalmologist.

A.    I remember having them look at my eye
through a lot of machines.  I couldn't necessarily
tell you specifically what the treatments were, you
know.

Q.    And it looks like from the records, the
last time you saw Dr. Esmaili was October the 15th,
2020; does that sound right?

A.    That sounds correct, yeah.

Q.    Okay.  And was there any reason you ended
treatment with him at that time?

A.    I think things were looking pretty good
from a long-term perspective.  And he sort of was
like, you know, check back in if things don't
continue to improve.  And they did, luckily.

Q.    And then there was a Jessica Buriani also
referred to as providing treatment.  Her last name
is spelled B-u-r-i-a n-i.  And she appears to be a
physician's assistant over at Good Samaritan
Hospital.  Do you recall receiving treatment from
her?

A.    Yeah, I do.  I think that she might have
just been an eye specialist.  There was, I recall,
like quite a bit of overlap from the urgent care to

Page 120

media that she's definitely gotten some bruises, but I never talked to her about those injuries.

Q. Have you ever talked to Jil about any injuries she may have received during these protests?

A. No.

Q. So other than the doctors we just talked about and the two urgent cares you went to, have you received any other care for injuries from the August 25th protest?

A. No.

Q. Would it be an accurate summary to say that the injuries from the August 25th protest have resolved by this date?

A. Yes. By today, yes.

Q. Had you ever been to the south Los Angeles sheriff's station before the September 5th protest?

A. Not that I can recall, no.

Q. Had you ever visited the neighborhood around the south Los Angeles sheriff's station prior to the September 5th protest?

A. I've been down in that general area for a couple film shoots, but never specifically that area on Imperial or that neighborhood, no.

Page 124

Joseph Mischo
May 22, 2023

Q.   What was your reason for participating in the September 5th protest?

A.   You know, I think similar to the reasons I had for participating on August 25th.  And I think it was important to me that even after I've been injured to continue to show up.

Q.   On September the 5th, were you still experiencing the effects of the August 25th protest?

A.   Yes.

Q.   And what were those?

A.   Bruising, you know, general pain, pretty limited vision in my right eye.

Q.   Going back to the August 25th protest, did you see any protestors between yourself and the line of deputies at the time, or right before you were struck by munitions?

A.   The only body that I can say was between or near me, between myself and the line of sheriffs, would have been the man in the video I took, you know, yelling, don't shoot, please.

Q.   Do you know his name?

A.   No.

Q.   So at the time you were hit by the projectiles, did you know who, if anyone, was

Page 125

Q.    So can you describe, say in chronologic order, what happened to you at the protest?

A.    I remember being kind of out in front of the station.  BLM, or people from that group, were talking on the microphone in the afternoon.  And I think at one point, like a pretty young girl got PepperBalled or some type of irritant agent shot at her.  And then at some point after that, a large group of people started to march.  The march kind of like went out way down Imperial.  Some people moved out onto a highway.  Some people stayed a little bit closer to the station.

I ended up coming back after all that to like the Imperial area, right out in front of the sheriff's station.  And at some point from like the roof of the sheriff's station, sheriffs starting shooting PepperBalls and less lethal stuff at the people that were kind of leftover, straggling there.

Q.    And was this when you were hit with the less lethals?

A.    Yeah, that's when I got hit by what I think were a few PepperBalls.

Q.    Okay.  Do you recall what time you arrived at this protest?

Page 128

Q.   Okay.  Was there a law enforcement presence on the freeway or near the freeway?

A.   I recall seeing some CHP at one point. That's all I really recall.

Q.   Okay.  And after you were on the on-ramp for about a half an hour, then is that when you marched back, or the protestors marched back to the South LA station?

A.   Yeah, I remember feeling pretty leery at that point and just the state that I was in.  And so I -- I marched back, and I remember hanging out on like a sidewalk overpass area and just kind of watching the rest of the highway protest for a bit.

But I think at that point, in like the early evening, lots of little groups were kind of all doing their own thing.  At that point it didn't feel like there was really a centralized protest anymore.

Q.   Okay.  And is that when you decided to go back to the South LA station?

A.   Yeah, eventually.  I went back to the south LA station like around sunset, dusk, yeah.

Q.   And your declaration says sometime between 8:00 p.m., and 9:00 p.m., that's when the less lethal projectiles were fired.  Does that

Page 133

accurately reflect your memory?

A.    Yes.

Q.    Okay.  So, how long had you been at the South LA protest before any less lethals were fired?

A.    You know, tracking from the very first moment I got there, probably between like, you know, three and five hours.

Q.    When you went back to the south LA station, and you know, it was after dusk, between 8:00 and 9:00 p.m., about how many protestors were left?

A.    It felt like, between, maybe 50 and a hundred.  Significantly less than earlier in the afternoon.

Q.    When the less lethal projectiles were fired, do you recall where you were standing?

I'm going to share that overhead again.

MR. SAKAI:  And I'm going to mark this as Exhibit Number 16, which is the Google Map aerial view of the south LA station up to Imperial Highway.

(Whereupon Exhibit 16 was marked for identification by the court reporter and is attached hereto.)

Page 134

Joseph Mischo
May 22, 2023

THE WITNESS:  Yeah, I was somewhere just right off the curb on Imperial.

MR. SAKAI:  The cursor hand is right in the middle of the sidewalk.  That's like right in the middle of the station, if you're standing on the sidewalk.  Were you toward the left of that, right of that, on that area?

A.    Vague memory.  I want to say I was on the right-hand side.

Q.    Okay.

A.    And I was standing by my car, so in the street, you know.

Q.    So was that where your car was originally parked, or had you moved your car to this location?

A.    Yes, I had moved my car to that location.

Q.    Okay.  How did it come to be that you moved your car from where were you originally parked a couple of blocks away?

A.    I wanted to be close to my car.

Q.    So is it you walked over to your car, you drove it over, and you parked on Imperial Highway?

A.    That's correct.

Q.    So were you -- which direction were you facing whether you parked on Imperial?

A.    I would have been facing east, yeah.

Page 135

know, about this distance, is that roughly where your truck was parked?

A.    Uh-huh, yes.

MR. SAKAI:  So I have created a light blue rectangle roughly where the deponent's truck was parked.  So what I'll do is I'll save that.

And I will mark as Exhibit 16.1, which will be the blue square where the deponent was parked.

(Whereupon Exhibit 16.1 was marked for identification by the court reporter and is attached hereto.)

MR. SAKAI:  Well, let me try to stop sharing this.  Hopefully that got captured.  Because the exhibit just disappeared.

Q.    So you were standing -- were you standing right by your truck when you were hit?

A.    Yes.

Q.    Okay.  Where were you hit with the projectiles?

A.    Best of my memory, in like the arm or the back area.

Q.    Do you recall how many times you were hit?

A.    I believe twice.

Page 137

Joseph Mischo
May 22, 2023

Q.    Yeah, did you take any pictures of your injuries from September the 5th?

A.    No, I did not.

MR. SAKAI:  I'm just going back to the record.  So Exhibit Number 16.1 is the Google map aerial, with the blue box indicating where the deponent's truck was parked.

Q.    Did -- the two times you were struck by the projectiles, did they leave any marks on your body?

A.    No significant, I don't believe so.

Q.    Okay.  How long did it take for those projectile injuries from September the 5th to heal?

A.    A few days.

Q.    Okay.  So would you characterize these two projectile injuries as more akin to your experience with a paintball bruise?

A.    Yes, much closer to that than foam round.

Q.    So when you were struck by these two PepperBall rounds on September 5th, on a pain scale of 0 through 10, what would you rate them?

A.    Somewhere around 3.

Q.    And how long did that 3 rating last?

A.    You know, maybe up to an hour.

Q.    Okay.  And after an hour, did it pretty

Page 138

much go down to 1 or 0?

A.    It went down to probably a 1.

Q.    Okay.  Did you talk to any other protestors who were injured on September 5th?

A.    No.

Q.    Did you see any protestors throwing any objects at the deputies on September the 5th?

A.    No.

Q.    Okay.  Did you see any protestors attempt to damage or obscure the barrier, yellow barrier wire, that was in the sheriff's department parking lot?

A.    No.

Q.    Did you hear a disbursal order on September the 5th?

A.    I don't recall.

Q.    Okay.  In your interrogatory responses, you refer to a couple of PepperBalls hitting your car.  Are you referring to -- your Tacoma?

A.    Yes, my friend's.

Q.    And where did the PepperBalls hit your car?

A.    On the south facing side.  Just basically, yeah.

Q.    Did it leave any damage to your truck?

Page 139

Joseph Mischo
May 22, 2023

A.   No.   No.   No permanent damage, no.

Q.   So in summary, the two PepperBall hits from September the 5th were drastically less severe than the injuries you received on August the 25th; is that a valid characterization?

A.   Yeah.

Q.   How long after you were hit by these projectiles on September the 5th did you stay at the station?

A.   I left pretty much immediately, within 1 to 2 minutes.

Q.   And where did you go?

A.   Home.

Q.   And did you travel, or did you drive anyone else away from the protest?

A.   I drove a man who was there a few blocks north to his car, and then dropped him off.

Q.   Was that person injured in any way?

A.   No.

Q.   And do you know who that person was?

A.   No.

Q.   And you have protested in other -- you have -- you have participated in other protests after September the 5th; is that correct?

A.   Yeah, I've definitely been to the Jackie

Page 140

Joseph Mischo
May 22, 2023

Lacey protests, and those things after, yeah.

Q.    Do you know anyone else who attended the September 5th protests?

A.    Almost certain that Dee would have been there or was there, a few, like, BLM speakers, that, you know, were kind of organizing those events.  Nothing other than that, no.

Q.    Okay.  And did you talk to anyone else about any injuries they received on September the 5th?

A.    No.

Q.    And to confirm, you received -- you sought no medical treatment for the injuries from September the 5th; is that accurate?

A.    That's accurate.

Q.    And then within a couple days, these injuries resolved themselves?

A.    That is accurate.

Q.    Did you attend the protest on May the 30th of 2020 at Pan Pacific Park?

A.    No.

Q.    How about the June 3rd Grand Park protest?

A.    Yes, I was near Grand Park, yeah, on June 3rd.

Page 141

Q.   Okay.  As a result of -- you know, as a result of or after attending any of these protests, did you come down with COVID?

A.   Not that I know of, no.

Q.   Okay.  In your interrogatory responses, you list two witnesses regarding your injuries and this incident.  And the first one is Ellen Webb, who we talked about at the beginning of your deposition.  Who is Ellen Webb?

A.   Ellen Webb is a friend of mine.  At the time, her and her partner, another friend of mine, were in the process of moving to LA from the Bay Area.

Q.   Uh-huh.

A.   Just she was staying with me, as they kind of made that transition, and didn't have a place fully lined up yet.

Q.   What is your understanding of what Ellen witnessed regarding your injuries from the protests?

A.   Ellen saw me in the morning after the protest, so the morning of August 26th.  She saw my eye all bandaged up, and my bruises.  And then, I want to say, stayed with me for like two or three days, longer.

Page 146

Joseph Micho
May 22, 2023

Q.    Do you know him through anything other than the protest?

A.    No.

Q.    How about an Austin Thorp?

A.    No.

Q.    Grace Bryant?

A.    No.

Q.    To confirm, you're not seeking any lost wages or a loss of earning capacity as a result of these two incidents; is that correct?

A.    That's correct, yeah.

Q.    Okay.  Have you sought any mental health care as a result of these two protests?

A.    Yeah.

Q.    What mental health care have you sought?

A.    Therapy.

Q.    Anything else?

A.    No.

Q.    And who have you sought therapy from?

A.    Therapist that I had been seeing at the time that I just continued to see, Jed Meyers.

Q.    J-e-d?

A.    J-e-d, yeah.

Q.    And Meyers, M-e-y-e-r-s?

A.    I believe M-e-y-e-r-s, yes.

Page 152

Joseph Mischo
May 22, 2023

A.    A generalized anxiety and post-traumatic stress.

Q.    Anything else?

A.    No.

Q.    What type of treatment does Mr. Meyers give you regarding generalized anxiety?

A.    We do talk therapy primarily.

Q.    And is that the same for PTSD?

A.    Yeah.

Q.    And each of these sessions, are they an hour, 45 minutes, or somewhere in between?

A.    Generally an hour.

Q.    Okay.  And for the generalized anxiety, has Mr. Meyers given you any type of prognosis?

A.    No.

Q.    And how about for the PTSD?

A.    No.

Q.    So, prior to these two protests, had you ever suffered from generalized anxiety?

A.    I'm not sure.

Q.    Okay.  And prior to these two incidents, had you ever experienced PTSD?

A.    No.

Q.    Okay.  So when you're not sure that you've ever experienced generalized anxiety prior

Page 154

to these protests, what do you mean by that?  What aren't you sure of?

A.    I think I'm unsure whether or not my anxiety, prior to these incidents, was at a level that would be diagnosed or quantifiable as generalized anxiety disorder.

Q.    And as a result of your -- can you explain how your generalized anxiety from these two protests has affected you?

A.    Yeah, I had trouble sleeping, trouble concentrating on things that used to not be hard for me to concentrate on, or for periods of time that extend.  Pretty much just that.

Q.    Okay.  And how can -- can you explain how the PTSD from these two protests has affected you?

A.    Yeah, they even -- yeah, a general sense of fear and flight in the presence of any law enforcement.  For a period of time, you know, fireworks on the 4th of July were pretty triggering.  Pretty heightened sense of fear.

Q.    Anything else?

A.    No, not off the top of my head, specifically, no.

Q.    Did you suffer any depression as a result of the two protests?

Page 155

do with the depression that you were treated for back in 2011 and 2012?

A.   Yes.

Q.   And how so?  How are they related?

A.   My understanding of depression is like, a temperature.  I mean, there is a lot of different reasons why throughout the course of a day or a year the temperature rises and falls.  But with additional traumatic experiences and feelings of hopelessness that follow, years of maybe -- yeah, years of sitting with those things without a whole lot of resolution, that kind of turns up the overall temperature.

Q.   Have you ever been prescribed medication because of your depression?

A.   Yes.

Q.   When was the last time you were taking medication for your depression?

A.   This morning.

Q.   Okay.  And what medication are you taking?

A.   I've been taking 100 milligrams of sertraline, or the generic for Zoloft, since 2011.

Q.   And that's a 100 milligrams a day?

A.   Yes.

Page 157

Joseph Mischo
May 22, 2023

Q.    Okay.  Any other -- any other medications for depression?

A.    No.

Q.    Are you under the care of a psychiatrist?

A.    Not actively.  I was initially prescribed that treatment by a psychiatrist back in 2011 and '12.  And since then, I've just seen therapists.

Q.    Okay.  How did the two protest incidents in 2020 affect your depression?

A.    I would say they dramatically increased a sense of hopelessness and fear in me.

Q.    Any other effects?

A.    No.  Having less money usually doesn't help depression.

Q.    Was that also related to COVID, and work slowing down, and the other things we talked about at the beginning of the deposition?

A.    I think it was much more related to pain for medical treatment in response to injuries inflicted by a department that is paid by tax dollars, like my own.

Q.    Today, are you suffering, or are experiencing any effects of generalized anxiety based on your attendance at these two protests?

A.    Yeah, watching those videos increased my

Page 158

STATE OF CALIFORNIA    )

                       ) ss:

COUNTY OF LOS ANGELES )



          I, Leticia Rojo, do hereby certify:



          That I am a duly qualified Certified shorthand Reporter, in and for the State of California, holder of certificate number 12132, which is in full force and effect and that I am authorized to administer oaths and affirmations;

          That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

          That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

          That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

          That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

Page 167

Joseph Mischo
May 22, 2023

That prior to the completion of the foregoing deposition, review of the transcript WAS requested.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 26th day of June, 2023.

LETICIA ROJO, CSR No. 12132

Page 168

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Blvd. #2910
Los Angeles CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,

PLAINTIFFS,

v.

COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,

DEFENDANTS.

Case No.: 2:20-cv-07870-DMG-PD
*Assigned to: Honorable Dolly M. Gee*

**PLAINTIFF JOSEPH MISCHO'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE**

**D026**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.     Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

### RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring him to "state all facts" related to his allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On August 25, 2020, I attended a march to protest the killings of Jacob Blake and Anthony McClain. I rode my bicycle as I moved with the other protesters from Los Angeles City Hall to the Twin Towers Correctional Facility. Los Angeles Sheriff

Department (LASD) deputies were at the Twin Towers Correctional Facility with a "slinky" barrier. Though the sheriff deputies had lethal and non-lethal munitions, the protesters left the Twin Towers Correctional Facility without incident after holding a demonstration there for approximately half an hour. I saw approximately ten Los Angeles Police Department (LAPD) vehicles a block away from the Twin Towers Correctional Facility. As protesters marched back to City Hall, LAPD used their vehicles to block off streets and direct the protesters to Broadway Street and Temple Street. At 11:48 pm, LASD deputies stationed at Broadway Street and Temple Street began shooting pepper balls, rubber bullets, and foam rounds at protesters. They also threw teargas and flash bangs at the protesters. I was hit in my right eye with a pepper ball. I was hit in my left buttock and left elbow with what I believe to have been rubber bullets and/or foam rounds. I was also hit in the lower right leg with a flash bang grenade. I was about 20-25 feet from the sheriff deputies when they shot at me. I did not see any protesters throw anything at deputies or spray painting. The shields that protesters carried were made of foam. I did not hear a dispersal order, a declaration of unlawful assembly, or a warning of any kind prior to the use of force. The protesters then dispersed.

From the protest, I went to two different urgent care centers due to my eye injury. I was advised to go to an emergency room. I went to an emergency room the following day. I was then referred to a retinal specialist and an ophthalmologist. I had to undergo an ultrasound. My eye was bleeding internally, so I was prescribed eye drops and antibiotics. I treated with eye doctors on several occasions from August 26 until at least October 15.

On September 5th, I attended a protest at LASD South Los Angeles Station on Imperial Highway. The protest was organized by Black Lives Matter Los Angeles around the fatal shooting of Dijon Kizzee by LASD deputies. Sheriff deputies fired pepper balls at peaceful protesters early in the afternoon. The protesters included families, and I saw one young girl who was affected by the pepper ball dust cloud.

After the protesters march to the 110 freeway and returned to the LASD South Los Angeles Station. Many protesters left after the march, but some people, including myself, continued to protest in front of the LASD South Los Angeles Station. Sometime between 8pm and 9pm, LASD deputies indiscriminately opened fire with less lethal projectiles on the protestors, and threw flash bangs and stinger grenades. The deputies provided no warning or dispersal order before using force against the protesters. I was hit in the back with two pepper balls, and the side of my car was hit with at least four pepper balls.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Injuries: eye being hit by pepper ball, flash bang hit leg, rubber bullet hit buttocks, being struck by pepper balls, car being struck by pepper balls. Los Angeles Sheriff's Deputies caused the injury, but I do not know which ones threw the grenades or shot the pepper balls or rubber bullets.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

Identify all statements, signed or unsigned, recorded electronically or otherwise, prepared by you, or any other person relating to your allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous as to whether it requests only recorded or documented statements, or all statements including oral and unrecorded statements, and to the extent it seeks unrecorded as well as recorded statements, it is overly broad. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney/client and/or attorney work product privileges. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff has not prepared any such statements other than the Declaration filed in this action in support of the TRO.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Downtown Urgent Care (213) 947-3600 269 S. San Pedro St. Los Angeles CA 90012

Dr. Daniel Esmaili (213) 483-8810 1245 Wilshire Blvd. #380, Los Angeles CA 90017

Dr. Jessica Buriani, (213) 977-2121 1225 Wilshire Blvd. Los Angeles CA 90017

Dr. Robert Feinfield/Dr. Shaden Sarafzadeh (818) 845-3557 2625 W. Alameda Ave. Suite 208, Burbank CA 91505

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

$5,018.01 in medical bills.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

8/26/2020 Downtown Urgent Care visit: $129.00

8/26/2020 hospital care from Good Samaritan Hospital: $1,774.01

**D026**

8/26/2020 doctor visit with Dr. Jessica Buriani: $330.00

8/27/2020 doctor visit with Dr. Esmaili: $895.00

8/27/2020 doctor visit with Dr. Feinfield: $250.00 (note: the insurance records show this date as 8/2/2020, but Plaintiff verifies that date is incorrect. The true date is reflected in his receipts for Dr. Feinfield's care, being produced concurrently with this response.)

8/28/2020 doctor visit with Dr. Feinfield: $100.00

9/01/2020 doctor visit with Dr. Feinfield: $100.00

9/03/2020 doctor visit with Dr. Feinfield: $100.00

9/03/2020 doctor visit with Dr. Esmaili: $620.00

9/08/2020 doctor visit with Dr. Feinfield: $100.00

10/15/2020 doctor visit with Dr. Esmaili: $620.00

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated him for physical injuries to the same part of his body as the injuries he claims in this case, and providers who have treated his for the same or related

and providers who have treated his for the same or related psychological or psychiatric conditions he claims in this case, if any, and therefore responds as follows:

Plaintiff has not made any such claims in the last ten years.

**INTERROGATORY NO. 18:**

Identify the amount and source of all money, compensation, or payment of any kind you received from any source from the date of the incident alleged in the Complaint through and including the present in response to any complaint made regarding the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 18:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not claiming lost wages.

**INTERROGATORY NO. 19:**

List every specific policy of the County of Los Angeles that you allege violated your constitutional rights in the incident alleged in your Complaint.

**RESPONSE TO INTERROGATORY NO. 19:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. . Plaintiff further objects on the grounds that contention interrogatories are premature, and Plaintiff should not be required to respond to them at this early stage in the litigation prior to depositions having been taken. *See, e.g.*, *McCarthy v. Paine Webber Group, Inc.,* 168 F.R.D. 448, 450 (D. Conn. 1996); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985); Fed. R. Civ. 33(c) (court may order that contention interrogatories not be answered until after discovery is completed or a pre-trial conference is held).

3) shutting down and impeding the exercise of First Amendment activities by, *inter alia*:

i. declaring unlawful assemblies without accommodating, or attempting to accommodate, the right to peaceable assembly and protest and without adequate sound amplification audible enough to be heard and understood by the protesters, and without providing directions, means and opportunity to disperse before taking aggressive police action (Plaintiff does not know if an unlawful assembly was declared, but if one was, he did not hear it, despite being within earshot of the deputies);

ii. kettling lawful demonstrators in order to arrest them without affording them an opportunity to leave,

iii. taking aggressive police action without declaring an unlawful assembly;

iv. the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bang grenade—so as to deter persons from seeking to exercise their first amendment rights.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not claiming lost wages.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring his to "state all facts" related to his allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal.  1985).

Plaintiff further objects to this interrogatory on the grounds that it violates the limit of 25 interrogatories set forth in FRCP 33 as the reference to each separate Request For Admission ("RFA") constitutes a separate integratory. Accordingly, Plaintiff will only respond to this interrogatory regarding the first three requests for admissions. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

## <u>VERIFICATION</u>

I have read the below-titled documents and know their contents:

**PLAINTIFF** Joseph Mischo **'S RESPONSES TO COUNTY OF LOS ANGELES' FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF SPECIAL INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION**

I am a Plaintiff in this action, numbered 2:20-cv-07870-DMG-PD, filed in the Central District of the United States Federal Court. The matters stated in the foregoing documents are true and correct to the best of my knowledge except as to matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __03 / 01 / 2022__, in Los Angeles County, California.

_____

Plaintiff   Joseph Mischo

**D026**
Doc ID: a211dedf83c485f4d0c9305e7e730adeb3352847

Jillian O'Neil
April 24, 2023

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

KRIZIA BERG, et al.,

      Plaintiffs,

   v.                          Case No.

COUNTY OF LOS ANGELES, etc.,      2:20-cv-07870-

et al.,                      DMG-PD

      Defendants.

_____

VIDEOCONFERENCE DEPOSITION OF

JILLIAN O'NEIL

DATE:          Monday, April 24, 2023

TIME:          10:11 a.m.

LOCATION:      Remote Proceeding

               128 North Fair Oaks Avenue, Suite 204

               Pasadena, CA 91103

OFFICIATED BY: Peter Shen, Notary Public

JOB NO.:      5883572

Page 1

Q   Sure.  You've just defined violence in three categories.  I'm asking about your third category of interpersonal violence.  Have you seen protesters at any of the protests be involved in any conduct that you would classify as in the interpersonal violence category?

A   No.

Q   Have you ever seen a protester throw anything at a protest you've attended?

A   Yes.

Q   Would you characterize that as violence?

A   No.

Q   Okay.  Why not?

A   Again, we haven't established what violence means, but I don't think throwing something necessarily indicates violence.

Q   Let's say -- so what objects have you seen protesters throw?

A   At the protest in question, or what is the question?

Q   At any protest you've attended.

A   Water bottles.

Q   Anything else?

A   Other inanimate objects I couldn't identify.

Q   Anything else?

Page 24

Eita O'Neil
April 24, 2023

A    Smoke bombs, maybe.

Q    Anything else?

A    Fireworks.

Q    Anything else?

A    Not that I recall.

Q    So, in your classification of violence, is throwing a water bottle a violent act?

          MS. BROWN:  Objection.  Vague and ambiguous.

A    No.

Q    Okay.  How about throwing a smoke bomb?  Is that a violent act?

          MS. BROWN:  Objection.  Vague and ambiguous.

A    No.

Q    How about throwing fireworks?

          MS. BROWN:  Objection.  Vague and ambiguous.

A    Circumstantial.

Q    What does that mean?

A    Just, throwing a firework is not inherently violent.

Q    What if it's thrown at a person?

          MS. BROWN:  Objection.  Vague and ambiguous.

Page 25

Elliott O'Neil
April 24, 2023

Q    Do you remember how many photos you provided?

A    I don't have an accurate guess on how many photos I provided.

Q    Over ten?

A    I really don't know.

Q    Okay.  Do you have any recollection of what these photos document?

A    Yes.

Q    What is that?

A    The injury to my leg.

Q    Anything else?

A    I can't recall if there was other photos.

Q    DO you have those photos somewhere in a native format?

A    In a what format?

Q    With metadata.

A    I don't understand the question.

Q    Okay.  So, how did you take these photos or how were the photos taken?

A    With my phone.

Q    Are they still on your phone?

A    Probably.

Q    Did you provide your attorneys these photos from your phone?

A    I believe so.

Page 41

Elliot O'Neil
April 24, 2023

not making claims for a loss of earnings or loss of earnings capacity; is that correct?

A    Are you asking me?

Q    Yes.

A    At the time, I couldn't work.  But I don't know -- if I didn't put that in there, then I'm not sure what you're asking.  But, no.  I was too damaged to work.

Q    Okay.  So, in your requests for admissions -- okay.  Well, let me ask this.  Are you making a claim for loss of earnings?

A    I guess not, if I didn't turn that over.

Q    And then -- and I also want to confirm that you are not making a claim for loss of earnings capacity?

A    I did have a loss of earnings capacity.

Q    But the specific question is that you are not making a claim for that in this lawsuit.

A    I don't recall what the original claims were. If it's not in there, then I guess that's the answer.

Q    Okay.  So, to the best of your knowledge, as you sit there today, the answer is no; is that right?

A    Correct.

          MR. SAKAI:  All right.  Let me take a quick five-minute break, if that's agreeable.

Page 65

Elliana O'Neil
April 24, 2023

Q    Just tell me everything that you remember happening to you at the protest.

MS. BROWN:  Objection.  Vague and ambiguous.

A    I don't recall what time I arrived at the protest.  I was asked to legal observe a peaceful demonstration that ended up turning into a march.  At one point, I know we were in front of Men's Central Jail when the protesters decided to move to a different location.  We were following them as legal observers on the sides.  We got separated from them at some point. We came up behind a police line that was, you know, holding the ground against -- of protesters.  We put our hands up, exclaimed we were legal observers.  We asked where they wanted us to go.  They pointed in a direction after some back and forth, giving us attitude.

And we walked over to the direction that they told us to stand, which is in front of a line of protesters.  It was shortly after there -- I don't recall if we were gathering protesters' names or if we were trying to collect badge numbers.  Either way, we were documenting, and a short time later, I saw something coming towards us.  I heard a loud bang, and I felt my legs on fire.  I looked down.

Some piece of the -- you know, what I

Page 79

Elliana O'Neil
April 24, 2023

understand to be a flash bang grenade was between my legs, fallen. I continued to, after shouting and screaming, started to run away, and was accosted with rubber bullets. Someone did jump on top to shield me from that. I was not hit, I believe, at that time. And then it seemed to be of a dispersement. I made sure there was still everybody there. We all received some sort of medic attention. And when it was safe to do so, we left the area and went home.

Q    Where did you go after the protest?

A    Home.

Q    Okay. Directly home?

A    I may have stopped for bandages and such, but I believe I went directly home. But I can't say for sure. If anywhere, I stopped at, like, a CVS or a Rite-Aid.

Q    How did you get to the protest?

A    I drove my car.

Q    What was -- well, describe your car.

A    What kind of car I drive?

Q    Yes.

A    A 2016 Honda Fit.

Q    Color?

A    Grayish.

Q    Light gray, dark gray?

Page 80

A    Dark gray.

Q    Did you drive anybody to the protest?

A    I believe there was one other person with me. I can't say for sure how many people I drove there.

Q    Do you have any recollection who that person may have been?

A    Yes.

Q    Who?

A    His name's Martin Leyva.

Q    Anyone else?

A    Not that I recall.

Q    Who is Martin Leyva?

A    He's a person that I know.

Q    How do you know him?

A    He was my client. I'm a hairdresser.

Q    How long have you known him?

A    Fifteen years.

Q    Okay. You cut his hair?

A    I've cut his hair. Yes.

Q    Okay. Is he also a legal observer?

A    He is not. No.

Q    Did you receive any injuries at this protest?

A    Yes.

Q    What injuries?

A    I received second to third degree burns

Page 81

between my legs.

Q    Anything else?

A    Multiple bruisings that took up beyond the burns, the bruising was taking up, you know, three-quarters of my upper thighs and legs.

Q    Anything else?

A    I had some scrapes on different parts of my body as well.

Q    Anything else?

A    Not that I can recall.

Q    How do you believe you sustained the second to third degree burns on your legs?

A    I believe I already stated when something was thrown in our direction and it landed between my legs.

Q    Anything else cause that injury?

A    I don't understand the question.

Q    Is there any way that you believe you received this injury?

A    No.

Q    Okay.  How did you -- well, how do you believe you sustained the bruising in your upper thighs and legs?

A    From the same injury and shock.

Q    And then you also said scrapes on other parts of the body; how did you receive those scrapes on other

Page 82

parts of your body?

A    I fell to the ground when it hit me.

Q    You fell to the ground when the object that was thrown between your legs hit you?

A    When the object was coming towards me, I ducked, it hit me between the legs, and I fell over in pain.  Yes.

Q    Okay.  Describe how you fell to the ground.

A    I rolled over frontwards in pain and used my hands to catch my fall.  So, I scraped my knee in my hand.

Q    Were you down on all fours?

A    I don't recall.

Q    Did your knees touch the ground?

A    I don't recall.

Q    Okay.  Do you recall if you were prone on the ground, meaning fully face down on the ground?

A    I was not.  No.

Q    Okay.  Where did you receive the scrapes?

A    I believe on a hand and a shin.

Q    Did you document the scrapes to your hand and shin?

A    I may have pictures.

Q    Okay.  So, describe the sequence between when the object was thrown to you and when you ended up on

Page 83

Elita O'Neil
April 24, 2023

the ground.

MS. BROWN:  Objection.  Vague and ambiguous.

A    Something was coming towards me that I understood to be a flash grenade.  Loud boom.  Some sort of piece of that -- I ducked.  Some sort of piece of that landed between my legs.  It was burned -- melted my pants into my inner thighs.  I was screaming, "It is on fire."  It was the most pain I've ever felt.  I leaned over, put my hand down to catch myself, and then I pushed myself back up to get out of the line of fire, 'cause they were throwing more things.

Q    How long were you down on the ground?

A    I have no idea.  I don't think it was very long.

Q    After you go down to the ground, you get up, what happens next?

A    I was looking through all the smoke for anyone that I knew that could assist me because I could not walk.  I was looking for the other legal observer, particularly.  As people were moving out of the line of fire, sheriffs from all four corners started shooting rubber bullets at the crowd.  So, I got on the ground and ducked.

Q    How far were you away from the original

Page 84

Elliot O'Neil
April 24, 2023

Q    Of these roughly 30 to 50 people, do you know how many were injured in any way?

MS. BROWN:  Objection.  Calls for speculation.

A    The only injuries that I witnessed with my own two eyes were about, I believe, four different people I can recall from that time, off the top of my head.

Q    And were any of these four -- did any of these four receive similar injuries to what you received?

A    I don't understand.

Q    Sure.  Were any of these other four injuries that you saw from flash bang burns?

MS. BROWN:  Objection.  Calls for speculation.

A    I can't say exactly what caused other people's injuries.  I do believe that there was a shrapnel hit.  But, like, I don't know.  I saw their injuries with my eyes.  I could not tell you how exactly they received them.

Q    Okay.  Anything that you saw, did it resemble your injuries?

A    Like, my physical injuries specifically?

Q    Yes.

A    No.  No.

Q    Okay.  Through all of the protests you've

Page 87

Elliana O'Neil
April 24, 2023

attended during 2020, did you ever see any protester that had received a similar injury that you received on August 25th?

A    I did not see, personally, the wounds of other people having specific burns from flash grenades.  But, yeah.

Q    Okay.  Just to clarify, so, of all the protests you've attended in 2020, you've never seen any protesters that had similar second to third degree burn injuries; is that right?

A    I've seen flash grenades hit other protesters. I have not seen their second or third degree burns personally.

Q    So, as far as you know, you're the only one, only protester, that has received a flash bang burn injury; is that right?

MS. BROWN:  Objection.  Calls for speculation.

A    I was not there as a protester.  I was a legal observer.  But, yes.  That is what my -- to the best of my knowledge, yes.

Q    Okay.  And when I say, "protester," what I am meaning to convey is an attendee.  So, my protester would encompass everybody who attended the protest who is not in law enforcement.  Is that understandable?

Page 88

A    I do not recall that.  No.

Q    Do you remember you being at the front of where the protesters were, hearing the metal object, and cringing or ducking before the sheriff's department used less lethal munitions?

A    I cringed and ducked when I heard a flash bang go off, which I've heard before.  I don't know anything about a metal object.

Q    So, if -- I just want to get your testimony straight.  You ducked when you heard a flash bang go off; you did not duck before then, to the best of your memory?

A    To the best of my memory, something was coming at me.  I don't remember if it was a sound or a sight that had me cover my body to protect myself.  That's the best answer that I can give you.

Q    Okay.  So, you don't remember a metal object hitting the ground, you ducking, and then the sheriff's department deploying the less lethals?

A    That does not sound correct to me.

Q    Okay.  What was the duration of your injuries?

A    I had lingering -- I mean, I still have lingering scar tissue that needs to be worked out, so at this point, I still have an issue with my leg, but obviously lessened.

Page 91

Eliana O'Neil
April 24, 2023

Q    How about any other complaints?

A    Can you be more specific?

Q    Yeah.  Sure.  Do you have any other complaints from any injuries today from the first protest?

A    Physical injuries?

Q    Yeah.

A    Physically?

Q    Mm-hmm.

A    No.

Q    And so when did your physical injuries from this night resolve?

A    As I said, I still have lingering issues with my injury from this night.

Q    Sure.  So, other than the scar tissue, do you have any other lingering complaints?

A    Physically?

Q    Yes.

A    No.

Q    Okay.  Did you receive any treatments for the scrapes on other parts of your body?

A    I believe they were all taken care of at the same time.

Q    And how long did it take for those scrapes on other parts of your body to heal?

A    I couldn't give you a precise date, but I

Page 92

Elliana O'Neil
April 24, 2023

would say a few weeks, a month.

Q    Any scars from these scrapes?

A    Not from the scrapes, but from the burn.

Q    Okay.   And how about the bruising on the upper thigh and legs?   How long did that take to go away?

A    Months.

Q    How many months?

A    I can't be specific, but I would say at least two months.   I still had traces.   Probably three.

Q    So, after two to three months, the bruises resolved?

A    To the best of my memory, yes.

Q    Okay.   And so where are the -- well, okay. So, what -- where is the scar tissue from the second to third degree burns?

A    Inside of my right leg, near my knee.

Q    Can you describe the remaining scar tissue?

A    It's in the shape of a crescent, that's burned into it, and the remaining scar tissue is super knotted. It has to be continually worked out.

Q    Were you given -- did you seek any treatment for the burn?

A    Yes.

Q    What treatment is that?

A    I tried with home stuff that I bought CVS,

Page 93

burn ointments, et cetera.  I had my friend who was a nurse look at it and make sure I was wrapping it and taking care of it correctly.  Eventually, it got infected and I had to go to Urgent Care and they treated it as well.

Q     Any other treatment?

A     I've had treatment on the scar tissue.  Yes.

Q     And what's that?

A     Acupuncture and massage therapy to work out the knot.

Q     Okay.  And that sounds like the documents that I was just sent.  So, I'm going to -- after our break, we'll talk about it a little bit later.  Okay.  So, have you told me now all the treatment you've received for any injuries or all your injuries on August 25th?

A     Physically?

Q     Yes.

A     Yes.

Q     And then for -- so, have you received any treatment for emotional injuries or emotional distress?

A     Yes.

Q     And what's that?

A     Talk therapy.

Q     Anything else?

A     No.

Page 94

Elizabeth O'Neil
April 24, 2023

Q    And is this the result of the August 25th protest or the September 5th protest or some other protest?

A    I would say both.

Q    Okay.  Did you receive talk therapy for any other reason?

A    During that time?

Q    Yes.

A    Not at that time.

Q    So, who did you go to for this talk therapy?

A    My therapist.

Q    Who's your therapist?

A    Dr. Zoe Gillis, Z-O-E G-I-L-L-I-S.

Q    And what is Dr. Gillis?  What is she a doctor of?

A    I believe she's a licensed marriage and family counselor.

MR. SAKAI:  Rebecca, I just haven't popped that open.  DO we have some information or records from Dr. Gillis in the email?

MS. BROWN:  We should.

MR. SAKAI:  Okay.

MS. BROWN:  All medical records that we have are in there.

MR. SAKAI:  Sure.

Page 95

A    I was seeing her weekly for at least another year after this.  So, I would say it was brought into most sessions as ...

Q    Were you seeing Dr. Gillis weekly prior to August 25, 2020?

A    Yes.

Q    Okay.  How long had you been seeing her weekly prior to August 25, 2020?

A    Just since the lockdown.  May 2020.

Q    And did you continuously see her weekly until early 2022?

A    I continuously saw her weekly until I stopped seeing her, which I don't -- I don't recall when that was.

Q    Okay.

A    But, yes.  To the best of my knowledge, yes.

Q    Do you have any records from your care with Dr. Gillis related to these two protests?

A    No.

Q    Okay.  Is Dr. Gillis still in practice?

A    I believe so.  Yes.

Q    Is she still in Silverlake?

A    I am not sure about that part.

Q    So, why did you go see Dr. Gillis about these two protests?

Page 97

Elita O'Neil
April 24, 2023

A    Because I was under emotional duress.

Q    Anything else?

A    In regards to the protest?

Q    Yes.

A    I mean, I was suffering symptoms of PTSD, complex PTSD.

Q    Anything else?

A    Not that I can recall at this time.

Q    Okay.  What do you mean by you were under emotional duress?

A    I mean, I was having anxiety, I was in pain physically, mentally.  It was upsetting.

Q    Anything else?

A    Just, again, the PTSD symptoms that were making me hyper vigilant.

Q    And we'll get to that in a minute.  Were you suffering from anxiety prior to August 25, 2020?

A    On and off.  Yes.

Q    Okay.  And what was the nature of that anxiety?

A    Generalized anxiety disorder.

Q    Okay.  What does that mean?

A    It means I have generalized anxiety.

Q    Did Dr. Gillis give you a prognosis for your generalized anxiety disorder?

Page 98

Elliana O'Neil
April 24, 2023

A    I don't understand the question.

Q    Sure.  Let's -- how about, did she tell you when you last saw her what she thought the state of your generalized anxiety disorder was?

A    Upon our last meeting?

Q    Yes.

A    Yes.  She said that I was in a good place and that I could move on to taking a break from talk therapy.

Q    Prior to August 25, 2020, were you seeing Dr. Gillis because you were upset?

A    Can you be more specific?

        MS. BROWN:  Sorry.  Just let me make an objection.  Vague and ambiguous.  Go ahead.

        THE WITNESS:  Can you be more specific?

BY MR. SAKAI:

Q    Well, I'm just repeating your characterizations, because you said you were -- when I asked about your emotional duress, you said anxiety, pain, and you were upset.  So, were you seeing Dr. Gillis for being upset prior to August 25th?

        MS. BROWN:  Same objection.

A    Yes.  There was things I was upset about prior to this.  Yes.

Q    What were you upset about prior to August

Page 99

Ellia O'Neil
April 24, 2023

depression?

A   I don't understand the question.

Q   So, during your four-year treatment -- well, okay.  So, is it accurate that you first went to see Dr. Gillis to treat your depression?

A   Yes.

Q   Okay.  What was the nature of your depression?

MS. BROWN:  Objection.  Vague and ambiguous.  Go ahead.

THE WITNESS:  I have major depression disorder.  There's no nature of it; it just is.

BY MR. SAKAI:

Q   And how long have you had major depression disorder?

A   Since I was 14.

Q   Have you ever sought medication for your major depression disorder?

A   Yes.

Q   And when was the last time you've taken any medication for that?

A   This morning.

Q   What do you take?

A   Wellbutrin.

Q   Anything else?

A   For depression?  No.

Page 101

psychiatrist before August 25th?

A    I do not.  No.

Q    And then at the time of the protest, were you seeking -- well, I'll save it until afterwards.  I'll just finish up with this.  So, what was the nature of the anxiety you were seeking treatment from Dr. Gillis when you first saw her?

A    I have generalized anxiety disorder.  It doesn't have a nature.

Q    And how long have you had the generalized anxiety disorder?

A    Since I was about seven years old.

Q    At the time of the protests, were you receiving any other treatment other than from Dr. Gillis or your generalized anxiety disorder?

A    Not from another doctor.  No.

Q    Okay.  Were you seeking any type of treatment?

A    I have modalities and tools, but I was not seeking other treatment.  No.

Q    Okay.  What do you mean by modalities and tools?

A    Yoga, meditation, exercise.

MR. SAKAI:  All right.  Let's take ten.  What time do you have?

THE OFFICER:  Let me take us off the

Page 103

Elizabeth O'Neil
April 24, 2023

mill family issue was a source of a diagnosis for PTSD?

A   Again, it's complex PTSD, so it doesn't relate to one single issue.  It is multiple little issues over time that relate to a PTSD diagnosis.  So, I don't have a specific issue for you.

Q   So, is it that there wasn't one event that was so traumatic that caused the PTSD, but it's a bunch of other, smaller events that collectively caused or support the PTSD diagnosis?

A   Correct.

Q   Okay.  So, just to summarize this, it seems like the emotional distress you're claiming from attending these two protests is more than the emotional distress just from receiving the injury, but there's another layer that is, let's call it more extreme emotional distress that resulted in a complex PTSD diagnosis; is that pretty much it?

A   It added to an already existing diagnosis.  Yes.  And it exacerbated symptoms.

Q   And that's unique to you based on prior events, which were also part of this complex PTSD diagnosis; is that right?

A   Can you be specific on what you mean?

Q   Sure.  That this complex PTSD diagnosis is unique to you because it's based on past experiences

Page 105

Elliana O'Neil
April 24, 2023

that you experienced?

A    My specific diagnosis is unique to me, yes. Complex PTSD is not a unique diagnosis.

Q    Sure.  I mean the diagnosis as to you.  Is that accurate?

A    Yes.

MR. SAKAI:  Okay.  So, Rebecca, I looked over the interrogatory responses regarding injuries. There was the medical doctors were there, but Dr. Gillis wasn't.

MS. BROWN:  Okay.

MR. SAKAI:  Could we get a supplemental response with her records?  It sounds like she has about a year of treatments where this has come up.

MS. BROWN:  Yeah.  Absolutely.

MR. SAKAI:  Just because she's claiming something other than, you know, let's just say the normal emotional distress, and it seems to go to the next level of extreme emotional distress.  I think we're entitled to those documents.  Take a look at them, let us know if there are any references.  We could talk about them.

MS. BROWN:  Yeah.  Absolutely.  I'll work on that and I'll share that with you all soon.

MR. SAKAI:  Thank you.  Appreciate it.  I

Page 106

Elika O'Neil
April 24, 2023

THE WITNESS:  Yes.  9/4/2020.

BY MR. SAKAI:

Q    Okay.  And why did you go to Urgent Care on September the 4th?

A    As stated, my wound was getting infected.

Q    And what type of treatment did you get during this September the 4, 2020, visit?

A    They cleaned and assessed my wounds.  I believe they gave me a shot of something, steroid or something or other.  And they gave me the Silvadene cream.

Q    Did they give you a course of treatment for this injury?

A    No.

Q    Did they tell you to do or not do anything to help with the recovery from this incident?

A    They just said to let it, you know, to wrap it when I'm out and unwrap it when it has time to breathe.

Q    Okay.  So, the injury you received on August 25th didn't prevent you from attending the protest the next day on September 5th; did it?

A    No.

Q    Okay.  I'm going to click over to O'Neil Number 2, which appears to be an invoice from Amalia Gardner.  Is this for treatment regarding the August

Page 108

Elliant O'Neil
April 24, 2023

25th injury?

A     Yes.

Q     Okay.  So, what type of treatment were you receiving from Ms. Gardner?

A     Acupuncture and cupping.

Q     And what was she treating with acupuncture and cupping?

A     My scar tissue.

Q     Let's see.  Was it fire cupping?

A     Not on the scar tissue.

Q     Was she cupping anywhere else other than the scar tissue?

A     Possibly.

Q     Okay.  There appears to be nine treatments here.  Were they all for your scar tissue?

A     They weren't specifically for it, but every time my scar tissue was treated along with the rest of any other injuries.  It's an integrative medicine to the whole body.

Q     So, were you seeing Ms. Gardner for anything else other than your scar tissue?

A     Yeah.  I guess so.

Q     Okay.  So, the acupuncture, for example, it wasn't just to treat your scar tissue, but it was to treat other parts of your body and your being too; is

Page 109

that right?

A    For some sessions, yes.  Some sessions were just for my leg.

Q    And how do you know which sessions were for the entire body and which ones were just for your leg?

A    I could find those notes.  But either way, when I say, "entire body," they were still specifically targeted to my scar tissue as I was treated for my scar tissue all of these dates.  There's more dates that I didn't include.

Q    And let me mark this as Exhibit No. 5, which is O'Neil No. 2.  Did you pay for any of these treatments?

                (Exhibit 5 was marked for

                identification.)

A    We did trade of services.

Q    Okay.  So, did you pay out of pocket cash for any of these treatments?

A    No.  We did trade of services.

Q    Okay.  And what does that mean?

A    That means we evaluated the service based on a service I could provide them, because I could not afford to pay for these services and I traded my labor for their labor.

Q    Do you have any documentation of the trade for

Page 110

Elliott O'Neil
April 24, 2023

her services for your services?

A    I mean, it's in her notes.  I can show you the times when -- I mean, I can produce a document saying when I've given her hair treatments.  But I don't know if I have thus far.

Q    Then O'Neil No. 3, it appears to be a Chase statement with purchases from CVS and other pharmacies.  Are these purchase for injuries from August 25th?

A    Yes.

Q    Okay.  I'm going to attach this as Exhibit No. 6, O'Neil No. 3, Row 8.

(Exhibit 6 was marked for identification.)

And what is O'Neil No. 9 through 10, what I have on the screen?  Let me just do one screen at a time.  Can you tell me what O'Neil No. 9 is?

A    This is an invoice for massage therapy that I got to massage the scar on my leg.

Q    And did you pay this invoice?

A    I believe we also worked in trade, but I can't recall right off the top of my head.

Q    Okay.  So, I'm going to mark as Exhibit No. 7 O'Neil No. 9 and 10, which appear to be two screen captures for PayPal invoices.  Is that accurate?

//

Page 111

Elliot O'Neil
April 24, 2023

(Exhibit 7 was marked for identification.)

A    That looks correct.  Yeah.

Q    Okay.  Then we have page 1 with an invoice date of July 27, 2021, for 75 minutes of in-home massage and the second one is April 21, 2021, 75 minutes in-home massage, each one 60.  Is that what these two records reflect?

A    Yes.

Q    Did the massage sessions help your injuries?

A    They broke up some of the scar tissue.

Q    Was the massage for anything else other than the scar tissue?

A    Not at those times.

Q    Okay.  So, each of the 75-minute sessions were -- oops, let's see, where did it go -- each of the 75-minute sessions were for the scar tissue exclusively; is that right?

A    That was the purpose of the appointment.  I don't recall if she worked on any other parts of my body at that time.  But the purpose was to massage the scar tissue.

Q    Okay.  Let's see.  I think the next in order got separated.  Let's see if I can move it back here.  Okay.  So, what I am going to attach as Exhibit No. 8 is

Page 112

Elliot O'Neil
April 24, 2023

Bates number O'Neil 11 through 33.   They appear to be -- let's see -- 23 pictures of your legs and thighs; is that correct?   And let me get it to page 1 first.   Okay.  So, O'Neil 11, what is that?

(Exhibit 8 was marked for identification.)

A     What is that?

Q     Yes.

A     That's my leg.

Q     And is that your right leg?

A     Yes.

Q     Okay.   Do you remember when this was taken?

A     I believe this was the next morning after what happened.   But I cannot say for sure.

Q     Okay.   And do you --

A     It may have been within a few days.

Q     Did you take this picture?

A     I believe so.

Q     And where were you when you took this picture?

A     In my house.

Q     And what is depicted in O'Neil No. 12?

A     I believe that's my left leg.

Q     And is that -- what part of your leg?   It looks like it's between the knee and the hip; is that about right?

Page 113

Elita O'Neil
April 24, 2023

A    Yeah.  It's my thigh.

Q    Thigh.  Okay.  And was this taken at or about the same time as No. 11?

A    I would say so, but I can't be sure.

Q    Is this one of the bruises that resolved in about two to three months?

A    Yes.

Q    Let's see.  These files are very large, so they're a little bit slow loading up.  Okay.  Is this, O'Neil No. 13, is that your left shin?

A    I believe so.  Yes.

Q    Okay.  And has that scrape or cut healed?

A    As of now?

Q    Yes.

A    Yes.

Q    Okay.  So, clicking through some of these other pictures, do all these pictures look like they were taken at or about the same time?

A    I took a progression of photos, obviously, to see where it was going.  I cannot -- it was in a short progression of time.  I can't tell you which is which.

Q    Okay.  So, there's no way to tell when 16 was taken versus 1?

A    I can't tell what part of my body that is.  If I could, I would imagine it was taken after that.

Page 114

Elliot O'Neil
April 24, 2023

Q    Okay.  So, 17 looks like it's identical to 11. Okay.  That looks like it's identical to 12.  This is identical -- 19 is identical is 13.  It seems like 20 is identical to 14.  21 looks identical to 15, or I guess 22 is identical to 15.  Do you know when 23 was taken?

A    It was a couple days after it happened.

Q    Okay.

A    I'm not sure exactly when.  But it had started to scab at that point, so I believe, you know, a few days after.

Q    Okay.  So, that is -- for the record, that is O'Neil 23.  Do you know when O'Neil 24 was taken?

A    That seems to be more along the lines of, you know, one way back.  You know, this has to be in the first ten days somewhere.  I didn't continue to document my leg.

Q    Do you know when O'Neil 27 was taken?

A    I couldn't tell you.

Q    How about O'Neil No. 31?  Do you know when that was taken?

A    This photo?

Q    Yes.

A    This was right after I cut my pants off from the original night, an hour or two, or, you know, two hours after it happened.

Page 115

Elliana O'Neil
April 24, 2023

productive thing to do to let them know you're there and who you are?

MS. BROWN:  Objection.  Vague and ambiguous.

A    That's not part of our protocol.  Only in extreme cases do we speak to the law enforcement.

Q    Well, I'm not talking about the protocol.  I'm talking about you as an individual.  Did it ever occur to you it might be a good idea that you introduce yourself to law enforcement at the protest?

MS. BROWN:  Objection.  Vague and ambiguous.  Calls for speculation.

A    I was there with the National Lawyers Guild and I was doing what I was trained to do.  So, no.  It did not occur to me.

Q    Okay.  And so you've never done it?

A    Not that I recall.  No.

Q    Have you ever attended any protest as a participant?

A    Yes.

Q    In 2020?

A    I may have a few times.

Q    And at these protests you attended as a participant, were you ever injured by less lethal munitions?

Page 124

Elliana O'Neil
April 24, 2023

A    Not that I recall.

Q    Did you ever receive any injuries at the protests you attended as a participant?

A    Not that I recall.

Q    As a legal observer, are you trained to observe all laws?

MS. BROWN:  I'm going to instruct the witness not to answer questions pertaining to the content of legal observer training under attorney work product.

MR. SAKAI:  There's no privilege here.

BY MR. SAKAI:

Q    I'm asking, were you ever trained to observe all laws when you're acting as a legal observer, yes or no?

MS. BROWN:  I'm going to, again, instruct the witness not to answer in addition to attorney work product on the basis of the First Amendment privilege for the legal observer program.

MR. SAKAI:  This goes -- sorry.  This goes directly to the issues that are relevant to her claims against the department.  So, I mean, we'll just mark this and we'll take it to the magistrate also.  Can you please mark the transcript?

//

Page 125

Elliot O'Neil
April 24, 2023

Q   Do you know what the purpose was of marching to Men's Central Jail?

MS. BROWN:  Objection.  Vague and ambiguous.

A   I don't know the exact statement by the organizers.  No.

Q   I'm going to show you a Google aerial of the surroundings of the Hall of Justice.  Okay.  Are you familiar with the location and the surroundings of the Hall of Justice?

A   Just the general area.

Q   Do you recall where you were standing when you were -- when the flash bang was thrown?

A   It was a long time ago.  But I want to say somewhere at the corner of Spring and Temple.  But I can't say for sure without looking back.

Q   Okay.  How would you refresh your recollection?

A   I would either need to read back my statement or look at any time.  I would have to think.  But I do believe it was somewhere along the lines of Spring and Temple.

Q   Okay.  Do you remember what direction you were walking?

A   At what time?

Page 130

Q    When the flash bang was thrown.

A    I was on the cross street, so I would've been on Temple, assuming those are the correct streets.

Q    And do you recall if you were heading north or south on Temple?

A    Is there a compass on there?

Q    North would be up at the top, roughly, and then south would be down at the bottom.  So, if you were on Temple, if you can see the hand at the intersection, heading up towards the Criminal Justice Center, that would be north.  Heading down toward the Springhouse Courthouse would be south.

A    I believe we would've been going south.

Q    And were you on Temple heading south, or were you coming off of Spring Street, heading south on Temple?

A    To the best of my recollection and knowledge, I came up Spring Street, which is where the police were standing, and they told me to stand on Temple.  And then after these incidents, we moved south.

Q    Okay.  What did the -- we'll call them deputies.  What exactly did the deputies tell you?

A    I'm sorry.  Can you repeat that?  I didn't hear you.

Q    Sure.  Instead of -- let's call them deputies,

Page 131

Elita O'Neil
April 24, 2023

Q    And so when he said, "Go over there," you used your discretion to stop at the point where you stopped; is that right?

A    Correct.

Q    Okay.  No one blocked you from walking further down Temple Street; did they?

A    No.

Q    No one blocked you from walking further down south on Spring Street; did they?

A    Not at that time.  There was law enforcement surrounding.

Q    So, you had the discretion on where you ended up; is that right?

MS. BROWN:  Objection.  Vague and ambiguous.

A    Sure.

Q    Okay.  Have you received any training on where you're supposed to stand when you're observing protesters?

A    Yes.

Q    Okay.  What is that training?

MS. BROWN:  I'm going to instruct the witness not to answer questions related to the contents of legal observer training as work product and First Amendment privilege with the National Lawyers Guild

Page 134

Ella O'Neil
April 24, 2023

A    Go ahead.  No.  Go ahead.

Q    Do you have any calendar or diary or any documentation of the protests you've attended in 2020?

A    No.

Q    Tell me what happened at the -- well, before we go into it, so when I'm going to refer to September 5th, that's the protest you attended at the South L.A. station; does that sound right?

A    Yes.  Correct.

Q    Okay.  So, I'll either call it "September 5th" or "South L.A. station"; is that okay?

A    Yes.

Q    Okay.  So, tell me how you were injured at the South L.A. protest on September 5th.

A    Well, I mean, I was hit with rubber bullets and either pepper balls or tear gas.  I can't say for sure.  Whatever it was, something that made you not be able to see or breathe.

Q    Other than the rubber bullets, pepper balls, and gas or tear gas, injured in any other way?

A    Not that I recall.

Q    Okay.  Tell me about how you were hit by rubber bullets.

A    Can you explain -- I mean, I was hit by a rubber bullet.  What context are you looking for?

Page 142

Q    Let's just start with the definition.  Can you describe the rubber bullet?

A    It's a blue pellet that looks like a rubber bullet.

Q    So, if I tell you that sounds like a 40-millimeter foam tip round, does that sound right?

A    I couldn't say for sure, but maybe.

Q    Okay.

A    I didn't see the ammunitions that hit me.

Q    So, how do you know you were hit by this blue rubber bullet?

A    They were all over the ground and I had sustained multiple hits to my side and body.

Q    So, how do you know you were hit by a rubber bullet versus a pepper ball?

A    From my understanding, a pepper ball releases a chemical that helps you not be able to breathe.  And those were two separate times in that night.

Q    So, let's talk about this.  Okay.  So, to your understanding, what precipitated the firing of the rubber bullets, pepper balls that hit you?

        MS. BROWN:  Objection.  Vague and ambiguous.

A    Can you be specific?

Q    Sure.  What is your understanding of what led

Page 143

Elianah O'Neil
April 24, 2023

to those less lethal munitions being fired at you?

MS. BROWN:  Objection.  Vague and ambiguous.  And calls for speculation.

A    From my understanding, there was some interference with a coil that was set up in front of the sheriff's station, touching it, being near it.  But I did not see exactly what happened.  All I know is that I heard them start shooting and I started running the other way, and I was hit multiple times.

Q    Where were you hit?

A    On my, I believe my right side of my body, between, like, my ribs, my lower ribs, and, like, my back hip area.

Q    Okay.  And then just for the record, the deponent is gesturing, while seated, toward, it appears to be, the lower right back area, just off the immediate side of the right, and going down toward the upper right thigh; is that the general area we're talking about?

A    Generally, yes.

Q    Okay.  How many times were you hit in that area?

A    I want to say three, but I can't say for sure.

Q    Did you document these injuries?

A    I had written it down somewhere on what had happened, but I do not believe I have photos of those

Page 144

injuries.

Q    So, can you describe these injuries for us?

A    Bruises.  Pretty intense bruising.

Q    How many bruises?

A    I think there was about two or three.

Q    How big were the bruises?

A    This size.

Q    Okay.  So, for the record, the deponent holds up her left fist indicating size.  Since we're not in the same room, I can't really quantify how big your fist is.  I'm going to --

A    Baseball.

Q    Baseball.  Okay.  Thank you.  So, were all two to three of the bruises about baseball size?

A    To the best of my recollection.

Q    Okay.  So, let's talk about the bruises.  How did they appear?  If we're talking about the baseball size bruises, can you describe what they look like?

A    Run of the mill bruise.  Blue, purple, yellow, that kind of thing.  They were not exactly in an area I could see them.  So, that's the best I can say.

Q    Were the uniformly blue, purple, yellow?

A    To the best I can recall.

Q    Okay.  Were there any distinguishing marks about the bruises, like, distinguishing shapes?

Page 145

Elizabeth O'Neil
April 24, 2023

A    Not on this injury.  No.

Q    How long did it take for the bruises to go away?

A    A few weeks.

Q    Did you seek any treatment for the bruises?

A    Not anything that's not over the drugstore counter.

Q    And what over-the-counter treatments did you take for the bruises?

A    Just Icy Hot, you know, Advil, Naproxen, whatever.

Q    Can you describe -- well, okay.  Let's see. Do you have any bruises from September the 5th today?

A    No.

Q    Okay.  And did you receive any mental health care, treatment as a result of September the 5th?

A    They were combined.  Yes.

Q    And is it anything different than the mental healthcare we talked about in relation to August 25th?

A    No.

Q    Okay.  And so that would be Dr. Gillis; is that correct?  Sorry.  Is that a "Yes"?

A    Yes.  Yes.

Q    And so is it the same that you received treatment from Dr. Gillis for a year with weekly

Page 146

Elta O'Neil
April 24, 2023

appointments?

A    Yes.

Q    Okay.   So, on the pain scale from the most intense pain being 10 to no pain being 0, what would you rate these two to three hits with either the blue pellets or the pepper balls at?

MS. BROWN:   Objection.   Vague and ambiguous.

A    The impact or the result?

Q    Let's say the impact.

MS. BROWN:   Same objection.

A    Like, an 8.

Q    Okay.   Pretty painful, then?

A    Correct.

Q    Okay.   And then how about the resulting pain?

MS. BROWN:   Objection.   Vague and ambiguous.

A    Dwindling, you know, as a bruise does.   It hurt a lot at first.   8, 7, 6, 5 as it goes.

Q    So, these were -- you've had other bruises in your life, I take it?

A    Yes.

Q    And these bruises healed in the normal course as you just described them; yes?

A    Yes.

Page 147

Elliott O'Neil
April 24, 2023

toward.

(Exhibit 12 was marked for identification.)

I'm going to save this as -- oh -- Exhibit 12. So, let me see if I can save it. Okay. I'm trying to see if I could capture this. How long after the less than lethals were fired did the symptoms of the gas wear off?

A    There was lingering remains all night.

Q    How about the next day?

A    I think I was okay by the next day.

Q    What time did you leave the protest?

A    I couldn't say.

Q    Did you drive?

A    I did. Yes.

Q    And did you drive yourself home?

A    I did. Yes.

Q    Well, let me ask, did you go anywhere else from the protest?

A    I don't recall.

Q    Did you drive anyone away from the protest?

A    Possibly.

Q    Do you have any memory of who that might've been?

A    Could've been Addie Tinnell or Dee Barbadillo.

Page 168

Elia O'Neil
April 24, 2023

A    Yes.

Q    Okay.  And then of those over 40 protests, do you have any idea of how many you attended as a legal observer versus a participant?

A    98 percent legal observer.

Q    Okay.  Did you attend any protests in 2021?

A    Yes.

Q    About how many?

A    The same amount, I guess.  I'm not really sure how many there were.

Q    So, let's just say approximately 40?

A    Sure.

Q    Okay.  And how about in 2022?  Do you know how many protests you've attended?

A    Probably a little less, but, I mean, at least another 20 or so, probably.

Q    And how about this year?  Have you attended any protests?

A    Yes.

Q    Approximately how many?

A    Ten, maybe, five.  I'm not sure.

Q    Okay.  So, somewhere between five and ten?

A    Yeah.

Q    So, you know, crunching the numbers roughly, that puts us at about 105 and 110 protests since 2020.

Page 173

Elliot O'Neil
April 24, 2023

So, let me ask before 2020, going back, let's say -- let's start at 2013.  From 2013 up until 2020, do you know about how many protests you've attended?

A    I couldn't recall.

Q    Is it about the same number that we're talking about from 2020 until current?

A    No.  Probably not.  Probably less.

Q    About how much less?  Like, 50?

A    In seven years?

Q    Yes.

A    Yeah.  I don't know.  I really couldn't put a number on it.  I'm sorry.

Q    Okay.  So, let's just estimate then.  From 2013 until today, would it be safe to say you've attended, let's say, over 200 protests?

A    I really don't know.  I don't have an accurate -- I don't remember from 2013 to 2020.  2020 to now, yes, a lot.  2013, I was not as active in that capacity.

Q    So, from 2013 until today, other than the injuries you received at these two protests, have you ever been injured at any of these other protests?

A    Yes.

Q    Okay.  And what type of injuries did you receive at these other protests?

Page 174

Elita O'Neil
April 24, 2023

A    Bruises, et cetera.

Q    Anything else, other than bruises?

A    Meaning, like, what the physical injury was or how I was violated?

Q    What the physical injury was.

A    No.  Just bruising.

Q    And at how many protests did you receive or were you injured and bruised?

A    Like, ten total.

Q    And of these ten, let's say approximately ten total protests, other than these two protests where you were injured and bruised, do you recall how you received the bruises?

A    Yes.

Q    How did you receive them?

A    Police batons.

Q    Anything else?

A    Just the batons and the bully stick.

Q    Anything else?

A    Not that I recall.

Q    And do you recall what agencies were involved in these other ten protests where you were injured?

A    Not all of them, but LAPD and LASD, for sure.

Q    Okay.  So, what protests did you attend where you received a bruise from a sheriff department baton?

Page 175

Elliot O'Neil
April 24, 2023

A    I don't recall.

Q    Do you recall how many times you've attended a protest and been injured by a sheriff department baton?

A    I don't recall.  No.

Q    Okay.  So, let's just say, then, have you -- other than these two protests we're here to talk about, September the 5th and August the 25th, have you ever been injured by less lethal munitions at a protest?

A    No.

Q    Okay.  Have you ever been arrested?

A    No.

Q    Are you a member of the National Lawyers Guild?

A    Yes.

Q    When did you first join?

A    I believe in 2020.

Q    When did you first become a legal observer?

A    In 2020.

Q    So, what made you want to join the Guild?

A    I believed in the mission statement and holding police accountable for brutality.

Q    Did you know anybody that was part of the organization before you joined?

A    No.

Q    Are you currently still a member?

Page 176

Elliana O'Neil
April 24, 2023

A    Not that I recall.  No.

Q    When we were talking about the flash bang and the pain, I believe you testified that was the most painful thing you've ever experienced; is that right?

A    To the best of my recollection, yeah.

Q    Sure.  So, if we're talking about a physical pain scale, 0 being no pain, 10 being the worst pain you ever felt, this would be a 10; is that right?

A    Yes.

Q    Have you ever experienced anything other than what we've talked about for the other protest that you would consider on the pain scale of being an 8, 9, or 10?

MS. BROWN:  Objection.  Vague and ambiguous.

A    I'm sorry.  For when?

Q    At any time, have you experienced any pain between the 8 and 10 on the pain scale?  10 is for the flash bang, and I believe you testified an 8 is when you were hit by the rubber bullet.

MS. BROWN:  Same objection.

A    And you're asking if I've ever felt that, or at a protest?

Q    No.  Ever.

MS. BROWN:  Same objection.

Page 203

Elliot O'Neil
April 24, 2023

A    Oh.    Not that I recall.

Q    Okay.  At the time of the protest, did you have a general physician?

A    I did not.  No.

Q    Other than the -- I think it was Dr. Gillis, have you sought any other mental healthcare treatment?

A    No.

Q    Have you ever organized a protest?

A    No.

Q    Who's your attorney in this lawsuit?

A    Rebecca Brown.

MR. SAKAI:  Other than Rebecca, are -- well, okay.  Let's take a break.  Let's take, possibly, 15 minutes.

THE OFFICER:  Okay.  This marks the end of Media No. 8.  The time is 5:19 p.m.  We are off the record.

(Off the record.)

THE OFFICER:  This marks the beginning of Media No. 9.  The time is 5:40 p.m.  We're on the record.

BY MR. SAKAI:

Q    Follow-up question about the approximately 200 protests that you attended from 2020 onto today.  Do you have any estimate of how many of those protests involved

Page 204

Elita O'Neil
April 24, 2023

MS. BROWN:  Objection.  Vague and ambiguous.

A    Sure.  Yes.

Q    Did you ever test positive for COVID within two weeks after attending a protest?

A    No.

MR. SAKAI:  All right.  I don't have any other questions.

MS. BROWN:  I don't have cross questions.

MR. SAKAI:  Okay.

THE OFFICER:  Okay.  This is the reporter speaking.  Let me just do some housekeeping.  Ms. Brown, did you need to order a copy of this transcript?

MS. BROWN:  Yes, please.

THE OFFICER:  Perfect.  And, Mr. Sakai, any sort of expedite on yours?

MR. SAKAI:  No.  I do have just a follow-up question.  I know on the record, you, at the very beginning, you read on that this transcript can be used for any and all purposes.  I'm just going to amend that a little bit that the parties stipulate that this transcript can be used -- that a certified transcript can be used for any and all purposes, if that's agreeable.

MS. BROWN:  Yes.  We stipulate to that.

Page 207

CERTIFICATE OF DEPOSITION OFFICER

I, PETER SHEN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

PETER SHEN

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**D027**

CERTIFICATE OF TRANSCRIBER

I, BRENNA SHEA, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

BRENNA SHEA

Page 210

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Blvd. #2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,

PLAINTIFFS,

v.

COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,

DEFENDANTS.

Case No.: 2:20-cv-07870-DMG-PD
*Assigned to: Honorable Dolly M. Gee*

**PLAINTIFF JILL O'NEIL'S RESPONSE TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.    Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

I am a hairdresser and am working towards obtaining my degree in sociology. I have attended trainings put on by the National Lawyers Guild to be a legal observer at protests.  I have learned to recognize and document police tactics and use of force

-3-

**D028**

on protesters as part of this training.  I have attended around one hundred actions as a legal observer for the National Lawyers Guild, which is an organization which works to advance the rights of all Americans by advocating for groups which are marginalized or oppressed, including those impacted by police violence and peaceful protesters whose rights are violated by law enforcement.

**August 25, 2020**

On August 25, 2020, I attended a peaceful demonstration in the downtown area of Los Angeles as a legal observer. At that time I had attended around twenty actions as a legal observer.  The subject matter of the protest related to police violence, specifically a victim of Pasadena police brutality named Anthony McClain, and there was significant LASD (Los Angeles Sheriff's Department) presence at the demonstration. At all times while I was at the demonstration, I was wearing a lime green legal observer hat, which I believe sheriff's deputies are aware signifies that I am attending the demonstration as an NLG-trained legal observer rather than as a participant, because I have interacted with them numerous times while legal observing.

By 10:10 p.m., there was a law enforcement helicopter circling the demonstration.  I counted dozens of sheriff's deputies in riot gear patrolling the area of the demonstration, despite the fact that it was peaceful and there was no violence occurring.

I saw most sheriff's deputies had their hands on their "less lethal" weapons in a low ready position by 11:11 p.m.  Most sheriff's deputies had their badges and names covered or simply were not wearing them at all.

I was observing with Diana Barbadillo.  We became separated from the demonstration at one point, and were traveling back towards the group.  They were at the corner of Temple and Hill, with backs to us, and one deputy in particular was

413    -4-    **D028**

telling us to get to the side and move across the street. We had a short interaction with him in which it was my impression that he did not want to let us go through towards the demonstration. I believe I said words to the effect that we were legal observers or I pointed at my hat, and he responded that we should not get smart. I believe he was unhappy about letting us through based on his tone of voice and facial expression. We followed the deputy's instruction to move towards the other side of the street as we continued towards the demonstration.

Demonstrators were at least 20' from the deputies, not advancing; in fact, they were moving away from the deputies, moving to the south. I walked in front of the demonstrators to begin attempting to get badge numbers. I was about five feet in front of demonstrators, closer to the deputies. I was not able to get any badge numbers because there was not enough time; within two seconds I saw a deputy throw a flash bang grenade at me. I ran away from it to the right (south), and then suddenly I felt something explode between my legs.

It is my personal belief that the flash bang grenades were thrown at me and Diana Barbadillo intentionally because of our legal observer status, based on the attitudes of the deputies we spoke with beforehand. We were the only two legal observers present.

I sustained multiple injuries on both legs; the worse injuries were on the right leg, but the resulting bruises covered my legs on both sides.

I continued to run away south, holding my legs, screaming in extreme pain, and calling for help. A demonstrator, Martin Leyva, came to help me and as he got to me I saw four sheriff's deputies aiming and firing weapons at me. I believe they were rubber bullets. Martin covered me with his body and we were fortunately not hit.

The deputies stopped firing, so we got up and started moving and stayed in the middle of the group of demonstrators. I checked in with Diana Barbadillo and

continued to walk with the protest to stay safe until I could get away to go home and tend to my injuries.  Because there were sheriff's deputies on every corner, it did not appear safe to leave on my own for some time after the injuries occurred.

I observed at least seven other demonstrators who were confirmed injured, besides myself. I know that besides me, Joe Mischo, Vishal Singh, and Diana Barbadillo were among the injured, and there were others. Several demonstrators had to have their eyes cleaned out by medics.  At least two people, including one of the organizers (someone named Bree), were on the ground in pain and being attended to by other people.  Di Barbadillo had some sort of shrapnel or other hit.  I know others got hit but did not need medical attention.  I did not directly observe, but I learned later that Joe Mischo was hit in the eye directly with one of the projectiles.

I did seek medical attention from a person I know who is a Registered Nurse, Sandy Honig. Due to cost concerns I did not go to an emergency room or urgent care at first.  However, on September 3 or 4, 2020, I did go to an urgent care because the wound appeared as if it was becoming infected.  They said it was on the verge of becoming infected, cleaned it for me, and gave me a steroid cream to help. I paid $145.00 out of pocket. When this happened, I was on Medi-Cal (and then it expired at the end of the year and I was just uninsured), and I couldn't find an urgent care that accepted Medi-Cal. Due to covid, many places weren't taking people or there would be very long waits. Finally, I figured out an arrangement recently with a masseuse, Celina Reyes, and an acupuncturist, Dr. Amalia Gardner, to treat me to help break up the scar tissue. I trade services with them; because I am a hairstylist, I do their hair, and they treat me in return. I have gone to Dr. Gardner about 6 times or so, and to Ms. Reyes once. I would have wanted to go more, but she stopped because of the covid-19 delta variant.

For a while I could hobble around, but for about a week I spent the majority of my days staying off my leg with the leg elevated and wrapped. It was on the side of my

knee, so every time I bent my leg to walk, the wound would open and start bleeding. It was really painful. After about a week, it started to scab over and stop bleeding, and I just couldn't stay in bed anymore. I did legal observe at some protests in this time, but I went to fewer than I otherwise would have and I would leave early, and I would participate less and in a different way than I normally would. If I had been to legal observe, I wouldn't be able to do much else on my feet that day. For a couple of weeks, I had to be really careful not to get my leg wet. It made showering difficult, because I would have to triple wrap my leg with gauze, shower as quickly as I could, then unwrap the gauze. For about six weeks, I couldn't really wear pants because if they were too tight, my leg would start to bleed.

<u>September 5, 2020 Demonstration</u>

On September 5, 2020, I attended a peaceful demonstration scheduled to begin at 4pm, but I didn't arrive until 5:45 p.m. because I had been working. On September 1, we were allowed to reopen salons, so I had to go back to work because I had been off work since the last week of July and I really needed the money. I recall clients asking me what was wrong with my leg.

I attended as a legal observer. The demonstration was attended by about 250-300 other individuals, including several other legal observers and members of the media with cameras. I know that some of them were with the media because a woman dressed up formally with a microphone and two cameramen who appeared to be with a news network came to interview one of the demonstrators who was injured early in the demonstration. I saw another person wearing a press hat. I was not paying as much attention to the media because my focus was to observe the deputies.

At all times while I was at the demonstration, I was wearing a lime green legal observer hat.

The demonstrators had gathered in front of the sheriff's department on Imperial in the South-Central area of Los Angeles to express disapproval regarding the killing of Dijon Kizzee. There was significant LASD (Los Angeles Sheriff's Department) presence outside the station watching the demonstration.

LASD erected some sort of barrier in front of (to the north of) the station, using yellow caution tape and what we call the Slinky, which is yellow wire. I am not aware of how far around the station the barrier extended. The deputies stood close to the station, about 75'-100' behind (to the south of) the barrier.

Imperial is a street that runs east-west. For much of the demonstration, most of the demonstrators were in the street in front of the sheriff's station. Directly south of Imperial at that location is a wide sidewalk. Directly south of the wide sidewalk is a grassy area about twice the width of the sidewalk. Directly south of the grassy area is a line of bushes. Directly south of the line of bushes is a narrower sidewalk. Directly south of the narrow sidewalk is a set of parking spaces oriented north-south. About halfway through those parking spaces, so that cars could not park in them, is where the Sheriff's Department had set up the barrier.

As soon as I arrived, around 6:00 p.m., I walked over to Addie Tinnell, a fellow legal observer, to speak with her regarding the plan for legal observing. I saw a deputy with a less lethal weapon and heard a noise. Someone claimed that someone had touched the barrier and a deputy had fired at a little girl in response, who ran away to her mother. I spoke with the little girl, who is Keyanna Bean and Cliff Smith's child. She was about 7 years old and was crying. She said she had been hit by a pepper ball and that it was in her nose and throat. At that time, everyone was listening to the BLM speakers, who acknowledged what had just happened to the little girl, but encouraged the crowd not to react to that situation.

The demonstration began to march towards the 110 freeway. Di Barbadillo – another legal observer – and I were a bit behind the march and caught up to the

front. The march entered the 110 freeway. The highway patrol came. The demonstration remained peaceful the entire time and ultimately left the freeway and marched back to the sheriff's station.

At the station, people were standing on the hill north of the bushes. Some were gathered in the street. The media was standing between the bushes and the barrier. We were there between 30-45 minutes.

At around 8:35-8:40 p.m., Di and I were standing at the western entrance to the parking lot, walking towards the barrier. We began to hear shots being fired. I had not heard a dispersal order. I ran for cover with Di. I was hit at least three times on my right hip and the right side of my right leg, which left marks, but I was okay to keep walking. I was also tear gassed and could not breathe for what felt like a long time but may have only been 2-3 minutes. I could not stop coughing for a long time and gasping for air for a long time as well. I was with Di and Katherine Franco, another legal observer, both of whom were also struggling to breathe. I was running backwards away; I looked for Addie, who was still ducking where she was for cover and seemed to have some kind of shelter. The deputies did not cease firing to allow us to leave. We were exposed and trying to retreat.

Addie and Katherine went to look for other people that they knew had not yet left. I went to get my car and came back to pick up anyone who needed to get out. During the time I walked to my car, I briefly took my hat off, but other than that I had the hat back on.

When I finally did hear a dispersal order, I remember it was a pretty standard dispersal order, but it was not given in Spanish and they did not tell us where to leave or how to leave or where would be safe to go and not get shot. It was not given until after shots had already been fired, and at the time it was given, there were still deputies firing at us. Many demonstrators took cover behind cars that were on Imperial and a semi-truck that was parked on the north side of the street.

At some point there was a break in the firing. I parked my car for several minutes to try to locate three of the other legal observers, two sheriff's vehicles pulled out from the station onto Imperial and someone inside began to throw at least two flash bang grenades at my car and other cars that were shielding demonstrators from fire. I did not see any damage to my car but I feared that my tires would be damaged by the grenades, and left; it took me about 45 minutes from the time the tear gas was sprayed to be able to see well enough to drive, and I had to rinse my eyes out with saline first. I was able to find out that everyone else I knew that was there had made it out safely. I gave one person a ride to her car; it might have been Di or Addie. I know it wasn't Katherine. Martin Leyva was also there most of the time.

The hit on my thigh caused a bruise. Another rubber bullet hit me in the wound from the flash bang grenade just a few days before and caused it to reopen and bleed. We had to take our masks off because they were covered in tear gas. Even if I moved on the drive home, my clothes would give off some of it and the smell would return and I would cough again. For about two hours after the tear gas, I was coughing – at first constantly, and then more intermittently as time went on.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

August 25, 2020:

I sustained multiple injuries on both legs; the worse injuries were on the right leg, but the resulting bruises covered my legs on both sides. I continued to run away south, holding my legs, screaming in extreme pain, and calling for help. A demonstrator, Martin Leyva, came to help me and as he got to me I saw four sheriff's deputies aiming and firing weapons at me.  I believe they were rubber bullets.  Martin covered me with his body and we were fortunately not hit. The deputies stopped firing, so we got up and started moving and stayed in the middle of the group of demonstrators.  I checked in with Diana Barbadillo and continued to walk with the protest to stay safe until I could get away to go home and tend to my injuries.  Because there were sheriff's deputies on every corner, it did not appear safe to leave on my own for some time after the injuries occurred. I observed at least seven other demonstrators who were confirmed injured, besides myself. I sought medical attention from a person I know who is a Registered Nurse, Sandy Honig. Due to cost concerns I did not go to an emergency room or urgent care at first. However, on September 3 or 4, 2020, I did go to Advanced Urgent Care in Pasadena because the wound appeared as if it was becoming infected. They said it was on the verge of becoming infected, cleaned it for me, and gave me a steroid cream to help. I paid $145.00 out of pocket.

When this happened, I was on Medi-Cal (and then it expired at the end of 2020 and I was just uninsured), and I couldn't find an urgent care that accepted Medi-Cal. Due to covid, many places weren't taking people or there would be very long waits. Finally, I figured out an arrangement recently with a masseuse, Celina Reyes, and an acupuncturist, Dr. Amalia Gardner, to treat me to help break up the scar tissue. I trade services with them; because I am a hairstylist, I do their hair, and they treat me in return. I have gone to Dr. Gardner about 6 times or so, and to Ms. Reyes once. I would have wanted to go more, but she stopped because of the covid-19's delta variant.

For a while after the explosion, I could hobble around, but for about a week I spent the majority of my days staying off my leg with the leg elevated and wrapped. It was on the side of my knee, so every time I bent my leg to walk, the wound would open and start bleeding. It was really painful. After about a week, it started to scab over and stop bleeding, and I just couldn't stay in bed anymore. I did legal observe at some protests during this time, but I went to fewer than I otherwise would have and I would leave early, and I would participate in a different way than I normally would. If I had been to legal observe, I wouldn't be able to do much else on my feet that day. For a couple of weeks, I had to be really careful not to get my leg wet. It made showering difficult, because I would have to triple wrap my leg with gauze, shower as quickly as I could, then unwrap the gauze. For about six weeks, I couldn't really wear pants because if they were too tight, my leg would start to bleed.

September 5, 2020:

At around 8:35-8:40 p.m., Diana Barbadillo ("Di") and I were standing at the western entrance to the parking lot, walking towards the barrier. We began to hear shots being fired. I had not heard a dispersal order. I ran for cover with Di. I was hit at least three times on my right hip and the right side of my right leg, which left marks, but I was okay to keep walking. I was also tear gassed and could not breathe for what felt like a long time but may have only been 2-3 minutes. I could not stop coughing for a long time and gasping for air for a long time as well. I was with Di and Katherine Franco, another legal observer, both of whom were also struggling to breathe. I was running backwards away; I looked for Addie, who was still ducking where she was for cover and seemed to have some kind of shelter. The deputies did not cease firing to allow us to leave. We were exposed and trying to retreat.

Addie and Katherine went to look for other people that they knew had not yet left. I went to get my car and came back to pick up anyone who needed to get out. During

the time I walked to my car, I briefly took my hat off, but other than that I had the hat back on.

When I finally did hear a dispersal order, I remember it was a pretty standard dispersal order, but it was not given in Spanish and they did not tell us where to leave or how to leave or where would be safe to go and not get shot. It was not given until after shots had already been fired, and at the time it was given, there were still deputies firing at us. Many demonstrators took cover behind cars that were on Imperial and a semi-truck that was parked on the north side of the street.

At some point there was a break in the firing. I parked my car for several minutes to try to locate three of the other legal observers, two sheriff's vehicles pulled out from the station onto Imperial and someone inside began to throw at least two flash bang grenades at my car and other cars that were blocking demonstrators. I did not see any damage to my car but I feared that my tires would be damaged by the grenades, and left; it took me about 45 minutes from the time the tear gas was sprayed to be able to see well enough to drive, and I had to rinse my eyes out with saline first. I was able to find out that everyone else I knew that was there had made it out safely. I gave one person a ride to her car; it might have been Di or Addie. I know it wasn't Katherine. Martin Leyva was also there most of the time.

The hit on my thigh caused a bruise. Another rubber bullet hit me in the wound from the flash bang grenade just a few days before and caused it to reopen and bleed. We had to take our masks off because they were covered in tear gas. Even if I moved on the drive home, my clothes would give off some of it and the smell would return and I would cough again. For about two hours after the tear gas, I was coughing – at first constantly, and then more intermittently as time went on.

**INTERROGATORY NO. 3:**

422     -13-                                                    **D028**

## VERIFICATION

I have read the below-titled documents and know their contents:

**PLAINTIFF** Jill O'Neil **'S RESPONSES TO COUNTY OF LOS ANGELES' FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF SPECIAL INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION**

I am a Plaintiff in this action, numbered 2:20-cv-07870-DMG-PD, filed in the Central District of the United States Federal Court. The matters stated in the foregoing documents are true and correct to the best of my knowledge except as to matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __03 / 08 / 2022__, in Los Angeles County, California.

_____

Plaintiff  Jill O'Neil

423

**D028**

Doc ID: 8814dc6435b3e28946384b28304d7213acdc45fc

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--o0o--

KRIZIA BERG, et al,

Plaintiffs,

vs.                                          NO. 2:20-CV-07870

DMG-PD

COUNTY OF LOS ANGELES, etc.,

et al.,

Defendants.

_____//

VIDEOTAPED ZOOM DEPOSITION OF

SHAKEER RAHMAN

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 14, 2023

VERITEXT

COURT REPORTERS

(213) 623-5005

www.veritext.com

REPORTED BY:  CASSANDRA RUSSELL, CSR NO. 11934

FILE NO.:  5807467

Page 1

downtown that I attended.

Q.  When was the next one you remember?

A.  Um, I guess I just remember that that week -- kind of the week or two followed the police killing of George Floyd.  There were a bunch of protests that I attended.

Locations I can remember were downtown around the LAPD building and the Hall of Justice, the County building, and then in the Mid City neighborhood around Pan Pacific Park, probably other locations too.

There were just a lot of protests in those couple weeks -- two or three weeks.  And then after that I remember this protest in kind of late June in Compton.  I can't remember -- there were -- there were just a lot back then.  So I don't remember exact dates.

Q.  Okay.  So, you know, roughly I think the first protest was probably in Pan Pacific Park at the end of May, May 30th.  Does that sound about right?

A.  I was at a protest around Pan Pacific Park.  I think I had been at a protest before that, but I don't know if that's the first.

Q.  Okay.  So what I have here is that

Page 23

roughly you attended five protests.  They seem to    10:46:36

be around the two weeks following George Floyd's    10:46:42

killing.  And they were in downtown LA.  One was    10:46:49

by Sheriff headquarters, one was by the County    10:46:53

Hall of Justice, one was Mid City and Pan Pacific    10:46:58

Park.  And then in June you also attended the    10:47:01

Compton protest, which is the subject of this    10:47:06

lawsuit.  Other than that can you recall any other    10:47:09

protest that you attended?    10:47:12

        A.    Well, some of that was incorrect.  I    10:47:12

said more than five.    10:47:15

        Q.    Okay.    10:47:16

        A.    I'm just giving kind of the minimum.    10:47:16

And then I said outside the LAPD headquarters.  I    10:47:19

don't know where the Sheriff headquarters are.    10:47:25

        Q.    All right.  So with those corrections,    10:47:28

do you recall any other protests that you    10:47:33

attended?    10:47:35

        A.    Yeah.  Actually, when you say two weeks    10:47:37

let's just make that longer.  I think I had said    10:47:40

at least two weeks.  So let's say the month after    10:47:42

that.  I'm remembering now there was a protest in    10:47:45

Beverly Hills.    10:47:49

        Q.    Uh-huh.    10:47:50

        A.    Yeah, I honestly couldn't tell you the    10:47:52

Page 24

Shane Rahman
March 14, 2023

date.  I'm trying to remember where else there might have been protests.  Yeah, nothing more is coming to mind.

Like I said, in that -- kind of the weeks following George Floyd's killing there were a lot of protests in the city.  I attended some of them.  I just don't remember exactly what dates.

Q.   After -- well, just so I have this clear, to the best of your memory those are the protests that you attended in 2020?

A.   That's correct.

Q.   Okay.  After 2020 from, say, 2021 to present, have you attended any other similar protests?

A.   Yes.  I've attended protests related to police violence in 2021.

Q.   Chronologically let's go through those. When is the first you remember?

A.   Yeah, honestly I don't have these clear in my head.  You know, I've attended a lot of protests in different capacities, including as an attorney and for other work.  So I -- like, I can just tell you that I've -- I definitely attended a bunch of protests in 2021.

If you ask me about specific dates

Page 25

I can try to remember them, but I don't remember them generally.

Q.   How about in 2022?

A.   The same as what I said for 2021.

Q.   Okay.   How about for this year?

A.   I've attended protests outside -- yes, outside of LAPD headquarters and outside City Hall.   There were some protests a couple months ago after a police killing, the killing in Memphis miss, but I don't remember the exact date.

Q.   These protests that we've talked about in 2020 to present, did these occur in Los Angeles County?

A.   Yes.

Q.   Do you document your attendance at these protests in any way, for instance, like an Outlook calendar that let's you know this is going on on this day I'm going to go, or do you write it in in a handwritten calendar or something like that?

A.   No, I don't write or calendar it in.

Q.   Other than a calendar, do you document your attendance at these protests in any way?

A.   Sometimes I will take photos with my phone or videos.

Q.   Do you ever post these videos or photos?

Page 26

Shakeel Rahman
March 14, 2023

Q.   At these protests that you attended -- well, let me ask this.

Prior to May of 2020, had you attended any other similar protests in the County of Los Angeles?

A.   Can you explain what you mean by other similar?

Q.   We'll with just go with the same deposition.  So it's both LA protests, police violence.

A.   I don't think so.  For the months before May 2020 it was the pandemic.  And then I'm trying to think in 2019.  I don't think so.

Q.   So in these protests we just talked about from the mid -- the middle of May 2020 to present, how many of them did you witness police use less-lethal munitions?

A.   Also, when you're saying protests, like, we're kind of counting one protest as one day?  Because I can kind of think of some of the May 2020 protests as sort of ongoing protests.  Do you mean -- yeah.

Q.   Yeah, let's just say -- so we're all clear, so let's just say Pan Pacific Park and in those large gathering it went on let's call it for

Page 31

the day versus South LA Station where it went on

for, say, two weeks, we'll count each of those

protest days as separate protests.

A. Okay. Got it. Less-lethal munitions probably more than five, like probably not more than a dozen, but maybe less than ten. Somewhere in there.

Q. Based on what you can remember, let's go through this chronology. When was the first time you saw law enforcement in LA County use less-lethal munitions at a protest?

A. It would have been in May 2020, but I don't know which of the dates.

Q. Okay. When you first saw less-lethal munitions used, do you know what kind of munitions were used?

A. I don't know what kind.

Q. Okay. When was the next time you saw less-lethal munitions used at a protest?

A. I saw them use, I would say, often in those protests in May and June of 2020.

Q. What do you mean by often?

A. They were like -- I can think of multiple days they were used. Yeah, multiple days that I witnessed them being used. And so I don't

Page 32

Shakeel Rahman
March 14, 2023

A.   Yes, that's accurate.  You said weren't used?

Q.   That's correct, yeah.

Some protests that you attended law enforcement was there and no less-than-lethal munitions were used; is that correct?

A.   Yes.

Q.   Other than the day of this incident in Compton, do you know what types of less-than-lethal munitions you witnessed being used during those 1 to 10 protests?

A.   I don't know the types of the munitions.

Q.   Okay.  In any of the protests could you identify specific law enforcement officers or deputies who were using the less-than-lethal munitions?

A.   No.

MS. BROWN:  Objection.  Vague and ambiguous.

BY MR. SAKAI:

Q.   What's your date of birth?

A.   July 12, 1987.

Q.   Where were you born?

A.   Portland, Oregon.

Q.   At the time of let's just call it June

Page 35

organizations.

Q.   It's a highly competitive and a prestigious award; is that true?  Or fellowship?

A.   I don't know if I would characterize it that way.  But it's -- it's -- yeah, you have to apply for it.  And it's for public interest work.

Q.   I'll confirm your responses in your interrogatories and request for production of documents that you are not seeking any damages for loss of earnings or future loss of earnings; is that correct?

A.   Yes, that's correct.

Q.   Okay.  And now you're also not seeking damages for medical expenses; is that correct?

A.   That's correct.

Q.   Other than this lawsuit have you ever been a party to a lawsuit?

A.   I don't think so.

Q.   And we previously talked about -- a little bit about the lawsuits that you're involved in on the counsel side against the City of Los Angeles.  Can you estimate how many cases you filed in your capacity as an attorney where a law enforcement agency or the city that is -- that governs the law enforcement agency is a party in

Page 45

THE WITNESS: Yeah, can you explain 11:37:43

what you mean by involved? 11:37:43

BY MR. SAKAI: 11:37:47

Q. Sure. So let's -- let's say, you know, 11:37:47

you understand, you know, as an attorney working 11:37:50

in the this filed that if you're in the City of 11:37:52

Los Angeles you're going to have the LAPD who is 11:37:55

going to be there. If you're in the county area 11:37:56

it's the Sheriff's Department. If you're in 11:38:00

another smaller city that has their own police 11:38:02

department they're going to be patrolling it. 11:38:06

So for these protests that you 11:38:09

attended, you know which law enforcement was 11:38:10

involved in policing the protests. 11:38:11

A. I can list, like, law enforcement 11:38:15

agencies that I've seen. 11:38:16

Q. Okay. 11:38:18

A. So the Los Angeles Police Department, 11:38:20

I've seen the Los Angeles Sheriff's Department. 11:38:24

I've seen Beverly Hills Police. Maybe I've seen 11:38:26

the Highway Patrol, but I'm not honestly not sure. 11:38:30

Q. At some of these protests that we talked 11:38:35

about they were -- would it be accurate to say 11:38:37

that they were not LA Sheriff's Department 11:38:40

protests, meaning that the LA Sheriff's Department 11:38:44

Page 48

Shakeer Rahman
March 14, 2023

wasn't there?                                    11:38:47

A.    I would say for most of them the LA        11:38:48

Sheriff's Department was not there.              11:38:52

Q.    Okay.  So, for example, we were talking    11:38:53

about the LAPD lawsuits you're involved with.    11:38:56

Those deal with a whole bunch of other protests  11:38:59

that the Sheriff's Department wasn't involved     11:39:02

with; is that right?                             11:39:05

A.    I think some of -- at least the case       11:39:06

that has to do with the protest from the summer of  11:39:09

2020 that is against the City of Los Angeles, I  11:39:11

think the Sheriff's Department was in the mix of  11:39:15

some those.                                      11:39:19

Q.    Okay.                                      11:39:21

A.    I don't know for sure, but I think with    11:39:22

those kind of larger-scale protests there are    11:39:24

multiple agencies.                               11:39:28

Q.    Okay.  So some of the protests that you    11:39:29

saw less-than-lethal munitions used at were      11:39:31

protests that the LA Sheriff's Department was not  11:39:37

involved with; is that true?                     11:39:41

A.    Yes.  At least some of them.               11:39:44

Q.    Okay.  At the time of the 2020 protests,   11:39:47

did you have any social media accounts?          11:40:38

A.    Yes.                                       11:40:42

Page 49

Shakeer Rahman
March 14, 2023

I -- yeah, I'm their -- I represent the plaintiffs.

Q. So as a plaintiffs' attorney you're an advocate for the plaintiffs against the City of Los Angeles and against the LAPD; is that right?

A. Yeah. I'm representing them in the case. I don't know what -- I guess what are you trying to say besides I represent them? Maybe that's what I'm kind of confused about.

Q. Maybe that's -- that's -- that's the easier question.

A. Yeah, I represent the plaintiffs.

Q. And as an attorney in your capacity representing the plaintiff's it's your ethical duty to zealously represent and advocate for their interests; is that right?

A. Yeah. I have an ethical responsibility to zealously represent their interests.

Q. Okay. So as the plaintiff attorney on those cases you're not a neutral party?

A. No. I'm an officer of the court representing my clients.

Q. Have you ever had any negative interactions with law enforcement?

A. Yeah. I was hit in the head with a

Page 64

teargas canister in this case.

Q.   Okay.   Anything else?

A.   I've witnessed -- I've witnessed unlawful, excessive policing in a variety of contexts.

Q.   Anything else?

A.   I've witnessed excessive forces at other protests.

Q.   Anything else?

A.   I've witnessed police abuses and violence toward my clients in a variety of contexts.  Or not witnessed, like, aware of.

Q.   Anything else?

A.   I'm aware of the history and kind of news and reporting on variety of forms of misconduct and harm by police officers.

Q.   Anything else?

A.   I think everything else fits in one of those answers.

Q.   And so what is the unlawful conduct that you witnessed other than this -- the incident that we're here for today?

A.   When you say "witnessed," do you mean like personally rather than sort of seeing video or reading about it in the news?

Page 65

Shakeel Rahman
March 14, 2023

All you know is the object gets thrown at you, 12:22:37
right?  So, you know an object gets thrown at -- 12:22:40
so, for instance, in this case I believe you 12:22:40
allege a canister was thrown at your head.  Is 12:22:44
that right? 12:22:50

A.   Yes. 12:22:50

Q.   How do you know that? 12:22:51

A.   I alleged that the canister hit me in 12:22:52
the head. 12:22:55

Q.   Okay.  And so -- okay. 12:22:56

So do you think the canister was 12:22:59
thrown at your head? 12:23:01

A.   I don't know.  I think -- what I can say 12:23:05
is given the fact that it hit me in my head and 12:23:07
from a fairly close -- the -- the Sheriff's 12:23:14
deputies were standing not that far away.  Seems 12:23:17
like you would of had to aim for my head to hit my 12:23:21
head. 12:23:25

Q.   So now if that same Sheriff deputy threw 12:23:25
a tire iron at you, would that be peaceful? 12:23:27

A.   No. 12:23:34

Q.   Okay.  And if you threw a tire iron at 12:23:35
that deputy would be being peaceful? 12:23:37

A.   Again, the at -- but here you're just 12:23:41
imagining it's flipped and we're hitting him in 12:23:43

Page 82

Shakeer Rahman
March 14, 2023

Boulevard basically, because that's where we had marched.                                                    02:15:54
02:15:56

Or maybe some people -- I think there's a Metro right there, too.  And so we were -- people were just kind of, yeah, disbursing.  And it's around then that I came up against an exit that I -- that previously had been open.  And the Sheriff's deputies had set up metal barricades there.  And -- and were standing there armed kind of closing off, blocking the exit.                                                    02:15:57
02:15:58
02:16:02
02:16:04
02:16:08
02:16:12
02:16:15
02:16:20

And -- and this -- this was -- it all happened quite quickly.  It is kind of within I would say minutes, like, you know, less than ten minutes maybe shorter that they blocked off these exits and they were starting to shoot with their riot guns trying to shoot people as they were -- as they were trying to leave.                                                    02:16:25
02:16:29
02:16:30
02:16:34
02:16:38
02:16:41
02:16:45

Q.   Can you identify on this aerial where the deputies were?                                                    02:16:47
02:16:49

A.   Yeah.  What I remember I think was -- it was kind of, like, sort of on that -- the east side exit.  So, yeah, maybe above.                                                    02:16:53
02:16:56
02:17:02

Q.   Like right up here?                                                    02:17:07

A.   Yeah.  I think above the Compton City Hall --                                                    02:17:08
02:17:12

Page 130

Shakeel Rahman
March 14, 2023

right here.  Let's see if I can actually do it.  02:18:16

A.   Honestly, the marker is probably more  02:18:18
accurate for what -- because I just remember in  02:18:19
that area.  I don't remember how far from the  02:18:22
street.  02:18:25

Q.   So this area?  02:18:26

A.   Yeah.  Again, maybe a little left of  02:18:26
that, maybe a little to the right but around  02:18:30
there.  02:18:33

Q.   Okay.  So what I've done -- for the  02:18:33
record we'll call it a green oval that designates  02:18:35
where roughly the Sheriff's Department was.  Is  02:18:38
that accurate?  02:18:43

A.   Yeah.  02:18:45

Q.   Okay.  And then where were -- where were  02:18:45
you and the protestors before the less lethals?  02:18:48

A.   Well, we were at the rally.  02:18:56

Q.   Like, we'll go up to the time when the  02:18:59
deputies fire the less-lethal munitions.  02:19:01

A.   Okay.  So where were we before -- I  02:19:08
think we were -- they were shooting at us while we  02:19:10
were kind of in that corridor, kind of pathway  02:19:14
area that ends.  02:19:18

Q.   Okay.  So is it where my pen is?  It  02:19:19
would be -- there's a walkway.  And there's, like,  02:19:24

Page 132

less-than-lethal munitions were?                02:21:56

A.   I don't -- they might have been           02:22:00

shooting -- I think they were shooting less than  02:22:01

lethals from other parts, too.                  02:22:03

Q.   Okay.                                      02:22:06

A.   I don't -- but that's just -- that's --    02:22:06

yeah, I'm not saying they weren't doing that    02:22:09

elsewhere.  I don't know.  I kind of remember them  02:22:12

shooting from a lot of places.  That's just where  02:22:17

I -- that's -- I mean that's -- this location is  02:22:20

where I was shot.                               02:22:22

Q.   Okay.  Okay.  We'll leave it at that       02:22:23

then.                                           02:22:26

So were the -- where the red is              02:22:26

that's the general area where you were hit by the  02:22:29

canister; is that right?                        02:22:32

A.   Yeah.                                      02:22:35

Q.   Okay.  Okay.  Let's see if I could blow    02:22:36

this up a little bit.                           02:22:39

Okay.  So what I've done is I've              02:23:10

focused in on the area where the Sheriffs were and  02:23:13

where you were.                                 02:23:17

Do you remember where you were               02:23:19

standing when you were hit by the canister?     02:23:20

A.   Yeah.  If you put your arrow back there    02:23:25

Page 135

I can kind of try.                                    02:23:27

Q.   Okay.  Let me see if I can get something         02:23:30
better.                                               02:23:32

Okay.  So can you see the cursor?                     02:23:34

A.   Yeah.  I think it was the other side of          02:23:39
that overpath, over thing, yeah.  So probably         02:23:42
somewhere around right where you are right now,       02:23:45
yes.                                                  02:23:47

Q.   Okay.                                            02:23:48

A.   But it could be -- again, it could be a          02:23:48
little to the left of that.  It could be to the       02:23:49
right.  It could be --                                02:23:52

Q.   Let's see.  Maybe -- so what I -- let me         02:23:55
erase what I have here.  I put a star in here.        02:23:58
I'll just get an oval so it will be the general       02:24:02
area.                                                 02:24:07

A.   Okay.                                            02:24:08

Q.   All right.  So do you see the X?  So             02:24:09
would it be in this area right here?                  02:24:17

A.   Maybe make your circumference a little           02:24:21
bigger.                                               02:24:25

Q.   Like right here?                                 02:24:26

A.   Yeah.                                            02:24:27

Q.   Okay.  Well let's see.  I think I might          02:24:28
have to move this over a little bit.  Well, that      02:24:30

Page 136

doesn't do it.                                         02:24:37

                So would it be the third circle?      02:24:38

I'll erase the other two.                             02:24:45

     A.   You know, I just know it was somewhere      02:24:50

around there.  Like -- like, it might have even       02:24:52

been closer to the underpass.  Because I don't        02:24:55

remember -- you know, or the overpass that's above    02:24:59

me.  But it was in the -- yeah.                        02:25:01

     Q.   I'll make a big -- hopefully this is        02:25:04

better.                                               02:25:07

                So for the record, it's a circle      02:25:07

which designates the area generally where deponent    02:25:12

was standing when he was hit by the canister.         02:25:19

                And what I'll do is I'll mark this    02:25:24

as Exhibit No. 4.                                     02:25:25

                    (Deposition Exhibit 4 marked for  02:25:28

                    identification.)                  02:25:31

BY MR. SAKAI:                                          02:25:32

     Q.   Let's see.  Let's see.  I'll take a         02:25:33

screenshot here.                                      02:25:52

                Okay.  So during the time you were    02:26:26

listening to the -- to the speeches and up until      02:26:33

the time you went to the area where the red oval      02:26:37

was in Exhibit 4, did you witness any use of          02:26:40

less-lethal force by the Sheriff's Department?        02:26:45

                                              Page 137

A.    No.  Sorry.  I just meant -- because I think it was just in that direction.

Yeah, I walked towards them.  Um, and I don't think I was -- I think the closest I came to the line of barricades and deputies was probably, like, 10 feet.  But sometimes there was less -- or sometimes it was, yeah, further out. And the closest, as I said, is probably 10 feet.

Q.    During the time you were walking turning the corner into this walkway and you got 10 feet -- within 10 feet of the barricade, can you describe what's going on around you?

A.    Yeah.  There were others who had gathered there who were chanting, you know, speaking, holding up signs, maybe some people filming, you know, with their cameras, phones, taking pictures or videoing the Sheriff deputies and what was going on.  I observed that.

Q.    Where were you standing when you were hit with the canister?

A.    It's where you drew the red circle earlier.

Q.    Okay.  And what -- so you were in the walkway between the Sheriffs to the east and somewhere either underneath or to the east of the

Page 140

overpass or the walkway between the two buildings; 02:31:24

is that pretty much where you were? 02:31:28

A. I think so. 02:31:30

Q. Okay. Was -- at the time when you were 02:31:30

hit was the area crowded with protestors? Were 02:31:37

there few protestors, or how would you describe 02:31:41

how many people were in your area? 02:31:45

A. So I would say in that whole kind of 02:31:48

pathway there that's the gray color rather than 02:31:51

the red color of the -- of the -- more towards the 02:31:54

plaza there were probably, like, a few dozen 02:31:58

people -- 02:32:01

Q. Okay. 02:32:02

A. -- from, like, all the way from the left 02:32:05

where it starts up towards the barricades. 02:32:07

Q. Was there anyone standing between you 02:32:12

and the deputies? 02:32:14

A. Yeah. Sometimes yeah. I wasn't the 02:32:16

closest person to the deputies. 02:32:20

Q. Those few dozen people that were in your 02:32:29

vicinity, did you know any of them? 02:32:33

A. I don't remember. I don't think so. 02:32:36

Q. Okay. 02:32:37

A. I didn't recognize anybody as it was 02:32:38

happening. 02:32:40

Page 141

Q.   And so at least from what you saw at the
Compton protest you never saw any protestors throw
anything at the deputies; is that right?

A.   Yeah.  I don't remember seeing anyone --
any -- anyone throwing anything at the Sheriff's.

Q.   Describe what happened to you when you
were struck by the canister?

A.   Yeah.  It very suddenly hit the side of
my head.  And so, you know, I was sort of -- like,
my ears are ringing.  I was, like, kind of super
disoriented all of a sudden.  And I couldn't see
because I couldn't open my eyes.

I was blanketed with the gas or
powder or whatever all over my head, in my hair.
I think I had kind of slightly longer hair back
then.  So it caught more of the -- of the powder.

And so all -- yeah, so I was just
disoriented.  It was very loud kind of noise, too.
So I was disoriented, you know, both visually and
in terms of hearing.  And I just remember sort of
just running, clutching my head in towards -- back
towards the inside of the plaza.

And, you know, it was just -- my
eyes were burning.  I couldn't open them like I
said.  If I opened them they would -- they would

02:37:15
02:37:19
02:37:24
02:37:27
02:37:29
02:37:50
02:37:52
02:37:56
02:37:59
02:38:05
02:38:11
02:38:15
02:38:17
02:38:20
02:38:26
02:38:31
02:38:35
02:38:41
02:38:48
02:38:49
02:38:56
02:39:01
02:39:05
02:39:08
02:39:13

Page 145

burn.  I couldn't breathe.  Every time I would take a breath I would -- it would be -- I think I was kind of blanketed all over my head with the powder or the gas or whatever it is.

And so I was inhaling it with every breath and kind of coughing and just kind of spitting and coughing it up.  And I couldn't see anything.  I just remember kind of running back towards the plaza area.

Q.   How long did you stay in the area where you were struck by the canister?

A.   It all happened in a matter of seconds. I was struck.  I kind of was really shocked and disoriented.  And I sort of started just running back in that direction of the plaza away from the Sheriffs.

Q.   Okay.  So within seconds of when you were struck you were moving out of the area; is that correct:

A.   Well, I was moving back toward the plaza, yes.

Q.   Okay.  And then even though we're being videoed we need to get it down on the record. What side of your head was -- were you struck with the canister?

Page 146

Sheila Rahman
March 14, 2023

A.   The left side.    02:40:24

Q.   And then on video it appeared that you were pointing to the temple off to your side kind of I'd say -- okay, so above your ear?    02:40:26 / 02:40:27 / 02:40:33

A.   Yeah.  More --    02:40:35

Q.   Okay.    02:40:36

A.   Not towards the temple, kind of more above my ear.  Maybe more forward from my ear but above, like, the side of that area.    02:40:37 / 02:40:39 / 02:40:43

Q.   Okay.  Can you describe how hard it hit that side of your head?    02:40:45 / 02:40:51

A.   Extremely hard.    02:40:54

Q.   Okay.  And have -- you know, is there any example that you could compare it to such as if you were playing baseball, you know, a ball, softball, baseball hit you on the head, basketball hit you on this head, something like that?    02:40:55 / 02:40:57 / 02:41:03 / 02:41:09 / 02:41:12

A.   I didn't play base ball, but I would say I felt -- because it was a hard object.    02:41:16 / 02:41:19

Q.   Uh-huh.    02:41:21

A.   And so it I probably felt like a -- like, how I imagine a baseball hitting.  In that range.    02:41:21 / 02:41:23 / 02:41:26

Q.   Okay.    02:41:27

A.   But it was metal.  Like, I remember just    02:41:28

Page 147

feeling that when it hit me.  So it kind of felt     02:41:29
honestly less like a baseball, probably even more    02:41:33
like a bat.     02:41:36

Q.    Okay.  And when it hit you on the side    02:41:37
of the head did you fall over?     02:41:41

A.    I definitely lost my bearing and kind    02:41:46
of -- yeah, I don't remember exactly.     02:41:48

Q.    Okay.     02:41:51

A.    It was just a very sudden shocking hit    02:41:52
by a metal object to the side of my head.  And,    02:41:55
yeah, honestly I might have fallen -- fallen over.    02:42:00
It all happened very quickly.     02:42:04

Q.    In reviewing any video -- well, let me    02:42:09
ask.     02:42:11

Have you reviewed any video    02:42:12
regarding the use of less lethals at this    02:42:13
location?     02:42:14

A.    Like I said, you know, there is a video    02:42:20
that I took.  And then there was the    02:42:23
video -- like, I kind of saw some news, like,    02:42:25
broadcasts and stuff of the protest, but that was    02:42:27
way back kind of right after, like, you know, the    02:42:33
night it happened, the day after it happened.    02:42:37

Q.    Okay.  So let me -- I'm going to play    02:42:40
part of the video that was produced by your    02:42:56

Page 148

(Recess.)

VIDEOGRAPHER:  This marks the beginning of Media Unit 3 in the deposition of Shakeer Rahman.  We are back on the record.  The time is 3:01 p.m.

BY MR. SAKAI:

Q.  After you were hit by the canister and you left the area, do you recall if you went to the north of the path or to the south of the path or into the -- I guess it would be the center quad of the Civic Center?

A.  I think I first kind of ran out into, like, kind of the mouth of that -- like, where that path begins.

Q.  Uh-huh.

A.  And it was there where I kind of sat down on the ground.  And, yeah, it was clear there.  So I just kind of was on the ground, you know, trying to wipe it out of my hair and all of that.

Q.  Were you hit by any other less-lethal munition?

A.  I don't remember.  I might have been hit by rubber bullets.  I don't remember.

Q.  Okay.  Do you remember, you know, the

Page 154

day or the night of this protest seeing any other   03:02:55

marks on your body?   03:02:59

A.   I don't remember.   03:03:04

Q.   Okay.  And would it be fair to say,   03:03:04

then, other than the photos of your face and hair   03:03:09

you don't have any other body -- photos of your   03:03:14

body or any marks on your body from this protest?   03:03:18

A.   No.   03:03:21

Q.   Okay.   03:03:22

Rebecca, what we've looked at is --   03:03:23

we have a production from 1 to 95.  And we don't   03:03:24

have any of Mr. Rahman's pictures.   03:03:30

MS. BROWN:  Okay.   03:03:36

MR. SAKAI:  So if you can shoot   03:03:38

them over at some point and supplement --   03:03:39

MS. BROWN:  Yeah.  I'll make sure   03:03:41

they get to you.   03:03:42

MR. SAKAI:  Oh, sure.  Okay.  Do   03:03:45

those also include his videos?   03:03:45

MS. BROWN:  I would have to   03:03:48

doublecheck.  I mean, essentially what he shared   03:03:49

with us we'll produce as well.   03:03:52

THE WITNESS:  And I -- I don't   03:03:58

remember -- like, I think I took both photos.  It   03:04:00

was all on the same app on my phone.  So I don't   03:04:04

Page 155

remember if it was photos versus videos.  But it

could be both.  I shared all of them.

BY MR. SAKAI:

Q.   Okay.  So since we don't have the

pictures -- so they haven't been provided to us

yet -- can you go through your recollection of

what these pictures show?

A.   Yeah.  I mean, I took photos throughout

the whole march, the rally.  The video --

actually, I did take -- I remember taking a video

of, for example, of the -- of the dancers and

stuff like that.  So I at least took videos at

that point.

I think during the shooting I

probably took some photos or videos of that, of

the -- you know, the line of the deputies.

After my injuries, I took a bunch

of -- I tried to take photos of my head.  And

then -- yeah, and then afterwards I took more

photos and videos of just, like, the area and the

deputies.

Q.   So focusing on the pictures of the --

your injury to your head, do they show any

bleeding?

A.   I don't think so.

Page 156

Q.   Okay.  Do they show any contusions?    03:05:27

A.   What's a contusion?    03:05:31

Q.   Like a bruise.    03:05:32

A.   Well, so you know my hair -- actually,    03:05:34
back then I think my hair was much longer.  So you    03:05:37
wouldn't be able to see it.  It would be behind.    03:05:42

Q.   Okay.  Do you remember if you took any    03:05:44
pictures that showed, you know, any bruising or    03:05:46
discoloration or anything else of the area where    03:05:49
you were hit?    03:05:52

A.   Um, I remember -- what I do remember is    03:05:54
the photos clearly will show, like, a big white    03:05:58
kind of, like, just mass -- you know, just all of    03:06:01
the powder, spray or gas or whatever that is.    03:06:06

And I had a bump, like a kind of    03:06:11
big bump on my head right there.  I can't remember    03:06:17
if that -- if you can see in the photo because of    03:06:21
my hair.    03:06:24

THE REPORTER:  I'm sorry, I can't    03:06:27
hear you.  You're mumbling, sir.    03:06:27

BY MR. SAKAI:    03:06:30

Q.   How long was your -- we don't have the    03:06:31
photos yet.  How long was your hair at the time of    03:06:33
this incident?    03:06:37

A.   It wasn't, like, long.  I just, like, I    03:06:39

Page 157

had more of it.                                          03:06:42

Q.    Okay.   When the canister hit you on the          03:06:47
side of the head, you know, pain scale zero no          03:06:51
pain, ten the worst pain you felt in your life,         03:06:54
where would you rank that?                              03:06:54

A.    Like an eight.                                    03:07:00

Q.    And have you ever experienced anything            03:07:03
similar to that eight on the pain scale before or       03:07:06
after?                                                  03:07:10

A.    Not after.   Before?   I can't think             03:07:13
of -- I can't think of what.   I mean, I've broken      03:07:19
bones when I was younger.   It's hard to -- like,       03:07:23
never in my head.                                       03:07:29

Q.    So at this point you have been struck in          03:07:40
the head, you travel out toward the opening area.       03:07:44
What happens next?                                      03:07:49

A.    Um, I think I was on the ground trying            03:07:52
to collect myself again a little bit.   And I think     03:07:56
someone -- others, you know, saw me kind of             03:08:03
struggling there and offered, like, water or            03:08:06
something and helped -- offered to pour it in my        03:08:11
eyes.   So we did that.   I mean, I might have          03:08:16
grabbed a water bottle from my backpack or like         03:08:18
that.                                                   03:08:23

          I just remember trying to pour                03:08:24

Page 158

water in my eyes.  That didn't help.  You know, I was trying to flush the stuff out.  But you can kind of see -- I think I remember the photos that, like -- like, it was -- like, you could see a white all over my eyes, too.

Q.    Uh-huh.

A.    Yeah.  So I was doing that for a while kind of on the ground or in that clear area.

Q.    And these photos, are they all photos you took of yourself, or did somebody else take them?

A.    I took a bunch by myself.  And then, like, a some point, like a few minutes after that, that a friend of mine Aaron, who I mentioned earlier, kind of came up to me or saw me struggling there.  And he -- so he took -- I gave him my phone and he took some, you know, photos from -- zoomed out of my face and head.

Q.    Other than flushing out your eyes with water, did you do anything else at the scene to treat yourself?

A.    You know, I think -- I don't have a clear memory of this.  I think someone might have had some kind of, like, the saline solution or something like that to help flush my eyes.

Page 159

Someone might have offered.    03:09:45

I just don't, like -- like, you --    03:09:47

I wouldn't of like -- I don't even remember what    03:09:48

they looked like or anything because I didn't    03:09:51

really see.    03:09:54

The guy was trying to flush it out    03:09:55

with some kind of solution that was good for your    03:09:58

eyes.    03:10:00

Q.    How long did you remain in the Civic    03:10:02

Center area?    03:10:06

A.    Um, I don't remember.  I think I stayed    03:10:07

there for a while.  I remember later on hearing,    03:10:13

like, an announcement from the helicopter about,    03:10:16

like, a disbursal announcement.    03:10:22

Q.    Okay.  Then looking at your    03:10:28

interrogatory response it looks like that was    03:10:30

about 6:30 p.m.  Does that sound about right?    03:10:32

A.    Yeah.  It was -- yeah.    03:10:36

Q.    Because you heard the disbursal order    03:10:39

you left the scene; is that right?    03:10:42

A.    Yeah.  It was around -- I started    03:10:44

leaving.  I left, walked up to -- yeah.    03:10:45

Q.    And then from the Compton Civil Center    03:10:50

did you walk back to your car in Gardenia?    03:10:54

A.    That's right.    03:11:00

Page 160

Shakeel Rahman
March 14, 2023

Q. How long did it take you to walk back to your car?  03:11:01  03:11:03

A. I don't remember. Maybe 30 minutes, maybe 30 to an hour. Somewhere in there.  03:11:04  03:11:07

Q. Did you walk back with anybody to your car?  03:11:12  03:11:16

A. No. I walked by myself.  03:11:16

Q. While you were walking back to your car was it still light outside?  03:11:21  03:11:24

A. Yeah.  03:11:27

Q. At what point after you were hit by the canister did you regain your vision or were you able to see?  03:11:31  03:11:34  03:11:40

A. Yeah. It's hard because, like, you know I could kind of -- at some points I could kind of peak with one eye kind of thing. So I don't think I regained my full vision for a long time after. But just vision it's not like my eyes are blinded or something. I just couldn't open them without the powder getting in them. So it stung every time I opened my eyes.  03:11:41  03:11:44  03:11:48  03:11:51  03:11:55  03:11:58  03:12:01  03:12:05

Q. Were you able to drive home from Gardenia?  03:12:08  03:12:14

A. Yeah.  03:12:17

Q. How long did the effects of the powder  03:12:23

Page 161

last?                                                          03:12:27

A.    Um, I think they last -- they basically   03:12:28
last every time I -- or the would kind of return   03:12:32
every time I opened my eyes or like -- I mean, you   03:12:35
might have noticed even during this deposition I   03:12:38
kind of play with my hair a lot.  So whenever I   03:12:41
would sort of -- if would touch my hair I was   03:12:44
trying to touch it to clear it out, but then that   03:12:45
would also cause more of it sometimes to get back   03:12:51
in my eyes.  So in that way I think it continued   03:12:52
for a while after.                                            03:12:56

I got home and took a shower.  I   03:12:56
think the helped kind of clear a lot of it out.   03:12:59
But, you know, it was -- it was over -- you know,   03:13:01
starting from the moment that it happened over the   03:13:02
next hour or so it lessened with time, but it   03:13:04
still kind of continued in some form.   03:13:09

Q.    Have you ever been hit in the head with   03:13:14
a canister of -- let's call it CS gas -- before   03:13:18
this incident?   03:13:21

A.    No.   03:13:22

Q.    How about after?   03:13:22

A.    No.   03:13:23

Q.    Do you know anyone else who attended   03:13:25
these protests that were hit in the head with a   03:13:27

Page 162

can of CS gas?                                          03:13:31

A.   I think I recently read some news          03:13:34

articles about someone who had a lawsuit related       03:13:37

to being hit in the head during the protests.  But     03:13:43

at the time I hadn't.  It's only more recently.        03:13:47

Q.   Did you seek any medical treatment for     03:14:10

any injury from this protest?                          03:14:12

A.   No, besides just self kind of treating     03:14:16

it.                                                    03:14:22

Q.   Okay.  And was there anything preventing   03:14:23

you from seeking medical treatment?                    03:14:26

A.   Yeah.  The main reason I didn't want to    03:14:29

go into an urgent care somewhere -- that's where I     03:14:31

would have had to go with my insurance -- was I        03:14:35

didn't want to be indoors in a medical facility.       03:14:38

You know, it was June 2020, so it was kind of the      03:14:39

height of the pandemic.  I was comfortable being       03:14:43

in outdoor spaces, but I didn't want to be inside      03:14:48

especially at a medical facility.                      03:14:54

Q.   Is it true up until today you haven't      03:14:56

sought any medical treatment for any injury during     03:14:59

this protest event?                                    03:15:01

A.   Yeah.                                       03:15:03

Q.   All right.  Did you see who threw the      03:15:03

canister?                                              03:15:16

Page 163

Shakeel Rahman
March 14, 2023

A.   I didn't.  And, also, I don't know if they threw it.  Or I know sometimes they can fire them from their -- the guns.  So I don't know if it was thrown or fired.

Q.   Okay.  Do you know what direction it came from?

A.   It came from the direction of the deputies.

Q.   How do you know that?

A.   Because that was the only people who were shooting teargas canisters.

Q.   Did you see the canister before it hit you?

A.   No.

Q.   When the canister hit you, which direction were you facing -- or to, say, assume you're in the anatomical position standing up with your head forward with the rest of your body.

A.   Yeah.  That's the thing, I don't remember if I was, for example, standing, like, you know, with my head facing forward or my body facing forward with my head to the side.  That I just don't know.  I don't remember.

Q.   Do you remember which direction you were looking when you were hit by the canister?

Page 164

Shakeel Rahman
March 14, 2023

A.   No.

Q.   Okay.  Okay.  Do you have any information that whoever threw the canister at your head was aiming for your head?

A.   Well, I know it had to have come from that line of deputies that was right there probably not that far away.  So, you know, it was very close.

And, you know, I know that the deputies are -- or I presume that the deputies are kind of trained in using these weapons and have experience using these weapons.  So based on that, I was able to conclude that -- that they, you know, must have aimed for my head in order to be able to have hit my head from such a short distance, you know, in the area of my head.

Q.   Okay.  So what do you base your assumption on that -- that a deputy threw the canister at your head?

A.   It came from the direction of the deputies.

Q.   How do you know that?

A.   Because I remember that, that it came from that.  You know, they were all in -- they weren't in every side.  They were only on one

Page 165

side.  And it came from that side.  And that's where it hit me.

Q.    How do you know that it wasn't thrown by a protester?

A.    Because I was standing not far, like, make ten-something feet from the deputies.  And it came from that direction.  So I --

Q.    Okay.  So is that based on something you saw, i.e., that the deputy had it in his hand and was throwing it at on you, or it that based on your assumption it must have come from the deputy because it came from that direction?

A.    It was based on it came from that direction.  And the deputies were the only people I saw shooting or throwing any kind of canisters.

Q.    Okay.  So at the protest you yourself didn't see anyone pick up a canister and throw it?

A.    Oh, yeah.  No, I didn't see that.

Q.    Okay.  But -- okay.

When you state it exploded in your hair, can you further describe what exactly happened?

Specifically, when it hit your head was it already exploded?  Did it hit your head and explode, or did something else happen?

Page 166

Shakeel Rahman
March 14, 2023

A.    It felt like it hit my head and
exploded.   The impact that felt and the sound it
was kind of like a huge -- like a bang.

Q.    Uh-huh.

A.    Yeah.   Based on, yeah, the feeling of
the impact, the sound and then also just kind of
being blanketed in the powder or gas all over my
head and, like, upper body.

Q.    At any point did you see what had hit
your head?

A.    Like a projectile itself you mean?

Q.    Sure.   Did you go back and look at the
area, or did somebody pick up whatever hit you in
the head?

A.    I didn't go back and look at the area as
far as I can remember.   And nobody picked it up.
Or if someone picked it up I was already gone.

Q.    Okay.   So how do you know it was a
canister versus a pepper ball or some other type
of munition?

A.    What's a pepper ball?

Q.    Let's call it a paintball.   It's a
paintball full of white powder.

A.    I don't know.   All I know is that it
felt like something metal hit my head.

03:19:36
03:19:38
03:19:40
03:19:44
03:19:45
03:19:47
03:19:51
03:19:59
03:20:01
03:20:15
03:20:19
03:20:23
03:20:24
03:20:28
03:20:29
03:20:32
03:20:36
03:20:39
03:20:42
03:20:46
03:20:48
03:20:49
03:20:53
03:20:58
03:20:59

Page 167

Shakeel Rahman
March 14, 2023

Q.    Uh-huh.                                          03:21:02

A.    Kind of heard and felt an explosion and         03:21:02
then I was covered all over with the powder.          03:21:05
That's what I know.                                   03:21:10

Q.    Do you know if anyone witnessed you get         03:21:21
hit by that object?                                   03:21:23

A.    There were a lot of people around me.           03:21:26
And they probably witnessed it, but I don't -- I      03:21:28
haven't talked to anyone if that's your question.     03:21:31

Q.    So yeah.  So you haven't talked to              03:21:34
anybody who said, Hey, I saw you get hit by           03:21:37
something; is that right?                             03:21:41

A.    That's not right exactly.  Because,             03:21:42
like, especially afterwards when I was kind of        03:21:44
trying to recover there were people who, you know,    03:21:47
oh, you were hit by -- they were trying to help me    03:21:50
out.  So I think they might have seen me gotten       03:21:51
hit by something.                                     03:21:55

Q.    Do you know if any of your video or any         03:21:56
videos that you've seen show you getting hit by an    03:22:00
object?                                               03:22:06

A.    My own videos didn't show that.  I              03:22:06
didn't -- I'm not sure if I was making a video.  I    03:22:08
don't think I was making a video at that time         03:22:10
because I didn't -- I haven't -- you know, I don't    03:22:12

Page 168

Shereef Rahman
March 14, 2023

have a video of that that I remember.  And I    03:22:13
haven't seen -- you know, I haven't seen it in any    03:22:16
of the -- in any of the videos.  I haven't really    03:22:18
seen videos.    03:22:22

Q.   Okay.  Prior to you when you were hit,    03:22:23
did you see anyone else get hit with anything?    03:22:25

A.   I think some -- I might -- I think I saw    03:22:30
people getting hit with the -- like, the riot    03:22:31
guns, like, the bullets.  I definitely saw a lot    03:22:38
of that both before and after I was hit.    03:22:42

Q.   Did you -- other than the riot guns did    03:22:46
you see any other people get hit by any other    03:22:50
objects?    03:22:54

A.   People might have been hit with batons,    03:22:56
because I remember the Sheriffs all had their    03:22:57
batons.  And then -- not all, but some Sheriffs    03:23:03
who had their batons out.  And I remember them    03:23:06
firing the -- the grenades from their guns.    03:23:13

I vividly remember one person in    03:23:17
particular with the Sheriffs kept shooting.  And    03:23:20
he had a bunch of bloody welts.  And I remember he    03:23:22
was either being interviewed by a news reporter    03:23:28
after or something, because he was wearing a    03:23:31
military uniform like a marine uniform.  And the    03:23:33
Reporter mentioned or asked or something to    03:23:35

Page 169

Q.   Okay.   When?                                        03:24:43

A.   I don't remember exactly.   I just            03:24:48
remember I saw them with their batons when I saw    03:24:49
them.   The batons I don't have a clear memory of   03:24:53
that when exactly that was.   I remember the        03:24:56
shooting.   The batons I remember they had them,    03:25:00
yeah.                                                03:25:03

Q.   The very specific question, did you ever       03:25:04
see a deputy use a baton on a protestor?            03:25:07

A.   I thinking so, but I can't remember,           03:25:12
like, specifically kind of exactly where or who.    03:25:13

Q.   Was a baton ever used on you?                  03:25:25

A.   At this protest I don't remember that.         03:25:28

Q.   Okay.   Has a baton ever been used on you      03:25:30
at any other protests?                              03:25:36

A.   I've -- I've been at other protests            03:25:37
where -- I don't know if it was -- I don't think    03:25:39
it was Sheriff's but other agencies where, yeah,    03:25:41
they've been swinging on lines of protestors, and   03:25:46
I've experienced that.                              03:25:50

Q.   Did you talk to any press at the scene?        03:25:54

A.   I don't think so.                              03:26:02

Q.   Did you talk to the protestor in the           03:26:12
military outfit?                                     03:26:15

A.   I don't remember.   If I did it was maybe       03:26:20

Page 171

Sheriffs kind of had detained on the ground.  I   03:27:42
remember seeing that.  I didn't see actual arrests   03:27:47
happening, but I saw them detained in that way.   03:27:47

Q.   At what point of the protest did you see   03:27:49
this?   03:27:51

A.   It was after I was hit.  This was some   03:27:51
time an hour after.   03:27:54

Q.   Did you see these folks who were being   03:27:59
detained transported anywhere?   03:28:04

A.   I don't remember.   03:28:08

Q.   So as you mentioned, this was back in   03:28:16
June 2020 at the height of COVID.  Did you take   03:28:19
any COVID precautions when attending the protest?   03:28:22

A.   Yeah.  I was wearing a face mask.   03:28:29

Q.   Anything else?   03:28:34

A.   I was avoiding getting too close to   03:28:35
anybody or just avoiding anything indoors.  The   03:28:38
entire march happened outside.   03:28:40

Q.   Okay.  During any of the other protests   03:29:00
you attended, were you hit by any less-lethal   03:29:03
munitions?   03:29:08

A.   Yeah.  I had been hit by rubber bullets.   03:29:11
And I guess I also mentioned the batons.   03:29:17

Q.   This is -- I'm going to limit it to 2020   03:29:20
protests.   03:29:22

Page 173

Shakeel Rahman
March 14, 2023

A.    Okay.    03:29:25

Q.    Okay.    Where was the protest where you were hit by rubber bullets?    03:29:25 03:29:28

A.    I think that happened more than once, but it definitely happened a few times the protests kind of outside or around Pan Pacific Park.    03:29:32 03:29:33 03:29:38 03:29:43

Q.    How many times were you hit by munitions or less-lethal munitions at Pan Pacific Park?    03:29:48 03:29:52

A.    Well, it wasn't at the park.    It was around the park.    But I think less than ten.    03:29:57 03:30:00

Q.    Okay.    Do you know what kind of munitions --    03:30:02 03:30:05

A.    Probably less than 20, but I think closer to ten.    03:30:07 03:30:10

Q.    Okay.    Do you know what kind of less-lethal munitions you were hit with?    03:30:11 03:30:12

A.    No.    I don't know what kind of munitions.    03:30:16 03:30:18

Q.    What part of your body was hit?    03:30:19

A.    I had been hit in my legs, in my chest, in my back, like, upper body back, arms.    There was a time when I was hit in my hand I remember.    03:30:22 03:30:27 03:30:36

Q.    Do you know what law enforcement agency used munitions?    03:30:42 03:30:44

Page 174

Shakeer Rahman
March 14, 2023

A.    I know at a minimum there was LAPD.    But    03:30:47
I don't know if there were others as well.    But I    03:30:52
can't remember with certainty.    03:30:55

Q.    Were you struck by these munitions at a    03:30:57
certain location or at a couple locations?    03:31:00

A.    A couple locations.    03:31:03

Q.    Let's go through it.    How many different    03:31:05
locations were you struck by less-lethal munitions    03:31:07
around Pan Pacific Park?    03:31:12

A.    Probably around five, but definitely    03:31:17
less than ten.    Probably more than three.    03:31:20

Q.    Oh, I mean -- different locations where    03:31:22
you were struck, or how many times were you    03:31:25
struck?    Because I just want to know where    03:31:28
geographically were you hit with these.    A couple    03:31:29
locations?    You know, one?    Five?    Something like    03:31:32
that?    03:31:34

A.    I want to say, like, maybe, like, three,    03:31:34
like, to five.    03:31:36

Q.    Okay.    03:31:39

A.    The five is probably the max.    03:31:40
Definitely probably less, yeah.    03:31:42

Q.    Okay.    And so as you -- just to be    03:31:45
clear, to your recollection today you know the    03:31:50
LAPD was involved, but you don't know any other    03:31:54

Page 175

Shakeer Rahman
March 14, 2023

law enforcement agency that was involved at least in the less lethals that hit you?

A.   In the less lethals that hit me, yes, I know LAPD -- I saw LAPD shooting them.  I don't know if other agencies are involved.

Q.   Okay.  And other than near Pan Pacific Park were you ever hit by less-lethal munitions at any other protest?

A.   In 2020?

Q.   Yeah.

A.   Yeah.  I think I might have been hit at some, like, downtown, but it's all in that same kind of couple weeks.

Q.   So at the downtown protest or whatever protest it was downtown how many times were you hit?

A.   Like, less than five.

Q.   Do you know what type of munition you were hit with?

A.   No.  And, yeah, actually now that I think -- like, I think all together I would say less than, like, 15, like, in the 10, like, range.

Q.   That's for all of the protests in 2020?

A.   Yeah.

Q.   Okay.  And then in the downtown LA

Page 176

protest where you were hit was that by the LAPD?

A.    Yeah.    I can certainly say LAPD.    I don't know if there was another agency involved.

Q.    Okay.    So other than Pan Pacific Park in downtown LA and then the Compton incident we were talking about, have you been hit by less-lethal munitions anywhere else, at any other protest?

A.    In 2020?

Q.    Yes.

A.    No, I do not think so.

Q.    And then you mentioned batons at protests in 2020.    What protest or protests are you referring to?

A.    These same ones that I just mentioned.

Q.    Okay.    So the Pan Pacific Park and downtown LA?

A.    Yeah.

Q.    And the law enforcement officers that were using the batons they were LAPD?

A.    Yeah.

Q.    Okay.    Did you seek medical treatment for any other of these injuries from less-lethal munitions?

A.    No.

Q.    And did -- so for instance with -- how

Page 177

long did these injuries last, or how long did the symptoms of these injuries last?

A.   You're talking about the injuries from the rubber bullets and stuff?

Q.   Yeah, exactly.

A.   You know, there's, like, a bruise that kind of might last a day or two.  You will have some discoloration.  You will see, like, the welt of the bruise.

It's, like, sensitive and it hurts.  But usually that goes away after a few days.  There might be a mark that remains, maybe some like -- like, if there's sort of -- there's a couple of places like a -- like scaring.  I mean, it wasn't bleeding but scaring that remains.

Q.   Do you have any marks on your body from the Compton incident?

A.   Right now?

Q.   Yes.

A.   No.  Um, well, I mean I haven't really seen what's under my hair, but I think no.

Q.   Okay.  Do you -- today is there any lasting pain from the Compton protest injury?

A.   I don't think so.

Q.   I think you also said you attended some

Page 178

Shakeer Rahman
March 14, 2023

of the South LA protests; is that right, or South LA station protests?

A.   No.  I don't think so.

Q.   Oh, okay.  Okay.  So pretty much we've talked about all the protests you've attended in 2020?

A.   I don't know about that.  I mean, like, I think -- again, if you remind me of other ones I could try to tell you.

Q.   West Hollywood?

A.   Yes.  I was at a -- I was at, like, a protest related to pride that the Sheriffs were at.  Honestly, now I can't remember what that date -- I think it was in 2020.

Q.   Did the Sheriffs use any less-lethal force at that protest?

A.   I don't -- like -- like, I don't remember them shooting anything or using the teargas at that one.

Q.   Then how about Santa Monica?

A.   I don't think I was in any protests in Santa Monica.

Q.   Long Beach?

A.   I might have been.  I, yeah, have some family in Long Beach.  I think during that period

Page 179

I might have gone down there.  I wasn't hit with    03:37:14

any munitions or anything, yeah.    03:37:18

    Q.    Have you ever discussed with any other    03:37:43

people that aren't your attorneys injuries that    03:37:44

other protestors receive from less-lethal    03:37:48

munitions at the 2020 protest?    03:37:51

    A.    Have I discussed injuries other people    03:37:59

received?  I think probably I've talked about it.    03:38:03

I don't recall any specific conversations, but I    03:38:06

must have.  It's not something I would avoid    03:38:10

talking about.    03:38:13

    Q.    And if you recall, did you note any of    03:38:17

these conversations about any injuries that other    03:38:20

people have experienced in these protests?    03:38:25

    A.    Well, once I'm an attorney in the --    03:38:29

    Q.    Outside that, outside the    03:38:31

attorney-client context.    03:38:34

    A.    Well, it's hard to get outside the    03:38:36

attorney-client context.  Because it's like I'm    03:38:38

representing a punitive or a certified class of    03:38:41

potentially thousands of people.  So I guess in    03:38:42

that sense, like, if they --    03:38:45

            THE REPORTER:  I can't hear you,    03:38:52

sir.    03:38:52

            THE WITNESS:  I'm sorry.  I was    03:38:52

Page 180

A.   Cantu, C-A-U-T-U.                          03:40:37

Q.   Did Aaron or did you ever have a -- do    03:40:41
you know if Aaron saw your injury or saw you get   03:40:43
hit by an object at the Compton protest?        03:40:49

A.   I don't remember if he saw the -- me     03:40:52
getting hit.  I don't think he did, because I   03:40:56
don't think he was in that area.  I think he was   03:40:58
more in the opening area.  But he saw the injury   03:41:01
after it happened.                              03:41:07

Q.   Have you attended any other protests     03:41:11
with Aaron either going together or just        03:41:13
recognizing that he was also there?             03:41:17

A.   Never going together.  I think if        03:41:22
possible I've run into him at other protests, but   03:41:26
I don't really remember specifics.              03:41:30

Q.   Do you know if he's ever been arrested   03:41:32
related to the protest?                         03:41:35

A.   I don't know.                            03:41:36

Q.   Okay.  Do you know if he's ever been     03:41:38
struck by less-lethal munitions as part of the   03:41:40
protest?                                        03:41:45

A.   I don't know.  I don't remember.         03:41:47

Q.   Have you ever sought -- well, I guess    03:41:59
I'll ask this.                                  03:42:03

Have you -- are you seeking damages   03:42:04

Page 182

for any emotional distress outside of getting the
pain of getting hit by this object such as, you
know, severe emotional distress, posttraumatic
stress disorder?

A. No. I might be -- nothing -- nothing,
like, you know, severe emotional distress or
posttraumatic. I'm not seeking these two things.

Q. Okay. So just to be clear then, at
least related to this protest you didn't seek any
mental healthcare?

A. No.

Q. And as of today, there's no lasting
effects of the injury you received in Compton?

A. I don't know.

Q. Okay. Just to the extent -- like, you
haven't seen any doctor and talked about this
incident or any other healthcare professional to
talk about this incident?

A. It's possible that I kind of have
mentioned it to my primary care provider during
the yearly check in, but not like -- not like in
kind of seeking care. And I don't -- yeah.

Q. Okay. Have you ever received a similar
injury to your head?

A. No.

Page 183

Shakeel Rahman
March 14, 2023

Q.   Have you ever been in a car accident?                03:43:37

A.   Yes.                                                 03:43:41

Q.   Okay.   More than one time?                          03:43:41

A.   I mean, I've been more than one just,               03:43:49
like, fender-bender type thing.                           03:43:51

Q.   Sure.   Let's say within two years of               03:43:55
this incident, you know, prior or after have you          03:43:59
been involved in any type of vehicle accident?            03:44:02

A.   Yeah.   Not prior that I can remember.              03:44:06
After, like, maybe a year and a half or year after        03:44:12
I was hit -- I was in an accident where I had some         03:44:16
injuries.                                                 03:44:20

Q.   Okay.   Can you describe that accident?             03:44:21

A.   Yeah.   I was driving and someone made an          03:44:26
unprotected left turn.   And we collided at the            03:44:30
intersection that was -- I had the right of way.           03:44:34
I was going straight.   And the other car was              03:44:36
making a left.                                             03:44:39

Q.   Receive any injuries?                                03:44:41

A.   Yeah.   I had, like, sort whiplash, soft           03:44:42
tissue injuries to my back and neck.   And then            03:44:49
also the airbags went off, so I kind of had burn           03:44:52
injuries from the airbag.                                  03:44:57

Q.   And where were the burn injuries from                03:44:58
the airbag?                                                03:44:58

Page 184

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**D029**

Shakeel Rahman
March 14, 2023

A.    On my arm.                                            03:44:59

Q.    Okay.  Did any litigation arise from            03:45:07
this accident?                                              03:45:10

A.    No litigation.                                       03:45:13

Q.    And has it been resolved?                        03:45:15

A.    Yeah.  I made a claim against the other       03:45:18
car's insurance.  And they settled it.               03:45:21

Q.    In an article that you authored about          03:45:52
body-worn cameras you mentioned the downside to      03:45:56
officers wearing body-worn cameras.  Can you         03:46:01
explain?                                                    03:46:06

A.    When is this article from?                       03:46:08

Q.    Gosh.  It was in, like, a tech journal.      03:46:11
Does that sound familiar?                                  03:46:14

A.    No.                                                    03:46:16

Q.    Okay.  To your recollection, do you          03:46:17
remember writing an article about your analysis of   03:46:22
officers wearing body-worn cameras?                       03:46:28

A.    I remember writing something like that        03:46:33
while I was in law school.  So that was about a      03:46:36
decade ago.                                                03:46:39

Q.    All right.                                         03:46:40

A.    If that's what you mean maybe I could          03:46:41
revisit that.                                              03:46:43

Q.    Oh, no, it's not that pressing.              03:46:45

Page 185

yeah, sort of the similar -- less pain than immediately but still struggling to breathe and hurting in my eyes and throat.

Q.   In the moments before you were hit in the head did you witness deputies deploying gas canisters?

A.   Yeah.  Yeah.  I saw them shooting the teargas canisters in the direction of the crowd. Yeah, that kind of -- yeah, right before -- as it was happening and before.

Q.   Did you witness more than one deputy deploying teargas canisters?

A.   Yeah.  I think it was a few.  I don't think they all were, but I would probably guess two or three.

MS. BROWN:  Okay.  That's all the questions I have.

THE REPORTER:  Okay.  Ms. Brown, are you ordering a copy of the transcript?

MS. BROWN:  Yes, please.

VIDEOGRAPHER:  Do you want a copy of the video, slash, synched copy?

MS. BROWN:  I don't need a copy of the video.

VIDEOGRAPHER:  No copy?  All right.

Page 188

REPORTER'S CERTIFICATE

I, CASSANDRA RUSSELL, CSR No. 11934,

Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 21st day of April, 2023.

*Cassandra Russell*

CASSANDRA RUSSELL C.S.R. No. 11934

Page 191

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS, 9415
Culver Blvd, # 115
Culver City, CA 90232
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL GROUP
1001Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

Rebecca Brown
NATIONAL LAWYERS GUILD LOS
ANGELES
5165 ½ Santa Monica Blvd., Ste. C
Los Angeles, CA 90029
t. 860-944-5111
e. rebecca@nlg-la.org

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>PLAINTIFFS,<br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br>*Assigned to: Honorable Dolly M. Gee*<br><br>**PLAINTIFF SHAKEER RAHMAN'S RESPONSE DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE**<br><br>**PROPOUNDING PARTY:**<br><br>County of Los Angeles<br><br>**RESPONDING PARTY**:<br><br>Plaintiff Shakeer Rahman<br><br>**SET NO.**: One |

**D030**

treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.    Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1:

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

## RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring him to "state all facts" related to his allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On Sunday, June 21, 2020, a Los Angeles County Sheriff deputy either hit or shot me on the side of my head with a tear gas grenade. The tear gas powder exploded in my hair, blanketing my face. I struggled to breathe, and I could barely see for several minutes. This happened at a protest supporting the family of Andres Guardado, an 18-year-old who sheriff's deputies shot to death three days earlier. The protest was peaceful, and I was simply standing in place when I was hit. No one around me had

weapons, threw anything at police, or were close enough to police to touch them.

Over the few weeks prior, I had been attending local protests against police violence and racial terror. At those protests, I repeatedly saw Los Angeles Police Department and Los Angeles Sheriff's Department officers fire tear gas at crowds containing children, shoot us with riot guns, and beat us with batons.

On Thursday, June 18th, I read news reports about sheriff's deputies shooting Andres Guardado to death. I read that he was running away when police shot him. I read that they shot his body six times. I read that he was killed around 6 p.m. and they left his body on the ground until 5 a.m., not letting his mother and father see their child. As I kept reading, it felt so cruel to lose a child this way, yet so consistent with the long history of racial violence in this country.

On Saturday June 20th, I read some words from Andres's father Cristobal. He talked about how he didn't want his son to work so far from their home in Koreatown, but Andres wanted to support the family. He said: "He was 18. He had just graduated high school. He didn't deserve this. El era un buen hijo."

Also on Saturday, I read that the family was leading a march the next day. The march would begin in Gardena, on the block where Andres was shot, and end at the Compton sheriff's station, the place where Andres's killers worked. I wanted to go to the march to support the family.

Another reason I wanted to attend the march is because I volunteer to help run a community bail fund, and I wanted to give information about the bail fund's services to any protestors who needed assistance paying bail that they were too poor to afford.

I arrived in Gardena for the march around 2:45pm. This was Sunday, June 21. I parked on South Broadway, about a block from where Andres had been shot and people had placed flowers and candles to mourn his killing. I then walked down Compton Avenue and joined the march. I had a bag of water bottles with me and handed them out to other marchers.

The march continued down Compton Avenue until we reached the Compton courthouse. I probably entered the plaza very around 4:00 p.m. The march stopped next to the courthouse, by the sheriff's station. Different people began to address the crowd. As people spoke, the sheriff's deputies stood there heavily armored and carrying what looked like military gear. Many of them with were pointing guns, and some were holding out batons. I even saw sheriff's deputies with assault rifles on top of the roof. One of the speakers was Andres's father. He cried as he spoke. A person near me translated what he was saying from Spanish, about his grief and pain. It was Father's Day, making this so much more tragic. The crowd was peaceful and full of families and children. Aztec dancers performed a dance with drumming in front of the metal barricades that police were standing behind with their guns.

I never once in the day saw anyone break anything or throw anything. I never once saw anyone with a weapon, other than police. I never once saw anyone try to charge or cross the metal barricades the police were standing behind.

After the speakers were finished, the crowd started heading home. Most people headed out through the plaza in front of the courthouse, probably a little after 5:00 p.m. This is when the police closed off some of the exits from the plaza and started attacking us. I doubt it had been even five minutes since the speakers finished talking in front of the sheriff's station when the attacks began. At one exit on the east side of the plaza in front of the courthouse, a line of deputies was standing on the top of the stairs behind metal barricades. Some people had gathered and I joined them. The group was chanting and demanding justice for Andres. I again did not see a single person either throw anything at the sheriffs, carry a weapon, or try to cross the barricades. I stood for a while, and the only things I saw people holding up were signs, cameras, and phones. The group was just chanting at a distance when police started shooting their riot guns. The police's tear gas cannisters also started exploding around me.

That was the moment I was hit in the head. It was around 5:15 p.m. I think I was about ten or fifteen feet from the metal barricades police were standing behind. That's where they must have thrown the grenade at my head from. The grenade exploded in my hair. I ran and my ears were ringing from the explosion.

As I ran, I felt a searing pain in my throat with every breath. I was uncontrollably coughing and spitting. I kept trying to open my eyes to see where I was going but my eyes burned burn with a severe stinging pain, so I could at most peek a little through the pain to make sure I didn't hit anything.

When I got back to a clearing in the plaza, I sat down on the ground and people offered to help. Others were also screaming from pain from the tear gas and stumbling around. Someone gave me a water bottle that I poured into my eyes, but it wasn't making a difference. Every time I opened my eyes, it was a brutal stinging. I couldn't see and it felt like I couldn't get rid of the tear gas.

Eventually someone came up to me and said they had a combination of malox and water which is helpful for clearing the pain from tear gas. They poured it on my eyes. Even after that, it still hurt to open my eyes. And I had nothing to wipe my face either, since I knew my clothes had the tear gas on them too and I didn't want to spread that further on my eyes. It took about ten or so minutes of flushing with water and just waiting before I was able to keep my eyes open for more than just a few seconds.

A bit later, maybe another five minutes, a friend and former coworker named Aaron, who I had previously ran into during the march, came up to me and took a look. He said he didn't see any wound on my head, but he saw a large patch of the tear gas powder visible on my hair. Aaron took some pictures of my head on his phone. He later sent me the pictures, which show a large spray of white powder on the left side of my head.

After I could see better, I stayed with the crowd for a while. I talked to some people whose friends had gotten arrested, and I told them about the bail fund. I gave them

my number in case anyone was too poor to afford their bail and needed our help, and I took down information about their cases to follow up.

At no point up until then did police announce that people had to leave the plaza, which is an open public area. At no point did police say it was an unlawful assembly or that we had to disperse, as I've heard at other protests. All we did was chant words from a distance, and they shot at us. Some of the deputies were shooting riot guns too, and I saw people got hit with those. One person who they hit an inch above his eye and on his chest, leaving large bloody welts, was wearing a military uniform. I later saw a reporter say that he is a former Marine.

I don't know if the grenade was thrown or shot at me. Either way, I don't know how police would have hit my head unless they were aiming for it.

Later, around 6:30 or so was the first time I heard police announce that people had to go home because it was an unlawful assembly, and we could be arrested if we stayed. The sheriff's department made this announcement from a helicopter. I never heard anything like that from the dozens of police who were on the ground and shooting at us. They never made any announcements, and I never saw them use a bullhorn or speaker system. I was standing close to these officers too, so I would have heard.

The helicopter also announced something like: "We don't want to see your children hurt." I don't know why anyone's children would be hurt unless the police hurt them. I didn't see a single person hurting children at the protest other than the police firing tear gas and riot guns at crowds.

Although I wanted to stay and support anyone else who might need advice about bail, I decided I didn't want to get arrested. Because my car was parked in Gardena, where the march began, it was a long walk back, over three miles. Whenever time I touched my head on the walk, the tear gas would spray out a bit and I could feel it in my eyes. I could feel it in my throat too.

Once I got home, I took a shower to try to get the tear gas out of my hair and off my skin. My head still hurt from where the grenade hit me, and I could feel a bump as

well as a headache from the impact. I considered going to an urgent care just to make sure I didn't have serious complications from the impact to my head. But I was worried the hospital could be a COVID-19 hotspot, and I figured it wasn't worth taking that risk for now.

My head was still sore the next day where the grenade hit it and I could feel a bump there.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff Rahman attended the march and rally on Sunday, June 21, 2020, from Gardena to Compton, supporting the family of Andres Guardado, an 18-year-old whom LASD deputies had fatally shot in the back three days earlier. During the rally, an LASD deputy either hit or shot him on the side of his head with a tear gas grenade. The tear gas powder exploded in his hair, blanketing his face. He struggled to breathe and could barely see for several minutes.

The protest had been peaceful prior to the deputies' attack, and Plaintiff Rahman was simply standing in place when he was hit. No protesters around him had weapons, threw anything at the police, or were close enough to the deputies to touch them. When the grenade exploded in his hair, he immediately began to run and his ears were ringing from the explosion. As he ran, he felt a searing pain in his throat

486    -8-    **D030**

with every breath. He was uncontrollably coughing and spitting. He kept trying to open his eyes to see where he was going but his eyes burned with a severe stinging pain. At most, he could peek a little through the pain to make sure he did not run into anything.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Aaron Cantu, (956) 451-9412, 1047 South Bonnie Brae Street, Suite A, Los Angeles CA 90006

**INTERROGATORY NO. 4:**

Identify every witness to the incident giving rise to your lawsuit, including his/her residential address and telephone number.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Aaron Cantu, (956) 451-9412, 1047 South Bonnie Brae Street, Suite A, Los Angeles CA 90006

**INTERROGATORY NO. 5:**

Identify all statements, signed or unsigned, recorded electronically or otherwise, prepared by you, or any other person relating to your allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous as to whether it requests only recorded or documented statements, or all statements including oral and unrecorded statements, and to the extent it seeks unrecorded as well as recorded statements, it is overly broad. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney/client and/or attorney work product privileges. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Responding Party will not comply because no nonprivileged responsive documents have ever existed.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: None.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

None.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

None.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated him for physical injuries to the same part of his body as the injuries he claims in this case, and providers who have treated his for the same or related psychological or psychiatric conditions he claims in this case, if any, and therefore responds as follows:

None.

**INTERROGATORY NO. 10:**

Identify any other action in which you have alleged a violation of your civil rights or other allegedly improper government action and state all facts, in reasonable detail, on which you base the allegations, including the time, place, manner, and participants in each alleged violation.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff presumes that the term "any other action" refers to a separate lawsuit filed by Plaintiff. Plaintiff further objects to requiring him to "state all facts" related to his allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

None.

490    -12-                                      **D030**

3) shutting down and impeding the exercise of First Amendment activities by, *inter alia*:

    i.   taking aggressive police action without declaring an unlawful assembly;

    ii.  the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bang grenade—so as to deter persons from seeking to exercise their first amendment rights.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Not applicable.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an

# <u>VERIFICATION</u>

I have read the below-titled documents and know their contents:

**PLAINTIFF** Shakeer Rahman **'S RESPONSES TO COUNTY OF LOS ANGELES' FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF SPECIAL INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION**

I am a Plaintiff in this action, numbered 2:20-cv-07870-DMG-PD, filed in the Central District of the United States Federal Court.  The matters stated in the foregoing documents are true and correct to the best of my knowledge except as to matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __05 / 27 / 2022__, in Los Angeles County, California.

_____

Plaintiff  Shakeer Rahman

VERIFICATION

492

**D030**
Doc ID: 1858c222c5d16a474b1295a6eae22244a90c77ec

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,           )
                               )
          Plaintiffs,          )
                               )
          vs.                  ) Case No.
                               ) 2:20-CV-07870-DMG-PD
                               )
COUNTY OF LOS ANGELES, etc.,   )
et al.,                        )
                               )
          Defendants.          )
_____)

VIDEOCONFERENCE DEPOSITION OF

DAVID RAMIREZ

OCTOBER 30, 2023

Reported by:  Joyce A. Griffith
CSR No.:      11010
NDS Job No.:  289277

1

David Ramirez                                                                October 30, 2023

BY MR. SAKAI:

Q    Because of the pain you were in after these protests, did it prevent you from taking any work?

MS. MULLEN:  Asked and answered.

You can respond.

THE WITNESS:  I mean, should I have not worked? Should I have taken a break from work?  Yes.  Could I afford to not make money to pay my bills?  No.

So I felt like I had no choice, but to work, because I had to pay my bills.  Again, I worked, but I was in a lot of pain, especially at the beginning, because I didn't -- yeah.  It just hurt a lot, like at the beginning.

MS. MULLEN:  Ms. Griffith, what was the question? What was the pending question?

THE COURT REPORTER:  "Question:  Because of the pain you were in after these protests, did it prevent you from taking any work?"

MS. MULLEN:  Thank you.

THE WITNESS:  Yes, yeah.  Again, my answer is I was in a lot of pain.  I should have not taken anymore work, but because I had to pay my bills, I took work.

BY MR. SAKAI:

Q    Are you claiming as part of this lawsuit, as a result of the injuries from these protests, that you lost

26

your capacity to earn income at any point in time?

MS. MULLEN:  Calls for legal conclusion, calls for expert opinion, asked and answered.

THE WITNESS:  No.  All I'm saying is that I didn't have a choice but to work, because I had to pay my rent.  I was in excruciating pain while I was working.

BY MR. SAKAI:

Q    Do you have any medical bills as a result of attending these protests?

MS. MULLEN:  Potentially calls for a legal conclusion and/or expert opinion.

You can respond, if you understand.

THE WITNESS:  I have a medical report that states what my injuries were about.

BY MR. SAKAI:

Q    Do you have any bills regarding any medical treatment you received?

MS. MULLEN:  Same objections.

THE WITNESS:  Bills?  Like medical bills?

MR. SAKAI:  Yes.

MS. MULLEN:  Same objections.

THE WITNESS:  Do I answer?

MS. MULLEN:  Yes.

THE WITNESS:  Medical bills, no.

///

27

THE WITNESS:  No.

BY MR. SAKAI:

Q    Have you sought mental health care as a result of your attendance at these two protests, September 5th and 8th, 2020?

MS. MULLEN:  Potentially calls for legal and/or expert opinion.

You can answer.

THE WITNESS:  No.

BY MR. SAKAI:

Q    I see that you are wearing glasses.  Are they to correct your vision?

A    They are blue light glasses, anti-blue light glasses.

Q    At the time of the 2020 protests, did you have any corrective lenses?

A    No.

Q    At the time of the 2020 protests, did you have or did you know whether you had any impairment to your hearing?

A    To my hearing, no.

Q    At the time of the 2020 protests, do you know if you had any impairment to any of your other senses?

A    No.

Q    What is your date of birth?

48

David Ramirez                                                              October 30, 2023

were doing when you needed to use an inhaler?

A    No.

Q    Do you recall the last time you were treated for asthma?

A    For asthma, I don't remember.

Q    Do you remember the last time you had an asthma attack?

A    Can you define what you mean by "asthma attack"?

Q    Sure.

Where you had difficulty breathing.

A    The only thing that comes to mind is during the incident of September 5th when we were tear gassed and I literally couldn't breathe, and it was scary.

Q    Were you ever treated for your exposure to the gas on September 5th?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  For the gas, no.

BY MR. SAKAI:

Q    At any point did any health care professional tell you that your exposure to the gas somehow triggered a reaction based on your asthma?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  No.

BY MR. SAKAI:

Q    Have you ever been convicted of a felony?

57

saw another, like an individual there.  I don't know who

they were, but this was like during the shooting.  I saw

what looked like a male chuck a half-empty bottle of water

over the hedge at the sheriffs.  That's something that

stuck in my mind.

I also saw a little girl running towards the

truck.  That's something that also I remember.  I remember

there was a car parked like directly in front of the

sheriffs station that was just being basically like --

there were just so many bullets that hit that white car.

So as soon as I felt like the people or I thought

the people were to safety, at least the people around me,

because there was a lot going on.  As soon as I felt like

I was able to retreat to the back of the semi-truck

without leaving somebody behind, that's when I started

seeing all the smoke, which was tear gas.

So we were literally like -- at this point, we

are on the opposite side of the semi-truck, covering

ourselves from the bullets, but now we are not even able

to sort of defend ourselves, because now we are basically

being tear gassed.  So the truck basically shielded us

from the bullets, but it wasn't shielding us from the tear

gas.

At that point, people were basically trying to

like figure out if they were hurt, people were trying to

63

David Ramirez                                                          October 30, 2023

figure out who needed help, because people were, you

know -- some people got hit, some people got injured.  I

was hit in my lower abdomen as I was basically retrieving

backward to get behind the semi-truck.  I was hit in my

lower abdomen, like right below where I had the poster.

As soon as I got to the back of the truck, I

felt safer, but again not safe, because of the smoke that

started to surround us.  At that point, I see a little

girl come into that area, and she's like choking.

MS. MULLEN:  David, do you need a break?  Are you

okay?

THE WITNESS:  I think I'm okay.

MS. MULLEN:  Okay.

THE WITNESS:  I'm sorry.  I don't really talk

about this.

MS. MULLEN:  Take your time.

THE WITNESS:  At that point, I realized even

though we are behind the truck, we are still not safe, and

as much as I wanted to stay there, we couldn't, because

have all the smoke.  It felt like -- immediately as soon

as the tear gas started to be shot at us, a dispersal

order was given.  I don't know which one came first.  But

definitely the shooting came first.  I want to say the

tear gas came second and I want to say that the dispersal

order came right after the tear gas.  I say that because

64

David Ramirez                                                    October 30, 2023

BY MR. SAKAI:

Q    At this point, how much longer did you stay at the location?

A    At that point, a few of us, like a handful of us, stayed at 112th Street and Raymond basically treating people.  How long, I don't remember.

Q    Do you remember what time you left that location?

A    No.

Q    Was it still September 5th or was it into the next day, September 6th?

A    I don't remember.

Q    Did you leave the location while it was still dark?

A    Yes.

Q    You mentioned that you were struck my some munitions.  Is that accurate?

A    I was holding the sign, and my sign was hit three times.  Keep in mind, I was shielding my face with my sign.  And then one of the bullets, the fourth bullet, hit me in my abdomen.  This was when I was on the sidewalk in front of the station.  As I was walking towards behind the semi-truck, I was still being shot at, but none of them hit me.

As we were being tear gassed and shot at, again,

66

David Ramirez                                                    October 30, 2023

there was shooting being -- like there were bullets coming toward us, and I wasn't even facing the sheriffs at this point.  I was like fleeing, so as I was like basically fleeing behind the truck to get to 112th and Raymond, I could see bullets like -- I mean from the side, like basically missing me.

Q    So how many projectiles struck you?

A    That night, three struck my poster, one struck my abdomen, and like six to ten bullets missed me.

Q    When you are referring to bullets, what are you referring to specifically?

A    I'm assuming that what I was seeing fly near my face, head, body, everything -- I'm assuming that it was the same red pepper bullets that were lodged into my poster.

Q    Are you familiar with what paint balls are?

A    Yes.

Q    Did they appear to be about the same size and shape of a paint ball, but red?

A    I actually was able to keep one of the balls.  I don't have it anymore, but I wouldn't compare it to a paint ball, only because there was like a heat sensation to these balls that they were throwing and people were calling them like pepper balls or pepper bullets, so no, I wouldn't compare them to paint balls.

67

David Ramirez                                                          October 30, 2023

Q    Specifically as to the size and shape, were they comparable to a paint ball?

A    I would say a little bigger, but close to a paint ball.

Q    As a result of being struck by -- it sounds like one of these pepper bullets or pepper balls -- did you seek medical treatment?

A    For the pepper ones on the 5th, no.  Because it was bruising, and I didn't feel like I needed to get treatment for bruising.

Q    I'll bring up the picture.  It's part of your declaration.

Was the brusIing captured in one of the pictures in your declaration?

A    I believe so.

Q    Let me pull that up for you, so that we can verify that.

I'm going to share my screen.  This was previously marked as Exhibit 1.  I'm going to share my screen on the pictures that follow the declaration.

A    This is September 8th.  Sorry, yeah.  This is September 8th wound.

Q    And that's marked as page 1 of the pictures.  I'm going to go to the next two pages.  If I could direct your attention to what is marked as Page 2.

68

David Ramirez                                                    October 30, 2023

which one is which?

A    I don't remember which one came first.

Q    And then these are close-ups, and it looks like it's a little bit above what appears to be the underwear line?

A    Yes.

Q    When you describe the right pelvis area, could you be more specific as to what part of your body that is referring to?

A    Do you want me to show you?  I mean --

Q    If you could just stand up and point to the area on your body, so we can --

MS. MULLEN:  You can keep your shirt down.

WITNESS:  To be clear, let's see -- so if this is where my underwear line is, it's right above it.

BY MR. SAKAI:

Q    For the record, the deponent has stood up, lifted his shirt a little bit.  He was pointing to -- it appears to be a little bit right of center above the underwear line.

Is that what you were pointing at?

A    I guess right above where like -- I don't have abs, but right above the ab triangle.

Q    Today do you have any marks from where you were hit by the pepper ball on September 5th?

70

David Ramirez                                                          October 30, 2023

A    September 5th?  Can I check?

Q    Sure.

MS. MULLEN:  You can do that off camera, that's okay, for privacy.

THE WITNESS:  I don't see anything.

BY MR. SAKAI:

Q    How long after you were hit with that projectile on September 5th were you experiencing any type of sensation?

A    No.  Just bruising and whatever comes with bruising -- discomfort, a little bit of stinging, but -- yeah.

Q    How long did that take to go away?

A    I want to say maybe like two weeks.

Q    During those two weeks, did you do anything to treat that injury?

A    I iced it.

Q    Anything else?

A    No.

Q    As we sit here today, are you experiencing any symptoms stemming from that pepper bullet injury?

MS. MULLEN:  Vague and ambiguous, potentially calls for expert and/or legal conclusion.

THE WITNESS:  Not that I'm aware of.

///

71

David Ramirez                                                    October 30, 2023

Q    Do you still have this poster?

A    No.

Q    What happened to it?

A    Honestly, I don't remember.  I may have lost it.

Q    Did any other pepper balls puncture or go through this poster?

A    I mean, clearly not, because there would be physical damage to it.

Q    So at least where we see the three round objects, those are pepper balls that were stopped by your poster. Is that what I'm seeing?

A    Yes.  So as soon as the shooting started, I again placed it in front of my face and chest area, and that's how I got them.

Q    And then you also state that when you were on the other side of the street behind the truck, that you experienced some tear gas.

Is that accurate?

A    The tear gas happened as I was walking towards the back of the semi-truck, yes.

Q    Can you describe the sensations that you experienced when you -- well, when you were exposed to the tear gas?

A    I mean, there were two sensations that stand out.

74

David Ramirez                                                                October 30, 2023

The first one being my eyes are completely like itchy, runny. Like I couldn't stop crying, basically, so my vision -- I couldn't see anything, because my eyes were burning.

Then the second sensation I was feeling was I couldn't breathe. There was just so much gas that -- there was just no clean air to breathe in, so all we were breathing was this tear gas. So there was a point where I felt like I was choking and I couldn't see anything. That was scary.

Q    Were there any other sensations you were experiencing?

A    I mean, quite a few. I was afraid for my own safety. I was afraid for the safety of others. There was disorientation because they were telling us to disperse at this time, after we were tear gassed, but we couldn't see.

So like I didn't know where to go, and there was definitely a sense of danger, because as we were being tear gassed, the shooting never stopped, so we were basically like forced to seek safety and shelter while we were blinded and they were shooting at us.

Q    Other than the breathing and the vision sensations that you described, were there any other physical sensations you experienced with this exposure to tear gas?

75

David Ramirez                                                    October 30, 2023

MS. MULLEN:  Misstates prior testimony.

Go ahead.

THE WITNESS:  Not that I can think of.

BY MR. SAKAI:

Q    How long did the sensation in your eyes last?

A    Quite a long time.  I want to say at least 45 minutes to one hour and a half.

Q    Can you describe the sensation that you felt in your eyes?

MS. MULLEN:  That was asked and answered, but go ahead.

THE WITNESS:  It was just burning, like my eyes were literally burning.  And then, you know, you try rubbing it and then the burning would get on your finger tips, so that was one sensation.

Again, the worse one was that I felt like I was going to pass out because I couldn't breathe and I just wasn't sure how to make it better.

BY MR. SAKAI:

Q    Did the intensity of the burning in your eyes, was it continuous?  Did it get worse?  Did it get less? Did it --

A    Well, that's like -- immediately when we were exposed to it, it was like --

Q    Go ahead.

76

A    When we were first hit with the tear gas, obviously, it was really, really bad.  Again, we couldn't go to safety right away when we were behind the truck because the shooting was ongoing, so we did stay behind the truck for, I don't know, minutes, trying to figure out what do we do, where do we go.  But at the same time, we didn't have a lot of time to make up our minds because we were literally choking.

Q    How long did this immediate intense burning last in your eyes?

A    The super, super intense portion, probably 30 minutes, and then it slowly started to burn less after, but I couldn't figure out how to make it not burn.  I had other people try and treat my burning sensation.  Some people had milk.

This was after.  This was once we were at 111th and Raymond that I guess somebody was driving, and they stopped by and they had milk and they treated me.

Q    And at some point, did the sensation, the burning sensation, cease in your eyes?

A    Very, very gradually.

Q    How long did that take to subside?

A    Again, after 45 minutes of intense burning, it did take like half an hour for it to slowly go away, but even the next morning when I woke up, my eyes were

77

tender.

Q   How long did it take for your eyes to return to normal?

A   Maybe a whole day after.

Q   Did you seek any medical care for the exposure to tear gas to your eyes?

A   No.

Q   Do you have any symptoms in your eyes related to the tear gas exposure?

MS. MULLEN:  Potentially calls for expert and/or legal conclusion.

THE WITNESS:  I don't know.

BY MR. SAKAI:

Q   What do you mean by you don't know?  Can you rephrase?

A   Can you rephrase the question?

Q   Sure.

I just want to make sure that -- is it you don't know, you have no idea if you are still experiencing any issues with your eyes, or are you experiencing issues, or you don't know if they were related or something else?

A   Well, two things.

I'm experiencing issues with my eyes.  I'm not saying it was because of the tear gas.  But also something that is on my mind is I don't know the long-term effects

78

of tear gas.

Q    What are you experiencing with your eyes today?

A    I mean, it has -- I cannot look at a screen, whether it's my phone, telephone or computer -- for like more than -- I don't know, three hours, before my eyesight starts to basically weaken.

Q    Anything else?

A    Yes.  But this is pertaining to the September 8th injury.

Q    Okay.

A    After I was hit, again I couldn't sit.  Like right after, it was just hard for me to sit, because when I sat, obviously, my thigh had to bend 90 degrees, and that would create pressure on the wound.  So I couldn't sit for a while because of the external injury.

After the external injury started to heal, obviously it would still be painful to sit, but then it turned into like internal pain that prevented me from sitting, and it was then that I went to get it looked at and they basically told me -- at least the lady that helped me told me that it was peripheral nerve damage, what she called it.  The discomfort of that injury never went away.

Q    How about as to your eyes?

A    What about them?

D031

David Ramirez                                                           October 30, 2023

looking at a screen for pretty much all of your work day?

A    Not all of it.  There are times when I have like -- it's maybe like 60/40.

Q    Okay.

A    60 in front of the computer; 40 not in front of the computer.

There's a lot of time spent visiting construction sites.  There's a lot of appointments where I need to go and talk to clients in person, but the vast -- not the vast, the 60 percent, the majority of my work does require computer usage.

Q    And then the last set of questions, just to summarize my notes about your eye injuries.  Let me know if this is right or not.

Immediately you experienced intense burning in your eyes which lasted roughly 30 minutes to 45 minutes. Is that true?

A    Correct.

MS. MULLEN:   That misstates prior testimony.

BY MR. SAKAI:

Q    And then gradually the burning subsided over the next -- let's just say the next day, but you still had tenderness in your eyes the next morning?

A    Correct.

82

Q    And then about a whole day later, after that, that's when I recall your eyes returning to normal.

A    I wouldn't say normal.

MS. MULLEN:    That misstates prior testimony.

BY MR. SAKAI:

Q    Let me ask you.  I believe you said -- my question was, when did you stop feeling the pain in your eyes -- so let me ask the question.

How long after your exposure to the gas did you stop feeling the burning in your eyes?

A    Well, there is burning and then there's discomfort.  The burning, like I mentioned, it did take like a whole day after for the burning to subside.  There was definitely discomfort that lasted, I don't know, maybe five days, five to seven days.

Q    Then after the five to seven days of discomfort, how would you describe the sensation in your eyes?

A    It felt like my eyes were at that point starting to heal.

Q    And at least as to how you feel, when did you feel that your eyes had returned to normal after this exposure beginning?

MS. MULLEN:    Assumes facts, vague and ambiguous.

THE WITNESS:    It's hard to say.

83

BY MR. SAKAI:

Q    If you could give me any type of estimate?

Was it a matter of weeks?  Months?  A few more days?

A    I would say --

MS. MULLEN:  Same objections.

THE WITNESS:  I would definitely say it was months.

BY MR. SAKAI:

Q    So it was months after this incident before you felt your eyes return to normal.  Is that true?

A    Yes.

MR. SAKAI:  Let's break and go off the record.

It's 12:32 now.  I actually want to go and eat something.  What if we come back at 1:15?

MS. MULLEN:  That works for me.

MR. SAKAI:  I'll see you all back at 1:15.

Thanks, everyone.

(Recess from 12:35 p.m. through 1:20 p.m.)

BY MR. SAKAI:

Q    We are still talking about September 5, 2020.

When you were hit by the pepper ball on the right pelvis, can you describe the sensation?

A    Well, there was a lot going on, so it's hard to just focus on the sensation of the pepper bullet.  There

84

David Ramirez                                                   October 30, 2023

was like physically what I felt was like stinging.  I definitely felt stinging.

Obviously at the time, there was too much going on for me to stop and say, "What was that?"

Q    When you stay "stinging," can you describe what you mean by "stinging"?

A    If I could describe it to something else, it was like getting your finger caught in the door.  There's pain, there's stinging.  You don't feel like you are dying, but it's definitely there and uncomfortable.

Q    Then about how long did this stinging sensation last?

A    Probably for -- honestly, I don't remember.

I know it was through the rest of the night, and I want to say it lasted probably a few days after for the irritation to go away.

Q    After a few days, did the discomfort or irritation go back to pre-protest levels?

A    Yes and no.  Yes, because it was healing, and no because a few days later, I got hit again.

Q    And then what did the stinging feel like, say between no pain at all and the worst pain in your life?

A    It was probably a 7.

Q    How long did this pain level of 7 last?

A    Probably like when I first -- like on impact,

85

David Ramirez                                                   October 30, 2023

that was probably the worst, and then it went down to like a 6, I would say maybe minutes after, and it stayed probably at a 6 that night, and then it slowly dropped after several days.

    Q    Did you treat this pepper ball wound in any way from September 5th?

            MS. MULLEN:  Asked and answered.

            THE WITNESS:  This was already asked before.

            MS. MULLEN:  You can re-answer it.  It's okay.

            THE WITNESS:  I basically treated it with ice at home.

BY MR. SAKAI:

    Q    Anything else?

    A    No.  Just like, you know, antibacterial ointment I put on it, and just a lot of rest.

    Q    In your declaration regarding your inhalation of tear gas, you said, "I could not breathe for a minute because it exacerbated my asthma symptoms."

            What did that mean?

    A    I guess that meant that I at one point had no control over my breathing.

    Q    Why did you refer to an exacerbation of your asthma symptoms?

    A    Because that's what it reminded me of.

    Q    So from your declaration, is it that sensation

86

David Ramirez                                                         October 30, 2023

felt like when you had previous asthma attacks?

A     Yes.

           MS. MULLEN:  Misstates prior testimony.

BY MR. SAKAI:

     Q     And it doesn't mean that you experienced an asthma attack as a result of inhaling gas on September 5th?  Is that right?

           MS. MULLEN:  Objection; misstates prior testimony and calls for legal and/or expert opinion.

           THE WITNESS:  I would say it's the former.

BY MR. SAKAI:

     Q     What's that?

     A     It reminded me of when I used to get them.

     Q     What was your reason for participating in the protest on September 5th?

           MS. MULLEN:  Vague and ambiguous.

           THE WITNESS:  I wanted to, first and foremost, educate myself on what happened to Dijon Kizzee.

BY MR. SAKAI:

     Q     Any other reason?

           MS. MULLEN:  Same objection.

           THE WITNESS:  No.

BY MR. SAKAI:

     Q     Were you intending to send any type of message by attending this protest?

87

David Ramirez                                                    October 30, 2023

Q    Other than these two videos, do you recall filming any other videos on September 5th?

A    Not to my recollection, no.

Q    When was the next protest that you attended after the September 5th protest?

A    I don't remember off the top of my head.  I don't remember.

Q    Do you recall attending any other protests between the September 5th South L.A. protest and the September 8th South L.A. protest?

A    Are you asking if I remember attending other protests?

Q    Between the 5th and the 8th of September.

A    No, I did not.  I -- yeah.

Q    Were you injured at the September 8th protest?

A    Yes, I was.

Q    Can you describe how you were injured?

Let me be more clear.  Can you describe what your injuries were?

A    So on September 8th, I believe I was walking backwards again with a poster.  At the time of the impact, there was a row of sheriffs walking towards us.  They were probably -- I don't know -- 10 feet in front of us, so even closer than September 5th.  And this time -- I don't know exactly what projectiles they were using, but to me,

127

**D031**

it sounded like they were using the bigger ones and, you know, when you review my injury, I was shot at with one of those big blue foam bullets point blank.  One, I guess hit me on the side of my lower abdomen, and I believe I had another one hit my leg.

Q    Were you injured in any other way?

A    So that was probably the biggest injury I received, the one that hit my lower abdomen.  But as soon as I was hit, I decided to basically just kneel, because I did not want to get hit again.

I turned around and I ran toward the nearest little street to get out of the firing range, I guess, and the same thing as September 5th, I kept hearing bullets going all around me.  So they were basically still shooting at me as I was fleeing with the poster now behind my head, because I felt the need to cover my head with the poster.

Q    Other than these injuries to your abdomen and leg, did you receive any other injuries on September 8th?

MS. MULLEN:  Calls for expert opinion.

THE WITNESS:  Physically -- so there was a time when I had to throw myself under a car because the police were basically abducting -- or at least what looked like an abduction.  I wouldn't classify it as an arrest, because they were literally driving in their cars and

128

David Ramirez                                                    October 30, 2023

Q    And then at the time you were hit in the right knee, on a pain scale of zero to 10, what would you rate the initial impact?

A    Well, I wasn't hit on the right knee.  I was hit above it, but the level of pain would have probably been maybe a 6.

Q    How long did that 6 level of pain last?

A    Maybe three days.

Q    And then how long did it take before that area in the right thigh was the same as before the protest?

A    Maybe two to three weeks.

Q    Did you receive any treatment for this right thigh injury?

A    I just iced it.

Q    Do you have any continuing symptoms regarding this right thigh injury?

A    Not for the right thigh injury.

Q    For the left lower rib area injury, what would you describe the pain level at the time of impact?

A    That was definitely a 10.

Q    How long did that last?

A    I mean, it's hard to gauge, because I'm still sort of hurting from that injury, but if I had to guess how long the 10 lasted for, maybe a month, and than it went down to maybe like a 9 for like the next three

131

months, and it just slowly started to heal, but it was very painful.

Q    And as of today, how would you rate the level of pain or discomfort in that area of your left lower rib?

A    It varies between like a 3 and a 4.  If I sit for too long, I start to get pain.

Q    So was this the injury that you went for treatment for?

A    After I realized that, like internally, the wound wasn't healing the way it was healing externally, yes.  I decided to go get it looked at.

MR. SAKAI:  Let me share what was produced this morning.  I'm going to mark this as Exhibit 7.  It appears to be six pages of medical records from L.A. County USC Medical Center.

(Exhibit 7 was marked for identification and it is attached hereto)

BY MR. SAKAI:

Q    Let me share it with you and ask if you recognize it.  Do you recognize this document to be at least the first pages of the L.A. County USC medical records?

A    Yes.  It looks like what I submitted, yes.

Q    Here it says that you sought treatment on October 30, 2020.  Does that sound like the right date?

A    If that's what it says, yes.  I remember I waited

132

David Ramirez                                                    October 30, 2023

some time because I was -- I have always been afraid of

doctors, so I wanted to see if I could wait it out.  But

the pain wouldn't allow me to.

MS. MULLEN:  Counsel, I'm having a difficult time

reading this.  I don't know if it's clear to the witness,

but it's difficult for me to read.

MR. SAKAI:  Is it blurry?

MS. MULLEN:  Yes.

BY MR. SAKAI:

Q    Mr. Ramirez, is it also blurry for you?

A    No.  I can still --

MS. MULLEN:  It's really pixilated to me.  I'll

pull up the documents anyway, as long as the witness can

read them.

MR. SAKAI:  For the record, they appear to be

photos of the document.  I don't know if I'm pulling it up

on my PDF editor or -- I don't know if over Zoom that

affects the quality, so I would ask the deponent.

BY MR. SAKAI:

Q    Does it appear to you to be photos of your

medical records?

A    Yes.

Q    And then it looks like you went to receive

emergency care at L.A. County USC?

A    Yes.

133

David Ramirez                                                              October 30, 2023

Q    Why did you go to L.A. County USC at this time?

A    Is it okay if I read the document?

Would you mind zooming in?

Q    Sure.  Let me see.  Let me just do a page at a time.

Can you read that better?

A    Can you Zoom?

Q    Okay.

That should be fine.

Q    Let me move down.  That's pretty much the whole document.

A    Okay.  I have read it.

Q    Do you recall why you went into receive medical treatment on this day?

A    Yes.

Q    Why is that?

A    Because I was unable to sit without being in excruciating pain.

Q    Any other reason?

A    No.  I think it was all due to that one injury on the 8th.

Q    Can you describe this not being able to sit without being in excruciating pain?

A    I'm not sure if anywhere on this document it tells you exactly what the symptoms I had were, or I don't

134

David Ramirez                                          October 30, 2023

know if the neuropathy is something that I guess you know what it's about.  But basically what I was told after I was looked at was that there had been some type of nerve damage done.

Q    Anything else that you were told?

A    They pretty much just said that nerve damage was linked to the wound.

Q    Did they tell you anything else about your injury?

A    They said if I wanted to get it fixed, that I would have to have basically -- what is it called -- neurosurgery or surgery of the nerves to actually fix it.

Q    Did they tell you anything else?

A    No.

Q    So can you describe to me what kind of pain you were experiencing when you were trying to sit?

MS. MULLEN:  Vague as to time.

MR. SAKAI:  Leading up to this appointment.

THE WITNESS:  Yes.  So I guess the reason they went to get it looked at was because at this time, I literally couldn't even sit for more than like ten minutes before the nerve pain would basically travel down to my groin area.  And they said that it was linked to the nerve damage.

135

523                                              D031

MR. SAKAI:  Yes.

THE WITNESS:  No.

BY MR. SAKAI:

Q    Are there still any marks left from this injury to your left low rib?

A    Yes.  There is a scar, and the tissue got really hard, so it feels like there is a ball lodged inside.

Q    Also in the Dropbox I was sent today, there's a -- it looks like a Home Depot receipt or a -- let's see. What is this?  A Home Depot web page for it looks like a standing desk.

Do you recall --

A    I think I know what you are talking about, but I would like to see it.

MR. SAKAI:  Let me mark it as Exhibit 8.

For the record, it's like 13 pages.  In the left-hand corner it says April 7, 2022, 11:31 a.m.

(Exhibit 8 was marked for identification and it is attached hereto)

BY MR. SAKAI:

Q    Do you recognize what this, at least these two pages, depict?

A    Yes.

Q    What is that?

A    It's the stand up desk I had to purchase because

137

the first time after that I attended one.

Q   So have you attended any event, public event that you are referring to here, since September 8, 2020?

A   Up until now?

Q   Yes.

A   Yes.

Q   Approximately how many?

A   I don't remember.  But it's way less than I would have if I wasn't injured.  I don't remember.

Q   Over five?

A   That would be a good estimate, yes.

Q   Under ten?

A   I don't know.

Q   Would it be fair to say since September 8, 2020, you have attended between five and ten events, public events that we have been referring to here?

A   Yes.

Q   And at any of those events, did you see any law enforcement?

A   No.

Q   At any protests in L.A. County prior to September 5, 2020, did you see any use of force by law enforcement?

A   Repeat that question.

Q   Prior to September 5, 2020, the first protest

185

**D031**

to this incident, was there any health condition that

limited your activities?

    A    No.  I have been pretty healthy.

    Q    Have you ever filed a workers' compensation

claim?

    A    No.

    MS. MULLEN:  Calls for legal conclusion.

BY MR. SAKAI:

    Q    Have you ever received disability benefits?

    A    No, I have not.

    Q    Prior to September 2020, have you ever

experienced similar physical injuries or symptoms?

    A    Never.

    Q    Are there any physical limitations that you still have based on the injuries received during these incidents?

    A    Yes.

    Again, I cannot sit for too long without having a sense of discomfort in the area that was injured.  That pain also travels to my groin area.  So yes, I still suffer from the September 8th wound.

    Q    Anything else?

    A    I'm having sight issues right now, but it's not

my place to say that it was from this incident or not.

    Q    Anything else?

189

David Ramirez                                                                October 30, 2023

A    There's a lot of anxiety that I experience whenever I do go to an event or even a protest, and it happens as soon as I leave my house.  Because sometimes when there's a cop that drives behind me, I literally have to pull over and let them pass me by, because it's just a little bit anxiety-inducing.  I also don't go out to these events as much as I can and want to.

I'm just afraid of getting hurt again.  It's also a huge mental toll that it's taken on me, so I have to be like in a good mental place to leave my house, and that's hard to reach now.

Q    Anything else?

A    Just the fact that I don't feel safe whenever cops come and shut down an event or protest, because I always feel like they are going to just start shooting out of nowhere.

Q    So now have you told me everything that you are continuing to experience as a result of the September protests you attended?

MS. MULLEN:  Vague and ambiguous, potentially calls for legal and/or expert opinion.

Go for it, if you understand it.

THE WITNESS:  I didn't understand the question.

BY MR. SAKAI:

Q    Have you now told me everything that you are

190

527                                                              D031

David Ramirez                                                    October 30, 2023

still experiencing based on your injuries obtained at the September 2020 protests?

MS. MULLEN:  Same objections.  Go ahead.

THE WITNESS:  Let me think.

Yes.  I think I have.

BY MR. SAKAI:

Q    Have you considered obtaining mental health care?

A    I have a therapist that I go to, at least I try to go to every week.

Q    Are you seeing this therapist because of the September 2020 protests?

A    Not specifically.

Q    So have you ever discussed the 2020 protests with your therapist?

A    Not in detail.

Q    In general?

A    General stuff, yes, but if you want me to be specific, I can't remember specifically what I have shared with her.  But, again, I don't go into detail about this incident with the therapist.

Q    Why not?

A    I'm afraid she is going to judge me.

Q    What do you mean by that?

A    It's personal stuff that I just don't want to

191

share with her, and I don't know if she's going to understand, so I would just rather keep it to myself.

Q    Have you tried anything else to address the mental health issues that have arisen from the September 2020 protests?

A    Sadly, the only thing that does help is not attending these protests and events, but that's also a double-bladed sword, because I want to.  I'm unable to sometimes.

Q    Other than that, have you tried anything else to treat these mental health issues arising from the protests?

A    Just besides being nicer to myself, no.  I mean, I try to work out to sort of, you know, forget about it or work out the anxiety, you know.  I try to eat healthy so that, you know, it helps my mood.  But no, I have not.

Q    Have you now told me everything you attempted to do to address the mental health issues that came out of attending the September 2020 protest?

A    Is the question if I have addressed, if I have done everything to address --

Q    Have you told me everything that you have done to try to --

A    Yes, I believe so.

Q    Have you ever discussed your anxiety with your

192

David Ramirez                                                                    October 30, 2023

STATE OF CALIFORNIA          )
                             ) ss:
COUNTY OF ORANGE             )

        I, JOYCE GRIFFITH, do hereby certify:

        That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of certificate number 11010, which is in full force and effect and that I am authorized to administer oaths and affirmations;

        That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

        That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

        That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

        That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

202

Network Deposition Services, Inc. ● networkdepo.com ● 866-NET-DEPO

530                                    **D031**

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 29th day of November, 2023.

JOYCE GRIFFITH, CSR No. 11010

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd,, #115
Culver City, CA 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
t. 213-995-3935
e. morgan@morganricketts.com

Colleen M. Mullen SBN 299059
Employee Justice Legal Group
1101 Wilshire Blvd.
Los Angeles, CA 90017
t. (213) 382-2222
e. cmullen@ejlglaw.com

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,

PLAINTIFFS,

v.

COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive,

DEFENDANTS.

Case No.: 2:20-cv-07870-DMG-PD
*Assigned to: Honorable Dolly M. Gee*

**PLAINTIFF DAVID RAMIREZ'S RESPONSE DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE**

**D032**

admissible; (b) a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6. Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

### RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

September 5, 2020, Incident

//

**D032**

On or about September 5, 2020, Plaintiff DAVID RAMIREZ attended a protest organized by Black Lives Matter Los Angeles to protest the shooting of Dijon Kizzee by Los Angeles Sheriff's Department. The protest began at the Los Angeles Sheriff's Station located at 1310 West Imperial Highway in Los Angeles. Plaintiff arrived at approximately 7:00pm. When Plaintiff arrived, Plaintiff did not see any protestors throw anything, destroy any property, or instigate violence.

At approximately 7:15-7:30pm, the protestors then marched along Imperial Highway to the 110 freeway. Several Sheriffs in marked cars followed the march, though the Sheriffs did not block off any of the freeway entrances along Imperial Highway.

The protestors then blocked traffic on the 110 freeway southbound. The demonstration was peaceful. Plaintiff did not witness any protestor destroy any property or threaten any violence. After for approximately 30 to 45 minutes, Defendant officers arrived and announced, via loudspeaker, that the protestors should disperse. The protestors peacefully acquiesced and proceeded off the freeway.

The protestors then attempted to walk back to the Sheriff's Station, where the protest began. The protestors resumed the protest on the sidewalk in front of the Sheriff's station. Again, the protest was peaceful at this time. Plaintiff did not witness anyone throw any objects, destroy property, or threaten violence.

Very shortly after the group reconvened at the Sheriff's station, the sheriffs began shooting rubber and/or foam projectiles at the group. Plaintiff did not hear any dispersal orders or warnings issued by Defendants prior to the use of force. Plaintiff saw several children in the crowd where Defendant officers were shooting. Plaintiff believes he saw one protestor throw a small, plastic waterbottle at the officers *after* the officers began shooting into the crowd, but did not see any protestors follow suit. Plaintiff was forced to take cover behind his cardboard poster, which acted as a shield while Plaintiff retreated away from the shots. His cardboard

**D032**

sign was hit at least three times. Plaintiff was struck with a projectile on his right pelvis area and lower left rib.

While the protestors attempted to retreat behind parked cars on the streets to avoid being hit by the projectiles, Sheriffs then shot tear gas canisters into the crowd. Plaintiff struggled to see and breathe given the amount of tear gas used. His eyes burned with the tear gas. Plaintiff felt like he could not move. Defendants then began issuing indiscernible orders to the protestors as they continued shooting into the crowd. Plaintiff could not hear what the orders were over the sounds of the shootings.

Plaintiff believes he heard Defendants provide a dispersal order after they had already begun to shoot the crowd with foam bullets and use tear gas. The protestors were not given any time to comply with the dispersal orders, as Defendants continued to utilize force against the crowd as they gave orders.

Plaintiff left as soon as he was able to catch his breath, as his asthma was triggered by the use of tear gas. Plaintiff heard Defendants continue to shoot into the crowd as he left the scene.

September 8, 2020, Incident

On September 8, 2020, at around approximately 7:30pm, Plaintiff attended another protest against the shooting of Dijon Kizzee by the Los Angeles Sheriff's Department at the intersection of Normandie Avenue and Imperial Highway. Defendant Officers had blocked off the sidewalk and parking lot in front of the Sheriff's Station located on Imperial Highway, forcing the protestors onto the street down Imperial Highway to the intersection of Normandie Avenue and Imperial Highway. The protestors remained at the intersection for approximately thirty minutes.

Plaintiff witnessed the Sheriff's form perpendicular lines, one preventing the protestors from proceeding South on Normandie and the other preventing the protestors from proceeding East on Imperial Highway back toward the Sheriff's

station. The protestors were then forced to proceed North on Normandie, keeping approximately 15-20 feet between themselves and the line of encroaching Sheriff Officers.

All of the sudden and with no prior warning, Sheriff's began shooting projectiles into the crowd. Plaintiff did not hear any dispersal orders provided or warnings that force would be used. Plaintiff had not seen any protestors throw anything at the officers or threaten violence to prompt the response from Defendants. Plaintiff was struck on his right thigh and on the lower left side of his abdomen, below his ribs.  Plaintiff was in severe pain from being hit with the projectiles. He was forced to immediately retreat into the residential neighborhoods further down Normandie where he was able to eventually leave the protest.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff received multiple severe contusions and bruises where he was hit with rubber and/or foam bullets, including in or around his right pelvis area, lower left rib, and right thigh. Plaintiff was diagnosed with peripheral neuropathy, a result of damage to his nerves sustained as a result of the physical injuries related to the foam and/or rubber bullets. Plaintiff continues to experience significant pain due and

his injuries are ongoing. Additionally, Plaintiff experienced significant emotional distress as a result of Defendants' actions.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff sought treatment at LAC + USC Medical Center located at 1200 North State Street, Los Angeles, CA 90033.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 4:**

Identify every witness to the incident giving rise to your lawsuit, including his/her residential address and telephone number.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

//

**D032**

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff sought treatment at LAC + USC Medical Center located at 1200 North State Street, Los Angeles, CA 90033.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

//

Plaintiff is unable to provide a "specific amount" of medical bills he has incurred to date, as his injuries are ongoing. Due to Plaintiff's peripheral neuropathy he developed as a result of being hit with rubber and/or foam bullets, Plaintiff began experiencing severe pain in his abdomen if forced to sit too long in one position. He had to purchase a standing desk so he could continue working without experiencing severe pain. Plaintiff spent approximately $272 for the standing desk to alleviate his pain.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is unable to provide a "specific amount" of medical bills he has incurred to date, as his injuries are ongoing. Plaintiff sought treatment at LAC + USC Medical Center located at 1200 North State Street, Los Angeles, CA 90033.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other

Plaintiff further objects to this interrogatory to the extent that it violates the right to privacy and/or doctor patient privilege and/or seeks information that is neither relevant to this action, nor reasonably calculated to lead to the discovery of admissible evidence, nor proportional to the needs of this case. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff received treatment in the State of California, County of Los Angeles, City of Los Angeles for injuries sustained in the Incident(s) complained of in this action which were covered through MediCal via L.A. Care.

**INTERROGATORY NO. 17:**

If you have made a claim with any insurance carrier for physical, mental or emotional injuries within the past ten (10) years, identify each claim by date, injury, and insurance carrier.

**RESPONSE TO INTERROGATORY NO. 17:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.

Subject to and without waiving the foregoing objections, Plaintiff will only identify claims relating to physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Not applicable.

**INTERROGATORY NO. 18:**

Identify the amount and source of all money, compensation, or payment of any kind you received from any source from the date of the incident alleged in the

**D032**

Complaint through and including the present in response to any complaint made regarding the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 18:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

In or around September 2020, Plaintiff was self-employed and provided architecture drafting and rendering to clients. Plaintiff is not making a claim for lost wages and/or earning capacity.

**INTERROGATORY NO. 19:**

List every specific policy of the County of Los Angeles that you allege violated your constitutional rights in the incident alleged in your Complaint.

**RESPONSE TO INTERROGATORY NO. 19:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. . Plaintiff further objects on the grounds that contention interrogatories are premature, and Plaintiff should not be required to respond to them at this early stage in the litigation prior to depositions having been taken. *See, e.g.*, *McCarthy v. Paine Webber Group, Inc.,* 168 F.R.D. 448, 450 (D. Conn. 1996); *In re Convergent Technologies Securities Litig.,* 108 F.R.D. 328, 338-39 (N.D. Cal. 1985); Fed. R. Civ. 33(c) (court may order that contention interrogatories not be answered until after discovery is completed or a pre-trial conference is held).

The term "specific policy" is vague and ambiguous and in responding to this interrogatory, Plaintiff is assuming that Defendant is referring to the LASD's alleged unconstitutional policies, customs or practice which pursuant to *Monell* as alleged in the operative complaint.

3) shutting down and impeding the exercise of First Amendment activities by, *inter alia*:

ii. declaring unlawful assemblies without accommodating, or attempting to accommodate, the right to peaceable assembly and protest and without adequate sound amplification audible enough to be heard and understood by the protesters, and without providing directions, means and opportunity to disperse before taking aggressive police action;

iii. kettling lawful demonstrators in order to arrest them without affording them an opportunity to leave,

iv. taking aggressive police action without declaring an unlawful assembly;

v.  the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bong grenade—so as to deter persons from seeking to exercise their first amendment rights.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: No.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

//

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not making a claim for lost wages and/or earning capacity.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985).

Plaintiff further objects to this interrogatory on the grounds that it violates the limit of 25 interrogatories set forth in FRCP 33 as the reference to each separate Request For Admission ("RFA") constitutes a separate integratory. Accordingly, Plaintiff will only respond to this interrogatory regarding the first three requests for admissions. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

**D032**

DocuSign Envelope ID: 08480591-E742-4220-9DA1-A97CFF4C92FA

## VERIFICATION

UNITED STATES DISTRICT COURT,

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

*Case No. 2:20-cv-07870-DMG-PD*

I, DAVID RAMIREZ, have read the **PLAINTIFF DAVID RAMIREZ'S RESPONSES TO INTERROGATORIES (SET ONE) PROPOUNDED BY DEFENDANT COUNTY OF LOS ANGELES.**

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters, which are stated on information and belief and as to those matters I believe them to be true.

Executed on ___04.08.2022___, at ___Downey___, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
DAVID RAMIREZ

VERIFICATION

544

**D032**

Noelani Del Rosario-Sabet
April 3, 2023

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

KRIZIA BERG, et al.,

      Plaintiffs,

   v.                  Case No.

COUNTY OF LOS ANGELES, etc.,    2:20-cv-07870-DMG-PD

et al.,

      Defendants.

_____

VIDEOCONFERENCE DEPOSITION OF

NOELANI DEL ROSARIO-SABET

DATE:         Monday, April 03, 2023

TIME:         10:03 a.m.

LOCATION:     Remote Proceeding

              Los Angeles, CA 90017

OFFICIATED BY: Peter Shen, Notary Public

JOB NO.:     5851995

Page 1

EXHIBIT D38 - 698

D033

van, were they placed in the van at the same time or close to the same time?

A    Yes.

Q    So since you were sat in the middle you were in the van before Grace was placed in the van?

A    I believe we were all placed, like, really right about the same time.  So if it was before it would be moments.

Q    Okay.  So would it be fair to say you didn't spend that much more time than Grace did in the van?  It would be pretty much the same time?

A    I believe so.

Q    Okay.  So we're up to the point -- it takes around three to fifteen minutes to get to the van, you're in the van for about an hour.  So what did you do while you were in the van for about an hour?

A    Chatted with the people around me.  Grace really needed to use the restroom and we tried to get the attention of the deputies.

Q    Okay.  Anything else?

A    Anything else that I did?

Q    Yes.

A    No.

Q    Did anyone else do any -- what was everyone else doing during that hour in the van?

Page 117

EXHIBIT D38 - 699
D033

Q    Let's see.  Did you ever seek medical treatment as a result of anything in this incident?

A    No.

Q    Have you ever sought medical treatment as a result of attendance at any other protests?

A    No.

Q    Did you ever have to pay a fee, bail, as a result of this incident?

A    No.

Q    Okay.  Have you ever had to pay bail as a result of any of the other two arrests?

A    No.

Q    Have you ever -- well, okay.  So who did you leave the second location with?

A    With -- I know Grace was there.  And that's what I can recall.

Q    Okay.  Was James with you?

A    Oh.  Yes.

Q    And was Devon with you?

A    Not that I can recall.

Q    Was Austin with you?

A    I don't remember.

Q    Okay.  Was Gabe with you?

A    I don't remember.

Q    Okay.  So after you were released from that

Page 128

Rosaura Del Rosario-Silva
April 3, 2023

CERTIFICATE OF DEPOSITION OFFICER

I, PETER SHEN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

PETER SHEN

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Page 163

EXHIBIT D38 - 701

D033

Roselane Del Rosario-Sabet
April 5, 2023

CERTIFICATE OF TRANSCRIBER

I, JILLIAN PORTER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JILLIAN PORTER

Page 164

EXHIBIT D38 - 702

D033

Jorge Gonzalez, SBN 100799
**A PROFESSIONAL CORPORATION**
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
Tel: 626-328-3081
*e. jgonzalezlawoffice@gmail.com*

Paul Hoffman, SBN 71244
Michael D. Seplow, SBN 150183
Aidan C. McGlaze, SBN 277270
Kristina A. Harootun, SBN 308718
John Washington, SBN 315991
**SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP**
11543 W. Olympic Blvd.
Los Angeles, California 90064
Tel: 310-396-0731 | Fax: 310 399-7040
*e. hoffpaul@aol.com*
*e. mseplow@sshhzlaw.com*
*e. amcglaze@sshhzlaw.com*
*e. kharootun@sshhzlaw.com*
*e. jwashington@sshhlaw.com*

Kaveh S. Elihu, SBN 268249
Colleen M. Mullen, SBN 299059
**EMPLOYEE JUSTICE LEGAL GROUP**
1001Wilshire Boulevard,
Los Angeles, CA 90017
Tel: (213) 382-2222 | Fax: (213) 382-2230
*e: cmullen@ejlglaw.com;*
*ngarcia@ejlglaw.com*

Carolyn Y. Park SBN 229754
**LAW OFFICE OF CAROLYN PARK**
595 Lincoln Ave., Suite 200
Pasadena, CA 91103
Tel: 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas, SBN 158519
Denisse O. Gastélum, SBN 282771
**CASILLAS & ASSOCIATES**
3777 Long Beach Blvd., 3rd  Floor
Long Beach, CA 90807
Tel: 323-725-0350
*e. acasillas@casillaslegal.com*
*e. dgastelum@casillaslegal.com*

Morgan E. Ricketts, SBN 268892
**RICKETTS LAW**
540 El Dorado Street, Ste. 202
Pasadena, CA 91101
Tel: 213-995-3935
*e. morgan@morganricketts.com*

Attorneys for Plaintiffs,

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and Does 1-10 inclusive,<br><br>Defendants. | Case No.: 2:20-cv-07870-DMG-PD<br><br>Assigned to: *Honorable Dolly M. Gee*<br><br>**PLAINTIFF NOELANI DEL ROSARIO-SABET'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

1

D034

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Giselle L. Jones, LCSW, CMF, CSAT; (323) 870-8224.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad.  Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion and/or legal conclusion.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Due to the ongoing emotional distress she continued to experience following the protest, Plaintiff has spent approximately $185 per appointment with Giselle Jones. Plaintiff was treating with Giselle Jones approximately once a week from July 2020 to the present. Plaintiff's emotional distress is ongoing. Additionally, LASD Officers cut the straps of Plaintiff's backpack because they

9

**D034**

failed to remove Plaintiff's backpack prior to placing her hands in zipties. Plaintiff estimates the backpack cost approximately $45.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Due to the ongoing emotional distress she continued to experience following the protest, Plaintiff has spent approximately $185 per appointment with Giselle Jones. Plaintiff was treating with Giselle Jones approximately once a week from July 2020 to the present. Plaintiff's emotional distress is ongoing.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.

Subject to and without waiving the foregoing objections, Plaintiff will only identify those

10

PLAINTIFF NOELANI DEL ROSARIO-SABET'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE

552

D034

# VERIFICATION

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I have read the foregoing document entitled or described as:

**PLAINTIFF NOELANI ROSARIO-SABET RESPONSES TO DEFENDANTS'**

**INTERROGATORIES - SET ONE**

**[X]**    I am a Party to this action.

[  ]    I am an [  ] Officer  [  ] Partner  [  ] a _____, of _____ a corporate or business entity party to this action and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

I am familiar with the contents of the foregoing document.  The information supplied therein is based on my own personal knowledge and/or has been supplied by my attorneys or other agents and is therefore provided as required by law.  The information contained in the foregoing document is true, except as to the matters which were provided by my attorneys or other agents, and, as to those matters, I am informed and believe that they are true.

[  ]    I am one of the attorneys of record for _____, a party to this action.  Such party is absent from the aforesaid county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am familiar with the contents of the foregoing document.  The information supplied therein is based on the party's personal knowledge and/or has been supplied by me or other agents and is therefore provided as required by law.  The information contained in the foregoing document is true, except as to the matters which were provided by the party or other agents, and, as to those matters, I am informed and believe that they are true.

**[X]**    **[FEDERAL]:** I declare under penalty of perjury that the foregoing is true and correct.

Executed on __09/19_____, 2022, at _____Los Angeles_____, California.

*Noelani del Rosario-Sabet*
Noelani del Rosario-Sabet (Sep 19, 2022 21:25 PDT)
NOELANI ROSARIO-SABET

VERIFICATION

553

**D034**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

_____
                                )
KRIZIA BERG, et al.,            ) Case No.
                                )
            Plaintiffs,         ) 2:20-cv-07870
                                )
    vs.                         ) DMG-PD
                                )
COUNTY OF LOS ANGELES, etc.,    )
et al.,                         )
                                )
            Defendants.         )
_____)

VIDEOCONFERENCE DEPOSITION OF

VISHAL SINGH

FRIDAY, APRIL 28, 2023

(Contains Confidential Portions)

ATKINSON-BAKER, A VERITEXT COMPANY

(800) 288-3376

Reported by:

     FRANCES SANDOVAL

     CSR. No. 7539

FILE NO:  5883610

Page 1

testimony today?

A    No.

Q    Okay.  So just so we're clear on the incidents that are relevant to you in this lawsuit, is it agreeable that in this complaint, the protests that are at issue for you are the August 25th, 2020 protest in Downtown L.A., and the September 12th, 2021 protest at the South L.A. station?

A    Yes.

Q    Do you remember reviewing and signing interrogatories, which are written questions from the defense to you?

A    Yes, I do.

Q    And I just want to verify a few things at the beginning --

MS. MULLEN:  Hold on.  Calls for a legal conclusion potentially.

And just to be clear, Mr. Singh, he's not going to ask you -- if you learned any information for -- we had any conversations about that, he's not going to ask that any of our communications with -- and that includes with Mr. Seplow's office as well.

THE WITNESS:  And yes, I understand.

Q    BY MR. SAKAI:  I want to confirm that you are not seeking loss of income in this lawsuit.

Page 14

MS. MULLEN:  It potentially calls for a legal conclusion.

You can respond.

THE WITNESS:  That's correct, I am not.

Q    BY MR. SAKAI:  And then I also want to confirm that you're not seeking loss of earnings capacity as part of this lawsuit?

MS. MULLEN:  Same objections.

THE WITNESS:  Correct.

Q    BY MR. SAKAI:  And I also want to confirm that you have no medical bills as a result of the protests at issue in this lawsuit regarding you?

MS. MULLEN:  Same objection.  Calls for expert opinion.

You can respond.

THE WITNESS:  Correct.

Q    BY MR. SAKAI:  And I want to also confirm that you have no mental healthcare bills related to these two protests?

MS. MULLEN:  Same objection.

You can respond.

THE WITNESS:  Correct.

Q    BY MR. SAKAI:  Can you estimate about how many protests you've attended from 2020 till today?

A    Over 100.

Page 15

Q    And have you attended these protests in more than one capacity, for instance, as a journalist, as just a protester, as something else?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  I attended these protests as a journalist.

Q    BY MR. SAKAI:  Would it be fair to say that you were injured at some of these protests?

A    Yes.

MS. MULLEN:  Vague and ambiguous.

Q    BY MR. SAKAI:  And some of these injuries required hospitalizations?

A    Yes.

Q    Some of these injuries were caused by law enforcement?

A    Yes.

Q    And some of these injuries were caused by protests?

MS. MULLEN:  Hold on.  I don't know if my vocal is not coming through.

Calls for speculation as phrased.  It's vague and ambiguous.

MR. SAKAI:  Let me raise the volume here on my side.  Maybe that's what's doing it.

THE WITNESS:  Can you repeat the last one?

Page 16

MR. SAKAI:  Yes.

Q    Some of these injuries were caused by law enforcement?

MS. MULLEN:  Same objections.

THE WITNESS:  And my answer is yes.

Q    BY MR. SAKAI:   And some of these injuries were caused by protesters?

MS. MULLEN:   Same objection.

THE WITNESS:  Yes.

Q    BY MR. SAKAI:   So since 2020, you've been -- your foot's been injured by a car running over it at a protest; is that right?

A    That is correct.

Q    And that caused you to be on crutches for a couple of weeks?

A    Correct.

Q    Was the car that ran over your foot a law enforcement-related car?

MS. MULLEN:  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  Not that I know of.

Q    BY MR. SAKAI:   At another protest, a protester attacked you and hit you in the face, causing fractures to your face; is that correct?

A    Correct.

Page 17

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com

**D035**

Vishal Singh
April 28, 2023

Q    And that injury caused -- or required a hospitalization; is that correct?

A    Correct.

Q    And at another protest you've had your arm broken?

A    Yes.

Q    And at some protests you were hit by less lethal munitions?

A    Yes.

MS. MULLEN:  Vague and ambiguous.  Calls for expert and/or legal conclusion.

Q    BY MR. SAKAI:  And at some of these protests you were exposed to some sort of gas; is that correct?

A    Yes.

Q    So other than these injuries that I listed from these protests since 2020, have you received any other injuries at these protests?

MS. MULLEN:  Vague and ambiguous as phrased, calls for expert and/or legal conclusion.

THE WITNESS:  Broadly speaking, that covers the injuries I have received.

Q    BY MR. SAKAI:  Of all these injuries that we've just gone over, what do you consider the most severe?

A    I would characterize being -- having my foot

Page 18

Vishal Singh
April 28, 2023

run over by the truck, being punched in the face with facial fractures, and being shot with a less lethal, all three as my top, most intense or extreme.

Q    And if you had to rank those three injuries from most severe to less severe, could you?

MS. MULLEN:  Calls for expert opinion.  Vague and ambiguous.

THE WITNESS:  I don't think I could.  They all were the same level of intensity.

Q    BY MR. SAKAI:  When your foot was run over by a truck, how would you rate that on a pain scale from zero being no pain at all to ten being the worst pain you felt in your entire life?

A    Ten.

Q    I'm going to ask the same for when you were attacked and hit in the face, causing facial fractures.

A    Ten.

Q    Okay.  And I'm going to ask the same thing for when you were hit by less lethal munitions.

A    Ten.

Q    Have you ever felt a level of pain to the ten level at any other times in your life?

MS. MULLEN:  Vague and ambiguous.  It's overbroad.  It potentially violates his right to privacy.

Page 19

Vishal Singh
April 28, 2023

a larger person, in which I was nearly suffocated and lost some breathing capabilities until they let go of my neck.

Other than that, when I was in high school, there were people who bullied me and punched me, but not on the level of what we talked about today.

Q    BY MR. SAKAI:  Any other experiences?

MS. MULLEN:  Same objections.

THE WITNESS:  No, those are the two I would say on a seven to nine scale.

Q    BY MR. SAKAI:  During these protests, since 2020, how many times have you been exposed to gas?

MS. MULLEN:  Vague and ambiguous.  Can you clarify what type of gas you're discussing?  Tear gas, I assume?

MR. SAKAI:  Sure.

Q    Let me ask this, so have you been exposed to any type of gas in protests since 2020?

A    I would say tear gas, OC/pepper spray, bear mace.

Q    Okay.  So I'll refer to tear gas, OC pepper spray and bear mace under the umbrella of gas; is that agreeable?

A    That's agreeable.

Q    How many times have you been exposed to gas

Page 21

Vishal Singh
April 28, 2023

during protests?

MS. MULLEN:   Since 2020?

MR. SAKAI:   Yes.

THE WITNESS:   Off the top of my head, it's difficult to know for sure because I have seen pepper spray and mace be used a lot.   However, specifically tear gas, I have only seen the one time.

Q     BY MR. SAKAI:   When was that?

A     That was August 25th.

Q     And how many times have you been exposed to gas at protests where it has affected you physically?

A     At least ten times.

Q     Can you describe the range of physical effects this gas exposure had.

A     Yes.

MS. MULLEN:   Calls for expert opinion as phrased.

You can respond.

THE WITNESS:   Yes.   So at the most intense range, I would characterize the tear gas, which creates difficulty breathing and immediately creates a coughing and a sensation of dizziness.

At the mid-range scale, I would put bear mace, which really hinders your vision, causes intense burning, also causes difficulty breathing.

Page 22

**D035**

And at the lower end, I would put pepper spray or pepper balls a kind of less lethal ammunition used by law enforcement comparable to paint balls, except instead of being filled with paint, they were filled with pepper spray or OC spray.

And that causes temporary irritation, but nothing on the level of being hit with mace by itself or being tear-gassed, if that makes sense.

MR. SAKAI:  Sure.

Q     So you've stated that you've been exposed one time to tear gas on August 25th.  Can you estimate -- I'm sorry.  Is that a yes?

A     Yes.

Q     Can you estimate how many times you've been exposed to bear mace?

MS. MULLEN:  Again, your question is limited to 2020 moving forward, correct?

MR. SAKAI:  Sure.

THE WITNESS:  It's difficult to estimate. I would stick to approximately ten times.  There are times where it was immediately used on my person or near me, and there are other times where I was downwind of it.

Q     BY MR. SAKAI:  Same question for pepper spray.

Page 23

Vishal Singh
April 28, 2023

A     Same answer, approximately ten times.

Q     So have you ever been exposed to these types of gases prior to 2020?

A     No.

MS. MULLEN:  Didn't we agree to limit questions that participation in other protests 2020 moving forward?

MR. SAKAI:  Well, that wasn't the question. But as the -- what it sounds like, the objection as phrased, it was as to attendance at protests.  We're not talking about that.

THE WITNESS:  My answer is no.

Q     BY MR. SAKAI:  When you were exposed to bear spray, was it painful?

A     Yes.

Q     And on the pain scale we talked about, how would you rate that?

A     I would say between, depending on what part of my face was affected, five to six if it was just in the mist.  If it actually got into my eyes that required eye washing, I would rate that as seven to eight.

Q     And how about in regards to pepper spray exposure?

A     Same.

Page 24

Vishal Singh
April 28, 2023

Q     Do you recall how many times you were hit directly in the face with bear mace?

A     I don't recall exactly how many times.

Q     Over five?

A     I would say about four to five times.

Q     How about for pepper balls or pepper spray?

A     Probably five to ten times.

Q     When you were hit directly in the face by bear mace, do you recall about how long it took for you to recover from the effects?

A     Several hours.

Q     And did the exposure to bear mace have any long lasting effects on you?

A     No, by the next day I was fine.

Q     Okay.  And how about for pepper balls exposure to the face?

A     Same.

Q     Is that the same?

A     Uh-huh.

Q     Okay.  So after pepper ball exposure, within the next day you were back to normal?

A     Correct.

Q     Okay.  How long did the effects of tear gas last?

A     I would say at least five to six hours.

Page 25

Vishal Singh
April 28, 2023

Q      And how long did it take before you were back to normal?

A      Not until the following morning.

Q      Did you do anything to treat your exposure to tear gas?

A      No.

Q      And how did you know it was tear gas on August 25th versus some other type of chemical agent?

A      Because from what I understand, law enforcement uses OC and tear gas as a means of crowd dispersal.  And I witnessed a sheriff's deputy throw a tear gas grenade and saw, like, emanating out of it.

Q      To your understanding, is OC gas different than tear gas?

A      I am not an expert in these things, so I know they have similar effects and I know law enforcement can use both sometimes together.

Q      Prior to August 25th, had you ever seen law enforcement use a similar type of -- I think you described it as a grenade or a canister?

A      Not in person, just on television.

Q      And have you seen a similar use of a canister since then?

A      I have on television.  In person, no.

Q      Can you describe what the grenade or canister

Page 26

Vishal Singh
April 28, 2023

looked like.

MS. MULLEN:  You're talking about on August 25th, right?

MR. SAKAI:  That's correct.

THE WITNESS:  It was long and had a large mechanism at the top.  I saw it from far, you know. I wasn't trying to get close to it.

Q    BY MR. SAKAI:  Can you describe how you saw it deployed.

A    Yes, I witnessed a group of protesters crossing an intersection.  And at the opposite side of the intersection, I saw a skirmish line of Los Angeles County Sheriff's Department deputies in riot gear.

And right as the protesters were passing by them in the middle of the intersection, they started shooting pepper ball munitions.  And they threw one of these grenades at the protesters who were walking away.

Q    Specifically did you see any particular deputies throw this tear gas grenade/canister?

A    I could not identify any of the deputies.

Q    Did you see the canister being thrown towards the protesters?

A    Yes, I did.

Q    Did it explode at some point?

A    I wouldn't say explode.  There was definitely

Page 27

some kind of spark or some kind of ignition, but it was more just the gas was emanating from it.  There was a loud bang.

Q    Did you see what happened to that canister after it hit the ground, it sparked and the gas came out of it?

A    I think --

MS. MULLEN:  The question assumes facts.

Go ahead.

THE WITNESS:  I believe someone tried to kick it away from themselves.

Q    BY MR. SAKAI:  And was the person who tried to kick it, was it a protester?

A    I believe it was a protester.

MS. MULLEN:  Calls for speculation.

If you can wait just a half second before moving on to the next question in case I have an objection.

THE WITNESS:  Absolutely.

MS. MULLEN:  Thank you.

Q    BY MR. SAKAI:  Did you see which direction the protester kicked the canister to?

A    They kicked it away from themselves, towards where it came from.

Q    Did the protester kick it back towards the

Page 28

deputies?

A    I wouldn't characterize it as kicking it towards them.  The deputies were too far away.  It was just in that direction.

Q    As a result of attending these two protests on August 25th, 2020 and June 12th, 2021, did you miss any work?

A    No.

Q    Do you know any sheriff's department personnel?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  Not personally.  I have interacted with deputies before.  I don't know them, like, personally.  And to be clear, those interactions were as -- in a journalist capacity.

Q    BY MR. SAKAI:  Did you do anything to prepare for your deposition?

A    I reviewed the declarations I made and I reviewed the footage that I filmed at the protest.

Q    Did you do anything else?

A    No.

Q    Okay.  When you say -- did you say declarations, more than one?

A    Declaration.

Q    Okay.  And that's the declaration that you

Page 29

some clips from both these incidents in that montage.

Q    Any other social media posts?

A    That's it.

Q    The Instagram posts, were they of the videos that you provided to your attorney?

A    Yes.

Q    And the same thing goes for the Tweets, are those the same videos that you provided to your attorney?

A    Yes.

Q    Other than with your attorneys, do you have any communications or correspondence with anyone about these two protests?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  No.

Q    BY MR. SAKAI:  Do you have any documents or material that support your emotional distress claim?

MS. MULLEN:  Vague and ambiguous.  Calls for a legal and/or expert opinion.

Do you understand the question?

THE WITNESS:  Yes, I do.

Documentation I do not.

Q    BY MR. SAKAI:  Other than to your attorneys and the declaration we already talked about, have you given any other statements to anyone else about these

Page 33

suffering.  And I just wanted them to know everything that I was going through.

Q   Do you know if you sent anything -- sent any correspondence other than just having a telephone conference with them?

A   No, it was just via telephone calls.

Q   Do they live locally?

A   No.

Q   Generally what area do they live in?

A   Northern California.

Q   Okay.  Do you see them on -- let's just say at that time, did you see them in person on any regular basis?

MS. MULLEN:  Vague and ambiguous as to time. You mean 2020/2021?

MR. SAKAI:  Yes.

THE WITNESS:  No.

Q   BY MR. SAKAI:  So other than -- do you remember any specifics about what you shared with your parents about the August 25th protest?

A   I believe I just told them that I had been tear-gassed.  And I talked to them about how they had seen people get tear-gassed on TV and how that had happened to me.

Q   Do you remember anything else that you shared

Page 47

with them?

A    I don't recall.

Q    Do you remember anything they told you?

A    Other than asking if I was okay and checking on my health, there was not much else we talked about.

Q    Do you recall anything in particular you talked to them about the June 12, 2021 protest?

A    I told them that I had been hit with a pepper ball and that it was -- I kind of described what it was like for them.

And I just let them know that I was okay and that it wasn't something that they needed to come visit for or anything like that.  I just wanted them to know it had happened.  They responded by asking if I was okay.

Q    How about your older brother, do you recall how many times you spoke with him about these two protests?

A    About once or twice.

Q    In the same time period you spoke with your parents?

A    Yes.

Q    Did you share anything with your older brother that you didn't share with your parents?

A    No.

Page 48

Vishal Singh
April 28, 2023

THE WITNESS:  There was the mental trauma, but nothing physical.

MS. MULLEN:  Thank you for clarifying, Vishal.

THE WITNESS:  Yeah.

Q    BY MR. SAKAI:  Did you ever speak with your parents about the mental trauma from these two protests?

A    Yes, as part of those conversations I earlier mentioned.

Q    And what did you tell them about the mental trauma?

A    I told them that being exposed to things like tear gas or less lethal munitions was very traumatizing and it was giving me a sense of PTSD and that I was managing it, that it was difficult.

Q    Anything else?

A    No.

Q    How about to your brother, did you talk to him about any of the mental trauma from these protests?

A    Yes, and same thing.

Q    Do your parents or your brother, do any of them have a medical or mental health background?

MS. MULLEN:  Vague and ambiguous.  Are they mental health workers?

Page 50

///

///

///

Q    BY MR. SAKAI:   And just to confirm, as a result of attending these two protests on August 25th and June 12th, you didn't miss any work?

A    That is correct, I did not miss any work as a result of these two protests.

Q    As a result of any of the other injuries you received in other protests, did you miss any work?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  Yes.

Q    BY MR. SAKAI:  For which of the injuries?

A    The incident where I was run over with a truck, I was unable to go to work for about a month. The incident where my hand was broken, I had to significantly slow down how much work I could do and how much I could work on a computer.

Q    How long did you have to slow down how much you could -- work you could do after you broke your hand?

A    I was in the cast for about a month or more, I think, so as long as I was in the cast.

Q    Other than this lawsuit, have you ever been a party to a lawsuit?

Page 56

to his understanding, correct?

MR. SAKAI:  Yeah, that's right.

THE WITNESS:  It's my understanding, I don't think they do.  I think they can leave comments on posts.

Q    BY MR. SAKAI:  So for instance, I've never used it, so I'm just thinking, would somebody say, oh, I like vps_reports because I like what he writes.  And then I'll write down, here's my donation, keep on writing about this subject.

Do you get that feedback from your Patreon supporters?

A    No, that's more of like a Venmo style.

Q    Okay.  And for Patreon, is there a specific account name or names that you use?

A    Also vps_reports.

Q    And vps, that's just your initials; is that right?

A    Yeah.

Q    Okay.  Let's talk about the first protests, August 25th.  Can you describe what happened to you during this protest.

A    Yes, so the protest -- at the beginning of the protest, there was a march.  And I had an interaction with a sheriff's deputy, who walked up to

Page 64

me and kind of pressured me and pushed me to go backwards as I was filming and was holding a canister of bear mace of which he brandished to me and told me to get back.

After that I -- most of my interactions was just -- I was filming either the protesters or the police as they protested as protesters do and as the deputies stood and created their scrimmage line near Twin Towers.  After that the protest march continued on and marching through Downtown Los Angeles.

Q    One second.  Just for clarification, when you're referring to Twin Towers, is that also the location where Men's Central Jail is?

A    Yes, Men's Central Jail.

Q    Okay.  Please continue.

A    Yes.  So after Men's Central Jail, the protesters continued marching through downtown Los Angeles.  And at one point, passed an intersection where deputies were on the perpendicular side of the intersection.

And they were kind of just standing there, completely blocking the side of the road that the protesters weren't going towards, they were walking past it.

And they -- as the protesters were almost

Page 65

Vishal Singh
April 28, 2023

done passing the intersection and the deputies who are
to the rear and the left of the protesters started
shooting pepper balls and throwing tear gas canisters
and I believe a flash bang grenade, causing a large
flash and a bang.   And then there was a lot of gas
emanating from that area.

Q     And what happened to you during this protest?

A     So I was following kind of behind the march.
So the march is halfway through the intersection when
they started getting shot by pepper balls and hit with
tear gas.

So I was kind of sandwiched between --
there's the deputies in front of me, behind me there
was nowhere to go.   I could see the protesters marching
through the tear gas.

And so I had to keep moving because now the
deputies were shooting with pepper balls.   So I decided
to just -- as I was filming, I needed to run.   I wanted
to minimize how much of the gas I was exposed to.

So I tried to just run through the gas as
quickly as I could to catch up with the protest march
so that I could keep reporting.   As I moved through
the gas, it still affected me and I started coughing
heavily, started having trouble breathing.

My camera angle started becoming shaky and

Page 66

Vishal Singh
April 28, 2023

it was difficult for me to focus on operating my phone camera.

Eventually I turned the camera off and just tried to resituate myself and get some sense of breathing, so that I can continue moving because I could still hear pepper balls being fired and I did not want to be hit.

Q    Were you hit by any -- well, let me -- before I go into that, did anything else happen to you at that protest?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  No.  After that I marched with the protesters and the march ended after that and people dispersed and I went home.

Q    BY MR. SAKAI:  About how long after you were exposed to gas did you leave the downtown area?

A    Within less than an hour.

Q    How did you leave from the protest?

A    I called an Uber.

Q    And do you recall about what time -- well, did you take the Uber directly home?

A    Yes.

Q    About how long did it take you to get home that night?

A    I would say probably 15 to 20 minutes.

Page 67

Vinhal Singh

April 28, 2023

Q    Was anyone with you in the Uber?

A    No, besides the driver.

Q    Do you recall about what time you got home?

A    I think it must have been 1:30.

Q    Was there anyone at your home?

A    No.

Q    So what did you do after you got home?

A    I contacted my significant other, told them what happened.  I tried to decompress and go to sleep and calm down and kind of trying to put the trauma aside so I can try to relax maybe.

But I ended up just lying in bed, having trouble breathing.  Sometimes going to the bathroom and cough, trying to drink hot tea to see if that would help.

Basically just spent time trying to decrease my mental panic as well as my breathing troubles until I was finally able to go to bed.  I'm not sure what time, it was after four a.m.

Q    Do you know what time you woke up the next day?

A    I don't recall.

Q    When you woke up the next day, had all the physical effects of the tear gas worn off?

A    That is correct.

Page 68

Vishal Singh
April 28, 2023

Q   Just to summarize, let me know if I have this right.  The injury complaint from the August 25 protest was exposure to tear gas; is that correct?

MS. MULLEN:  Misstates prior testimony.  Also calls for a legal and/or expert opinion.

Go ahead.

THE WITNESS:  That is correct.

Q   BY MR. SAKAI:  And you weren't hit by any other less than lethal munitions or any other force used on you; is that correct?

A   That is correct.

MS. MULLEN:  Misstates prior testimony.  Calls for a legal and/or expert opinion.

THE WITNESS:  Yeah.  No less lethal munitions from that day.  As far as I can tell, the only thing I was inflicted by was the gas that was used.  Whether that is tear gas or OC gas, whatever kind the Sheriff's Department uses, that's what I'm talking about.

Q   BY MR. SAKAI:  When you refer to bear mace that a deputy had, can you describe what you mean by bear mace.

A   Yes, so bear mace as opposed to a regular mace, which is a small canister that people can carry on their person, bear mace is kind of a larger aerosol can that is a significantly larger spray nozzle as well

Page 69

but it is not exclusive.

Q   Sure.  So you would go to these protests. You would film the police, but you would also film other folks, protesters, bystanders, maybe even yourself; is that right?

A   That is correct.

Q   So right before you were exposed to the gas up near where the deputies were at the intersection, was there anything in back of you?

A   Behind me I think there might have been some other journalists, some other media people.  Sometimes we move a slightly separate block, especially in moments where there's gunfire or less lethal munitions fire.  So behind me I think there was some other journalists.  That was it.

Q   About how many other journalists were with you or were at the protest that you saw that night?

A   That would be very difficult for me to estimate.  I could guess maybe like 10, 15, but there were journalists who were just using their iPhone like me.  There were journalists with big cameras.  There were photo journalists.  So it was hard to get a hard count of how many people were just there documenting.

Q   At the time you were exposed to the gas, did

Page 82

you see where the other journalists were?

A      Yeah.  I could see some were around me.  I could see some had already moved past and were in the group that was getting hit with the gas and getting shot at with pepper balls.  Typically the journalists are all over, trying to get different angles from each other.

Q      Did you see some journalists on the corner opposite the side of where the protesters were?

A      By that do you mean behind the deputies?

Q      Let's just say -- let's just kind of get our barriers here.  So I believe you testified that the less lethals came from the left side of the line?

A      Yeah, behind and to the left.

MS. MULLEN:  Facing what direction?

Q      BY MR. SAKAI:  Was that you facing the deputies or the deputies facing out toward you?

A      The deputies were facing towards us, towards the side of the protesters and the protesters marched past.  Once munitions started being deployed, some protesters ran away, others turned and saw what was happening.

And others still were where I was, where we had gotten to that part of the intersection and were unsure how to proceed.  Do you run through?  Do you

Page 83

Vishal Singh
April 28, 2023

wait for them stop shooting?  They don't stop, so what do you do?

Q    So just to clarify, I think your counsel was asking and I'm asking too, when you described the left side of the line of the sheriffs, would that be from the sheriff's perspective to their left or would it be from your perspective to your left?

A    My perspective.

Q    Was there anything stopping you, before you were exposed to the gas, from walking in any other direction?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  Not that I recall.  You know, I could go behind me, but the gas was moving toward me, and I would also not be able to do my job as a journalist.

Q    BY MR. SAKAI:  So you could have turned around and walked the other direction, in the direction the gas was flowing; is that right?

MS. MULLEN:  Misstates prior testimony.

THE WITNESS:  I physically could walk backwards, yes.  I would not be able to continue doing what I was there to do.

Q    BY MR. SAKAI:  So it was -- the reason you walked through the gas is because you wanted to

Page 84

Vishal Singh
April 28, 2023

continue filming the protest; is that right?

A    That is correct, it is my responsibility to.

Q    So nobody forced you to walk through the gas; is that right?

MS. MULLEN:  Vague and ambiguous, misstates prior testimony.

THE WITNESS:  I walked through the gas because I had to move that direction and it was already moving towards me, so there are only two directions I could walk.  I could either go backwards or forwards.

MS. MULLEN:  Let's note it's been going about an hour.

MR. SAKAI:  Sure, I have a few more to wrap this section off, and then we'll take a break probably for lunch.

MS. MULLEN:  That works.

Q    BY MR. SAKAI:  It's accurate that no sheriff told you to walk through the gas?

A    That is accurate.

MR. SAKAI:  Okay.  Let's go off the record.

                    *   *   *

               (At the hour of 12:21
               the luncheon recess was taken, the
               proceedings to be resumed at 1:08.)

///

Page 85

584                                          **D035** B

Vishal Singh
April 28, 2023

A    Correct.

MR. SAKAI:  So can the record reflect that there's a green arrow that illustrates the path the plaintiff walked to from the beginning of the arrow till the tip of the arrow where he first started feeling the effects of the gas.

Q    After you started feeling the effects of gas, what happened -- or where did you go next?

MS. MULLEN:  That misstates the prior testimony.  That's where he stopped because he couldn't breathe because of the gas, not when he started first feeling the gas.

THE WITNESS:  Yes, I wanted to clarify that point as well.  I started feeling the effects of it as soon as it exploded and was in the air.  When I was de-habilitated by it with the edge of the arrow.

Q    BY MR. SAKAI:  I see.  And what do you mean by de-habilitated?

A    Like it actually, physically affected my ability to keep walking forward and breathe properly and hold my camera.

Q    Where did you go after this point?

A    I started coughing and I was trying to orient myself, so I kind of turned around and looked back at what was behind me again and saw, like, someone else

Page 91

Vishal Singh
April 28, 2023

was also coughing.

I believe I ran up to them to see if they were okay. And I said, are you okay or something along those lines. And then I turned around and kept walking southwest on Broadway to get as far away as I could.

Q    Did you check on the other person around the tip of the arrow, the green arrow?

A    Yeah.

Q    And then when you checked on that person, then you continued walking down Broadway?

A    Yes.

Q    Do you know how far you made it down Broadway?

A    I believe towards Grand Park.

Q    Right in this area where the G of Grand Park is?

A    Correct.

Q    Okay. So if I draw a line from the tip of the green arrow till the G of Grand Park, would that accurately illustrate your rough path after you felt debilitated by the gas?

A    Approximately, yes.

Q    So I'm going to draw -- hopefully this is a blue line. We'll see.

A blue line from the tip of the arrow towards

Page 92

D035 D

Vishal Singh
April 28, 2023

indicating that they had used a higher caliber less lethal munitions, either a 40 millimeter or something else.  Most likely a 40 millimeter munitions launcher.

I don't know where they fired it or who they fired it at, but I was hit in the leg with a pepper ball.  Around the time I heard the bang and I saw some other people get hit with a pepper ball.

After a while, there was a gentleman who wasn't a part of the protest who was trying to walk around this whole drama that was unfolding and tried to walk around on the sidewalk and around the barricade and just stay away from the protesters and the police.

The deputies started aiming their weapons at this individual who was not involved in the protest. Some of the protesters yelled, like, don't shoot him and the deputies shot him several times with pepper balls.

He turned away and left the area after that. And soon after that, the pepper balls started dying down and protesters chanted a little bit longer, then everyone dispersed and the protest ended.

Q    How long was it between the time you were hit in the leg with the pepper ball and you left?

A    Probably about an hour, maybe 90 minutes maximum.  But I think around an hour, maybe less.

Page 117

Q    Where did it hit you in the leg?

A    My right leg, kind of near my knee, but on the leg part.

Q    So when you say "right leg," near the knee --

A    Below the knee kind of on my right leg.

Q    Is that more on the side of your calf or on your shin or on the side of that?

A    On the front side of my leg, like right below my knee.

Q    So being hit on the right leg, that didn't cause you to leave the protest immediately?

A    No, it did not.

Q    Did you take any picture of the location you were hit by the pepper ball?  Let me ask a better question.

Did you take a picture of your right leg where you were hit by the pepper ball?

A    I don't believe that I did.  I remember looking for a welt or something, but I did not see a welt.

Q    Was there any bruise at that site?

A    Not that I could see.

Q    How long did it take for that injury to -- for the effects of the injury to no longer be felt?

A    So there's two parts, right?  So pepper ball

Page 118

Vishal Singh
April 28, 2023

ammo has pepper inside of it, so the impact which hit my leg, that stung for, I would say, a few seconds as if someone slapped you really hard.  That went away after a few seconds.

The pepper spray that was in the air, not just from the round that impacted me, but from the multitude of rounds that were impacting everyone was creating somewhat of a mist in the air that was making my eyes water.

It was not -- it was not as bad as tear gas or OC gas, but it was definitely making it difficult to see, making my eyes water.  That did not -- that feeling did not go away until at least like 10 minutes after deputies stopped shooting and like the wind hadn't cleared the area enough.

Q    In total, how much time did you feel the pepper spray effect from the mist?

A    I believe deputies were shooting for about 10 minutes, so I would say about 10, 15 minutes max.

Q    And after the 10 to 15 minutes max, the effect of the pepper spray mist also dissipated on you?

A    Correct.  I would say by the time the protest was over, I was feeling fine.

Q    What were you wearing to the protest?

A    I don't recall exactly.  I believe it was

Page 119

they were just passing and they went along their way on their march and I didn't follow them, I wanted to describe their route so that people understood, yeah.

In the moment, it wasn't very clear to me that there were two separate protests.  I just saw protesters all gathering in place, but these folks marched somewhere else, a few blocks away.

Does that make sense?

Q   Yes, it does.

MS. MULLEN:  What was the last question?  Can I get it read back to me.

(The record was read.)

MS. MULLEN:  Okay.  Thank you.

Q   BY MR. SAKAI:   Then we're at the second page and there's no time on this Tweet, but it looks like it's in the middle of the second page.

And it says, "They've opened fire with less lethals.  I was hit in the leg with a pepper ball.  No biggy, though.  Live on Instagram right now."

Does that reflect and document when you were shot in the right leg with the pepper ball?

A   Yes, so I was live streaming on Instagram at the time.  And I believe that is the 22-minute video that I referred to, number 67.  I downloaded it from Instagram and I saved the file and that was the number

Page 130

Vishal Singh
April 28, 2023

of it.

Q    When you said, "I was hit in the leg with a pepper ball.  No biggy, though," what does the "no biggy though" mean?

A    It's kind of me just trying to downplay it because I've been through this so many times.

Q    So if you had to rate the pain that you felt from the pepper ball strike this time on the zero to ten scale, what would you rate the initial strike?

A    As I said earlier, kind of like a hard slap, small sting, so I would say like a two, three.

Q    And then that initial sting dissipates down to nothing pretty rapidly?

A    Yes.

MS. MULLEN:  Vague and ambiguous.

Q    BY MR. SAKAI:  Then other than being hit once on the right leg by a pepper ball, you weren't hit by any other less lethal munitions that day?

A    That is correct, and that is the one time and it was just that pepper ball.

Q    Did you recognize the deputy that called out your name?

A    I did not.  I don't know his name.  I didn't recognize him from the time he alleges he yelled at me before.

Page 131

Q    And do you know if the pepper ball hit you directly or did it ricochet off something?

A    I honestly have no idea where it came from. I just felt it.

MS. MULLEN:  For the record, I just confirmed the P67 that was produced is 20 minutes.

MR. SAKAI:  Okay.  I'm going to share Exhibit Number 77, which is another clip approximately -- let's see.  It looks like it's 48 seconds.  This is Plaintiffs' 77, which I'm going to mark as Defendants' Number 7.

(Defendants' Exhibit 7 was marked
   for identification and is attached hereto.)

Q    BY MR. SAKAI:  Does this appear to be video you shot on the day of the June 12th protest?

A    Yes.

Q    I'm going to continue playing it at 10 seconds.

(The video was played.)

Q    BY MR. SAKAI:  So at this point, at 26 seconds, how far are you away from the barrier wire?

A    Probably like one to two feet.

Q    I'm going to start it at 26 seconds again.

(The video was played.)

Q    BY MR. SAKAI:  So at around 30, 32 seconds,

Page 134

Vishal Singh
April 28, 2023

you shot on September -- sorry, June 12th?

A    Yes, I do.

Q    Then I'm going to speed the video up towards the end.  And towards out -- 15 seconds towards the end.  Let's see.  Okay.

(The video was played.)

MR. SAKAI:  I'm going to stop it and start it at about 24 seconds from the end, so the run time is starting at around five minutes and 59 seconds.  I'm going to start playing.

(The video was played.)

Q    BY MR. SAKAI:  Is the main voice in that clip, is it yours?

A    Yes.

Q    And you state that you were hit in the leg with a pepper ball; is that right?

A    Correct.

Q    And you state that it barely hurt at all; is that right?

A    Correct.  It was like a stinging and I was also running on a lot of adrenaline.

Q    So what you said at that time and on video is accurate, to the best of your recollection?

A    Yes.

Q    Then when you say, "I'm going off live

Page 137

lethals, about how many protesters were at the location?

MS. MULLEN:  Vague and ambiguous.  Calls for speculation as phrased.

THE WITNESS:  I'm going to guess around 50.  As I said earlier, it was less than a hundred.

MS. MULLEN:  Don't guess.  You can provide an estimate, but don't guess.

THE WITNESS:  Okay.  Then I'm going to stick with less than 100.  I'm sorry.  I'm bad with counting heads.

Q    BY MR. SAKAI:   And I want to confirm that you didn't seek medical care for this pepper ball injury; is that right?

A    Correct, as previously stated.

Q    Do you know anyone else that attended this protest?

A    Not that I recall.

Q    Do you remember talking to anyone at this protest about any injuries?

A    Not that I recall.  Someone might have asked if I was hit or something and I might have responded, but I don't remember specifics.

Q    I think I asked, I don't remember so I apologize.  But do you recall if any National Lawyers

Page 139

small-framed person.  We talked about I only weigh 100 pounds.  I'm five foot-five.  That leaves a lasting impact on you.  I feel physically afraid.

Q    Other than what you just shared with me, were there any other lasting effects or emotional effects of this attack on you?

A    I would say that covers all of it.

MS. MULLEN:  Same objections.

Q    BY MR. SAKAI:  And did you ever seek mental healthcare treatment for this attack?

A    This August 22nd one specifically, no.  I want to clarify that by saying there are times I have sought out mental healthcare.  And I have talked about trauma I received from protests broadly speaking.

And I would say that would include this, along with so many other incidents, but not -- if you're asking about, did I specifically get mental health treatment for this incident by itself, the answer is no.  Broadly speaking, all of these contribute to it.

Does that make sense?

Q    Sure.  So did you ever seek mental healthcare treatment broadly for emotional -- for the lasting emotional effects of attending these protests?

MS. MULLEN:  Your question is vague and

Page 157

Vishal Singh
April 28, 2023

ambiguous.  I'll clarify for the record, we're not making any emotional distress claims beyond the -- you know, what's the phrase that I need to use?  Beyond what is normally associated, beyond normal.

You can respond.

THE WITNESS:  So as counsel stated, not related specifically to the incidents of this case.  In incidents after this case, there are times where I received enough trauma where I specifically sought out mental healthcare for those incidents and broadly for the trauma received from protests.

Q   BY MR. SAKAI:  What type of mental healthcare did you seek out?

MS. MULLEN:  Expert opinion.  Vague and ambiguous as phrased.

Q   BY MR. SAKAI:  Go ahead, sorry.  I could just be -- I'll just ask.

Who did you see for mental health, if anybody?

MS. MULLEN:  It violates potential right to privacy.

You can respond.

THE WITNESS:  Yeah, it was a licensed counselor.  I used the service Better Help to connect me with a therapist and I used that service.

Page 158

Vishal Singh
April 28, 2023

Q     BY MR. SAKAI:   Other than seeing a licensed counselor through Better Help, did you see anyone else for any mental healthcare treatment?

A     No.

Q     How many times did you see the licensed counselor?

A     So the way Better Help works, it's kind of an app that you can communicate with them at all times. You have licensed sessions digitally through Zoom or things like that or phone calls or FaceTimes.

So it's hard for me to estimate because there's some weeks where I would not contact them. Other times where I contacted them multiple times a day.   I'd have to go through my whole log again.

MS. MULLEN:   What was the question, Madam Court Reporter?

(The record was read.)

Q     BY MR. SAKAI:   Based on your clarification, did you have counseling sessions?

A     Yes.

Q     How many do you remember?

A     Between three and five.

Q     Were these about specific protests or were these about generally the effect the protests have had on you?

Page 159

Vishal Singh
April 28, 2023

MS. MULLEN:  Again, I'll remind counsel, we're not seeking emotional distress damages above what is typically associated with this type of physical harm.

THE WITNESS:  Yeah, my answer is both.  The incident that -- it's both.  Not this incident related to this case.

MS. MULLEN:  Is now a good time for a break?  We've been going for an hour.

MR. SAKAI:  Sure.  Let's come back at a little bit after four.  How about 4:05?

MS. MULLEN:  Okay.  That works.

MR. SAKAI:  Okay.  Off the record.

(A recess was held from 3:52 to 4:06.)

Q   BY MR. SAKAI:  Can you describe how you were shot at close range with the beanbag on August the 26th, 2020.

A   I'm sorry, do you mean August 22nd?

Q   Was that it?

A   August 26.  I'm sorry.

Q   The Third Street tunnel protest.

A   Thank you.  I didn't realize we were moving to a different date.

I was in the tunnel filming.  I saw a police

Page 160

Vishal Singh
April 28, 2023

MR. SAKAI: Sure.

Q And then is an activacy journalist, is that pretty much the same thing as a gonzo journalist?

A No.

Q So would you describe a gonzo journalist?

A Gonzo more relates to a writing style and a philosophy kind of inspired by the journalist Hunter S. Thompson, so it's much more broad, specifically a writing style philosophy about how you write.

Q And how would you describe your role as an independent journalist?

A I don't work for a specific company or a specific news organization. I license my footage out to various news organizations, some large, some small.

Q And how about as a freelance journalist?

A Same thing.

Q Okay. Over the time period of 2020 till today, do you know about how much you've earned in licensing your journalism out to third-parties?

MS. MULLEN: We're not making any loss of earnings claim or loss of earning capacity, loss of wage claims. It potentially interferes with his right to privacy, so it's vague and ambiguous.

If you understand it, you can answer.

THE WITNESS: I understand the question, but

Page 180

REPORTER'S CERTIFICATION

I, FRANCES SANDOVAL, CSR No. 7539, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly affirmed and that the transcript is a true record of the testimony given;

That said deposition was taken before me at the time and place therein set forth and was taken down by me stenographically and thereafter transcribed via computer-aided transcription under my direction;

I further certify that I am neither counsel for, nor related to, any party to said action, nor interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 15th day of MAY 2023.

*Frances Sandoval*

FRANCES SANDOVAL, CSR No. 7539

Page 203

Jorge Gonzalez SBN 100799
A PROFESSIONAL CORPORATION
2485 Huntington Dr., Ste. 238
San Marino, CA 91108-2622
t. 626-328-3081
e. jgonzalezlawoffice@gmail.com

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, California 90064
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhlaw.com

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Blvd. #2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated, <br><br> PLAINTIFFS, <br><br> v. <br><br> COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD <br> *Assigned to: Honorable Dolly M. Gee* <br><br> **PLAINTIFF VISHAL SINGH'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

**D036**

a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.    Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring him to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

I am an independent journalist, and I have been covering the protests against police brutality since the end of May 2020. On August 25, 2020, I attended a march to protest the fatal shootings of Jacob Blake and Anthony McClain by law

enforcement. At approximately 9:00pm, I joined the protest at Los Angeles City Hall. The protesters, including myself, began marching from City Hall at 9:30pm. The march moved east on Cesar Chavez Avenue to the Twin Towers Correctional Facility. When the march arrived at the Twin Towers Correctional Facility, the Los Angeles Sheriff's Department (LASD) had created a defensive perimeter around Men's Central Jail with deputies who had shield and truck with large long-range acoustic device (LRAD). Sheriff deputies also put up a barrier that was a giant yellow "slinky". The sheriff deputies had rubber bullet guns, pepper ball guns, and what I believe to be bear mace, as well as lethal weapons. One LASD sergeant threatened me with bear mace. He brandished it and then shoved me backwards. The protesters were at the Twin Towers Correctional Facility for about 20-25 minutes, and then we headed back to City Hall. Streets were blocked off by law enforcement. We were tailed by unmarked cars. When the protesters were forced on to Broadway Street and Temple Street, we were met by LASD deputies.

At approximately 11:48pm, sheriff deputies shot less lethal munitions and threw teargas at the protesters. I saw that National Lawyers Guild legal observers were in the line of fire. Sheriff deputies made no declaration of unlawful assembly and gave no dispersal order prior to shooting and teargassing us. There was a LAPD helicopter spotlighting protesters most of the way, but no announcements were made from it.

I was teargassed. The tear gas irritated my eyes and made it hard to see. The teargas made me cough and made it hard for me to breathe. I could not sleep until 4:00 am. I felt the effects of the teargas for approximately 2 to 3 hours.

I have had nightmares and multiple moments since August 25, 2020 when I'm either asleep or awake when I've had flashbacks to the gas, which cause me to have trouble breathing, which can then trigger a panic attack. I have a phobia about not being able to breathe stemming from childhood trauma, which has been exacerbated by the August 25 incident.

On June 12, 2021, there was a protest at LASD – Imperial station. I arrived early and observed deputies setting the perimeter and blocking off the road in front of their station. Right after that, one of the deputies called me by name and said he recognized me from a Grand Park sweep the year before and reminded me of our interaction. Protesters started arriving after that. Normal chanting and speeches ensued. Protesters were talking about instances when police had killed Black or brown individuals without cause. I noticed that one deputy began pointing his pepper ball gun at protesters. It did not seem like he was aiming at a particular person, just generally at the crowd. The deputies used a megaphone to call out certain individual protesters by name, including Plaintiff Emanuel Padilla.

A few minutes after that, they started firing. I got hit by one pepper ball in my leg, which hurt but did not disable me; I was filming at this time. Several others were hit as well. Thereafter I filmed them continuing to fire at the crowd, and at least once, they fired a 40mm, which I determined based on the sound, although they did not hit anyone with it. I noticed a gentleman not there with the protest was trying to walk around the barricade, and deputies fired at him. He was hit once or twice, and protesters expressed that it was not right for the sheriffs to shoot at a person who was not even there with the protest. For about thirty minutes, on and off, the deputies would shoot at the crowd in bursts. The crowd did not disperse, nor did the sheriffs issue a dispersal order. The only verbal command I heard was "Don't touch the barricade." There was never a declaration of an unlawful assembly or warnings given.

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

-5-

604

**D036**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Plaintiff did not seek medical attention and does not claim permanent and lasting physical injury. However, Plaintiff has had lasting psychological injuries as a result of the August 25, 2020 teargassing incident. Plaintiff cannot identify which deputy teargassed him.

Plaintiff has had nightmares and multiple moments since August 25, 2020 when he is either asleep or awake when he has had flashbacks to the gas, which cause him to have trouble breathing, which can then trigger a panic attack. Plaintiff has a phobia about not being able to breathe stemming from childhood trauma, which has been exacerbated by the August 25 incident.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Alecia Denegar, who may be reached through counsel for Plaintiffs.

**INTERROGATORY NO. 4:**

Identify every witness to the incident giving rise to your lawsuit, including his/her residential address and telephone number.

**RESPONSE TO INTERROGATORY NO. 4:**

605                    -6-                                        **D036**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As to August 25, 2020: Plaintiff Joe Mischo; Plaintiff Diana Barbadillo; Plaintiff Linda Jiang; Plaintiff Krizia Berg; Plaintiff Emanuel Padilla; Plaintiff Devon Young. As to June 12, 2021: Alecia Denegar, who may be reached through counsel for Plaintiffs.

**INTERROGATORY NO. 5:**

Identify all statements, signed or unsigned, recorded electronically or otherwise, prepared by you, or any other person relating to your allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous as to whether it requests only recorded or documented statements, or all statements including oral and unrecorded statements, and to the extent it seeks unrecorded as well as recorded statements, it is overly broad. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney/client and/or attorney work product privileges. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No such documents exist.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought

treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: No such professionals exist.

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No economic injuries are claimed.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No medical expenses have been incurred.

**D036**

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated her for physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff is not claiming medical injuries and therefore this information is not responsive.

**INTERROGATORY NO. 10:**

Identify any other action in which you have alleged a violation of your civil rights or other allegedly improper government action and state all facts, in reasonable detail, on which you base the allegations, including the time, place, manner, and participants in each alleged violation.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff

i. declaring unlawful assemblies without accommodating, or attempting to accommodate, the right to peaceable assembly and protest and without adequate sound amplification audible enough to be heard and understood by the protesters, and without providing directions, means and opportunity to disperse before taking aggressive police action (if an unlawful assembly was declared, Plaintiff didn't hear it);

ii. taking aggressive police action without declaring an unlawful assembly;

iii.  the use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bong grenade—so as to deter persons from seeking to exercise their first amendment rights.

4) Targeting journalists and others observing protests and the LASD response by using excessive force and/or unlawful detentions against journalists covering the protests.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

-17-

609    D036

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not claiming lost income.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989), ); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985).

Plaintiff further objects to this interrogatory on the grounds that it violates the limit of 25 interrogatories set forth in FRCP 33 as the reference to each separate Request For Admission ("RFA") constitutes a separate integratory. Accordingly, Plaintiff will only respond to this interrogatory regarding the first three requests for admissions. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

With respect to RFA No. 1, Singh interprets "state all facts upon which you based your response" to mean, "state all facts upon which you based your denial" which in this RFA, was based on the existence of evidence. Singh has evidence in

## VERIFICATION

I have read the below-titled documents and know their contents:

**PLAINTIFF** Vishal Singh **'S RESPONSES TO COUNTY OF LOS ANGELES' FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF SPECIAL INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION**

I am a Plaintiff in this action, numbered 2:20-cv-07870-DMG-PD, filed in the Central District of the United States Federal Court.  The matters stated in the foregoing documents are true and correct to the best of my knowledge except as to matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __03 / 02 / 2022__, in Los Angeles County, California.

*Vishal P. Singh*
_____

Plaintiff  Vishal Singh

VERIFICATION

611

**D036**
Doc ID: 624c3bc39a0b96c30d881ad42ea70fc175290dd3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,            )
                               )
            Plaintiffs,        )   CASE No.
                               )   2:20-cv-07870-DMG-PD
VS.                            )
                               )
COUNTY OF LOS ANGELES,         )
etc., et al.,                  )
                               )
            Defendants.        )
_____)

DEPOSITION OF AUSTIN THARPE

Via Zoom Videoconference

Wednesday, November 8, 2023

Reported by:  JUSTYNE JOHNSON,
              CSR No. 14301

Job No.:      290146

1

**D037**

Q    Okay.  Have you lost a lot of weight since June of 2020?

A    No.

Q    Had you gained a lot of weight?

A    No.

Q    So it would be approximately the same as it is now as it was in 2020; is that right?

A    Plus or minus five pounds in (indiscernible).

Q    Do you have any mental health conditions?

MS. MULLEN:  Hold -- I'm going to object on privacy.

Just to be clear, Counsel, we're making garden variety distress claims here, so we're not claiming that he's experiencing any emotional distress from this incident above and beyond what the protesters experienced.

MS. CARTER:  Okay.  So you're instructing him not to answer?

MS. MULLEN:  As phrased, yes.

(Witness instructed not to answer.)

THE STENOGRAPHER:  And I'm sorry.  I missed a couple of words.  You said we're making some kind of distress claims?

MS. MULLEN:  We are not making any -- we're making garden variety emotional distress claims.  Nothing above and beyond what would be expected and what other protesters experienced given the incidents.

41

**D037**

A    No.

Q    Apart from the incident in this case, have you ever been arrested before?

A    Yes.

Q    How many times?

A    Once.

Q    Okay.  What was the circumstance of that arrest?

A    Protesting social justice.

Q    When did that protest occur?  What date?

A    I don't remember.

Q    Do you remember a year?

A    2020.

Q    Was that in the County of Los Angeles?

A    Yes.

Q    And we're -- again, we're not talking about the Compton time; correct?

A    Correct.

Q    Okay.  So in addition to the Compton arrest, you were also arrested in 2020 in Los Angeles for protesting another time; is that right?

A    Correct.

Q    Okay.  Do you remember the month that that occurred?

A    I don't.  No.

Q    Do you remember if it was in the spring, fall,

54

**D037**

summer, winter?

A    It was -- I think it was in the summer of 2020.

Q    And where in Los Angeles County did that happen?

A    Koreatown.

Q    Was this part of a large protest with other people or --

A    Are you asking --

Q    -- was this a smaller thing with just a few people?

MS. MULLEN:  Vague and ambiguous.

MS. CARTER:  Hm?

THE WITNESS:  What are you asking?

BY MS. CARTER:

Q    The protest in the summer of 2020 that doesn't involve the Compton incident where you were arrested, was that with -- was it a protest involving a large number of people or was it a smaller number of people?

A    "Large" meaning how many -- can you give me some context?  Like, large meaning 10 to 20?  Small meaning how many people?

Q    Yeah.  Let me rephrase.  About how many people went to the Koreatown protest in the summer of 2020 where you were also arrested?

A    To the best of my knowledge, a hundred.  Around a hundred.

55

D037

Austin Tharpe                                                                November 8, 2023

MS. MULLEN:  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  What are you asking?  Like, in -- in what departments or who or --

BY MS. CARTER:

Q    Do you know any LA County employees?

MS. MULLEN:  Same objection.

THE WITNESS:  (Indiscernible) no.

BY MS. CARTER:

Q    I'm sorry.  I didn't catch the answer.

A    Not personal.

Q    And do you know any LA County Sheriff's deputies?

A    No.

MS. MULLEN:  Calls for speculation.

BY MS. CARTER:

Q    Have you had any conversations with any County of LA employees about this incident?

A    No.

Q    How many protests have you attended since 2010?

A    2010?

Q    (Nodding head.)

A    I don't know an exact number.

Q    Can you give me an estimate?

A    50.  Possibly around 50.

Q    Do you know how many of those occurred after June

61

**D037**

of 2020?

A    No.  I have to think about it.  Hold on.

Q    Do you have an estimate?

A    After June 2020?

Q    (Nodding head.)

A    Maybe between five and ten.

Q    Have you had any training on how to safely attend protests?

MS. MULLEN:  I'm going to object on vague and ambiguous.  Also potentially calls for attorney-client privilege to the extent that information was gathered through National Lawyers Guild and/or through his counsel.

So if you had any conversations with attorneys or through the National Lawyers Guild, Austin, let us know. But otherwise, any -- any trainings outside of that context, you can answer questions.  Does that make sense?

THE WITNESS:  Yes.

Not in that context, Ms. Carter.  No.

BY MS. CARTER:

Q    So going back to the Koreatown summer of 2020 protest, did you attend that protest before or after the Compton one on June 21, 2020?

A    It's before, I believe.

Q    I think you mentioned you were arrested; is that right?

62

**D037**

'Cause it was in Beverly Hills that used tear gas and the sound machine.  Then another night in Beverly Hills, they had tear gas rubber bullets, and I think beanbags.  And that night, I had issues breathing from tear gas.  There was -- I mean, there's a lot of protests obviously in 2020.  There's been -- I don't know the exact date, but I was Downtown LA near -- what street is -- City Hall possibly.  And we were also tear gassed and shot at with rubber bullets.

          I think that --

BY MS. CARTER:

    Q    So just to clarify --

    MS. MULLEN:  I'm sorry --

BY MS. CARTER

    Q    -- when you say, "We were tear gassed," do you mean the crowd as a whole, or you personally inhaled tear gas?

    A    I personally inhaled tear gas.

    Q    Okay.  So I was taking notes on what you were saying.  So were you saying that you were tear gassed in Compton, twice by Beverly Hills, and then Downtown LA at the City Hall; is that correct?

    MS. MULLEN:  I think that misstates prior testimony.

          Go ahead, Austin.

    THE WITNESS:  To my knowledge at this moment, that's

72

**D037**

what I remember.  Yes.

BY MS. CARTER:

Q    Okay.  Did I leave any out?

A    That's what I remember right now.

Q    Okay.  And then you also mentioned rubber bullets.  Were you ever hit by a rubber bullet during any of the protests in 2020 and 2021?

A    Yes.

Q    Okay.  Which protests were you hit with rubber bullets at?

A    Beverly Hills, the first time that I was there.  Not the time with the sound machine.

Q    Okay.  Just that one?

A    Yes.

Q    Okay.  And then you mentioned beanbags.  During the 2020 and 2021 LA County protests, were you ever hit with a bean bag?

A    No.

Q    And then I'm going to try and get the -- the timeline straight for the different protests that we're talking about.  What was -- out of the -- the Beverly Hills ones, the Downtown LA one at City Hall, the Compton one, and the Koreatown one, do you remember which protest occurred first in time?

A    I believe Koreatown was first.

73

**D037**

Austin Tharpe                                                    November 8, 2023

A    No.

Q    Okay.  What other protests did you attend?

A    It was a lot honestly.  I've been to so many in 2020 and 2021.  To me, just like -- to, like, recall, I feel like I was out a lot.  Yeah.  I'd have to -- I don't know -- really think about that.

Q    Okay.  That's fair.  All right.  But these five that we identified were the five where you were either arrested or injured; is that right?

A    Respectively, yes.

Q    Were there any others that we haven't talked about yet where you were arrested or injured in 2020 or 2021?

A    No.

Q    Okay.  What was the most severe injury that you received at any of these protests?

MS. MULLEN:   Calls for expert opinion potentially.  It's vague and ambiguous.

You can answer, if you know.

THE WITNESS:  Yeah.  I don't know, Ms. Carter.

BY MS. CARTER:

Q    So you're not sure which one was the first for you?

A    They're all --

MS. MULLEN:  Same objections.  Vague and ambiguous.

76

**D037**

Calls for expert opinion.

THE WITNESS:  They're all traumatic.  I mean, I don't know -- I haven't ranked my injuries.  No.

BY MS. CARTER:

Q    Okay.  So you think they were all equally traumatic experiences?

MS. MULLEN:  Misstates prior testimony.

THE WITNESS:  I didn't say that.  I said they were all traumatic.

MS. CARTER:  Okay.

THE WITNESS:  And I have not ranked them in -- no.  I haven't ranked them.

BY MS. CARTER:

Q    If -- if you took a minute to think about it, can you identify what one was kind of one of the worst, if not the worst?

MS. MULLEN:  Vague and ambiguous.  Potentially calls for legal and/or expert opinion.

THE WITNESS:  I don't know, Ms. Carter.  I mean, like I said, they're all traumatic.  Like, getting hit with a rubber bullet is pretty painful.  Inhaling pepper -- bullets and pepper spray, not being able to breathe is also traumatic.  So I don't have an opinion on that right now.

///

77

**D037**

Austin Tharpe                                                    November 8, 2023

A    No.

MS. MULLEN:  Potentially calls for a legal conclusion.

THE WITNESS:  Personally, no.  I didn't -- you know, I didn't see anything.

BY MS. CARTER:

Q    And what effect did it have on you to see people running and being shot at at the Beverly Hills first protest?

MS. MULLEN:  Vague and ambiguous.  Calls for expert opinion.

THE WITNESS:  I mean, the same thing.  It's stress.  Everything is stress.  Every situation that is -- every protest where people are either detained or arrested or tear gassed or shot at, it's all stress.  That's Beverly Hills, Compton, Downtown LA, courthouse, all that.

BY MS. CARTER:

Q    Was it all sort of equal levels of stress at -- that -- at once or were some of them worse than others?  How would you characterize that?

MS. MULLEN:  Misstates prior testimony.  Vague and ambiguous.

THE WITNESS:  I mean, it's stress.  I don't know, like, I know you're asking for -- sounds like you're asking for me to rate stress again, but it's all stress.

So yeah.  I mean, it's all stress.

91

**D037**

Austin Tharpe                                                    November 8, 2023

A    It was, like, a younger -- a younger guy.  I believe he's Latino.  Yeah.

Q    Do you remember what he was wearing?

A    No.

Q    Do you remember if he was carrying a backpack or anything like that?

A    I don't remember.  No.

Q    Do you remember anything else about him?  Height?  Weight?  Shirt color?  Anything like that?

A    No.  He was -- I don't know.  He had this similar build as me maybe.  I don't want to speculate, but he looked young.  He looked under 35.  But...

Q    What happened after you were washing his eyes out with the water bottle?

A    I guess the LASD continued shooting rubber -- not rubber bullets.  I'm sorry -- pepper bullets, pepper spray in our area.  I remember getting it in my eyes and my throat, in my lungs and chest.

Q    Where were you standing when you were hit with pepper spray?

A    It's, like, a little corridor that's around the side of one of the buildings.

Q    Okay.  Were you still washing that person's eyes out with water when you were hit with pepper spray?

A    Yes.

155

**D037**

Q    So you hadn't moved from where you were washing that person's eyes out when you were hit with pepper spray?

A    I don't believe so.  No.

Q    What happened next?

A    I was doubled over.  Coughing.  Trying to breathe.  I remember feeling just upset about what was going on, upset that they're shooting peaceful protesters.  But yeah, we were just trying to breathe at that point.

Q    What happened next?

A    After that, I guess more people had walked over from -- from the other side of the -- of the walkway.  Like, we were -- I was kind of, like, in that little corridor off to the right a little bit, and the people are walking over, I guess, coming to check on everyone else that was, you know, in the area that I was in.

Q    So when you say these people came over, are you saying that because you saw people came over or did you have another reason for thinking that?

A    No.  I witnessed people walking over.

Q    Okay.  After you saw people walking over, what did you do?

A    I remembered trying to go sit down 'cause I was, like, coughing heavily, trying to breathe.  So I remember, like, walking, like, towards a -- like, a statue thing

156

**D037**

that was kind of there and just walking over, just trying
to catch my breath.

Q    What happened next?

A    I guess after I caught my breath, we walked -- or
I walked back towards our original location when we first
arrived and the police had -- or LASD had formed, like, a
line, like, in front of me and other protesters.

Q    Why did you walk back that way?

A    I was looking for, like, James and -- and Grace
and people that I knew that were there, trying to see how
they were and if they're okay.

Q    What happened after you walked back to that
original location?

A    The police were -- LASD was there.  I guess they
blocked off, I believe, two parts of the sidewalk.  Like,
there's an alleyway that goes on the side of this
sheriff's building.  I don't know what it was.  May be a
sheriff's building.  May be a government building.  But it
was, like, a government building that the sheriff's
department had blocked off on to my left, and then they
were in front of me directly.  So they made, like, I
guess, like, an L kind of shape similar to -- similar to
that.

And we were -- I was walking up and then people
were protesting right in front of the police.

157

**D037**

Q    After you got hit with the pepper spray, did you have any thoughts about staying or leaving at that point?

A    I knew I wanted to stay.  Because if I wanted to leave, I would have left.

Q    Why did you want to stay?

MS. MULLEN:  Asked and answered.

THE WITNESS:  I'm sorry.  I feel like we're talking in circles.  Are we -- 'cause I literally just answered this question.  I'm trying to understand, like, why you keep asking --

BY MS. CARTER:

Q    So I'm --

MS. MULLEN:  Again --

BY MS. CARTER:

Q    -- asking every point along the instance.  So I just want to know what you were thinking.  That's what I'm asking about?

A    I mean, like I previously stated, I just wanted to be there.  I felt like I needed to be there, so I stayed.

Q    Did you have any thoughts about leaving the protest after you saw the deputies in what I think you described as riot gear?

A    No.

Q    And why not?

178

**D037**

concerns in mind?

MS. MULLEN:  Asked and answered.

THE WITNESS:  I wasn't focused on COVID-19.  I think protesting for someone being murdered is bigger than COVID.  So that's why I was there.

BY MS. CARTER:

Q   Did you wear a mask at the protest?

A   I don't recall at that one.  I have no idea.

Q   Do you remember if you wore a mask at any of the other five protests that we discussed earlier?

A   Honestly, I have no idea.

Q   Were you in the practice of wearing a mask when you were out in public?

MS. MULLEN:  Vague as to time.

THE WITNESS:  I would wear a mask sometimes when I was out.  Yes.

BY MS. CARTER:

Q   Did you become infected with COVID-19 any time after you attended a protest?

A   No.

Q   Did you know any other protesters who became infected with COVID-19 shortly after attending a protest?

A   No, not to my memory.

Q   Do you know who Shakeer Rahman is?

A   No.

185

**D037**

protests where you were injured for those injuries?

A    No.

Q    In 2020, did you see any medical professional following any protest based on injuries that you sustained physically from those protests?

A    No.

Q    Did you have any ongoing medical issue prior to the injuries you sustained for the Compton protest that would affect how those injuries were sustained or what you experienced from them?

A    No.

Q    Starting first with the physical injuries that you sustained in the Compton protest, what physical injuries did you have from the incident in that -- in the Compton protest?

A    From the pepper balls -- bullets -- whatever you want to call it -- trouble breathing, shortness of breath, burning sensation in my lungs, general breathlessness, uncomfortably tight zip ties cutting off circulation to my hands.  Being bulldozed over when sitting down by LASD.  I think that's the extent of it.

Q    When you said being "bulldozed over by LASD," what physical injuries did you sustain from that?

A    Just general soreness from being knocked over to the ground.

213

**D037**

Austin Tharpe                                                    November 8, 2023

Q    Were there any particular parts of your body that were sore?

A    It's, like, lower back but nothing substantial. Just (indiscernible.)

THE STENOGRAPHER:    It was just what?

THE WITNESS:    I said nothing substantial.    Just lower back pain.

BY MS. CARTER:

Q    Did you have any other injuries apart from what you just described with the pepper balls, the zip ties, and the -- being knocked over?

A    Dehydration, being in a van for an hour and a half without water.    Lack of use for -- of a bathroom for an hour and a half.    Sitting in a hot car for an hour and a half.    No air.

Q    Did you have any other injuries apart from the pepper balls, the zip ties, the being knocked over, and the sitting-in-the-car injuries that you just mentioned?

A    No.

Q    So I'm going to go through each of these types of injuries based on what caused it, the pepper balls, the zip ties, the being in the hot car, and being knocked over.    Okay?

So starting first with the pepper balls, at the time that you sustained that injury, on a scale of 1 to 10

214

**D037**

Austin Tharpe                                                    November 8, 2023

with 10 [sic] being no pain -- I'm sorry, 1 being no pain

and 10 being the worst pain you can imagine, how painful

were those injuries at the time that you got those

injuries?

     A     Probably a 10.

     Q     What was the healing process like for those

injuries specifically?  How long did it take?  How did you

heal?  That type of thing.

     A     It mean, it took a couple of days just to, like,

feel normal breathing again.  Just, like, general burning

sensation in your lungs kind of -- I mean, for me, it sits

in your -- inside my body for a couple days just like

breathlessness after that, feeling, like, really short of

breath and -- almost like asthma.  I mean, to an extent,

if I could describe it.

     Q     How long did it take for you to return to

normal -- your nor- -- normal self after you sustained

those injuries?

     A     Probably after day three felt more normal.

     Q     Did you feel completely normal after day three?

     A     I wouldn't say completely, but it was, like,

noticely [sic] better.

     Q     Okay.  So better on day three.  At what -- what

day did you feel completely normal again, if -- if ever?

     A     Probably five days.

215

**D037**

Austin Tharpe

November 8, 2023

Q    Have you had any long-term effects from those injuries?

MS. MULLEN:  Potentially calls for expert opinion.

THE WITNESS:  Not --

MS. MULLEN:  You're limiting just to physical?

MS. CARTER:  Yep.  For now.

THE WITNESS:  Nothing that I'm aware of currently.

BY MS. CARTER:

Q    Would you describe that physical injury that you sustained as severe?

A    Yes.

Q    Going next to the injuries you sustained from the zip ties, can you describe that injury for me?

A    Loss of feeling in my hands.  Neuropathy. Tingling.

Q    On a pain scale of 1 to 10 where 1 is no pain and 10 is the worst pain you can imagine, where would you put that specific injury?

A    Probably a 7.

Q    How long did it take you to return to normal after sustaining that injury?

A    It was just, like, a day or two.

Q    So by the second day, you -- you were back to normal completely?

A    About.

216

631

**D037**

Q    Have you noticed any long-term effects from that injury?

A    No, not to my knowledge.

Q    Would you describe that zip tie injury as severe?

MS. MULLEN:  Calls for expert opinion.  It's vague and ambiguous.

You can answer.

THE WITNESS:  I'd say it's moderate.  In between moderate and severe.

BY MS. CARTER:

Q    Going next to the injuries you sustained in your lower back from being knocked over, can you describe that -- that physical injury?

A    Just bruising and tenderness generally.

Q    On a scale of 1 to 10 with 1 being no pain and 10 being the worst pain you can imagine, where would you places that injury on the pain scale?

A    Probably a 5.

Q    How long did it take you to return to normal after sustaining that injury?

A    Probably five days.

Q    Have you noticed any long-term effects from that injury?

A    No.  Not to my knowledge.

Q    Would you describe the injuries that you

217

**D037**

Austin Tharpe

November 8, 2023

sustained from being knocked over as severe?

A    No.

Q    Going to the injuries you sustained sitting in the hot car, can you describe those injuries?

A    Excuse me.  Just dehydration.  Just -- I mean, it was June in the summer.  It's dehydration.  Excessive sweating.  Just that type of thing.

Q    On a scale of 1 to 10 where 1 is no pain and 10 is the worst pain you can imagine, what was the pain level of sustaining that injury?

A    It's not really pain.  It's just, you know, it's uncomfortable being dehydrated, but I'd probably say 3.

Q    How long did it take for you to return to normal after that injury?

A    Two or three hours that day.

Q    Have you noticed any long-term effects from that injury?

A    No, not to my knowledge.

Q    Would you describe the injury that you sustained from sitting in the hot car as severe?

A    No.

MS. CARTER:  And, Counsel, I'm confirming that we're not -- he's not asking for any monetary claim for physical injury?

MS. MULLEN:  I don't believe that's what we said.  I

218

D037

just said he's -- he didn't seek any medical treatment for those --

MS. CARTER:  Okay.

MS. MULLEN:  -- injuries.

MS. CARTER:  I'll just ask.

BY MS. CARTER:

Q    Mr. Tharpe, are you seeking any monetary compensation based on your physical injuries?

MS. MULLEN:  Calls for a legal conclusion.  Expert opinion.  Also violates attorney-client privilege.

To your understanding, I guess, Austin, you can answer that.

THE WITNESS:  Right now, I'm not.  No.

MS. MULLEN:  I'll say that (indiscernible) specifically with what he's entitled to and what's on the complaint.  I'll defer to what's on the complaint.

BY MS. CARTER:

Q    Moving now to mental health.  So that was physical.  We're going to move on to mental.

Did you have any prior mental health history before the Compton protest?

MS. MULLEN:  So, again, I'm going to object on privacy as stated during the break.  Plaintiff is not seeking any emotional distress beyond your garden variety as what would be expected from this type of event.  So getting

219

D037

into his history of mental health, et cetera, is protected

by the attorney -- is protected by client's right to

privacy and I'll object and instruct the witness not to

answer on that -- on those grounds.

        (Witness instructed not to answer.)

    MS. CARTER:  Okay.  And just to clarify for the

record, any question I asked about any prior mental health

history you would object and instruct him not to answer?

    MS. MULLEN:  Yes.  Based on right to privacy because

we are not seeking any beyond garden variety at this time.

    MS. CARTER:  Okay.  Based on those objections and the

instructions you tend to give, I won't ask those

questions.

BY MS. CARTER:

    Q    After the Compton protest, did you seek any

mental health treatment in relation to any mental health

injury that you sustained during the Compton protest?

    A    Yes.  I sought therapy.

    Q    How did you seek therapy?  What did you use to

find it?

    A    Just a computer.

    Q    Okay.  And what therapy did you find?

    A    It's a company called BetterHelp.

    Q    What is BetterHelp?

    MS. MULLEN:  Calls for speculation.

220

You can answer as to your understanding.

THE WITNESS:  They seem to be a counseling/therapy organization, to my knowledge.

BY MS. CARTER:

Q    Why did you decide to pick BetterHelp as your provider?

A    I really didn't have an opinion.  I was just looking for something that made sense for me at the time.

Q    Okay.  And who was your doctor through BetterHelp?

MS. MULLEN:  If you recall.

THE WITNESS:  Her name was Ashley Codding -- Coddling (phonetic).  Something like that.

BY MS. CARTER:

Q    What did she treat you for?

MS. MULLEN:  Calls for expert opinion as phrased. Calls for speculation.

If you know, you can answer.

THE WITNESS:  She was a talk therapist, so she didn't treat me for anything.

BY MS. CARTER:

Q    How long did you have treatment with her?

A    I believe it was two to three months, if I remember correctly.

Q    Do you remember how many sessions you did either

221

**D037**

weekly or monthly?

A    It depends on the week.  Usually one -- once a week.  Just kind of depended on my schedule.  I was trying to find the time.  But usually once a week for two to three months.  Maybe four months.  I don't know of the time period, but usually once a week.

Q    When you ended therapy with her, why did you end the therapy?

A    I didn't feel like I was getting anywhere.  When I ended, I feel like I had gotten what I needed from what it was.

Q    Can you describe the emotional or mental pain that you experienced due to the incident at the Compton test?

A    General anxiety, fear of law enforcement, depression.  Those are the main things.

Q    Was there any minor things that you didn't mention that you also experienced?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  No, not to my knowledge.  I mean, those are the -- the big three.

BY MS. CARTER:

Q    Was there anything else that you haven't detailed that you experienced emotional or mental pain was from the Compton protest incident?

222

Austin Tharpe                                                                    November 8, 2023

A    PTSD.  Seeing police out.  Just general triggers of seeing law enforcement, whether that's LASD or LAPD. Just uniformed officers in general just trigger anxiety.

Q    Have you had triggering events since the Compton protest incident?

A    Yes, with --

MS. MULLEN:  Potentially calls for expert opinion.

Go ahead.

THE WITNESS:  Triggering events with the Sheriff's Department?

BY MS. CARTER:

Q    With anybody.  You said you had triggers.  Did you have any triggering events?

MS. MULLEN:  Same objections.

THE WITNESS:  No.  Usually it's related to policing.

BY MS. CARTER:

Q    Have you had anything happen in your life that triggered the emotional or mental pain that you suffered from the Compton incident?

MS. MULLEN:  Vague and ambiguous.  Calls for expert opinion.

THE WITNESS:  Yeah.  Can you rephrase that?

BY MS. CARTER:

Q    Sure.  So you mentioned that you've had triggers. So I'm trying to find out if there were any events that

223

D037

did trigger you to reexperience or to otherwise feel things that you felt, you know, that was related to the pain you experienced at the Compton protest?

MS. MULLEN:  You're talking about his triggers around law enforcement?

MS. CARTER:  Yes.

MS. MULLEN:  Vague and ambiguous.

But you can answer, if you understand.

THE WITNESS:  So you're saying, like, what are my actual triggers in regards to law enforcement?

BY MS. CARTER:

Q    Yes.  Any that you developed due to the Compton protest.

A    Just -- I mean, generally just seeing women and men in uniform generally triggers me.  It -- get anxiety, get racing thoughts, get sweaty, get anxious.  Seeing weapons on their hip makes me anxious.  Batons, militarized gear makes me anxious.  That sort of thing.

Q    When you are triggered by seeing someone in uniform, do you have any other symptoms apart from anxiety, racing thoughts, sweating?  I'm not sure if I covered -- if I listed all the ones you named.

A    Not that I think of right now.  That's -- yeah.  I think that's it.  Well, I mean, yeah.  That's what I can think of in the moment.

224

**D037**

Q    Okay.  Did you have any problem -- getting paralyzed or unable to take action or -- or any symptom like that?

A    No.

MS. MULLEN:  Potentially calls for expert opinion.

Go ahead.

BY MS. CARTER:

Q    What about flashbacks?  When you get triggered, do you do any flashbacks to the Compton protest?

MS. MULLEN:  Calls for an expert opinion.

THE WITNESS:  No.  I haven't really had flashbacks. Not recently.

BY MS. CARTER:

Q    Did you have any after the Compton protest but not recently?

A    Yeah.  For the next couple of months, I had -- yeah, like, memories that would, you know, pop in my head. But now, no.

Q    Did that impede your daily life at all?

MS. MULLEN:  Vague and ambiguous.  Calls for expert opinion.

THE WITNESS:  Impede in what way?

BY MS. CARTER:

Q    In any way.

MS. MULLEN:  Same objections.

225

**D037**

Austin Tharpe                                                          November 8, 2023

Go ahead.

THE WITNESS:  You mean just general feelings of safety, yes.

BY MS. CARTER:

Q    Did any of the other general anxiety, the fear of law enforcement, depression, PTSD, or triggers affect your daily life in any way following the Compton protest?

MS. MULLEN:  Vague and ambiguous.  Potentially calls for expert opinion.

THE WITNESS:  I mean, yes.  It's more of a -- it's like a gut feeling where you're just uneasy and it kind of takes over your mind sometimes.  So yeah.  I mean, for me, I've learned some techniques that try to help.  But, I mean, yes.  It's been few different things.

BY MS. CARTER:

Q    Do you still have these fail -- feelings now or have they sort of abated since the protest happened?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  I for sure have them.  Still feel anxiousness around police.  Still generally uncomfortable around people in uniform with weapons on their hips.

BY MS. CARTER:

Q    How often on a daily, weekly, monthly basis do you have these feelings that bother you?

A    Whenever I see someone in uniform.

226

D037

(Indiscernible.)

Q    Every time?

A    Yeah.  People walk outside now in Koreatown, I'd see an officer and I feel a little anxiety.

Q    Has that anxiety been the same, increased, or decreased since the Compton protest?

A    It's probably increased a little bit.

Q    Okay.  Has it also increased the over the last three years since the first time you felt it after the Compton protest?

A    For sure it's --

MS. MULLEN:  Vague and ambiguous.

Go ahead.

THE WITNESS:  It's my understanding, it's like -- it's compounded.  Like you -- something happens and then it just kind of builds on itself.

BY MS. CARTER:

Q    Has it affected your relationships with others?

MS. MULLEN:  Vague and ambiguous.  Potentially calls for expert opinion.

THE WITNESS:  Yeah.  I don't know what you're asking, Ms. Carter.

BY MS. CARTER:

Q    Has this anxiety, depression, fear of law enforcement, PTSD, and triggers, has it affected your

227

**D037**

Austin Tharpe                                                                November 8, 2023

relationships with other people at all?

MS. MULLEN:  Same objections.

THE WITNESS:  Are you saying, like, all these things in context of law enforcement or just generally feelings these things?

BY MS. CARTER:

Q    Generally feeling these things.

A    Sure.  Yes.

Q    Okay.  And how is that -- how has feeing those things affected your relationships with other people?

A    Not wanting to open up about things. Self-isolation.  Yeah.  That's the gist of it.

Q    Has it affected your work at all?

A    It's affected making connections in the context of work.

Q    So how have these negative feelings been affecting your ability to make connections at work?

A    Affects confidence in some -- some regards. Yeah.  That's the gist of it.

Q    Do you anticipate these feelings affecting your future ability to work?

MS. MULLEN:  Vague and ambiguous.  Potentially calls for expert opinion.

THE WITNESS:  Is it's very possible.  I hope not.  But it's very possible.

228

**D037**

busy.

Q    Did the injuries you sustained from the Compton protest affect your work at all following the incident?

A    I feel like it did.  Yes.

Q    How did it affect your work?

A    Just anxiety, ability to focus.  Just nerves are kind of on edge.

Q    Did you have to turn down any jobs that you were offered for your freelance work?

A    Yes.

Q    What jobs did you turn down?

A    The photography jobs, I'd have to go back and look to see what they were.

Q    Do you remember how many you turned down?

A    I believe it was three to four.

Q    And why did you turn this down?

A    Confidence.  I, like, shaky hands.  Like, I can't have shaky hands when I'm trying to hold a camera.  Those are the main things.

Q    How long did you have shaky hands after the Compton protest?

A    It was off and on for a few months until it kind of just went away.

Q    Were you unable to work for that entire few months?

230

**D037**

A    I worked off and on.  I wasn't always doing photography.  Sometimes it was, like, a film production thing, but yeah.  It wasn't the entire time.  I tried to find other work when I could.

Q    Were you unable to do photography work for the entire time that you had shaky hands?

A    For a portion of it.

Q    What portion of it were you unable to do photography work while you had shaky hands?

A    Maybe three to four weeks.

Q    What is the total amount of money that you're asking for based on loss of income?

MS. MULLEN:  I'm going to object on attorney-client privilege, attorney work product doctrine.  Calls for expert opinion and calls for a legal conclusion.  I'll instruct -- instruct the client not to answer based on those -- those objections.

(Witness instructed not to answer.)

BY MS. CARTER:

Q    Were you aware of any risks involved in participating in the Compton protest?

MS. MULLEN:  Vague and ambiguous.

THE WITNESS:  And what risk are you talking about?

BY MS. CARTER:

Q    Any risks.  Were you thinking about risks before

231

**D037**

But go ahead.

THE STENOGRAPHER:  I didn't hear the answer.

THE WITNESS:  Yes.  I think the Compton was more severe than the other protests that we spoke of earlier.

BY MS. CARTER:

Q    And you may have already answered this, but you're not currently in litigation based on any of those other protests, are you?

A    Not currently.  No.

Q    Without disclosing anything you talked to any lawyers about, why did you personally decide to bring this lawsuit?

MS. MULLEN:  Vague and ambiguous.

You can answer.

THE WITNESS:  I felt like law enforcement was more aggressive in Compton, more dehumanizing, more overtly out -- out of their -- I'm looking for the word -- out of their -- their right to do what they did.  Aggressiveness. The way we were treated.  The dehumanizing factor.  All of that together, to me, made sense for, you know, seeking counsel and seeking a listening ear.

BY MS. CARTER:

Q    You said you felt Compton was more aggressive and more dehumanizing.  When you say "more," are you comparing it to something else?

234

STATE OF CALIFORNIA            )
                               )
COUNTY OF VENTURA              )

          I, JUSTYNE N. JOHNSON, do hereby certify:

          That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of certificate number 14301, which is in full force and effect, and that I am authorized to administer oaths and affirmations;

          That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

          That prior to being examined, the witness named in the foregoing deposition was duly sworn or affirmed by me to testify the truth, the whole truth, and nothing but the truth;

          That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

          That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

246

I further certify I am not a relative or

employee or attorney or counsel of any of the parties, nor

am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my

name this __21st__ day of __November__ ,20__23__.

_____

JUSTYNE N. JOHNSON, CSR No. 14301

247

**D037**

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
Kristina A. Harootun SBN 308718
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd., #115
Culver City, California 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. kharootun@sshhzlaw.com
e. jwashington@sshhzlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL GROUP
1001 Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Rebecca Brown
NATIONAL LAWYERS GUILD
LOS ANGELES
5165 ½ Santa Monica Blvd., Ste. C
Los Angeles, CA 90029
t. 860-944-5111
e. rebecca@nlg-la.org

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

*Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| KRIZIA BERG, GRACE BRYANT, JAMES BUTLER, NOELANI DEL ROSARIO-SABET, LINDA JIANG, SEBASTIAN MILITANTE, CHRISTIAN MONROE, MATTHEW NIELSEN, EMANUEL PADILLA, SHAKEER RAHMAN, AUSTIN THARPE, TRAVIS WELLS, DEVON YOUNG, individually and on behalf others similarly situated, <br><br> PLAINTIFFS, <br><br> v. <br><br> COUNTY OF LOS ANGELES, a municipal entity, SHERIFF ALEX VILLANUEVA, and DOES 1-10 inclusive, <br><br> DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD <br> *Assigned to: Honorable Dolly M. Gee* <br><br> **PLAINTIFF AUSTIN THARPE'S RESPONSE DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |

649

**D038**

admissible; (b) a waiver of any of these General Objections; (c) a waiver of any specific objections asserted in response to individual interrogatories; or (d) an agreement that a interrogatory for similar information in this or any other related proceedings will be treated in a similar manner. Plaintiff reserves all proper objections regarding the competency, relevancy, materiality, privilege, authenticity and/or admissibility of any and all information provided by Plaintiff in this litigation.

6.      Plaintiff objects to each interrogatory to the extent it is overbroad, vague or burdensome as to time or scope. Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).

The above general objections are incorporated into each of the responses set forth below:

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

If your claims in this action are based on any facts that are not alleged in the Complaint, please state any such additional facts.

### RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989),); *In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328, 338-39 (N.D. Cal. 1985). Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

On or about June 21, 2020, Plaintiff attended a protest in or around the Compton Courthouse located at 200 West Compton in Compton, California supporting the family of Andres Guardado, an 18-year-old whom LASH had fatally shot in the back a mere three days earlier.

Plaintiff arrived at the protests at approximately 4:00 p.m., or later afternoon. Plaintiff listened to several speakers, including members of the deceased's family. He chanted the deceased's name with other protestors and held up signs. The protest was entirely peaceful. Plaintiff did not witness any of the protestors destroy any property, threaten violence, or commit any violent acts.

At some point after Plaintiff's arrival to the protest, Plaintiff observed LASD officers begin to block access to the Courthouse. Plaintiff did not witness any of the protestors throw anything at the officers, threaten violence, or otherwise destroy property to prompt the arrival of the LASD officers.

After approximately one to two hours after the speakers finished, Plaintiff believes he heard LASD officers make an announcement to leave premises and believes he heard the term "unlawful assembly." However, the precise language used was difficult to hear over the noise of the crowd. Plaintiff is not aware of any incident prompting the announcement.

Approximately five to ten minutes after this announcement, Plaintiff became aware of screams from another group of protestors behind his location. He became aware that LASD Officers had used tear gas on the other protestors. He did not hear any further announcements from the LASD providing a warning about the imminent use of tear gas. Plaintiff tried assisting other protestors who had been tear gassed wash out their eyes. While assisting others, Plaintiff was exposed to the tear gas. His eyes, throat, and chest burned.

A group of approximately five to ten protestors, including Plaintiff, sat down and formed a line close to the Dr. Martin Luther King Jr. Memorial in the central courtyard near the Compton Courthouse. These protestors were entirely peaceful

and, in passively sitting down in front of the memorial, did not threaten or commit any violence against any of the LASD Officers.

Nonetheless, LASD Officers aggressively approached the peaceful protestors with full riot gear, batons out, and shields. Several of the LASD Officers stepped over the heads of the peaceful protestors; several others walked around. The LASD Officers used their batons and shields to push several of the sitting, peaceful protestors to the ground. The LASD Officers separated the peaceful protestors from the remaining crowd. Several of the LASD Officers roughly grabbed protestors by the arms and aggressively lifted them off the floor. Even as the Officers responded with aggression and violence, Plaintiff did not see any of the protestors attempt to strike, hit, or throw anything at the Officers in response.

LASD Officers then began arresting the peaceful, sitting protestors. Plaintiff was arrested and placed in handcuffs. Plaintiff was made to wait in the backseat in a stationary patrol vehicle for approximately 30 to 45 minutes with one other protestor, handcuffed the entire time. The car was left in the sun. Plaintiff was not provided with any water or fresh air.

Plaintiff and the other protestor were then placed in a van with approximately four to five other arrested protestors. The protestors were again made to wait for approximately fifteen or twenty minutes. Plaintiff heard one protestor complain urgently about needing to use the restroom; her pleas were ignored. LASD Officers drove the van two or three miles down the way, issued citations to the protestors including Plaintiff, and then released the protestors.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

//

//

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As a result of being tear gassed, Plaintiff's eyes, chest, and throat burned intensely at the scene. Plaintiff continued to experience these effects for several days thereafter. Plaintiff also experienced coughing for several days following the protest. Plaintiff also experienced emotional distress following the incident. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Grace Bryant, may be contacted through counsel;

Noelani del Rosario-Sabet, may be contacted through counsel;

James Butler; may be contacted through counsel;

Krizia Bryant; may be contacted through counsel;

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

In or around June 2020, Plaintiff worked as a freelance photographer. Following the incident, Plaintiff had to take personal time and turn down several paying jobs. Plaintiff's standard hourly rate is approximately $250/hour, and Plaintiff is usually booked several hours at a time. Additionally, Plaintiff spent approximately $27 per week in seeking treatment from Dr. Codding, and received treatment for approximately two months during the summer of 2020.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff spent approximately $27 per week in seeking treatment from Dr. Codding, and received treatment for approximately two months during the summer of 2020.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.

Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated her for physical injuries to the same part of his body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Dr. Ashley Jacobsen Codding, contact information presently unknown, treated at BetterHelp.Com.

Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

In or around June 2020, Plaintiff worked as a freelance photographer. Following the incident, Plaintiff had to take personal time and turned down several paying offers.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an unqualified admission, state the number of the request and all facts, documents, and tangible things upon which you based your response.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal. 1998); *Roberts v. Heim*, 130 F.R.D. 424, 427–28 (N.D. Cal. 1989),); *In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328, 338-39 (N.D. Cal. 1985).

**D038**

## VERIFICATION

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

I, AUSTIN THARPE, have read the **PLAINTIFF AUSTIN THARPE RESPONSES TO DEFENDANT. COUNTY OF LOS ANGELES; SHERIFF ALEX VILLANUEVA'S SPECIAL INTERRGOATIRES – (SET ONE).**

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters, which are stated on information and belief and as to those matters I believe them to be true.

Executed on this _Jun 7, 2022_ May 18, 2022 at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_Austin Tharpe (Jun 7, 2022 11:46 PDT)_

**AUSTIN THARPE**

VERIFICATION

657                                                                    **D038**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KRIZIA BERG, et al.,                )
                                    )
            Plaintiffs,             )
                                    )
            vs.                     ) Case No.
                                    ) 2:20-cv-07870-DMG-PD
COUNTY OF LOS ANGELES, etc.,        )
et al.,                             )
                                    )
            Defendants.             )
_____)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

OF

DEVON YOUNG

NOVEMBER 20, 2023

Reported by:  Joyce A. Griffith
CSR No.:      11010
NDS Job No.:  290790

A    The fourth protest -- I have been doing all arrests.  I haven't been doing injuries yet.  The fourth arrest was by CHP in the fall of 2020.  It was a few days before Thanksgiving, I believe, so somewhere around November 24th.  I don't have the date in front of me, so I cannot confirm.          15:00:56

Q    So we have named four protests in 2020. You said those were only the arrests, not the injuries?

A    Correct.

Q    Were there any other arrests in 2020 where you were arrested?

A    I'm sorry?

Q    Were there any other protests in 2020 where you were arrested?          15:01:30

A    No.

Q    So starting back from the top then, what was the first protest in 2020 where you were injured?

A    To the best of my memory, it would have been this Compton protest where I was tear gassed.

Q    What was the next protest after the Compton protest where you were injured?

A    To the best of my memory, it would have          15:02:00
been either the first or second Beverly Hills arrest

42

A    I did not hear any shooting until I heard the voice and then walked in that direction.

Q    Did you hear anything else besides that woman's voice?

MS. BROWN:  Vague and ambiguous.

THE WITNESS:  I heard yelling.  I can't    16:12:29 remember specifics, but certainly yelling.

BY MS. CARTER:

Q    What happened after you moved towards where the woman was yelling, "They're shooting at us"?

A    There was shooting happening, and so I moved directly to the side, so right in front of the officers, but to the side of where they were    16:13:00 shooting, so that I would not be hit.  But then I could observe the shooting and film the shooting.

Q    What happened next?

A    I filmed protesters being shot at and I filmed police officers or sheriffs throwing flash grenades, and I filmed and witnessed what appeared    16:13:27 to be a large cloud of gas.  This was all from my vantage point behind the wall.

Q    What happened after that?

A    After I had been filming for approximately ten minutes, a sheriff's officer, I guess, noticed that another woman and I were behind the wall.  He

78

pointed his weapon at us and said something to the effect of, "You need to move."

There was only one way to move, which was the direction of the shooting and the tear gas, but the implication was move or be shot.

Q    When you said there was nowhere else to move, can you kind of describe the situation in which you came -- on which there was only one way to go?

A    Yeah.  To the best of my memory, there was a fence separating us from the officers, and then the area to the left of me was walled off.  So I was just over a small wall.  There was no exit that way. The only possible exit was going across the line where the officers were shooting at protesters.

Q    Did you look around for an exit when he mentioned that to you?

A    Yes.  I did not want to walk into their line of fire and tear gas, but the direction he pointed was directly in to the line of fire and tear gas.  There were no other exits or options that I could see.

Q    What happened next?

A    I followed the orders.  I told the woman that I was with that we needed to move because we

79

are not safe where we are standing.  So I exited where the officer prompted me to exit, and at that point I was hit by a wave of tear gas, a very intense burning in my eyes and nose and lungs and couldn't breathe or see.

Thankfully, some fellow protesters and   16:15:58 medics sort of pulled me to the side out of the line of fire and began helping me treat the tear gas injury.

Q    How did they do that?

A    At first a woman handed me a scarf to sort of wipe my eyes, but that didn't help at all. Eventually someone told me to kneel and they began pouring water into my eyes to try to flush out the tear gas.

Q    Did that work?   16:16:29

A    It took quite a while.  I think they were pouring water into my eyes for about ten minutes before I could start to see again.  There was still intense burning, so we just kept flushing for past the ten minutes.

Q    Then what happened?

A    After that, I was pretty shaken.  I   16:16:54 remember I was starting to gain visibility again.  I think just trying to like gather my bearings.  I

80

Devon Young                                                          November 20, 2023

think that I may have -- I know that I continued to

film some of what the officers were doing and trying

to be helpful to other protesters on the ground who

were also being injured or arrested.  Then

eventually, the sheriffs began pushing everyone off    16:17:25

the property altogether.

        Q    How were they doing that?

        A    They were moving as a wall, you know,

together with their weapons, so the protesters would

move back.

        Q    After they started doing that, what

happened?

        A    I remember myself and some other

protesters, you know, we retreated more, I believe,    16:18:00

onto the street, to the best of my memory.  People

were still filming what was happening.  I noticed

some people were being arrested, so I stayed and

tried to like film what was happening.

        Q    Then what happened?

        A    I can't recall exactly, you know.         16:18:33

Eventually there were fewer and fewer protesters.

People were starting to go home, and I left as

well.

        Q    How long did you stay before you left?

        A    After being tear gassed?

81

Q    Yes.                                                    16:19:00

A    Perhaps about an hour.

Q    Why did you leave when you left?

A    It seemed at that point that the protest had ended, and there was no more reason to stay.

Q    Why did you think the protest had ended at that point?

A    There were so few protesters left.  It was clear that the speeches were not going to be able to happen, and yeah.                                16:19:30

Q    Do you remember about what time you left?

A    I don't recall the exact time.

Q    Did you leave alone or did you leave with someone?

A    To the best of my memory, I left alone.    16:19:47

Q    Throughout the protest, apart from what you told me about hearing that woman saying, "They're shooting at us," did you hear any other protesters say anything else?

A    Well, I was listening to people giving speeches.

Q    Apart from the speeches?

A    I don't recall what other protesters were saying before the shooting.                       16:20:27

Q    Do you remember what they were saying

82

Devon Young

November 20, 2023

MS. BROWN:  Yes.  Those have been produced.

MS. CARTER:  Great.

BY MS. CARTER:

Q    If you find any new videos or any new audio, you will turn that over to your attorney?

A    Yes.

Q    Can you tell me more about the tear gas injury?  You described it a little bit, but can you tell me how it felt when you walked through that tear gas cloud?                                          16:23:29

A    Yes.  It was extremely painful.  Again, my eyes were burning, my nose, my throat.  It was very difficult to breathe.  I had never experienced anything like that pain.  It was very overwhelming.

Q    On a scale of 1 to 10, 1 being no pain and 10 being the worst pain you could think of, what was your pain level when you experienced that?

A    I would say that was at a 10.            16:23:56

Q    Did you continue to have any pain later after that injury happened?

A    I remember my eyes were still burning when I got home.

Q    How long did it take for your eyes to go

85

D039

back to normal?

A     To the best of my memory, the burning lasted just a few days.

Q     Did you have any other injuries, apart from your eyes?    16:24:29

A     From that protest, no, not to the best of my memory.

Q     No other physical injuries from anything that happened?

A     No, not that I recall.

Q     Did you have any emotional injuries based on what happened with the Compton incident?

A     Yes.

Q     What emotional injuries did you have?

A     I experienced nightmares, acute stress, anxiety.    16:25:00

Q     Was that at all similar to the acute stress disorder that you were suffering from the incident in late May, early June?    16:25:28

A     I would say that was around that time that the acute stress disorder started.

Q     It didn't start after the late May, early June incident at Garcetti's house?

A     Again, I mean, trauma is cumulative.  I definitely felt stressed, anxious after that first

86

Devon Young                                                November 20, 2023

arrest, protest, especially because of the sexual

assault.  Sorry, sexual harassment.  This one was --    16:25:59

the stress that I felt after this was pretty

distinct, because of the tear gassing.

Q    And the sexual harassment you are alluding

to -- are you talking about the late May, early June

incident, where you felt violated by officers

looking at your skirt or up your skirt?                 16:26:27

A    Yes.

Q    Did you experience any sexual harassment

during the Compton incident?

A    No.

Q    Did you film any of the other protests that

we have talked about today, either the late May,

early June one at Garcetti's house, the first

Garcetti house protest where you were arrested, or

either of the Beverly Hills ones that we talked       16:27:00

about, or the second Garcetti house one or the one

in November?

A    Yes.  I took some footage, film footage, at

each of the protests.

Q    You filmed all of them that I just

mentioned?

A    To the best of my memory, yes.

Q    Why were you filming at these protests?

87

A    I think it's helpful to add accountability
to the protests.

Q    How does filming do that?

A    Well, I think that when officers are aware
that they are being filmed, they are often more
likely or hopefully more likely to act within the
law, although that's of course not always the case.
It also helps, since memory of protests can be not
always reliable among protesters.  I think that it's
really helpful to have that firsthand account and
evidence of what's happening.

Q    So part of the reason that you were filming
was to try to affect how the officers reacted to
protesters?

A    It was my goal, yes, part of my goal.

Q    And you said that while you walked through
that tear gas, you were still filming.  Is that
right?

A    I was filming the officers up until the
officer indicated that we needed to move.  At that
point, my camera remained on, but the footage is all
of the ground, and it's not very intelligible.  It's
just -- I couldn't keep filming while I was walking
through tear gas, but technically, yes, the film was
still going.

88

Devon Young

November 20, 2023

Q    At what point were you able to get your eyesight back enough to be able to move the camera to be able to film again?

A    I believe that took about 30 minutes, 30 to 45 minutes, to my memory.

Q    So it took 30 to 45 minutes for you to regain your sight enough to be able to film?

A    Correct, to the best of my memory.

MS. CARTER:  I'm going to bring up a screen   16:29:45
shot of the Compton area.

I'm sorry, Counsel.  I don't think I said this to you.  When you see it, let me know if you have any objections to it.  It's really just a   16:29:58
Google Maps aerial photo.

BY MS. CARTER:

Q    I'd kind of just like to ask a few more questions about where you were, where you remember different things happening, et cetera.

So I'm starting the screen share now.  Can   16:30:14
everyone see this Google Maps aerial photo?

A    I cannot.

MS. BROWN:  I'm able to see it on my end.

MS. CARTER:  Ms. Young, can I ask what you see on your screen?

THE WITNESS:  I can see it now.

89

were able to see it.

          MS. CARTER:  I can see it.  The only

problem is that it doesn't include anything like        16:41:00

about -- you know, like a physical building or, you

know -- I know you said wall, but that could be any

wall.  And then you said officers and people.  It's

okay.  We'll try and figure it out later.  If we

can't, we can't.  No big deal.

          THE WITNESS:  Okay.

BY MS. CARTER:

     Q     Do you remember how long it took you to

drive home?

     A     Approximately 30 minutes.

     Q     Did you have any difficulties driving        16:41:31

home?

     A     I remember my eyes were still burning, but

that didn't prevent me from having the ability to

drive home safely.

     Q     Did you have any permanent or lasting

effect from the injury to your eyes?

     A     The burning lasted, I believe a few days,

but nothing beyond that.

     Q     And you had no other injuries, apart from   16:42:03

the burning eyes?

     A     Not that I can recall, no.

                                                        97

**D039**

talked about what had happened to him.

Q    Did he explain to you anything that happened to him?  Did he describe what his experience with the Compton protest was?

A    I believe we talked about that, yes, but I  16:51:58 don't remember the specifics.

Q    Did you tell him about your experience at the Compton protest?

A    I cannot recall if I told him about my experience.

Q    Is there any reason why you haven't seen him since late 2020 or early 2021?

MS. BROWN:  Vague and ambiguous.

THE WITNESS:  No.  He was a protester.  I haven't really spoken to any of the protesters that  16:52:27 I knew at that time since the protests for the most part.

BY MS. CARTER:

Q    Is there any reason why?

A    I knew these people.  I interacted with them in a protest capacity.  We did not have any reason to stay engaged further.

Q    Have you continued protesting at all since you lost contact with them?

A    I don't recall having attended any protests  16:53:00

105

Devon Young                                                          November 20, 2023

since that November.  To the best of my memory,
no.

Q    Since November 2021 -- you haven't attended
any since the November of 2020 protest?

A    To the best of my memory, no.

MS. CARTER:  Okay.  Let's go off the
record.  I think that's a good stopping point for
me.

(Recess from 4:53 p.m. through 5:16 p.m.)

BY MS. CARTER:

Q    Do you know a James Butler?                     16:53:25

A    I have met James, yes.

Q    How do you know James?

A    I met him at a protest.

Q    Which protest did you meet him at?

A    I believe the first time -- the first time    17:16:56
I remember seeing him at a protest was the original
Garcetti protest where I was arrested.  I don't
think that we met during that time.  I think that we
may have met for the first time at Grant Park, but I
cannot recall.

Q    Do you remember seeing him at the Compton
protest?

A    I remember knowing that he was one of the
protesters who was arrested, but I don't recall if I  17:17:27

106

that the sheriffs had done in the community, I never came across any reading that indicated that they had a mental health team that was trained to deal with matters without using force or weapons.

Q    Did you go looking for that information or it was just that you didn't come across it on your news feed or whatever you happened to be reading?

A    I went looking for the information, yeah.

Q    So you went looking to see if the Los Angeles Sheriff's Department had any kind of community outreach team, and you found out that they did not?

A    To the best of my knowledge, yes, that's what I found.

Q    Did you suffer any permanent or serious emotional or mental injury as a result of the Compton incident?

MS. BROWN:    Objection; calls for expert opinion, calls for speculation.

THE WITNESS:    Because I went to a trauma specialist therapist, I felt like for the most part the mental health issues that I experienced were not long-lasting past 2020.

BY MS. CARTER:

Q    When did you go to the trauma -- what did

145

you say?  Trauma specialist?  Is it called a trauma

specialist?  Is that --

A     That is the therapist I mentioned to you     18:12:58

earlier in the conversation.

Q    A trauma specialist therapist, when did you

go to the trauma therapist specialist?

A    I answered that earlier in the

conversation, but it was, I believe, after --

definitely after the Compton protest, but before the

November.  Somewhere in the summer.

Q    Did you pay for that?                          18:13:28

A    No.

Q    So you are not seeking any payment for

medical costs associated with going to see that

trauma specialist?

A    I am not, no.

Q    Did you seek any medical care after the

Compton incident?

A    No, I did not.

Q    Have you since found out that you need any    18:14:02

ongoing medical care as a result of what happened at

the Compton protest?

A    No.

Q    In this lawsuit, are you seeking to recover

any money for any future medical care?

146

A    No.

Q    Are you seeking to recover loss of earnings for anything that occurred during the Compton protest or after?                                                    18:14:29

A    No.

MS. CARTER:  I think I'm fairly close to done.

Do you guys mind if we take a five-minute break to make sure I didn't miss anything?          18:14:59

MS. BROWN:  Sure.  No problem.  So about 6:20?

MS. CARTER:  6:20 sounds good.  Thanks everybody.

(Recess from 6:15 p.m. through 6:21 p.m.)

MS. CARTER:  That concludes my questioning.  18:15:03

Counsel and I are going stipulate that a certified copy of this transcript can be used for    18:21:28 all purposes.

Counsel, do you agree with that?

MS. BROWN:  I do, yes.

We will stipulate that the witness' counsel shall maintain custody of the original transcript; that counsel will make it available for lodging with the Court for trial or any other purpose with reasonable notice.

147

Devon Young                                                        November 20, 2023

STATE OF CALIFORNIA          )
                             ) ss:
COUNTY OF ORANGE             )


         I, JOYCE GRIFFITH, do hereby certify:


         That I am a duly qualified Certified Shorthand

Reporter, in and for the State of California, holder of

certificate number 11010, which is in full force and

effect and that I am authorized to administer oaths and

affirmations;

         That the foregoing deposition testimony of the

herein named witness was taken before me at the time and

place herein set forth;

         That prior to being examined, the witness named

in the foregoing deposition, was duly sworn or affirmed

by me, to testify the truth, the whole truth, and

nothing but the truth;

         That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me, and were thereafter

transcribed under my direction and supervision;

         That the foregoing pages contain a full, true

and accurate record of the proceedings and testimony to

the best of my skill and ability;

150

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 8th day of January, 2024.

_____

JOYCE GRIFFITH, CSR No. 11010

151

677                                                                D039

Paul Hoffman SBN 71244
Michael D. Seplow SBN 150183
Aidan C. McGlaze SBN 277270
John Washington SBN 315991
SCHONBRUN SEPLOW HARRIS,
HOFFMAN & ZELDES LLP
9415 Culver Blvd, # 115
Culver City, CA 90232
t. 310-396-0731; f. 310 399-7040
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. amcglaze@sshhzlaw.com
e. jwashington@sshhzlaw.com

Colleen M. Mullen SBN 299059
EMPLOYEE JUSTICE LEGAL
GROUP
1001Wilshire Blvd.
Los Angeles, CA 90017
t. 213-382-2222
e. cmullen@ejlglaw.com

Rebecca Brown
NATIONAL LAWYERS GUILD
LOS ANGELES
3435 Wilshire Boulevard, Ste.
2910
Los Angeles, CA 90010
t. 860-944-5111
e. rebecca@nlg-la.org
*Attorneys for Plaintiffs.*

Carolyn Y. Park SBN 229754
LAW OFFICE OF CAROLYN PARK
595 Lincoln Ave., SUITE 200
Pasadena, CA 91103
t. 213-290-0055
e. carolynyoungpark@gmail.com

Arnoldo Casillas SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
t. 323-725-0350
e. acasillas@casillaslegal.com

Morgan E. Ricketts SBN 268892
RICKETTS LAW
3435 Wilshire Boulevard, Ste. 2910
Los Angeles, CA 90010
t. 213-995-3935
e. morgan@morganricketts.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| KRIZIA BERG, et al., | Case No.: 2:20-cv-07870-DMG-PD |
|---|---|
| PLAINTIFFS, | *Assigned to: Honorable Dolly M. Gee* |
| v. | |
| COUNTY OF LOS ANGELES, et al., | **PLAINTIFF DEVON YOUNG'S RESPONSE TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** |
| DEFENDANTS. | |

**D040**

**INTERROGATORY NO. 2:**

Identify all injuries claimed by you, as a result, of the allegations in the Complaint, by describing the nature of the alleged injury, how the injury occurred, and who, if any person, caused the alleged injury.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

On June 21, 2020, LASD deputies pointed a gun at Plaintiff and another woman and told them to move. The deputies forced them to exit through an area where deputies were firing less lethal weapons and deploying tear gas. Plaintiff inhaled so much gas that she could not breathe or see for several minutes. She experienced intense burning in her eyes and face. Volunteer medics helped flush water into Plaintiff's eyes until she was able to see again.

**INTERROGATORY NO. 3:**

Identify all persons with knowledge or information relating to all injuries, including physical, mental, and emotional injuries, you allegedly sustained, as a result, of the allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not aware of the identities of any individuals with such knowledge. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

///

///

///

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous as to whether it requests only recorded or documented statements, or all statements including oral and unrecorded statements, and to the extent it seeks unrecorded as well as recorded statements, it is overly broad. Plaintiff further objects to this interrogatory to the extent that it seeks information protected by the attorney/client and/or attorney work product privileges. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not aware of any such statements.

**INTERROGATORY NO. 6:**

Identify all healthcare professionals, including but not limited to physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, and other healthcare professionals with whom you consulted or from whom you received or sought treatment relating to any injuries you allegedly sustained as a result of allegations in the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff did not seek medical treatment for the injuries sustained as a result of the incident. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

///

///

///

**INTERROGATORY NO. 7:**

Identify the specific amounts of all economic injuries claimed by you as a result of the allegations in the Complaint, including, but not limited to, expenditures for medical, psychiatric, or psychological treatment; and lost income.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent it calls for an expert opinion. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not making a claim for lost income and/or future earning capacity. Plaintiff did not incur any medical expenses. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

List all medical expenses you have incurred in connection with any injury you suffered as a result of the incident.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff did not incur any medical expenses. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Identify all medical providers including, but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, acupuncturists, chiropractors, physician assistants, nurses, occupational therapists, hospitals, clinics and other

**D040**

healthcare professionals or centers, who have rendered any treatment, exams, or evaluations to you within the past ten (10) years.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify those providers who treated her for physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff did not receive any medical treatment stemming from the incident. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 10:**

Identify any other action in which you have alleged a violation of your civil rights or other allegedly improper government action and state all facts, in reasonable detail, on which you base the allegations, including the time, place, manner, and participants in each alleged violation.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff presumes that the term "any other action" refers to a separate lawsuit filed by Plaintiff. Plaintiff further objects to requiring her to "state all facts" related to her allegations as unduly burdensome, harassing, overly broad, and an improper use of interrogatories, especially since Defendants will have the opportunity to depose Plaintiff. *See Safeco of America v. Rawstron*, 181 F.R.D. 441, 447-48 (C.D. Cal.

**RESPONSE TO INTERROGATORY NO. 14:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Young is a plaintiff in *Black Lives Matter et al. v. City of Los Angeles et al.*, No. 2:20-cv-05027 CMB-AS. The case is currently pending.

**INTERROGATORY NO. 15:**

Identify each occasion on which you have given testimony or statements regarding the subject of this lawsuit.

**RESPONSE TO INTERROGATORY NO. 15:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not aware of having provided any testimony or statements regarding the subject of this lawsuit. Discovery is ongoing and Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 16:**

If you have applied for Medicare and/or Medicaid within the past ten (10) years, identify each state, city, or other jurisdiction that provided Medicare and/or Medicaid to you.

**RESPONSE TO INTERROGATORY NO. 16:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory to the extent that it violates the right to privacy and/or doctor patient privilege and/or seeks information that is neither relevant to this action, nor reasonably calculated to lead to the discovery of admissible evidence, nor

proportional to the needs of this case. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not seeking damages for medical costs in this action.

**INTERROGATORY NO. 17:**

If you have made a claim with any insurance carrier for physical, mental or emotional injuries within the past ten (10) years, identify each claim by date, injury, and insurance carrier.

**RESPONSE TO INTERROGATORY NO. 17:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Plaintiff further objects to this interrogatory on the grounds that it calls for information protected by the right to privacy and/or the doctor-patient privilege.    Subject to and without waiving the foregoing objections, Plaintiff will only identify claims relating to physical injuries to the same part of her body as the injuries she claims in this case, and providers who have treated her for the same or related psychological or psychiatric conditions she claims in this case, if any, and therefore responds as follows:

Plaintiff is not aware of any such claim.

**INTERROGATORY NO. 18:**

Identify the amount and source of all money, compensation, or payment of any kind you received from any source from the date of the incident alleged in the Complaint through and including the present in response to any complaint made regarding the allegations in the Complaint.

///

///

///

**RESPONSE TO INTERROGATORY NO. 18:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not making claims for lost wages and/or loss of future earnings.

**INTERROGATORY NO. 19:**

List every specific policy of the County of Los Angeles that you allege violated your constitutional rights in the incident alleged in your Complaint.

**RESPONSE TO INTERROGATORY NO. 19:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. . Plaintiff further objects on the grounds that contention interrogatories are premature, and Plaintiff should not be required to respond to them at this early stage in the litigation prior to depositions having been take. *See, e.g.*, *McCarthy v. Paine Webber Group, Inc.,* 168 F.R.D. 448, 450 (D. Conn. 1996); *In re Convergent Technologies Securities Litig.,* 108 F .R.D. 328, 338-39 (N.D. Cal. 1985); Fed. R. Civ. 33(c) (court may order that contention interrogatories not be answered until after discovery is completed or a pre-trial conference is held).

The term "specific policy" is vague and ambiguous and in responding to this interrogatory, Plaintiff is assuming that Defendant is referring to the LASD's alleged unconstitutional policies, customs or practice which pursuant to *Monell* as alleged in the operative complaint.

Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

As set forth in the operative Complaint, Plaintiff contends that her rights were violated by the LASD's unconstitutional policies, customs, and practices, including:

-14-

685    **D040**

c. The use of indiscriminate and unreasonable force against hundreds of protesters – hitting many protesters with batons, foam rounds, and/or "rubber bullets" and subjecting non-violent protesters to the indiscriminate use of pepper balls and tear gas, and flash bong grenade— so as to deter persons from seeking to exercise their first amendment rights.

**INTERROGATORY NO. 21:**

Do you attribute any loss of income or earning capacity to the incident?

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

No, Plaintiff is not seeking loss of earnings damages.

**INTERROGATORY NO. 22:**

State the date you returned to work at each place of employment following the incident.

**RESPONSE TO INTERROGATORY NO. 22:**

In addition to the general objections above, Plaintiff further objects to this interrogatory on the grounds that it is vague and ambiguous and overly broad. Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

Plaintiff is not seeking loss of earnings damages.

**INTERROGATORY NO. 23:**

For each and every one of your responses to Defendant's Requests for Admissions, Set One (propounded upon you concurrently herewith) that was not an

-17-

686                                                                    **D040**

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,

I, the undersigned attest as follows:

I am employed and reside in the County of Los Angeles, State of California. I am over the age of eighteen (18) and not a party to the within action, and that my business address is located within: Employee Justice Legal Group, at 1001 Wilshire Boulevard, Los Angeles, CA 90017. My electronic transmission service address is: ngarcia@ejlglaw.com.

On September 20, 2022, I served and delivered the document(s) described as:
**PLAINTIFF DEVON YOUNG'S RESPONSES TO DEFENDANT COUNTY OF LOS ANGELES' INTERROGATORIES, SET ONE** on all interested parties in this action by placing a true and correct copy thereof, enclosed and addressed as indicated:

**[ X ]**    **BY ELECTRONIC TRANSMISSION**: Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused a PDF version of the document(s) described above to be transmitted to the person(s) at their electronic notification address(es). I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[ X ]**    **BY MAIL** (CCP §§1013a, et seq.): I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

**[   ]**    **BY CERTIFIED MAIL** (C.C.P. §§1020, et seq.): I caused said document(s) to be deposited with the United States Mail, postage prepaid, return receipt requested, signed by address(es) that said documents were received.

**[   ]**    **BY PERSONAL SERVICE**: I caused to be delivered such document(s) by hand to the offices of the addressee(s) in the service list below.

**[   ]**    **BY FACSIMILE TRANSMISSION**: Through facsimile number (213) 382-2230 to the fax numbers listed herein. The facsimile machine I used complies with Court Rule 2.306. Pursuant to Rule 2.306, I received and printed a confirmation report of the transmission that showed the referenced document(s) transmitted complete and without error and a copy of the fax confirmation page is attached.

**[   ]**    **STATE**: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**[ X ]**    **FEDERAL**: I am employed by a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on, September 20, 2022, at Los Angeles, California.

_____
Neida Garcia

1
PROOF OF SERVICE                    **D040**