Paul Hoffman, SBN 71244
*hoffpaul@aol.com*
Michael D. Seplow, SBN 150183
*mseplow@sshhzlaw.com*
Aidan C. McGlaze, SBN 277270
*amcglaze@sshhzlaw.com*
John Washington, SBN 315991
*jwashington@sshhzlaw.com*
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
9415 Culver Blvd, # 115
Culver City, CA 90232
310-396-0731

Colleen M. Mullen, SBN 299059
*colleen@mcelroyparris.com*
MCELROY PARRIS TRIAL
LAWYERS, APLC
407 Bryant Circle, Ste. F
Ojai, CA 93023
805-272-4001

Arnoldo Casillas, SBN 158519
*acasillas@casillaslegal.com*
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., 3RD FLO,
Long Beach, CA 90807
323-725-0350

Morgan Ricketts, SBN 268892
*mricketts@hadsellstormer.com*
Rebecca Brown, SBN 336638
*rbrown@hadsellstormer.com*
HADSELL STORMER
RENICK & DAI LLP
128 N. Fair Oaks Ave.
Pasadena, CA 91103
(626) 585-9600

*Attorneys for Plaintiffs and Proposed Class.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRIZIA BERG, et al.<br><br>PLAINTIFFS,<br><br>v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>DEFENDANTS. | Case No.: 2:20-cv-07870-DMG-PD<br><br>**DECLARATION OF CAROL A. SOBEL IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**<br><br>Hearing Date:    January 23, 2026<br>Hearing Time:    9:30 a.m.<br>Courtroom:    8C |

## DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1.    I am an attorney admitted to practice before the Supreme Court of California and the United States District Court for the Central District of California, among other federal courts.  I have personal knowledge of the facts herein and, if called to testify to those facts, could and would do so competently.

2.    I graduated from law school and was admitted to practice in 1978. After 20 years with the ACLU Foundation of Southern California, I entered private practice in April of 1997.  My practice primarily involves complex civil rights litigation, focusing on the rights of homeless people, First Amendment rights and police practices.  Exhibit 1 is my resumé.

3.    I received many awards for my legal work over the years.  In 2008, I was named a California Lawyer of the Year (CLAY) for civil rights by California Lawyer Magazine.  That same year, I was also named as one of the Top 75 Women Litigators in California by the Daily Journal Corporation.  In 2007, I received an Angel Award from California Lawyer Magazine for pro bono work and was also named by the Daily Journal as one of the Top 100 Most Influential Lawyers in California.  In 2013 and again in 2014, I was named one of the top 50 women lawyers in Los Angeles.  I am named as a Superlawyer in the area of First Amendment or civil rights litigation consistently for more than a decade. Additional recognition of my legal work is set out in my attached resumé.

4.    For the six years prior to 1997, I was a Senior Staff Counsel in the legal department of the ACLU Foundation of Southern California.  During that time, I was responsible for preparing many of the fee motions in cases where the ACLU represented the prevailing party.  Because the ACLU does not bill clients on an hourly basis for its services, I was required to obtain information to establish reasonable market rates for the ACLU lawyers.  It was my practice to obtain current billing rates for lawyers of comparable skill and experience at several firms

1

throughout the City.  I did this on an annual basis, contacting partners familiar with the ACLU lawyers in question so that they could assess the comparable skill levels of attorneys at their firms to establish ACLU billing rates.  At the time that I consulted these individuals, I was aware that the partners had been personally involved in pro bono litigation with the ACLU and worked directly with the ACLU lawyers for whom I sought to establish market billing rates, so they were able to assess the skill and experience of the ACLU lawyers.

5.      As a sole practitioner, I assess a reasonable market rate by comparison to lawyers of comparable skill and experience at other firms in the Los Angeles area, as I did when I was at the ACLU.  Since entering private practice, I continue to survey firms each year to obtain relevant information for rates.  As part of my survey, I obtain information concerning rates for attorneys in larger law firms engaged in complex litigation, as well as smaller boutique civil rights law firms.

6.      I also review fee applications and awards in other cases than my own.  Specifically, I regularly review fee applications submitted by, and awards to, private attorneys practicing civil rights law, as well as court awards to the ACLU, Disability Rights Legal Center ("DRLC"), Public Counsel,  Western Center on Law and Poverty ("WCLP"), and other public interest groups in Los Angeles.  Because many cases brought by public interest groups are co-counseled by attorneys at private commercial firms, I see those billing rates as well.

7.      When I become aware of a case where statutory fees are sought, I obtain fee applications and any resulting awards from on-line public records for the courts, as well as from legal research databases such as LEXIS and Westlaw.  Included in my review of fee applications and awards are those by, and awards to, large firms engaged in complex litigation to assess customary billing rates for these firms.  Many of these commercial firms also serve as pro bono counsel on occasion.  I estimate that I review around 100 or more fee motions, supporting declarations and fee awards annually and have done so for more than 30 years.  If I am preparing

a declaration for a specific jurisdiction, I search for recent fee awards for comparably skilled and experienced attorneys in that legal market.

8. I do not charge for a fee declaration, although I do suggest that the attorneys in private civil rights practices donate to a non-profit legal organization.

9. I believe I am extremely qualified to provide declarations for the civil rights bar and the non-profit legal community based on my work at the ACLU and in private practice, my adjunct teaching at Loyola Law School for 18 years, and my role in organizing large-scale legal actions. For example, at the request of the ACLU of Georgia, I organized representation for nearly 1,000 Mariel Cubans in immigration hearings after they were transferred to federal prisons in Southern California following an uprising over conditions and prolonged detention at the Atlanta Federal Penitentiary in the late 1980s. Ultimately, the USC Criminal Law Clinic took over responsibility; however, in the initial rounds of hearings, I recruited and supervised dozens of law students from UCLA, Loyola and USC in representing the Mariel Cubans at administrative hearings. Many of these students are now employed at various public interest and civil rights groups in Los Angeles.

10. I also organized attorneys and students to represent about 5,000 high-school students in Southern California charged in juvenile court as truants for walking out of school to protest the proposed Sensenbrenner immigration bill in Congress in 2005. Through all this work, I am familiar with a significant portion of civil rights and public interest law lawyers in Los Angeles and am able to assess their skill, experience and reputation based on my interactions with them.

11. In addition, unlike most other attorneys providing "expert" evidence of market rates, I have extensive experience in a broad range of civil rights litigation, including, among other areas, Public Records Act Requests, employment law, First Amendment Church/State law, free speech and assembly, anti-SLAPP litigation, homelessness litigation, excessive force, false arrest and class actions. As my resumé demonstrates, I successfully brought landmark cases in these and

other civil rights subject areas, including a state-wide class-action on behalf of women's health-care providers in California against the anti-abortion group Operation Rescue. *National Abortion Federation, et al. v. Operation Rescue, et. al.*, 8 F.3d 680 (9th Cir. 1993).  Many of these cases required novel approaches and became models for attorneys challenging similar issues around the country.

12.    For example, in *Jones v. City of Los Angeles*,  2014 U.S. App. LEXIS 6640 (9th Cir. Apr. 10, 2014), (subsequent citation on vacatur upon settlement omitted), first filed in 2003, the groundwork was laid for *Martin v. City of Boise,* 920 F.3d 584 (9th Cir. 2019).  When *Jones* was filed, I faced three cases in the Ninth Circuit and one at the California Supreme Court, as well as multiple lawsuits across the country, all unsuccessful in striking policies criminalizing homelessness and replicating *Pottinger v. City of Miami*, 720 F. Supp. 955 (S.D. Fla. 1989), *aff'd*.  40 F.3d 1155 (11th Cir. 1994).  Although the *Jones* case has now been rejected by the Supreme Court in *Grants Pass v. Johnson*, 603 U.S. 520 (2024), the legal theory I developed to protect the rights of unhoused persons was successfully applied around the country for more than two decades.

13.    In *National Abortion Federation*, the district court dismissed the action pursuant to *Bray v. Alexandria Clinic,* 506 U.S. 263 (1993), holding the first two clauses of the Ku Klux Klan Act, 42 U.S.C.S. § 1985 did not state a claim for relief.  The Circuit reversed and remanded, finding the district court erred in denying Plaintiffs' move to amend to add a claim under 42 U.S.C.S. § 1985(3), the "hindrance" clause. 8 F.3d at 685-87.

14.    My declarations in support of fee applications for civil rights and public interest attorneys have been cited repeatedly by courts as evidence of reasonable market rates. My declaration was cited favorably in support of an award of fees in *HIT & MISS ENTERPRISES, INC.,* Case 2:18-cv-09996-WLH-SSC, [Doc. 138] (C.D. Cal. Feb. 11, 2025).  In September 2023, my declaration was cited with approval for both rates and methodology in an award of attorney fees in

*Mickail Myles v. County of San Diego*, Case No. 3:15-cv-01985-JAH-BLM (S.D. Cal. 2023). [Doc. 484, p.7]. The motion in *Myles* was filed in late 2022 in San Diego.   Earlier in 2023, my declaration was cited with approval in *Valenzuela v. City of Anaheim*, Case No. SACV 17-00278-CJC (DFMx) (C.D. Cal. 2023) [Dkt. 462], and the companion case of *Craig v. City of Anaheim,* SACV 17-02094-CJC (DFMx) (C.D. Cal. 2023) [Dkt. 280], on behalf of the Galipo law firm.   My declaration was also cited with approval in *D. R., a minor v. Redondo Beach Unified School District*, Case No. 21-56033 (9th Cir. Aug. 2023).  In *Nadarajah v. Holder*, 569 F.3d 906, 912-914 (9th Cir. 2009), the Ninth Circuit referenced my declaration with approval in support of attorney's fees for the ACLU under the Equal Access to Justice Act ("EAJA").   In *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (C.D. Cal. 2008), granting IDEA fees pursuant to 20 U.S.C. §1415(i)(3)(c), the Court cited my declaration as persuasive evidence of market rates.  In *Atkins v. Miller*, CV 01-01574 DDP (C.D. Cal. 2007), Judge Pregerson cited my declaration and that of Barry Litt to support the requested rates.  *Id.* at pp. 8-9 and n.4.  Additional cases in which my declaration was cited favorably include, among others, *Charlebois v. Angels Baseball LP*, SACV 10-0853 DOC (C.D. Cal. May 30, 2012); *Orantes-Hernandez v. Holder*, 713 F. Supp. 2d 29,963-64 (C.D. Cal. 2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013), *Hiken v. DOD*, 836 F.3d 1037 (9th Cir. 2016); *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Cal. 2011); *Rauda v. City of Los Angeles*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. 2010); *Jochimsen v. County of Los Angeles*, *supra*; *Dugan v. County of Los Angeles,* cv-11-08145 CAS (C.D. Cal. Mar. 3, 2014); *Flores v. City of Westminster*, SA-CV-11-0278 DOC (C.D. Cal. Oct. 23, 2014); *Xue Lu v. United States*, 2014 U.S. Dist. LEXIS 77789 (C.D. Cal. May 23, 2014); *Wagafe v. Trump*, Case 2:17-cv-00094-RAJ [Doc. 223] (W.D. Wash. 02/27/19);  *Webb v. Officer J. Ackerman*, 13-cv-01992 PLA (C.D. Cal. Jan. 4, 2018) [Doc. 180, p.5]; and  *Carrillo v. Schneider Logistics,*

awarding fees in Circuit Case No. 12-55042 (9th Cir. Apr. 2014), following the affirmance of a preliminary injunction (*See* 501 Fed. Appx. 713, 2012 U.S. App. LEXIS 26601 (9th Cir. Dec. 28, 2012); and *Gomez-Sanchez v. Barr, sub nom Gomez-Sanchez v. Sessions,* 892 F.3d 985 (9th Cir. 2018), awarding EAJA fees to the ACLU.  In *Jochimsen*, a unanimous court held I was qualified as an expert on market rates in California.

15.    I also litigated statutory fee issues at the appellate level in several cases, including *Tipton-Whittingham v. City of Los Angeles*, 34 Cal. 4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal. 4th 533 (2004), affirming continued vitality of the "catalyst" fee doctrine in California and affirming a nearly $2 million fee award in 1999 in a multi-plaintiff sexual discrimination/harassment lawsuit on behalf of female employees of the Los Angeles Police Department.  I was co-counsel in that case with attorneys Connie Rice and Barry Litt.  I was also counsel in *Jones v. City of Los Angeles*, 555 Fed. Appx. 659 (9th Cir. 2014), establishing entitlement to fees as a "prevailing party" based on the Circuit's necessary approval of a settlement that was, in turn, conditioned on vacatur of the panel decision.

16.    I provide training on attorney fees best practices for civil rights and public interest firms, including the Legal Aid Foundation of Los Angeles and the ACLU. I also have done CLEs on attorney fees for the National Lawyers Guild and the National Police Accountability Project.

17.    In addition, I have considerable experience reviewing and analyzing billing records in my own cases and in cases for which I provide a supporting declaration on the reasonableness of rates or hours.  Many of these cases involve multiple attorneys and law offices.  In my own cases, I am usually the attorney who conducts a review of all of the fee records and exercises billing judgment to eliminate any impermissible hours.  This includes, among other issues, eliminating clerical tasks, unnecessarily duplicative items,

6

improperly billed items and vague items.  For example, in the *Tipton-Whittingham* case cited above, it was my responsibility to review the fee records covering six years of work for attorneys from three firms: the ACLU, the Western Regional Office of the NAACP Legal Defense Fund, and Litt & Associates.  The unadorned lodestar in *Tipton* was approximately $1,900,000.

18.    In *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, involving a police assault on a lawful demonstration in MacArthur Park on May Day, 2007, I performed a billing judgment on the fee records for all attorneys and support staff in the case.   Because the case was a hybrid class action, with both 300 individual plaintiffs and a residual class of several thousand persons, the legal team was sizable.  The fee approved in the case 25 years ago was $3,713,000.

19.    In all the fee declarations I prepare, I apply my understanding of the decision in *Blum v. Stenson*, 465 U.S. 886 (1984), that "rates charged in private representations may afford relevant comparisons." *Id.* at 895 fn. 11.  I understand this to mean that fees for civil rights lawyers should approximate the rates charged by attorneys of comparable skill, experience and reputation in the relevant legal market, who are engaged in similarly complex litigation, regardless of whether the attorneys work for a non-profit, represent individuals on contingency, serve as in-house counsel, or charge a minimal rate with the possibility of receiving a market rate award if successful. *See Nadarajah,* 569 F.3d at 910.

20.    I apply several additional principles to assess market rates.  First, when available, I look at rates awarded to the attorneys in previous cases because I understand such awards are viewed as strong evidence of reasonable market rates. *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1111 (9th Cir. 2014); *U.S. v. $28,000 in U.S. Currency*, 802 F.3d 1100, 1106 (9th Cir. 2015); *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 976 (9th Cir. 2008). Past decisions where "a lawyer charges a particular hourly rate, and gets it, is evidence bearing on what the market rate is, because the lawyer and his clients are part of the market." *Carson v.*

*Billings Police Dept.*, 470 F.3d 889, 892 (9th Cir. 2008).

21.    Next, I look to billing rates by attorneys engaged in similarly complex litigation as an approved method of setting market rates for civil rights attorneys who do not bill on an hourly basis.  *See Blum*, 465 U.S. at 895; *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (approving use of declarations of other attorneys regarding prevailing rates in the relevant market and rates in other cases). I understand the market rate comparison "extends to all attorneys in the relevant community engaged in equally complex Federal litigation, no matter the subject matter." *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (internal quotation omitted).

22.    When the specific rate evidence identified in the preceding paragraph is available, I usually do not rely on surveys because, in my opinion, they do not meet the standards for the lodestar analysis.  In my experience, fee surveys report market rates in sweeping categories with no identification of the comparable skill, experience and reputation of the individual attorneys included in the survey and often no indication of the relevant legal market.  *See, e.g., Shirrod v. Director, Office of Workers' Compensation Programs*, 809 F.3d 1082, 1089 (9th Cir. 2015) (reversing where the lower court relied on a national survey rather than local rates).

23.    I do not apply rates billed by and paid to opposing counsel who are usually salaried, contract government attorneys, or retained insurance defense lawyers as they generally charge rates well below market and are paid win or lose, so they do not share the risk of fee-shifting statutes and other contingent fees.  *See e.g., Shapiro v. Paradise Valley Unified School Dist.*, 374 F.3d 857, 866 (9th Cir. 2004) (government lawyers and retained defense attorneys generally bill at lower rates, so they do not reflect the same legal market).

24.    Finally, I apply the rule that the relative "simplicity" or "complexity" of a case is reflected in the hours, not the lodestar rate. *See Van Skike v Director, Office of Workers' Compensation Programs,* 557 F.3d 1041, 1046 (9th Cir. 2009).

25.    The most important factors in determining reasonable market rates are skill and experience.  The size of the firm is not a determinative factor.  In *Davis v. City & County of San Francisco*, 976 F.2d 1536, modified on other grounds, 984 F.2d 345 (9th Cir. 1993), the Court upheld rates for sole practitioners and non-profit law firm staff at those charged by "corporate attorneys of equal caliber." *Id.* at 1545; *see also Auer v. Robbins*, 519 U.S. 452 (1997) (market rates for comparably skilled attorneys not reduced based on firm size).

26.    To support my opinion on the reasonableness of the fees sought by this motion, I attach fee awards and declarations in cases in the Los Angeles legal market. Each is a true and correct copy of the document available in the Court's files.  Some are now several years old, so they do not reflect current rates. In *Hiken v. DOD*, the court noted that "market rates in effect more than two years *before* the work was performed" are not current lodestar rates. 802 F.3d at 1107 (9th Cir. 2016) (emphasis in original).  To adjust for rates more than two years old, I apply a minimum of a 3.1 percent increase, which was the average legal services component increase in the Consumer Price Index for Los Angeles before the pandemic.  *See*  http://www.bis.gov/news.release/cpi.102.htm  (Table2.Consumer Price Index for All Urban Consumers (CPI-U): U.S. city average by detailed expenditure category).  For the last two years, I have used a slightly higher increase of five percent to reflect a rise in inflation rates.  Even that is below what I observed for increases in the Los Angeles legal market at firms doing complex litigation.

27.    My rate is well below attorneys with far less experience at large commercial firms.  My 2025 rate is $1,425 an hour. That is slightly above the "discounted" rate the City of Los Angeles is paying to attorneys with one to three years of experience at Gibson Dunn & Crutcher for representation in *LA Alliance v. City of Los Angeles*, Case No. 2:2—cv-02291-DOC-KES, currently pending before the Honorable David O. Carter.  *See* Exhibit 4.  The customary billing rate for an attorney at Gibson Dunn with approximately 16 years of experience is listed

as $2,110. *Id.* The 2025 customary billing rate for a 7-year associate is $1,555.00.

28.    I have not filed a contested fee motion in several years other than to seek Court approval of the fees in class-action settlements, or to settle non-class cases. In 2024, the Court approved the rate of $1,325 an hour for me in granting final approval of a class action against the City of Santa Monica arising from the 2020 George Floyd protests. *Black Lives Matter, et al. v. City of Santa Monica, et al.,* 2:21-cv-05253-CAS-AJR [Doc 64].

29.    In 2022, the Court approved a rate of $1,150 an hour for me in *Shawn Carroll, et al. v. County of Orange, et al.*, Case No. 8:19-cv-00614 DOC-DFM (C.D. Cal.), a class-action challenging Orange County's regulations for determining eligibility to qualify for General Relief. [Doc. 40, p.5]. In the same case, the Court approved the 2022 rate of $650 an hour for my co-counsel, Brooke Weitzman, then with 8 years of experience.

30.    In May 2019, I used the rate of $1050 an hour for the fees in *Mitchell v. City of Los Angeles*, Case No. 2:16-cv-01750-SJO-JPR (C.D. Cal.) and for a lodestar cross-check in a class action, *Chua v. City of Los Angeles*, Case 2:16-cv-00237-JAK-GJS (C.D. Cal.). Prior to 2019, I resolved attorney fees in several cases at rates of $900 and $975 an hour. My last court awarded fee in a contested motion was $875 an hour in 2014 in *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015).

31.    I understand fees are sought by this motion for attorneys and paralegal staff. The chart of personnel and rates is set out below for each person on whose behalf the motion is filed.

| Paul Hoffman | 49 (1976) | $1,475 |
| Michael Seplow | 35 (1990) | $1,300 |
| Aidan McGlaze | 17 (2007) | $1,100 |
| Morgan Ricketts | 16 (2009) | $1,050 |
| Colleen Mullen | 11 (2014) | $ 900 |

| John Washington | 8  (2017) | $  850 |
|---|---|---|
| Rebecca Brown | 5  (2021) | $  650 |
| Carlos Gallegos | Paralegal | $  300 |

32.    I am familiar with all the attorneys for whom fees are sought by this motion and believe them to be highly experienced and skilled.  I know Mr. Hoffman the longest and worked with him when we were both at the ACLU.  We currently are co-counsel on several cases, along with Michael Seplow and John Washington. Ms. Mullen was a student in the civil rights practicum I co-teach at Loyola Law School and worked at my office after her graduation. I am aware that Aidan McGlaze did not practice for one year between leaving his prior firm and joining Schonbrun Seplow Harris & Hoffman.  I analyzed the reasonableness of his requested rate by applying 17 years of experience for him.  I worked with Rebecca Brown when she was a fellow at the National Lawyers Guild and also participated in a moot court for her and was able to observe her skills. Morgan Ricketts and I worked together when we had companion cases arising from the Ferguson protests in 2014. I had the chance to observe her argue before the Ninth Circuit.  I also have observed her in trial.

33.    Attached to my declaration are several exhibits setting out rates for attorneys in the Central District legal market.  Each exhibit is a true and correct copy of the document as it appears on the official Court websites, is published on LEXIS or Westlaw, or on an official government website.

34.    In my experience, the rates for counsel in this matter are well within the market rate for attorneys of their skill, experience and reputation in the public interest legal community but well below rates for comparably skilled and experienced attorneys at large firms engaged in similarly complex litigation in the Los Angeles legal market.

35.    Attached at Exhibit 2 is the order approving fees in *Logan v. Country Oaks Partners, LLC*, 20STCV26536 (LASC Nov. 6, 2025).  The Court approved fees for, among others, attorneys Matthew Borden and Kory DeClark, partners at the law firm Braun Hagey & Borden, a San Francisco-based firm.  I am very familiar with the attorneys and currently serve as co-counsel with them on *Los Angele Press Club v. Noem*, Case No. 2:25-cv-05563-HDV-E (C.D. Cal.), challenging the use of force by federal agents against protestors and journalists at recent protests against immigration enforcement in Southern California.

36.    The 2025 rate approved for Matthew Borden is $1,550 per hour.  I understand he is a 2001 graduate.  The rate approved for Kory DeClark is $875 an hour.  I understand that he is a 2015 graduate. Mr. Borden's 2025 approved rate is higher than Paul Hoffman's and Michael Seplow's, both of whom have significantly more experience.   Mr. DeClark's rate of $875 supports the reasonableness of the rate of $900 an hour for Colleen Mullen and $850 an hour for John Washington.

37.    Attached at Exhibit 3 is the fee award in *Clinicomp Interna tional, Inc. v. Cerner Corporation*, Case No. 3:37-CV-02479- GPC-DEB. Jared Bobrow, the lead attorney on the case, practices in Orrick's Northern California office and the motion was filed in the Southern District of California.  In my experience, the rates approved in the Southern District are generally about 10 percent below Central District rates.  The rates in the Northern District are comparable to those in the Central District.

38.    Orrick's customary 2022 rate for Jared Bobrow was $1,465.  Based on my review of his biography on the firm's website, I believe he is a 1986 law school graduate.  The 2022 rate for Diana Rutkowski, a 2004 law school graduate, was $1,120 an hour.  In 2022, Ms. Rutkowski one year more of experience as Aidan McGlaze has in 2025.  His requested rate is only $30 an hour above the rate approved for Ms. Rutkowski three years ago. The 2022 rate for Jason Yu, a 2009

law school graduate, was $1,055 an hour.  That is essentially the same rate now requested for Morgan Ricketts with three years more experience. The 2022 rate approved for Ben Austin, a fourth-year associate, was $805 an hour. Ex. 3, ¶28.

39.    With 36 years of experience, Mr. Bobrow's 2022 rate is only $10 an hour below Mr. Hoffman's requested 2025 rate.  Similarly, Jason Yu's 2022 rate of $1,055 is essentially the same as the 2025 rate for Morgan Ricketts, who has three additional years of experience.  Mr. Austin's 2022 rate of $805 an hour is significantly above the rate requested for Rebecca Brown, who has one additional year of experience.

40.    Attached at Exhibit 4 is the recent fee award by Judge Marshall to the law firm of Hadsell, Stormer, Renick and Dai in *Pineda v. City of Los Angeles*, Case 2:21-cv-06470-CBM-AS (C.D. Cal. April 19, 2024) [Doc. 195]. I am very familiar with each of these attorneys. The motion was filed in 2023, seeking 2023 market rates. The Court approved $1,400 an hour for attorney Dan Stormer, $915 an hour for Morgan Ricketts, $800 an hour for Shaleen Shanbhag and $700 an hour for David Washington. Ex. 4, pp. 3,4.

41.    As the Court's order notes, Mr. Stormer was practicing 49 years in 2023. Ex. 4, p.6. The Court also noted that he received fees in 2024 at $1500 an hour in *Pederson, et al. v. The County of Plumas*, 2:89-1659 (E.D. Cal. Filed Dec. 4, 1989).  *Id.*  Mr. Hoffman's requested 2025 rate is only $25 an hour above the 2023 rate approved for Dan Stormer.

42.    Ms. Ricketts was noted to be a 2009 law graduate. Ex.4, p.7.  Ms. Shanbhag is listed as a 2014 law graduate. *Id.* With nine years of experience, her 2023 rate of $800 an hour is only $25 below the rate requested for Ben Shaw. Mr. Shaw has one year less experience than Ms. Shanbhag had in 2023. Even applying a modest annual increase of 5 percent, Ms. Shanbhag's increase over two years would bring the 2023 billing rate for an attorney with 9 years of experience in the

13

range of $882 an hour, supporting the reasonableness of the 2025 rate of $850 an hour for John Washington.

43.    Exhibit 5 is a true and correct copy of the contract between the City of Los Angeles and the law firm of Gibson, Dunn & Crutcher in *Los Angeles Alliance for Human Rights, et al. v. City of Los Angeles, et al.,* 2:20-cv-02291-DOC-KES.  At p. 23, the contract sets out Gibson Dunn's standard billing rates for 2025 and its discounted rates for this litigation. I am very familiar with the litigation in the case and represent an intervenor.

44.    Across the board, the standard billing rates for Gibson are far higher than the rates sought by this motion. To illustrate, the lead Gibson partner on the case is Theane Evangelis. Her standard rate for 2025 is $2,425 and her discounted rate is $1,295.00. Ex. 5, Ex. B, p. 23.  Although I do not know her personally, I read a number of briefs she wrote and watched her argument before the Supreme Court in *Grants Pass v. Johnson*, 603 U.S. 520 (2025).  Based on my review of her profile on the firm's website, I believe she is a 2003 graduate, now with 22 years of experience.  Her standard 2025 rate is $1,000 an hour above the rate for Mr. Hoffman and $1,125 an hour above the rate for Mr. Seplow. Indeed, Ms. Evangelis' "discounted rate" is only $5 an hour below the rate requested for Mr. Seplow, who has a decade more experience.

45.    As another point of comparison in Exhibit 5, the standard 2025 billing rate for Bradley Hamburger is $2,110 an hour, nearly $1,000 an hour above the rates requested for Aidan McGlaze and Morgan Ricketts. *Id.* I reviewed Mr. Hamburger's listing on the firm's website and, on that basis, believe he is a 2009 law graduate, the same year as Morgan Ricketts. Mr. Hamburger has one year less experience than Aidan McGlaze.

46.    Finally, in Exhibit 5, Gibson's standard rate for a seventh-year associate is $1,555 an hour, nearly twice the rate for John Washington.

47.    In *Herring Networks v. Rachel Maddow*, Case No. 19-cv-1713 BAS-AHG (S.D. Cal. 2020), Gibson Dunn submitted the declaration of Scott Edelman, listing the firm's customary billing rates in the Los Angeles legal market. A true and correct copy of the Edelman Declaration is attached at Exhibit 6. The *Herring Networks* case was an anti-SLAPP lawsuit in the Southern District of California. The motion sought fees for Nathaniel Bach, then a senior associate in the Los Angeles office at Gibson Dunn, at his customary 2019 rate of $915 an hour and his 2020 rate of $960 an hour. Ex. 6, pp. 5-6. I reviewed Mr. Bach's listing on the websites for the State Bar and his current firm and, on that basis, concluded that he is a 2006 law graduate. In 2020, the year of the *Herring* award, Mr. Bach had 14 years of experience. Although the Court in *Herring* reduced Mr. Bach's rate to align with local market rates in San Diego, more recent awards to Mr. Bach are Los Angeles market rates and support the reasonableness of the rates in this motion.

48.    Attached at Exhibit 7 is the declaration of Nathaniel Bach submitted in support of an award of fees in *Tracy Anderson Mind and Body, LLC v. Megan Roup*, et al., Case No. 2:22-cv-04735-PSG-E (C.D. Cal. 2023), an anti-SLAPP case. In his declaration, Mr. Bach set out his standard 2022 rate of $960 an hour and his standard 2023 rate of $1,065 an hour, an increase of approximately 12 percent annually. Ex. 7, p. 5. In 2023, Mr. Bach had 17 years of experience, one year more than Morgan Ricketts has in 2025. Mr. Bach's 2023 rate of $1,065 is slightly above the 2025 rate requested for Ms. Ricketts.

49.    Among the other attorneys at Manatt for whom fees were sought in Exhibit 7 was Andrea Gonzalez. Her 2022 rate was $620 an hour and her 2023 rate was $655 an hour. *Id.* I reviewed Ms. Gonzalez's listing on the firm's website and, on that basis, believe she is a 2020 graduate of UCLA Law School. In 2023, Ms. Gonzalez had two years less experience than Ms. Brown has now.

50.    The Manatt firm was also awarded fees at the 2022 rate of $395 an hour and the 2023 rate of $455 an hour for a "Practice Support Specialist," which I

15

understand to be a term describing an experienced paralegal. *Id.*, pp. 5-6. These rates are well above the requested rates for paralegal time sought by this motion.

51. Attached at Exhibit 8 is the 2024 order of final approval by Judge Snyder in the class action against the City of Santa Monica arising from the 2020 George Floyd protests. *Black Lives Matter, et al. v. City of Santa Monica, et al.,* 2:21-cv-05253-CAS-AJR [Doc 64], filed October 22, 2024. Among the attorneys for whom fees were approved were Paul Hoffman at the 2024 rate of $1,425 an hour. His requested 2025 rate is a four percent increase over his approved 2024 rate. In the same order, John Washington was approved at $770 an hour. His requested rate in this motion is approximately 10 percent above the rate approved for hm in 2024. While a bit higher than some of the other annual increases, the rate is well within the range of rates for similarly skilled attorneys as illustrated by the rates approved in the attached exhibits.

52. In Exhibit 8, Erin Darling was also approved at the 2024 rate of $975 an hour. I have known Mr. Darling since he was a law student and, based on my personal knowledge, believe him to be a 2008 graduate. In 2025, Morgan Ricketts has the same amount of experience as Mr. Darling had in 2024. Her requested rate reflects an increase of approximately seven percent above Mr. Darling's 2024 rate.

53. Attached at Exhibit 9 is the Order awarding fees in *Paolo French v. City of Los Angeles* (*French II*), Case No. EDCV 20-0416 JGB (SPx) (C.D. Cal. 2024). Doc. 188]. The 2024 award followed the City's unsuccessful appeal to the Ninth Circuit. The Court approved the 2024 rate of $1400 an hour for Dale Galipo, $975 an hour for John Fattahi and $800 an hour for Eric Valenzuela. *Id.* at 5-6. As the Court's Order notes, I filed a supporting declaration on market rates. I am personally familiar with Mr. Galipo and Mr. Fattahi and am aware that Dale Galipo has been practicing law since 1988 and Mr. Fattahi since 2006. Based on my review of the State Bar website, I believe Eric Valenzuela was admitted in 2012.

54.    Mr. Galipo's 2024 rate is approximately five percent below the 2025 rate for Mr. Hoffman. In 2024, John Fattahi had one year more of experience than Aidan McGlaze has now.

55.    Attached at Exhibit 10 is a rate sheet filed by Robbins Geller Rudman & Dowd, a nationally recognized class-action litigation firm.  Over the years, I have known several attorneys at the firm. In an anti-SLAPP case against Trump University where Robbins Geller represented the prevailing defendants, I provided a declaration on the reasonableness of the hours incurred in defeating the SLAPP lawsuit. The 2024 rates set forth in Exhibit 10 were provided for a lodestar crosscheck in *Dicker v. TuSimple Holdings, Inc., et al.,* Case No. 3:22-cv-01300 BEN-MSB. *See* 2024 U.S. Dist. LEXIS 232627 (CA SD 12 18 24).

56.    The approved 2024 rates in Exhibit 10 include $1,075 an hour for Danielle Myers.  I reviewed Ms. Myers' biography on the firm's website and on that basis believe she is a 2008 law graduate. In 2024, Ms. Myers had the same amount of experience as Morgan Ricketts has in 2025.

57.    The approved rates in Exhibit 10 also include $1400 an hour for Darren Robbins, listed on the firm's website as a 1993 law graduate. With three years more experience, Mr. Seplow's 2025 rate is below Mr. Robbins' 2024 rate.

58.    Attached at Exhibit 11 is an excerpt for Los Angeles from the 2024 Real Rate Report for Los Angeles. I am aware that many judges in the Central District consider the Report to be a "useful guidepost" for evaluating rates in the Central District. *See e.g., Sarabia v. Ricoh USA Inc,* Case No. 8:20-cv-00218-JLS-KES, 2023 WL 3432160, *8 (C.D. Cal. May 1, 2023); *Tracy Anderson Mind & Body, LLC v. Roup*, Case No 2:22-cv-04735 PSG (Ex). 2023 U.S. Dist. LEXIS 189055, *6 and Exhibit 6. I did not apply the Report's analysis of rates by size of the firm because that comparison is not relevant to Section 1988 fee awards. *See Auer v. Robbins*, 519 U.S. 452 (1997) (market rates for comparably skilled attorneys not reduced based on firm size).

17

59.   Last year, the median rate for an attorney with between three and seven years of experience was $755 an hour. Ex. 11.  The Third Quartile rate for an attorney with three to seven years of experience was $962 an hour. The 2025 rate for Rebecca Brown is significantly below the median and third-quartile 2024 rates.  As Exhibit 11 establishes, the rates for comparably skilled and experienced attorneys in the Los Angeles legal market was roughly the same across a number of practice areas.  The 2024 median rate for a partner in Los Angeles was $1,123 and the third quartile was $1,410. Ex. 11, p.

60.   The chart below sets out the rates referenced in my declaration.

| Ex. | Attorney | Graduation | Award | Years | Rate |
|---|---|---|---|---|---|
| 2 | Matthew Borden | 2001 | 2025 | 14 | $1,555.00 |
| 2 | Kory DeClark | 2015 | 2025 | 10 | $  875.00 |
| 3 | Jared Bobrow | 1986 | 2022 | 36 | $1,465.00 |
| 3 | Diana Rutkowski | 2004 | 2022 | 18 | $1,120.00 |
| 3 | Jason Yu | 2009 | 2022 | 13 | $1,055.00 |
| 3 | Ben Austin | 2018 | 2022 | 4 | $  805.00 |
| 3 | Orrick paralegals | n/a | 2022 | n/a | $ 415-495 |
| 4 | Dan Stormer | 1974 | 2023 | 49 | $1,400.00 |
| 4 | Morgan Ricketts | 2009 | 2023 | 14 | $  915.00 |
| 4 | Shaleen Shanbhag | 2014 | 2023 | 9 | $  800.00 |
| 4 | David Washington | 2015 | 2023 | 8 | $  700.00 |
| 5 | Theane Evangelis | 2003 | 2025 | 22 | $2,425.00 |
| 5 | Marcellus McRae | 1988 | 2025 | 37 | $2,245.00 |
| 5 | Bradley Hamburger | 2009 | 2025 | 16 | $2,110.00 |
| 5 | 7th Year Associate | 2018 | 2025 | 7 | $1,555.00 |
| 5 | Gibson Dunn Paralegals | n/a | 2025 | n/a | $  820.00 |
| 6 | Nathaniel Bach | 2006 | 2020 | 14 | $  960.00 |

| 7 | Nathaniel Bach | 2006 | 2023 | 17 | $1,065.00 |
| 7 | Andrea Gonzalez | 2020 | 2023 | 3 | $ 655.00 |
| 7 | Practice Support Specialist | Paralegal | 2023 | n/a | $ 455.00 |
| 8 | Erin Darling | 2008 | 2024 | 16 | $ 975.00 |
| 8 | Paul Hoffman | 1976 | 2024 | 48 | $1,425.00 |
| 8 | John Washington | 2017 | 2924 | 7 | $ 770.00 |
| 9 | Dale Galipo | 1988 | 2024 | 36 | $1,400.00 |
| 9 | John Fattahi | 2006 | 2024 | 18 | $ 975.00 |
| 10 | Darrell Robbins | Attorney | 2024 | 31 | $1,400.00 |
| 10 | Danielle Myers | Attorney | 2024 | 16 | $1,075.00 |
| 10 | Paralegals | Paralegal | 2024 | n/a | $360-410 |
| 11 | Real Rate Report | associate | 2024 | 3-7 | $755.00-$962.00 |
| 11 | Real Rate Report | Partner | 2024 | 7+ | $1,123-$1410 |

61.    The list above provides approved billing rates for paralegals. The rates sought by this motion are within the range of rates approved for individuals performing these functions.

62.    Based on the foregoing, I believe the rates sought by this motion are reasonable in the Los Angeles legal market.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of November, 2025 at Los Angeles, California.

_____
CAROL A. SOBEL

19

# EXHIBIT 1

# CAROL A. SOBEL

725 Arizona Avenue• Suite 300 • Santa Monica, CA 90401 •
Tel. 310 393-3055 • Email carolsobellaw@gmail.com

## Employment:

| | |
|---|---|
| LAW OFFICE OF CAROL A. SOBEL | APRIL, 1997 TO PRESENT |

Solo civil rights law firm.

| | |
|---|---|
| SENIOR STAFF COUNSEL | 1990 TO APRIL, 1997 |
| *ACLU Foundation of Southern California* | |

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California; supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

| | |
|---|---|
| STAFF ATTORNEY | 1985 TO 1990 |
| *ACLU Foundation of Southern Califonria* | |

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other First Amendment rights.

| | |
|---|---|
| ASSOCIATE DIRECTOR | 1979 TO 1985 |
| *ACLU Foundation of Southern California* | |
| *American Civil Liberties Union of Southern California* | |

Under the direction of the Executive Director, responsible for administration of two non-profit organizations, including working with Boards of Directors on development of policy on civil liberties issues. Engaged in litigation and assisted Legal Director in coordination and supervision of pro bono attorneys.

| | |
|---|---|
| DEVELOPMENT DIRECTOR | 1977 TO 1979 |
| *ACLU Foundation of Southern California* | |
| *American Civil Liberties Union of Southern California* | |

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a 501(c)(3) and a 501(c)(4).

## Admitted to Practice:

| | |
|---|---|
| California Supreme Court | November, 1978 |
| United States Supreme Court | September, 1991 |
| Ninth Circuit Court of Appeals | August, 1986 |
| U.S.D.C. Central District of California | February, 1986 |
| U.S.D.C. Eastern District of California | June, 1990 |

## Litigation Experience:

### Federal courts:  (Partial listing of published opinions and significant cases)

*CPR for SKID ROW,*
779 F.3d 1098 (9th Cir. 2015)
Partial reversal of summary judgment in favor of the Defendant and holding that California Penal Code §403 could not lawfully be applied to criminalize the expressive activity of the Plaintiffs for protesting on Skid Row.
(Lead counsel and argued on appeal)

*Desertrain v. City of Los Angeles*
754 F.3d 1114 (9th Cir. 2014)
Reversal of summary judgment in favor of the Defendants and holding that Los Angeles Municipal Code §85.02, prohibiting parking a vehicle on public streets or parking lots any time of day or night if a person "lives" in the vehicle, is unconstitutionally vague.
(Lead counsel and argued on appeal)

*Lavan v. City of Los Angeles*
693 F.3d 1022 (9th Cir. 2012), *affirming* grant of preliminary injunction 797 F.Supp.2d 1005 (C.D. Cal. 2011)
Preliminary injunction barring City from confiscating and immediately destroying the property of homeless individuals on Los Angeles' Skid Row.
(Lead Counsel)

*Long Beach Area Peace Network v. City of Long Beach*
522 F.3d 1010 (9th Cir. 2008), as amended July 24, 2009
Upholding and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter alia*, advance-notice requirements  police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.
(Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)
Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of searching for parole and probation violations.  See below for discussion of permanent injunction in 2003.
(Co-Counsel)

*Multi-Ethnic Immigrant Worker Organizing Network (MIWON) v. City of Los Angeles*
246 F.R.D. 621 (C.D. Cal. 2007)
Order granting class certification in challenge to police assault on a lawful assembly of immigrant rights supporters by the Los Angeles Police Department on May Day, 2007.
(Class Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006), vacated pursuant to settlement 505 F.3d 1006 (2007)
Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street or sidewalk anywhere in the City at any time of day or night.  Plaintiffs, all of whom are homeless persons, brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when their was no available adequate shelter.
(Co-counsel)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)
Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil rights fee shifting statutes.  Following oral argument, the Ninth Circuit certified issue of continued availability of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting catalyst fee doctrine under federal law absent express legislative authorization.  Certified for hearing before the California Supreme Court and ultimately upheld the catalyst fee doctrine under California law.
(Co-counsel; argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)
Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD). The injunction prevents the LAPD  from engaging in stops of homeless persons for parole and probation sweeps on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and subject to a search condition, or that the individual has engaged in, or is about to commit a crime.
(Lead counsel)

*Khademi v. South Orange County Community College District*
194 F.Supp.2d 1011 (C.D. CA 2002)
First Amendment facial challenge invalidating college policy  regulating time, place and manner of student speech on campus.
(Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)
Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement and permitted high insurance and police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)
First Amendment challenge to disciplinary action against college professor for publication of an alternative newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and personnel. The college sought to discipline the professor for violating the district's policies on discrimination and work-place violence. The polices were declared unconstitutional as applied to the professor's speech.

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)
Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction stipulated to in settlement following certification of the injunctive relief class.
(Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22 Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)
Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas of traditional public fora. Preliminary injunction entered by district court based on California Constitution. On appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court. Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction.
(Co-counsel)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)
Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as a preliminary injunction to enjoin the City of Los Angeles parade ordinance.
(Co-counsel)

*United States v. Wunsch*
54 F.3d 579 (9th Cir. 1995);84 F.3d 1110 (9th Cir. 1996) (reargument)
First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S. Attorney after she successfully moved to disqualify him as defense counsel in a criminal case. Ninth Circuit invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys' professional conduct. (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
65 F.3d 1539 (9th Cir. 1995);90 F.3d 379 (9th Cir. 1996) (en banc)
First Amendment challenge to display of a religious symbol on public property and to permit scheme for expressive activities in public fora in the City of Beverly Hills. The en banc panel held the permit scheme unconstitutional and found that a preference had occurred for the display of a particular religious symbol. The en banc decision was unanimous. (Argued and briefed on appeal)

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks about public employees during public board meetings.

*Wallin v. City of Los Angeles*,
1194 U.S. App. LEXIS 2343 (9th Cir. 2004)

Circuit dismissed appeal of defendant City and law enforcement officers from denial of qualified immunity. Appellee, a female officer with the Los Angeles Police Department, alleged that appellants violated her right to equal protection, due process and right to petition the government because they violated LAPD confidentiality regulations and delayed the investigation into her allegations of co-worker rape.

(Lead counsel)

*National Abortion Federation v. Operation Rescue*
8 F.3d 680 (9th Cir. 1993)
Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists. First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed 12(b)(6) ruling on that claim.

(Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*

940 F.2d 1561 (9th Cir. 1991)

Establishment Clause challenge to Christian theme park, Desert Christ Park, owned and operated by San Bernardino County. Ninth Circuit held County ownership and operation of the park violated the Establishment Clause.

(Lead counsel throughout litigation; argued on appeal).

*Standing Deer v. Carlson*

831 F.2d 1525 (9th Cir. 1986)

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious headbands in the dining facilities for purported health reasons.

(Argued and briefed on appeal)

*Burbridge v. Sampson*

74 F.Supp.2d 940 (C.D. Ca. 1999)

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.

*Rubin v. City of Santa Monica*

823 F.Supp. 709 (C.D. Ca. 1993)

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities. Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds. (Lead counsel)

# State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*

34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code of Civ. Proc. §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law. Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties.

(Co-counsel and argued at California Supreme Court)

*Los Angeles Alliance for Survival v. City of Los Angeles*

22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution

(co-counsel)

*Williams v. Garcetti*

5 Cal.4th 561 (1993), *sub nom Williams v. Reiner*, 13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty on parents of minor children engaged in or at risk of delinquent conduct.

(Argued and brief on appeal to California Supreme Court)

*Sands v. Morongo Unified School District*

53 Cal.3d 863 , *cert denied*, 112 U.S. 3026 (1991)

225 Cal.App.3d 1385 (1989)

Establishment Clause challenge invalidating prayers at public high-school graduations.

(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*

47 Cal.3d 112 (1988)

Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian Science parents for death resulting from use of prayer instead of traditional medicine in treatment of ill child.  (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*

129 Cal.App.4th 1482 (2005)

Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires actual joint agreement and mutual development of revisions to faculty hiring policies.

(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*

111 Cal.App.4th 1128 (2004)

Special motion to strike defamation complaint by retainer against garment worker advocates must be granted as the plaintiff retailer could not establish a probability of prevailing on the merits of their claims.  Garment worker advocates properly relied on draft labor commission regulations suggesting retailer could be liable for sweatshop conditions of manufacturing of its retail goods.

(lead counsel at all stages)

*Gonzalez v. Superior Court*

33 Cal.App.4th 1539 (1995)

Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential informant who provided her with photographic evidence of harassment.  "After-acquired evidence" rule applied to require disclosure.

(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*

28 Cal.App.4th 1839 (1994)

Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP § 1985(3), requiring strict adherence to statutory procedures and limiting exemption of local government agencies from adhering to statutory requirements.

(Lead counsel throughout litigation)

*Rudnick v. McMillan*

25 Cal.App.4th 1183 (1994)

Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof burden.  Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*

224 Cal.App.3d 546 (1990)

Challenge to restrictions on First Amendment petition activities in shopping center.

(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*

208 Cal.App.3d 1394 (1989)

Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he constituted a public nuisance to his neighbors in a residential area.

(Argued and briefed on appeal)

*McCarthy v. Fletcher*

207 Cal.App.3d 130 (1989)

Challenge to removal of textbooks from school reading list based on community-based religious objections. Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.

(Argued and brief on appeal)

*Fiske v. Gillespie*

200 Cal.App.3d 130 (1988)

Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance and annuity benefits.

(Co-Counsel, Argued on appeal)

# Publications:

# (Partial listing)s

*Catalyst Fees After Buckhannon*
Civil Rights Litigation and Attorney Fees Annual Handbook
(January 2006)

*Free Speech and Harassment: An Overview*
*in the Public Employee Sector*
CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS
Institute of Industrial Relations - UC Berkeley
June 1999  No. 136

*Defeating Employer Defenses to Supervisor Liability*
*After* Ellerth *and* Faragher
ADVOCATE, October 1998

*Student Expression Under California Law*
UCLA Journal of Education
Volume 3, pp. 127-137 (1989)

*Should Attorneys Be Disciplined For Gender Bias*
Point/Counterpoint ABA Journal   August, 1995

*Fight Illegal Police Practices in State Court*
Los Angeles Daily Journal
March 6, 1992

*Judicial Oversight Limited by Supreme Court*
Los Angeles Daily Journal
May 6, 1991

*Jury Nullification is Conscience of Community*
Los Angeles Daily Journal
August 31, 1990

*A Basic Right Merits Shield From The Mob*
Los Angeles Times
August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes*
*deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988    II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS   p.3

## Education:

| | |
|---|---|
| Peoples College of Law | J.D.  May, 1978 |
| Douglass College.For Women, Rutgers University | B.A .  June, 1968 |

## Professional and Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School<br>Civil Rights Advocacy Practicum | 2007-present |
| Blue Ribbon Panel on LAPD Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force<br>Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit"<br>Member, Working Subcommittee | 1993 |
| Los Angeles Public Interest Law Journal<br>Advisory Board | 2007-present |

| | |
|---|---|
| Los Angeles Center for Law and Community Action<br>Member, Board of Directors | 2015-present |
| National Police Accountability Project<br>Member, Advisory Board and Board of Directors | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild - National Executive Vice President | 2009-2011 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-2012 |
| NLG National Mass Defense Committee, Co-chair | 2003-2012 |
| Women Lawyers Association of Los Angeles<br>Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project<br>Member, Board of Directors | 1995-2010 |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2019 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |

| | |
|---|---|
| National Lawyers Guild - Ernie Goodman Award | 2007 |
| Angel Award - California Lawyer Magazine Award for pro bono work | 2007 |
| CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine | 2008 |
| Top 75 Women Litigators in California - Daily Journal | 2008, 2013 |
| California Super Lawyers - Top 50 Women Lawyers in Southern California | 2014 |
| National Lawyers Guild, Los Angeles Law for the People Award | 2014 |
| ACLU Lifetime Achievement Award | 2017 |

# EXHIBIT 2

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 71

**20STCV26536**                                                November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**              8:30 AM
**et al.**

Judge: Honorable Daniel M. Crowley       CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez        ERM: None
Courtroom Assistant: Debra Major          Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Matthew Brooks Borden; Elizabeth Marley In Wha Kim via LACC

For Defendant(s): Daniel McCann via LACC for Trent Carlos Evans

**NATURE OF PROCEEDINGS:** Hearing on Motion for Attorney Fees

The Court issues a tentative ruling and its posted on the Court's website for the parties to review.

Pursuant to Government Code sections 68086, 70044, and California Rules of Court, rule 2.956, Wil S. Wilcox, CSR # 9178, certified shorthand reporter is appointed as an official Court reporter pro tempore in these proceedings, and is ordered to comply with the terms of the Court Reporter Agreement. The Order is signed and filed this date.

The matter is called for hearing.

The Court and all counsel confer regarding the tentative ruling.

The Court has read and considered all documents filed hereto regarding the above-captioned Motion. Counsel is given the opportunity to argue. After oral argument, the Court adopts its Tentative Ruling as the Final Ruling as follows:

**Plaintiff Charles Logan by way of his successor in interest Mark Harrod's motion for attorneys' fees is granted in the total reduced amount of $630,629.00, comprised of $630,629.00 in attorneys' fees and $.00 in costs.**

Plaintiff Charles Logan by way of his successor in interest Mark Harrod ("Harrod") ("Plaintiff") moves for an order awarding him attorneys' fees and costs on appeal.  (Notice of Motion Fees, pg. 1; C.C.P. §1021.5.)  Plaintiff requests this Court order Defendants to pay $1,276,795.83, which includes (1) attorney's fees of $630,629; (2) a 2.0 multiplier (for a total of $1,261,258 in legal fees); and (3) $15,537.83 in costs.  (Motion, pg. 2.)

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 71

**20STCV26536**                                                November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**                      8:30 AM
**et al.**


Judge: Honorable Daniel M. Crowley          CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez          ERM: None
Courtroom Assistant: Debra Major             Deputy Sheriff: None

---

*Background*

This is an Elder Abuse and Neglect, Negligence, and Violation of Residents' Bill of Rights case that was heard before the Court of Appeal and California Supreme Court regarding this Court's denial of Defendants Country Oaks Partners, LLC dba Country Oaks Care Center's ("Country Oaks), Sun Mar Management Services, Inc.'s ("Sun Mar"), and Alessandra Hovey's ("Hovey") (collectively, "Defendants") petition to compel arbitration, which the California Supreme Court affirmed. (*Harrod v. Country Oaks Partners, LLC* (2024) 15 Cal.5th 939, *cert. denied* (2024) 145 S.Ct. 175; *see Logan v. Country Oaks Partners, LLC* (2022) 82 Cal.App.5th 365, 369 ["We therefore affirm the trial court's order denying the motion to compel arbitration."].)

On June 26, 2024, Plaintiff filed his amended memorandum of costs on appeal. On September 22, 2025, Plaintiff filed this motion for attorneys' fees and costs. Defendants Country Oaks and Sun Mar (collectively, "Moving Defendants") filed their opposition on October 21, 2025. Plaintiff filed his reply on October 27, 2025.

*Discussion*

A court may award legal fees to a party who succeeds in an action that "result[s] in the enforcement of an important right affecting the public interest." (C.C.P. §1021.5.)

A "successful party" to an action may obtain fees under §1021.5 if: "(a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (C.C.P. §1021.5.)

A trial court need not wait until the underlying litigation wraps up to conclude that a litigant is a "successful party." A party is "successful" under C.C.P. §1021.5 so long as "the [public] benefit obtained [is] secure." (*Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173, 179, quoting *Urbaniak v. Newton* (1993) 19 Cal.App.4th 1837, 1844, *as modified on denial of reh'g* (Dec. 13, 1993).) A benefit obtained on appeal is "secure" if subsequent trial court proceedings cannot erase it.

Here, Plaintiff is a "successful party" on appeal pursuant to C.C.P. §1021.5(a) because he won a complete victory in the Court of Appeal, then another complete victory through a

---

Minute Order                                                     Page 2 of 7

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 71

**20STCV26536**                                                      November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**                      8:30 AM
**et al.**

Judge: Honorable Daniel M. Crowley          CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez          ERM: None
Courtroom Assistant: Debra Major            Deputy Sheriff: None

---

unanimous opinion before the California Supreme Court on the issue of whether a Health Care Power of Attorney did not have authorization to make an optional, freestanding decision to waive a principal's right to a jury trial.  In doing so, Plaintiff secured the right to a jury trial for millions of people living in California who cannot be compelled to arbitration in the same circumstances.  That right is "secure"  because nothing that happens later in the case can eliminate it.

The importance of the right to a jury trial is well established.  (*See, e.g.*, *Byram v. Superior Court* (1977) 74 Cal.App.3d 648, 654 ["The right to trial by jury is a basic and fundamental part of our system of jurisprudence [and] it should be zealously guarded by the courts."].)  Courts have awarded attorney's fees under C.C.P. §1021.5 for protecting this right.  (*See, e.g.*, *MBNA America Bank, N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 8-9 [upholding award of attorney's fees where credit-card holder successfully challenged bank's petition to confirm arbitration award on the grounds that it was unenforceable, finding that credit card holder had enforced his right to a jury trial and vindicated a public right]; *Mounger v. Gates* (1987) 193 Cal.App.3d 1248, 1259 [establishing law that public safety officer need not exhaust administrative remedies before seeking judicial relief "furthers the public interest"].)

 The constitutional right to autonomy is also well established.  (*See, e.g.*, *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 342 ["We conclude that, under the California constitutional privacy clause, a statute that impinges upon the fundamental autonomy privacy right of either a minor or an adult must be evaluated under the demanding 'compelling interest' test."]; *Hill v. National Collegiate Athletic Assn.* (1994)  7 Cal.4th 1, 35 [explaining that legally recognized privacy interests include "interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')"].)

The California Supreme Court further explained in the instant case that the Legislature intended the Health Care Decisions Law to protect "individual autonomy" and the "dignity" of patients facing end-of-life scenarios.  (*Harrod v. Country Oaks Partners, LLC* (2024) 15 Cal.5th 939, 953.)

Under C.C.P. §1021.5(b), private enforcement of a public benefit is necessary when public enforcement is not "sufficiently available."  (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1217; *see also Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1348 [describing necessity element as looking "to the adequacy of public enforcement and seek[ing] economic equalization of representation in cases where private enforcement is

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 71

20STCV26536                                                      November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**                  8:30 AM
**et al.**

Judge: Honorable Daniel M. Crowley          CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez          ERM: None
Courtroom Assistant: Debra Major             Deputy Sheriff: None

---

necessary"].)  For instance, courts have found that private enforcement is necessary where "no public entity or official came to the defense of the [entities] with respect to the issues litigated." (*Grossmont Union High School District v. Diego Plus Education Corp.* (2023) 98 Cal.App.5th 552, 582.)

Here, enforce Plaintiff had to undertake to enforce his rights privately because no government action or aid existed regarding the matter litigated.  The case law the California Supreme Court overruled, *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253, and *Hogan v. Country Villa Health Services* (2007) 148 Cal.App.4th 259, had been in place for two decades.  Plaintiff had to undertake to represent himself in order to enforce his rights, first in this Court, then in the Court of Appeal, and finally in the California Supreme Court.

This protracted litigation imposed a disproportionate financial burden on Plaintiff.  C.C.P. §1021.5's financial burden requirement is met "when the cost of the [litigant's] legal victory transcends [their] personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the [litigant] out of proportion to [their] individual stake in the matter." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 941.3.)  Burden is calculated by weighing the costs and benefits of continued litigation. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215-1216.)  A "bounty" is appropriate where the actual costs of the litigation outweigh the estimated monetary value of bringing the case at the time key legal decisions were made. (*Id.* at pg. 1216.)

C.C.P. §1021.5(c) requires the Court to determine whether Plaintiff's attorney's fees should, in the interests of justice, be paid out of the recovery to plaintiff.  This element also overwhelmingly favors awarding fees.

First, this factor is only analyzed when there is a monetary recovery in the case. (*See Press v. Lucky Stores* (1983) 34 Cal.3d 311, 318 n.5 [explaining that §1021.5(c) is "inapplicable" where "plaintiffs' action did not produce any monetary recovery"].)  Here, Plaintiff secured no monetary recovery from his California Supreme Court victory.  Moreover, the issue on which he prevailed is wholly distinct from the merits of the case. There is no source of fees other than Defendants.

Accordingly, Plaintiff's motion is proper.

*Reasonable Fees*

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 71

**20STCV26536**                                                November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**                8:30 AM
**et al.**

Judge: Honorable Daniel M. Crowley        CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez        ERM: None
Courtroom Assistant: Debra Major          Deputy Sheriff: None

---

To calculate a lodestar amount, the Court must first determine the reasonableness of the hourly rates sought by the Plaintiff's counsel.  The Supreme Court of California has concluded that a reasonable hourly lodestar rate is the prevailing rate for private attorneys "conducting non-contingent litigation of the same type."  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133, emphasis added.)

The attorneys of Lanzone Morgan, LLP ("LM"), declare the following hourly rates: (a) Anthony C. Lanzone ($750 per hour); (b) Ayman Mourad ($550 per hour); (c) Alexander Rynerson ($350 per hour); (d) Suzanne Voas ($350 per hour); and (e) Elizabeth M. Kim ($350 per hour).  (Decl. of Lanzone ¶¶5-6.)  These rates are appropriate given the attorneys' relative experiences and qualifications.  (*See id.*)  The attorneys of Braun Hagey & Borden, LLP ("BHB"), declare the following hourly rates for their appellate advocacy: (a) Matthew Borden ($1,550 per hour); (b) Kory DeClark ($875 per hour); and (c) "other associates" ($300-$595 per hour).  Plaintiff has sufficiently demonstrated his counsel's hourly rates are reasonable in their community of practice in their specialized area of law.

Defendants challenge Plaintiff's counsels' hourly rates as unreasonable, but Defendants' argument is unavailing.  (Opposition, pgs. 16-20.)  The Court finds Plaintiff's counsels' rates to be reasonable in their community of practice and do not warrant reductions.

*Billed Hours*

The party seeking fees and costs bears the burden to show "the fees incurred were allowable, were reasonably necessary to the conduct of the litigation, and were reasonable in amount."  (*Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 104.)

"The court's discretion in awarding attorney fees is, initially ('absent circumstances rendering the award unjust'), to be exercised so as to fully compensate counsel for the prevailing party for services reasonably provided to his or her client. The basis for the trial court's calculation must be the actual hours counsel has devoted to the case, less those that result from inefficient or duplicative use of time. [Citation.]  Then the court must adjust the resulting fee to fulfill the statutory purpose of bringing 'the financial incentives for attorneys enforcing important constitutional rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-service basis.'"  (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 395.)

Plaintiff's counsel's fee recovery for LH is based on LH's 265.77 hours spent litigating

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 71

**20STCV26536**                                                                November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**                           8:30 AM
**et al.**

Judge: Honorable Daniel M. Crowley          CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez          ERM: None
Courtroom Assistant: Debra Major             Deputy Sheriff: None

---

this case ($101,246.50).  (Decl. of Lanzone ¶¶15-17, Exh. D.)  Plaintiff's counsel declares the following hours were incurred by LH: (a) Anthony C. Lanzone (17.50 hours); (b) Ayman Mourad (17.56 hours); (c) Alexander Rynerson (48.85 hours); (d) Suzanne Voas (57.25 hours); and (e) Elizabeth M. Kim (33.23 hours).  (Decl. of Lazone ¶17, Exh. D.)

Plaintiff's counsel's fee recovery for BHB is based on BHB's 762.1 hours spent litigating this case ($572,518.00).  (Decl. of Borden ¶¶17, 19, Exh. 1.)

Defendants argue Plaintiff's counsels' billed hours were not reasonably incurred because they were inflated, vaguely defined, and block billed.  (Opposition, pgs. 20-22.)  Defendants' objections to Plaintiff's counsels' billed hours are not well taken.

Defendant's argument that the work performed by two attorneys at trial, depositions, or hearing was duplicative or unreasonable is unsupported by case law.  (*See Margolin v. Regional Planning Commission* (1982) 134 Cal. App. 3d 999, 1007.) To show unreasonable duplication, fee opponents must provide "specific evidence that plaintiffs' hours were duplicative or inefficient"; generalized objections that the work is "excessive" or "duplicative" do not satisfy that burden.  (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 684.)  Defendants were granted leave to file an oversize brief; to fail to argue in the body of the oversize brief the specific evidence that Plaintiff's counsel's hours were block billed or duplicative is not acceptable.  Defendants cannot expand their argument into attached exhibits without further, substantive arguments.

Accordingly, Plaintiff's request for attorneys' fees is granted in the amount of $630,629.00

*Multiplier*

Plaintiff requests a 2.0 multiplier.  In determining whether to use a multiplier, courts look to factors such as the contingent risk, the extraordinary skill exercised in obtaining a result, the novelty and difficulty of the questions involved, and the extent to which the nature of the litigation precluded other employment by the attorneys. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132, 1138 (2001). There is also a "results obtained" factor, which "can properly be used to enhance a lodestar calculation where an exceptional effort produced an exceptional benefit." *Thayer v. Wells Fargo Bank, N.A.,* 92 Cal. App. 4th 819, 838 (2001). "In cases involving

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Stanley Mosk Courthouse, Department 71

**20STCV26536**                                                   November 6, 2025
**CHARLES LOGAN vs COUNTRY OAKS PARTNERS, LLC,**                        8:30 AM
**et al.**

Judge: Honorable Daniel M. Crowley          CSR: Wil S. Wilcox, CSR # 9178 via LACC
Judicial Assistant: Jontae Marquez          ERM: None
Courtroom Assistant: Debra Major             Deputy Sheriff: None

enforcement of constitutional rights, but little or no damages, such fee enhancements may make such cases economically feasible to competent private attorneys." *Ketchum*, 24 Cal.4th at 1133; *see also Center for Biological Diversity v. County of San Bernardino*,185 Cal. App. 4th 866, 899 (2010). The Court agrees with Plaintiff that these factors weigh in favor of a fee enhancement here.  Accordingly, the Court grants a 1.5 multiplier

   *Costs*

   Any effort to tax or strike costs must occur in the form of a motion to strike or to tax costs and must be served and filed fifteen (15) days after service of the cost memorandum.  (CRC, Rule 3.1700(b)(1).)  After the 15-day deadline to file a motion to tax costs has passed, the Court clerk must immediately enter the costs. (CRC, Rule 3.1700(b)(4).)

   Plaintiff submitted his cost memorandum on June 26, 2024, for the total costs of $1,543.94.  Defendants failed to submit a motion to tax costs within the 15-day deadline.  Therefore, Defendants' objections to Plaintiff's costs claimed on the June 26, 2024 cost memorandum must be denied.  (CRC, Rule 3.1700(b)(4).)

   Plaintiff's motion impermissibly requests $15,537.83 in costs not included in the June 26, 2024 memorandum of costs.  (*See* Decl. of Borden ¶21; Decl. of Lanzone ¶27, Exh. E.)  Such costs should have been included in the June 26, 2024 cost memorandum.

   Accordingly, Plaintiff's requested costs on the instant motion are denied.

   *Conclusion*

   Accordingly, Plaintiff's request for attorneys' fees and costs is granted in the reduced total of $945,943.50, comprised of $945,943.50 (1.5 x $630,629.00) in attorneys' fees and $0.00 in costs sought in Plaintiff's instant motion.

The Motion for Attorney Fees filed by Charles Logan on 09/22/2025 is Granted.

Counsel for Plaintiff is to give notice.

EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CLINICOMP INTERNATIONAL, INC.,

Plaintiff,

v.

CERNER CORPORATION,

Defendant.

Case No.: 17-cv-02479-GPC (DEB)

**ORDER AWARDING DEFENDANT ATTORNEYS' FEES UNDER 35 U.S.C. § 285**

On February 3, 2023, the Court granted Defendant Cerner Corporation ("Cerner")'s motion for attorneys' fees pursuant to 35 U.S.C. § 285; found this case to be "exceptional;" and awarded Cerner its reasonable attorneys' fees incurred since August 29, 2022. (Dkt. No. 133.) On February 24, 2023, Cerner filed its brief in support of its request for its attorneys' fees incurred since August 29, 2022. (Dkt. No. 136.) On March 10, 2023, CliniComp filed its response to Cerner's request for attorneys' fees. (Dkt. No. 141.) On March 17, 2023, Cerner filed its reply. (Dkt. No. 149.) For the reasons set forth below, the Court awards Cerner $802,334.60 in attorneys' fees under 35 U.S.C. § 285.

## I.      BACKGROUND

CliniComp is the owner of U.S. Patent No. 6,665,647 ("the '647 Patent") by assignment. (Dkt. No. 1, Compl. ¶ 2.) In the present action, CliniComp alleged that Cerner directly infringes claims 1, 2, 5, 10-13, 15-18, and 20-23 of the '647 Patent by making,

1

using, selling, and/or offering to sell within the United States Cerner's CommunityWorks, PowerWorks, and Lights on Network services (collectively "the accused services"). (Dkt. No. 103, Ex. 2 at 21; see also Dkt. No. 1, Compl. ¶¶ 15-16.)

On December 11, 2017, CliniComp filed a complaint for patent infringement against Cerner, alleging infringement of the '647 Patent. (Dkt. No. 1, Compl.) On May 16, 2018, the Court granted Cerner's motion to dismiss CliniComp's claims for willful infringement and indirect infringement as well as the relief sought in connection with these claims of injunctive relief, treble damages, and exceptionality damages. (Dkt. No. 18 at 21.) On June 25, 2018, Cerner filed an answer to CliniComp's complaint. (Dkt. No. 19.)

On March 5, 2019, the Patent Trial and Appeal Board ("PTAB") instituted an *inter partes* review ("IPR") as to claims 1-25 and 50-55 of the '647 Patent. (Dkt. No. 30-1, Ex. A.) On March 7, 2019, the Court granted a stay of the action pending completion of the IPR proceedings. (Dkt. No. 31.) On March 26, 2020, the PTAB issued a final written decision, determining that claims 50-55 of the '647 Patent are not patentable in light of the prior art, but that claims 1-25 of the '647 Patent are patentable.[1] (Dkt. No. 32, Ex. A at 93-94.) On April 20, 2021, the Federal Circuit affirmed the PTAB's determination that claims 1-25 of the '647 Patent are patentable.[2] (Dkt. No. 38-2, Ex. B at 10.) On June 24, 2021, the Court granted the parties' joint motion to lift the stay of the action. (Dkt. No. 44.)

---

[1] Specifically, the PTAB concluded that Cerner had shown by a preponderance of the evidence that: (1) claims 50-52 are not patentable based on Evans; (2) claims 53 and 54 are not patentable based on Evans and Rai; (3) claims 50-53, and 55 are not patentable based on Johnson and Evans; and (4) claim 54 is not patentable based on Johnson, Evans, and Rai. (Dkt. No. 32, Ex. A at 93-94.) The PTAB further concluded that Cerner had not shown by a preponderance of the evidence: (1) that claims 1-5, 10-13, and 15-25 are unpatentable based on Johnson and Evans; or (2) that claims 6-9, and 14 are unpatentable based on Johnson, Evans, and Rai. (Id. at 93.)

[2] On November 15, 2021, the PTO issued an *inter partes* review certificate for the '647 Patent, stating: "Claims 1-25 are found patentable" and "Claims 50-55 are cancelled." (Dkt. No. 71-2, Ex. A at A-20–A-21.)

17-cv-02479-GPC (DEB)

On July 23, 2021, Cerner filed an amended answer to CliniComp's complaint. (Dkt. No. 52.) On October 7, 2021, the Court issued a scheduling order for the action. (Dkt. No. 55.) On July 28, 2022, the Court issued a claim construction order, construing the disputed claim terms from the '647 Patent. (Dkt. No. 91.)

On November 15, 2022, the Court granted Cerner's motion for summary judgment of non-infringement. (Dkt. No. 120.) Specifically, the Court held that Cerner demonstrated that the accused services do not infringe the asserted claims of the '647 Patent as a matter of law. (Id. at 44.) On November 16, 2022, the Court entered a judgment in the action in favor of Defendant Cerner and against Plaintiff CliniComp. (Dkt. No. 121.)

On December 30, 2022, the Clerk of Court taxed costs in favor of Cerner in the amount of $8,265.80. (Dkt. No. 131 at 3.) On February 3, 2023, the Court granted Cerner's motion for attorneys' fees pursuant to 35 U.S.C. § 285, and the Court awarded Cerner its reasonable attorneys' fees incurred since August 29, 2022. (Dkt. No. 133 at 23.) By the present briefing, Cerner requests that the Court award it $802,334.60 for its attorneys' fees incurred since August 29, 2022. (Dkt. No. 144 at 1, 11; Dkt. No. 149 at 6.)

## II. DISCUSSION

Cerner requests that the Court award it $802,334.60 in attorneys' fees under the lodestar method. (Dkt. No. 144 at 1-2; Dkt. No. 149 at 6.) An award of attorneys' fees under 35 U.S.C. § 285 must be "reasonable." Kilopass Tech., Inc. v. Sidense Corp., 82 F. Supp. 3d 1154, 1164 (N.D. Cal. 2015); see SRI Int'l, Inc. v. Cisco Sys., Inc., 930 F.3d 1295, 1311 (Fed. Cir. 2019) ("Section 285 permits a prevailing party to recover reasonable attorneys' fees."). "The requirement that fees awarded be reasonable is a safeguard against excessive reimbursement." IPS Grp., Inc. v. Duncan Sols., Inc., No. 15-CV-1526-CAB (MDD), 2018 WL 3956019, at *1 (S.D. Cal. Aug. 17, 2018) (citing Mathis v. Spears, 857 F.2d 749, 754 (Fed. Cir. 1988)).

In calculating an attorneys' fee award under § 285, "a district court usually applies the lodestar method, which provides a presumptively reasonable fee amount by multiplying a reasonable hourly rate by the reasonable number of hours required to litigate a

3

17-cv-02479-GPC (DEB)

comparable case." Lumen View Tech. LLC v. Findthebest.com, Inc., 811 F.3d 479, 483 (Fed. Cir. 2016) (citing Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551, 554 (2010)); see also Staton v. Boeing Co., 327 F.3d 938, 965 (9th Cir. 2003) ("When a statute provides for such fees, it is termed a 'fee-shifting' statute. Under a fee-shifting statute, the court 'must calculate awards for attorneys' fees using the 'lodestar' method.'"). "Ultimately, a 'reasonable' number of hours equals 'the number of hours which could reasonably have been billed to a private client.'" Gonzalez v. City of Maywood, 729 F.3d 1196, 1202 (9th Cir. 2013) (quoting Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008)). A district court should not award "fees for hours expended by counsel that were 'excessive, redundant, or otherwise unnecessary.'" SRI, 930 F.3d at 1311 (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)); accord Gonzalez, 729 F.3d at 1203.

"The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437; see Welch v. Metro. Life Ins. Co., 480 F.3d 942, 945–46 (9th Cir. 2007) ("The party seeking fees bears the burden of documenting the hours expended in the litigation and must submit evidence supporting those hours and the rates claimed."). "Once the party seeking fees meets that initial burden of adequately documenting the hours requested, the burden shifts to the opposing party" to challenge the accuracy and reasonableness of the hours billed. Maloney v. T3Media, Inc., No. CV 14-05048-AB VBKX, 2015 WL 3879634, at *4 (C.D. Cal. May 27, 2015); see Hiken v. Dep't of Def., 836 F.3d 1037, 1045 (9th Cir. 2016) ("'[T]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits.'" (quoting Gates v. Deukmejian, 987 F.2d 1392, 1397–98 (9th Cir. 1992)).

The determination of the amount of reasonable attorneys' fees under § 285 is "'a matter that is committed to the sound discretion of a district court judge.'" In re Rembrandt Techs. LP Pat. Litig., 899 F.3d 1254, 1278 (Fed. Cir. 2018) (quoting Lumen View, 811 F.3d at 483). In awarding fees, a district court must "explain how it came up with the

17-cv-02479-GPC (DEB)

amount," and that explanation "must be 'concise but clear.'" Moreno, 534 F.3d at 1111 (quoting Hensley, 461 U.S. at 437); see also United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990) ("[H]ours actually expended in the litigation are not to be disallowed without a supporting rationale."). "Where the difference between the lawyer's request and the court's award is relatively small, a somewhat cursory explanation will suffice. But where the disparity is larger, a more specific articulation of the court's reasoning is expected." Moreno, 534 F.3d at 1111.

In support of its fees request, Cerner explains that the undiscounted hourly rates for defense counsel in this action are as follows: (1) $1,465, $1,120, and $1,055 for the three partners; (2) $805 and $610 for the two associates; and (3) $495, $420, and $415 for the three paralegals. (Dkt. No. 144 at 2-3.) Cerner further explains that the actual hourly rates paid by Cerner are lower than this due to the benefit of a negotiated discount that Cerner received from defense counsel. (Id. at 2-3.)

The Court finds these hourly rates to be reasonable. First, "rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate." United Steelworkers, 896 F.2d at 407. District courts in other complex patent cases have found similar rates to be reasonable in awarding attorneys' fees. See, e.g., Orthopaedic Hosp. v. Encore Med., L.P., No. 319CV00970JLSAHG, 2021 WL 5449041, at *13 (S.D. Cal. Nov. 19, 2021) (approving hourly rates of up to $1,260 for partners and $1,065 for associates as reasonable); NuVasive, Inc. v. Alphatec Holdings, Inc., No. 3:18-CV-347-CAB-MDD, 2020 WL 6876300, at *3 (S.D. Cal. Mar. 20, 2020) (approving hourly rates of $1,005 and $860 for partners as reasonable); Facebook, Inc. v. Power Ventures, Inc., No. 08-CV-05780-LHK, 2017 WL 3394754, at *7 (N.D. Cal. Aug. 8, 2017) (approving Orrick's hourly rates of up to $1,200 for a partner, $800 for an associate, and $430 for a paralegal as reasonable); Healthier Choices Mgmt. Corp. v. Philip Morris USA, Inc., No. 1:20-CV-4816-TCB, 2022 WL 870206, at *4 (N.D. Ga. Feb. 22, 2022) (approving hourly rates of

17-cv-02479-GPC (DEB)

up to $1,318 for partners, $935 for associates, and $450 for paralegals as reasonable).[3] Second, "[t]he reasonableness of the requested rates is strongly supported by the fact that these are the rates that counsel billed to [Cerner] and that [Cerner] has already paid." Facebook, 2017 WL 3394754, at *7; see Wi-LAN, 2022 WL 1224901, at *4 ("The Federal Circuit has explicitly approved the award of attorney fees under § 285 at the rates that the attorneys actually charged." (citing SRI, 930 F.3d at 1311)). Third, that Cerner received a discount on the hourly rates at issue also supports the reasonableness of the rates. See Orthopaedic Hosp., 2021 WL 5449041, at *14. Fourth, "the fact that this matter is a complex, high-stakes patent litigation" further supports the reasonableness of the rates. Id.; see also Yufa v. TSI Inc., No. 09-CV-01315-KAW, 2014 WL 4071902, at *5 (N.D. Cal. Aug. 14, 2014) ("[T]he field of intellectual property law requires specialized knowledge."). Finally, CliniComp does not challenge the reasonableness of Cerner's hourly rates.

Turning to the reasonable number of hours expended, "to determine whether attorneys for the prevailing party could have reasonably billed the hours they claim to their private clients, the district court should begin with the billing records the prevailing party has submitted." Gonzalez, 729 F.3d at 1202. As part of its fee request, Cerner has provided the Court with detailed billing records with time billed in one-tenth of an hour increments and with specific narratives detailing each billed task. (See Dkt. No. 144, Bobrow Decl. Ex. 1.) After reviewing these billing records, the Court finds the hours expended by

---

[3]  Although the Court cites to cases from the Northern District of California and the Northern District of Georgia, this is permissible because as another court in this District has explained: "based on the Court's knowledge of local billing rates and of the practices of national law firms, large national law firms . . . do not charge different rates based on the jurisdiction in which a complex patent lawsuit is filed." NuVasive, 2020 WL 6876300, at *3 n.1; see also Wi-LAN Inc. v. Sharp Elecs. Corp., No. CV 15-379-LPS, 2022 WL 1224901, at *4 (D. Del. Apr. 25, 2022) ("[T]his Court remains of the view that the appropriate 'market' for assessing rates in a high-stakes patent litigation like the instant case is the market for national (and Delaware) counsel who litigate patent cases in Delaware.").

17-cv-02479-GPC (DEB)

Cerner's counsel to be reasonable.

Although CliniComp does not challenge the total number of hours billed by Cerner's attorneys, CliniComp challenges Cerner's requested fees on the grounds that the amount reflects a disproportionately high use of partners for routine matters. (Dkt. No. 141 at 1-5.) CliniComp contends that district courts have held that when a case is appropriately staffed, partner time should account for no more than 30% of the total time. (Id. at 2 (citing Larson v. United Nat. Foods W. Inc., No. CV-10-00185-PHX-DGC, 2013 WL 4507473, at *2 (D. Ariz. Aug. 23, 2013).)[4] CliniComp notes, for example, that Cerner's partners accounted for 71% of the hours expended on Cerner's motion for summary judgment and 72% of the hours expended on Cerner's motion for attorneys' fees.[5] (Id. at 3.) CliniComp argues that, in light of this "top-heavy billing" by Cerner, the Court should exercise its discretion and reduce Cerner's requested fee amount by 50%, to correct a purported 82%

---

[4]     The Court notes that to support this contention, CliniComp cites to a single district court case that involved claims for violation of the Family Medical Leave Act and for disability discrimination and did not involve complex claims for patent infringement. See Larson, 2013 WL 4507473, at *1. Further, in that case, the district court did not broadly state that when a case is appropriately staffed, partner time should generally account for no more than 30% of the total time. Rather, the district court specifically stated "a reasonable fee *in this case* includes no more than 30% of the time at partner rates." Id. at *2 (emphasis added).

[5]     In its brief, CliniComp asserts that achieving summary judgment on claims that a party considered to be meritless does not require that most of the work be done by a partner, and CliniComp notes that Cerner asserted that CliniComp's claim for patent infringement was meritless following the issuance of the Court's claim construction order. (Dkt. No. 141 at 3 (citing Larson, 2013 WL 4507473, at *2.) The Court notes that although this may generally be true, the present case involved complex technology. Further, as explained in the Court's February 3, 2023 order granting Cerner's motion for attorneys' fees, CliniComp changed its theory of infringement at least three times during the summary judgment stage of this case. (See Dkt No. 133 at 13-19.) A theory of infringement that changes three times in a few months, even if meritless, probably demands more attention from partners at the summary judgment stage than a meritless claim for patent infringement that is static. (See also Dkt. No. 149 at 2-4.)

overbilling by partners. (Id. at 4-5.)

In response, Cerner contends that its staffing decisions were reasonable and justified by the demands of its clients in the legal market. (Dkt. No. 149 at 1.) Cerner contends: "It is widely recognized that, for the last decade, clients have been pushing back on the use of junior lawyers, particularly given the increase in associate salaries and billing rates. Clients, including Cerner, find it more efficient to use more senior attorneys because they get the work done in significantly less time than junior lawyers." (Id. (citing Dkt. No. 149-1, Bobrow Decl. ¶ 5).) Cerner explains that this is underscored by "the shrinking delta between partner and non-partner billing rates as associate salaries increase." (Id.) Cerner further notes that the discounted hourly rates for two of its partners on this case were less than or commensurate with the rates of non-partner attorneys that courts in this District have found to be reasonable in other cases. (Id. at 1-2.)

Although the Court agrees with CliniComp that Cerner's law firm could have better utilized its associates in this case,[6] Cerner's counsel has provided reasonable explanations for its staffing decisions. (See Dkt. No. 149 at 1-4; Dkt. No. 149-1, Bobrow Decl. ¶¶ 5-7.) Further, the Court agrees with Cerner that the problem with CliniComp's challenge is that it fails to consider the discounted hourly rates that Cerner was paying the partners at issue. In light of those discounts, Cerner was essentially paying reasonable senior associate-level hourly rates for the work of two of three partners in this case. See, e.g., Orthopaedic Hosp., 2021 WL 5449041, at *13 (approving hourly rates of up to $1,065 for associates as reasonable); Healthier Choices, 2022 WL 870206, at *4 (approving hourly rates of up to $935 for associates as reasonable); Facebook, 2017 WL 3394754, at *7 (approving Orrick's hourly rates of up to $800 for an associate). As such, the Court rejects CliniComp's characterization of Cerner's staffing decisions as "top-heavy billing," and the

---

[6] The Court acknowledges that it also appears to be true that CliniComp's law firm could have better utilized its associates in this case as well. (See Dkt. No. 149 at 2; Dkt. No. 149-1, Bobrow Decl. ¶ 8.)

17-cv-02479-GPC (DEB)

Court rejects CliniComp's request to reduce Cerner's requested fee amount by 50%.  See also Finjan, Inc. v. Juniper Network, Inc., No. 3:17-CV-05659-WHA, 2021 WL 3674101, at *4 (N.D. Cal. May 20, 2021), report and recommendation adopted by Finjan, Inc. v. Juniper Networks, Inc., No. C 17-05659 WHA, 2021 WL 3140716 (N.D. Cal. July 26, 2021) ("In its strongest form, Finjan's argument appears to be that Juniper could only reasonably defend the case by employing a model where its lead counsel only parachuted in for hearings and trial.  That is not the only way to reasonably staff a case, or even necessarily advisable given the benefits that experienced counsel can bring to a case.").

Finally, CliniComp asserts that even if the Court finds Cerner's hourly rates and hours expended to be reasonable, the Court may make a discretionary 10% reduction to the requested fees.  (Dkt. No. 141 at 5.)  The Ninth Circuit has explained that in determining the reasonableness of a fees request, a "'district court can impose a small reduction, no greater than 10 percent—a "haircut"—based on its exercise of discretion and without a . . . specific explanation.'"  Gonzalez, 729 F.3d at 1203 (quoting Moreno, 534 F.3d at 1112).  The Court, exercising its sound discretion, declines to perform a "haircut" to Cerner's requested amount of fees.

### III.   CONCLUSION

For the reasons above, the Court awards Cerner $802,334.60 in attorneys' fees under 35 U.S.C. § 285.

IT IS SO ORDERED.

Dated:  March 22, 2023

Hon. Gonzalo P. Curiel
United States District Judge

9

17-cv-02479-GPC (DEB)

# EXHIBIT 4

Case 2:21-cv-06470-CBM-AS Document 195 Filed 04/19/24 Page 1 of 17 Page ID #:7396
Case 2:21-cv-06470-CBM-AS Document 180 Filed 04/19/24 Page 25 of 17 Page ID #:5507
Page ID #:5507

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTIAN PINEDA,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES; *et al.*,<br><br>    Defendants. | Case No.: 2:21-cv-06470-CBM-ASx<br><br>**ORDER RE: PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND NON-TAXABLE COSTS [181]** |

The matter before the Court is Plaintiff's Motion for Attorneys' Fees and Non-Taxable Costs. (Dkt. No. 181 (the "Motion").) The matter is fully briefed. (Dkt. Nos. 182, 187.)

## I.    BACKGROUND

On May 29, 2020, Plaintiff sustained injuries to his left side while moving backwards with his arms and hands up while attending a protest in Los Angeles.

**A.    Complaint**

On August 11, 2021, Plaintiff filed this action asserting First Amendment and Fourth Amendment claims under 42 U.S.C. § 1983 against the City of Los Angeles, Chief Michel More, and Officer Colton Haney and seeking damages, declaratory judgment and attorneys' fees. *Id.* (Dkt. No. 1.) Plaintiff also brought *Monell* claims against the City for unconstitutional policy, practice, or custom, ratification, and failure to train, supervise, discipline, or correct. *Id.*

1

**B.     Trial and Jury Verdict**

On April 19, 2023, the Case proceeded to trial on Plaintiff's First and Fourth Amendment claims against Officer Haney and Plaintiff's *Monell* claims against the City of Los Angeles and Chief Michel Moore.  (Dkt. No. 138.)  On April 27, 2020, the jury returned its verdict.  The jury found in favor of Plaintiff on his Fourth Amendment claim and his *Monell* claim against the City for failure to properly train its officers to handle the usual and recurring situations with which they would have to deal.  (Dkt. No. 171.)  The jury awarded Plaintiff $85,000 in compensatory damages.  While the jury found that Plaintiff proved Officer Haney acted with malice, oppression, or reckless disregard for Plaintiff's rights, they did not award punitive damages.

## II.     STATEMENT OF THE LAW

Plaintiffs seek an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.  Section 1988 provides that in a Section 1983 action, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988.  "The purpose of [Section] 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances."  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). (quoting H.R.Rep. No. 94-1558, p. 1 (1976)).

"The Supreme Court has instructed that [t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate,' an approach commonly known as the 'lodestar.' Method."  *Vargas v. Howell*, 949 F.3d 1188, 1194 (9th Cir. 2020) (internal quotation marks and citation omitted).  "Reasonable hourly rates are to be calculated according to the prevailing market rates in the relevant community."  *Id.* (internal quotation marks and citation omitted.)  "The hours expended and the rate should be supported by adequate documentation and other evidence."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ),

2

*overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 388 (2011).  The party seeking an award of attorneys' fees bears the burden of establishing the reasonableness of the hourly rates requested.  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008).

### III.    DISCUSSION

### A.    Prevailing Party

A "prevailing party 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Ackerley Commc'ns, Inc. v. City of Salem, Or.*, 752 F.2d at 1394 (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)).  Plaintiffs "may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (internal quotation mark and citation omitted); *see also* 42 U.S.C. § 1988.  Defendants contest that Plaintiff is the prevailing party, and request that the Court exercise its discretion not to award attorneys' fees because Defendants prevailed on Plaintiff's First Amendment claims and on all claims against Chief Michel Moore.  However, Plaintiff prevailed on his Section 1983 excessive force claim against Defendant Haney and his Section 1983 *Monell* claim against the City for failure to train.  Accordingly, Plaintiff is the prevailing party for purposes of Section 1983.

### B.    Lodestar

Plaintiff seeks $1,257,522.30 in attorneys' fees.  Plaintiffs seek the following:

| Attorney/Biller | | Hours | Hourly Rate | Lodestar x .9 |
|---|---|---|---|---|
| Dan Stormer | Attorney | 239.3 | $1,400 | $335,020 |
| Morgan Ricketts | Attorney | 325.8 | $915 | $298,107 |
| Shaleen Shanbhag | Attorney | 80.5 | $800 | $64,400 |

3

| David Washington | Attorney | 845.6 | $700 | $591,920 |
|---|---|---|---|---|
| Tami Galindo | Paralegal | 385 | $280 | $107,800 |
| **SUBTOTAL** | | 1,876.2 | | $1,397,247 **x 90%** |
| **TOTAL** | | | | **$1,257,522.30** |
| | | | | |

### 1. Reasonable Hourly Rate

"Reasonable hourly rates are to be calculated according to the prevailing market rates in the relevant community." *Vargas*, 949 F.3d at 1194 (internal quotation marks and citation omitted). "[T]he established standard when determining a reasonable hourly rate is the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho*, 523 F.3d at 979 (internal quotation marks and citation omitted). "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 980 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). Thus, the district court "must base its determination" of the prevailing market hourly rate "on the *current* market rate." *United States v. $28,000.00 in U.S. Currency*, 802 F.3d 1100, 1107 (9th Cir. 2015) (emphasis in original).

Plaintiff submits declarations from Paul Hoffman and V. James DeSimone demonstrating comparable attorneys' fee rates in the Central District for attorneys with similar experience to Plaintiff's counsel. (Declaration of Paul Hoffman ("Hoffman Decl."); Declaration of V. James DeSimone ("DeSimone Decl.").) Mr. Hoffman has practiced law in Los Angeles since 1976 and is the Director of the Civil Rights Litigation Clinic at UC Irvine Law School. (Hoffman Decl. ¶ 2.) From 1984 to 1994, Mr. Hoffman was the Legal Director of the ACLU

Foundation of Southern California and litigated hundreds of civil rights cases. (*Id.*) Mr. Hoffman declares that over the past 47 years, he has become familiar with the rates charged by lawyers in the Los Angeles community. (*Id.* ¶ 4.) Mr. Hoffman has known Mr. Stormer for more than 40 years and has litigated cases with him. (*Id.* ¶ 5.) Mr. Hoffman declares that Mr. Stormer is one of the premier civil rights lawyers in California, and given his expertise, background and reputation, Mr. Hoffman believes $1,400 an hour is a reasonable hourly rate. (*Id.* ¶ 5.) Mr. Hoffman further declares that he has known Ms. Rickets for nearly ten years and referred a civil rights case to her when she was first beginning to practice in the field. (*Id.* ¶ 6.) Ms. Ricketts has consulted Mr. Hoffman on civil rights cases, including Ninth Circuit argument. (*Id.*) Based on Ms. Ricketts' experience, skill level, and ability as a civil rights attorney in Los Angeles, Mr. Hoffman believes an hourly rate of $915 is reasonable. (*Id.*) As to Mr. Washington, Mr. Hoffman declares that while he has not worked with Mr. Washington, he understands that Mr. Washington is a 2015 law school graduate who clerked for the District of Puerto Rico. (*Id.* ¶ 7.) Mr. Hoffman believes that a rate of $700 per hour is within the standard range of rates charged in the community for work by an attorney of this level of experience. (*Id.*)

Plaintiff also submits the declaration of V. James DeSimone who has practice law in Los Angeles since 1985. (DeSimone Decl. ¶ 2.) Mr. DeSimone declares that he has litigated civil rights cases since 1990. (*Id.* ¶¶ 2-3.) He has authored numerous articles and taught seminars on civil rights and speaks often at bar association events. (*Id.* ¶ 5.) Mr. DeSimone declares that he is familiar with the rates charged by plaintiffs' attorneys throughout California as he has had to survey them in connection with fee applications each year. (*Id.* at ¶ 8.) Mr. DeSimone further declares that rates of similarly trained attorneys for complex civil litigation such as civil rights cases vary from $350 to $1500 an hour. (*Id.* ¶ 16.) As a lawyer with thirty-five years of experience, Mr. DeSimone's hourly rate

5

is $1,100, which he believes to be on the lower end of the range. (*Id.*) Mr. DeSimone has known Mr. Stormer for over thirty years and has co-counseled cases with him. (*Id.* ¶ 18.) Mr. DeSimone declares that Mr. Stormer's hourly rate is in line with rates currently being charged by attorneys in large firms of comparable or lesser skill and experience in specialized litigation groups. (*Id.*) Further, he declares that he is aware that attorneys with Mr. Stormer's skills, experience, and abilities charge anywhere from $1,100 to $1,800 per hour for plaintiff's side litigation. (*Id.* ¶ 19.) Mr. DeSimone has known Ms. Ricketts for about ten years and believes her hourly rate is in line with fees charged by trial attorneys in civil rights cases at her skill and experience level. (*Id.* ¶ 20.)

The Declarations of DeSimone and Hoffman evidence that Dan Stormer is considered a leading civil rights attorney. (*See* DeSimone Decl. ¶ 18; Hoffman Decl. ¶ 5.) Plaintiff also submits declarations attesting to the reputation, skill, and experience of Plaintiff's counsel. (*See e.g.,* Declaration of Dan Stormer ("Stormer Decl."); Declaration of Morgan Ricketts ("Ricketts Decl."); Declaration of Clay Washington ("Washington Decl.").) Mr. Stormer declares that he has practiced law for 49 years and is a founding partner of the law firm Hadsell Stormer Renick & Dai LLP, which practices primarily in the areas of employment discrimination, constitutional, civil rights, international human rights, and public interest law. (Stormer Decl. ¶ 2.) Among his many accolades, Mr. Stormer has co-authored three law review articles, wrote a monthly column for the Matthew Bender California Labor and Employment Bulletin, has been the subject of numerous legal media profiles, taught legal programs, and received numerous awards in recognition of his skills in civil rights cases. (*Id.* ¶¶ 6-8.) Additionally, on February 22, 2024, in *Pederson, et al. v. The County of Plumas, et al.*, 2:89-1659 (E.D. Cal. filed Dec. 4, 1989), a Court in the Eastern District of California awarded Plaintiffs attorneys' fees, including $6,000 for 4 hours billed by Mr. Stormer at his hourly rate of $1,500. (Dkt. No. 194, March 29, 2024 Declaration

6

of David Washington ¶¶ 2, 4.)  Thus, Plaintiff's requested rate of $1,400 per hour for Mr. Stormer is supported.

Morgan Ricketts served as counsel in the case and during trial.  Ms. Ricketts graduated from the Harvard Law School in 2009,  has litigated civil rights cases since 2013, and has first-chaired at least ten jury trials.  (Ricketts Decl. ¶ 2.) Ms. Ricketts estimates litigating twenty to thirty plaintiff's civil rights cases.  (*Id.*) Plaintiff submitted declarations attesting to her skill and experience.  (*See* DeSimone Decl. ¶ 20; Hoffman Decl. ¶ 6.)  The Court finds her requested rate of $915 reasonable and supported by the evidence.

David Washington served as counsel in the case and during trial.  Mr. Washington has been practicing for eight years, first as a Federal Defender, then as a Civil Rights Fellow with the Southern Poverty Law Center, where he declares he litigated the largest class action lawsuit ever brought against the Alabama Department of Corrections.  (Washington Decl. ¶ 6-8.)  Additionally, in *Pederson,* 2:89-1659 the district court awarded Plaintiffs' attorneys' fees, including $110,460 for 157.8 hours billed by Mr. Washington at his 2023 hourly rate of $700.  (Dkt. No. 194, March 29, 2024 Declaration of David Washington ¶¶ 2, 4.) The Court finds the requested $700 per hour reasonable based on the evidence presented.

The Court similarly finds the requested rates of $800 for attorney Shaleen Shanbhag and $280 for paralegal Tami Galindo reasonable based on the evidence presented in the Declarations of Dan Stormer and Morgan Rickets.  (Stormer Decl. ¶ 21, Ricketts Decl. ¶ 8.)  Ms. Shanbhag is a former partner at Hadsell & Stormer and graduated from law school in 2014.  (Stormer Decl. ¶ 33.)  Ms. Galindo's requested hourly rate is consistent with the City's requested rate for its own paralegal's time as demonstrated in a Motion for Attorney's fees filed by the City of Los Angeles in February 2019.  (Ricketts Decl. ¶ 8.)

Defendants contend that (1) the rates requested by Mr. Washington and Ms.

7

Rickets should be reduced based on their lack of experience litigating civil rights cases, and (2) Mr. Stormer's rate should be reduced back on his lack of involvement throughout the case, including trial. Defendants support their argument with a declaration from Gerald G. Knapton, an expert on legal fees. (Declaration of Gerald G. Knapton ("Knapton Decl.").) Mr. Knapton is a senior partner with Ropers, Majeski P.C. (*Id.* ¶ 2.) He has qualified and testified as an expert on legal fees more than sixty times. (*Id.* ¶ 3.) Mr. Knapton relies on the 2022 Real Rate Report[1] to determine non-contingent hourly rates of partners, associates and paralegals based on location, experience, firm size, areas of expertise, and industry, as well as specific practice areas, and is based on actual legal billing and paid invoices from about 80 companies. (*Id.* ¶ 35.) The Real Rate Report shows the following data for partners, associates, and paralegals:

| Role | Timekeepers | First Quartile | Median | Third Quartile |
|---|---|---|---|---|
| Partner | 10592 | $430 | $653 | $969 |
| Associate | 9930 | $329 | $485 | $703 |
| Paralegal | 4215 | $150 | $225 | $325 |

The numbers change slightly for attorneys in Los Angeles:

| Role | Timekeepers | First Quartile | Median | Third Quartile |
|---|---|---|---|---|
| Partner | 40 | $410 | $835 | $995 |
| Associate | 38 | $361 | $475 | $735 |

Based on Mr. Knapton's analysis, Defendants propose reducing Plaintiff's counsel's rates to $835 for Mr. Stormer, $835 for Ms. Ricketts, $475 for Mr. Washington, and $225 for Ms. Galindo.

In the Ninth Circuit, reasonable rates for civil rights cases are not based

---

[1] The Real Rate Report is powered by the Wolters Kluwer ELM Solutions LegalVIEW® data warehouse and contains data on law firm rates and staffing trends based on actual invoice data.

8

only on rates offered in similar civil rights claims but rather comparison "extends to all attorneys in the relevant community engaged in equally complex Federal litigation, no matter the subject." *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir.2009) (holding that "the proper scope of comparison is not so limited" as to only other attorneys involved in prison litigation) (internal quotation marks and citation omitted). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990); *see also Camacho*, 523 F.3d at 980 ("[A]ffidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community, and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate.") (citation omitted).

The declarations filed in support of Plaintiff's Motion demonstrate that Plaintiff's counsel's requested rates are comparable to other attorneys in Los Angeles with similar skill and experience in complex litigation. The Court finds that counsel represented Plaintiff with professionalism, skill, and knowledge of the law. Thus, the Court overrules Defendants' objections to the declarations submitted by Plaintiff. The Court considers the declarations in calculating appropriate hourly rates for Mr. Stormer, Ms. Ricketts, Mr. Washington, Ms. Shahbag and Ms. Galindo.

### 2. Reasonable Hours

"By and large, the [district] court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1111 (9th Cir. 2014) (quoting *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008)). Courts generally accept the reasonableness of hours supported by declarations of counsel. *See, e.g., Horsford v. Bd. of Trustees of Cal. State Univ.*, 132 Cal. App. 4th 359,

9

396 (2005) ("[T]he verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous.")

Counsel's sworn declarations and attached time records evidence the attorney and paralegal hours spent on this litigation. Counsel applied a 10% reduction across the board to account for any potential billing errors. (Stormer Decl. ¶ 33.) Plaintiff requests a total of 1,876.2 hours.

Defendants contend that Plaintiff should not be awarded fees for administrative work, duplicative work, excessively billed work, block-billed entries, and vague billing descriptions. Defendants seek a 100% reduction for "administrative work." Defendants refer to Exhibit 5A of Mr. Knapton's declaration which includes 82.10 hours of billing entries totaling $44,910.50 in fees. (Knapton Decl. ¶ 68, Exhibit 5A.) Defendants cite to *Keith v. Volpe*, 644 F. Supp. 1317, 1323 (C.D. Cal. 1986), *aff'd*, 858 F.2d 467 (9th Cir. 1988), which disallowed hours for "clerical, secretarial and similar routine work" such as "pickup copies," "Xerox/distribute memo," "tag exhibits," "file review," "organize files," and "reproduce documents." Exhibit 5A includes a large number of time entries for "Outlook/calendaring." Counsel includes time entries for 1.8, 1.6 and .8 hours of work done by Mr. Washington for "draft trial calendar," "trial related deadlines chart," and "Update case calendar," respectively. The Court finds these tasks to be appropriately billed at the paralegal hourly rate. Exhibit 5A also includes time spent to "Prepare/edit/finalize Plaintiff's complaint/initiating documents (summons/civil case cover sheet/notice of interested parties)/efile/open new case/prepare chambers copies"; and "Work with IT and client to extract data from his phone for production." On reply, Plaintiff explains that while there is staff that perform non-specialized tasks such as answering phones, mailing, and printing, tasks that require compliance with court rules such as such as determining how many copies must be delivered to chambers and by what time,

10

filling out legal forms such as a summons, preparing proofs of service, and filing court documents – are all considered paralegal or attorney tasks, because they require familiarity with and adherence to court procedures and rules. The Court agrees that these tasks require some familiarity with court rules, and thus the Court does not reduce the fee award based on those time entries. The Court subtracts $1,764 from the requested fee award to account for attorney time spent calendaring.

Defendants request a 30% reduction for block billed entries. Defendants refer the Court to Exhibit 5B of Mr. Knapton's declaration which includes 261.50 hours of billing entries totaling $130,127.50 in fees. (Knapton Decl. ¶ 86, Exhibit 5B.) Defendants contend that the block billed entries are vague, duplicative, and unnecessary and should be reduced for failing to set forth with any degree of particularity, a breakdown of attorney time for the multiple tasks set forth in each block billed entry. However, the examples in Exhibit 5b are not examples of improper block-billing. The Ninth Circuit defines block billing as "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007) (citation omitted). A time entry which identifies interrelated tasks performed simultaneously is not considered block billing. *See, e.g.*, *LaToya A. v. San Francisco Unified Sch. Dist.*, 2016 WL 344558, at *8 (N.D. Cal. Jan. 28, 2016) Therefore, the Court includes the time entries identified in Exhibit 5B in the fee award.

Defendants request an additional 30% reduction for vague billing entries. Defendants refer the Court to Exhibit 5C of Mr. Knapton's declaration which contains 567.30 hours of billing entries totaling $293,972 in fees. A fee applicant must submit "evidence supporting the hours worked" and "should identify the general subject matter of his time expenditures" but "is not required to record in

11

great detail how each minute of his time was expended." *Hensley*, 461 U.S. at 437 n.12. Here, the majority of the time entries included in Exhibit 5C relate to communications with the client. On Reply, Plaintiff explains that most of the time, the subject of the call with the client is privileged and inappropriate to disclose, and that the safer practice is to simply note that there was a client communication. While the time entries referencing "call with client" are vague, each entry is less than an hour, which the Court finds to be a reasonable amount of time to discuss matters with the client. Additionally, Plaintiff requests $14,210 for time entries described as "document review" but has not provided any evidence to support this request, such as the volume or categories of documents reviewed. Without additional information, the Court finds these entries vague. Upon review of additional entries which Defendants contend are vague including "Emails/prepare/edit Plaintiff's complaint," "Discovery plan," "Leave message for Daniel Sosa," "Edit video clip for production," and "Draft discovery requests" the Court finds these entries adequate and do not warrant a reduction in the fee award. Moreover, Plaintiff's counsel has already applied a 10% across the board reduction in the attorneys' fees sought. The Court subtracts $14,210 from the requested fee award to account for unexplained time spent on "document review."

Defendants request a 100% reduction of duplicative work. Defendants refer the Court to Exhibit 5D of Mr. Knapton's declaration which contains 13.10 hours of billing entries totaling $5,647.50. (Knapton Decl. ¶ 69, Exhibit 5D.) Defendants contend that in light of counsels' experience and expertise in civil rights work, only one attorney should have been required to attend conferences with opposing counsel, depositions, and client meetings. The Ninth Circuit has held "duplicative work is not inherently inappropriate" (*see Chaudhry v*, 751 F.3d at 1112 (finding district court's reduction of fees by 88% in light of the fact that "multiple attorneys and legal assistants attended and participated in certain conferences, depositions, court hearings, and trial, doing much of the same work"

12

and "[m]any of the law clerks billed for duplicative note-taking or for training at trial or depositions" required a "more specific explanation than that provided by the district court) (citing *Moreno*, 534 F.3d at 1112)), and "the participation of more than one attorney" in case or at a hearing "does not constitute an unnecessary duplication of effort" (*see Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 785 (9th Cir. 1986)); *see also Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989) ("[T]he participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort."); *Lauderdale v. City of Long Beach*, 2010 WL 11570514, at *7 (C.D. Cal. Jan. 11, 2010) ("[H]aving multiple attorneys attend depositions, meetings and settlement conferences allowed counsel to contribute creative solutions, reduced the need for inter-office communications after meetings, and ameliorated disagreements over what actually went on at meetings."). As Plaintiff explains, it is a routine practice for more than one attorney to attend conferences with opposing counsel, depositions, and client meetings. Additionally, the entries in Exhibit 5D relate to conferences amongst Plaintiff's various counsel for purposes of discussing case strategy. (*See* Ex. 5D ("Litigation strategy call w/ DS"; "Telephone call with DS and DCW re litigation strategy"; "conf with DS, DW re: experts; "Meeting with SS, DW re experts.").) The participation of more than one attorney was necessary to discuss the relevant issues as provided in the time entries. Therefore, the Court the Court includes the time entries identified in Exhibit 5D in the fee award.

Defendants request a 40% reduction of "excessively billed work." Defendants refer the Court to Exhibit 5E of Mr. Knapton's declaration which contains 293.10 hours of billing entries totaling $131,892.50. (Knapton Decl. ¶ 72, Exhibit 5E.) Defendants identify tasks that appear to have taken more time than necessary based on the length of the document filed with the Court. For example, Defendants identify 11.2 hours spent by Ms. Shanbhag's entries to "Draft initial disclosures" which were 3.5 pages in length and 13.7 hours spent by

13

Mr. Washington's to "Draft ex parte app to compel and for sanctions" which was a 4.5-page Application that was denied by the Court. (*See* Dkt. No. 44.) The time spent on the initial disclosures and ex parte application were excessive. Plaintiff's counsel include time entries of 3 and 6 hours spent by Ms. Ricketts and Mr. Washington, respectively, for "Travel to and from Court." This time appears excessive based on the location of Plaintiff's counsel's offices and the courthouse. Plaintiff's counsel also include time entries of 11, 12.4, 15.8, 16.8 and 17.4 hours, for "trial preparation" or trial-related tasks, without substantiating the amount requested. During trial, Court was in session with the jury for approximately five hours, with about two hours spent with counsel after the jury was excused. Without additional information, the Court finds these time entries excessive. The Court limits trial days to eight hours and subtracts the additional time billed. As to the other time entries identified in Exhibit 5E, the Court does not find these entries excessive. Additionally, as noted above, Plaintiff's counsel has already applied a 10% reduction in the attorneys' fees sought. Therefore, the Court subtracts $59,215 from the requested fee award to account for excessive time as indicated above.

### 3. Multiplier

Plaintiff does not request a multiplier. However, Defendants contend that Plaintiff's fee demand should be reduced based on Defendants' success on the majority of the claims asserted against them. The jury found in favor of Defendants on Plaintiff's claims against Chief Moore, and on the majority of claims against the City of Los Angeles with respect to *Monell* liability. Defendants attempt to quantify Plaintiff's success based on a 50% success rate and ask that the Court reduce Plaintiff's number of hours by 75% for their limited success.

The Supreme Court has held: "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will

14

encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435. Here, Plaintiff prevailed on his Fourth Amendment claim against Officer Haney and his *Monell* claim against the City of Los Angeles for failure to properly train its officers (Dkt. No. 171.) The jury awarded Plaintiff $85,000 in compensatory damages and found that Plaintiff proved Officer Haney acted with malice, oppression, or reckless disregard for Plaintiff's rights. The other claims asserted were related to the underlying incident and based on a common core of facts. Thus, the time spent on claims for which Plaintiff did not prevail cannot reasonably be separated from time spent on claims on which Plaintiff did prevail. *See City of Riverside v. Rivera*, 477 U.S. 561, 569-73 (1986) (holding the district court did not abuse its discretion in awarding attorney's fees for all time reasonably spent litigating the case although respondents had prevailed only on some of their claims and against only some of the defendants); *McCown v. City of Fontana*, 565 F.3d 1097, 1103 (9th Cir. 2009) (noting "in a lawsuit where the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories,' the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis.")

### 4. Costs

Plaintiff seeks reimbursement of non-taxable costs totaling $15,703.50. Section 1988 permits a prevailing party to recover as part of an attorneys' fee award "those out-of-pocket expenses that would normally be charged to a fee-paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks and citation omitted); *Dang v. Cross*, 422 F.3d 800, 814 (9th Cir. 2005) (quoting same). Plaintiff's counsel declares that it is the routine and common practice of firms handling complex litigation to charge fee-paying clients

separately for copying, expert or consultant fees and other necessary out-of-pocket expenses. (Stormer Decl. ¶ 38.) In addition to the $19,080.29 in costs requested in Plaintiff's Bill of Costs, filed on June 13, 2023, Plaintiff requests reimbursement of $15,703.50 in non-taxable expenses. (Dkt. No. 180.) Plaintiff includes an exhibit with documents supporting the costs requested. (Stormer Decl. ¶ 40, Ex. 4.) Plaintiff seeks the following non-taxable costs: $600 paid to Defendants' police practices expert, Edward Flosi, for time spent in deposition; $10,043 in photocopying costs; $2500 in costs to prepare demonstrative video clips for trial; and $2,560.50 in costs to prepare exhibit binders for trial. Defendants concede that these costs are recoverable with the exception of $10,043.10 for photocopying, which Defendants' expert declares "constitutes a part of the firm's overhead." The Court finds reasonable photocopying costs are generally recoverable, however Plaintiff has not adequately shown that the request for $10,043 is reasonable. *See Harper v. City of Los Angeles*, 2006 WL 8446990, at *11 (C.D. Cal. May 16, 2006) (finding plaintiff had not met burden of demonstrating that photocopying costs were "reasonable and necessary for effective and competent representation"). It is Plaintiff's burden to provide the Court with evidence indicating the general purpose or subject matter of the photocopies. The Court cannot determine what would be a reasonable figure based upon this lack of evidence. Accordingly, the Court declines to award the photocopying costs sought. As to the other costs sought and upon review of the evidence, Plaintiff's requests appear reasonably and necessarily incurred in advancing the interests of the client. Therefore, the Motion is **GRANTED** as to the request for nontaxable costs, with the exception of the costs for photocopying.

///

///

///

///

16

## IV.  CONCLUSION

Accordingly, the Court **GRANTS** Plaintiff's Motion for Attorneys' Fees in the amount of $1,182,333.30 and $5,660.4 for nontaxable costs pursuant to 42 U.S.C. § 1988.


**IT IS SO ORDERED.**


DATED:  APRIL 19, 2024

_____
HON. CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

17

# EXHIBIT 5

AGREEMENT FOR PROFESSIONAL LEGAL SERVICES

BETWEEN

THE CITY OF LOS ANGELES

AND

GIBSON, DUNN & CRUTCHER LLP

## AGREEMENT FOR PROFESSIONAL LEGAL SERVICES

C-201616

THIS AGREEMENT, Contract Number _____, is made and entered into by and between the City of Los Angeles ("City"), a municipal corporation, acting through the Office of the City Attorney ("City Attorney"), and Gibson, Dunn & Crutcher LLP, a Delaware limited liability partnership ("Outside Counsel" or "Gibson Dunn"), with reference to the following:

### RECITALS

**WHEREAS,** the City Attorney and the Los Angeles City Council/Board have approved the use of Outside Counsel to assist the City Attorney with legal representation in the matter of the LA Alliance for Human Rights, et. al v. City of Los Angeles, et. al; and

**WHEREAS,** Outside Counsel indicates that it has the expertise and competence to perform the professional legal services sought by the City; and

**WHEREAS,** the City Attorney has selected Outside Counsel to provide assistance in such matters, Outside Counsel is willing to provide such assistance and represents to the City that it is able to do so without a conflict of interest; and

**WHEREAS,** the professional legal services to be performed by the Outside Counsel are of an expert and technical nature and are temporary and occasional in character;

**NOW, THEREFORE,** in consideration of the promises, covenants, terms and conditions contained herein, the parties hereby covenant, agree and represent as follows:

### I.    SCOPE OF REPRESENTATION AND PARTNERING

Outside Counsel is retained to assist the City Attorney in providing legal representation for the City in the matter of LA Alliance for Human Rights, et. al v. City of Los Angeles, et. al. Outside Counsel shall at all times work under the direction of the City Attorney. The City and City Attorney shall rely on the competence, expertise and experience of Outside Counsel. At all times, Outside Counsel shall provide professional legal advice and services at the highest level expected of law firms providing legal services in the Los Angeles region. This is a non-exclusive agreement to provide legal services to the City and, at the City Attorney's discretion, the City may augment the services with another law firm or law firms or select to terminate Outside Counsel's services in a manner consistent with this Agreement.

City Attorney and Outside Counsel recognize and agree that an important purpose of this Agreement is to promote effective collaboration between City Attorney and Outside Counsel so that, among other things, City Attorney is able to gain familiarity with the legal issues presented in these matters and for Outside Counsel to impart substantive subject matter knowledge to City Attorney's lawyers. To this end, City Attorney and Outside Counsel both agree to make reasonable efforts to coordinate their efforts and work.

1

## II.    **GENERAL CONDITIONS**

### A.    Period of Performance

This Agreement shall begin on the effective date hereof and will be considered terminated at the earlier of (a) City's termination of Outside Counsel's representation pursuant to Section II.B. below, (b) Outside Counsel's withdrawal from its representation of City, or (c) the substantial completion of Outside Counsel's work for City. In the event there has been no work performed by Outside Counsel's attorneys on City's behalf for a period of six consecutive months, the parties agree that the attorney-client relationship will have been terminated, unless the matter on which Outside Counsel was engaged is a litigation matter that is still pending in a court or other tribunal.

### B.    Termination or Suspension of Legal Services

#### 1.    Termination or Suspension for City's Convenience

a)    Services performed under this Agreement may be terminated or suspended in whole or in part at any time by City Attorney. City Attorney shall terminate or suspend services by delivering to Outside Counsel a written notice specifying the extent to which services are terminated or suspended and the effective date of such termination or suspension.

b)    After receiving a notice of termination or suspension, unless otherwise directed by City Attorney, Outside Counsel shall:

1)    Stop services on the date and to the extent specified in the notice; and

2)    Continue to perform services not terminated or suspended by the notice.

c)    After receiving a notice of termination, Outside Counsel shall submit final billing for services rendered through the time of termination no later than thirty (30) calendar days from the effective date of termination.

#### 2.    Termination for Outside Counsel's Default

a)    Services performed under this Agreement may be terminated in whole or in part by City Attorney upon a default by Outside Counsel. Under this Agreement, Outside Counsel will be deemed in default if Outside Counsel:

1)    Fails to perform the service(s) within the specified time period; or

2)    Fails to perform any of the provisions contained in this Agreement; or

3)    Fails to make adequate progress in the matter and

2

endangers the performance of this Agreement's terms.

b)      If City Attorney wholly or partially terminates services under this Agreement, City Attorney may obtain alternative legal services with terms and in a manner City Attorney deems appropriate.

### 3.      Termination By Outside Counsel

Outside Counsel may withdraw from representation and terminate this agreement with consent of the City Attorney or for good cause, which includes the City's breach of this agreement or refusal to cooperate with Outside Counsel or follow our Outside Counsel's advice on a material matter, as well as in any other circumstance permitted by applicable rules.      Otherwise, Outside Counsel's representation of the City will terminate upon the earlier of May 21, 2028, or six months of no work recorded by Outside Counsel on the matter.

### 4.      Transfer of Client File

Outside Counsel shall give City Attorney the Client File (defined below) for every matter in which Outside Counsel is substituted out as attorney of record. Outside Counsel shall reasonably cooperate with City in connection with its transition to alternate counsel.

5.      Notwithstanding such termination, City will remain obligated to pay Outside Counsel for all services provided and to reimburse Outside Counsel for all costs and expenses paid or incurred on City's behalf prior to such termination in accordance with the terms of this Agreement.   If requested by City Attorney, Outside Counsel shall file a Motion for Substitution of Counsel or other necessary pleadings with the court when instructed to do so by City Attorney and shall deliver a Closing Report to City Attorney as soon as reasonably practicable of the termination of services.   The Closing Report shall include:

1)      A brief description of the facts of the case;

2)      A discussion of applicable law;

3)      A description of the status of the case; and

4)      A list and description of future scheduled court appearances.

### C.      Independent Contractor Status

This Agreement is between City and Outside Counsel and is not intended, and shall not be construed, to create, as between City and Outside Counsel, the relationship of agent, servant, employee, partnership, joint venture or association.   Outside Counsel understands and agrees that all Outside Counsel personnel furnishing services to City under this Agreement are employees solely of Outside Counsel and not City.   Outside

3

Counsel shall bear the sole responsibility and liability for furnishing workers' compensation benefits to any Outside Counsel personnel for injuries arising from services performed under this Agreement.

D.    Ownership of Documents

All information, documents, records, reports, data, or other materials furnished to Outside Counsel or other such information, documents, records, data or other materials to which Outside Counsel has access during their performance pursuant to this Agreement are deemed confidential and shall remain the property of City ("City Information"). All memorandum, filings, drafts, closing sets, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other work product produced in the course of representing the City for which Outside Counsel has been paid, together with the City Information is defined as the "Client File". Outside Counsel shall not make use of City Information for any purpose unrelated to the Retained Matter and shall not make oral or written disclosure thereof, other than as necessary for their performance hereunder, in each case, without the prior written approval of City Attorney.

Outside Counsel will retain the Client File electronically and/or in its off-site storage facilities in accordance with Outside Counsel's records retention policy. In the absence of any other arrangements made with City, Outside Counsel's records retention policy provides that upon the expiration of ten years after a matter has been closed, all materials in the file may be destroyed or discarded without notice to City.

The "Firm's Files" are comprised of administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal correspondence and lawyers' work product (such as drafts, notes, internal memoranda, mental impressions, and legal and factual research), or other similar materials. The Firm's Files are Outside Counsel's property and, as such, Outside Counsel may retain or dispose of the Firm's Files at its sole discretion.

E.    Insurance

Outside Counsel shall comply with the insurance requirements described in this Agreement. If Outside Counsel does not obtain professional liability insurance or maintain the insurance throughout the duration of this Agreement, City Attorney may terminate the Agreement.

F.    Governing Law

The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of California and any action brought by either party on this Agreement shall be brought in the Los Angeles County Central District of California Superior Courts.

G.    Validity

The invalidity in whole or in part of any provision of this Agreement shall not void or affect the validity of any other provision.

H.    Waiver

4

No waiver of a breach of any provision of this Agreement by either party shall constitute a waiver of any future breach of the provision or any breach of any other provision of this Agreement. Failure of either party to enforce any provision of this Agreement at any time shall not be construed as a waiver of that provision.

I.    Remedies Reserved to City

The remedies reserved to City shall be cumulative and additional to any other remedies provided in law or equity.

J.    Authorization for Warranty

Outside Counsel represents and warrants that the signatory(ies) to this Agreement is(are) fully authorized to obligate Outside Counsel and that all corporate acts necessary to the execution of this Agreement have been accomplished.

K.    Changes and Written Amendment of Terms

Material changes to this Agreement shall only be effective upon the execution of a mutually-approved written amendment.

III.    **OUTSIDE COUNSEL'S SERVICES AND RESPONSIBILITIES**

A.    Professional Ethics and Conflicts of Interest

Outside Counsel is a large international law firm with active practices in a variety of areas including regulatory matters, government contracts and litigation. City recognizes that Outside Counsel currently represents and may in the future represent other clients that, from time to time, may have interests adverse to City. Any such representation shall be in accordance with applicable rules of professional conduct.

In a variety of matters currently being handled by Outside Counsel for other clients, the scope of Outside Counsel's representation is such that the City and other City agencies are or may be or later become adverse parties in such matters. Based upon the results of our conflict search, we do not believe that Outside Counsel's representations of other clients presents any direct conflict with the City, other than the representations identified below (collectively, the "Existing Matters"), none of which is directly related to the litigation matter in which Outside Counsel has been asked to represent the City (the "Retained Matter"):

- Representation of Uber in connection with *People v. Uber Technologies, Inc.*
- Representation of HomeAway in connection with *People v. HomeAway.com, Inc.*
- Representation of HRRP Garland in connection with *LA Care v. HRRP Garland, LLC* and *City of Los Angeles v. HRRP Garland, LLC*
- Representation of Alliance for Automotive Innovation as amicus curiae in litigation in the D.C. Circuit concerning Corporate Average Fuel Economy standards
- Representation of SoCalGas and SoCal Edison (and/or their affiliates) in connection with various matters related to franchise agreements with the City (and Port and LAX)
- Representation of MacQuarie in connection with a lease agreement with the City/Port

5

- Representation of SSA Marine/Carrix and Blackstone Infrastructure Partners in connection with a lease agreement related to the Port
- Representation of Berggruen Institute in connection with a proposed Specific Plan and related CEQA approvals for a think tank / educational institute in CD11
- Representation of Al Violet (Hines) in connection with a proposed office development project in Downtown Los Angeles (CD14)
- Representation of Phillips 66 in connection with a proposed conversion of a Wilmington refinery to a different industrial use (CD15)
- Representation of the Los Angeles Rams in connection with a proposed Master Plan for a new practice facility and mixed-use development in Warner Center (CD3)
- Representation of Burlington Stores in connection with potential land use development issues related to improvements to existing store location(s) in the San Fernando Valley
- Representation of Fifteen Group in connection with a potential redevelopment project in CD14
- Representation of Prime Property Capital in connection with a potential land use application in CD4

In addition to the Existing Matters, Outside Counsel also expects to represent existing and future clients in future matters, including litigation, under circumstances in which the City and other City agencies may be adverse parties (collectively, "Future Matters").

To ensure that our work for the City does not adversely affect the ability of Outside Counsel to continue to represent other clients on current or future matters where their interests may be adverse to the City or any agencies thereof, including but not limited to litigation adverse to the City or any of its agencies, the City agrees that:

(1) the City is Outside Counsel's only client in the Retained Matter, and Outside Counsel shall not be deemed to represent (a) the City with respect to any matter other than the Retained Matter; or (b) any other agency with respect to the Retained Matter or any other matters, in each case, absent both parties' consent and our completing a conflicts check;

(2) the City waives any conflict of interest that might exist or arise from Outside Counsel's representation of other clients in connection with:

> a. the Existing Matters and any Future Matters that do not involve litigation against the City;
>
> b. any Future Matters that involve litigation adverse to the City where such litigation is initiated by the City; and
>
> c. any Future Matters that involve litigation adverse to the City where such litigation is initiated by another client, provided that (i) such Future Matters do not directly relate to homelessness issues or the work performed for the City in the Retained Matter, and (ii) Outside Counsel establishes an ethical screen between the team on any such Future Matters and the team that has represented the City in the Retained Matter; and

6

(3)      the City will not seek to disqualify Outside Counsel or any of Outside Counsel's lawyers in, or assert a conflict with respect to, Outside Counsel's engagement in any Existing Matters or any Future Matters that are in compliance with the City's agreement to waive conflicts under this paragraph.

Outside Counsel understands and agrees that Outside Counsel may not pay or receive, or agree to pay or receive, any referral fees, remuneration, reciprocal referral or anything else of value as a result of or related to the matters on which Outside Counsel is engaged by the City, other than the fees and costs paid by the City for Outside Counsel's services in these matters. Outside Counsel understands and agrees that no City employee may solicit, agree to accept or receive any referral fees, remuneration or other item of value related to any services rendered to the City, any claim or other matter brought or filed against the City or any settlement, resolution, verdict, or other disposition by or against City. Outside Counsel immediately shall report any such solicitation, agreement or receipt to the City Attorney and to the City Ethics Commission.

B.     Key Outside Counsel Personnel

1.      Outside Counsel's Supervising Attorney for this Agreement shall be Theane Evangelis.  Outside Counsel's Supervising Attorney shall not be changed without City Attorney's written authorization.

2.      Outside Counsel's Supervising Attorney shall have full authority to act for Outside Counsel on all daily operational matters under this Agreement and shall serve as or designate Lead Counsel for all law and motion appearances, pretrial and trial proceeding(s), settlement conference(s) or meetings of counsel for the litigants, depositions, document productions, and all court and other proceedings in which substantive rights of the parties may be determined.  Designation of a Lead Counsel other than the Supervising Attorney shall be subject to City Attorney's prior written approval.

C.     Legal Representation

1.      Outside Counsel shall provide City with the necessary representation by qualified staff at the least costly billing category.  Partners and associates shall be admitted to practice law before all of the courts of the State of California or of whatever state or district in which Outside Counsel is engaged to represent the City. The names of personnel authorized to provide services under this Agreement and the hourly rates for each staff member are listed in the document entitled, "Hourly Rates for Gibson Dunn," attached hereto and incorporated herein as Exhibit B to this Contract.

Any use of personnel other than as enumerated shall be subject to the prior written approval of City Attorney's Supervising Attorney.  Outside Counsel may hire experts or consultants, but only with the prior written approval of City Attorney's Supervising Attorney.  Outside Counsel may retain other law firms or attorneys as subcontractors to provide the legal services covered by this Agreement, but only with the prior written approval of the Chief Deputy City Attorney.  Any such written approval of subcontractors must set forth the name of each approved attorney or other personnel and the agreed rate for such individual.

7

Outside Counsel will use commercially reasonable efforts to require any such subcontractors or consultants comply with the terms and conditions of this Agreement, but Outside Counsel shall not be liable for any act or omission of any such subcontractors or consultants.

2.    Outside Counsel's legal representation shall include, but is not limited to:

a)    All settlement negotiations and pretrial proceedings;

b)    Appearances at all law and motion hearings, discovery proceedings, hearings regarding orders to show cause, writs, trials and, when applicable, administrative hearings;

c)    All due diligence, legal research, preparation for hearings, and review of all documents and other evidentiary materials;

d)    Investigative, secretarial, and clerical support services necessary to perform the legal representation in a professional manner.

3.    Outside Counsel shall provide all required reports referenced in this Agreement.

4.    Outside Counsel shall meet with City Attorney as City Attorney requires.

5.    Outside Counsel shall consult with City Attorney on trial and tactical decisions.

6.    Outside Counsel shall assist City Attorney's Supervising Attorney in settlement evaluations and negotiations, and shall obtain City Attorney's authority before making any settlement proposal on City's behalf to the Court or any party.

7.    Outside Counsel shall immediately notify City Attorney, in writing, when a judgment, verdict or other award is rendered.

8.    Upon City Attorney's request, Outside Counsel shall provide copies of all court rulings and all pleadings filed with the court or other administrative body, including those submitted by other parties.

9.    Outside Counsel shall maintain all backup documentation to support all entries included in its billings.

D.    Reporting Requirements

Depending on the nature of the matter and the benefit derived, City Attorney may request that Outside Counsel provide City Attorney with the following reports:

1.    Case Evaluation and Plan

a)    The Case Evaluation and Plan is a written independent evaluation of the case that can be used to develop City's legal position and strategy. It will also serve to assist in controlling litigation costs.  Outside Counsel

8

shall base the Case Evaluation and Plan on a review of the pleadings, discovery, reports and other documents, physical evidence, conversations with City Attorney and any other information Outside Counsel deems appropriate based on Outside Counsel's expertise and experience.

b)    The Case Evaluation and Plan shall include, but is not limited to:

1)    Statement of known facts and identified legal issues, including identities of opposing attorney(s), if known;

2)    Statement of precedent-setting or sensitive issues, if applicable;

3)    Statement of alleged and probable injuries and damages;

4)    Statement of liability exposure;

5)    Statement of recommendation(s) on case strategy, including discovery, motions, extent of legal research, consultants and percipient witnesses, experts to be retained, and the extent of expert services to be performed;

6)    Statement of Outside Counsel's projected costs that can be reasonably anticipated.   Costs shall be budgeted on a total, annualized basis and shall include, but are not limited to:

(a)    Attorney fees - an identification of the staffing levels, hourly rates and estimated number of hours for each partner, associate, and/or paralegal;

(b)    Consultant and expert witness rates, and estimated number of hours each will be needed;

(c)    Deposition, transcript and other expenses;

(d)    Fees and expenses for handling the case through each of the following applicable stages:

(1)    Pleadings

(2)    Discovery

(3)    Pretrial conference(s)

(4)    Mediation or Arbitration

(5)    Trial, and

(6)    Any other identified stages.

9

2.    Proposed Settlement Recommendations

a)    If requested by City Attorney, Outside Counsel shall submit to City Attorney written settlement recommendations that clearly state the reasons supporting a proposed settlement.

3.    Appellate Action

a)    If requested by City Attorney, Outside Counsel shall submit to City Attorney recommendations as to whether to appeal or petition for other review, or defend in the appellate courts. Outside Counsel shall state clearly the reason(s) supporting the recommended action.

b)    Outside Counsel shall list City Attorney as co-counsel with Outside Counsel on all briefs and papers submitted to the appellate courts or other reviewing body.

## IV.    CITY'S DUTIES AND RESPONSIBILITIES

A.    Key City Personnel

1.    City hereby appoints the City Attorney, or his or her designee, to represent the City on all matters related to this Agreement; however, any written amendment to this Agreement requiring additional funds shall be conditioned upon the approval of the additional appropriation of said funds by the Los Angeles City Council/Board. The City Attorney's Supervising Attorneys shall be Chief Deputy City Attorney Valerie Flores and Hydee Feldstein Soto, the Los Angeles City Attorney.  On all matters relating to invoices the City Attorney's representative shall be Valerie Flores, Arlene Hoang and Jessica Mariani.

2.    City Attorney's Supervising Attorneys shall have full authority to act for City on all daily operational matters under this Agreement and shall review and approve Outside Counsel's reports, whether written or verbal, and any change in Outside Counsel's designated Lead Counsel.

3.    Approval of proposed settlement recommendations is subject to City's settlement approval procedures.

## V.    COMPENSATION

A.    Appropriation of Funds

The Los Angeles City Council has appropriated $900,000 for this Agreement. Outside Counsel's work pursuant to this Agreement shall not exceed that amount without the prior written approval of City Attorney.  While the contract amount is not intended to be a binding fee cap, the City may delay payment for any work done and/or costs incurred in excess of the appropriated amount unless additional appropriations are made and a written amendment to this Agreement is executed by the parties.

10

B.    Outside Counsel's Obligation for Continued Performance

In the event that Outside Counsel's fees, costs and expenses, in the aggregate, exceed the amount appropriated by City as provided herein, Outside Counsel shall not be obligated to provide services or incur any further costs or expenses on the work required hereunder, and the City shall not be liable for fees or costs in excess of the amount appropriated, unless the appropriated amount is increased as provided herein. Outside Counsel shall be responsible for notifying City Attorney's Supervising Attorneys that the aforesaid appropriated amount will be expended before completion of the work required hereunder and that Outside Counsel will need additional funds if City desires further work. Outside Counsel shall give written notice to City Attorney's Supervising Attorney and to the City Attorney's Chief Financial and Administrative Officer, when Outside Counsel's expenditures under this Agreement are equal to sixty percent (60%) and eighty percent (80%) of the total dollar value appropriated for this Agreement so that City Attorney has sufficient time to consider whether it desires to seek an additional appropriation and written amendment to the Agreement.

C.    Fees

1.    The City shall pay Outside Counsel for the services performed by Outside Counsel which are reasonably necessary. The fees for such services shall be based upon the time expended to render the required services, with fractions thereof being stated to the tenth of an hour, and shall be computed at a rate not to exceed the discounted rates specified for each category of staff as listed in Exhibit B. Notwithstanding the foregoing, in no event shall the total fees for Outside Counsel's services over the life of the Retained Matter exceed the amount that Outside Counsel would have billed the City if its fees were computed based on the standard hourly rates in effect at the time the services were provided for each category of staff.

2.    Billing rates may only be increased with the prior written approval of the Chief Deputy City Attorney.

D.    City's Reservation of Rights to Obtain Reimbursement

City shall pay Outside Counsel based on Outside Counsel's submission of monthly invoices consistent with the provisions of this Agreement. Even though City makes payment pursuant to invoices, City shall have the right to demand reimbursement any time City determines that previously paid costs and expenses where not properly billed by Outside Counsel. Outside Counsel shall promptly reimburse City for such costs and expenses previously paid by City.

E.    Expenses

Absent the express prior written approval of the appropriate City Attorney's Supervising Attorney, the City will not pay for any extraordinary expenses incurred in any legal matter. The City Attorney's Chief Financial and Administrative Office must approve in writing any item of expense that exceeds $5,000. The City Attorney's Supervising Attorney must approve in writing any item of expense that exceeds $1,000. Such expenses include, but are not limited to, expert witnesses, consultant services,

11

investigative services, computer litigation support services, videotaping of depositions, temporary office help, travel expenses, meals as well as other expenses. Travel time is non-reimbursable. The City will not pay for business class or first class airfare or luxury hotels. City shall reimburse Outside Counsel for the actual out-of-pocket expenses, enumerated below, but without any additional costs for having advanced the funds. Outside Counsel shall note that City is exempt from all filing fee charges.

1.    Reimbursable ordinary expenses shall include, but are not limited to:

a)    Deposition fees- The City expects Outside Counsel to keep the costs of deposition transcripts to a minimum. When depositions are taken and Outside Counsel receives the original, City shall not pay the court reporter's fee for providing Outside Counsel with an extra photocopy of the deposition transcript. City expects Outside Counsel to make a photocopy of the original at Outside Counsel's office. Likewise, when attending depositions of third parties or third-party witnesses, City requests that, if Outside Counsel believes an additional copy of the deposition transcript is necessary, Outside Counsel agree with opposing counsel or co-counsel to share the costs. Prior written approval from City must be obtained before ordering any expedited original or expedited copy of a deposition transcript.

b)    Deposition summaries, if necessary, should be brief and should be completed by the deposing attorney. The City shall not pay for a paralegal or other lawyer to summarize the deposition transcript unless trial is imminent. City shall not pay for summaries that are, in effect, a complete regurgitation of the underlying deposition.

c)    Transcript fees;

d)    Messenger service - where appropriate, documents should be transmitted via email or facsimile/telecopier;

e)    Facsimile/Telecopier (FAX) transmission - Outside Counsel shall not bill the City for any expense related to facsimile charges beyond Outside Counsel's actual net costs for long distance telephone charges actually and reasonably incurred by Outside Counsel for the sending of facsimiles. Outside Counsel shall indicate in its billing statements the number of pages transmitted via facsimile together with the related cost of each charge. Outside Counsel shall attach the appropriate receipts, invoices or proof of any expenditure for facsimile charges; and

f)    Process service.

2.    Reimbursable extraordinary expenses shall include charges for which Outside Counsel has obtained City Attorney's prior written approval. Such expenses shall include, but are not limited to:

a)    Consultants;

b)    Expert witnesses;

12

c)     Investigative services;

d)     Computer Assisted Legal Research ("CALR") - The City of Los Angeles's decision to retain a particular firm is based in part on the firm's expertise and knowledge. The City therefore assumes familiarity with the basic substantive law at issue in the matter for which the firm was retained; any exception to this general expectation should be discussed fully at the time of retention. In conducting legal research the law firm is expected to utilize all appropriate sources reasonably available, including previously prepared briefs and memoranda. Should Outside Counsel determine that it is necessary to incur CALR charges in order to satisfy the terms of this Agreement, Outside Counsel shall obtain City Attorney Supervising Attorney's prior written approval to charge for such expenses. No charges for CALR shall be paid by the City without its prior written approval of such a charge.

Outside Counsel shall describe in detail in its billings any travel expenses incurred by Outside Counsel. City retains the right to audit these expenses. Only coach fare will be reimbursed for travel. Travel time is non-reimbursable. If a receipt is submitted, a reasonable single occupancy hotel accommodations will be reimbursed. For trial attendance by out-of-town experts or consultants, this rate may be increased, depending on the availability of lodging and prior City Attorney written approval.

3.     Non-reimbursable expenses shall include, but are not limited to:

a)     Staff time or overtime for performing secretarial, clerical, or word processing functions;

b)     Charges for time spent complying with City Attorney audits or billing or budgeting inquiries;

c)     Charges for work performed which City Attorney had not authorized. Such work shall be a gratuitous effort by Outside Counsel; and

d)     Expenses that are considered to be part of general law firm overhead, including but not limited to, administrative time, secretarial time, calendaring, setting up files, indexing, word processing, air conditioning, equipment rental, office supplies, meals, snacks, beverages, seminars, books or association dues, etc.;

e)     Travel time.

F.     Rates

Outside Counsel represents that, as of the date hereof, the rates set forth in Sections III.C. and V.C. above and the other economic terms and conditions provided in this Agreement, taken individually, are agreed upon for both parties.

13

## VI.   BILLINGS AND PAYMENTS

### A.   Billings

1.    Outside Counsel shall endeavor to submit its billing statement monthly in arrears, no later than the tenth business day of the month following the month service was rendered.

2.    Outside Counsel and City Attorney recognize that legal services performed under this Agreement are being paid for with tax dollars from the citizens of the City of Los Angeles and that, therefore, a heightened duty of care exists in both Outside Counsel and City Attorney to ensure that Outside Counsel scrupulously adheres to principles of moderation, frugality and cost consciousness in carrying out the goals of this Agreement. Outside Counsel pledges to observe a duty of reasonableness and cost effective representation in all aspects of this Agreement. Accordingly, each billing statement shall contain a certification by Outside Counsel's Supervising Attorney that the services performed and the expenses incurred were both reasonable and necessary.

3.    The City will not pay for more than one attorney doing any particular task unless City Attorney has given its prior written approval. The City will not pay for excessive attorneys attending the same deposition or court appearance. The City will pay for the time recorded by more than one attorney for in-office conferences, but only if the conference is an occasional and necessary strategy meeting relating to some significant legal event or proceeding.

The City shall not pay for duplicative time charges by two or more attorneys, e.g., for legal research, reviewing documents, drafting documents, except as reasonably necessary for the complexity of the matter or as approved in writing by City Attorney. The City shall not pay for "training" or "apprenticeship" time. The City shall not pay for the involvement of attorneys who work on the case irregularly or sporadically, unless a particular attorney has a special expertise that substantially advances the prosecution/defense of the case.

4.    Use of paralegals is encouraged providing they meet the requirements set forth herein. Assignment of work to paralegals should not result in duplicative activity between attorneys and paralegals, or the reworking or rewriting of paralegals' work product by attorneys. The City will not pay for paralegal time spent performing clerical/secretarial work (e.g., filing, indexing, sorting, organizing, photocopying and bates stamping documents) unless the City has given its prior written approval. City expects paralegals to perform true paralegal work, e.g., research, document productions, preparing discovery or responses, interviewing witnesses, etc.

5.  Billings under this Agreement shall not be made in more than one-tenth of an hour (six minute) increments, and shall represent the devotion of a full six minutes before such an increment is billed. Under no circumstances shall Outside Counsel use "block billing" procedures, wherein a list of series of activities is done each day with only an aggregate amount of time specified. Instead, Outside Counsel shall provide a detailed specific entry for each separate task and sub-task reflecting the time for such task or subtask. All tasks set forth in Outside Counsel's billing documentation shall be highly specific and highly detailed. Overly generalized listings of task descriptions

14

such as "review contract" or "prepare for negotiations" will not be acceptable. Outside Counsel shall provide a detailed description of each action as described below.

6.      Each billing statement shall be identified by a unique number and itemized to include:

a)      Case name and case number;

b)      Staffing level(s), hourly rates and specific activities for each attorney and/or paralegal;

      1)      Each activity shall be billed in a reporting format acceptable to City Attorney.

      2)      A detailed description of specific activities for each attorney and/or paralegal shall include, but is not limited to:

            (a)      In-person conferences.

            (b)      Telephone call(s).

            (c)      Correspondence.

            (d)      Depositions.

            (e)      Case reports.

            (f)      Pleading, brief or opinion drafting.

            (g)      Hearings.

            (h)      Research, including computerized legal research databases.

            (i)      Case reviews.

            (j)      Trials.

c)      Total current monthly fees billed for each staffing level;

d)      Total cumulative fees billed for each staffing level;

e)      Total current monthly expenses billed in the following categories:

      1)      Consultant and expert witness expenses;

      2)      Deposition and transcript expenses;

      3)      Other miscellaneous expenses.

f)      Total cumulative expenses to date billed in (e) above.

15

B.    Payments

1.    City shall make payment(s) for services rendered under this Agreement based on the monthly, itemized billing statement(s) Outside Counsel submits to City Attorney.

2.    City Attorney's legal and accounting staff shall review all billing statements in accordance with City's review procedures.

3.    City shall make its best effort to process payments promptly after receiving Outside Counsel's monthly billing statement. City shall not pay interest or finance charges on any outstanding balance(s).

C.    Audit

For at least three years after completion of services under this Agreement or termination of this Agreement, Outside Counsel and any third party retained by Outside Counsel to assist in the performance of this Agreement, shall maintain backup documentation to support all entries included in the monthly billing statement. Such backup documentation shall be maintained in an auditable format. City Attorney, at its sole discretion, may, at any time prior to the termination of this Agreement, request an audit of Outside Counsel. Outside Counsel shall cooperate with reasonable audit requests, provided that such audits are conducted with reasonable advance notice to Outside Counsel, do not exceed once annually, and are subject at all times to Outside Counsel's confidentiality and other ethical obligations with respect to other clients.

## VII.    NOTICES

All invoices, notices and required reports shall be written and hand-delivered or mailed by first class, postage prepaid, addressed to City Attorney or Outside Counsel at the addresses below, or at any other address City Attorney or Outside Counsel shall provide in writing to each other, or by email:

A.    If invoice to City Attorney:

Aimee Sevilla
Outside Counsel Accounting Unit
Office of the City Attorney
200 North Main Street,
8th Floor, City Hall East
Los Angeles, California 90012-4130


If notice or a report to City Attorney:

City of Los Angeles
Office of the City Attorney
200 North Main Street, City Hall East
Los Angeles, California 90012-4130
Attention: Arlene Hoang and Jessica Mariani

16

If notice concerning conflict of interest to City Attorney:

Anne Haley, Assistant City Attorney
City of Los Angeles
Office of the City Attorney
200 North Main Street
8th Floor, City Hall East
Los Angeles, California 90012-4130

B.      If notice to Outside Counsel:

GIBSON, DUNN & CRUTCHER LLP
333 South Grand
Los Angeles, CA 90071
Attention: Theane Evangelis

## VIII.   ASSIGNMENT

A.      No part of this Agreement or any right or obligation arising from it is assignable without City's prior written consent.

B.      Any attempt by Outside Counsel to assign or subcontract services relating to this Agreement without City's prior written consent shall constitute a material breach of this Agreement.

## IX.   STANDARD TERMS AND CONDITIONS

### IRAN CONTRACTING ACT OF 2010

In accordance with California Public Contract Code Sections 2200-2208, all bidders submitting proposals for, entering into, or renewing contracts with the City of Los Angeles for goods and services estimated at $1,000,000 or more is required to complete, sign, and submit the "Iran Contracting Act of 2010 Compliance Affidavit."

### STANDARD PROVISIONS FOR CITY CONTRACTS

Contractor agrees to comply with the Standard Provisions for City Contracts (Rev. 6/24 [v. 1.]), which are attached hereto as Exhibit A and incorporated herein by reference, except as follows:

PSC -6 shall not apply to payment of fees.

17

PSC-9 shall be deleted in its entirety. Termination shall be governed by this Agreement.

The second paragraph of PSC-11 shall be amended to read:

"CONTRACTOR shall not use Subcontractors to assist in performance of this Contract without the prior written approval of CITY. If CITY permits the use of Subcontractors, CONTRACTOR shall remain responsible for performing all aspects of this Contract and paying all Subcontractors. CITY has the right to approve CONTRACTOR'S Subcontractors, and CITY reserves the right to request replacement of any Subcontractor. CITY does not have any obligation to pay CONTRACTOR'S Subcontractors, and nothing herein creates any privity of contract between CITY and any

Subcontractor, provided that, CONTRACTOR may, with consent of the CITY, retain third-party vendors, such as eDiscovery providers, consultants or expert witnesses, specifically to work on behalf of the CITY in conjunction with this matter. The retention agreements with such third-party vendors, consultants, and/or experts shall state that the City shall have sole responsibility for payment of services and shall require invoices to be submitted directly to the CITY."

PSC-14 is hereby deleted in its entirety.

PSC-16 shall be deleted in its entirety and replaced with the following:

"Retention of Records. Audit and Reports. CONTRACTOR shall maintain all records, including records of financial transactions, pertaining to the performance of this Contract, in their original form or as otherwise approved by CITY. These records shall be retained as required by law, but in no event for a period of less than three years from the later of the following: (1) final payment made by CITY, (2) the expiration of this Contract or (3) termination of this Contract. The records will be subject to examination and audit by authorized CITY personnel or CITY'S representatives at any time (provided that such audits are conducted with reasonable advance notice to CONTRACTOR, do not exceed once annually, and are subject at all times to CONTRACTOR's confidentiality and other ethical obligations with respect to other clients). CONTRACTOR shall provide any reports requested by CITY regarding performance of this Contract to which CITY is entitled pursuant to the Agreement. Any subcontract entered into by CONTRACTOR for work to be performed under this Contract must include an identical provision. In lieu of retaining the records for the term as prescribed in this provision, CONTRACTOR may, upon CITY'S written approval, submit the required information to CITY in an electronic format, e.g. USB flash drive, at the expiration or termination of this Contract."

PSC-18 is hereby deleted in its entirety.

18

PSC-19 is hereby deleted in its entirety.

PSC-21 is hereby deleted in its entirety. Document ownership and retention is governed by this Agreement.

PSC-22 shall be deleted in its entirety and replaced with the following:

"Data Protection.

A. CONTRACTOR shall protect, using commercially reasonable security means and technology, CITY-provided data or consumer-provided data acquired in the course and scope of this Contract, including but not limited to customer lists and customer credit card or consumer data, (collectively, the "City Data"). CONTRACTOR shall notify CITY in writing as soon as reasonably feasible, and in any event within forty- eight hours, of CONTRACTOR'S discovery or reasonable belief of any unauthorized access of City Data (a "Data Breach"), or of any incident affecting, or potentially affecting City Data related to cyber security (a "Security Incident"), including, but not limited to, denial of service attack, and system outage, instability or degradation due to computer malware or virus. CONTRACTOR shall begin remediation immediately. CONTRACTOR shall provide periodic updates regarding findings and actions performed by CONTRACTOR until the Data Breach or Security Incident has been effectively resolved. CONTRACTOR shall conduct an investigation of the Data Breach or Security Incident and shall share the report of the investigation with CITY. CONTRACTOR shall cooperate fully with CITY, its agents and law enforcement.

B. CONTRACTOR shall fully cooperate with CITY throughout the investigation of a Security Incident and work closely to determine the necessity, extent and timing of remediation responsibilities on a case-by-case basis."

PSC-23 shall be deleted in its entirety and replaced with the following:

"During the term of this Contract, CONTRACTOR shall maintain at its own expense adequate and industry-standard insurance policies with reputable providers. Exhibit 1 attached hereto is deemed deleted."

PSC-24 shall be deleted in its entirety and replaced with the following:

"Best Terms. While it is not possible to make perfect comparisons between the rates that CONTRACTOR will charge CITY and the rates CONTRACTOR charges other clients in other matters, given the different teams staffed on different matters and different times in which agreements are made, the discounted rates CONTRACTOR will charge CITY will be competitive with the financial arrangements CONTRACTOR has with its

19

other clients that are similarly situated and have received rate discounts."

PSC-26 is hereby deleted in its entirety.

PSC-27 is hereby deleted in its entirety.

PSC-29 is hereby deleted in its entirety.

PSC-30, C. is hereby deleted in its entirety.

PSC-32 is hereby deleted in its entirety.

PSC-34 is hereby deleted in its entirety.

PSC-35 is hereby deleted in its entirety.

PSC-37 is hereby deleted in its entirety.

PSC-38 is hereby deleted in its entirety.

PSC-39 is hereby deleted in its entirety.

PSC-40 is hereby deleted in its entirety.

## X.    MERGER

This Agreement supersedes all prior communications and all previous written and oral agreements, and shall constitute the complete and exclusive statement of understanding between City, City Attorney and Outside Counsel relating to the subject matter of this Agreement.

## XI.    ORDER OF PRECEDENCE

In the event of any inconsistency between the provisions in the body of this Agreement and the attachments, the provisions in the body of this Agreement take precedence, followed by Attachment A, Standard Provisions for City Contracts (Rev. 1.25) [v.2], followed by Attachment B, Fee Schedule, followed by any other exhibits or attachments to this Agreement in the order in which they are attached. This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. The parties further agree that facsimile signatures or signatures scanned into .pdf (or signatures in another electronic format designated by City) and sent by e-mail shall be deemed original signatures.

20

**IN WITNESS WHEREOF** the parties have caused this Agreement to be executed by their respective, duly authorized representatives.

THE CITY OF LOS ANGELES,
a municipal corporation

HYDEE FELDSTEIN SOTO, City Attorney

By _____
      Chief Deputy City Attorney

Date _May 20, 2025_

GIBSON, DUNN & CRUTCHER LLP

By _____

Date _5/20/25_

APPROVED AS TO FORM

HYDEE FELDSTEIN SOTO, City Attorney

By _____

Date _5/29/2025_

ATTEST: PETTY SANTOS, Interim City Clerk

By _____
      Deputy City Clerk

Date **Jun 2, 2025**

City Business License Number: _____

Internal Revenue Service ID Number: _____

Council File/CAO File Number: _____

Contract Number: C-201616

21

**ATTACHMENT A**

Standard Provisions for City Contracts (Rev. 1/25 [v.2])

**STANDARD PROVISIONS FOR CITY CONTRACTS**

**TABLE OF CONTENTS**

PSC-1   Construction of Provisions and Titles Herein ........................................... 1

PSC-2   Applicable Law, Interpretation and Enforcement ...................................... 1

PSC-3   Time of Effectiveness ................................................................................ 1

PSC-4   Integrated Contract .................................................................................. 2

PSC-5   Amendment ............................................................................................... 2

PSC-6   Excusable Delays ..................................................................................... 2

PSC-7   Waiver ....................................................................................................... 2

PSC-8   Suspension ............................................................................................... 2

PSC-9   Termination ............................................................................................... 3

PSC-10  Independent Contractor ........................................................................... 5

PSC-11   Contractor's Personnel ........................................................................... 5

PSC-12  Assignment and Delegation ..................................................................... 6

PSC-13  Permits ..................................................................................................... 6

PSC-14  Claims for Labor and Materials ................................................................ 6

PSC-15  Current Los Angeles City Business Tax Registration Certificate Required .... 6

PSC-16  Retention of Records, Audit and Reports ................................................. 6

PSC-17  Bonds ....................................................................................................... 7

PSC-18  Indemnification ........................................................................................ 7

PSC-19  Intellectual Property Indemnification ....................................................... 7

PSC-20  Intellectual Property Warranty .................................................................. 8

PSC-21  Ownership and License ............................................................................ 8

PSC-22  Data Protection ........................................................................................ 9

PSC-23  Insurance .................................................................................................. 9

i

**TABLE OF CONTENTS (Continued)**

**PSC-24**   Best Terms.................................................................................... **9**

**PSC-25**   Warranty and Responsibility of Contractor...................................... **10**

**PSC-26**   Mandatory Provisions Pertaining to Non-Discrimination in Employment...... **10**

**PSC-27**   Child Support Assignment Orders ................................................... **10**

**PSC-28**   Living Wage Ordinance .................................................................. **11**

**PSC-29**   Service Contractor Worker Retention Ordinance ........................... **11**

**PSC-30**   Access and Accommodations ........................................................ **11**

**PSC-31**   Contractor Responsibility Ordinance .............................................. **12**

**PSC-32**   Business Inclusion Program ........................................................... **12**

**PSC-33**   Slavery Disclosure Ordinance ....................................................... **12**

**PSC-34**   First Source Hiring Ordinance ....................................................... **12**

**PSC-35**   Local Business Preference Ordinance ........................................... **12**

**PSC-36**   Iran Contracting Act ...................................................................... **12**

**PSC-37**   Restrictions on Campaign Contributions in City Elections............... **12**

**PSC-38**   Contractors' Use of Criminal History for Consideration of Employment Application ...............................................................................**13**

**PSC-39**    Limitation of City's Obligation to Make Payment to Contractor ...............**13**

**PSC-40**   Compliance with Identity Theft Laws and Payment Card Data Security Standards......................................................................................**14**

**PSC-41**   Compliance with California Public Resources Code Section 5164 ............. **14**

**PSC-42**   Possessory Interests Tax .............................................................. **14**

**PSC-43**   Confidentiality............................................................................... **15**

**PSC-44**   Contractor Data Reporting ............................................................. **15**

**Exhibit 1** Insurance Contractual Requirements ............................................ **16**

**STANDARD PROVISIONS FOR CITY CONTRACTS**

**PSC-1.** <u>Construction of Provisions and Titles Herein</u>

All titles, subtitles, or headings in this Contract have been inserted for convenience, and shall not be deemed to affect the meaning or construction of any of the terms or provisions of this Contract. The language of this Contract shall be construed according to its fair meaning and not strictly for or against **CITY** or **CONTRACTOR**. The word **"CONTRACTOR"** includes the party or parties identified in this Contract. The singular shall include the plural and if there is more than one **CONTRACTOR**, unless expressly stated otherwise, their obligations and liabilities shall be joint and several. Use of the feminine, masculine, or neuter genders shall be deemed to include the genders not used.

**PSC-2.** <u>Applicable Law, Interpretation and Enforcement</u>

Each party's performance shall comply with all applicable laws of the United States of America, the State of California, and **CITY**, including but not limited to, laws regarding health and safety, labor and employment, wage and hours and licensing. This Contract shall be enforced and interpreted under the laws of the State of California without regard to conflict of law principles. **CONTRACTOR** shall comply with new, amended, or revised laws, regulations, or procedures that apply to the performance of this Contract with no additional compensation paid to **CONTRACTOR**.

In any action arising out of this Contract, **CONTRACTOR** consents to personal jurisdiction, and agrees to bring all such actions, exclusively in state or federal courts located in Los Angeles County, California.

If any part, term or provision of this Contract is held void, illegal, unenforceable, or in conflict with any federal, state or local law or regulation, the validity of the remaining parts, terms or provisions of this Contract shall not be affected.

**PSC-3.** <u>Time of Effectiveness</u>

Unless otherwise provided, this Contract shall take effect when all of the following events have occurred:

A.     This Contract has been signed on behalf of **CONTRACTOR** by the person or persons authorized to bind **CONTRACTOR**;

B.     This Contract has been approved by the City Council or by the board, officer or employee authorized to give such approval;

C.     The Office of the City Attorney has indicated in writing its approval of this Contract as to form; and

D.     This Contract has been signed on behalf of **CITY** by the person designated by the City Council, or by the board, officer or employee authorized to enter into this Contract.

**STANDARD PROVISIONS
FOR CITY CONTRACTS (Rev. 1/25 [v.2])**     1     **ATTACHMENT A**

**PSC-4.** Integrated Contract

This Contract sets forth all of the rights and duties of the parties with respect to the subject matter of this Contract, and replaces any and all previous Contracts or understandings, whether written or oral, relating thereto. This Contract may be amended only as provided for in the provisions of PSC-5 hereof.

**PSC-5.** Amendment

All amendments to this Contract shall be in writing and signed and approved pursuant to the provisions of PSC-3.

**PSC-6.** Excusable Delays

Neither party shall be liable for its delay or failure to perform any obligation under and in accordance with this Contract, if the delay or failure arises out of fires, floods, earthquakes, epidemics, quarantine restrictions, other natural occurrences, strikes, lockouts (other than a lockout by the party or any of the party's Subcontractors), freight embargoes, terrorist acts, insurrections or other civil disturbances, or other similar events to those described above, but in each case the delay or failure to perform must be beyond the control and without any fault or negligence of the party delayed or failing to perform (these events are referred to in this provision as "Force Majeure Events").

Notwithstanding the foregoing, a delay or failure to perform by a Subcontractor of **CONTRACTOR** shall not constitute a Force Majeure Event, unless the delay or failure arises out of causes beyond the control of both **CONTRACTOR** and Subcontractor, and without any fault or negligence of either of them. In such case, **CONTRACTOR** shall not be liable for the delay or failure to perform, unless the goods or services to be furnished by the Subcontractor were obtainable from other sources in sufficient time to permit **CONTRACTOR** to perform timely. As used in this Contract, the term "Subcontractor" means a subcontractor at any tier.

In the event **CONTRACTOR'S** delay or failure to perform arises out of a Force Majeure Event, **CONTRACTOR** agrees to use commercially reasonable best efforts to obtain the goods or services from other sources, and to otherwise mitigate the damages and reduce the delay caused by the Force Majeure Event.

**PSC-7.** Waiver

A waiver of a default of any part, term or provision of this Contract shall not be construed as a waiver of any succeeding default or as a waiver of the part, term or provision itself. A party's performance after the other party's default shall not be construed as a waiver of that default.

**PSC-8.** Suspension

At **CITY'S** sole discretion, **CITY** may suspend any or all services provided under this Contract by providing **CONTRACTOR** with written notice of suspension. Upon receipt of the notice of suspension, **CONTRACTOR** shall immediately cease the services

suspended and shall not incur any additional obligations, costs or expenses to **CITY** until **CITY** gives written notice to recommence the services.

**PSC-9.** Termination

    A.    Termination for Convenience

**CITY** may terminate this Contract for **CITY'S** convenience at any time by providing **CONTRACTOR** thirty days written notice. Upon receipt of the notice of termination, **CONTRACTOR** shall immediately take action not to incur any additional obligations, costs or expenses, except as may be necessary to terminate its activities. **CITY** shall pay **CONTRACTOR** its reasonable and allowable costs through the effective date of termination and those reasonable and necessary costs incurred by **CONTRACTOR** to effect the termination. Thereafter, **CONTRACTOR** shall have no further claims against **CITY** under this Contract. All finished and unfinished documents and materials procured for or produced under this Contract, including all intellectual property rights **CITY** is entitled to, shall become **CITY** property upon the date of the termination. **CONTRACTOR** agrees to execute any documents necessary for **CITY** to perfect, memorialize, or record **CITY'S** ownership of rights provided herein.

    B.    Termination for Breach of Contract

    1.    Except as provided in PSC-6, if **CONTRACTOR** fails to perform any of the provisions of this Contract or so fails to make progress as to endanger timely performance of this Contract, **CITY** may give **CONTRACTOR** written notice of the default. **CITY'S** default notice will indicate whether the default may be cured and the time period to cure the default to the sole satisfaction of **CITY**. Additionally, **CITY'S** default notice may offer **CONTRACTOR** an opportunity to provide **CITY** with a plan to cure the default, which shall be submitted to **CITY** within the time period allowed by **CITY**. At **CITY'S** sole discretion, **CITY** may accept or reject **CONTRACTOR'S** plan. If the default cannot be cured or if **CONTRACTOR** fails to cure within the period allowed by **CITY**, then **CITY** may terminate this Contract due to **CONTRACTOR'S** breach of this Contract.

    2.    If the default under this Contract is due to **CONTRACTOR'S** failure to maintain the insurance required under this Contract, **CONTRACTOR** shall immediately: (1) suspend performance of any services under this Contract for which insurance was required; and (2) notify its employees and Subcontractors of the loss of insurance coverage and Contractor's obligation to suspend performance of services. **CONTRACTOR** shall not recommence performance until **CONTRACTOR** is fully insured and in compliance with **CITY'S** requirements.

3.  If a federal or state proceeding for relief of debtors is undertaken by or against **CONTRACTOR**, or if **CONTRACTOR** makes an assignment for the benefit of creditors, then **CITY** may immediately terminate this Contract.

4.  If **CONTRACTOR** engages in any dishonest conduct related to the performance or administration of this Contract or violates **CITY'S** laws, regulations or policies relating to lobbying, then **CITY** may immediately terminate this Contract.

5.  Acts of Moral Turpitude

    a.  **CONTRACTOR** shall immediately notify **CITY** if **CONTRACTOR** or any Key Person, as defined below, is charged with, indicted for, convicted of, pleads nolo contendere to, or forfeits bail or fails to appear in court for a hearing related to, any act which constitutes an offense involving moral turpitude under federal, state, or local laws ("Act of Moral Turpitude").

    b.  If **CONTRACTOR** or a Key Person is convicted of, pleads nolo contendere to, or forfeits bail or fails to appear in court for a hearing related to, an Act of Moral Turpitude, **CITY** may immediately terminate this Contract.

    c.  If **CONTRACTOR** or a Key Person is charged with or indicted for an Act of Moral Turpitude, **CITY** may terminate this Contract after providing **CONTRACTOR** an opportunity to present evidence of **CONTRACTOR'S** ability to perform under the terms of this Contract.

    d.  Acts of Moral Turpitude include, but are not limited to: violent felonies as defined by Penal Code Section 667.5, crimes involving weapons, crimes resulting in serious bodily injury or death, serious felonies as defined by Penal Code Section 1192.7, and those crimes referenced in the Penal Code and articulated in California Public Resources Code Section 5164(a)(2); in addition to and including acts of murder, rape, sexual assault, robbery, kidnapping, human trafficking, pimping, voluntary manslaughter, aggravated assault, assault on a peace officer, mayhem, fraud, domestic abuse, elderly abuse, and child abuse, regardless of whether such acts are punishable by felony or misdemeanor conviction.

e. For the purposes of this provision, a Key Person is a principal, officer, or employee assigned to this Contract, or owner (directly or indirectly, through one or more intermediaries) of ten percent or more of the voting power or equity interests of **CONTRACTOR**.

6. In the event **CITY** terminates this Contract as provided in this section, **CITY** may procure, upon such terms and in the manner as **CITY** may deem appropriate, services similar in scope and level of effort to those so terminated, and **CONTRACTOR** shall be liable to **CITY** for all of its costs and damages, including, but not limited to, any excess costs for such services.

7. If, after notice of termination of this Contract under the provisions of this section, it is determined for any reason that **CONTRACTOR** was not in default under the provisions of this section, or that the default was excusable under the terms of this Contract, the rights and obligations of the parties shall be the same as if the notice of termination had been issued pursuant to PSC-9(A) Termination for Convenience.

8. The rights and remedies of **CITY** provided in this section shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Contract.

C. In the event that this Contract is terminated, **CONTRACTOR** shall immediately notify all employees and Subcontractors, and shall notify in writing all other parties contracted with under the terms of this Contract within five working days of the termination.

**PSC-10.** Independent Contractor

**CONTRACTOR** is an independent contractor and not an agent or employee of **CITY**. **CONTRACTOR** shall not represent or otherwise hold out itself or any of its directors, officers, partners, employees, or agents to be an agent or employee of **CITY**.

**PSC-11.** Contractor's Personnel

Unless otherwise approved by **CITY**, **CONTRACTOR** shall use its own employees to perform the services described in this Contract. **CITY** has the right to review and approve any personnel who are assigned to work under this Contract. **CONTRACTOR** shall remove personnel from performing work under this Contract if requested to do so by **CITY**.

**CONTRACTOR** shall not use Subcontractors to assist in performance of this Contract without the prior written approval of **CITY**. If **CITY** permits the use of Subcontractors, **CONTRACTOR** shall remain responsible for performing all aspects of this Contract and paying all Subcontractors. **CITY** has the right to approve **CONTRACTOR'S** Subcontractors, and **CITY** reserves the right to request replacement of any

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 1/25 [v.2])**          5          **ATTACHMENT A**

Subcontractor. **CITY** does not have any obligation to pay **CONTRACTOR'S** Subcontractors, and nothing herein creates any privity of contract between **CITY** and any Subcontractor.

**PSC-12.** Assignment and Delegation

**CONTRACTOR** may not, unless it has first obtained the written permission of **CITY**:

A.    Assign or otherwise alienate any of its rights under this Contract, including the right to payment; or

B.    Delegate, subcontract, or otherwise transfer any of its duties under this Contract.

**PSC-13.** Permits

**CONTRACTOR** and its directors, officers, partners, agents, employees, and Subcontractors, shall obtain and maintain all licenses, permits, certifications and other documents necessary for **CONTRACTOR'S** performance of this Contract. **CONTRACTOR** shall immediately notify **CITY** of any suspension, termination, lapses, non-renewals, or restrictions of licenses, permits, certificates, or other documents that relate to **CONTRACTOR'S** performance of this Contract.

**PSC-14.** Claims for Labor and Materials

**CONTRACTOR** shall promptly pay when due all amounts owed for labor and materials furnished in the performance of this Contract so as to prevent any lien or other claim under any provision of law from arising against any **CITY** property (including reports, documents, and other tangible or intangible matter produced by **CONTRACTOR** hereunder), and shall pay all amounts due under the Unemployment Insurance Act or any other applicable law with respect to labor used to perform under this Contract.

**PSC-15.** Current Los Angeles City Business Tax Registration Certificate Required

For the duration of this Contract, **CONTRACTOR** shall maintain valid Business Tax Registration Certificate(s) as required by **CITY'S** Business Tax Ordinance, Section 21.00 *et seq*. of the Los Angeles Municipal Code ("LAMC"), and shall not allow the Certificate to lapse or be revoked or suspended.

**PSC-16.** Retention of Records, Audit and Reports

**CONTRACTOR** shall maintain all records, including records of financial transactions, pertaining to the performance of this Contract, in their original form or as otherwise approved by **CITY**. These records shall be retained for a period of no less than three years from the later of the following: (1) final payment made by **CITY**, (2) the expiration of this Contract or (3) termination of this Contract. The records will be subject to examination and audit by authorized **CITY** personnel or **CITY'S** representatives at any time. **CONTRACTOR** shall provide any reports requested by **CITY** regarding

performance of this Contract. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

In lieu of retaining the records for the term as prescribed in this provision, **CONTRACTOR** may, upon **CITY'S** written approval, submit the required information to **CITY** in an electronic format, e.g. USB flash drive, at the expiration or termination of this Contract.

**PSC-17.** Bonds

All bonds required by **CITY** shall be filed with the Office of the City Administrative Officer, Risk Management for its review and acceptance in accordance with Los Angeles Administrative Code ("LAAC") Sections 11.47 *et seq*., as amended from to time.

**PSC-18.** Indemnification

Except for the active negligence or willful misconduct of **CITY**, or any of its boards, officers, agents, employees, assigns and successors in interest, **CONTRACTOR** shall defend, indemnify and hold harmless **CITY** and any of its boards, officers, agents, employees, assigns, and successors in interest from and against all lawsuits and causes of action, claims, losses, demands and expenses, including, but not limited to, attorney's fees (both in house and outside counsel) and cost of litigation (including all actual litigation costs incurred by **CITY**, including but not limited to, costs of experts and consultants), damages or liability of any nature whatsoever, for death or injury to any person, including **CONTRACTOR'S** employees and agents, or damage or destruction of any property of either party hereto or of third parties, arising in any manner by reason of an act, error, or omission by **CONTRACTOR,** Subcontractors, or their boards, officers, agents, employees, assigns, and successors in interest. The rights and remedies of **CITY** provided in this section shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Contract. This provision will survive expiration or termination of this Contract.

**PSC-19.** Intellectual Property Indemnification

**CONTRACTOR**, at its own expense, shall defend, indemnify, and hold harmless the **CITY**, and any of its boards, officers, agents, employees, assigns, and successors in interest from and against all lawsuits and causes of action, claims, losses, demands and expenses, including, but not limited to, attorney's fees (both in house and outside counsel) and cost of litigation (including all actual litigation costs incurred by **CITY**, including but not limited to, costs of experts and consultants), damages or liability of any nature arising out of the infringement, actual or alleged, direct or contributory, of any intellectual property rights, including, without limitation, patent, copyright, trademark, trade secret, right of publicity, and proprietary information: (1) on or in any design, medium, matter, article, process, method, application, equipment, device, instrumentation, software, hardware, or firmware used by **CONTRACTOR**, or its Subcontractors, in performing the work under this Contract; or (2) as a result of **CITY'S** actual or intended use of any Work Product (as defined in PSC-21) furnished by **CONTRACTOR**, or its Subcontractors, under this Contract. The rights and remedies of **CITY** provided in this section shall not be exclusive

**STANDARD PROVISIONS
FOR CITY CONTRACTS (Rev. 1/25 [v.2])**　　　　**7**　　　　　　　　　**ATTACHMENT A**

and are in addition to any other rights and remedies provided by law or under this Contract. This provision will survive expiration or termination of this Contract.

**PSC-20.** Intellectual Property Warranty

**CONTRACTOR** represents and warrants that its performance of all obligations under this Contract does not infringe in any way, directly or contributorily, upon any third party's intellectual property rights, including, without limitation, patent, copyright, trademark, trade secret, right of publicity and proprietary information.

**PSC-21.** Ownership and License

Unless otherwise provided for herein, all finished and unfinished works, tangible or not, created under this Contract including, without limitation, documents, materials, data, reports, manuals, specifications, artwork, drawings, sketches, blueprints, studies, memoranda, computation sheets, computer programs and databases, schematics, photographs, video and audiovisual recordings, sound recordings, marks, logos, graphic designs, notes, websites, domain names, inventions, processes, formulas, matters and combinations thereof, and all forms of intellectual property originated and prepared by **CONTRACTOR** or its Subcontractors under this Contract (each a "Work Product"; collectively "Work Products") shall be and remain the exclusive property of **CITY** for its use in any manner **CITY** deems appropriate. **CONTRACTOR** hereby assigns to **CITY** all goodwill, copyright, trademark, patent, trade secret and all other intellectual property rights worldwide in any Work Products originated and prepared under this Contract. **CONTRACTOR** further agrees to execute any documents necessary for **CITY** to perfect, memorialize, or record **CITY'S** ownership of rights provided herein.

**CONTRACTOR** agrees that a monetary remedy for breach of this Contract may be inadequate, impracticable, or difficult to prove and that a breach may cause **CITY** irreparable harm. **CITY** may therefore enforce this requirement by seeking injunctive relief and specific performance, without any necessity of showing actual damage or irreparable harm. Seeking injunctive relief or specific performance does not preclude **CITY** from seeking or obtaining any other relief to which **CITY** may be entitled.

For all Work Products delivered to **CITY** that are not originated or prepared by **CONTRACTOR** or its Subcontractors under this Contract, **CONTRACTOR** shall secure a grant, at no cost to **CITY**, for a non-exclusive perpetual license to use such Work Products for any **CITY** purposes.

**CONTRACTOR** shall not provide or disclose any Work Product to any third party without prior written consent of **CITY**.

Any subcontract entered into by **CONTRACTOR** relating to this Contract shall include this provision to contractually bind its Subcontractors performing work under this Contract such that **CITY'S** ownership and license rights of all Work Products are preserved and protected as intended herein.

**PSC-22.**   <u>Data Protection</u>

A.   **CONTRACTOR** shall protect, using the most secure means and technology that is commercially available, **CITY**-provided data or consumer-provided data acquired in the course and scope of this Contract, including but not limited to customer lists and customer credit card or consumer data, (collectively, the "City Data"). **CONTRACTOR** shall notify **CITY** in writing as soon as reasonably feasible, and in any event within twenty-four hours, of **CONTRACTOR'S** discovery or reasonable belief of any unauthorized access of City Data (a "Data Breach"), or of any incident affecting, or potentially affecting City Data related to cyber security (a "Security Incident"), including, but not limited to, denial of service attack, and system outage, instability or degradation due to computer malware or virus. **CONTRACTOR** shall begin remediation immediately. **CONTRACTOR** shall provide daily updates, or more frequently if required by **CITY**, regarding findings and actions performed by **CONTRACTOR** until the Data Breach or Security Incident has been effectively resolved to **CITY'S** satisfaction. **CONTRACTOR** shall conduct an investigation of the Data Breach or Security Incident and shall share the report of the investigation with **CITY**. At **CITY'S** sole discretion, **CITY** and its authorized agents shall have the right to lead or participate in the investigation. **CONTRACTOR** shall cooperate fully with **CITY**, its agents and law enforcement.

B.   If **CITY** is subject to liability for any Data Breach or Security Incident, then **CONTRACTOR** shall fully indemnify and hold harmless **CITY** and defend against any resulting actions.

**PSC-23.**   <u>Insurance</u>

During the term of this Contract and without limiting **CONTRACTOR'S** obligation to indemnify, hold harmless and defend **CITY**, **CONTRACTOR** shall provide and maintain at its own expense a program of insurance having the coverages and limits not less than the required amounts and types as determined by the Office of the City Administrative Officer of Los Angeles, Risk Management (template Form General 146 in Exhibit 1 hereto). The insurance must: (1) conform to **CITY'S** requirements; (2) comply with the Insurance Contractual Requirements (Form General 133 in Exhibit 1 hereto); and (3) otherwise be in a form acceptable to the Office of the City Administrative Officer, Risk Management. **CONTRACTOR** shall comply with all Insurance Contractual Requirements shown on Exhibit 1 hereto. Exhibit 1 is hereby incorporated by reference and made a part of this Contract.

**PSC-24.** <u>Best Terms</u>

Throughout the term of this Contract, **CONTRACTOR**, shall offer **CITY** the best terms, prices, and discounts that are offered to any of **CONTRACTOR'S** customers for similar goods and services provided under this Contract.

**PSC-25.** Warranty and Responsibility of Contractor

**CONTRACTOR** warrants that the work performed hereunder shall be completed in a manner consistent with professional standards practiced among those firms within **CONTRACTOR'S** profession, doing the same or similar work under the same or similar circumstances.

**PSC-26.** Mandatory Provisions Pertaining to Non-Discrimination in Employment

Unless otherwise exempt, this Contract is subject to the applicable non-discrimination, equal benefits, equal employment practices, and affirmative action program provisions in LAAC Section 10.8 et seq., as amended from time to time.

A.    **CONTRACTOR** shall comply with the applicable non-discrimination and affirmative action provisions of the laws of the United States of America, the State of California, and **CITY**. In performing this Contract, **CONTRACTOR** shall not discriminate in any of its hiring or employment practices against any employee or applicant for employment because of such person's race, color, religion, national origin, ancestry, sex, sexual orientation, gender, gender identity, age, disability, domestic partner status, marital status or medical condition.

B.    The requirements of Section 10.8.2.1 of the LAAC, the Equal Benefits Ordinance, and the provisions of Section 10.8.2.1(f) are incorporated and made a part of this Contract by reference.

C.    The provisions of Section 10.8.3 of the LAAC are incorporated and made a part of this Contract by reference and will be known as the "Equal Employment Practices" provisions of this Contract.

D.    The provisions of Section 10.8.4 of the LAAC are incorporated and made a part of this Contract by reference and will be known as the "Affirmative Action Program" provisions of this Contract.

Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-27.**    Child Support Assignment Orders

**CONTRACTOR** shall comply with the Child Support Assignment Orders Ordinance, Section 10.10 of the LAAC, as amended from time to time. Pursuant to Section 10.10(b) of the LAAC, **CONTRACTOR** shall fully comply with all applicable State and Federal employment reporting requirements. Failure of **CONTRACTOR** to comply with all applicable reporting requirements or to implement lawfully served Wage and Earnings Assignment or Notices of Assignment, or the failure of any principal owner(s) of **CONTRACTOR** to comply with any Wage and Earnings Assignment or Notices of Assignment applicable to them personally, shall constitute a default by the **CONTRACTOR** under this Contract. Failure of **CONTRACTOR** or principal owner to cure

the default within 90 days of the notice of default will subject this Contract to termination for breach. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-28.** Living Wage Ordinance

**CONTRACTOR** shall comply with the Living Wage Ordinance, LAAC Section 10.37 *et seq.*, as amended from time to time. **CONTRACTOR** further agrees that it shall comply with federal law proscribing retaliation for union organizing. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-29.** Service Contractor Worker Retention Ordinance

**CONTRACTOR** shall comply with the Service Contractor Worker Retention Ordinance, LAAC Section 10.36 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-30.** Access and Accommodations

**CONTRACTOR** represents and certifies that:

A. **CONTRACTOR** shall comply with the Americans with Disabilities Act, as amended, 42 U.S.C. Section 12101 et seq., the Rehabilitation Act of 1973, as amended, 29 U.S.C. Section 701 et seq., the Fair Housing Act, and its implementing regulations and any subsequent amendments, and California Government Code Section 11135;

B. **CONTRACTOR** shall not discriminate on the basis of disability or on the basis of a person's relationship to, or association with, a person who has a disability;

C. **CONTRACTOR** shall provide reasonable accommodation upon request to ensure equal access to **CITY**-funded programs, services and activities;

D. Construction will be performed in accordance with the Uniform Federal Accessibility Standards (UFAS), 24 C.F.R. Part 40; and

E. The buildings and facilities used to provide services under this Contract are in compliance with the federal and state standards for accessibility as set forth in the 2010 ADA Standards, California Title 24, Chapter 11, or other applicable federal and state law.

**CONTRACTOR** understands that **CITY** is relying upon these certifications and representations as a condition to funding this Contract. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 1/25 [v.2])**        11        **ATTACHMENT A**

**PSC-31.** <u>Contractor Responsibility Ordinance</u>

**CONTRACTOR** shall comply with the Contractor Responsibility Ordinance, LAAC Section 10.40 *et seq*., as amended from time to time.

**PSC-32.** <u>Business Inclusion Program</u>

Unless otherwise exempted prior to bid submission, **CONTRACTOR** shall comply with all aspects of the Business Inclusion Program as described in the Request for Proposal/Qualification process, throughout the duration of this Contract. **CONTRACTOR** shall utilize the Regional Alliance Marketplace for Procurement ("RAMP") at https://www.rampla.org/s/, to perform and document outreach to Minority, Women, and Other Business Enterprises. **CONTRACTOR** shall perform subcontractor outreach activities through RAMP. **CONTRACTOR** shall not change any of its designated Subcontractors or pledged specific items of work to be performed by these Subcontractors, nor shall **CONTRACTOR** reduce their level of effort, without prior written approval of **CITY**.

**PSC-33.** <u>Slavery Disclosure Ordinance</u>

**CONTRACTOR** shall comply with the Slavery Disclosure Ordinance, LAAC Section 10.41 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-34.** <u>First Source Hiring Ordinance</u>

**CONTRACTOR** shall comply with the First Source Hiring Ordinance, LAAC Section 10.44 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-35.** <u>Local Business Preference Ordinance</u>

**CONTRACTOR** shall comply with the Local Business Preference Ordinance, LAAC Section 10.47 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-36.** <u>Iran Contracting Act</u>

In accordance with California Public Contract Code Sections 2200-2208, all contractors entering into, or renewing contracts with **CITY** for goods and services estimated at $1,000,000 or more are required to complete, sign, and submit the "Iran Contracting Act of 2010 Compliance Affidavit."

**PSC-37.** <u>Restrictions on Campaign Contributions and Fundraising in City Elections</u>

Unless otherwise exempt, if this Contract is valued at $100,000 or more and requires approval by an elected **CITY** office, **CONTRACTOR**, **CONTRACTOR'S** principals, and **CONTRACTOR'S** Subcontractors expected to receive at least $100,000 for performance

under the Contract, and the principals of those Subcontractors (the "Restricted Persons") shall comply with Charter Section 470(c)(12) and LAMC Section 49.7.35. Failure to comply entitles **CITY** to terminate this Contract and to pursue all available legal remedies. Charter Section 470(c)(12) and LAMC Section 49.7.35 limit the ability of the Restricted Persons to make campaign contributions to and engage in fundraising for certain elected **CITY** officials or candidates for elected **CITY** office for twelve months after this Contract is signed. Additionally, a **CONTRACTOR** subject to Charter Section 470(c)(12) is required to comply with disclosure requirements by submitting a completed and signed Ethics Commission Form 55 and to amend the information in that form as specified by law. Any **CONTRACTOR** subject to Charter Section 470(c)(12) shall include the following notice in any contract with any Subcontractor expected to receive at least $100,000 for performance under this Contract:

> "Notice Regarding Restrictions on Campaign Contributions and Fundraising in City Elections
>
> You are a subcontractor on City of Los Angeles Contract # _____. Pursuant to the City of Los Angeles Charter Section 470(c)(12) and related ordinances, you and your principals are prohibited from making campaign contributions to and fundraising for certain elected City of Los Angeles ("**CITY**") officials and candidates for elected **CITY** office for twelve months after the **CITY** contract is signed. You are required to provide the names and contact information of your principals to the **CONTRACTOR** and to amend that information within ten business days if it changes during the twelve month time period. Failure to comply may result in termination of this Contract and any other available legal remedies. Information about the restrictions may be found online at ethics.lacity.org or by calling the Los Angeles City Ethics Commission at (213) 978-1960."

**PSC-38.** Contractors' Use of Criminal History for Consideration of Employment Applications

**CONTRACTOR** shall comply with the City Contractors' Use of Criminal History for Consideration of Employment Applications Ordinance, LAAC Section 10.48 *et seq*., as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-39.** Limitation of City's Obligation to Make Payment to Contractor

Notwithstanding any other provision of this Contract, including any exhibits or attachments incorporated therein, and in order for **CITY** to comply with its governing legal requirements, **CITY** shall have no obligation to make any payments to **CONTRACTOR** unless **CITY** shall have first made an appropriation of funds equal to or in excess of its obligation to make any payments as provided in this Contract. **CONTRACTOR** agrees that any services provided by **CONTRACTOR**, purchases made by **CONTRACTOR** or expenses incurred by **CONTRACTOR** in excess of the appropriation(s) shall be free and without charge to **CITY** and **CITY** shall have no obligation to pay for the services, purchases or expenses. **CONTRACTOR** shall have no obligation to provide any services,

**STANDARD PROVISIONS
FOR CITY CONTRACTS (Rev. 1/25 [v.2])**          13          **ATTACHMENT A**

provide any equipment or incur any expenses in excess of the appropriated amount(s) until **CITY** appropriates additional funds for this Contract.

**PSC-40.** Compliance with Identity Theft Laws and Payment Card Data Security Standards

**CONTRACTOR** shall comply with all identity theft laws including without limitation, laws related to: (1) payment devices; (2) credit and debit card fraud; and (3) the Fair and Accurate Credit Transactions Act ("FACTA"), including its requirement relating to the content of transaction receipts provided to Customers. **CONTRACTOR** also shall comply with all requirements related to maintaining compliance with Payment Card Industry Data Security Standards ("PCI DSS"). During the performance of any service to install, program or update payment devices equipped to conduct credit or debit card transactions, including PCI DSS services, **CONTRACTOR** shall verify proper truncation of receipts in compliance with FACTA.

**PSC-41.** Compliance with California Public Resources Code Section 5164

California Public Resources Code Section 5164 prohibits a public agency from hiring a person for employment or as a volunteer to perform services at any park, playground, or community center used for recreational purposes in a position that has supervisory or disciplinary authority over any minor, if the person has been convicted of certain crimes as referenced in the Penal Code, and articulated in California Public Resources Code Section 5164(a)(2).

If applicable, **CONTRACTOR** shall comply with California Public Resources Code Section 5164, and shall additionally adhere to all rules and regulations that have been adopted or that may be adopted by **CITY**. **CONTRACTOR** is required to have all employees, volunteers and Subcontractors (including all employees and volunteers of any Subcontractor) of **CONTRACTOR** working on premises to pass a fingerprint and background check through the California Department of Justice at **CONTRACTOR'S** sole expense, indicating that such individuals have never been convicted of certain crimes as referenced in the Penal Code and articulated in California Public Resources Code Section 5164(a)(2), if the individual will have supervisory or disciplinary authority over any minor.

**PSC-42.** Possessory Interests Tax

Rights granted to **CONTRACTOR** by **CITY** may create a possessory interest. **CONTRACTOR** agrees that any possessory interest created may be subject to California Revenue and Taxation Code Section 107.6 and a property tax may be levied on that possessory interest. If applicable, **CONTRACTOR** shall pay the property tax. **CONTRACTOR** acknowledges that the notice required under California Revenue and Taxation Code Section 107.6 has been provided.

**PSC-43.** <u>Confidentiality</u>

All documents, information, City Data (as that term is defined in PSC-22), and materials provided to **CONTRACTOR** by **CITY** or developed by **CONTRACTOR** pursuant to this Contract (collectively "Confidential Information") are confidential. **CONTRACTOR** shall not provide, and shall prohibit its employees and subcontractors from providing or disclosing, any Confidential Information or their contents or any information therein either orally or in writing, to any person or entity, except as authorized by **CITY** or as required by law. **CONTRACTOR** shall immediately notify **CITY** of any attempt by a third party to obtain access to any Confidential Information. This provision will survive expiration or termination of this Contract.

**PSC-44**. <u>Contractor Data Reporting</u>

If Contractor is a for-profit, privately owned business, Contractor shall, within 30 days of the effective date of the Contract and on an annual basis thereafter (i.e., within 30 days of the annual anniversary of the effective date of the Contract), report the following information to City via the Regional Alliance Marketplace for Procurement ("RAMP") or via another method specified by City: Contractor's and any Subcontractor's annual revenue, number of employees, location, industry, race/ethnicity and gender of majority owner ("Contractor/Subcontractor Information"). Contractor shall further request, on an annual basis, that any Subcontractor input or update its business profile, including the Contractor/Subcontractor Information, on RAMP or via another method prescribed by City.

Form Gen. 133 (Rev.10/17)

## EXHIBIT 1

### INSURANCE CONTRACTUAL REQUIREMENTS

**CONTACT** For additional information about compliance with City Insurance and Bond requirements, contact the Office of the City Administrative Officer, Risk Management at (213) 978-RISK (7475) or go online at www.lacity.org/cao/risk. The City approved Bond Assistance Program is available for those contractors who are unable to obtain the City-required performance bonds. A City approved insurance program may be available as a low-cost alternative for contractors who are unable to obtain City-required insurance.

## CONTRACTUAL REQUIREMENTS

CONTRACTOR AGREES THAT:

**1. Additional Insured/Loss Payee.** The CITY must be included as an Additional Insured in applicable liability policies to cover the CITY'S liability arising out of the acts or omissions of the named insured. The CITY is to be named as an Additional Named Insured and a Loss Payee As Its Interests May Appear in property insurance in which the CITY has an interest, e.g., as a lien holder.

**2. Notice of Cancellation.** All required insurance will be maintained in full force for the duration of its business with the CITY. By ordinance, all required insurance must provide at least thirty (30) days' prior written notice (ten (10) days for non-payment of premium) directly to the CITY if your insurance company elects to cancel or materially reduce coverage or limits prior to the policy expiration date, for any reason except impairment of an aggregate limit due to prior claims.

**3. Primary Coverage.** CONTRACTOR will provide coverage that is primary with respect to any insurance or self-insurance of the CITY. The CITY'S program shall be excess of this insurance and non-contributing.

**4. Modification of Coverage.** The CITY reserves the right at any time during the term of this Contract to change the amounts and types of insurance required hereunder by giving CONTRACTOR ninety (90) days' advance written notice of such change. If such change should result in substantial additional cost to CONTRACTOR, the CITY agrees to negotiate additional compensation proportional to the increased benefit to the CITY.

**5. Failure to Procure Insurance.** All required insurance must be submitted and approved by the Office of the City Administrative Officer, Risk Management prior to the inception of any operations by CONTRACTOR.

CONTRACTOR'S failure to procure or maintain required insurance or a self-insurance program during the entire term of this Contract shall constitute a material breach of this Contract under which the CITY may immediately suspend or terminate this Contract or, at its discretion, procure or renew such insurance to protect the CITY'S interests and pay any and all premiums in connection therewith and recover all monies so paid from CONTRACTOR.

**6. Workers' Compensation.** By signing this Contract, CONTRACTOR hereby certifies that it is aware of the provisions of Section 3700 *et seq*., of the California Labor Code which require every employer to be insured against liability for Workers' Compensation or to undertake

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 1/25 [v.2])**

1

**ATTACHMENT A**

Form Gen. 133 (Rev. 10/17)

self-insurance in accordance with the provisions of that Code, and that it will comply with such provisions at all time during the performance of the work pursuant to this Contract.

**7.   California Licensee.** All insurance must be provided by an insurer admitted to do business in California or written through a California-licensed surplus lines broker or through an insurer otherwise acceptable to the CITY. Non-admitted coverage must contain a **Service of Suit** clause in which the underwriters agree to submit as necessary to the jurisdiction of a California court in the event of a coverage dispute. Service of process for this purpose must be allowed upon an agent in California designated by the insurer or upon the California Insurance Commissioner.

**8.   Aggregate Limits/Impairment.** If any of the required insurance coverages contain annual aggregate limits, CONTRACTOR must give the CITY written notice of any pending claim or lawsuit which will materially diminish the aggregate within thirty (30) days of knowledge of same. You must take appropriate steps to restore the impaired aggregates or provide replacement insurance protection within thirty (30) days of knowledge of same. The CITY has the option to specify the minimum acceptable aggregate limit for each line of coverage required. No substantial reductions in scope of coverage which may affect the CITY'S protection are allowed without the CITY'S prior written consent.

**9.   Commencement of Work.** For purposes of insurance coverage only, this Contract will be deemed to have been executed immediately upon any party hereto taking any steps that can be considered to be in furtherance of or towards performance of this Contract. The requirements in this Section supersede all other sections and provisions of this Contract, including, but not limited to, PSC-3, to the extent that any other section or provision conflicts with or impairs the provisions of this Section.

# Required Insurance and Minimum Limits

Name: _____    Date: _____

Agreement/Reference: _____

Evidence of coverages checked below, with the specified minimum limits, must be submitted and approved prior to occupancy/start of operations. Amounts shown are Combined Single Limits ("CSLs"). For Automobile Liability, split limits may be substituted for a CSL if the total per occurrence equals or exceeds the CSL amount.

**Limits**

____ **Workers' Compensation (WC) and Employer's Liability (EL)**

WC

☐ Waiver of Subrogation in favor of City        ☐ Longshore & Harbor Workers        _____ *Statutory*
☐ Jones Act

EL _____

____ **General Liability** _____        _____

☐ Products/Completed Operations        ☐
☐ Fire Legal Liability _____        Sexual Misconduct _____
☐

____ **Automobile Liability** (for any and all vehicles used for this contract, other than commuting to/from work)        _____

____ **Professional Liability** (Errors and Omissions)        _____

Discovery Period _____

____ **Property Insurance** (to cover replacement cost of building - as determined by insurance company)        _____

☐ All Risk Coverage        ☐ Boiler and Machinery
☐ Flood _____        ☐ Builder's Risk
☐ Earthquake _____        ☐ _____

____ **Pollution Liability**        _____

☐ _____

____ **Surety Bonds -** Performance and Payment (Labor and Materials) Bonds        _____
____ **Crime Insurance**        _____

**Other:** _____
_____

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 1/25 [v.2])**        1

**EXHIBIT B**

**Hourly Rates for Gibson Dunn**

A.    **The specific hourly rates for each authorized timekeeper shall not exceed the following during calendar year 2025:**

| Authorized Timekeeper | Title | Standard Hourly Rate | Discounted Hourly Rate |
|---|---|---|---|
| Theane Evangelis | Lead Partner | $2,425 | $1,295 |
| Marcellus McRae | Partner | $2,245 | $1,295 |
| Kahn Scolnick | Partner | $2,190 | $1,295 |
| Bradley Hamburger | Partner | $2,110 | $1,295 |
| Senior Associate (7th+ Year) | Associate | $1,555 | $1,295 |
| Mid-Level Associate (4th-6th Year) | Associate | $1,415 | $1,295 |
| Junior Associate (1st -3rd Year) | Associate | $945 - $1,220 | $1,295 |

B.    **The hourly rate for each timekeeper category shall not exceed the following:**

| Title | Standard Hourly Rate | Discounted Hourly Rate |
|---|---|---|
| Partners | $2,650 | $1,295 |
| Of Counsel | $1,675 | $1,295 |
| Associates | $1,555 | $1,295 |
| Paralegals | $820 | $550 |

109082941.3

23

# EXHIBIT 6

THEODORE J. BOUTROUS JR., SBN 132099
   tboutrous@gibsondunn.com
THEANE EVANGELIS, SBN 243570
   tevangelis@gibsondunn.com
NATHANIEL L. BACH, SBN 246518
   nbach@gibsondunn.com
MARISSA B. MOSHELL, SBN 319734
   mmoshell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

SCOTT A. EDELMAN, SBN 116927
   sedelman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
Telephone:  310.552.8500
Facsimile:   310.551.8741

Attorneys for Defendants Rachel Maddow,
MSNBC Cable L.L.C., NBCUniversal Media,
LLC, and Comcast Corporation

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERRING NETWORKS, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>RACHEL MADDOW; COMCAST CORPORATION; NBCUNIVERSAL MEDIA, LLC; and MSNBC CABLE L.L.C.,<br><br>       Defendants. | CASE NO. 19-cv-1713-BAS-AHG<br><br>**DECLARATION OF SCOTT A. EDELMAN IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS (Cal. Civ. Proc. Code § 425.16(c)(1))**<br><br>**COURT TO ISSUE BRIEFING SCHEDULE AND HEARING DATE**<br><br>Action Filed:  September 9, 2019<br><br>Judge:  Hon. Cynthia Bashant<br>Magistrate Judge: Hon. Allison Goddard<br>Courtroom 3B |

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

I, Scott A. Edelman, declare as follows:

1.       I am an attorney at law licensed to practice in the State of California.  I am a partner at Gibson, Dunn & Crutcher LLP ("Gibson Dunn") and counsel of record for Defendants Rachel Maddow, Comcast Corporation, NBCUniversal Media, LLC, and MSNBC Cable L.L.C. ("Defendants").  I am one of the supervising partners in charge of the work performed on this case by the attorneys and other professionals at Gibson Dunn.

2.       I submit this declaration in support of Defendants' Motion for Attorneys' Fees and Costs pursuant to California Code of Civil Procedure section 425.16(c)(1).  All statements in this declaration are based upon my personal knowledge and, if called upon to testify, I could and would testify to the facts set forth herein.

### Gibson Dunn's Retention and Efforts Defending This Case

3.       On September 9, 2019, Plaintiff Herring Networks, Inc. filed a Complaint for defamation in the United States District Court for the Southern District of California.

4.       Gibson Dunn was retained soon thereafter, and we assembled a team of attorneys experienced in First Amendment jurisprudence, defamation actions, and anti-SLAPP practice.  This team included the following individuals:

- Theodore J. Boutrous, Jr., a partner at Gibson Dunn (a true and correct copy of Mr. Boutrous' biography, showing his credentials and experience, is attached hereto as **Exhibit A**);

- Myself, Scott A. Edelman, a partner at Gibson Dunn (a true and correct copy of my biography, showing my credentials and experience, is attached hereto as **Exhibit B**);

- Nathaniel L. Bach, a senior associate at Gibson Dunn (a true and correct copy of Mr. Bach's biography, showing his credentials and experience, is attached hereto as **Exhibit C**);

1

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

· Marissa B. Moshell, a mid-level associate at Gibson Dunn (a true and correct copy of Ms. Moshell's biography, showing her credentials and experience, is attached hereto as **Exhibit D**); and

· Daniel M. Rubin, a mid-level associate at Gibson Dunn (a true and correct copy of Mr. Rubin's biography, showing his credentials and experience, is attached hereto as **Exhibit E**).

5.      I believe all of the aforementioned attorneys were both necessary and reasonable for the litigation of Defendants' successful Motion to Strike and, based on my experience, I believe that Gibson Dunn staffed and litigated this case in a reasonable, efficient, and appropriate manner.

6.      Once our team was assembled, Defendants' counsel determined the best method for defeating Plaintiff's Complaint was to file a Special Motion to Strike under California Code of Civil Procedure section 425.16.

7.      I communicated our intention of filing an anti-SLAPP motion to Amnon Z. Siegel of Miller Barondess LLP, counsel for Plaintiff, on September 25, 2019.  Mr. Siegel would not agree to dismiss the Complaint.  Mr. Siegel informed me that he still wanted to move forward with discovery, which he felt was permissible at that phase of the proceedings.  As such, I had my team research the permissibility of discovery when defendants file a motion to strike based solely on the complaint and judicially noticeable materials (akin to a Rule 12(b)(6) motion to dismiss), as opposed to factual grounds.  The parties met and conferred on this issue, but did not reach agreement on the permissibility of discovery.  At no point during the meet and confer process, or anytime thereafter, did Plaintiff offer to dismiss its claim.

8.      Substantial efforts went into the preparation of this dispositive motion. Gibson Dunn attorneys researched the legal doctrine of protected opinion, which requires a totality of the circumstances test in which numerous factors may be considered, requiring significant research.  Defendants' counsel also researched the case law surrounding substantially true speech.  Further, given that Plaintiff brought its

2

Gibson, Dunn &
Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

Complaint in federal district court, Gibson Dunn attorneys needed to research the interplay between California's state anti-SLAPP statute and federal procedural law. Gibson Dunn attorneys also spent time analyzing the segment of *The Rachel Maddow Show* that was at the center of Plaintiff's lawsuit.

9. Defendants filed their Special Motion to Strike on October 21, 2019.

10. Defendants received Plaintiff's Opposition to their Motion to Strike on December 2, 2019. The Opposition included three declarations, one of which was from an alleged linguistics expert, Professor Stefan Th. Gries. Professor Gries submitted a report with 17 single-spaced pages of analysis concerning Rachel Maddow's statement.

11. Gibson Dunn did not hire an expert to rebut Professor Gries' expert report. Defendants' counsel understood that evidentiary submissions of this sort were improper at this stage of the proceedings, and chose not to waste time and resources retaining an expert to work on a report that should not be considered. Plaintiff's improper submission did, however, compel Defendants to research the impropriety of evidentiary submissions in the context of a special motion to strike submitted on a legal basis only. Defendants' counsel also conducted further research to respond to Plaintiff's other arguments.

12. Defendants filed their reply brief on December 9, 2019.

13. The next day, Mr. Siegel contacted Defendants' counsel and informed Defendants of his plan to file an *Ex Parte* Application to Supplement the Record. Mr. Siegel wanted to submit new *evidence* of a December 9, 2019 episode of *Hardball* with Chris Matthews. Defendants' counsel again told Mr. Siegel that evidentiary submissions were improper at this stage, and that the video was irrelevant. Plaintiff nonetheless filed its *Ex Parte* Application on December 11, 2019.

14. As a result of Plaintiff's *Ex Parte* Application, Defendants' counsel was forced to undertake even further research and briefing to oppose the Application. Defendants filed their Opposition on December 13, 2019.

3

Gibson, Dunn &
Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

15. The Court scheduled an oral argument on Defendants' Motion to Strike and Plaintiff's *Ex Parte* Application to Supplement the Record. Defendants' counsel spent significant time preparing for the hearing, re-reading nearly thirty cases cited across the briefing, and drafting case summaries and oral argument outlines. Defendants' counsel also reviewed *The Rachel Maddow Show* segment and *The Daily Beast* article on which it was based. This effort was undoubtedly made more time intensive due to Plaintiff's *Ex Parte* Application to Supplement the Record.

16. The Court heard telephonic oral argument on May 19, 2020, and issued an Order granting Defendants' Special Motion to Strike on May 22, 2020. A true and correct copy of the transcript of the hearing on Defendants' Special Motion to Strike is attached hereto as **Exhibit F**.

## Gibson Dunn's Fees

17. Gibson Dunn was retained on a modified contingency fee basis—NBCU agreed to pay Defendants' counsel a rate of $100,000 for the filing and argument on the Anti-SLAPP Motion. NBCU further agreed that, if they were successful on the Anti-SLAPP Motion and recovered from Plaintiff, they would pay Gibson Dunn any difference between the $100,00 and the fees actually incurred by counsel.

18. At the time Gibson Dunn was retained in 2019, our standard hourly rates were as follows:

| Timekeeper | Standard 2019 Rate/Hour |
|---|---|
| Theodore J. Boutrous, Jr. (Partner) | $1,450 |
| Scott A. Edelman (Partner) | $1,335 |
| Nathaniel L. Bach (Senior Associate) | $915 |
| Marissa B. Moshell (Mid-Level Associate) | $625 |
| Daniel M. Rubin (Mid-Level Associate) | $625 |
| Lolita C. Gadberry | $460 |

Gibson, Dunn & Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| | |
|---|---|
| (Paralegal) | |
| Erin E. Kurinsky (Researcher) | $270 |
| Carla H. Jones (Researcher) | $270 |

19. Starting in January 2020, our standard hourly rates were as follows:

| Timekeeper | Standard 2020 Rate/Hour |
|---|---|
| Theodore J. Boutrous, Jr. (Partner) | $1,525 |
| Scott A. Edelman (Partner) | $1,395 |
| Nathaniel L. Bach (Senior Associate) | $960 |
| Marissa B. Moshell (Mid-Level Associate) | $740 |
| Lolita C. Gadberry (Paralegal) | $480 |
| Duke K. Amponsah (Paralegal) | $480 |

20. Based on my reading of the relevant case law, fee applications submitted in other district courts in California, and my overall familiarity with rates charged by my firm's competitors, it is my understanding that these rates are comparable to the rates charged by peer firms and attorneys with similar skill and experience.

· Attached hereto as **Exhibit G** is a true and correct copy of an April 2020 fee application submitted in bankruptcy court in the northern district of California, which reflects hourly billing rates for litigation partners and associates from Weil, Gotshal & Manges LLP charged in 2019 and 2020. This fee application shows that Weil charged rates up to $1,325 per hour for litigation partners, and between $595 and $1,050 for litigation associates. Ex. G at 7-9.

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

- Attached hereto as **Exhibit H** is a true and correct copy of an excerpt from the Public Rates Report issued by Thomson Reuters on January 14, 2020. The Thomson Reuters report shows the rates charged by attorneys for matters in various jurisdictions, including the northern and central districts of California. Exhibit H excerpts those entries pertaining to any district of California entries on the report. The report shows that, in 2019, senior attorneys were charging up to $1,145 per hour for work performed in the northern district of California. Ex. H at 2.

- Attached hereto as **Exhibit I** is a true and correct copy of an excerpt from the Public Rates Report issued by Thomson Reuters in September 2018. The Thomson Reuters report shows the rates charged by attorneys for matters in various jurisdictions, including California districts, from 2006 to 2015. Exhibit I excerpts those entries pertaining to any district of California entries on the report. The report shows that as early as 2012, eight years ago, senior attorneys were charging upwards of $800 per hour in the southern district of California. Ex. I at 257. As early as 2013, seven years ago, certain senior attorneys were already charging over $1,000 per hour in the central district of California. *Id.* at 139.

21. Gibson Dunn's hourly rates are also appropriate in light of the high degree of sophistication, experience, and excellence that Gibson Dunn attorneys bring to bear on their work (as demonstrated by the success in the present litigation).

22. I have reviewed Gibson Dunn's timekeeping records for this case, and the time referenced in these records reflects the time actually worked in connection with this matter. I have become very familiar with such records and the processes by which the firm creates and maintains them. In the regular course of business, Gibson Dunn maintains records of time spent by individual attorneys and other professionals with respect to each client matter. In recording their timekeeping entries, attorneys at

Gibson, Dunn & Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson Dunn are required to specify the client and matter, the nature of the work performed, and the amount of time that they expend on a designated task(s).

23. The work performed on this matter by the attorneys and other professionals at Gibson Dunn can be categorized as follows:

- (1) reviewing and analyzing Plaintiff's Complaint and discussing initial strategy to defeat Plaintiff's defamation claim;
- (2) researching and drafting the Anti-SLAPP Motion and supporting documents;
- (3) reviewing and responding to Plaintiff's opposition brief, including Plaintiff's improper evidentiary submission;
- (4) reviewing and responding to Plaintiff's *Ex Parte* Application to Supplement the Record;
- (5) preparing for and attending the hearing on the Anti-SLAPP Motion and Plaintiff's *Ex Parte* Application to Supplement the Record; and
- (6) researching and drafting the Attorneys' Fees Motion and supporting documents.

Set forth below are the details of the work completed by the Gibson Dunn attorneys and other professionals, divided by category, through the filing of this Motion for Attorneys' Fees and Costs. This information is a true and accurate reflection of our timekeeping records of amounts incurred:

| Date | Time | Amount Incurred (Rate x Time) | Timekeeper | Task(s) |
|------|------|------------------------------|------------|---------|
| **Reviewing and analyzing Plaintiff's Complaint and discussing initial strategy to defeat Plaintiff's defamation claim** | | | | |
| 9/23/2019 | 0.2 | $183 | Bach, Nathaniel L. | Call with S. Edelman re seeking extension of time to respond. |
| 9/23/2019 | 0.3 | $400.50 | Edelman, Scott A. | Address service of process. |

7

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| 9/25/2019 | 1.4 | $875 | Moshell, Marissa B. | Call with S. Edelman re response to Plaintiffs' counsel (.2); research for T. Boutrous (.2); draft response to Plaintiffs' counsel (1.0). |
|-----------|-----|------|---------------------|------------------|
| 9/25/2019 | 0.5 | $457.50 | Bach, Nathaniel L. | Telephone conference with client, T. Boutrous, S. Edelman, T. Evangelis re initial strategy. |
| 9/25/2019 | 1.6 | $2,320 | Boutrous Jr., Theodore J. | Analyzing issues, strategy, participate in strategy call with clients. |
| 9/25/2019 | 0.3 | $400.50 | Edelman, Scott A. | Review complaint, background. |
| 9/25/2019 | 0.5 | $667.50 | Edelman, Scott A. | Research in preparation for call with client. |
| 9/25/2019 | 0.6 | $801 | Edelman, Scott A. | Review correspondence from plaintiffs regarding Rule 26 meeting (.2); correspond with team regarding same (.2); telephone conference with M. Moshell regarding same (.1); update clients (.1). |
| 9/25/2019 | 0.4 | $534 | Edelman, Scott A. | Telephone conference with M. Moshell regarding extension of time to respond. |
| 9/26/2019 | 0.6 | $162 | Kurinsky, Erin E. | Research for M. Moshell. |
| 9/26/2019 | 0.2 | $267 | Edelman, Scott A. | Correspond with client. |
| 9/26/2019 | 0.6 | $801 | Edelman, Scott A. | Address time to respond to complaint with substituted service and email A. Siegel regarding extension. |
| 9/27/2019 | 1.4 | $875 | Moshell, Marissa B. | Draft stipulation and proposed order for extension of time to respond to Plaintiff's Complaint. |

8

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| 9/27/2019 | 0.6 | $801 | Edelman, Scott A. | Correspond with plaintiff's counsel regarding extension. |
|---|---|---|---|---|
| 9/30/2019 | 0.1 | $27 | Jones, Carla H. | Legal research for N. Bach. |
| 10/1/2019 | 0.8 | $500 | Moshell, Marissa B. | Draft corporate disclosure statement. |
| 10/1/2019 | 0.6 | $549 | Bach, Nathaniel L. | Emails with A. Jacobs re joint motion to extend time to respond to complaint (.4); email to M. Moshell re corporate disclosure statement (.2). |
| 10/2/2019 | 0.6 | $375 | Moshell, Marissa B. | Finalize stipulation and rule 7.1 statement for filing and file same. |
| 10/2/2019 | 0.7 | $640.50 | Bach, Nathaniel L. | Emails with client re joint stipulation to extend time to respond to complaint (.4); emails with A. Siegel re meet and confer (.3). |
| 10/07/2019 | 0.5 | $312.50 | Moshell, Marissa B. | Begin preparing notices of appearance. |
| 10/08/2019 | 0.5 | $312.50 | Moshell, Marissa B. | Prepare and file notices of appearance. |
| **Researching and drafting the Anti-SLAPP Motion and supporting documents** | | | | |
| 9/20/2019 | 0.4 | $366 | Bach, Nathaniel L. | Emails with T. Boutrous re anti-SLAPP timing. |
| 9/24/2019 | 1 | $1,450 | Boutrous Jr., Theodore J. | Emails, calls with clients, analyzing issues for anti-SLAPP motion. |
| 9/24/2019 | 0.4 | $366 | Bach, Nathaniel L. | Emails with T. Boutrous re anti-SLAPP motion preparation. |
| 9/25/2019 | 0.8 | $1,068 | Edelman, Scott A. | Prepare for and conference call with clients regarding anti-SLAPP strategy. |
| 9/26/2019 | 2.6 | $1,625 | Moshell, Marissa B. | Calls with N. Bach and T. Boutrous re anti-SLAPP motion (.2); research federal |

9

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| Date | Hours | Amount | Timekeeper | Description |
|---|---|---|---|---|
| | | | | court procedural question (1.0); research for anti-SLAPP motion (1.4). |
| 9/26/2019 | 2.6 | $2,379 | Bach, Nathaniel L. | Calls with T. Boutrous, S. Edelman, M. Moshell re anti-SLAPP brief (.2); research for and begin drafting anti-SLAPP motion to strike (2.4). |
| 9/27/2019 | 4.1 | $3,751.50 | Bach, Nathaniel L. | Research and draft outline for anti-SLAPP motion (3.6); review materials relevant to anti-SLAPP briefing (.4). |
| 9/28/2019 | 0.3 | $187.50 | Moshell, Marissa B. | Research for anti-SLAPP motion. |
| 9/29/2019 | 0.7 | $437.50 | Moshell, Marissa B. | Research for anti-SLAPP motion. |
| 10/1/2019 | 3 | $2,745 | Bach, Nathaniel L. | Research re anti-SLAPP motion to strike (2.2); prepare outline of same (.8). |
| 10/6/2019 | 2.4 | $2,196 | Bach, Nathaniel L. | Draft talking points for meet and confer call (1.2); review opinion standards re First Amendment (1.2). |
| 10/7/2019 | 4.3 | $2,687.50 | Moshell, Marissa B. | Research for anti-SLAPP motion (4.3). |
| 10/7/2019 | 2 | $1,830 | Bach, Nathaniel L. | Prepare for meet and confer with Plaintiff's counsel (.3); meet and confer call with A. Siegel re Anti-SLAPP motion (.4); emails with M. Moshell re research for anti-SLAPP motion (.5); review case law re same (.8). |
| 10/7/2019 | 1 | $1,335 | Edelman, Scott A. | Prepare for and meet and confer with plaintiff re Anti-SLAPP. |
| 10/8/2019 | 5.3 | $274.50 | Bach, Nathaniel L. | Research opinion cases for anti-SLAPP motion (3.0); |

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| | | | | draft anti-SLAPP motion (2.3). |
|---|---|---|---|---|
| 10/8/2019 | 2.3 | $1,437.50 | Moshell, Marissa B. | Continue research for anti-SLAPP motion (2.3). |
| 10/9/2019 | 4.9 | $4,483.50 | Bach, Nathaniel L. | Drafting anti-SLAPP motion. |
| 10/10/2019 | 5.6 | $5,124 | Bach, Nathaniel L. | Working on anti-SLAPP special motion to strike. |
| 10/10/2019 | 1.5 | $2,175 | Boutrous Jr., Theodore J. | Reading key cases for anti-SLAPP motion. |
| 10/11/2019 | 2 | $2,900 | Boutrous Jr., Theodore J. | Working on anti-SLAPP motion. |
| 10/11/2019 | 8 | $7,320 | Bach, Nathaniel L. | Drafting anti-SLAPP motion to strike (5.8); researching issues re same (2.2). |
| 10/12/2019 | 5 | $4,575 | Bach, Nathaniel L. | Working on draft of anti-SLAPP motion. |
| 10/13/2019 | 6.6 | $6,039 | Bach, Nathaniel L. | Emails with T. Boutrous re comments to Anti-SLAPP motion (.8); further revisions to same (5.8). |
| 10/13/2019 | 4 | $5,800 | Boutrous Jr., Theodore J. | Working on anti-SLAPP motion. |
| 10/14/2019 | 7.7 | $7,045.50 | Bach, Nathaniel L. | Call with T. Boutrous, S. Edelman, T. Evangelis re anti-SLAPP brief (.5); further calls with T. Boutrous re same (.3); further revisions to brief (6.9). |
| 10/14/2019 | 1 | $1,335 | Edelman, Scott A. | Review anti-SLAPP brief (.5); team call re same (.5). |
| 10/14/2019 | 6 | $8,700 | Boutrous Jr., Theodore J. | Working on anti-SLAPP motion. |
| 10/15/2019 | 2.2 | $1,375 | Rubin, Daniel M. | Revise anti-SLAPP motion. |
| 10/15/2019 | 4.9 | $4,483.50 | Bach, Nathaniel L. | Implementing further edits, revisions to anti-SLAPP draft (3.5); emails and calls |

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

Gibson, Dunn &
Crutcher LLP

| | | | | with T. Boutrous, S. Edelman, T. Evangelis re same (.5); emails with D. Rubin re supporting motion documents (.4); emails with T. Boutrous re upcoming client meeting (.5). |
|---|---|---|---|---|
| 10/15/2019 | 1 | $625 | Rubin, Daniel M. | Draft and revise notice of anti-SLAPP motion, request for judicial notice, and proposed order. |
| 10/15/2019 | 4.5 | $6,525 | Boutrous Jr., Theodore J. | Revising, editing anti-SLAPP motion. |
| 10/15/2019 | 2.9 | $3,871.50 | Edelman, Scott A. | Review draft anti-SLAPP Motion, edit same. |
| 10/16/2019 | 7.4 | $6,771 | Bach, Nathaniel L. | Review client comments on draft anti-SLAPP motion (.6); prepare for client meeting (.5); telephonic conference with S. Weiner, T. Hoff, A. Jacobs, T. Boutrous, S. Edelman re same (.6); further revisions to anti-SLAPP motion (5.7). |
| 10/16/2019 | 2.4 | $1,500 | Rubin, Daniel M. | Draft and revise materials in support of anti-SLAPP motion. |
| 10/16/2019 | 0.7 | $934.50 | Edelman, Scott A. | Telephone conference with clients regarding anti-SLAPP motion. |
| 10/16/2019 | 3 | $4,350 | Boutrous Jr., Theodore J. | Review client comments on anti-SLAPP motion, meet with clients, work on motion. |
| 10/17/2019 | 4.7 | $4,300.50 | Bach, Nathaniel L. | Further revisions to anti-SLAPP motion (3.0); emails with T. Boutrous, client re same (.5); review and revise supporting motion documents (RJN, proposed order, notice of motion, |

12

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| | | | | notice of lodging) and send same to client (1.2). |
|---|---|---|---|---|
| 10/17/2019 | 0.2 | $125 | Rubin, Daniel M. | Revise materials in support of anti-SLAPP motion. |
| 10/17/2019 | 2.9 | $4,205 | Boutrous Jr., Theodore J. | Start-to-finish editing, revising of anti-SLAPP motion. |
| 10/18/2019 | 0.9 | $823.50 | Bach, Nathaniel L. | Call with A. Jacobs re anti-SLAPP brief (.1); review further edits to same (.5); emails with D. Rubin re upcoming filing and lodging (.3). |
| 10/18/2019 | 5.1 | $3,187.50 | Rubin, Daniel M. | Revise anti-SLAPP motion to strike Plaintiff's complaint. |
| 10/18/2019 | 0.6 | $375 | Rubin, Daniel M. | Confer with N. Bach re filing of anti-SLAPP motion. |
| 10/18/2019 | 1 | $1,450 | Boutrous Jr., Theodore J. | Review clients' latest changes, review, revise anti-SLAPP brief. |
| 10/20/2019 | 2.1 | $1,921.50 | Bach, Nathaniel L. | Further revisions to anti-SLAPP motion, including cite check edits (2.0); email to client re putative final draft (.1). |
| 10/21/2019 | 4.2 | $2,625 | Rubin, Daniel M. | Final proof and cite check of anti-SLAPP motion to strike complaint and supporting materials. |
| 10/21/2019 | 3.6 | $3,294 | Bach, Nathaniel L. | Final review of anti-SLAPP motion, memorandum, request for judicial notice, notice of lodging, proposed order (2.7); emails with client re same (.4); emails and calls with D. Rubin re filing (.5). |
| 10/21/2019 | 0.9 | $562.50 | Rubin, Daniel M. | Confer with N. Bach re anti-SLAPP motion to |

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| | | | | strike and supporting documents. |
|---|---|---|---|---|
| 10/21/2019 | 1 | $1,450 | Boutrous Jr., Theodore J. | Final revisions to anti-SLAPP motion papers before filing. |
| **Reviewing and responding to Plaintiff's opposition brief, including Plaintiff's improper evidentiary submission** | | | | |
| 12/2/2019 | 4.7 | $2,937.50 | Moshell, Marissa B. | Call with N. Bach re reply brief (.1); research for reply brief (.1); review and analyze moving and opposition papers on anti-SLAPP motion (2.4); begin drafting reply in support of anti-SLAPP motion (2.1). |
| 12/2/2019 | 2.5 | $2,287.50 | Bach, Nathaniel L. | Review opposition to motion to strike and supporting documents (.8); meet with M. Moshell re drafting reply brief (.2); emails with GDC team re reply brief (.3); draft talking points for reply brief (1.2). |
| 12/3/2019 | 1.2 | $1,098 | Bach, Nathaniel L. | Call with A. Jacobs, M. Moshell re reply brief (.5); meeting with M. Moshell re same (.2); reading Plaintiff's cases (.5). |
| 12/3/2019 | 12.1 | $7,562.50 | Moshell, Marissa B. | Call with client and N. Bach re reply brief (.5); meeting with N. Bach re reply brief (.2); draft reply brief (11.4). |
| 12/3/2019 | 2.2 | $1,012 | Gadberry, Lolita C. | Review opposition brief and download cases and statutes cited in same (1.5); organize cases and statutes and forward zip file of same to M. Moshell (.7). |

Gibson, Dunn &
Crutcher LLP

14

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

| 12/4/2019 | 3.5 | $2,187.50 | Moshell, Marissa B. | Continue drafting reply brief (3.2); correspond with N. Bach re reply brief (.3). |
|---|---|---|---|---|
| 12/4/2019 | 8.6 | $7,869 | Bach, Nathaniel L. | Working on draft of reply in support of motion to strike. |
| 12/5/2019 | 1 | $460 | Gadberry, Lolita C. | Assist N. Bach with organization and printing of case files for T. Boutrous. |
| 12/5/2019 | 5.5 | $5,032.50 | Bach, Nathaniel L. | Revising reply in support of anti-SLAPP motion. |
| 12/5/2019 | 1 | $1,450 | Boutrous Jr., Theodore J. | Work on anti-SLAPP reply. |
| 12/6/2019 | 1.7 | $1,555.50 | Bach, Nathaniel L. | Revisions to reply brief in support of motion to strike. |
| 12/6/2019 | 0.4 | $250 | Moshell, Marissa B. | Research availability of stay of discovery pending appeal of an anti-SLAPP order. |
| 12/7/2019 | 0.7 | $437.50 | Moshell, Marissa B. | Research stays of discovery on appeal from an anti-SLAPP order. |
| 12/7/2019 | 0.8 | $732 | Bach, Nathaniel L. | Draft email memorandum to T. Boutrous re discovery stay on appeal from an anti-SLAPP order. |
| 12/7/2019 | 3.5 | $3,202.50 | Bach, Nathaniel L. | Revising reply brief in support of motion to dismiss. |
| 12/7/2019 | 1.2 | $1,740 | Boutrous Jr., Theodore J. | Work on anti-SLAPP reply. |
| 12/8/2019 | 1.5 | $1,372.50 | Bach, Nathaniel L. | Further revisions to reply in support of anti-SLAPP motion (1.0); emails with T. Boutrous, S. Weiner re discovery stay (.5). |
| 12/9/2019 | 2.8 | $1,750 | Moshell, Marissa B. | Revise and cite check reply in support of anti-SLAPP motion (2.5); file reply in support of anti-SLAPP motion (.3). |

Gibson, Dunn & Crutcher LLP

15

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| 12/9/2019 | 3.5 | $3,202.50 | Bach, Nathaniel L. | Final revisions to reply in support of motion to strike (2.0); emails with C. O'Hagan, S. Weiner, M. Moshell re same (.5); final proofs of motion before filing (1.0). |
|---|---|---|---|---|
| 12/9/2019 | 0.5 | $725 | Boutrous Jr., Theodore J. | Final review of anti-SLAPP reply. |
| **Reviewing and responding to Plaintiff's _Ex Parte_ Application to Supplement the Record** | | | | |
| 12/10/2019 | 0.9 | $823.50 | Bach, Nathaniel L. | Emails with A. Siegel, client team re ex parte application to supplement record (.6); call with A. Siegel re same (.2); call with S. Edelman re same (.1). |
| 12/10/2019 | 0.2 | $267 | Edelman, Scott A. | Telephone conference with N. Bach regarding ex parte application. |
| 12/11/2019 | 0.5 | $312.50 | Moshell, Marissa B. | Research for Opposition to ex parte application. |
| 12/11/2019 | 2 | $1,830 | Bach, Nathaniel L. | Draft opposition to ex parte application to supplement evidentiary record (1.5); emails with S. Weiner, M. Moshell re same (.5). |
| 12/12/2019 | 0.3 | $435 | Boutrous Jr., Theodore J. | Review, comment on opposition to ex parte. |
| 12/12/2019 | 4.6 | $4,209 | Bach, Nathaniel L. | Further revisions to opposition to ex parte application to supplement (4.2); emails and call with T. Boutrous re same (.4). |
| 12/13/2019 | 1.2 | $1,098 | Bach, Nathaniel L. | Final revision to and proof of opposition to ex parte application. |

16

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

Gibson, Dunn &
Crutcher LLP

| Preparing for and attending the hearing on the Anti-SLAPP Motion and Plaintiff's *Ex Parte* Application to Supplement the Record | | | | |
|---|---|---|---|---|
| 3/9/2020 | 0.2 | $192 | Bach, Nathaniel L. | Emails to M. Moshell re hearing preparation. |
| 3/12/2020 | 5.5 | $4,070 | Moshell, Marissa B. | Prepare one-pagers for oral argument on anti-SLAPP motion. |
| 3/16/2020 | 0.7 | $518 | Moshell, Marissa B. | Review and revise oral argument preparation materials. |
| 4/27/2020 | 0.8 | $768 | Bach, Nathaniel L. | Review Bashant orders re tentative rulings in other cases. |
| 4/27/2020 | 0.3 | $418.50 | Edelman, Scott A. | Correspond with client and N. Bach regarding upcoming hearing. |
| 5/4/2020 | 1 | $1,525 | Boutrous Jr., Theodore J. | Begin hearing preparation. |
| 5/7/2020 | 2.1 | $1,554 | Moshell, Marissa B. | Compile materials for T. Boutrous for hearing preparation. |
| 5/12/2020 | 6.9 | $5,106 | Moshell, Marissa B. | Review and analyze key cases and draft case summaries. |
| 5/12/2020 | 0.3 | $288 | Bach, Nathaniel L. | Reviewing outlines for hearing on anti-SLAPP motion. |
| 5/12/2020 | 1.7 | $1,632 | Bach, Nathaniel L. | Revising outline of talking points for anti-SLAPP hearing. |
| 5/12/2020 | 2.5 | $3,812.50 | Boutrous Jr., Theodore J. | Preparing for hearing on anti-SLAPP motion hearing, including studying briefs, cases |
| 5/13/2020 | 2.3 | $2,208 | Bach, Nathaniel L. | Draft mooting questions for anti-SLAPP hearing. |
| 5/13/2020 | 1.9 | $1,406 | Moshell, Marissa B. | Draft questions and answers for hearing preparation. |
| 5/13/2020 | 2.5 | $3,812.50 | Boutrous Jr., Theodore J. | Hearing preparation. |

Gibson, Dunn & Crutcher LLP

17
EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| 5/14/2020 | 2.9 | $2,146 | Moshell, Marissa B. | Meeting with team and client re hearing (.8); research and correspond with team re hearing on anti-SLAPP motion (2.1). |
|---|---|---|---|---|
| 5/14/2020 | 0.9 | $864 | Bach, Nathaniel L. | Pre-hearing call with client, T. Boutrous, S. Edelman, M. Moshell. |
| 5/14/2020 | 1 | $1,395 | Edelman, Scott A. | Review anti-SLAPP materials in preparation for moot session with client. |
| 5/14/2020 | 0.9 | $1,255.50 | Edelman, Scott A. | Moot session with client. |
| 5/14/2020 | 3.9 | $5,947.50 | Boutrous Jr., Theodore J. | Preparing for moot court, strategy session, participate in same, continue to prepare for hearing on SLAPP motion. |
| 5/15/2020 | 0.6 | $444 | Moshell, Marissa B. | Research for hearing on anti-SLAPP motion. |
| 5/16/2020 | 2 | $3,050 | Boutrous Jr., Theodore J. | Prepare for anti-SLAPP hearing. |
| 5/16/2020 | 0.3 | $222 | Moshell, Marissa B. | Research court reporting and hearing transcription for anti-SLAPP hearing. |
| 5/17/2020 | 3 | $4,575 | Boutrous Jr., Theodore J. | Preparing for hearing on anti-SLAPP motion. |
| 5/17/2020 | 0.3 | $222 | Moshell, Marissa B. | Correspond with T. Boutrous re materials for hearing preparation (.1); correspond with N. Bach and court reporter re hearing transcript (.2). |
| 5/18/2020 | 2.2 | $2,112 | Bach, Nathaniel L. | Draft one-sheets and hearing arguments. |
| 5/18/2020 | 1.3 | $962 | Moshell, Marissa B. | Draft one-pager for oral argument (1); correspond with team re hearing preparation (.3). |

18

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| 5/18/2020 | 4.5 | $6,862.50 | Boutrous Jr., Theodore J. | Continue to prepare for hearing on Anti-SLAPP motion. |
|---|---|---|---|---|
| 5/19/2020 | 1.5 | $1,440 | Bach, Nathaniel L. | Prepare for hearing on anti-SLAPP motion (.7); telephonic hearing re same (.6); post-hearing debrief with client (.3). |
| 5/19/2020 | 1 | $740 | Moshell, Marissa B. | Attend telephonic hearing on anti-SLAPP motion (.6); call with team re hearing (.1); correspond with court reporter re hearing transcript (.3). |
| 5/19/2020 | 1.5 | $2,092.50 | Edelman, Scott A. | Attend anti-SLAPP hearing. |
| 5/19/2020 | 4.3 | $6,557.50 | Boutrous Jr., Theodore J. | Final preparations for hearing on anti-SLAPP motion, argue motion, call with clients re same, review transcript. |
| **Researching and drafting the Attorneys' Fees Motion and supporting documents** | | | | |
| 5/22/2020 | 2.2 | $1,628 | Moshell, Marissa B. | Research filing deadline for motion for attorney's fees (1); review order granting anti-SLAPP motion and draft summary (1.2). |
| 5/22/2020 | 0.5 | $480 | Bach, Nathaniel L. | Review order granting anti-SLAPP motion. |
| 5/22/2020 | 0.6 | $915 | Boutrous Jr., Theodore J. | Analyzing anti-SLAPP ruling. |
| 5/25/2020 | 0.6 | $444 | Moshell, Marissa B. | Conduct research for motion for attorneys' fees. |
| 5/26/2020 | 5.1 | $3,774 | Moshell, Marissa B. | Research for attorney fees motion and bill of costs (4); begin drafting attorney fees motion (1.1). |
| 5/27/2020 | 10.1 | $7,474 | Moshell, Marissa B. | Continue drafting and researching for motion for |

19

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| | | | | attorneys' fees (9.9); call with N. Bach re motion for attorneys' fees and costs (.2). |
|---|---|---|---|---|
| 5/27/2020 | 1.2 | $1,152 | Bach, Nathaniel L. | Call with M. Moshell re drafting fee motion (.3); emails with M. Moshell, S. Edelman re same (.3); reviewing fee summary for motion (.6). |
| 5/27/2020 | 1.5 | $720 | Gadberry, Lolita C. | Review and analyze accounting department billing records received from M. Moshell. |
| 5/27/2020 | 0.3 | $418.50 | Edelman, Scott A. | Emails regarding fee application. |
| 5/28/2020 | 8.2 | $6,068 | Moshell, Marissa B. | Continue drafting fees motion. |
| 5/28/2020 | 0.5 | $480 | Bach, Nathaniel L. | Meet and confer with A. Siegel re motion for fees (.3); email to clients re same (.2). |
| 5/28/2020 | 4.5 | $2,160 | Gadberry, Lolita C. | Review billing records and prepare charts of billed time pursuant to the request of M. Moshell. |
| 5/28/2020 | 0.4 | $558 | Edelman, Scott A. | Edit fees motion; emails with M. Moshell regarding research for fees motion. |
| 5/28/2020 | 1.4 | $672 | Amponsah, Duke K. | Research for fees motion and confer with M. Moshell and R. Klyman re same. |
| 5/29/2020 | 7.4 | $5,476 | Moshell, Marissa B. | Draft declaration for S. Edelman in support of attorneys' fees motion. |
| 5/29/2020 | 5.5 | $2,640 | Gadberry, Lolita C. | Review and analyze chart regarding billed time and edit and revise same (5.00); email exchange with M. Moshell regarding |

20

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| | | | | preparation and review of motion for fees (.50). |
|---|---|---|---|---|
| 5/29/2020 | 0.5 | $697.50 | Edelman, Scott A. | Work on fee application and emails with M. Moshell regarding same. |
| 5/31/2020 | 1.5 | $1,440 | Bach, Nathaniel L. | Revising memorandum in support of fee motion. |
| 6/1/2020 | 2.3 | $1,702 | Moshell, Marissa B. | Review and revise motion for attorneys' fees and supporting declaration (1.8); correspond with team re motion for attorneys' fees (.5). |
| 6/1/2020 | 0.4 | $384 | Bach, Nathaniel L. | Emails with S. Edelman, M. Moshell re motion for fees. |
| 6/1/2020 | 1.0 | $1,395 | Edelman, Scott A. | Edit motion for attorneys' fees, declaration in support. |
| 6/2/2020 | 3.2 | $2,368 | Moshell, Marissa B. | Research for and revise motion for attorneys' fees. |
| 6/2/2020 | 3.5 | $2,590 | Moshell, Marissa B. | Call with S. Edelman and N. Bach re motion for attorneys' fees (.4); continue revising motion for attorneys' fees and supporting declaration (3.1). |
| 6/2/2020 | 1.0 | $1,395 | Edelman, Scott A. | Work on motion for attorneys' fees and telephone conference with N. Bach and M. Moshell regarding same. |
| 6/3/2020 | 3.5 | $2,590 | Moshell, Marissa B. | Revise motion for attorneys' fees and supporting declaration (2.5); compile exhibits for attorneys' fees motion (1). |
| 6/3/2020 | 0.5 | $697.50 | Edelman, Scott A. | Revise motion for attorneys' fees. |
| 6/4/2020 | 4.0 | $2,960 | Moshell, Marissa B. | Research for and revise motion for attorneys' fees and supporting declaration (3.8); call with S. Edelman |

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

|  |  |  |  | re attorneys' fees motion (.2). |
|---|---|---|---|---|
| **Total Hours and Fees** | | | | |
| **TOTAL** | 355.5 | $323,965 | | |

24.　Set forth below are the details of the hours expended by the Gibson Dunn attorneys and other professionals, divided by timekeeper, through the filing of this Motion for Attorneys' Fees and Costs.  This information is a true and accurate reflection of our records:

| Timekeeper | Hours Worked |
|---|---|
| Theodore J. Boutrous, Jr. (Partner) | 55.8 |
| Scott A. Edelman (Partner) | 17.5 |
| Nathaniel L. Bach (Senior Associate) | 135.1 |
| Marissa B. Moshell (Mid-Level Associate) | 113.7 |
| Daniel M. Rubin (Mid-Level Associate) | 16.6 |
| Lolita C. Gadberry (Paralegal) | 14.7 |
| Duke Amponsah (Paralegal) | 1.4 |
| Erin E. Kurinsky (Researcher) | .6 |
| Carla H. Jones (Researcher) | .1 |
| **TOTAL** | 355.5 |

25.　In sum, through the filing of this Motion for Attorneys' Fees and Costs, attorneys and other professionals collectively spent 355.5 hours working on this matter, which resulted in $323,965 in attorneys' fees.  Gibson Dunn is also seeking any

Gibson, Dunn & Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

additional fees incurred in connection with preparing a Reply and attending a hearing on this Motion.

### Gibson Dunn's Costs

26.     In addition to the fees for Gibson Dunn attorneys and other professionals, Defendants incurred certain costs in connection with their Motion to Strike. I have reviewed Gibson Dunn's record of costs for this case, and I am familiar with such records and the processes by which the firm creates and maintains them. In the regular course of business, Gibson Dunn maintains records of costs incurred in connection with a particular client and matter.

27.     The costs incurred by Gibson Dunn in connection with this matter can be categorized as follows:

- · Courier costs;
- · Document retrieval service costs;
- · Process server costs;
- · Photocopying costs;
- · Research costs; and
- · Transcript costs.

Set forth below are the details of the costs incurred by Defendants, divided by category, through the filing of this Motion for Attorneys' Fees and Costs. This information is a true and accurate reflection of our records:

| Date | Cost | Description |
|---|---|---|
| **Courier Costs** | | |
| 10/21/2019 | $11.90 | UPS Delivery of DVD to Amnon Z. Siegel at Miller Barondess LLP |
| 5/8/2020 | $48.99 | Delivery of hearing preparation materials to Theodore J. Boutrous, Jr. |
| **Document Retrieval Service Costs** | | |
| 9/26/2019 | $109.72 | Dun & Bradstreet Document Retrieval Research Costs |

23

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

| 10/21/2019 | $12.30 | PACER charges for October 2019 |
|---|---|---|
| 12/9/2019 | $1.50 | PACER charges for December 2019 |
| 2/2/2020 | $25.00 | Docket tracking charges through December 2019 |
| 2/28/2020 | $2.50 | Docket tracking charges through January 2020 |
| 4/1/2020 | $15.00 | Docket tracking charges through February 2020 |
| 4/30/2020 | $10.00 | Docket tracking charges through March 2020 |
| 5/31/2020 | $5.00 | Docket tracking charges through April 2020 |
| **Process Server Costs** | | |
| 10/21/2019 | $44.12 | First Legal Network, LLC delivery of Notice of Lodging and DVD to Judge Bashant |
| 10/21/2019 | $31.35 | First Legal Network, LLC delivery of DVD to Gibson Dunn |
| **Photocopying Costs** | | |
| 10/15/2019 | $73.80 | Printing and photocopying in connection with anti-SLAPP motion |
| 10/16/2019 | $6.20 | Printing and photocopying in connection with anti-SLAPP motion |
| 10/23/2019 | $24.80 | Printing and photocopying in connection with anti-SLAPP motion |
| 12/5/2019 | $16.90 | Printing and photocopying in connection with reply brief |
| 3/4/2020 | $4.50 | Printing and photocopying in connection with oral argument preparation |
| 5/7/2020 | $60.30 | Printing and photocopying in connection with oral argument preparation |
| 5/9/2020 | $10.35 | Printing and photocopying in connection with oral argument preparation |
| 5/13/2020 | $13.10 | Printing and photocopying in connection with oral argument preparation |
| 5/18/2020 | $7.50 | Printing and photocopying in connection with oral argument preparation |
| **Research Costs** | | |

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| | | |
|---|---|---|
| 9/26/2019 | $768.00 | Westlaw research costs |
| 9/28/2019 | $120.00 | Westlaw research costs |
| 9/29/2019 | $120.00 | Westlaw research costs |
| 9/30/2019 | $121.50 | Bloomberg Law research costs |
| 10/7/2019 | $1,123.20 | Westlaw research costs |
| 10/8/2019 | $120.00 | Westlaw research costs |
| 10/10/2019 | $408.00 | Westlaw research costs |
| 10/13/2019 | $201.60 | Westlaw research costs |
| 10/14/2019 | $1.60 | HeinOnline research costs |
| 10/14/2019 | $120.00 | Westlaw research costs |
| 10/15/2019 | $120.00 | Westlaw research costs |
| 10/16/2019 | $1,012.80 | Westlaw research costs |
| 10/17/2019 | $360.00 | Westlaw research costs |
| 10/18/2019 | $240.00 | Westlaw research costs |
| 10/20/2019 | $360.00 | Westlaw research costs |
| 12/4/2019 | $480.00 | Westlaw research costs |
| 12/7/2019 | $360.00 | Westlaw research costs |
| 12/11/2019 | $120.00 | Westlaw research costs |
| 5/7/2020 | $240.00 | Westlaw research costs |
| 5/14/2020 | $120.00 | Westlaw research costs |
| 5/15/2020 | $240.00 | Westlaw research costs |
| 5/22/2020 | $240.00 | Westlaw research costs |
| 5/26/2020 | $514.40 | Westlaw research costs |
| 5/27/2020 | $931.20 | Westlaw research costs |
| 5/28/2020 | $562.40 | Westlaw research costs |
| **Transcript Costs** | | |
| 5/19/2020 | $166.75 | Transcript order for hearing on anti-SLAPP motion and Plaintiff's ex parte application to supplement the record |
| **Total Costs** | | |
| **TOTAL** | $9,706.28 | |

28.    In sum, through the filing of this Motion for Attorneys' Fees and Costs, Gibson Dunn incurred $9,706.28 in costs.  Gibson Dunn is also seeking any additional costs incurred in connection with preparing a Reply and attending a hearing on this Motion.

Gibson, Dunn &
Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR
ATTORNEYS' FEES AND COSTS

29.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on June 5, 2020.

_____
Scott A. Edelman

26
EDELMAN DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn &
Crutcher LLP

# EXHIBIT 7



Neutral

As of: May 27, 2024 9:24 PM Z

## *Tracy Anderson Mind & Body, LLC v. Roup*

United States District Court for the Central District of California

September 11, 2023, Decided; September 11, 2023, Filed

2:22-cv-04735 PSG (Ex)

### Reporter

2023 U.S. Dist. LEXIS 189055 *; 2023 WL 6890744

Tracy Anderson Mind and Body, LLC et al. v. Megan Roup et al

**Prior History:** *Tracy Anderson Mind & Body, LLC v. Roup, 2022 U.S. Dist. LEXIS 225714, 2022 WL 17670418 (C.D. Cal., Dec. 12, 2022)*

## Core Terms

attorney's fees, anti-SLAPP, motion to dismiss, costs, spent, rates, adjusted, fee award, lodestar, hourly rate, drafting, prevailing, preparing, percent, breach of contract, motion to strike, recoverable, expended, billing, tasks

**Counsel:** [*1] Attorneys for Plaintiff(s): Not Present.

Attorneys for Defendant(s): Not Present.

**Judges:** Philip S. Gutierrez, United States District Judge.

**Opinion by:** Philip S. Gutierrez

## Opinion

### CIVIL MINUTES - GENERAL

**Proceedings (In Chambers): Order GRANTING Defendants' motion for attorneys' fees and costs as adjusted**.

Before the Court is Defendants' motion for attorneys' fees and costs. *See generally* Dkt. # 37-1 ("*Mot.*"). Plaintiffs opposed, *see* Dkt. # 42 ("*Opp.*"), and Defendants replied, *see* Dkt. # 43 ("*Reply*"). The Court finds this matter appropriate for decision without oral argument. *See Fed. R. Civ. P. 78*; L.R. 7 15. Having considered the moving and opposing papers, the Court **GRANTS** Defendants' motion for attorneys' fees and costs as adjusted and awards Defendants $163,953.21.

### I. Background

Plaintiff Tracy Anderson ("Plaintiff Anderson") developed the Tracy Anderson Method ("TA Method") workout routines combining choreography, fitness, and cardiovascular movement after decades of research, development, testing, and investment. *See First Amended Complaint* ("*FAC*") ¶ 1, Dkt. # 12. Plaintiff Anderson is the founder and CEO of Plaintiff Tracy Anderson Mind and Body ("Plaintiff TAMB"), which consists of fitness studios that offer choreography-based fitness [*2] and mat movement classes. *Id.* ¶ 2. Plaintiff TAMB is the owner of registered copyrights to various media, including DVDs created by and featuring Plaintiff Anderson that express, relate to, or are based on the TA Method. *Id.*

In 2011, Plaintiff Tracy Anderson New York ("Plaintiff TANY"), which is also owned by Plaintiff Anderson and is a subsidiary of Plaintiff TAMB, employed Defendant Megan Roup ("Defendant Roup") as a trainer. *Id.* ¶ 3.

Later, in or around February 2017, Defendant Roup terminated her employment with Plaintiff TANY and founded Defendant The Sculpt Society ("Defendant TSS") the next month. *Id.* ¶ 5. Defendant TSS also offers "choreography-based fitness and mat movement classes that directly compete with Plaintiff['s classes]." *Id.* In creating and operating Defendant TSS, Defendant Roup neither references her association with Plaintiffs, nor credits Plaintiffs for training and teaching Defendant Roup. *Id.* ¶ 7.

On July 11, 2022, Plaintiffs filed this action seeking damages and injunctive relief for copyright infringement, breach of contract, violation of the Lanham Act, and unfair competition. *Id.* ¶ 10; s*ee generally* Dkt. # 1. On September 13, 2022, Plaintiffs amended their complaint, **[*3]** seeking damages and injunctive relief for Defendants' alleged breach of contract and unlawful business practices. *See generally FAC.* Plaintiffs brought four causes of action against Defendants:

> Count One: Copyright infringement. *See id.* ¶¶ 50 56.
>
> Count Two: Violation of the Lanham Act. *Id.* ¶¶ 57 63.
>
> Count Three: Breach of contract. *Id.* ¶¶ 64 69.
>
> Court Four: Violation of California Unfair Competition Law ("UCL"). *Id.* ¶¶ 70 73.

Defendants moved to dismiss all of Plaintiffs' claims and to strike Plaintiffs' UCL claim. *See generally* Dkt. # 15-1 ("*Initial Mot.*"). The Court dismissed Plaintiffs' Lanham Act and UCL claims with leave to amend, declined to dismiss the copyright and breach of contract claims, and deferred its ruling on the motion to strike to allow Plaintiffs to amend their complaint. *See generally* Dkt. # 20 ("*Order*").

Defendants answered Plaintiffs' FAC and later amended their answer. *See generally* Dkt. # 25 ("*Am. Ans.*"); Dkt # 21 ("*Ans.*"). Around the same time, Defendants filed their motion to dismiss Plaintiffs' Lanham Act and UCL claims with prejudice and requested a ruling on their special motion to strike. *See* Dkt. # 22.

The Court granted Defendants' motion, including their special **[*4]** motion to strike Plaintiffs' UCL claim on anti-SLAPP grounds. *See* Dkt. # 31. The Court established that Defendant Roup's statements are protected conduct, and that Plaintiffs did not state a plausible UCL claim in violation of California's anti-SLAPP statute. *See generally id.* Now, Defendants move for attorneys' fees and costs. *See Mot.*

II. Legal Standard

Under California's anti-SLAPP statute, "a prevailing defendant on a special motion to strike *shall* be entitled to recover his or her attorney's fees and costs." *Cal. Civ. Proc. Code § 425.16(c)* (emphasis added). "[I]t is well-settled that an award of attorney's fees and costs to a successful anti-SLAPP movant is mandatory." *Kearney v. Foley and Lardner, 553 F. Supp. 2d 1178, 1181 (S.D. Cal. 2008)*. The fee provision of the anti-SLAPP statute is applied in federal court. *Metabolife Intern., Inc. v. Wornick, 213 F. Supp. 2d 1220, 1221 (S.D. Cal. 2002)*. Thus, California law governs attorneys' fees based on California's anti-SLAPP statute. *Graham-Sult v. Clainos, 756 F.3d 724, 751 (9th Cir. 2014)*.

Absent circumstances rendering an award unjust, the fee should ordinarily include compensation for all hours reasonably spent, including those relating solely to obtaining the fee award. *See Ketchum v. Moses, 24 Cal.4th 1122, 1133, 104 Cal. Rptr. 2d 377, 17 P.3d 735 (2001)*. "*Section 425.16(c)* does not expressly limit a fee award to 'reasonable' fees, but California courts have construed it to contain a reasonableness requirement." *Open*

*Source Sec., Inc. v. Perens, No. CV 17-04002 LB, 2018 U.S. Dist. LEXIS 98169, 2018 WL 2762637, at *2 (N.D. Cal. June 9, 2018)*; *Lunada Biomed. v. Nunez, 230 Cal. App. 4th 459, 488, 178 Cal. Rptr. 3d 784 (2014)* ("[E]ach fee application under *section 425.16, subdivision (c)* must be assessed **[*5]** on its own merits . . . taking into account what is reasonable under the circumstances.") (cleaned up).

The customary method of determining reasonable attorneys' fees, including fee awards on anti-SLAPP motions to strike, is known as the "lodestar" method. *See Morales v. City of San Rafael, 96 F.3d 359, 363 (9th Cir. 1996)*; *Ketchum, 24 Cal.4th at 1131* 34. The "lodestar" method involves "multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *See Morales, 96 F.3d at 363*. The resulting "lodestar" figure is presumptively reasonable. *See id. at 363 n.8*.

III. Discussion

Defendants are entitled to recover attorneys' fees incurred in bringing their special motion to strike and their motion for attorneys' fees and costs. *See Ketchum, 24 Cal.4th at 1133*; *Metabolife Int'l, Inc., 213 F. Supp. 2d at 1223*. Defendants' proposed lodestar figure is $239,056.49. *Mot.* 6:27 28; *Decl. of Nathanial Bach*, Dkt # 37-2 ("*Bach Decl.*"), ¶¶ 27 29. The Court breaks down Defendants' proposed fees and costs in greater detail in the following table:[1]

---

[1] The Court prepared this table based on Mr. Nathaniel Bach's declaration summarizing the hours billed and fees/costs incurred in moving to strike Plaintiffs' UCL claim. *See generally Bach Decl.*. There were several errors in the proffered billing records. For example, Defendants provide that the fees charged for Ms. Moses's 2022 hours is $45,657 but applying Ms. Moses's 2022 billing rate of $855/hour results in a fee of $45,742.50. Similarly, Mr. Chatham's 2023 billing entries provide for a fee of $5,853, but if his $1,010/hour billing rate is applied the fee should be $5,757. The Court has therefore

Go to table1

Based on these figures, the Court addresses in turn (a) whether these rates are reasonable, (b) whether these hours are reasonable, and (c) what, if any, final adjustments need to be made.

A. Reasonable Rate

The reasonable hourly rate is the rate prevailing in the community for similar work. *See Gonzalez v. City of Maywood, 729 F.3d 1196, 1200 (9th Cir. 2013)* ("[T]he court must compute the fee award using an hourly rate that is based on the prevailing market rates in the relevant community."); *Viveros v. Donahoe, CV 10-08593 MMM (Ex), 2013 U.S. Dist. LEXIS 46867, 2013 WL 1224848, at *2 (C.D. Cal. Mar. 27, 2013)* ("The court determines a reasonable hourly rate by looking to the prevailing market rate in the community for comparable services."). The relevant community is the community in which the court sits. *See Schwarz v. Sec. of Health & Hum. Servs., 73 F.3d 895, 906 (9th Cir. 1995)*.

Here, Defendants seek the following hourly rates: $950 for Mr. Bach in 2022, which increased to $1,065 in 2023; $900 for Mr. Chatham in 2022, which increased to $1,010 in 2023; $855 for Ms. Moses in 2022, which increased to $1,000 in 2023; $760 for Mr. Castro; $620 for Ms. Gonzalez in 2022, which increased to $655 in 2023; and $395 for Practice Support Specialist **[*7]** Ms. Gasik in 2022, which increased to $455 in 2023. *Bach Decl.* ¶¶ 13 14. These rates are supported by Mr. Bach's declaration, which details each individual's experience. *See Bach Decl.* ¶ 10. Defendants also cite various cases from this District and the billing rates of "similar firms for litigation in Los Angeles" to support their requested rates. *See Mot.* 13:20 14:25.

---

adjusted the total hours and requested fees to account for these errors.

2023 U.S. Dist. LEXIS 189055, *7

However, the Court prefers to rely on the Real Rate Report as "a much better reflection of true market rates than self-reported rates in all practice areas." *See Rolex Watch USA Inc. v. Zeotec Diamonds Inc., No. CV 02-1089 PSG (VBKx), 2021 U.S. Dist. LEXIS 200238, 2021 WL 4786889, at *3 (C.D. Cal. Aug. 24, 2021)* (quoting *Hicks v. Toys 'R' Us-Del., Inc., No. CV 13-1302 DSF (JCG), 2014 U.S. Dist. LEXIS 135596, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014)*); *Gilliam v. Levine, No. CV 18-2580 PSG (MRWx), 2022 U.S. Dist. LEXIS 25209, 2022 WL 401462, at *5 (C.D. Cal. Jan. 25, 2022)*.

The Real Rate Report does not specifically classify anti-SLAPP or unfair competition claim litigation as belonging to a certain practice area. *See 2022 Real Rate Report, The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices* at 232 34. But the Report does classify breach of contract litigation as "commercial" litigation. *Id.* Based on the listed practice area definitions, the Court determines that this litigation should be classified as "commercial" litigation since this dispute centers on business competition and contractual relations. *See id.* In Los Angeles, the median hourly rate for commercial litigation attorneys is $849 for **[*8]** partners and $686 for associates, while the fee rates in the upper quartile of attorneys are $1,071 for partners and $876 for associates. *Id.* at 91. Accordingly, Defendants' requested maximum hourly rates of $1,065 for partners and $760 for associates fall between the median and upper quartile rates in the community for comparable services. Having considered Defendants' attorneys' experience and the prevailing rates in the community for comparable work, the Court approves as reasonable Defendants' attorneys' rates.

The Court declines to accept the Defendants' rate for Ms. Gasik's work. Time spent on clerical or secretarial tasks is excluded in lodestar analyses, because it is considered part of the firm's overhead. *Browne v. Am. Honda Motor Co. Inc., No. CV 09-06750 MMM (DTBx), 2010 U.S. Dist. LEXIS 144823, 2010 WL 9499073, at *8 (C.D. Cal. Oct. 5, 2010)*. While Ms. Gasik's title is a "Practice Support Specialist," Ms. Gasik's work in this litigation consisted solely of e-filing moving papers. *See generally Bach Decl. ¶ 26.* This is not substantive case-related work that is recoverable, but is unrecoverable clerical work. Accordingly, the Court declines to award any fees based on Ms. Gasik's work. *See Aarons v. BMW of N. Am., LLC, No. CV 11-7667 PSG (CWx), 2014 U.S. Dist. LEXIS 118442, 2014 WL 4090564, at *16 (C.D. Cal. Apr. 29, 2014)* (declining to award fees for work done by administrative assistant absent a showing that such work was substantive and case-related). **[*9]** The Court adjusts Ms. Gasik's 2022 and 2023 rates to $0.

B. Reasonable Hours

"The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *United States v. $28,000.00 in U.S. Currency, 802 F.3d 1100, 1107 (9th Cir. 2015)* (quoting *Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir. 1992)*). "The district court . . . should exclude from this initial fee calculation hours that were not reasonably expended." *Hensley, 461 U.S. at 434* (cleaned up). Hours not reasonably expended are those that are "excessive, redundant, or otherwise unnecessary." *Id.* A district court may reduce hours by either conducting an hour-by-hour analysis or by making an across-the-board percentage cut. *See $28,000.00 in U.S. Currency, 802 F.3d at 1108*.

Here, Defendants seek attorneys' fees for 275.8 hours of work. *See Bach Decl.* ¶ 27. The Defendants group their hours into four categories: (1) "Researching and drafting the

Anti-SLAPP and Dismissal Motion and supporting documents"; (2) "[r]eviewing and responding to Plaintiff's Opposition brief"; (3) "[r]eviewing and analyzing Court's Order on Motion to Dismiss & Anti-SLAPP Motion, and researching and drafting the Request for Ruling"; and (4) "[r]esearching and drafting the Attorneys' Fees Motion and supporting documents." *Id.* ¶¶ 21, 26. The Court makes several adjustments to **[*10]** the requested hours.

### i. Hours for Briefing the Motion to Dismiss and Strike and Request for Ruling

Defendants moved to dismiss at the same time they moved to strike, *see generally* Dkt. # 15, and later moved to dismiss with prejudice when requesting a ruling on their motion to strike, *see generally* Dkt. # 24. Consequently, Defendants have annotated which time entries "refer to work related to both the dismiss and anti-SLAPP motion or that include tasks that Defendants are not seeking fees on." *Bach Decl.* 11 n.1. Defendants contend that such entries have been reduced by 50 percent to reflect the work done solely on the anti-SLAPP motion. *Id.* ¶ 25. To support this percentage of reduction, Mr. Bach states that the motion to dismiss and strike was "comprised of five parts" an argument for dismissal of each of the four claims plus the anti-SLAPP portion. *Bach Decl.* ¶ 25. Defendants seek fees for parts of the motion that concerned the Lanham Act and the UCL claims, in addition to the anti-SLAPP argument, because "the factual bases for those claims are inextricably intertwined and the analyses for those claims formed the basis for Defendants' arguments" in portions of the anti-SLAPP analysis. *Id.* ¶ 22. **[*11]** Mr. Bach argues, therefore, that their fees request is "conservative" because they are "rounding down" to 50 percent of the time billed for the motion, "rather than 60% (or 3/5) of that time." *Id.* ¶ 25.

While it is possible that some of the work for the motion to dismiss may be compensable, the Court must have "substantial evidence" to support the fee award. *Kearney, 553 F. Supp. 2d at 1185*. On a motion to dismiss and strike, only "[w]ork that is inextricably intertwined with an anti-SLAPP motion is compensable." *Resolute Forest Prods. Inc. v. Greenpeace Int'l, No. CV 17-02824 JST, 2019 U.S. Dist. LEXIS 230211, 2019 WL 8377690, at *4 (N.D. Cal. Sept. 24, 2019)*. Here, the time entries often fail to distinguish whether the time was actually spent on anti-SLAPP-related issues, and instead generally state that time was spent on the motion to dismiss. *See Kearney, 553 F. Supp. 2d at 1186* (holding that "fees will not be allowed" for entries like "Prepare motion to dismiss" because the court could not discern if any time was spent on anti-SLAPP-related issues). Other times, descriptions of work on anti-SLAPP issues are intermixed with descriptions of work unrelated to the anti-SLAPP argument, and it is unclear how the time should be divided.

Further, in the Defendants' motion to dismiss and strike, Defendants' arguments to dismiss Plaintiffs' claims span seven pages while their anti-SLAPP portion spans **[*12]** two pages. *See* Dkt. # 15-2. Similarly, Defendants' reply expends fifteen pages arguing for dismissal, and less than two pages on their anti-SLAPP argument. *See* Dkt. # 18. Later, Defendants requested the Court dismiss Plaintiffs' Lanham Act and UCL claims with prejudice and rule on their motion to strike. *See* Dkt. # 22. Once again, the majority of the arguments in the three-page filing addressed dismissal with prejudice, while only a paragraph discussed the anti-SLAPP motion. *See id.* Accordingly, the Court does not find that there is "substantial evidence" that a blanket 50 percent reduction appropriately reduces the fees to represent the hours spent on the anti-SLAPP litigation.

Where a fee request encompasses claims that are recoverable and nonrecoverable, it is often difficult to apportion the hours on a claim-by-claim basis, particularly where the claims "involve a 'common core of facts' or are based on 'related legal theories.'" *Cairns v. Franklin Mint Co., 292 F.3d 1139, 1157 (9th Cir. 2002)*. However, the Ninth Circuit has "cautioned . . . that the impossibility of making *an exact* apportionment . . . does not relieve the district court of its duty to make *some* attempt to adjust the fee award in an effort to reflect an apportionment." *Id.* (cleaned **[*13]** up); *see also Dow Chem. Canada Inc. v. HRD Corp., No. CA 05-023 RGA, 2013 U.S. Dist. LEXIS 105408, 2013 WL 3942052, at *1 (D. Del. July 29, 2013)* ("Where it is not reasonably possible to parse between which fees are recoverable fees from which are not, it is appropriate to award a reasoned fractioned of the total fees incurred.").

While the Court acknowledges that the amount of writing produced is not necessarily indicative of the time spent researching and drafting, the failure to specifically itemize tasks attributed to the motion to strike, particularly when counsel is aware that fees are recoverable for such motions, constitutes block billing that is properly subject to reduction. *See, e.g.*, *Havens v. Leong P'ship, 586 B.R. 760, 768 (N.D. Cal. 2018)*, aff'd, *788 F. App'x 526 (9th Cir. 2019)* (noting that "[r]eduction of fees between 10 30% for block billing have been approved" and approving a 20 percent reduction); *Okada v. Whitehead, No. CV 15-01449 JLS (KES), 2017 U.S. Dist. LEXIS 228621, 2017 WL 2626990, at *2 (C.D. Cal. June 12, 2017)* (reducing fees by 20 percent because the block billed entries "make[] it difficult for the Court . . . to separate billable activities from those that are not billable"); *SAS v. Sawabeh Info. Servs. Co., No. CV 11-04147 MMM (MANx), 2015 U.S. Dist. LEXIS 186838, 2015 WL 12763541, at *33 (C.D. Cal. June 22, 2015)* ("The court will . . . reduce the lodestar

by 20% to account for . . . block billing."). Therefore, the Court reduces by 20 percent entries in the three identified categories relating to the motion to dismiss and strike and request for ruling[2] where the time entries do not clearly identify that all the work performed **[*14]** benefitted the anti-SLAPP motion. Defendants also provide reduced entries where the listed tasks refer to only the motion to dismiss or tasks pertaining to the motion to dismiss. *See Bach Decl*. ¶ 26. The Court declines to award fees for some of these entries[3] and has adjusted the fees as needed.

### *i. Hours on the Motion Requesting Attorneys' Fees*

A "fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." *Ketchum, 24 Cal.4th at 1137*. In *NuVasive, Inc. v. Alphatec Holdings, Inc., No. CV 18-347 CAB (MDD), 2020 U.S. Dist. LEXIS 222117, 2020 WL 6876300, at *3 (S.D. Cal. Mar. 20, 2020)*, the court reduced the fees incurred on a fee motion because there was

---

[2] The three categories Defendants describe are: (1) "Researching and drafting the Anti-SLAPP and Dismissal Motion and supporting documents"; (2) "[r]eviewing and responding to Plaintiff's Opposition brief"; (3) "[r]eviewing and analyzing Court's Order on Motion to Dismiss & Anti-SLAPP Motion, and researching and drafting the Request for Ruling." *See Bach Decl*. ¶ 26.

[3] There are several entries where it is apparent from the surrounding entries that the entries referring to the motion to dismiss include work performed for the motion to strike. *See generally Bach Decl*. ¶ 26. For example, some entries throughout mid to late August 2022 refer solely to the motion to dismiss, yet surrounding entries by other timekeepers refer to a motion to dismiss and strike, indicating that the motion to strike was drafted simultaneously with the motion to dismiss. *Id.* The Court therefore exercises its discretion in reducing some of these entries, rather than declining to award fees for them. *See Metabolife Intern., Inc., 213 F. Supp. 2d at 1222* ("The Court has broad discretion in determining the reasonable amount of attorney fees and costs to award to a prevailing defendant.").

no urgency to the fee motion, the motion was immaterial to the defendant's ability to defend itself in the case, and the court had already determined the defendant was entitled to fees so "the motion itself required little more than an accounting for the fees and costs."

Out of the $238,838.50[4] in fees that Defendants are requesting, here, $90,422 are from drafting the motion for attorneys' fees. *See generally Bach Decl.* ¶ 26. After making the above changes to the fees for the motion to dismiss and strike and the request for ruling, the adjusted lodestar is $209,027.69.[5]

If left unadjusted, the fees resulting from the instant fees motion would be nearly half of the award. Further, Defendants are claiming that they have spent 109.1 hours on this motion, while they spent 94.6 hours on drafting the motion to dismiss and strike, 38.8 hours responding the Plaintiffs' opposition, and 33.3 hours preparing and drafting their request for ruling. *See generally Bach Decl.* ¶ 26.

The Court finds it unreasonable that nearly half the fees and hours to be collected on should be for preparing this motion, especially since there was no urgency,[6] no concern for

Defendants' ability to defend themselves, and Defendants are entitled to a fee award pursuant to California's anti-SLAPP laws. *See Cal. Civ. Proc. Code § 425.16(c)(1)*; *see also Dahn World Co. v. Chung, No. CV 05-3477 PCT (JAT), 2006 U.S. Dist. LEXIS 83047, 2006 WL 3313951, at *6 (D. Ariz. Nov. 13, 2006)* (finding "unreasonable the fact that more time was spent on the motion [for attorneys' fees] than on all other matters" "especially considering that the issue does not involve overly complex principles of law"). This motion should have amounted to a mere accounting exercise that does not make up such a significant portion of the final fees award.

The most extreme expenditures were by Mr. Bach who spent 30.9 hours preparing this motion (compared to the 34.4 hours **[*16]** he spent preparing the motion to dismiss and strike) and is the most expensive lawyer on the case and Ms. Gonzalez, who spent 59.1 hours on this motion. While Ms. Gonzalez is an associate and who properly spent the most time on the motion, the Court still finds the hours to be exorbitant. *See Bryant v. Cigna Healthcare of Cal., Inc., No. CV 10-9560 RGK (RZx), 2014 U.S. Dist. LEXIS 207216, 2014 WL 13020700, at *4 (C.D. Cal. Jan. 30, 2014)*, (finding that "it was unreasonable to devote 76.2 hours to a Motion for Attorney's Fees" and "that it would only have been reasonable for experienced attorneys to devote 25 hours total to this Motion for Attorney's Fees").

The Court finds it reasonable to reduce the amount of time recoverable for preparing the briefing for the motion for attorneys' fees by 50 percent. *See Open Source, 2018 U.S. Dist. LEXIS 98169, 2018 WL 2762637 at *7* (reducing the hours requested by O'Melveny & Myers in an anti-SLAPP case related to the motion for attorneys' fees from 242 to 109, or by 55 percent). Thus, the total hours of work that Defendants will be able to recover in

---

[4] This number has been corrected from $238,849.00 to account for erroneous calculations described above in note 1. *See generally [*15] Bach Decl.* ¶ 26.

[5] Defendants' requested attorneys' fees relating to the motion to dismiss and strike and the request for ruling are adjusted as follows: (1) Mr. Bach's 2022 hours are reduced by 9.34, and his 2023 hours are reduced by .26; (2) Mr. Chatham's 2022 hours are reduced by 1.82, and his 2023 hours are reduced by .34; (3) Ms. Moses's 2022 hours are reduced by 16.88, and her 2023 hours are reduced by .72; (4) Mr. Castro's 2022 hours are reduced by 3.18 hours; (5) Ms Gonzalez's 2022 hours are reduced by .66, and her 2023 hours are reduced by .02; and (6) Ms. Gasik's 2022 and 2023 hours are entirely eliminated. Accordingly, the adjusted lodestar is $209,027.69, before addressing fees related to the motion for attorneys' fees.

[6] The Court willingly granted two joint stipulations to extend time to file a motion for attorneys' fees. *See* Dkts. # 32 35.

regard to the instant motion is 54.25, with each attorney's hours divided in half.[7]

## C. Final Adjustments

Defendants' requested attorneys' fees are adjusted as follows: (1) Mr. Bach's 2022 hours are reduced by 9.34, and his 2023 hours are reduced by 15.71; (2) Mr. Chatham's 2022 hours are reduced by 1.82, and **[*17]** his 2023 hours are reduced by 1.84; (3) Ms. Moses's 2022 hours are reduced by 16.88, and her 2023 hours are reduced by 8.47; (4) Mr. Castro's 2022 hours are reduced by 3.18 hours; (5) Ms Gonzalez's 2022 hours are reduced by .66, and her 2023 hours are reduced by 29.57; and (6) Ms. Gasik's 2022 and 2023 hours are deducted entirely. Accordingly, the adjusted lodestar is $163,953.21, as detailed in the table below:

🗒️*Go to table2*

## D. Plaintiffs' Request to Stay Fees Award

Because the issues of breach of contract and copyright infringement remain live, Plaintiffs have requested that the Court stay a fee award as the award would not be immediately appealable. *Opp.* 15:5 25. "The Court has the discretion to stay an award of attorneys' fees." *Hallock v. Healey, No. CV 20-02726 CJC (MAAx), 2021 U.S. Dist. LEXIS 211673, 2021 WL 5000680, at \*1 (C.D. Cal. Apr. 1, 2021)*. When determining whether to stay an award of attorneys' fees and costs pending appeal, courts consider:

> (1) **[*18]** whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies.

*M.A. Mobile, Ltd. v. Indian Inst. of Tech. Kharagpur, No. CV 08-02658 WHO, 2019 U.S. Dist. LEXIS 209226, 2019 WL 6525752, at \*2 (N.D. Cal. Dec. 4, 2019)* (quoting *Hilton v. Braunskill, 481 U.S. 770, 776, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987)*); *see League for Coastal Prot. v. Kempthorne, No. C 05-0991-CW, 2007 U.S. Dist. LEXIS 51372, 2007 WL 1982778, at \*2 (N.D. Cal. July 2, 2007)* (considering the above factors in determining whether "a discretionary stay may be warranted"); *see also Resolute Forest Prod., 2020 U.S. Dist. LEXIS 252061, 2020 WL 8877819 at \*3* (using the above factors to deny a "motion to stay implementation of anti-SLAPP attorney's fees").

Here, Plaintiffs summarily state that it would be neither just nor efficient to have Plaintiffs pay Defendants an award, yet Plaintiffs provide no supporting reasons. *See Opp.* 5:19 25; *see also Nken v. Holder, 556 U.S. 418, 433 34, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)* ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."). Plaintiffs have made no attempt to argue that any of the above factors have been met. Plaintiffs do not claim that they will suffer irreparable harm or that they would likely succeed upon an appeal. *See Opp.* 15:5 25; *see also Resolute Forest Prod., 2020 U.S. Dist. LEXIS 252061, 2020 WL 8877819 at \*3* (denying request to stay in part because the plaintiff "has neither initiated an appeal nor informed the Court of the arguments **[*19]** that such an appeal would entail"). Without providing any support other than the bare assertion that the legal standard has been met, the Court cannot grant Plaintiffs' stay request.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS**

---

[7] This number excludes the hours charged for Ms. Gasik's work, since her works consisted entirely of e-filing the instant motion.

2023 U.S. Dist. LEXIS 189055, *19

Defendants' motion for attorneys' fees and costs as adjusted above and awards Defendants **$163, 953.21** in attorneys' fees and costs. The Court declines to stay its fee award and orders Plaintiffs to pay Defendants' attorneys' fees and costs within **30 days** of the entry of this order.

**IT          IS          SO          ORDERED.**

2023 U.S. Dist. LEXIS 189055, *19

**Table1 (**_Return to related document text_**)**

| Name | Title | Experience | 2022 Hours | 2022 Rate | 2023 Hours | 2023 Rate | Total Fee |
|------|-------|-----------|------------|-----------|------------|-----------|-----------|
| Mr. Nathaniel Bach | Partner | 15 years | 50.1 | $950 | 47.1 | $1,065 | $97,756.50 |
| Mr. Christopher Chatham | Partner | 10 years | 9.5 | $900 | 5.7 | $1,010 | $14,307.00 |
| Ms. Sarah Moses | Counsel | 15 years | 53.5 | $855 | 22.9 | $1,000 | $68,642.50 |
| Mr. Alejandro Castro | Associate | 5-6 years | 17.2 | $760 | -- | -- | $13,072.00 [*6] |
| Ms. Andrea Gonzalez | Associate | 2-3 years | 5.1 | $620 | 62.6 | $655 | $44,165.00 |
| Ms. Barbara Gasik | Practice Support Supervisor | 20+ years | 1.0 | $395 | 1.1 | $455 | $895.50 |
| Costs | -- | -- | -- | -- | -- | -- | $207.49 |
| **Totals** | **--** | **--** | **136.4** | **--** | **139.4** | **--** | **$239,045.99** |

**Table1 (**_Return to related document text_**)**

---

**Table2 (**_Return to related document text_**)**

| Name | 2022 Hours | 2022 Rate | 2023 Hours | 2023 Rate | Total Fee |
|------|-----------|-----------|------------|-----------|-----------|
| Mr. Nathaniel Bach | 40.76 | $950 | 31.39 | $1,065 | $72,152.35 |
| Mr. Christopher Chatham | 7.68 | $900 | 3.86 | $1,010 | $10,810.60 |
| Ms. Sarah Moses | 36.62 | $855 | 14.43 | $1,000 | $45,740.10 |
| Mr. Alejandro Castro Castro | 14.02 | $760 | -- | -- | $10,655.20 |
| Ms. Andrea Gonzalez | 4.44 | $620 | 33.03 | $655 | $24,387.47 |
| Ms. Barbara Gasik | 0 | $0 | 0 | $0 | $0.00 |
| Costs | -- | -- | -- | -- | $207.49 |
| **Totals** | **104.52** | **--** | **138.06** | **--** | **$163,953.21** |

2023 U.S. Dist. LEXIS 189055, *19

**Table2 (***Return to related document text***)**

---

**End of Document**

# EXHIBIT 8

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

BLACK LIVES MATTER LOS ANGELES, et al.,

Plaintiffs,

vs.

CITY OF SANTA MONICA, et al.,

Defendants.

Case No. 2:21-cv-05253-CAS-AJRx

CLASS ACTION

**FINAL ORDER APPROVING CLASS ACTION SETTLEMENT [DKT. 62]**

Judge:     Hon. Christina A. Snyder

## I.     INTRODUCTION AND BACKGROUND.

On May 31, 2020, in response to protests following the death of George Floyd in Minneapolis, the City of Santa Monica ("the City") instituted a City-wide curfew. Dkt. 1 ("Compl.") ¶¶ 1-2. Between May 31, 2020 and June 1, 2020, the Santa Monica Police Department ("SMPD") arrested approximately 400 people. Id. ¶ 3. Plaintiffs allege that these arrests were effectuated after protests were ended using force and that the SMPD "imposed unconstitutional conditions of confinement on arrestees by holding them on buses for many hours, tightly handcuffed with zip ties, without access to bathroom facilities, food, or water." Id. ¶ 5. Arrestees were largely

transported to the Santa Monica Airport, where "all or almost all arrestees were released on a misdemeanor charge of violating a City Municipal Code provision that applied to the curfew." Id. ¶ 6. Some arrestees, including a number of minors, were taken to the Civic Center jail for processing. Dkt. 56 ("Mot. for Final Approval") at 1.

At the time of filing, plaintiffs were members of two damages classes. Compl. ¶ 38. The first was the "Arrest Class," made up of persons present at protests on May 31, 2020, and June 1, 2020, who were handcuffed and arrested by the SMPD or an agent of the City. Id. The second class was the "Direct Force Class," made up of individuals present at the relevant protests, who "were subjected to unlawful force employed by [d]efendant City and its agents." Id. At this stage, only the Arrest Class remains in this litigation.

On June 28, 2021, plaintiffs filed their initial complaint in this matter. Compl. On August 2, 2023, claims asserted by the Direct Force Class and named plaintiff Kerry Hogan were dismissed with prejudice. Dkt. 42. On February 22, 2024, defendants filed a notice of conditional settlement. Dkt. 50. On July 22, 2024, plaintiffs submitted an unopposed motion for preliminary approval of class certification. Dkt. 53. On July 25, 2024, the settlement was preliminarily approved. Dkt. 55.

On September 16, 2024, plaintiffs filed a motion for final settlement approval and a motion for attorneys' fees and costs. Dkts. 56-57.

## II. SETTLEMENT AGREEMENT

### A. Definitions.

The capitalized terms used in this Final Approval Order shall have the meanings and/or definitions given to them in the Settlement Agreement [Dkt. 53-1 ("Settlement Agreement," "Settlement," or "Agreement")], or if not defined therein, the meanings and/or definitions given to them in this Final Approval Order.

1

**B. Incorporation of Documents.**

This Final Approval Order incorporates and makes a part hereof:

(a) the Settlement Agreement (including the exhibits thereto); and

(b) the Court's findings and conclusions contained in its Preliminary Approval Order.

**C. Jurisdiction and Venue.**

This Court has personal jurisdiction over the parties and the members of the Settlement Class. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 including, without limitation, jurisdiction to approve the Settlement, to settle and release all claims alleged in the action and all claims released by the Settlement, to adjudicate the objections submitted to the proposed Settlement by class members, and to dismiss the case with prejudice. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391.

**D. Definition of the Class and Settlement Class Members.**

The Settlement Class hereby certified by the Court is defined as:

All persons who were detained and cited or arrested in or around the City of Santa Monica between May 31, 2020 and June 1, 2020 in connection with law enforcement agencies' efforts to disperse Black Lives Matter protest and enforce a City-wide curfew.

Settlement Agreement at 2.

**E. Class Action Prerequisites are Satisfied.**

The Court finds that the Settlement Class meets all the prerequisites of Federal Rule of Civil Procedure 23(a) for class certification, including numerosity, commonality, typicality, predominance of common issues, superiority, and that Settlement Class Representatives and Class Counsel are adequate representatives of the Settlement Class.

2

The Court concludes that there are hundreds of members of the Settlement Class, making joinder of all members impracticable; there are questions of fact and law that are common to all members of the settlement class; the claims of the Class Representatives are typical of those of the absent members of the Settlement Class; and plaintiffs David Brown and David Clennon have and will fairly and adequately protect the interests of the absent members of the relevant Settlement Class and have retained counsel experienced in civil rights litigation who have and will continue to adequately advance the interests of the Settlement Class.

The Court finds that this action may be maintained as a class action under Rule 23(b)(3) for settlement because: (1) questions of fact and law common to the members of the Settlement Class predominate over any questions affecting only the claims of individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**F. Settlement Terms**

Plaintiffs have submitted an unopposed motion for final approval of class settlement. Mot. for Final Approval.

The Settlement Agreement provides for a total monetary settlement of $2,300,000, which includes attorneys' fees and costs of class administration. Settlement Agreement ¶ 19. It also provides for the dismissal of all individually named defendants with prejudice, leaving the City as the only defendant to whom the agreement is applicable. Id. The Settlement Agreement provides for payment of costs related to publication and distribution by defendant and for payment by the City to the Administrator part of the costs of Class Administration before Final Approval. Id. ¶ 21.

The Settlement Agreement provides for payments of no less than $5,000 and no more than $7,000 to all class members who timely file. Id. ¶ 27. Additionally, the two class representatives will receive the same payment as their fellow class

3

members as well as a $15,000 incentive award per the terms of the Settlement Agreement. Id. ¶ 28. Any person opting out of the Settlement does not qualify for payment. Id.

The Settlement Agreement establishes that once all costs, fees, expenses, and payments to class members are paid out, any remaining money in the Class Fund is to revert to the City after 180 days. Id. ¶ 32.

Defendants, in the Settlement Agreement, continue to deny all allegations of wrongdoing and deny all liability for the allegations and claims made in this case. ¶ 17.

**G. Objections to the Proposed Settlement.**

There have been no objections to the Settlement. Mot. for Final Approval at 9. Two individuals who are plaintiffs in a lawsuit proceeding in state court against the City and other defendants opted out, via letter from their counsel. Id.; Dkt. 56-1.

**H. Legal Standard.**

The Court may only approve a settlement class after finding the settlement is "fair, reasonable, and adequate." Fed. R. Civ. Pro. 23(e)(2). In doing so, the Court must consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

4

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Id.

"The purpose of the [modern] Rule 23(e)(2) is [to] establish a consistent set of approval factors to be applied uniformly in every circuit, without displacing the various lists of additional approval factors the circuit courts have created over the past several decades." Zamora Jordan v. Nationstar Mortg., LLC, No. 2:14-CV-0175-TOR, 2019 WL 1966112, at *2 (E.D. Wash. May 2, 2019). Factors that the Ninth Circuit has typically considered include (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; and (6) the experience and views of counsel. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998); Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004).

## I. Findings and Conclusions.

### 1. Notice to the Class was Adequate.

For every class to be certified under Rule 23(b), the Ninth Circuit mandates that "[d]istrict courts 'must direct notice [of a proposed settlement] in a reasonable manner to all class member who would be bound by the proposal." CLRB Hanson Indus., LLC v. Weiss & Assocs., PC, 465 F. App'x 617, 619 (9th Cir. 2012) (quoting Fed. R. Civ. P 23(e)(1)(B)) (edits in original). See also Altes v. Sambazon, Inc., No. 8:19-cv-01340-JLS-JDE, 2020 U.S. Dist. LEXIS 267747, at *8 (C.D. Cal. May 12, 2020). "[T]o satisfy due process, notice to class members must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id., citing Martinez v. Hammer Corp., No. 09-cv-06135-MMM-

5

AGRx, 2010 WL 11520538, at *2 (quoting In re Marsh ERISA Litigation, 265 F.R.D. 128, 144 (S.D.N.Y. 2010)) (internal quotations omitted).

The Court finds that fair and adequate notice of class members' right to object to the Settlement and to appear at the Fairness Hearing in support of such an objection has been provided in the form and manner required by the Settlement Agreement, the Court's Preliminary Approval Order, the requirements of due process, Rule 23, and any other applicable law. In particular, the Court finds that the Class Notice provided the best practicable notice of class members' rights and options and of the binding effect of the orders and Judgment in this case, whether favorable or unfavorable, on all class members.

Class counsel provided detailed information describing outreach to putative class members and the challenges to contacting the class, both because some citations were missing and others were not accurate, as well the number of times class members moved over the course of four years. Even so, class participation was slightly more than 50-percent of the potential class and 65-percent of those where current contacts were found. This is a good participation rate.

Plaintiffs provided information on publication of the notice on several activist websites and social media. The Declaration of Katherine Shapiro detailed outreach to those for whom the City provided citations. These persons were sent notice and claim forms by postal mail, email, and texts and online searches. Claims could be filed by mail, email or online on a dedicated website. In addition to conducting their own online searches, Plaintiffs hired a private investigator to conduct skip/trace searches for persons without current contact information. This is more than was required by the Court's Preliminary Approval Order.

The absence of objections to the Settlement by all class members strongly supports approval. See, e.g., Feist v. Petco Animal Supplies, Inc., No. 3:16-cv-01369-H-MSB, 2018 WL 6040801, at *5 (S.D. Cal. Nov. 16, 2018) ("[T]he absence

6

of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.") (quoting <u>Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.</u>, 221 F.R.D. 523, 529 (C.D. Cal. 2004)); <u>In re Omnivision Techs., Inc.</u>, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (same; three objections out of approximately 57,000 class members). In response to the Class Notice, there were no objections and only two opt-outs. Mot. for Final Approval at 9.

### 2. The Settlement was negotiated at arm's length.

Where, as here, the settlement agreement is negotiated prior to the grant of a motion for formal class certification, "courts must be 'particularly vigilant' for signs of collusion because, at this stage of the litigation, there is an even 'greater potential for breach of fiduciary duty owed to the class during settlement.'" <u>In re Bluetooth Headset Prod. Liab. Litig.</u>, 654 F.3d 935, 946 (9th Cir. 2011). For this reason, "such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." <u>Id.</u>

The Ninth Circuit directs courts to look for these "subtle signs" of collusion:

"(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no [money] but class counsel are amply rewarded;

(2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay counsel excessive fees and costs in exchange for counsel accepting an unfair settlement [ ]; and

(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."

<u>Altes</u>, 2020 U.S. Dist. LEXIS 267747 at *8 (citing <u>In re Bluetooth</u>, 654 F.3d at 947).

7

Based on the evidence filed in support of the motion for preliminary approval, the motion for final approval and the motion for attorney fees and costs, the Court is satisfied that there is no collusion in this instance and that approval is appropriate.

### 3. Incentive Awards

The settlement agreement provides for incentive awards to the two named class representatives. The Settlement Agreement provides for a $15,000 incentive award to each of the two class representatives. The Ninth Circuit instructs that "district courts [should] scrutinize carefully [incentive] awards so that they do not undermine the adequacy of the class representative." Radcliffe v. Experian Info. Sols. Inc., 715 F.3d 1157. 1163 (9th Cir. 2013). This includes considering "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 947 (9th Cir. 2015) (quoting Staton v. Boeing Co., 327 F.3d 938, 977 (9th Cir. 2003)).

Plaintiffs submit that the two class representatives, David Brown and David Clennon, assisted in gathering evidence, stayed in contact and met with counsel, responded to discovery from defendants, participated in deposition preparation, and discussed the Settlement Agreement with counsel. Mot. for Final Approval at 13. The plaintiffs also submit that the payment of these awards has no impact on the amount to be paid to other class members. Id. at 12. The proposed incentive award is just over two times the high end of the damages award for class members. Id. at 13.

The most important factor in approving incentive awards is the proportion between the amount received by class members and the incentive award. In determining an appropriate service award, courts consider whether the proposed amount is proportional to class members' payments under the settlement. Staton v. Boeing Co., 327 F.3d 938, 977 (9th Cir. 2003).

8

The proposed incentive awards are just slightly more than twice the individual damage awards to class members. Cf. Roe v. Frito-Lay, Inc., No. 14-CV-00751-HSG, 2017 WL 1315626, at *8 (N.D. Cal. Apr. 7, 2017) (reducing service award from $10,000 to $5,000 where "[a] $10,000 incentive award is substantially disproportionate to class members' anticipated recovery of $193.45"); Smith v. Am. Greetings Corp., No. 14-CV-02577-JST, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) (reducing $7,500 service award to $5,000 in a wage and hour class action where the proposed award was 4.7 times the average class member damages of $1,608.16); Willner v. Manpower Inc., No. 11-CV-02846-JST, 2015 WL 3863625 (N.D. Cal. June 22, 2015), at *9 (reducing requested $11,000 award to $5,000 where projected average settlement payment in a wage and hour case was $605.02). In each of these cases the proportion between the reduced incentive award and average amount to class members was greater than the ratio here.

Because the proposed incentive awards to the two class representatives are well within the proportional ratio to the individual damages provided to class members, the Court approves incentive awards of $15,000 to each named plaintiff.

### 4. Relief provided is adequate.

The Settlement delivers adequate relief by providing substantial cash payments to class members. Each class member is to receive a minimum of $5,000 and a maximum of $7,000, with class representatives receiving an additional $15,000 incentive award. Settlement Agreement ¶ 27.

The Court has considered the realistic range of outcomes in this matter, including the amount plaintiffs might receive if they prevailed at trial, the strength and weaknesses of the case, the novelty and number of the complex legal issues involved, the risk that plaintiffs would receive less than the relief afforded by the

9

Settlement Agreement or recover nothing at trial, and the risk of a reversal of any judgment. The Settlement is well within a range of reasonableness.

In this case, the parties have reached settlement before litigating dispositive motions or preparing for trial. Parties did, however, conduct extensive discovery over the course of the three years between the filing of this case and settlement.

**5. Proposed distribution method is effective.**

The Administrator will be responsible for processing and paying class claims based on submission of Proof of Claim Forms pursuant to the Settlement Agreement. Settlement Agreement ¶ 43.

**6. Attorneys' fees are reasonable.**

Pursuant to the Settlement Agreement, attorneys' fees are capped at $690,000, 30% of the total settlement. Id. ¶ 39. These fees are included in the total $2,300,000 settlement amount. Id. Further discussion of the reasonableness of attorneys' fees in this case can be found in Section V, infra.

**7. The Settlement Agreement treats class members equitably.**

In addition to the incentive awards described above, the Settlement Agreement provides for equal payments to each class member (exclusive of the class representatives). Settlement Agreement ¶ 27.

## III. LATE FILED CLAIMS

Plaintiffs also request the Court approve several claims filed after the September 9 Bar date. Most of the late claims were filed on behalf of individuals who were minors at the time of their arrest in 2020 and for whom the City did not produce arrest citations, as set out in Plaintiffs' Motion for Final Approval.

Pursuant to Ninth Circuit authority, the Court has the discretion to permit late claims filed in a large class action settlement fund. Advance Drywall Co. v. U.S. Gypsum Co. (In re Gypsum Antitrust Cases), 565 F.2d 1123, 1127-28 (9th Cir. 1977). "[I]n the distribution of a large class action settlement fund, 'a cutoff date is essential and at some point the matter must be terminated.'" Id. at 1127

10

(quoting Reports of the Conference for District Court Judges, 63 F.R.D. 231, 262 (1973)). The Ninth Circuit found that three months is "ordinarily a sufficiently long period within which class members may file claims." Id. at 1128. In this instance, the claims period was only half of this with slightly less than three months from preliminary to final approval of the settlement in this matter.

The Ninth Circuit approach is consistent with decisions in other circuits and the recommendation of the Manual of Complex Litigation. "Multiple circuits had held that the court maintains an inherent equitable power to 'allow late-filed proofs of claim and late-cured proofs of claim.' In re Cendant Corp. Prides Litig., 233 F.3d 188, 195 (3d Cir. 2000); accord Burns v. Elrod, 757 F.2d 151, 155 (7th Cir. 1985); Zients v. LaMorte, 459 F.2d 628, 630 (2d Cir. 1972) … . The Manual for Complex Litigation also recommends that '[t]he court should allow adequate time for late claims before any refund or other disposition of settlement funds occurs.' Manual for Complex Litigation (Fourth) § 21.662 (2004)." Norton v. LVNV Funding, LLC, No. 18-cv-05051-DMR, 2022 WL 562831, at *6 (N.D. Cal. Feb. 24, 2022) (edits supplied).

Based on strong authority allowing late claims the Court grants the request and directs that all such claim forms be approved.

## IV. ATTORNEYS' FEES

### A. Legal Standard.

District courts must ensure that attorneys' fees awards in class action cases are reasonable. Lowery v. Rhapsody Int'l, Inc., 75 F.4th 985, 991 (9th Cir. 2023). In the Ninth Circuit, there are "two ways to determine attorneys' fees awards in class actions: (1) the 'lodestar' method and (2) the 'percentage-of-recovery' method." Id. at 990. "[T]he choice between lodestar and percentage calculation depends on the circumstances, but . . . 'either method may . . . have its place in determining what would be reasonable compensation.'" Six (6) Mexican Workers v. Arizona Citrus

11

*Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (third alteration in original) (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

Twenty-five percent recovery is the benchmark for attorneys' fees, though courts in the Ninth Circuit have approved upward departures to be within the acceptable range. See In re Bluetooth, 654 F.3d at 942 (noting 25% benchmark); Powers v. Eichen, 229 F.3d 1249. 1256-57 (9th Cir. 2000) (upward departure acceptable when expressly explained).

Having reviewed the history and facts of this case, the Court finds that the percentage approach, followed by a lodestar cross check to ensure the reasonableness of fees is appropriate.

**B. Calculating Attorneys' Fees.**

Plaintiffs argue that the attorneys' fees and costs of $690,000 are reasonable compared to a total settlement fund of $2,300,000 applying either the percentage calculation approach or the lodestar method. Dkt. 57 ("Mot. for Attorneys' Fees and Costs").

**1. Percentage calculation**

Attorneys' fees and costs of $690,000, what plaintiffs' counsel requests here, amount to 30% of the settlement fund. Id. at 1. This includes reimbursed costs of litigation, plaintiffs contend, thus the fees are actually equal to about 27% of the Class Fund. Id. at 2. Though this is above the 25% benchmark set by the Ninth Circuit, the Court finds that the slight upward deviation is warranted here.

In determining whether a deviation from the 25% benchmark is warranted, courts frequently consider the Vizcaino factors: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; (6) and whether the case was

handled on a contingency basis. In re Optical Disk Drive Prod. Antitrust Litig., 959 F.3d 922, 930 (9th Cir. 2020) (citing Vizcaino v. Microsoft Corp., 290 F.3d 1043,1048-50 (9th Cir. 2002)).

Factor one, exceptional results, favors a slight upward deviation. A payout ranging from $5,000 to $7,000 per plaintiff is substantial. Plaintiffs point out that the amount is "greater than the base recovery in the comparator settlements and nearly twice the presumed damages of $4000 set out by the California Legislature for a Bane Act Violation." Mot. for Final Approval at 8. The Court agrees with plaintiffs that the settlement is favorable for the class.

Factor two, risk of the case for class counsel, is neutral. The Court does not find that the case was particularly risky for Class Counsel, as counsel in this case litigates primarily in this field; however, a favorable result was by no means certain. Looking to the third factor, the Court notes that there are no non-monetary benefits of the settlement to consider, thus this factor is also neutral.

The fourth factor, market rate, also supports an award slightly above the benchmark. The Ninth Circuit has found that 25% of the total settlement fund is the benchmark for attorney's fees in common fund cases, but that 20-30% of the fund is "the usual range." Vizcaino, 290 F.3d at 1047 (citing Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989)). The Court notes that the 27% agreed upon here falls within this range. The Court finds that the fifth factor, burden on class counsel, favors a slight upward adjustment. Class counsel and defendants negotiated this case without the assistance of a paid mediator, increasing the burden on counsel. Mot. for Final Approval at 10-11. Counsel also undertook additional notice procedures beyond those required by the Court to attempt to notify class members whose information was unclear or improperly recorded on their citations. Id. at 4. Finally, the sixth factor, contingency, also favors upward adjustment from the benchmark, as this case was litigated on a contingency basis.

13

Given these factors, the Court finds that the slight upward adjustment, from the Ninth Circuit's benchmark of 25%, to approximately 27%, is reasonable in this case.

### 2. Lodestar cross-check

A lodestar cross-check confirms that $690,000 is a reasonable award of attorneys' fees and costs. To guard against an unreasonable result, the Ninth Circuit encourages district courts to "cross-check[] their calculations against a second method." In re Bluetooth, 654 F.3d at 944; see also Vizcaino, 290 F.3d at 1050-51 (applying a lodestar cross-check to ensure the percentage-of-recovery method yielded a reasonable result).

Here, plaintiffs' counsel calculated their collective lodestar to be $702,662. Mot. for Attorneys' Fees at 4. In support, counsel submitted summary charts listing the attorneys and the student group that worked on the case, their hours, and their hourly rates. Id. These calculations are reproduced here.

| Name | Role | Admitted | Hours | Rate | Lodestar |
|---|---|---|---|---|---|
| Paul L. Hoffman | Attorney | 1976 | 18.8 | $1,425.00 | $ 26,790.00 |
| Carol A. Sobel | Attorney | 1978 | 239.8 | $1,325.00 | $ 317,735.00 |
| Erin Darling | Attorney | 2008 | 161.2 | $ 975.00 | $ 157,170.00 |
| John Washington | Attorney | 2017 | 19.5 | $ 770.00 | $ 15,105.00 |
| Katherine Robinson | Attorney | 2018 | 41.1 | $ 695.00 | $ 28,564.50 |
| Weston Rowland | Attorney | 2019 | 187.3 | $ 675.00 | $ 126,427.50 |
| UCI Civil Rights | Students | 2L/3L | 137.2 | $ 225.00 | $ 30,870.00 |
| TOTAL LODESTAR | | | 805.1 | | $ 702,662.00 |

Id. at 4.

These calculations are unopposed. The Court finds that the reported lodestar of $702,662 supports the reasonableness of a 27% award.

14

## V.    RETENTION OF JURISDICTION.

The Court has jurisdiction to enter this Final Approval Order.  Without in any way affecting the finality of this Final Approval Order, for the benefit of the Settlement Class and defendants, and to protect this Court's jurisdiction, the Court expressly retains continuing jurisdiction as to all matters relating to the Settlement, including but not limited to any modification, interpretation, administration, implementation, effectuation, and enforcement of the Settlement, the administration of the Settlement and Settlement relief, including notices, payments, and benefits thereunder, the Class Notice and sufficiency thereof, any objection to the Settlement, the adequacy of representation by Class Counsel and/or the class representatives, the amount of attorneys' fees and litigation expenses paid to plaintiffs' counsel, the amount of incentive awards to be paid to the class representatives, any claim by any person or entity relating to the representation of the Settlement Class by Class Counsel, any remand after appeal or denial of any appellate challenge, any collateral challenge made regarding any matter related to this litigation or this Settlement or the conduct of any party or counsel relating to this litigation or this Settlement, and all other issues related to this case and Settlement.

## VI.    CONCLUSION.

The Motion for Final Approval is **GRANTED** on the terms set forth in this Final Approval Order, and the parties and their counsel are directed to implement and consummate the Settlement according to its terms and provisions as set forth in the Settlement Agreement.

The Motion for Attorneys' Fees and Costs is also **GRANTED**.

Plaintiffs are to file a Notice of Dismissal within one week of this Order.

**IT IS SO ORDERED.**

DATED: October 22, 2024            By: _____

Honorable Judge Christina A. Snyder,
United States District Court Judge

15

# EXHIBIT 9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-0416 JGB (SPx)** | Date | February 21, 2024 |
|---|---|---|---|

| Title | ***Paola French, et al. v. City of Los Angeles, et al.*** |
|---|---|

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order (1) GRANTING Plaintiffs' Motion for Attorneys' Fees (Dkt. No. 185); and (2) VACATING the February 26, 2024 Hearing (IN CHAMBERS)**

Before the Court is a motion for attorneys' fees filed by plaintiffs Paola French and Russell French ("Plaintiffs"). ("Motion," Dkt. No. 185.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS** the Motion. The hearing set for February 26, 2024 is **VACATED**.

## I.  BACKGROUND

On February 28, 2020, Paola French and Russell French commenced this action against Defendants City of Los Angeles ("City") and Salvador Sanchez ("Sanchez") (collectively, "Defendants"). ("Complaint," Dkt. No. 1.) Plaintiffs alleged that Mr. Sanchez, who was an officer with the Los Angeles Police Department ("LAPD") at the time, used excessive force against them and their son Kenneth French ("Decedent," or "Kenneth") inside of a Costco warehouse store in Corona, California. (See id.) On April 1, 2020, Plaintiffs filed a first amended complaint as of right. ("FAC," Dkt. No. 10.) Following the Court's order dismissing Plaintiffs' federal causes of action (Dkt. No. 19), Plaintiffs filed a second amended complaint on July 20, 2020. ("SAC," Dkt. No. 21.) On January 8, 2021, the Court dismissed-in-part one of Plaintiffs' municipal liability claims, dismissed Plaintiffs' second municipal liability claim and negligent training, hiring, and retention claim, and granted Plaintiffs leave to amend. (Dkt. No. 45.) On January 18, 2021, Plaintiffs filed a third amended complaint, the operative complaint. ("TAC," Dkt. No. 46.)

---

Page 1 of 7            **CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk mg

The TAC asserted twelve causes of action: (1) unreasonable search and seizure, unlawful detention and arrest in violation of 42 U.S.C. § 1983 ("Section 1983"); (2) unreasonable search and seizure, excessive force in violation of Section 1983; (3) unreasonable search and seizure, denial of medical care in violation of Section 1983; (4) interference with familial relationship in violation of the Fourteenth Amendment's Substantive Due Process Clause and Section 1983; (5) municipal liability, unconstitutional custom, practice, or policy in violation of Section 1983; (6) false arrest/false imprisonment; (7) battery, including wrongful death; (8) negligence, including wrongful death; (9) negligent infliction of emotional distress; (10) violation of the Bane Act, Cal. Civil Code § 52.1; (11) negligent training, hiring, and retention; and (12) loss of consortium. (See TAC.)

On October 4, 2021, the Court granted in part and denied in part the City's motion for summary judgment. ("MSJ Order," Dkt. No. 92.) The Court dismissed Plaintiffs' municipal liability claim (Count Five), but denied summary judgment on Plaintiffs' state law claims (Counts Six through Twelve). (Id. at 16.)

On October 19, 2021, a jury trial began on Plaintiffs' federal and state law claims. (Dkt. No. 106.) On October 26, 2021, following the parties' presentation of the evidence, Plaintiffs voluntarily dismissed their Section 1983 claims for unlawful detention and arrest (Count One), denial of medical care (Count Three), and interference with familial relationship (Count Four), as well as their state law claims for false arrest/false imprisonment (Count Six) and negligent training, hiring, and retention claim (Count Eleven). (Dkt. No. 129, 10-26-21 RT 550:4-20.) Plaintiffs' remaining six claims were as follows: (1) excessive force under Section 1983 (Count Two), (2) battery (Count Seven), (3) negligence (Count Eight), (4) negligent infliction of emotional distress ("NIED") (Count Nine), (5) violation of the Bane Act (Count Ten), and (6) loss of consortium (Count Twelve). (10-26-21 RT 550:21-551:13.)

The Court also heard arguments on the parties' respective motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) ("Rule 50a") on October 26, 2021. The Court granted in part and denied in part Plaintiffs' motion and denied the City's motion, ruling that (1) Mr. Sanchez's use of force was unreasonable and, therefore, excessive, and (2) Mr. Sanchez's excessive force caused Plaintiffs' and Kenneth's injuries as a matter of law. (Id. 562:7-25.) The Court determined that, as a result, the corresponding elements for Plaintiffs' battery, negligence, NIED, and Bane Act claims were also satisfied as a matter of law. (Id. 562:12-16.) However, the Court found that disputed factual issues required the jury to determine whether Mr. Sanchez acted under color of state law and in the course and scope of his employment. (Id. 563:1-3.)

On October 27, 2021, the jury returned a verdict for Plaintiffs. ("Special Verdict," Dkt. No. 114.) The jury answered, "Yes," to all questions: whether Mr. Sanchez acted under color of state law during the incident, whether Mr. Sanchez acted within the course and scope of his employment with the City as a peace officer during the incident, whether he negligently inflicted severe emotional distress on Plaintiffs, and whether Plaintiffs suffered loss of consortium as a

---

result of Mr. Sanchez's use of unreasonable force against them. (Id. at 3–4.) The jury awarded $17,002,000.00 in total damages: (1) $4,000,000.00 for Kenneth's pre-death pain and suffering and loss of life damages; (2) $4,771,000.00 in compensatory damages for Paola French; (3) $400,000.00 in loss of consortium damages for Paola French; (4) $5,431,000.00 in compensatory damages for Russell French; (5) $400,000.00 in loss of consortium damages for Russell French; and (6) $2,000,000.00 for Plaintiffs' past and future wrongful death damages. (Id. at 5–7.) On November 29, 2021, the Court entered judgment consistent with the Special Verdict. (Dkt. No. 133.)

On December 27, 2021, the City timely filed a motion for judgment as a matter of law. (See Dkt. No. 138.) On January 24, 2022, Plaintiffs filed a motion for attorneys' fees.[1] (See Dkt. No. 145.) On May 10, 2022, the Court denied the City's motion for a judgment as a matter of law and granted in part Plaintiffs motion for attorneys' fees. ("Fees Order," Dkt. No. 165.) The Court awarded Plaintiffs' counsel $1,922,931.00 in attorneys' fees. (Id.)

On June 7, 2022, the City filed a notice of appeal to the Ninth Circuit Court of Appeals. ("Fees Order Appeal," Dkt. No. 168.) On October 16, 2023, the Ninth Circuit affirmed this Court's Fees Order (Dkt. Nos. 178-180) and granted appellees' motion to transfer consideration of attorneys' fees on appeal to this Court (Dkt. No. 181).

On January 18, 2024, Plaintiffs filed this Motion. (Motion.) In support, Plaintiffs filed the following:

- Declaration of Carol A. Sobel with attached exhibits ("Sobel Decl.," Dkt. No. 185-1);
- Declaration of Dale K. Galipo with attached exhibits ("Galipo Decl.," Dkt. No. 185-21);
- Declaration of John Fattahi with attached exhibits ("Fattahi Decl.," Dkt. No. 185-25);
- Declaration of Eric Valenzuela ("Valenzuela Decl.," Dkt. No. 185-30); and
- Declaration of Renee V. Masongsong with attached exhibit ("Masongsong Decl.," Dkt. No. 185-31).

On February 5, 2024, the City opposed the Motion. ("Opposition," Dkt. No. 186.) On February 6, 2024, Plaintiffs replied. ("Reply," Dkt. No. 187.) In support, Plaintiffs filed the declaration of John Fattahi ("Fattahi Reply Decl.," Dkt. No. 187-1.)

## II. DISCUSSION

Plaintiffs move for attorneys' fees as the prevailing party on appeal. (See Motion.) The Court considers whether the requested fees are reasonable.

---

[1] Plaintiffs initially filed the attorneys' fees motion as a motion for application to tax costs, but filed a notice of errata to clarify that it is a motion for attorneys' fees. (Dkt. No. 149.)

## A. Legal Standard

In general, courts apply the "American Rule," where "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). Under 42 U.S.C. § 1988 ("Section 1988"), a court may, in its discretion, award reasonable attorneys' fees in a suit seeking to vindicate rights under 42 U.S.C. § 1983. Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177, 1187 (9th Cir. 2012); 42 U.S.C. § 1988(b). Plaintiffs who prevail on a Bane Act claim are also entitled to attorneys' fees. Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1112 (9th Cir. 2014) (citing Cal. Civ. Code § 52.1(h)).

The customary method of determining the reasonableness of attorneys' fees under either 42 U.S.C. § 1988 or the Bane Act is the lodestar method. Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006) (Section 1988); Chaudhry, 751 F.3d 1096 (Bane Act). Under this method, a court multiplies "the time spent" with the "reasonable hourly compensation of each attorney involved in the presentation of the case." Hensley, 461 U.S. at 433. This lodestar figure is "presumptively reasonable." Id. "The district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). These factors include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."

Id. Because "California law allows for a multiplier of the lodestar to compensate for the risk of contingent representation," the Ninth Circuit allows a "a plaintiff [who] succeeds on both federal and state claims" to seek "the state-law multiplier." Chaudhry, 751 F.3d at 1112 (citing Ketchum v. Moses, 24 Cal. 4th 1122, 1133 (2001), and Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d 1470, 1478–79 (9th Cir. 1995)). The fee applicant holds the "burden of showing that the claimed rate and number of hours are reasonable." Blum v. Stenson, 465 U.S. 886, 897 (1984).

//
//
//
//
//
//
//

## B. Lodestar Analysis

Plaintiffs' counsel requests $596,655.00 in attorneys' fees for 395.5 hours worked. (See Reply at 3.) The requested fee amount includes time associated with drafting the Reply and represents the lodestar figure multiplied by a 1.5 enhancement, as detailed below:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 71 | $1,400.00 | $99,400.00 |
| John Fattahi | Attorney | 212.4 | $975.00 | $207,090.00 |
| Eric Valenzuela | Attorney | 44 | $800.00 | $35,200.00 |
| Renee Masongsong | Attorney | 70.1 | $800.00 | $56,080.00 |
| **SUBTOTAL** | | **395.5** | | **$397,770.00** |
| 1.5 Multiplier | | | | $198,885.00 |
| **TOTAL** | | | | **$596,655.00** |

(Reply at 3.)

The City argues that the requested fee award is unreasonable because of block-billing. (Opposition at 5.)

### 1. Previously Approved Rates

On May 10, 2022, the Court granted in part Plaintiffs' post-trial motion for attorneys' fees and awarded the following:

| Attorney / Biller | | Revised Hours | Hourly Rate | Revised Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 547.3 | $1,100.00 | $602,030.00 |
| John Fattahi | Attorney | 37.4 | $785.00 | $29,359.00 |
| Renee v. Masongsong | Attorney | 461.5 | $600.00 | $276,900.00 |
| Eric Valenzuela | Attorney | 457.8 | $700.00 | $320,460.00 |
| Alejandro Monguia | Legal Assistant | 10.9 | $200.00 | $2,180.00 |
| Karen Slyapich | Legal Assistant | 171.7 | $200.00 | $34,340.00 |
| Santiago Laurel | Legal Assistant | 32.05 | $200.00 | $6,410.00 |
| Marielle Sider | Legal Intern | 68.5 | $150.00 | $10,275.00 |
| **SUBTOTAL** | | 1,787.15 | | **$1,281,954.00** |
| 1.5 Multiplier | | | | $640,977 |
| **TOTAL** | | | | **$1,922,931.00** |

(Fees Order at 29.)

//
//
//

---

## 2. Hourly Rate

Reasonable fees under Section 1988 are calculated according to the prevailing market rates in the relevant legal community. <u>Gates v. Deukmejian</u>, 987 F.2d 1392, 1405 (9th Cir. 1992). Because "the relevant community is the forum in which the district court sits," <u>Prison Legal News v. Schwarzenegger</u>, 608 F.3d 446, 454 (9th Cir. 2010), the prevailing rates in the Central District of California control here. Plaintiffs request rates that are slightly higher than the Court awarded in 2022—a $300 increase per hour for Mr. Galipo; a $190 increase per hour for Mr. Fattahi; a $100 increase per hour for Mr. Valenzuela; a $200 increase per hour for Ms. Masongsong. (Motion at 10.) The City does not contest Plaintiffs' requested rates. (<u>See</u> Opposition.) Plaintiffs argue that these rates are reasonable based on two years of inflation and rate increases, along with the fact that this request pertains to appellate proceedings. (<u>Id.</u>) The Court agrees and concludes that Plaintiffs' requested rates are reasonable.

## 3. Hours Billed

Plaintiffs' counsel requests attorneys' fees for a total of 395.5 hours worked on the appeal in this case. (Reply at 3.) The City argues that these hours should be reduced because they include impermissible block billing. (Opposition at 4-6.)

The City argues that Mr. Galipo has impermissibly block-billed time. (Opposition at 4-6.) In general, courts look unfavorably on block billing in timesheets because it "does not allow the Court to scrutinize the amount of time spent performing each task." <u>Rahman v. FCA US LLC</u>, -- F. Supp. 3d --, 2022 WL 1013433, at *4 (C.D. Cal. Mar. 29, 2022) (internal citations omitted). A court may "reduc[e] or eliminat[e] certain claimed hours" based on such billing practices, but it may not "deny[] all fees." <u>Mendez v. County of San Bernardino</u>, 540 F.3d 1109, 1129 (9th Cir. 2008), <u>overruled on other grounds by</u> <u>Arizona v. ASARCO LLC</u>, 773 F.3d 1050 (9th Cir. 2014). However, a court need not reduce hours for block-billing if it can determine the reasonableness of the hours spent on each task. <u>See</u> <u>Donastorg v. City of Ontario</u>, 2021 WL 6103545, at 13–14 (C.D. Cal Sept. 2, 2021).

The City challenges Mr. Galipo's time entries for "oral argument preparation" as overbroad. (Opposition at 5.) The Court finds that Mr. Galipo's entries are reasonable and do not constitute block-billing. <u>See</u> <u>Donastorg</u>, 2021 WL 6103545, at *14 (finding reasonable Mr. Galipo's 224.8 hours billed for "trial and trial preparation" over 17 days). Thus, the Court will not reduce Mr. Galipo's hours on this basis.

## 4. Multiplier

Plaintiffs' counsel's lodestar is $397,770.00. Plaintiffs' counsel seeks a 1.5 multiplier of the lodestar to bring their total requested fee amount to $596,655.00. (Reply at 3.) The City does not contest Plaintiffs' 1.5 multiplier. (<u>See</u> Opposition.) The Court previously analyzed and approved a 1.5 multiplier in this case. (Fees Order at 29.) Accordingly, the Court applies a 1.5 multiplier to the lodestar calculation of $397,770.00 for a total award of $596,655.00.

In sum, the Court **GRANTS** the Motion as follows:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 71 | $1,400.00 | $99,400.00 |
| John Fattahi | Attorney | 212.4 | $975.00 | $207,090.00 |
| Eric Valenzuela | Attorney | 44 | $800.00 | $35,200.00 |
| Renee Masongsong | Attorney | 70.1 | $800.00 | $56,080.00 |
| **SUBTOTAL** | | **395.5** | | **$397,770.00** |
| 1.5 Multiplier | | | | $198,885.00 |
| **TOTAL** | | | | **$596,655.00** |

### III.     CONCLUSION

For the above reasons, the Court **GRANTS** Plaintiffs' Motion and **AWARDS** Plaintiffs' counsel $596,655.00 in attorneys' fees.  The February 26, 2024 hearing is **VACATED**.

**IT IS SO ORDERED.**

# EXHIBIT 10

**EXHIBIT A**

*Austin Dicker v. TuSimple Holdings, Inc., et al.*, Case No. 3:22-cv-01300-BEN-MSB
Robbins Geller Rudman & Dowd LLP
Inception through October 18, 2024

| *NAME* | | *HOURS* | *RATE* | *LODESTAR* |
|---|---|---|---|---|
| Albert, Michael | (P) | 20.70 | 785 | $ 16,249.50 |
| Caringal, Jennifer N. | (P) | 928.80 | 835 | 775,548.00 |
| Gusikoff Stewart, Ellen A. | (P) | 119.90 | 1200 | 143,880.00 |
| Myers, Danielle S. | (P) | 60.10 | 1075 | 64,607.50 |
| Olts, Lucas F. | (P) | 1,284.20 | 945 | 1,213,569.00 |
| Robbins, Darren J. | (P) | 302.50 | 1400 | 423,500.00 |
| Sanchez, Juan Carlos | (P) | 54.50 | 785 | 42,782.50 |
| Dolitsky, Kenneth P. | (A) | 10.30 | 400 | 4,120.00 |
| Geiger, Heather G. | (A) | 309.00 | 540 | 166,860.00 |
| Johnson, Stephen D. | (A) | 146.30 | 400 | 58,520.00 |
| Petix, Andrew T. | (SA) | 28.80 | 450 | 12,960.00 |
| Jennette, Heather J. | (FA) | 10.20 | 650 | 6,630.00 |
| Nguyen, Lacy | (SUA) | 11.00 | 185 | 2,035.00 |
| Economic Analysts | | 39.10 | 315-470 | 16,083.00 |
| Research Analysts | | 12.80 | 325 | 4,160.00 |
| Investigators | | 488.10 | 325-350 | 167,522.50 |
| Litigation Support | | 17.20 | 315-415 | 5,878.00 |
| Paralegals | | 352.80 | 360-410 | 141,343.00 |
| Document Clerks | | 17.40 | 160 | 2,784.00 |
| Shareholder Relations | | 4.00 | 110 | 440.00 |
| *TOTAL* | | *4,217.70* | | *$ 3,269,472.00* |

(P) Partner
(A) Associate
(SA) Staff Attorney
(FA) Forensic Accountant
(SUA) Summer Associate

# EXHIBIT 11

Case 2:20-cv-07870-DMG-KES    Document 180-2    Filed 11/21/25    Page 180 of 187
Page ID #:5637
Case 2:23-cv-06302-HDV-AJR    Document 133-1    Filed 10/23/25    Page 50 of 292
Page ID #:5279

*ELM Solutions*

# 2024 Real Rate Report®

The industry's leading analysis of law firm rates, trends, and practices

 Wolters Kluwer

Case 2:20-cv-07870-DMG-KES    Document 180-2    Filed 11/21/25    Page 181 of 187
Page ID #:5638
Case 2:23-cv-06302-HDV-AJR    Document 133-1    Filed 10/23/25    Page 111 of 292
Page ID #:5340

# Section I: High-Level Data Cuts

**Cities**
By YOE

**2024 - Real Rates for Associate**                                    **Trend Analysis - Mean**

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Dallas TX** | 3 to Fewer Than 7 Years | 13 | $425 | $636 | $730 | $567 | $565 | $555 |
| | 7 or More Years | 16 | $396 | $585 | $849 | $634 | $583 | $507 |
| **Denver CO** | 7 or More Years | 14 | $210 | $404 | $460 | $363 | $399 | $377 |
| **Houston TX** | 7 or More Years | 11 | $324 | $911 | $1,055 | $726 | $555 | $481 |
| **Kansas City MO** | 3 to Fewer Than 7 Years | 10 | $317 | $400 | $424 | $391 | $369 | $331 |
| | 7 or More Years | 21 | $294 | $353 | $431 | $390 | $370 | $334 |
| **Los Angeles CA** | 3 to Fewer Than 7 Years | 73 | $586 | $755 | $962 | $762 | $671 | $609 |
| | 7 or More Years | 101 | $475 | $768 | $972 | $737 | $727 | $661 |
| **Miami FL** | 3 to Fewer Than 7 Years | 11 | $336 | $448 | $545 | $430 | $432 | $385 |
| **Minneapolis MN** | 3 to Fewer Than 7 Years | 21 | $382 | $475 | $577 | $484 | $477 | $405 |
| | 7 or More Years | 24 | $390 | $698 | $799 | $606 | $471 | $472 |
| **New York NY** | Fewer Than 3 Years | 106 | $655 | $819 | $926 | $822 | $674 | $522 |
| | 3 to Fewer Than 7 Years | 241 | $480 | $923 | $1,192 | $898 | $782 | $700 |

Case 2:20-cv-07870-DMG-KES   Document 180-2   Filed 11/21/25   Page 182 of 187
Page ID #:5639
Case 2:23-cv-06302-HDV-AJR   Document 133-1   Filed 10/23/25   Page 155 of 292
Page ID #:5384

# Section III: Practice Area Analysis

**Corporate: Other**
By City

**2024 - Real Rates for Associate and Partner**                    **Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|------|------|---|----------------|--------|----------------|------|------|------|
| **Indianapolis IN** | Partner | 12 | $376 | $479 | $573 | $472 | $484 | $549 |
| **Jackson MS** | Partner | 13 | $405 | $420 | $445 | $438 | $418 | $456 |
| **Kansas City MO** | Partner | 34 | $468 | $575 | $674 | $584 | $561 | $535 |
| | Associate | 18 | $380 | $403 | $439 | $402 | $379 | $378 |
| **Los Angeles CA** | Partner | 220 | $716 | $1,123 | $1,410 | $1,078 | $1,019 | $925 |
| | Associate | 189 | $578 | $780 | $967 | $766 | $737 | $675 |
| **Miami FL** | Partner | 21 | $524 | $564 | $794 | $641 | $602 | $563 |
| | Associate | 10 | $370 | $400 | $542 | $467 | $419 | $359 |
| **Minneapolis MN** | Partner | 27 | $566 | $646 | $909 | $720 | $712 | $625 |
| | Associate | 19 | $338 | $457 | $555 | $491 | $420 | $415 |
| **New Orleans LA** | Partner | 22 | $344 | $387 | $479 | $412 | $408 | $382 |
| **New York NY** | Partner | 427 | $953 | $1,431 | $1,800 | $1,385 | $1,285 | $1,217 |
| | Associate | 465 | $655 | $900 | $1,178 | $920 | $844 | $800 |
| **Oklahoma City OK** | Partner | 10 | $315 | $331 | $381 | $349 | $375 | $338 |

Case 2:20-cv-07870-DMG-KES     Document 180-2     Filed 11/21/25     Page 183 of 187
Page ID #:5640
Case 2:23-cv-06302-HDV-AJR     Document 133-1     Filed 10/23/25     Page 169 of 292
Page ID #:5398

# Section III: Practice Area Analysis

## Employment and Labor
By City

**2024 - Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|------|------|---|----------------|--------|----------------|------|------|------|
| Denver CO | Partner | 28 | $520 | $576 | $645 | $606 | $577 | $573 |
| | Associate | 17 | $359 | $384 | $426 | $394 | $383 | $347 |
| Houston TX | Partner | 24 | $500 | $550 | $819 | $632 | $611 | $587 |
| | Associate | 13 | $410 | $495 | $525 | $487 | $463 | $385 |
| Kansas City MO | Partner | 17 | $400 | $496 | $561 | $492 | $488 | $428 |
| Los Angeles CA | Partner | 100 | $525 | $695 | $1,020 | $801 | $789 | $744 |
| | Associate | 88 | $421 | $529 | $858 | $632 | $607 | $502 |
| Miami FL | Partner | 18 | $455 | $545 | $629 | $556 | $583 | $593 |
| | Associate | 12 | $363 | $398 | $447 | $390 | $421 | $463 |
| Minneapolis MN | Partner | 29 | $441 | $561 | $761 | $623 | $651 | $587 |
| | Associate | 32 | $344 | $415 | $557 | $468 | $426 | $423 |
| Nashville TN | Partner | 19 | $490 | $517 | $570 | $523 | $483 | $451 |
| New York NY | Partner | 247 | $508 | $709 | $979 | $835 | $802 | $718 |
| | Associate | 211 | $374 | $522 | $704 | $581 | $614 | $508 |

Case 2:20-cv-07870-DMG-KES     Document 180-2     Filed 11/21/25     Page 184 of 187
Page ID #:5641
Case 2:23-cv-06302-HDV-AJR     Document 133-1     Filed 10/23/25     Page 179 of 292
Page ID #:5408

# Section III: Practice Area Analysis

## Finance and Securities
By City

**2024 - Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|------|------|---|----------------|--------|----------------|------|------|------|
| Cincinnati OH | Partner | 41 | $375 | $435 | $544 | $445 | $494 | $394 |
|  | Associate | 40 | $250 | $276 | $305 | $280 | $278 | $264 |
| Cleveland OH | Partner | 67 | $416 | $495 | $682 | $573 | $574 | $567 |
|  | Associate | 46 | $289 | $348 | $516 | $407 | $372 | $377 |
| Dallas TX | Partner | 64 | $574 | $795 | $1,121 | $848 | $865 | $792 |
|  | Associate | 94 | $345 | $550 | $759 | $558 | $564 | $540 |
| Denver CO | Partner | 19 | $520 | $605 | $739 | $625 | $651 | $554 |
|  | Associate | 24 | $410 | $430 | $480 | $470 | $429 | $353 |
| Detroit MI | Partner | 29 | $295 | $475 | $565 | $475 | $460 | $452 |
| Houston TX | Partner | 28 | $585 | $950 | $1,338 | $1,008 | $1,008 | $1,058 |
|  | Associate | 37 | $440 | $778 | $1,002 | $769 | $755 | $593 |
| Kansas City MO | Partner | 64 | $595 | $686 | $812 | $711 | $646 | $593 |
|  | Associate | 31 | $375 | $402 | $520 | $439 | $407 | $363 |
| Los Angeles CA | Partner | 150 | $910 | $1,205 | $1,640 | $1,248 | $1,176 | $1,143 |
|  | Associate | 174 | $569 | $808 | $1,065 | $840 | $792 | $824 |

Case 2:20-cv-07870-DMG-KES  Document 180-2  Filed 11/21/25  Page 185 of 187
Page ID #:5642
Case 2:23-cv-06302-HDV-AJR  Document 133-1  Filed 10/23/25  Page 187 of 292
Page ID #:5416

# Section III: Practice Area Analysis

**General Liability –
Litigation Only**
By City

**2024 - Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|------|------|---|----------------|--------|----------------|------|------|------|
| Kansas City MO | Partner | 10 | $378 | $546 | $575 | $496 | $423 | $406 |
| Los Angeles CA | Associate | 30 | $503 | $742 | $961 | $761 | $620 | $519 |
| Miami FL | Partner | 10 | $190 | $190 | $412 | $317 | $294 | $254 |
| Minneapolis MN | Partner | 16 | $345 | $360 | $721 | $480 | $442 | $515 |
| | Associate | 19 | $218 | $240 | $355 | $279 | $302 | $371 |
| Nashville TN | Partner | 11 | $302 | $475 | $548 | $447 | $368 | $308 |
| New Orleans LA | Partner | 32 | $300 | $363 | $378 | $342 | $319 | $301 |
| | Associate | 22 | $200 | $260 | $264 | $241 | $235 | $225 |
| New York NY | Partner | 83 | $275 | $471 | $728 | $577 | $556 | $615 |
| | Associate | 79 | $204 | $395 | $491 | $410 | $362 | $325 |
| Philadelphia PA | Partner | 68 | $310 | $660 | $885 | $675 | $620 | $616 |
| | Associate | 58 | $420 | $475 | $595 | $509 | $432 | $411 |
| Phoenix AZ | Partner | 11 | $190 | $285 | $325 | $289 | $314 | $341 |
| San Francisco CA | Partner | 15 | $265 | $353 | $555 | $497 | $439 | $497 |

Case 2:20-cv-07870-DMG-KES    Document 180-2    Filed 11/21/25    Page 186 of 187
Page ID #:5643
Case 2:23-cv-06302-HDV-AJR    Document 133-1    Filed 10/23/25    Page 229 of 292
Page ID #:5458

# Section IV: In-Depth Analysis for Select US Cities

## Los Angeles CA
By Practice Area and Firm Size

**2024 - Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| Practice Area | Firm Size | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Commercial | 50 Lawyers or Fewer | Partner | 10 | $325 | $502 | $525 | $466 | $503 | $479 |
| | 501-1,000 Lawyers | Partner | 14 | $741 | $975 | $1,114 | $955 | $1,003 | $901 |
| | | Associate | 12 | $806 | $935 | $1,005 | $913 | $818 | $696 |
| | More Than 1,000 Lawyers | Partner | 13 | $1,060 | $1,265 | $1,595 | $1,286 | $1,254 | $1,137 |
| | | Associate | 21 | $733 | $987 | $1,050 | $912 | $929 | $894 |
| Corporate: Other | 50 Lawyers or Fewer | Partner | 14 | $339 | $486 | $581 | $480 | $565 | $591 |
| | 51-200 Lawyers | Partner | 17 | $681 | $750 | $900 | $803 | $772 | $666 |
| | 201-500 Lawyers | Partner | 27 | $610 | $895 | $1,231 | $869 | $823 | $746 |
| | | Associate | 19 | $531 | $650 | $818 | $680 | $567 | $539 |
| | 501-1,000 Lawyers | Associate | 32 | $751 | $852 | $940 | $835 | $807 | $742 |
| | More Than 1,000 Lawyers | Partner | 80 | $1,166 | $1,390 | $1,553 | $1,383 | $1,325 | $1,213 |
| | | Associate | 70 | $783 | $931 | $1,138 | $944 | $871 | $787 |

Case 2:20-cv-07870-DMG-KES    Document 180-2    Filed 11/21/25    Page 187 of 187
Page ID #:5644
Case 2:23-cv-06302-HDV-AJR    Document 133-1    Filed 10/23/25    Page 230 of 292
Page ID #:5459

# Section IV: In-Depth Analysis for Select US Cities

## Los Angeles CA
By Practice Area and Firm Size

**2024 - Real Rates for Associate and Partner**　　　　　　　　　**Trend Analysis - Mean**

| Practice Area | Firm Size | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Corporate: Regulatory and Compliance | More Than 1,000 Lawyers | Partner | 22 | $979 | $1,149 | $1,273 | $1,141 | $1,005 | $1,058 |
| | | Associate | 26 | $635 | $746 | $813 | $746 | $742 | $760 |
| Employment and Labor: Other | 501-1,000 Lawyers | Partner | 10 | $561 | $675 | $704 | $888 | $750 | $758 |
| | More Than 1,000 Lawyers | Partner | 17 | $639 | $1,122 | $1,243 | $1,001 | $962 | $942 |
| | | Associate | 13 | $406 | $511 | $661 | $564 | $545 | $605 |
| Finance and Securities: Investments and Other Financial Instruments | More Than 1,000 Lawyers | Partner | 18 | $1,219 | $1,521 | $1,781 | $1,480 | $1,421 | $1,369 |
| Finance and Securities: Loans and Financing | 501-1,000 Lawyers | Partner | 21 | $910 | $1,043 | $1,248 | $1,117 | $1,011 | $878 |
| | More Than 1,000 Lawyers | Partner | 42 | $1,313 | $1,585 | $1,774 | $1,560 | $1,508 | $1,314 |
| Insurance Defense: Other | 50 Lawyers or Fewer | Partner | 68 | $200 | $252 | $280 | $275 | $306 | $292 |
| | | Associate | 80 | $187 | $215 | $232 | $209 | $211 | $209 |
| Intellectual Property: Patents | More Than 1,000 Lawyers | Associate | 15 | $672 | $995 | $1,073 | $894 | $762 | $769 |